Volume 4

Pages 816 - 1053

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARILYN HALL PATEL

| | |
|---|---|
| JAMES TAYLOR, individually;<br>ROBERT FORBES, individually, )<br><br>        Plaintiffs,<br><br> vs.<br><br>CITY OF OAKLAND, *et al.*,<br><br>        Defendants. | NO. C 04-4843-MHP<br><br>San Francisco, California<br>Friday<br>March 12, 2010<br>9:00 a.m. |

JAMES TAYLOR, individually; )
ROBERT FORBES, individually, )
                              )
          Plaintiffs,         )
                              )
  vs.                         ) NO. C 04-4843-MHP
                              )
CITY OF OAKLAND, *et al.*,    )
                              ) San Francisco, California
          Defendants.        ) Friday
                              ) March 12, 2010
_____) 9:00 a.m.
DARNELL FOSTER, RAFAEL DUARTE, )
and YANCIE YOUNG, each        )
indivically and on behalf of all )
others similarly situated,    )
                              )
          Plaintiffs,         )
                              )
  vs.                         ) NO. C 05-03110-MHP
                              )
CITY OF OAKLAND, *et al.*,    )
                              )
          Defendants.         )
                              )
_____)
DAVID WARD; *et al.*,         )
                              )
          Plaintiffs,         )
                              )
  vs.                         ) NO. C 07-04179-MHP
                              )
CITY OF OAKLAND, *et al.*,    )
                              )
          Defendants.         )
                              )
_____)

**TRANSCRIPT OF PROCEEDINGS**

*Lydia Zinn, CSR, RPR*
*Official Reporter - U.S. District Court*
*(415) 531-6587*

**APPEARANCES**:

**For Plaintiff**s          Haddad & Sherwin
                              505 Seventeenth Street
                              Oakland, CA  94612
                              (510) 452-5500
              BY:  **MICHAEL J. HADDAD**
                              **JULIA SHERWIN**

**For** Plaintiffs          Law Offices of John L. Burris
                              1212 Broadway, Ste. 1200
                              Oakland, California  94612
                              (510) 839-5200
              BY:  **JOHN L. BURRIS**
                              **BEN NISENBAUM**

**For Defendants**         Todd Boley, Attorney at Law
                              476 Third Street
                              Oakland, CA  94607
                              (510) 836-4500
              BY:  **TODD BOLEY**

Reported by:     Lydia Zinn, CSR #9223, RPR, CRR
                 *Official Reporter - US District Court*

1          THE COURT:  Good morning, Officer Thurston.

2          THE WITNESS:  Good morning, your Honor.

3                     D'VORE THURSTON,

4   called as a witness for the Defendant herein, having been

5   previously sworn, resumed the stand and testified further as

6   follows:

7          THE COURT:  I'll remind you you are still under oath.

8   The oath will not be readministered.

9          And you may continue.

10         MR. BOLEY:  Thank you, your Honor.

11         You know, I just wanted to make a statement for the

12  record --

13         THE COURT:  Yes.

14         MR. BOLEY:  -- that, to the extent that I examine

15  witnesses with regard to the search of the residence in

16  Richmond and the investigation of the parole violation --

17         THE COURT:  Mm-hm.

18         MR. BOLEY:  I do so without waiving any objection as

19  to the relevance of those matters to the issues at hand.

20         THE COURT:  Yes, yes.

21         MR. BOLEY:  Thank you, your Honor.

22                   DIRECT EXAMINATION

23  BY MR. BOLEY

24  Q.   Good morning, Officer Thurston.

25  A.   Good morning.

1  Q.    You testified yesterday regarding your location at the

2  time you observed the traffic violation involving the vehicle

3  driven by Mr. Lucas.  Where were you at the time that you

4  observed that violation?

5  A.    I believe we were on Martin Luther King, on Oakland side,

6  facing the Oakland direction, between, like, 33rd Street and

7  34th Street.

8  Q.    Okay.  Now, there -- is a traffic light at 34th and Martin

9  Luther King?

10 A.    That is correct.

11 Q.    Were you on the Berkeley or downtown-Oakland side of that

12 light on Martin Luther King?

13 A.    The downtown-Oakland side.

14 Q.    How far did you travel from the time you observed the

15 traffic violation until you came to a stop behind Mr. Lucas'

16 vehicle?

17 A.    As far as my recollection, probably, like, a block and a

18 half to two blocks, which was very quick.

19 Q.    Now, yesterday you referenced -- made reference to a few

20 feet.  Do you remember that?

21 A.    Yes.

22 Q.    What -- what was that in reference to?

23 A.    The position of our vehicle behind Lucas' vehicle.

24 Q.    Now, you testified yesterday that you took Mr. Bradshaw to

25 the North County Jail.  Is that right?

1  **A.**    That is correct.

2  **Q.**    All right.  Now, what happened after you arrived there

3  with Mr. Bradshaw?

4  **A.**    Once we arrived to North County Jail, I took Mr. Bradshaw

5  in to be processed at North County.

6          **MR. NISENBAUM:**  Objection.  Asked and answered.

7          **MR. BOLEY:**  I'm just trying to -- I wasn't certain

8  exactly where we had left off.

9          **THE COURT:**  Objection is overruled.

10         Go ahead.  Go ahead.

11 **BY MR. BOLEY**

12 **Q.**    What did you do after you processed Mr. Bradshaw through

13 booking?

14 **A.**    Once he was processed and his warrant was actually -- it

15 was confirmed, and North County took custody of Mr. Bradshaw, I

16 returned to the vehicle with Officer Mayer and Lucas, and --

17 **Q.**    All right.  And what happened at that point?

18 **A.**    At that point, Officer Mayer had told me that he received

19 a phone call back from the U. S. Marshals, indicating that

20 Mr. Lucas had more current address in Richmond.

21         **MR. NISENBAUM:**  Same objection.  We covered this all

22 yesterday afternoon.

23         **THE COURT:**  Objection is overruled.  We're going to

24 move on, I assume.

25         **MR. BOLEY:**  Correct.

1          **THE COURT:**  Okay.

2  **BY MR. BOLEY**

3  **Q.**    Now, when you say "more current," what do you mean by

4  that?

5  **A.**    Through our investigation, we did uncover an address in

6  Richmond, but it was kind of an older address.  And that's kind

7  of -- than we had at that particular time; but once, I guess,

8  Officer Mayer received that phone call from the marshals, it

9  was a more current address; more recent; within -- I don't

10 know -- a couple of months of this incident.

11         **THE COURT:**  Okay.  And did you decide at that point

12 to go to Richmond with Mr. Lucas?

13         **THE WITNESS:**  Yes.

14 **BY MR. BOLEY**

15 **Q.**    Now, who made that decision?

16 **A.**    It was a collective decision, determined by myself,

17 Officer Mayer, and Agent Nakamura.

18 **Q.**    Did you notify Richmond Police Department before you went

19 to Richmond?

20 **A.**    I don't recall if we did or didn't.

21 **Q.**    Are you required to notify Richmond police?

22 **A.**    No, we are not.

23 **Q.**    Do you remember any conversations with Mr. Lucas in the

24 car, going from Oakland to Richmond?

25 **A.**    No, not as we traveled from Oakland to Richmond.  I do

1    not.

2    **Q.**    Okay.  Do you remember any conversations with Mr. Lucas

3    concerning the residence that you were driving to in Richmond?

4    **A.**    No, not until we actually pulled up to that secondary

5    location that the marshals had told us about.

6    **Q.**    Okay.  And what conversation was had with Mr. Lucas at

7    that point?

8    **A.**    He briefly said -- stated that he doesn't necessarily live

9    at this address.  He didn't want to tell us about this address,

10   because he had his wife there, and he was not supposed to be

11   living out of county.

12   **Q.**    Did you run the registration of any vehicles parked in the

13   vicinity of this residence?

14   **A.**    Eventually, yes, I did.

15   **Q.**    And what did you find?

16   **A.**    I found that one of the vehicles was registered to

17   Mr. Lucas; however, not at that particular address we were at;

18   but it was registered to him.

19   **Q.**    Okay.  And where was that vehicle parked?

20   **A.**    It was parked directly, I believe, across the street from

21   the residence, but in close proximity.

22   **Q.**    At any point in Richmond was there any discussion between

23   you and Mr. Lucas about what was inside the residence?

24   **A.**    Yes.  Before Officer Mayer Agent Nakamura and other

25   additional team members actually went into the apartment to

1   test -- to see if the key was actually to that front door,

2   Mr. Lucas said that there's nothing in that apartment.  The

3   apartment is clean.  You know, I don't mind you guys doing a

4   search, but you know, the only thing I have in there is just a

5   pellet gun.

6   **Q.**   What did you do at that point?

7   **A.**   All I did was advise Agent Nakamura.  And I said, "Hey, he

8   said the residence was clean.  There's nothing inside the

9   residence, and all he has in there is a pellet gun."

10  **Q.**   All right.  Did you go inside of the house?

11  **A.**   I did not.

12  **Q.**   Okay.  And how long were the officers inside the house?

13  **A.**   Approximately 30 to 45 minutes, to my recollection.

14  **Q.**   Okay.  Now, do you remember what happened after the

15  officers came out of the house, after conducting the search?

16  **A.**   Yes.

17  **Q.**   What happened?

18  **A.**   They returned.  And there was -- Agent Nakamura had some

19  indicia with Mr. Lucas' name on it.  He also had, I believe,

20  some pictures.  And he also had the pellet gun that, I guess,

21  was recovered from the house.

22  **Q.**   What happened next?

23  **A.**   Then we actually took all of the evidence.  Actually,

24  Agent Nakamura kept the evidence that he recovered from the

25  residence.  And we transported Mr. Lucas back to North County

1   Jail, pending a parole hold that was placed by them on parole.

2   **Q.**   And whose decision was it to place Mr. Lucas on a parole

3   hold?

4   **A.**   It was the parole agent's decision.

5   **Q.**   All right.  I would like you to look at Exhibit 1.  Is

6   that in front of you?  Go back to the first tab.  And go to --

7   I don't know.  It looks like it's about 15 pages back, to --

8   there's a number:  OAK7923.

9   **A.**   Okay.

10  **Q.**   All right.  And you're looking at that page?

11  **A.**   Yes.

12  **Q.**   All right.  Now, this has been previously identified as a

13  CAD printout from OPD dispatch.  Is that what you recognize it

14  to be?

15  **A.**   Yes.

16  **Q.**   And do you see how, on the two right-hand columns, your

17  name is listed, and on another column, Officer Mayer's name is

18  listed?

19  **A.**   Yes.

20  **Q.**   And do you see that Officer Mayer -- the last entry for

21  Officer Mayer is one in which it's indicated:  unit off?

22          Do you see that?

23  **A.**   Yes, I do.

24  **Q.**   Okay.  Now, after that, there are a series of entries with

25  only your name.  Do you see that?

1    A.   Yes, I do.

2    Q.   And if you go to page 7,925, there are other entries for

3    that date, with your name.  Is that right?

4    A.   That is correct.

5    Q.   And the last such entry is at 23:59.  Is that right?

6    A.   That is correct.

7    Q.   Which is right before midnight.  Is that right?

8    A.   That is correct.

9    Q.   Okay.  Now, you started work that morning at 6:00 a.m.  Is

10   that right?

11   A.   That is correct.

12   Q.   And do you remember working from 6:00 in the morning to

13   midnight or past midnight on any occasion in 2005?

14   A.   Absolutely not.

15   Q.   Have you worked overtime before?

16   A.   Yes.

17   Q.   Have you ever worked overtime in an assignment without

18   Officer Mayer?

19   A.   Yes.

20   Q.   Okay.  And have you worked -- did you work overtime

21   without being a partner with Officer Mayer in 2005?

22   A.   Yes.

23   Q.   Okay.  Can you think of any reason why the -- this

24   document would indicate that you worked from 6:00 a.m. to

25   midnight or past midnight on December 15th, 2005?

1  A.   I don't -- I couldn't tell you why that says that.  I did

2  not work that many hours.

3  Q.   Okay.  All right.  Now, if a suspect or a parolee who you

4  are conducting an investigation about is riding in your

5  vehicle, and asks to use the bathroom, what is your policy?

6  A.   My policy is a policy that we share in our vehicle; is

7  that we try to make any attempt to let that person relieve him

8  or herself.

9  Q.   Now, when you dropped off Mr. Bradshaw at the North County

10  Jail, were there facilities there that Mr. Lucas could have

11  used?

12  A.   Yes.

13  Q.   If Mr. Lucas had asked you to use the bathroom facilities

14  when you were at North County Jail, what would your response

15  have been?

16  A.   It would have been -- my response would have been, "Fine.

17  He can come on in here and use the rest room."

18  Q.   All right.  Once you went to the residence in Richmond, if

19  he had asked to use the bathroom at that point, what would your

20  policy have been in respect to that request?

21  A.   I would have told Mr. Lucas, "Just to give me a second.

22  Wait until additional officers come back," so that we can

23  escort him to his residence, so he can use his bathroom.

24  Q.   Now, the vehicle that you were driving at that particular

25  time -- was it a vehicle assigned to you?

THURSTON - DIRECT EXAMINATION / MR. BOLEY

1   **A.**   Yes.

2   **Q.**   If a -- somebody that you were transporting relieved

3   himself in your vehicle, who had to clean it up?

4   **A.**   We would.

5   **Q.**   Did you have parole agents using the rear seat of your car

6   from time to time?

7   **A.**   Yes.

8           **MR. BOLEY:**  One moment, your Honor.

9           (Discussion off the record)

10  **BY MR. BOLEY**

11  **Q.**   Going back to Exhibit 2, page 7923, on the far left-hand

12  column, there's a column for "Unit."  Do you see that?

13  **A.**   Yes.

14  **Q.**   Do you recognize any of those unit designations for the

15  time after 15:33?

16  **A.**   Yes.

17  **Q.**   Are those units that you would have been assigned to?

18  **A.**   Yes.

19  **Q.**   Okay.  What was your unit assignment with the PAC team?

20  **A.**   It was 4 Adam 14.

21  **Q.**   So that would be Unit 4A14.  Is that right?

22  **A.**   That is correct.

23  **Q.**   What is Unit 3L15?

24  **A.**   That would indicate that that was a third watch unit,

25  working as a linking unit, working B15 in District 3.

1  Q.   Do you believe that you were -- worked that unit on -- in

2  December 2005?

3  A.   Absolutely not.

4  Q.   Why do you say that?

5  A.   Because I hadn't worked an overtime patrol slot in --

6  since we were mandated to work that.  And every time I worked

7  the overtime patrol slot, I always worked it with Officer Mayer

8  as an Adam unit.

9  Q.   Okay.  And then there's another unit designation -- other

10 unit designations for 3L18 and 3L19.  Are those also patrol

11 units?

12 A.   That is correct.

13 Q.   For beats?  For different beats:  18 and 19?  Is that

14 right?

15 A.   That is correct.

16 Q.   And would you have worked those units in December 2005?

17 A.   Absolutely not.

18 Q.   I want to go back to 32nd and Martin Luther King.  Based

19 on what you observed at the time, did you observe any

20 justification to strip-search any individual at that traffic

21 stop?

22 A.   No, I did not.

23 Q.   If you had been asked or ordered to conduct a strip search

24 of any of those individuals under those circumstances, would

25 you have done so?

1  **A.**   Absolutely not.

2  **Q.**   If you saw other officers conducting a strip search under

3  these circumstances, what action would you take?

4  **A.**   I would take immediate action and try to determine what

5  was going on, since I would be part of that incident.  And I --

6  I would need to know exactly what they saw that gave that --

7  that circumstance to give them to conduct that search, and then

8  facilitate if we can do this in a better manner than out there

9  in the open, as alleged.

10 **Q.**   Now, there's been testimony that an individual who was not

11 in handcuffs was asked, without having been searched -- without

12 having external clothing searched first, was asked to remove

13 his own clothing, and to lower his shorts to his ankles.

14         **MR. NISENBAUM:**  Objection, your Honor.  Misstates

15 testimony.

16         **THE COURT:**  Objection's overruled.

17         You may proceed.

18 **BY MR. BOLEY**

19 **Q.**   Is that an action that you would take?

20 **A.**   Absolutely not.

21 **Q.**   Why not?

22 **A.**   Well, first and foremost, that would be a very serious

23 officer-safety issue by not searching a person prior to them

24 putting hands in their pockets, as well as I would never allow

25 somebody to do that when we're going to conduct any type of

 1  search, let alone a strip search, for that matter.

 2  Q.   As an African American, how would you feel --

 3          MR. NISENBAUM:  Objection, your Honor.  Relevance.

 4          THE COURT:  What is the question?

 5          MR. BOLEY:  Well, I haven't finished the question.

 6  Q.   How would you feel about African-American suspects being

 7  strip-searched under the circumstances you observed at the

 8  scene?

 9          MR. NISENBAUM:  Objection.  Relevance.

10          THE COURT:  I don't think the question is how he

11  feels, Counsel.

12          MR. BOLEY:  Yes.  Pardon me?

13          THE COURT:  That's not -- the relevant question is

14  not how he feels.

15  BY MR. BOLEY

16  Q.   As an African American, would you permit other police

17  officers to strip-search African-American suspects under these

18  circumstances?

19          MR. NISENBAUM:  Objection.  Relevance.

20          THE COURT:  Objection sustained.

21  BY MR. BOLEY

22  Q.   As an officer with the Oakland police department, would

23  you permit other members of the Oakland police force to conduct

24  strip searches under the circumstances you observed at the 32nd

25  and Martin Luther King on December 15th, 2005?

 1  **A.**    Absolutely not.  That would be unlawful.  It would be

 2  unethical, and it would be against Department policy and manual

 3  rules.

 4           **MR. BOLEY:**  Just a moment, your Honor.

 5           (Discussion off the record)

 6           **MR. BOLEY:**  Nothing further, your Honor.

 7           **THE COURT:**  Mr. Nisenbaum, please.

 8           **MR. NISENBAUM:**  Thank you, your Honor.  One moment.

 9                          **CROSS EXAMINATION**

10  **BY MR. NISENBAUM**

11  **Q.**   Good morning, Officer.

12  **A.**   Good morning.

13  **Q.**   If I understood you correctly, you said that you would not

14  allow a strip search to occur by the Oakland police officers

15  under the circumstances -- out on 32nd Street, under the

16  circumstances as described by Mr. Lucas and Mr. Bradshaw.  Is

17  that right?

18  **A.**    That is correct.

19  **Q.**   Okay.  And, in fact, you agree that you would have a duty

20  to intervene in such a strip search if it occurred as alleged

21  by Mr. Lucas and Mr. Bradshaw, correct?

22  **A.**    If an unlawful strip search occurred that violated

23  departmental manual rules and procedures, it was unethical.

24  Absolutely.

25  **Q.**    And if you failed to intervene, you would agree that you,

1   too, would be responsible for that strip search occurring,

2   given that you were present at the scene, and were involved in

3   the detention of those two men, correct?

4   **A.**   Absolutely.

5   **Q.**   You also agree, based upon your training, as you

6   understand it, that such a strip search -- that allowing such a

7   strip search to occur, as described by Mr. Bradshaw and

8   Mr. Lucas, would be a violation of the Constitution, as you

9   understand it?

10  **A.**   Absolutely.

11  **Q.**   Now, I want to make sure I have had this right as well.

12  You testified just now about -- about the CAD sheet, which was

13  Bates stamped OAK7923 of Exhibit 1, correct?

14  **A.**   That is correct.

15  **Q.**   And there's a whole section of activity under your name,

16  correct?

17  **A.**   Correct.

18  **Q.**   Where there's no entry for Officer Mayer, correct?

19  **A.**   Correct.

20          **MR. BOLEY:**   Can we refer to him by the correct name?

21          **MR. NISENBAUM:**   I apologize, Officer Mayer.  I mean

22  no disrespect.

23  **Q.**   It's your understanding, though, that the CAD sheet is an

24  official record of the Oakland Police Department, isn't it?

25          **MR. BOLEY:**   Objection.  Vague as to "official."  And

1    lack of foundation.

2              **THE COURT:**  Objection is overruled.

3              You may answer.

4              **THE WITNESS:**  I'm sorry.  Can you repeat the

5    question?

6    **BY MR. NISENBAUM**

7    **Q.**  Isn't the CAD sheet an official record of the Oakland

8    Police Department?

9    **A.**  Correct.

10   **Q.**  It's stored by the Oakland Police Department and

11   maintained by the Oakland Police Department, correct?

12   **A.**  That is correct.

13   **Q.**  And this one -- and this one is wrong, right?

14   **A.**  Absolutely.

15   **Q.**  Okay.  And you know it's wrong, because you know for a

16   fact that you did not work that extra time, right?

17   **A.**  Absolutely.

18   **Q.**  You know what you did that day.  And even though this CAD

19   sheet contradicts it, you know that you did not actually work

20   that time, right?

21   **A.**  That is correct.

22   **Q.**  Anyone relying on this CAD sheet would -- would be relying

23   erroneously upon it to say that you worked that day at -- I'm

24   sorry -- those extra hours, correct?

25   **A.**  That is correct.

1   Q.   Thank you.

2          **THE COURT:**  On this CAD sheet, while we have it in

3   front of us, does this CAD sheet appear to be -- this -- the

4   CAD sheet for the very same vehicle you were operating on or

5   riding in on the day in question?

6          **THE WITNESS:**  Yes, your Honor.  It does appear to be

7   that.

8          **THE COURT:**  How can you tell that?

9          **THE WITNESS:**  Well, the vehicle is not listed,

10  your Honor.  However, just the fact that we did place ourselves

11  out there, and that is our call sign, and --

12         **THE COURT:**  What's your call sign?

13         **THE WITNESS:**  4 Adam 14, your Honor.

14         **THE COURT:**  Because at the time -- at the top of it,

15  it says, "Unit on.  Vehicle 1147," right?

16         **THE WITNESS:**  Correct, your Honor.

17         **THE COURT:**  Is that a number of the vehicle?

18         **THE WITNESS:**  Yes, your Honor.

19         **THE COURT:**  Now, down below, around 16:47, it says,

20  "Unit on.  Vehicle 1926."  Does that indicate that perhaps it's

21  not the same vehicle?

22         **THE WITNESS:**  Absolutely, your Honor.

23         **THE COURT:**  Is it the same vehicle?

24         **THE WITNESS:**  It is not, your Honor.

25         **THE COURT:**  So how does that happen that you have a

1  unit in one vehicle on the same CAD sheet, and -- as another,

2  with a different vehicle number; in other words, a different

3  vehicle?

4         **THE WITNESS:**  Your Honor, I don't input what goes on

5  through the CAD system, your Honor; the communications.

6         I don't know exactly.  This was brought to my

7  attention during this incident.  I didn't -- I don't -- wasn't

8  even aware that I was on duty for four hours, so I couldn't

9  explain and give you a correct answer why that happened.  I

10  don't know.

11         **THE COURT:**  Did you operate -- were you operating a

12  vehicle later that day, with the number 1926?

13         **THE WITNESS:**  Absolutely not, your Honor.

14         **THE COURT:**  Have you -- have you ever seen CAD sheets

15  like this before, that reflect more than one vehicle?

16         **THE WITNESS:**  Yes, your Honor.

17         **THE COURT:**  Okay.  So that's not unusual?

18         **THE WITNESS:**  That's not unusual, your Honor.

19         **THE COURT:**  I see.

20         **THE WITNESS:**  However, the way it's laid out,

21  your Honor, I -- I don't have an explanation, because I'm just

22  not the inputter of CAD, or a CAD expert.

23         **THE COURT:**  Okay.

24         **MR. NISENBAUM:**  Thank you.

25  **Q.**   Looking at the CAD sheet, the last accurate entry that

1  pertains to you, if I understand correctly, is the last entry

2  that has both your name and Officer Mayer's name on OAK79123.

3  Is that correct?

4         **MR. BOLEY:**  Objection.  Lack of foundation as to

5  accuracy.

6         **THE COURT:**  Objection overruled.

7         You may answer.

8         **THE WITNESS:**  Well, given that it's obviously a

9  mistake, somebody's CAD -- I would assume that that would be

10 correct.

11        **THE COURT:**  But what's the significance of the term,

12 "Unit off"?

13        **THE WITNESS:**  Your Honor, that's indicating that we

14 are actually taking ourself off duty completely.

15        **THE COURT:**  Now, what is meant by "Unit off"?  Does

16 that mean the vehicle, or the transmission system you have in

17 the vehicle?

18        **THE WITNESS:**  No, your Honor.  That actually means

19 our entire unit -- our 4 Adam 14, which includes myself, my

20 partner, and our vehicle -- we are done with our shift.

21        **THE COURT:**  Okay.

22        **MR. NISENBAUM:**  Okay.

23 Q.  Now, is it fair to say that everything from -- from "Unit

24 off" at 15:33, going up to the top of the page, with the first

25 entry at 06:59, "Unit on," is accurate, to your recollection?

 1          **MR. BOLEY:**  Objection.  Lack of foundation.

 2          **THE COURT:**  You're talking about everything up to

 3  that point, or after that point?

 4          **MR. NISENBAUM:**  Up to that point, going --

 5          **THE COURT:**  Before that point?

 6          **MR. NISENBAUM:**  Going back in time.  Yes.

 7          **THE COURT:**  Okay.  Then, I'll allow it.

 8          You may answer the question.

 9          **THE WITNESS:**  Again, I'd have to say on the

10  assumption that I was not the inputter of the CAD, I would

11  assume that is correct.

12  **BY MR. NISENBAUM**

13  **Q.**  Okay.  Let's go through the entries briefly.  You got to

14  work at 7 -- strike that.

15          Your unit was turned on, for CAD purposes, at

16  7:00 a.m. on the 15th of -- 2005 -- December, correct?

17  **A.**  It appears to be that, correct.

18  **Q.**  And that's consistent with your recollection?

19  **A.**  I don't recall.  We start work at 6:00 a.m.  So I don't

20  know why that did indicate that at 6:00 a.m.

21  **Q.**  Well, it takes you time to gear up for work, correct?

22  **A.**  Yes.

23  **Q.**  Okay.  And you do that in the locker room?

24  **A.**  Yes.

25  **Q.**  Okay.  And it can take up to an hour to do that?

1  **A.**   Well, our shift starts at 6:00 a.m.  So whatever you do

2  prior to that would be, like, 5:00 a.m. to 6:00a.m., which is

3  the beginning of our shift.  So gearing up and having your

4  uniform ready -- you should have that at 6:00 a.m.

5  **Q.**   Okay.  The first -- the first -- the very first radio

6  contact that your unit had was at, according to this CAD -- was

7  at 8:25 a.m.; location 600 32nd Street, correct?

8  **A.**   According to this CAD purge, correct.

9  **Q.**   And that was an entry that pertained to the very start of

10 this incident with Mr. Lucas and Mr. Bradshaw, correct?

11             **MR. BOLEY:**  Objection.  Lack of foundation.

12             **THE COURT:**  Objection is overruled.

13             You may answer.

14             **THE WITNESS:**  I assume so, correct.

15 **BY MR. NISENBAUM**

16 **Q.**   Okay.  Now, by the way, who was using the radio to call in

17 these entries?

18 **A.**   I don't recall.  Officer Mayer or myself.

19 **Q.**   Okay, but it would have been one of you, correct?

20 **A.**   That is correct.

21 **Q.**   And it would have been only you or Officer Mayer, correct?

22 **A.**   That is correct.

23 **Q.**   Okay.  The report added at 8:25 that ends in the numbers

24 2069 -- is that an accurate entry, to your knowledge?

25 **A.**   I have no idea what that report is, so I couldn't answer

1    that question.

2    Q.    Okay.  You have Exhibit 2 in front of you?

3    A.    Yes.

4    Q.    All right.  I want you to look at report number -- at

5    page 2 of Exhibit 2.  And this is OPD.  Oakland.  At the very

6    top right, it says, "Consolidated Arrest Report, Oakland Police

7    Department Report Number 05-082609."

8            What does that indicate?

9            MR. BOLEY:  Objection.  What does what indicate?

10   BY MR. NISENBAUM

11   Q.    Those numbers, if you know.

12   A.    It indicates a report number.

13   Q.    Right.  And that's -- -- and, by the way, that's your

14   handwriting, correct?

15   A.    That is correct.

16   Q.    And you wrote that report number?

17   A.    Yes.

18   Q.    And that was a report number that was assigned to you over

19   the radio, correct?

20   A.    Correct.

21   Q.    And it's the same number that appears in the entry on

22   Exhibit 1, Bates stamp OAK7923; the entry at 8:25, "Report

23   number added," correct?

24           MR. BOLEY:  Objection.  Misstates the evidence.

25           THE COURT:  What is misstating?

1          **MR. BOLEY:**  The numbers.

2          **MR. NISENBAUM:**  There's a date in front of it.  I'll

3   ask the question.

4          **THE COURT:**  Fine.

5   **BY MR. NISENBAUM**

6   **Q.**   December 15th, 2005, is 051215, correct?

7   **A.**   Correct.

8   **Q.**   Okay.  So those are the first several numbers in that

9   sequence.

10         The next set of numbers is the same numbers as your

11  report number, correct?

12  **A.**   That is correct.

13  **Q.**   Okay.  And it says, "Report number added," correct?

14  **A.**   Correct.

15  **Q.**   Okay.  And so it's fair to say, based on your

16  understanding of the CAD, that those numbers reflect your

17  report number for Mr. Bradshaw, correct?

18  **A.**   That is correct.

19  **Q.**   Does that mean that at about 8:25 is when you learned that

20  Mr. Bradshaw was on -- strike that.

21         Does that mean that at about 8:25 on December 15th,

22  2005, is when you received a report number pertaining to

23  Mr. Bradshaw?

24  **A.**   Correct.

25  **Q.**   Is it fair to say that by that time, you had learned that

 1  Mr. Bradshaw had a warrant for his arrest?

 2  **A.**    Repeat the question.

 3  **Q.**    Is it fair to say that by the time you got this report

 4  number, you had learned that Mr. Bradshaw had a warrant for his

 5  arrest?

 6  **A.**    That is not correct.

 7  **Q.**    Okay.  Well, at that time you had no intention of

 8  arresting either Mr. Bradshaw or Mr. Lucas, did you?

 9  **A.**    That is incorrect.

10          **MR. BOLEY:**  Objection.  Vague as to what time.

11          **THE WITNESS:**  That is incorrect.

12          **THE COURT:**  Objection is overruled.

13  **BY MR. NISENBAUM**

14  **Q.**    You intended to arrest them?

15  **A.**    Well, this only indicates the time that I asked for a

16  report number.

17          I could have very well saw that he had an outstanding

18  warrant before this time that's indicated on there.

19  **Q.**    Okay.  Well, I'm looking at the time frame here.  And it

20  says "8:25.  Location:  600 32nd Street.  8:25 type OV.

21  Location:  600 32nd Street.  8:25 primary unit OP/4A14."  And

22  then it says, "8:25 report number added."  And then the the

23  sequence of numbers that is identified -- that pertains to

24  Mr. Bradshaw's report, correct?

25  **A.**    Correct.

1  Q.  So by 8:25, at that point in time, is it your testimony

2  that you would have had -- that by that point in time, you did

3  not have -- you were not aware that Mr. Bradshaw had a warrant?

4  A.   What I'm stating is that, given the time of the stop and

5  the time that he was actually run out and a service check was

6  conducted, it may have revealed before this time that he

7  actually had an outstanding warrant.

8          Now, the time that I asked for a report number, it

9  could indicate five minutes after that, because then I had to

10  wait for service to confirm the warrant.

11  Q.   I see.  So you would have pulled the vehicle over, then --

12  the Cadillac that Mr. Bradshaw was found in -- you would have

13  pulled that over without letting dispatch know that you were

14  pulling it over, correct?

15  A.   It could have happened, because it could have been radio

16  transmission.  It could have been we couldn't get out at that

17  particular time.  It could have been that we were dealing with

18  the individuals that was involved in the vehicle.  So by the

19  time we did put out the vehicle stop, it could have had a time

20  lapse.  I don't recall.

21  Q.   I thought the unit log was the radio transmission; was --

22  kept track of the radio transmissions.

23  A.   Well, it's when we actually broadcast transmission.  So it

24  depends on when we broadcast the transmission.

25  Q.   So my question is:  based on this, if you had been dealing

 1  with Mr. Bradshaw for some period of time more than a minute

 2  prior to receiving this information or prior to -- to the

 3  entries that are reflected at 8:25, you would not have

 4  broadcast over your radio that you were stopping this vehicle,

 5  correct?

 6  **A.**   We would have attempted to broadcast when we had time to

 7  do so.

 8  **Q.**   Okay.  So is it -- if that's the case, you would not have

 9  had time to -- to let dispatch know that you were stopping this

10  vehicle?

11  **A.**   I don't really understand your -- your form of question,

12  other than the fact that we stopped the vehicle.  And at the

13  time, we informed dispatch when it was available to do so.

14  **Q.**   Aren't you supposed to let dispatch know when you stop

15  vehicles?

16  **A.**   When we have the time to do so in a safe manner.

17           As I stated before, there may have been radio

18  transmission where we couldn't get through.

19  **Q.**   Oh, I see.  So the radio circuits might have been tied up.

20  Is that right?

21  **A.**   Yes.

22  **Q.**   At 8:30 in the morning?

23  **A.**   Well, I don't know.  They could have been.

24  **Q.**   Or strike that.  Earlier than 8:25 in the morning?

25  **A.**   Could have been.

1   Q.   Okay, but you don't remember that, do you?

2   A.   I don't recall that, because at that time in the morning,

3   we're patched throughout the whole city.

4   Q.   Okay.  Moving on, the next set of entries occurs at

5   9:28 a.m.  Do you see that?

6   A.   I do.

7   Q.   Location at 9:25a.m. is indicated.  32nd Street and Martin

8   Luther King, correct?

9   A.   Correct.

10  Q.   So at that time is it fair to say, based upon the CAD

11  report, that you were located -- that your unit was located at

12  32nd and Martin Luther King?

13  A.   Again, the CAD report has already been -- I guess I could

14  say -- I guess I'd have to say "correct"; but again, this is an

15  assumption that this is correct.  And, obviously, there were

16  mistakes made on the CAD report.

17  Q.   Well, it looks to me like the only mistake that was made

18  so far that we're aware of -- at least, that you know of --

19  were the entries pertaining to your name, as if someone forgot

20  to shift over the name pertaining to this CAD sheet.

21           After --

22           MR. BOLEY:  Objection.  Argumentative.

23           MR. NISENBAUM:  After -- after --

24           THE COURT:  Is this a question?  Is this a question?

25           MR. NISENBAUM:  Is that right?

```
1              MR. BOLEY:  Argumentative, your Honor.

2              THE COURT:  Could you reask the question?

3              MR. NISENBAUM:  Sure, sure.

4              THE COURT:  I think that got to be a little garbled.

5   BY MR. NISENBAUM

6   Q.  I'm just curious other -- what other mistakes on the CAD

7   sheet that you know of, other than the entries that have your

8   name only.

9   A.  Again, I'm not the inputter of the CAD information, so

10  therefore, I don't know.

11  Q.  Oh.  I see.

12             THE COURT:  Well, what does -- what does this CAD

13  sheet tell us, if anything, about when the stop was effected;

14  the stop of the vehicle?

15             THE WITNESS:  Your Honor, it should tell you that

16  when we transmitted, that we had a vehicle stop.  Then it

17  should be inputted at that particular time.  However -- once we

18  transmit, if we can get through.  We may have a vehicle stop at

19  a particular time, and we can't necessarily get through,

20  because other traffic is coming in through the radio system.

21  So there could be a time lapse until when we actually get that

22  radio transmission, your Honor.

23             THE COURT:  Well, but assuming for the moment that it

24  was operating as it should, and that there was no interference,

25  what would this tell you about when the stop was effected?
```

 1              THE WITNESS:  Then it would indicate that at 8:25,
 2   there was some type of stop made.
 3              THE COURT:  At the 600 32nd Street entry?
 4              THE WITNESS:  Yes, your Honor.
 5              THE COURT:  And that is the -- another entry at 8:25
 6   is, "Report number added."  Is that when you're getting a
 7   report number from dispatch, or whoever's giving you that
 8   information?
 9              THE WITNESS:  Correct, your Honor.  However, if I
10   may --
11              THE COURT:  Yes.
12              THE WITNESS:  The 600 block of 32nd Street depends on
13   who was actually putting out the car stop.  Somebody may have
14   looked up and saw the block number of 600 block of 32nd Street
15   and then, once the report number was obtained, we put a block
16   of Martin Luther King.  So it's the same vicinity; it's just
17   somebody looked at it at a different angle of the street than
18   was being used.
19              THE COURT:  But -- but it appears that it was a whole
20   hour between 8:25 and -- actually 63 minutes, right?
21              MR. NISENBAUM:  That's correct.
22              THE COURT:  And 9:28 -- what was happening then.
23              THE WITNESS:  Your Honor, at that particular time is
24   when we were actually running the subjects outside the vehicle.
25   Officer Mayer was interacting with Lucas, as well as I was

1    trying to obtain information from the other two occupants that

2    were inside the vehicle.

3           Now, once we figured out that Mr. Bradshaw had a

4    warrant, we might not necessarily advise dispatch at that time.

5           The warrant was saw on the screen.  Okay?

6    Mr. Bradshaw was being searched; placed into handcuffs.

7    However, Officer Mayer may have still been working with Lucas

8    to ascertain about the key that he had found.  So there's a

9    time lapse there that -- when we are actually ready; that I

10   actually asked for a report number.  It could have been that

11   time lapse, your Honor, but that doesn't necessarily mean that

12   that particular person at that time was going to have an

13   outstanding warrant.  It's just that when I was ready to do the

14   arrest tag, and we were on our way to the jail, I asked for a

15   report number.

16          **THE COURT:**  When did you get -- according to this,

17   when did you get to the jail?  Can you tell from this?

18          **THE WITNESS:**  It doesn't indicate when we arrived at

19   the jail as well, either, your Honor.

20          **THE COURT:**  Well, did it take an hour to get these

21   gentlemen out of the car and to do a pat search, and then

22   figure out what to do with them?  Was that -- did that consume

23   a whole hour?

24          **THE WITNESS:**  Your Honor, no; not the initial stop;

25   not the initial finding out of the warrant that the person had,

 1  and, no, not the initial finding out that Mr. Lucas was on
 2  parole.  That was done right when the car stop was happening.
 3        However, going on with the investigation of
 4  Mr. Lucas, and going to the different sections of what we went
 5  to -- I guess the van and then the house itself -- by the time
 6  that we were actually going to the North County facility is
 7  when I asked for the report number.  So therefore, that would
 8  be your next entry.  To -- whereas -- okay.  Now he has this
 9  warrant.
10        And actually, I had to also wait for it to be
11  confirmed through search, which would not be indicated here on
12  the CAD purge.  So there were several thing that occurred
13  between the time that the vehicle was stopped, the time that I
14  discovered that Mr. Bradshaw had a warrant, the investigation
15  with Mr. Lucas as to where he was supposedly living, and then
16  the time that we actually took Mr. Bradshaw to jail.
17        **THE COURT:**  Excuse me.  Go ahead.
18        **MR. NISENBAUM:**  Oh.  Thank you, your Honor.
19  **Q.**  Okay.  Now, going again, the next entry after -- after
20  this set of entries at 9:28 is at 12:30, right?
21  **A.**  Correct.
22  **Q.**  And that was the, "Report number added."  And I take it,
23  by the way, that that was the report number pertaining to
24  Mr. Lucas.  Is that right?
25  **A.**  Correct.

1  Q.   Okay.  So that was at -- that was according to the CAD,

2  three hours after, correct?

3  A.   Correct.

4  Q.   So if the CAD is correct, you had an hour in the vicinity

5  of 32nd Street.  Then you had three hours up until a report

6  was -- a report number was obtained for Mr. Lucas if the CAD is

7  correct, right?

8  A.   However, the CAD does not indicate the time that we

9  arrived at North County.  The CAD does not indicate how long we

10  spent at North County to process Mr. Lucas.  And then the CAD

11  does not indicate as well the time it took us to travel to

12  Richmond.

13  Q.   Okay, but is it fair to say -- oh, by the way, if I

14  understand correctly, your shift did end around 3:30 that day?

15  A.   That is correct.

16  Q.   So the CAD appears to be correct about when the shift

17  ended with both you and Mayer -- you and Mayer, except for, of

18  course, the additional entries under your name, correct?

19  A.   Correct.

20  Q.   Okay.  So between 12:30, according to the CAD -- between

21  12:30 and -- and 14:34, which I believe is 2:34, there -- there

22  is no activity with your vehicle?

23  A.   According to the CAD.

24  Q.   Is it fair to say that between 12:30 and 3:30, you could

25  have -- you could have been dealing -- or you could have been

1   up in Richmond, and coming back from Richmond?

2   **A.**   I don't believe so.

3   **Q.**   And that's because it just wouldn't have taken that amount

4   of time to conduct a parole search at the 41st Street address,

5   correct?

6   **A.**   I don't believe so.  Correct.

7   **Q.**   Now, when you were at the 41st Street address in Richmond,

8   did anyone tell you -- aside from Mr. Lucas, did anyone tell

9   you that his wife lived there?

10   **A.**   No.

11   **Q.**   Now, it's -- if I understand correctly, Mr. Lucas told you

12   that he lived there, but he didn't want anyone to know that?

13   **A.**   From my recollection, yes, Mr. Lucas said that he stayed

14   there from time to time.

15          **THE COURT:**   Okay.  Did you ever travel to a 3800

16   MacDonald in Richmond.

17          **THE WITNESS:**   No.

18   **Q.**   Did you ever have an indication that Mr. Lucas stayed at

19   3800 MacDonald in Richmond?

20   **A.**   Yes.

21   **Q.**   Was that information that came back from the marshals?

22   **A.**   No.

23   **Q.**   That was from the credit check?

24   **A.**   No.

25   **Q.**   Where did that information come from?

1    **A.**    I believe that was through our own wants and warrants

2    indication.

3    **Q.**    And do you recall the basis of that information from wants

4    and warrants?

5    **A.**    I do not.

6    **Q.**    Did you -- did anyone contact Richmond Police Department

7    to indicate, with respect to 3800 MacDonald --

8    **A.**    No, I don't recall that.  No.

9    **Q.**    Okay.  And what does -- what does "ERT" mean, as far as

10   you know, based upon CAD -- CAD printouts?

11   **A.**    I believe it to mean *"en route."*

12   **Q.**    Okay.  I want you to turn to Bates stamp OAK7920 of

13   Exhibit 1.

14          **MR. NISENBAUM:**    And I'm going to put it on the Elmo,

15   your Honor, or I'm going to try to.

16   **Q.**    Okay.  First of all, Bates stamp OAK7920 of Exhibit 1 --

17   what is that document, to your knowledge?

18   **A.**    It appears to be a CAD purge.

19   **Q.**    Okay.  And do you know what this CAD periods pertains to?

20   **A.**    It appears to be from our unit: 4 Adam 14.

21   **Q.**    Okay.  And there are entries.  It appears to be an entry

22   at 9:29 that's highlighted on the -- if you look at the screen.

23   Do you see that?

24   **A.**    Yes.

25   **Q.**    Okay.  There are three entries that are highlighted,

1    correct?

2    **A.**    Correct.

3    **Q.**    9:29, 10:43, and 10:46.

4    **A.**    Correct.

5    **Q.**    What do those entries reflect, if you can take them one by

6    one, based upon your understanding of the CAD?

7    **A.**    They reflect that we were on our way to North County with

8    a prisoner.  And they -- then it also indicates that we're

9    leaving North County on our way to an address 3800 MacDonald

10   Avenue, Apartment Number 2, for a parole search.

11   **Q.**    Okay.  You never went to that address, did you?

12   **A.**    No, we did not.

13   **Q.**    And the reason you didn't go was what?

14   **A.**    Was because at the time that we actually, I guess, put

15   this out, this was where our attentions were going to go.

16   However, we learned later that there was a more-current

17   address, as I stated earlier, and, for some reason, that our

18   secondary address that we were going to was not updated.

19   **Q.**    Did you know when the 3800 MacDonald address pertained to

20   Mr. Lucas?

21   **A.**    I don't recall exactly when did we discover that, but it

22   was sometime while we were in the field, trying to ascertain

23   his residence in West Oakland.

24   **Q.**    Okay.  And if I understand correctly, there's no

25   requirement -- there's no requirement that you contact the

1  local agency when you're conducting a parole search out of your

2  jurisdiction -- out of the city of Oakland's jurisdiction,

3  correct, in that local agency's jurisdiction?

4  **A.**    That is correct.

5  **Q.**    And so Richmond police were never contacted regarding

6  your -- your vehicle going into Richmond to search residences

7  in Richmond pertaining to Mr. Lucas, correct?

8  **A.**    Once again, I don't recall if I called and gave a courtesy

9  call, or if Officer Mayer called and gave a courtesy call.  We

10  may have.

11  **Q.**    You typically would, though, right?

12  **A.**    Well, we try to extend that courtesy to adjoining cities,

13  correct.

14  **Q.**    There's no indication on the CAD sheet that you gave such

15  a call to Richmond police, correct?

16  **A.**    And -- no, there wouldn't be.

17  **Q.**    Okay, so according to -- to OAK7920 of Exhibit A, you

18  left -- you left North County at 9:29a.m. with Spencer Lucas,

19  correct?

20  **A.**    If you go by this, correct.

21  **Q.**    Okay.  And at 10:43 -- well, strike that.

22        You went to North County at 9:30.  And at 10:43, you

23  went to Richmond from North County with Mr. Lucas, correct?

24  **A.**    According to this CAD purge, that's correct.

25  **Q.**    Okay.  And at 10:46 you advised that you were going to

1  3800 MacDonald Avenue for a parole search, correct?

2  **A.**    According to this CAD purge, correct.

3  **Q.**    Okay.  And again, according to this CAD purge that's

4  OAK7920, on 051215 -- December 15th, 2005 -- there was an

5  evented added -- that's 12:30 -- with a series of numbers.

6  What is that?

7  **A.**    I have no idea what that stands for.

8  **Q.**    If you look at the numbers, and compare it to Exhibit 2,

9  and Spencer Lucas' Consolidated Arrest Report Number -- page 1

10  of Exhibit 2 -- do they appear to be -- let me know if that

11  refreshes your recollection as to whether or not that appears

12  to be -- to pertain to an added event for the arrest -- for the

13  report of Mr. Lucas.

14  **A.**    It appears to be.

15       **MR. BOLEY:**  The question is:  does it refresh his

16  recollection?

17  **BY MR. NISENBAUM**

18  **Q.**    Well, the question is whether you know that or not.  It's

19  got the same numbers, right?

20  **A.**    It appears they do have the same numbers, yes.

21  **Q.**    Okay.  And that would be consistent with adding a report

22  for Mr. Lucas to this event -- to this event, correct?

23  **A.**    Once again, I don't understand the input of the CAD

24  information once it's inputted, so I would say "Correct."

25  **Q.**    Okay, but in any event, that was at 12:30.

1          Then the next sequence of numbers is -- begins at

2    14:34.  And there are three entries dated -- that are labeled

3    "Command UO Operator":  one at 14:34; one at 14:55; and one at

4    14:58.  What are those, if you know?

5    **A.**   Once again, I have no idea what that means.

6    **Q.**   Then at 15:33 -- 3:33 p.m. -- is the last set of entries.

7    What are those two entries?

8              **MR. BOLEY:**  Objection.  Lack of foundation.

9              **THE COURT:**  You may testify if you know of your own

10   personal knowledge.

11             **THE WITNESS:**  Once again, your Honor, I'm sorry.  I'm

12   sorry.  Are you -- are you -- can you just repeat the question?

13   Maybe I can --

14   **BY MR. NISENBAUM**

15   **Q.**   I'm just asking.  What are the last -- the last two set of

16   entries at 15:33, if you know?

17   **A.**   It appears to be our unit call sign, 4 Adam 14.  And then

18   underneath that, it -- the disposition.  And it says, "Changed

19   to an OT."

20   **Q.**   So there's no entry -- to your knowledge, there's no CAD

21   entry reflecting the time when you brought Spencer Lucas back

22   to county jail [sic] from Richmond, correct?  Not to county

23   jail; but North County.

24   **A.**   Correct.  Correct.

25   **Q.**   Typically, there would be --

```
 1   A.    I --

 2   Q.    -- based on your experience?

 3   A.    Yes.

 4             THE COURT:   What does this add -- difference between

 5   what we're seeing on 7920, the page that you were just asking

 6   about, and 7923?   These appear to be two different types of

 7   logs.   Can you explain it to us?

 8             THE WITNESS:   See, your Honor, and that's -- I can't.

 9   I can't offer any explanation as to how this is inputted,

10   how -- how we -- how they disseminate the pages and

11   differentiate between what time did you go from here, because

12   it appears to me to be two different entries or two different

13   sets.   And I just -- I just don't really have a definite answer

14   for you regarding this CAD purge.   I'm just not an expert on

15   it.

16             THE COURT:   Okay.

17             THE WITNESS:   I mean, I barely understand what I'm

18   looking at here now, other than my call sign.

19             THE COURT:   Okay.   Okay.   Thank you.

20   BY MR. NISENBAUM

21   Q.    How long have you been an Oakland police officer?

22   A.    Eleven years.

23   Q.    And they've used the same CAD system during that whole 11

24   years, correct?

25   A.    No.   You're incorrect.
```

```
1  Q.   I could be wrong.  It's happened many times.  Tell me.

2  A.   You know, they transferred over to this current CAD

3  system -- I can't remember exactly what year.

4        However, I have never worked in communications, so

5  I've never been the inputter of any data into any CAD system,

6  previously or now.

7  Q.   But you have used CADs in court before, correct?

8  A.   Speak of?

9  Q.   You have used --

10       MR. BOLEY:  Objection.  Vague.

11 BY MR. NISENBAUM

12 Q.   You have used CAD reports in court before, correct?

13       MR. BOLEY:  Objection.  Vague, your Honor.

14       THE COURT:  Have you -- have you testified about CAD

15 reports previously?

16       THE WITNESS:  On our field-based-reporting part of

17 the CAD system, ma'am.  It's a different section.

18       THE COURT:  Do we have one of those here in this

19 exhibit?

20       THE WITNESS:  Um.

21       MR. NISENBAUM:  Take a look.

22       THE WITNESS:  No, your Honor, we don't.

23       THE COURT:  These are entirely different types of

24 documents?  Is that what you're saying?

25       THE WITNESS:  That is correct, your Honor.
```

```
 1              THE COURT:  How much, if any, of this information is

 2    input by you or by the officer operating the equipment in the

 3    vehicle?

 4              THE WITNESS:  Absolutely none, your Honor.

 5              THE COURT:  Well, how is this information picked up,

 6    then?

 7              THE WITNESS:  It's given.  We call it into our

 8    operators at the communications division and center.  They

 9    input all of the information.

10              THE COURT:  Okay.  Based upon your call-ins?

11              THE WITNESS:  Correct, your Honor.

12              THE COURT:  I see.  Okay.

13    BY MR. NISENBAUM

14    Q.   Okay.  I want you to turn to Exhibit 3, the third page of

15    Exhibit 3.

16              THE COURT:  Well, let me ask you one other thing

17    about that.  Then the call-ins are what you're calling in to

18    dispatch.  Is that correct?

19              THE WITNESS:  That is correct, your Honor.

20              THE COURT:  On your radio that's in your vehicle?  Is

21    that correct?

22              THE WITNESS:  That is correct, your Honor.

23              THE COURT:  Do you also send information in via cell

24    phone?

25              THE WITNESS:  Yes, your Honor.
```

```
 1              THE COURT:  And does that end up being recorded in
 2    any of these CAD reports?
 3              THE WITNESS:  See, your Honor, it's supposed to be
 4    logged in.  However, if we call in on our cell phone, it's
 5    through another dispatcher.  So they're supposed to link it
 6    together.  I --
 7              THE COURT:  I see.  Okay.  Well, I sort of see.  I'm
 8    not sure what the results of that look like.
 9    BY MR. NISENBAUM
10    Q.   Okay.  I'm going to put Exhibit 3-3 on the Elmo there.
11    And you have it in front of you.
12    Q.   Do you see it?  It's page 3.  It may have been taken out
13    of that binder -- hopefully not -- but it's 3-3.
14    A.   Okay.  I have 3-2 to 3-4.
15              MR. NISENBAUM:  Another one?  Thank you.
16              MR. BOLEY:  (Indicating)
17              THE COURT:  3-3 may be here with Mr. .
18              MR. NISENBAUM:  I'm sure it is.  Previously marked.
19    BY MR. NISENBAUM
20    Q.   I have one last question to ask you about the CAD before I
21    go there.  I apologize.  Thank you.
22              Looking at Bates stamp OAK7920 of Exhibit 1, the 9:29
23    entry, "ERT North County with PTY MIL 60369"  -- does that mean
24    that 9:29 -- at least, according to the CAD, as you understand
25    the CAD purge, that 9:29 would be the time that you left the
```

1   32nd Street area with Mr. Lucas *en route* to North County?

2   **A.**   It should indicate that, correct.

3   **Q.**   Okay.  And again, there's no -- the next entry is 10:43

4   *en route* to Richmond from North County.

5   **A.**   That is correct, according to the CAD.

6   **Q.**   Okay.  Going back to 3-3, can you tell me where -- where

7   on this -- on 3-3 you were when you first observed the -- the

8   vehicle that contained Mr. Lucas and Mr. Bradshaw?

9           I have just been informed that one way we can do this

10  is that you can put your finger on the screen at the location,

11  and we can then generate a print-out of that.

12          **MR. BURRIS:**  True?

13          **THE CLERK:**  Mm-hm.

14          **MR. NISENBAUM:**  Okay.  You're not under oath.

15          **THE COURT:**  We'll see.

16          **MR. NISENBAUM:**  Exactly.

17          **THE WITNESS:**  Well, okay.  Approximately right here

18  (indicating), by -- right by 33rd Street or in between 33rd and

19  34th Street.  I -- hopefully, I did that right.

20  **BY MR. NISENBAUM**

21  **Q.**   In between 33rd and 34th?

22  **A.**   On Martin Luther King.

23  **Q.**   Okay.  Can you touch it?  Touch the screen, please.  Make

24  a circle or an *X*, indicating the area.

25  **A.**   I guess.  I guess.

```
 1              (Witness complies)

 2         THE COURT:  Yes.  There you go.

 3         MR. NISENBAUM:  Did it show up?

 4         THE CLERK:  Is it not on your screen?

 5         MR. NISENBAUM:  I don't see it on my screen.

 6         MR. BURRIS:  It's red.

 7         MR. NISENBAUM:  It's not.  I don't know.  Not showing

 8  up on mine.

 9         MR. HADDAD:  It's not on Ben's screen.

10         MR. BURRIS:  It's here.

11         MR. NISENBAUM:  Oh.  Oh.  Beautiful.  Okay.

12         THE COURT:  Is there any way -- does it go up on that

13  one, too?

14         THE CLERK:  I don't know.  It's showing up on my --

15         THE COURT:  Did you have a button or something that

16  would --

17         THE CLERK:  I'm not sure why it's not on his.

18         THE COURT:  No, but I mean:  do you have a separate

19  button?

20         MR. NISENBAUM:  Okay.  I'll be able to see it from

21  here.

22         THE CLERK:  No.  I can't.  That's not controlled by

23  something else on there.

24         MR. NISENBAUM:  Yeah.  My pictures come up.

25         THE CLERK:  I'm not sure why the input isn't, but I
```

1    can print it out for them.

2              **MR. NISENBAUM:**  What I'll do -- I can use this one,

3    your Honor.  Thank you.

4              **THE COURT:**  Is that okay?  Can you see that one?

5              **MR. NISENBAUM:**  I can see it clearly now, Judge.

6              **THE COURT:**  Very good.

7              **MR. NISENBAUM:**  Fortunately, I don't even need those

8    glasses.  I have Lasix, so --

9              **MR. BURRIS:**  3-D.

10             **MR. NISENBAUM:**  Exactly.

11   **Q.**  Okay.  Now, at 34th, you said there was a stoplight.  Is

12   that right?

13   **A.**   Yes.  On the Berkeley side of 34th.

14   **Q.**  Okay.  Now, you were -- you were in a black Task Force

15   vehicle, correct?

16   **A.**   That is correct.

17   **Q.**  Okay.  And you were in that vehicle only with

18   Officer Mayer, correct?

19   **A.**   That is correct.

20   **Q.**  And Officer Mayer was driving, correct?

21   **A.**   That is correct.

22   **Q.**  And what other vehicles -- what other police vehicles were

23   near you, to your knowledge?

24   **A.**   Additional OPD units, which were also all black vehicles.

25   **Q.**  Okay.  How many?

1   **A.**   You know, I don't recall exactly how many vehicles were

2   there, but I know there was at least one other vehicle there.

3   **Q.**   And they were there at the time that you saw the gold

4   Cadillac, correct?

5   **A.**   You know, I don't know exactly if they were there at the

6   time we observed the gold Cadillac, or if they came afterwards.

7   **Q.**   Okay.  Now, do you recall whether or not you had driven

8   through the intersection of 34th Street without stopping at

9   the -- at the traffic light?

10  **A.**   Well, we were on the other side of 34th Street, closer to

11  Oakland side, so we did not drive through a traffic light.

12  **Q.**   Okay.  How did you get to the other side of 34th Street?

13  **A.**   Well, we were parked -- I tried to indicate we were in

14  between 34th Street and 33rd Street, somewhere up in that area;

15  but we were on the Oakland side.  So we didn't drive through a

16  traffic light.

17  **Q.**   Okay.  You were simply parked there, correct?

18  **A.**   That is correct.

19  **Q.**   And how long had you been parked there?

20  **A.**   You know, I don't know exactly how long it took us to

21  conduct the business that we were actually there for, so I

22  couldn't tell you.

23  **Q.**   Okay, but you were conducting some type of business there?

24  **A.**   We were, actually, yes.  We were -- one of our

25  identifiable targets in the morning -- we were actually

1    conducting either a parole search or trying to attempt an

2    arrest of somebody.

3    **Q.**    Okay.  And did you actually break off the parole search in

4    order to stop the -- strike that.

5             Did you actually break off of that investigation or

6    whatever you had been doing to stop the gold Cadillac?

7    **A.**    No.

8    **Q.**    So you were done with that?

9    **A.**    I believe so.

10   **Q.**    And the traffic infraction you observed the gold Cadillac

11   commit -- what was that, again?

12   **A.**    I don't recall the traffic violation at this time.

13   **Q.**    You recall nothing about it?

14   **A.**    I don't.

15   **Q.**    In fact, it's fair to say that your recollection of this

16   incident is vague, correct?

17   **A.**    As I stated, it was very vague at the time.  Yes, it was.

18   **Q.**    But you remember your precise location, and that you were

19   parked when you first saw the Cadillac, correct?

20   **A.**    I remember that we were approximately between 33rd and

21   34th Street.  And I -- I remember that we did not go through a

22   traffic light.  That is correct.

23   **Q.**    Okay, but you remember the precise location; the exact

24   location that you pinpointed, correct?

25   **A.**    As I said, it was an approximation.

1  Q.    Okay.  Now, Officer, you were interviewed by Internal

2  Affairs regarding this incident, weren't you?

3  A.    That is correct.

4  Q.    And when did that interview take place?

5  A.    I don't recall when that interview took place.

6  Q.    If I were to tell you that it was approximately March 19th

7  of 2008, would that sound about right to you?

8  A.    That would sound fair.

9  Q.    Okay.  And you had a lawyer present with you at that

10  interview, correct?

11  A.    That is correct.

12  Q.    Okay.  And that interview was recorded?

13  A.    Yes, it was.

14  Q.    By the way, did you have any discussion with the person

15  who interviewed you about this incident prior to the recorded

16  portion of the interview?

17  A.    I don't recall, just -- yes.

18  Q.    Yes, you did?

19  A.    Yes.  Only then that -- just to try to understand exactly

20  why I was there, because I didn't understand why I was giving a

21  statement.

22  Q.    And the person who interviewed you -- that was

23  Sergeant Chris Shannon, correct?

24  A.    I believe so.  Correct.

25  Q.    He's an I.A. investigator?

1  **A.**    Yes.

2  **Q.**    Okay.  Is your recollection of that incident better now

3  than it was when you gave the statement to Internal Affairs?

4  **A.**    Absolutely.

5  **Q.**    And what's refreshed it?

6  **A.**    Well, the documentation that's been presented by my

7  attorney, as well as just the overall case of seeing the

8  individuals involved during the incident.  And it just brings

9  back a more recollection than I had at that time.  I had none

10 of that in front of me when I gave my Internal Affairs

11 statement.

12 **Q.**    Okay.  And your Internal Affairs statement was only about

13 four minutes long, wasn't it?

14 **A.**    I don't recall.

15 **Q.**    Have you listened to it recently?

16 **A.**    I have.

17 **Q.**    When was the last time?

18 **A.**    I believe yesterday.

19 **Q.**    Okay.  At the time you gave your -- you're Internal

20 Affairs statement, you did not know the location of where the

21 traffic stop occurred, did you?

22 **A.**    I didn't recall.

23 **Q.**    All right.  You only knew it was somewhere in West

24 Oakland?

25 **A.**    That is correct.

1  Q.   And, in order to prepare for the Internal Affairs

2  investigation, did you review any -- any reports?

3  A.   I did not.

4  Q.   Okay.  You didn't review the Kirby Bradshaw Consolidated

5  Arrest Report that you prepared?

6  A.   I believe it was there.  I don't believe I reviewed it.

7  Q.   Okay, but nevertheless, the incident has now come back to

8  you, correct?

9  A.   Absolutely.

10  Q.   Now, at the -- today you recall that -- that you searched

11  Mr. Bradshaw, correct?

12  A.   That is correct.

13  Q.   You had forgotten that you had done that, correct?

14  A.   At the time I gave Internal Affairs, three years later,

15  and the contacts that I've had.  At the time I didn't recall.

16  Q.   And it was only after Mr. Lucas had said he was homeless

17  that Nakamura was called to the scene, correct?

18  A.   I don't recall exactly when we called Agent Nakamura to

19  the scene, but -- however, I know he was.

20  Q.   Okay.  You did recall at the time you gave the Internal

21  Affairs statement that -- that Spencer Lucas' parole agent had

22  been called by Agent Nakamura, correct?

23  A.   Correct.

24  Q.   And you also recalled at that time when you gave the

25  statement that -- that the agent had said that Mr. Lucas was

1   homeless, didn't really have a place to stay, but usually had a

2   room at the Motel 6, correct?

3   **A.**   Correct.

4   **Q.**   Now, how many Motel 6s are there in Oakland?

5   **A.**   I couldn't tell you.

6   **Q.**   Do you know of any?

7   **A.**   Yes.

8   **Q.**   Where are they?

9   **A.**   The only one that comes -- well two come to mind:  one on

10  Embarcadero in Jack London Square area, and then a second

11  one -- that I'm familiar with is 8500 block of Eades in

12  East Oakland.

13  **Q.**   Now, how difficult would it have been for you to contact

14  either of the Motel 6s?

15  **A.**   I suppose none -- not difficult at all.

16  **Q.**   All right.  I mean, you had cell phones.  You had a cell

17  phone on your person you could have used to contact Motel 6?

18  **A.**   Well, there would be no need to contact the Motel 6.  He

19  didn't have any keys, and he didn't have any indicia that he

20  was staying at the Motel 6.  He said he stated there from time

21  to time.

22  **Q.**   Did you ever ask him if he stayed anywhere else?

23  **A.**   I don't know the conversation that took place between

24  Officer Mayer and Lucas.  Since he was the primary person

25  dealing with Lucas, you've got to ask him.

1   Q.   I see.  You weren't actually dealing with Mr. Lucas.  You

2   were mostly dealing with Mr. Bradshaw.  Is that correct?

3   A.   At the time of the car stop, that's correct.

4   Q.   Is it fair to say that Officer Mayer led this

5   investigation?

6   A.   In terms of lead, I don't understand.

7   Q.   Well, that typically -- when -- and I think you had

8   testified to this, but typically, one -- you guys switch off,

9   in terms of who'll -- who'll lead the investigation?

10           **MR. BOLEY:**  Objection.  Misstates the testimony.

11           **THE COURT:**  Why don't you ask it as a question?

12           **MR. NISENBAUM:**  Okay.

13   Q.   First of all, when there's an investigation that occurs,

14   how does it -- is there one person who's in charge of the

15   investigation?

16   A.   Absolutely not.

17   Q.   Okay.  Both of you are co-partners in the investigation,

18   in terms of being in charge?

19   A.   It depends on what investigation you're speaking of.

20   Q.   Well, what type of -- well, who made the decision to pull

21   over the gold Cadillac?

22   A.   Well, Officer Mayer activated his -- our lights and

23   sirens, since he was driving.

24   Q.   Okay.  And was was there a discussion between you before

25   the lights and siren were activated?

1   **A.**   I don't recall a discussion.

2   **Q.**   Excuse me.  It was just -- do you know, if there was

3   discussion, whether or not you recall it?

4   **A.**   There had to be a discussion about the vehicle violation.

5   **Q.**   Okay.  And again, you don't -- let me ask you this.  Going

6   to page 2 -- or not page 2 -- Exhibit 2, page 2, your police

7   report pertaining to Kirby Bradshaw, there is no -- do you have

8   it?

9   **A.**   Yes.

10  **Q.**   Okay.  There is no indication of the violation -- of the

11  Vehicle Code violation, correct?

12  **A.**   That is correct.

13  **Q.**   And there's no probable-cause narrative, correct?

14  **A.**   That is incorrect.

15  **Q.**   And the probable-cause narrative is where it says,

16  "Warrant det."?  D-E-T?

17  **A.**   Warrant detention.  That is correct.

18  **Q.**   As a police officer, you've been trained that you can't

19  simply arrest someone because of -- of having a warrant,

20  without knowing that the person has a warrant, in order to stop

21  them, correct?

22  **A.**   That is correct.

23  **Q.**   Okay.  So what was your probable cause for stopping --

24  what was the specific probable cause for stopping the vehicle?

25  **A.**   I don't recall the vehicle violation at the time.

1  Q.   It doesn't say "vehicle violation" in the complete

2  probable-cause narrative, does it?

3  A.   And it would not indicate a vehicle violation, since

4  Mr. Bradshaw actually wasn't driving.  And I just don't recall

5  that at the time.

6  Q.   But it was the basis upon which the vehicle was stopped.

7  And that would be the basis upon which you would have to answer

8  to in court if the stop was contested, correct?

9           MR. BOLEY:  Objection.  Calls for a legal conclusion.

10          THE COURT:  The objection is overruled.

11          You may answer.

12          THE WITNESS:  Can you rephrase the question or state

13  the question again?  I'm sorry.

14          (Record read)

15          MR. BOLEY:  Objection.  Compound.

16          THE COURT:  Objection overruled.

17          You may answer.

18          THE WITNESS:  Yes.  If a citation was issued, and

19  that person decided to contest the stop, correct.

20  BY MR. NISENBAUM

21  Q.   Okay.  Well, if the person decided to contest their arrest

22  on a warrant that was discovered as -- as a fruit of the -- of

23  the stop, you would have to be able to tell the Judge in court,

24  "This is why I stopped the vehicle," correct?

25  A.   And, as I stated before, the vehicle was stopped for a

1  vehicle violation that we failed to annotate on here.

2          THE COURT:  Well, when you say, "We failed," did you

3  have some discussion with Officer Mayer about the Vehicle Code

4  violation in stopping this vehicle?

5          THE WITNESS:  At the time, your Honor?

6          THE COURT:  Yes.

7          THE WITNESS:  Yes.  There was a vehicle violation.

8  We decided to conduct a traffic stop on that vehicle.

9          THE COURT:  Did you see the Vehicle Code violation?

10          THE WITNESS:  At the time, your Honor, I don't know

11  if I saw it or if Officer Mayer saw it, but it was --

12          THE COURT:  But you had a discussion about it?

13          THE WITNESS:  Yes; about stopping this particular

14  vehicle.  Yes.

15          THE COURT:  And about the Vehicle Code violation?

16          THE WITNESS:  Not exactly about exactly what the

17  vehicle violation was, because I don't recall exactly what it

18  was, your Honor.

19          THE COURT:  But was the discussion, "Let's just stop

20  it because it looks suspicious"?

21          THE WITNESS:  What I'm getting at is, your Honor, it

22  was a violation.  And I'm not sure at this time when I even

23  brought this to my attention if I was the one who observed the

24  violation, or did Officer Mayer observe the violation; but I

25  know it was one that was happening at the time.

1          THE COURT:  Well, what did you believe the violation

2   was?

3          THE WITNESS:  You know, your Honor, it could have

4   been a cracked taillight; a muffler.  I just don't recall.

5   That's why I can't definitely say that it was expired

6   registration.  I just don't recall that -- that exact

7   violation.

8          THE COURT:  Well, did the vehicle have license plates

9   on it?

10          THE WITNESS:  Your Honor, I don't even recall if the

11   vehicle had license plates on it, which would have been a

12   violation within itself.

13          THE COURT:  If it had license plates, did it have

14   tags?

15          THE WITNESS:  Yes, your Honor, but those tags could

16   have been expired.

17          THE COURT:  But you don't know.  You're just

18   speculating now, right?

19          THE WITNESS:  Yes.  And that's -- yes.

20          THE COURT:  Did the vehicle run a red light?

21          THE WITNESS:  It did not, because it did not travel

22   through a red light at the time we observed the vehicle.

23          THE COURT:  Did it go through a stop sign without

24   stopping?

25          THE WITNESS:  Not at that time, your Honor.  I don't

1    believe it did.

2            **THE COURT:**  Was there any kind of a moving violation?

3            **THE WITNESS:**  Yes, your Honor.  It either was

4    expired-tags violation or --

5            **THE COURT:**  Is that a moving violation?

6            **THE WITNESS:**  Yes, your Honor, it's a moving

7    violation; but it also could be within a fix-it ticket as well

8    that -- after we issue it.  So it would give us probable cause.

9    If it's a cracked taillight, we'd pull a vehicle over with a

10   cracked taillight and cite that vehicle for that.  So, yes,

11   your Honor that would be a moving violation.

12           **THE COURT:**  So those -- it wasn't a moving violation,

13   in that the vehicle was moving in violation of some statute or

14   section of the Vehicle Code, correct?

15           **THE WITNESS:**  Yes.

16           **THE COURT:**  It would be some sort of a -- you know,

17   it would be a stationary violation.  If you saw the vehicle,

18   you know, sitting by the side of the road with people in it,

19   about to drive it, and it didn't have a -- current tags, you

20   could stop that vehicle, right?

21           **THE WITNESS:**  Yes, your Honor.

22           **THE COURT:**  Or that vehicle -- okay.  And that's a

23   fiction-it ticket, right?

24           **THE WITNESS:**  That's correct, your Honor.

25           **THE COURT:**  So that's not even a citation ticket?

 1            **THE WITNESS:**  No, your Honor.  It's a citation.  It's

 2    an infraction.

 3            **THE COURT:**  It's an infraction?

 4            **THE WITNESS:**  Yes, your Honor.

 5            **THE COURT:**  And it's a citation with a fix-it?

 6            **THE WITNESS:**  Eventually, yes, it is.  Even if the

 7    vehicle is moving, that, in my understanding, is still a moving

 8    violation, because the vehicle is in motion.

 9            Now, once you stop the vehicle, then you cite the

10    vehicle for whatever that violation is.

11            **THE COURT:**  Boy.  I think we need some more training.

12    **BY MR. NISENBAUM**

13    **Q.**   Officer, you were out there on -- when you were out there

14    in West Oakland this morning, I think you testified that you

15    were assigned to look for parolees, correct?

16    **A.**   Correct.

17    **Q.**   And, by the way, the Oakland Police Department takes

18    racial profiling seriously, don't they?

19    **A.**   That is correct.

20    **Q.**   And you're trained about racial profiling, correct?

21    **A.**   That is correct.

22    **Q.**   And what is racial profiling, as you understand it or as

23    you've been trained?

24    **A.**   As I've been trained, it is making vehicle stops or making

25    some type of walking stops on just a determination of a

1  person's race, gender, or ethnicity.

2  Q.   Okay.  Now, at some point you found out that the only men

3  in this gold Cadillac were African-American men, correct?

4  A.   Correct.

5  Q.   Okay.  And when did you first make that observation?

6  A.   Upon the vehicle actually pulling over, and upon our

7  contact with the individuals inside of the vehicle.

8  Q.   Okay.  Now, the vehicle had clear windows, correct?

9  A.   I don't recall.

10 Q.   Well, if it had -- if it had tinted window that

11 obstructed -- tinted windows that obstructed your vision into

12 it, it's fair to say you probably would have remembered that,

13 correct?

14 A.   That may have been the vehicle violation, so I don't

15 recall.

16 Q.   Okay.  To -- with respect to racial profiling, the Oakland

17 Police Department requires certain information be collected by

18 its officers pertaining to stops of people that they make,

19 correct?

20 A.   That is correct.

21 Q.   And there's a particular policy in that regard?

22 A.   Yes.

23 Q.   And that policy is Special Order Number 8012, correct?

24 A.   I don't know the exact order number, but if --

25 Q.   Okay.  You've seen -- you've seen a memorandum -- strike

1    that.

2    You've seen -- you've seen a Special Order that

3    pertains to gathering data of people who are stopped, right?

4    **A.**    Correct.

5    **Q.**    And there's actually a form that officers have, correct?

6    **A.**    That is correct.

7    **Q.**    That's called a "Stop Data Collection Form"?

8    **A.**    That is correct.

9    **Q.**    It's actually called a "Racial Profiling Stop Data

10    Collection Form," correct?

11    **A.**    I have not heard of it in that term.

12    **Q.**    Okay.  Well, I want you to turn to Exhibit 16, which is in

13    the book that I'm about to hand you (indicating).  I'm going to

14    put the front page on the Elmo.  It's already been admitted.

15    **THE CLERK:**  I got it.  Oh.  You need the red marker?

16    **MR. NISENBAUM:**  Okay.

17    **Q.**    Do you see that?

18    **A.**    Yes.

19    **Q.**    Have you ever seen this before?

20    **A.**    Yes.

21    **Q.**    Okay.  And, as you understand it -- well, strike that.

22    It's a multiple-page document.  And this is the front

23    page, correct?

24    **A.**    Correct.

25    **Q.**    Okay.  And it's titled, "Racial Profiling Stop Data

1  Collection Form," right?

2  **A.**    Correct.

3  **Q.**    And it says, "Purpose:  This Special Order outlines the

4  procedure for completing and processing the new data" [sic] --

5  "the new Stop Data Collection Form Scantron" -- series of

6  numbers -- "OPD.  A sample stop data collection form is

7  attached," correct?

8  **A.**    Correct.

9  **Q.**    Then it says, "Responsibilities," correct?

10 **A.**    Correct.

11 **Q.**    It says, "Members shall be responsible for completing a

12 Stop Data Collection Form for every vehicle, walking, or

13 bicycle stop conducted during their shift."

14 **A.**    Correct.

15 **Q.**    Right?

16         Did you complete a Stop Data Form for Mr. Bradshaw?

17 **A.**    I did not.  Officer Mayer did.

18 **Q.**    He did?

19 **A.**    Yes.

20 **Q.**    I thought Officer -- you prepared the police report for

21 Mr. Bradshaw, didn't you?

22 **A.**    The arrest tag.  Correct.

23 **Q.**    How did you decide that Officer Mayer should be the one to

24 prepare the Stop Data Form for Mr. Bradshaw?

25 **A.**    Well, first, there is no decision.  If you continue with

1 the Stop Data Form, there has indications on there for multiple

2 occupants inside the vehicle.  So therefore, you only need to

3 complete one Stop Data Form for that incident.

4 **Q.**   The one Stop Data Form would indicate -- I want you to

5 turn to -- one, two, three, -- the sixth page of Exhibit 16.

6          And I believe this has already been moved into

7 evidence.

8          **THE COURT:**  16?

9          **THE CLERK:**  Mm-hm.

10          **THE COURT:**  Yes.

11          **THE CLERK:**  Yes.

12          **MR. NISENBAUM:**  Okay.  Let me put it up on the Elmo,

13 here (indicating).

14 **Q.**   Exhibit 16 is a sample of the Stop Data Collection Form,

15 correct?

16 **A.**   That is correct.

17 **Q.**   Okay.  And it does indicate under Section 4.  It says --

18 well, strike that.

19          Under Section 3 it indicates, "Reason for stop,"

20 correct?

21 **A.**   Correct.

22 **Q.**   It indicates the result of the stop; the duration of the

23 stop?

24 **A.**   Correct.

25 **Q.**   Okay.  It indicates whether the stop is for a criminal or

1   for traffic, correct?

2   **A.**    Correct.

3   **Q.**    And it says -- under "Traffic," it says -- there are

4   different categories:  Moving (non dangerous), moving

5   (dangerous), mechanical/registration, or pedestrian violation.

6   Correct?

7   **A.**    Correct.

8   **Q.**    Now, I take it you never saw the Stop Data Form that

9   Officer Mayer filled out that he says -- that you say he filled

10  out, correct?

11  **A.**    Correct.

12  **Q.**    So you don't know what was filled in there, correct?

13  **A.**    I do not.  Correct.

14  **Q.**    You don't know if it was turned in to any supervisor, do

15  you?

16  **A.**    Correct.

17  **Q.**    Are you aware that it has never been produced to the

18  plaintiffs in this case?

19          **MR. BOLEY:**  Objection.  Lack of foundation.

20          **THE COURT:**  Objection is sustained.

21          **MR. NISENBAUM:**  Okay.

22  **BY MR. NISENBAUM**

23  **Q.**    Have you ever seen this -- have you ever the Stop Data

24  Form for Mr. -- for Mr. Bradshaw or Mr. Lucas?

25          **MR. BOLEY:**  Objection.  Asked and answered.

```
 1              THE COURT:  Objection is overruled.

 2              THE WITNESS:  As I stated, the form that was filled

 3  out by Officer Mayer, I did not see.

 4  BY MR. NISENBAUM

 5  Q.   Did you ever look for it?

 6  A.   There would be no reason for me to.  No.

 7  Q.   Well, we're here in court today on this matter, right?

 8              MR. BOLEY:  Objection.  Argumentative, your Honor.

 9              THE COURT:  Objection sustained.

10  BY MR. NISENBAUM

11  Q.   Well, you understand that part of this case pertains to

12  the reason Mr. Bradshaw -- strike that -- the reason Mr. Lucas'

13  vehicle was stopped, and how officers came in contact with

14  Mr. Lucas and Mr. Bradshaw, don't you?

15              MR. BOLEY:  Argumentative, your Honor.

16              THE COURT:  Objection overruled.

17              THE WITNESS:  I'm sorry.  Could you repeat the

18  question?

19  BY MR. NISENBAUM

20  Q.   You understand that part of this trial pertains to the

21  reason why Mr. Bradshaw and Mr. Lucas were stopped?

22  A.   Correct.

23  Q.   And the Stop Data Collection Form would be one

24  indication -- one piece of evidence as to why they were

25  stopped, if it were filled out, correct?
```

1  **A.**    Correct.

2  **Q.**    Okay.  And you've never seen it filled out, correct?

3  **A.**    At this particular time, that is correct.

4          **THE COURT:**  Well, would you leave that up there for

5  just a moment?

6          **MR. NISENBAUM:**  Oh, yeah, absolutely.  My apologies.

7          **THE COURT:**  You see where it says, "Traffic"?

8          **THE WITNESS:**  Yes, your Honor.

9          **THE COURT:**  Okay.  Tell me.  What are the nature of

10  the violations listed under there?

11          **THE WITNESS:**  If the traffic stop was because the

12  vehicle was nondangerous;

13          **THE COURT:**  What is the first word there?

14          **THE WITNESS:**  "Moving."

15          **THE COURT:**  Okay.  Next one?

16          **THE WITNESS:**  "Moving."

17          **THE COURT:**  Moving?

18          **THE WITNESS:**  "Moving dangerous."

19          **THE COURT:**  And then the next one?

20          **THE WITNESS:**  "Mechanical registration."

21          **THE COURT:**  And the next one?

22          **THE WITNESS:**  "Or pedestrian violation."

23          **THE COURT:**  Okay.  Now I'm going to go back and ask

24  you again about tags -- lack of tags.

25          **THE WITNESS:**  Yes, your Honor.

 1          THE COURT:  Items like that.  Broken taillight or

 2    something.

 3          THE WITNESS:  Yes, your Honor.

 4          THE COURT:  Okay.  Is that a moving violation, or a

 5    mechanical/registration violation?  Are those -- do those --

 6    which categories do those fall into?

 7          THE WITNESS:  Well, that would be if the vehicle was

 8    moving, then I would circle -- as I understand it, I would

 9    circle "moving nondangerous," as well as

10    "mechanical/registration."

11          THE COURT:  Do you get a point on your license for a

12    moving violation?

13          THE WITNESS:  Yes, your Honor.

14          THE COURT:  Do you get a point on your license for a

15    fix-it ticket?

16          THE WITNESS:  No, your Honor.

17          THE COURT:  Okay.

18          THE COURT:  Even if you've been moving, you get a

19    fix-it ticket; you don't get a point, correct?

20          THE WITNESS:  That is correct, your Honor.

21          THE COURT:  Okay.  I suggest you go back and you read

22    the Vehicle Code.  I just looked at it, and you'll find out

23    what a moving violation is.

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  That's today's training.

1          **MR. NISENBAUM:**  For today.

2          **THE COURT:**  For today.

3          **MR. NISENBAUM:**  So -- so you stopped -- is it fair to

4   say that the reason you stopped the vehicle was to -- was to

5   enforce the -- whatever violation it was that you observed?

6          **THE WITNESS:**  A vehicle violation.  Correct.

7   **BY MR. NISENBAUM**

8   **Q.**   Okay.  The Vehicle Code violation for which you never

9   issued a citation, correct?

10  **A.**   That -- I did not issue a citation for this incident,

11  correct.

12  **Q.**   And to your knowledge, neither did Officer Mayer, correct?

13  **A.**   To my knowledge, correct.

14  **Q.**   You did not stop the vehicle to try to find a parolee, did

15  you?

16  **A.**   No.

17  **Q.**   Okay.  You had no idea who Mr. Lucas was?

18  **A.**   I had no idea who Mr. Lucas was.  Correct.

19  **Q.**   Okay.  And you had no idea who Mr. Bradshaw was, correct?

20  **A.**   I had no idea who Mr. Bradshaw was, correct.

21  **Q.**   Now, about how far from -- about how far from 32nd and

22  Martin Luther King is the Oakland Police Department?

23  **A.**   Approximately -- I'd say a mile to a mile and a half or

24  so.

25  **Q.**   Basically, you could drive right down King to 7th Street,

1  and make a left on 7th, and you'd be at the Oakland Police

2  Department in a couple of blocks, correct?

3  **A.**    Correct.

4  **Q.**    Okay.  Now, about how long was it before the decision --

5  strike that.

6            You were not dealing with Mr. Lucas, correct?

7  **A.**    That is correct.

8  **Q.**    Okay.  You didn't necessarily see Mr. Lucas be handcuffed,

9  did you?

10 **A.**    Yes, I did.

11 **Q.**    Oh.  You saw that?

12 **A.**    Yes.

13 **Q.**    What were you doing at that time?

14 **A.**    I was providing cover on the passenger side during the

15 vehicle stop.

16 **Q.**    When you say you were "providing cover," what do you mean

17 by that?

18 **A.**    That means I was actually exited out of our patrol

19 vehicle, because I'm the first one.  I made contact with the

20 passengers, while Officer Mayer walked up to the driver's side

21 of the vehicle and made contact with Mr. Lucas.

22 **Q.**    And when did you first contact Kirby Bradshaw?

23 **A.**    At -- right as the car stopped.  The vehicle stop was

24 made.  Officer Mayer made contact with the driver, which was

25 Mr. Lucas.  And I made contact with the passenger and the rear

1  passenger simultaneously.

2  **Q.**    You made contact with Mr. Bradshaw before Mr. Lucas was

3  handcuffed?

4  **A.**    Yes.

5  **Q.**    Okay.  And, if I understand correctly, Mr. Bradshaw was

6  handcuffed very quickly as well.  Is that right?

7  **A.**    Yes, he was.

8  **Q.**    Okay.  You found out very quickly that he had a warrant,

9  right?

10 **A.**    I'm sorry.

11 **Q.**    You found out very quickly that there was a warrant for

12 Mr. Bradshaw?

13 **A.**    Not -- well, in the time -- yeah, in a timely manner, but

14 not very quickly.

15 **Q.**    Okay.  Well, was he handcuffed before or after you found

16 out there was a warrant?

17 **A.**    After I found out there was a warrant.

18 **Q.**    Okay.  So at the time you saw Mr. Lucas be handcuffed,

19 Mr. Bradshaw was out of the car, but was not handcuffed,

20 correct?

21 **A.**    That is incorrect.

22 **Q.**    Okay.  You didn't -- at what point in time did you --

23 okay.  Let me -- I think I misunderstood your earlier answer.

24 When Mr. Lucas got -- how long after Mr. Lucas got out of car

25 was he handcuffed?

1   **A.**   Mr. Lucas never actually got out of the vehicle.

2   Officer Mayer asked Mr. Lucas upon contact if he had his

3   driver's license, his registration, and if he was on parole or

4   probation.  At that particular time, Mr. Lucas advised that he

5   was on parole.

6          At that time, Officer Mayer handcuffed him in the --

7   inside the vehicle, halfway coming inside the vehicle; asked

8   him to turn around.

9   **Q.**   I see.  So he didn't -- he was handcuffed inside the

10  vehicle?

11  **A.**   Yes.

12  **Q.**   And Mr. Bradshaw was still in the vehicle?

13  **A.**   Yes.

14  **Q.**   Okay.  And why was Mr. Lucas handcuffed?

15  **A.**   Due to the fact that he advised that he was on parole.

16  **Q.**   So you handcuff everyone you come in contact to who turns

17  out to be on parole?

18  **A.**   Yes.

19  **Q.**   Regardless of the type of violation that led to their

20  stop?

21  **A.**   Him being on parole is why he's handcuffed.  Correct.

22  **Q.**   Mr. Bradshaw -- well, strike that.

23          Did you ask the same questions of Mr. Bradshaw about

24  parole or probation?

25  **A.**   Yes.

1   Q.   And is that a question that you ask everyone you come in

2   contact with?

3   A.   Yes.

4   Q.   And you ask them that whether or not -- whether you're on

5   32nd and West, or whether you're up by Rockridge, right?

6   A.   I don't understand the question.

7   Q.   Well, every person you detain, you ask whether they're on

8   parole or probation, correct?

9   A.   If I detain that person, correct.

10  Q.   Okay.  And it doesn't matter what location you're in in

11  Oakland?

12  A.   That is correct, if they're being detained.

13  Q.   If you were up in Montclair, and you detained them, you

14  would ask them, "Parole or probation"?

15  A.   Absolutely.

16  Q.   And you would ask them that, even for a minor -- possibly

17  a fix-it ticket on a vehicle stop?

18  A.   That is correct.

19  Q.   Now at some point, a search of Mr. Lucas' van was

20  conducted, correct?

21  A.   Yes.

22  Q.   And was there some appearance that the van was abandoned?

23  A.   You'd have to ask Officer Mayer.  He conducted the search

24  of the van.  I stayed in the vehicle with Mr. Bradshaw.

25  Q.   Okay.  So you never got -- you didn't get out of the

1  vehicle at that time when the van was searched, correct?

2  **A.**    That is correct.

3  **Q.**    Okay.  Now, I want you to point out to me or point out to

4  the Court where the van is, using Exhibit 3 -- I believe, 3-3;

5  what the location of the van is.

6            **MR. BOLEY:**  If you can.

7  **BY MR. NISENBAUM**

8  **Q.**  You can use 3-3.

9            **THE CLERK:**  I printed this out for you, so you can

10  use the same picture again.  Have him mark -- just mark that as

11  an exhibit.

12           **MR. NISENBAUM:**  Great.  Okay.  I do have your copy.

13           **MR. BOLEY:**  You have my copy?

14  **BY MR. NISENBAUM**

15  **Q.**  Okay.  So this -- this, again, was Exhibit 3-3.

16          Does Exhibit 3-3 show the location of Mr. Lucas' van?

17  **A.**   Yes, I believe so, but it's just hard to tell.

18  **Q.**   Okay.  Well, what was the location of Mr. Lucas' van?  Do

19  you recall the street or the cross-street?

20  **A.**   No.  I don't necessarily recall the exact location, since

21  I didn't conduct the search --

22  **Q.**   Okay.

23  **A.**   -- but I believe it was somewhere on the 600 block of

24  32nd Street.

25  **Q.**   And the 600 block of 32nd Street is what, exactly?  Which

 1  one of these blocks?

 2  **A.**    Well, it's closer to Martin Luther King.

 3  **Q.**    Okay.  And if you could, put a -- if you could, tab where

 4  you believe it is.

 5  **A.**    (Witness complies)

 6  **Q.**    And draw a circle in the area.  And put a "2" by it.

 7  **A.**    Can I -- can I --

 8  **Q.**    That's fine.  That's fine.  That's fine.  That's good

 9  enough.  It looks like there's "J.P." written there?

10  **A.**    Yeah.  I --

11  **Q.**    Just for the symbol, that appears to be the case.  "J.P.,"

12  referring to the location of the van, correct?

13  **A.**    That -- I believe that's correct.

14  **Q.**    Okay.  Okay.  It certainly was not on 34th Street, was it?

15  **A.**    I mean, it could have been, but to my recollection, that's

16  what I believe it to be.

17  **Q.**    Okay.  So you had to leave the scene to go to the van,

18  right?

19  **A.**    Correct.

20  **Q.**    And you left the gold Cadillac there?

21  **A.**    Correct.

22  **Q.**    Okay.  And was the gold Cadillac locked?

23  **A.**    No.

24  **Q.**    Okay.  What -- did you leave it open?  Unlocked?

25  **A.**    No.  We actually gave turned custody over, per Lucas'

1   request, to the other occupant that was inside the vehicle; the

2   third occupant.

3   **Q.**   Do you know that person's name?

4   **A.**   You know, I don't recall his name.

5   **Q.**   Do you know the name Marty Robertson?

6   **A.**   Yes.

7   **Q.**   Who was that?

8   **A.**   That, I believe, was the third occupant, when I was inside

9   the vehicle.

10  **Q.**   Okay.  Did you know whether or not Mr. Robertson was

11  licensed to drive when you gave him the keys?

12  **A.**   I don't recall.  He -- a warrant check and a service check

13  for his driver's license was conducted.  I don't recall if he

14  was valid or not at the time.

15  **Q.**   I see.  And, by the way, do you know where Mr. Robertson

16  went during the incident; during the incident at the scene

17  while you were at 32nd and King -- at M.L.K.?

18  **A.**   Yes.  Yes.

19  **Q.**   Where did he go?

20  **A.**   I believe he stood right next to where we were while we

21  were dealing with Mr. Lucas and Mr. Bradshaw.

22  **Q.**   Did you ever see him walk across -- well, let me go to

23  Exhibit 3.  I believe Exhibit 3-8 will work for this.  I don't

24  think it's been marked yet.  And did we capture that?

25          **THE CLERK:**  I hope so.

 1          THE COURT:  It's a little dark, but --

 2          MR. NISENBAUM:  Okay.

 3          (Whereupon a document was tendered to the Court)

 4          MR. NISENBAUM:  What's that?

 5          THE CLERK:  We've got to get it marked for this one

 6  or the next one.

 7          MR. NISENBAUM:  This was 3-3.  This is -- I'll say

 8  3-3.

 9          THE CLERK:  That would be 3-3B.

10          MR. NISENBAUM:  Thurston.

11          THE CLERK:  Here's your other one (indicating).

12          MR. NISENBAUM:  3-3C?

13          THE CLERK:  I can print copies of those, too.

14          MR. NISENBAUM:  Great.  Thurston.

15  Q.   Okay.  This is Exhibit 3-8.  Do you see it?

16          MR. BOLEY:  You know, can the witness look at the

17  copy in the witness binder?

18          MR. NISENBAUM:  Oh, of course.

19          MR. BOLEY:  Because the quality on the screen is --

20          THE COURT:  No.  I don't think that's the right

21  binder.  I think you need some other binder.

22          MR. NISENBAUM:  No.  He's got the binder.

23          THE COURT:  Underneath?

24          MR. NISENBAUM:  Yes.  Yes.

25          MR. HADDAD:  (Indicating)

1          **THE COURT:**  I love the way all of these pages say,

2    "Save trees.  Go green," but it doesn't appear that any of

3    these exhibits made the effort to accomplish that, given that

4    they weigh a ton.

5          **MR. NISENBAUM:**  And I'm sure it hurts the health-care

6    issue, too; sending people to the hospital, just carrying them

7    around.

8    **Q.**   Okay.  Do you see Exhibit 3-8?

9    **A.**   Yes.

10   **Q.**   Do you recognize what is depicted in Exhibit 3-8?

11   **A.**   I do not.

12   **Q.**   Okay.  Well, we have different views of -- of that area.

13         **MR. BURRIS:**  Try 3-10.

14         **MR. NISENBAUM:**  3-10.  Is 3-10 in evidence already?

15         **THE CLERK:**  3-10 is admitted.

16         **MR. NISENBAUM:**  Here it is.  I have it, too.  So let

17   me use this one.

18         **THE CLERK:**  Yeah.

19         **MR. NISENBAUM:**  Exactly.

20   **Q.**   Okay.  I'm going to show you what's been previously marked

21   as Plaintiffs' Exhibit 3-10.  Do you see it?

22   **A.**   Yes.

23   **Q.**   Okay.  Do you recognize what is depicted in this exhibit?

24   **A.**   Yes.

25   **Q.**   What is depicted here?

1   **A.**     It appears to be where we actually made the vehicle stop.

2   And there's a church located right here on the corner of this

3   street here.

4   **Q.**     And is that an accurate depiction of the -- the northwest

5   corner of 32nd and Martin Luther King?

6   **A.**     Well, from my understanding -- and hopefully I don't get

7   this turned around -- I mostly work East Oakland, so that would

8   be the south side of the street, to me.   I --

9   **Q.**     That would be the south side of the street?

10  **A.**     Yes.

11  **Q.**     I see.

12  **A.**     The north side would be across.

13  **Q.**     So you're not as familiar with this area of Oakland?

14  **A.**     With the directions of West Oakland?  No, I'm not.

15  **Q.**     Okay.  So you don't -- you're not familiar with the church

16  that is on the 600 block of Martin Luther King?

17  **A.**     Yes.  I remember the church setting there.  I'm just

18  speaking as far as directions go --

19  **Q.**     Okay.

20  **A.**     -- because they change when you go to East Oakland.

21  **Q.**     Okay.  In any event, let me ask you this.  Does -- is

22  this -- does this depict the corner on which the vehicle stop

23  of Mr. Lucas' vehicle was made?

24  **A.**     Yes.

25  **Q.**     Okay.  You do recall that much?

1  **A.**    Yes.

2  **Q.**    Correct?

3           And so I want to show you, now, Exhibit 3-8.  And let

4  me know if Exhibit 3-10 has refreshed your recollection, so

5  that you understand the location of Exhibit 3-8.  And I will

6  direct you to the blue house on the left side of Exhibit 3-10,

7  compared to the blue house on the right side of Exhibit 3-8.

8  **A.**    Okay.  My -- what I have here goes from exhibit, I guess,

9  3-9, and then it skips to 3-11.

10 **Q.**    Well, okay.  You have 3-8, though, right?  Do you have

11 that?  I'll show you -- I'll give you 3-10.

12 **A.**    Yes.  I have 3-8.

13 **Q.**    Okay.  And here's 3-10 (indicating).

14 **A.**    Okay.

15 **Q.**    Okay.  So do you know whether or not Exhibit 3-8 is -- is

16 a different view of the intersection of 32nd and M.L.K.?

17 **A.**    Yes.  It appears to be.

18 **Q.**    Okay.  And Exhibit 3-8 indicates also includes the corner

19 where -- where the vehicle stop with Mr. Lucas and Mr. Bradshaw

20 occurred, correct?

21 **A.**    Correct.

22 **Q.**    Okay.  If you can, use your -- use your finger to indicate

23 where the vehicle stop was.

24 **A.**    Well, --

25 **Q.**    If it's not on there, then let me know.

```
 1  A.   Well, the vehicle stop would have had to have been kind of
 2  up this way, on Martin Luther King (indicating).
 3  Q.   Okay.
 4  A.   So if this -- if I'm reading.
 5  Q.   Using Exhibit 3-10, does Exhibit 3-10 show the area of the
 6  vehicle stop?
 7  A.   Yes.  And it depicts it clearer than this depiction does.
 8  Q.   Okay.  Let me grab 3-10 back from you.
 9          Indicate on 3-10 the location where the gold
10  vehicle --
11          MR. HADDAD:  (Indicating)
12          MR. NISENBAUM:  Thank you.
13  Q.   Indicate on Exhibit 3-10 where the gold Cadillac was
14  stopped.
15  A.   Approximately right here (indicating).
16          THE COURT:  Is it possible to lighten this up a bit?
17  It's coming across very dark, compared to the photos.  Is there
18  some device on there?
19          Is that better?
20          Oh, yes.  It is.
21          MR. NISENBAUM:  Significantly better.
22          THE COURT:  Very, very good.
23          MR. NISENBAUM:  Thank you.  I'm technically
24  challenged.
25          THE WITNESS:  Approximately over here (indicating).
```

1    BY MR. NISENBAUM

2    Q.    Okay.  So the gold Cadillac was stopped way -- not way

3    down the street, but it was stopped -- it was actually stopped,

4    pursuant to the traffic stop, in front of that building; in

5    front of the building on the right where you've indicated,

6    correct?

7    A.    Correct.

8    Q.    Okay.

9            THE CLERK:  Wait.  Do you want me to print it?

10           MR. NISENBAUM:  I'm not moving.  Please print it; but

11    we should label it, though.

12           THE CLERK:  Right.  I'll hand it to you.

13           MR. NISENBAUM:  Okay.

14           THE CLERK:  (Indicating)

15    BY MR. NISENBAUM

16    Q.    All right.  Okay.  Where, in relation to the gold

17    vehicle -- to the gold Cadillac -- where was Mr.  -- where did

18    Mr. Robinson go?

19    A.    I don't recall Mr. Robinson ever leaving, so --

20    Q.    Okay.  Where was he?  You can put, I guess, M. R. 1.

21           MR. BOLEY:  He just testified he doesn't know where

22    he went.

23           MR. NISENBAUM:  No.  He said he didn't go anywhere.

24           THE COURT:  The last time you saw Mr. Robinson?  Is

25    that what you mean?

```
 1          MR. NISENBAUM:  Yes.

 2          THE COURT:  At that scene, where was he?

 3          THE WITNESS:  The last time that I saw Mr. Robinson,

 4   he was on the sidewalk.

 5   BY MR. NISENBAUM

 6   Q.   Where on the sidewalk?

 7   A.   I don't recall exactly where on the sidewalk, but he

 8   wasn't close to where we were dealing with Mr. Bradshaw or --

 9   Q.   Do you have a general sense of the location of the

10   sidewalk where he was?

11   A.   No.

12   Q.   Do you know if it was closer to 32nd or --

13   A.   I don't recall.

14   Q.   Okay.  Do you know if it was -- on -- which side of the

15   gold Cadillac he was on?

16   A.   Well, he was on the sidewalk, so it wouldn't have been in

17   the street.

18   Q.   Well, I'm asking:  was he on the other side of the -- of

19   the Cadillac, on the north -- well, on the side closer to

20   Brockhurst, or on the side closer to 32nd?

21   A.   You know, I don't recall.

22   Q.   So it could have been anywhere there?

23   A.   I just don't recall where he was placed.

24   Q.   How many other people were out?

25   A.   All I recall is Lucas, the passenger -- well, Kirby, and,
```

1    I guess, Robinson.  That's all I can recall at this time.

2    **Q.**    Do you know if there were other people out there?

3    **A.**    There may have been.  I don't recall.

4    **Q.**    Your police vehicle -- where was that parked in relation

5    to the gold Cadillac?

6    **A.**    It was parked directly behind the gold Cadillac,

7    approximately about five to six feet behind it.

8    **Q.**    Okay.  And where were the other vehicles parked?

9    **A.**    The other patrol cars -- once they arrived, I believe they

10   actually parked behind our vehicle.

11   **Q.**    Okay.  And now who -- when you made the stop, was it just

12   your vehicle that stopped Mr. Lucas and Bradshaw, or were there

13   other patrol vehicle present at that time?

14   **A.**    No.  It was just our vehicle.

15   **Q.**    Okay.  And you don't know when the other vehicles came, or

16   in what order they came, correct?

17   **A.**    Well, our units actually came -- I don't know -- probably

18   about ten seconds or so after we made that stop.

19   **Q.**    By the way, you used a cell phone?

20   **A.**    Yes.

21   **Q.**    And is that a private cell phone?

22   **A.**    No.

23   **Q.**    Is it issued by Oakland Police Department?

24   **A.**    Yes.

25   **Q.**    Okay.  And you used that cell phone to make communications

1  with other officers, correct?

2  **A.**    That is correct.

3  **Q.**    By the way, were there any black and white vehicles; black

4  and white patrol vehicles?

5  **A.**    No.

6  **Q.**    Okay.  It was all just black Task Force vehicles, correct?

7  **A.**    Correct.

8  **Q.**    Okay.  To your knowledge, the communications that you have

9  over the cell phones that are issued to you by OPD are not

10 monitored by anyone, correct?

11 **A.**    To my knowledge, correct.

12 **Q.**    And they're not recorded?

13 **A.**    To my knowledge, correct.

14 **Q.**    And even the fact of whether a call was made -- to your

15 knowledge, is that record kept anywhere?

16 **A.**    I'm sorry.  Can you repeat that question?

17 **Q.**    Even the fact of whether a call was made from your phone

18 to another phone -- is that kept -- is that record kept

19 anywhere?

20 **A.**    Well, it --

21          **MR. BOLEY:**  I'm just going to make a foundational

22 objection.  Lack of foundation.

23          **MR. NISENBAUM:**  If you know.

24          **THE COURT:**  You may testify if you know of your own

25 personal knowledge.

1              **THE WITNESS:**  My own personal knowledge?  Your Honor,

2     it had to be recorded at some point, because it's an active

3     cell phone.

4     **BY MR. NISENBAUM**

5     **Q.**    When you say it "had to be recorded," what do you mean?

6     **A.**    Any transactions that they had on that phone:  dialing

7     phone numbers, group talk.

8     **Q.**    I see.  Like a -- like a regular cell-phone bill, correct?

9     **A.**    Correct.

10    **Q.**    You would have the time of the call, the date of call, and

11    the duration of the call, and what number the call was made to;

12    where it came from?

13    **A.**    Correct, correct.

14    **Q.**    Okay.  You would have none of the content of the

15    discussions of the call, correct?

16    **A.**    I believe they can be ascertained, but I wouldn't have

17    access to it, correct.

18    **Q.**    How are those ascertained?

19    **A.**    I believe if you get a search warrant, there is a way to

20    actually depict what was said; or if it was text message,

21    things like that, or the content of the phone call, correct.

22    **Q.**    Text messaging is one thing, but I'm asking about the

23    actual conversations that occurred.

24    **A.**    Yeah.  I don't believe that that's recorded.

25    **Q.**    Okay.

```
1              THE COURT:  I'm sorry.  I didn't understand you.
2              THE WITNESS:  That you can't actually pull up a print
3  to see exactly what was said.
4              THE COURT:  Do you know if those conversations are
5  recorded?
6              THE WITNESS:  You know, your Honor, I don't know.
7  BY MR. NISENBAUM
8  Q.    Are these Nextel phones?
9  A.    Yes.
10 Q.    So they have that walkie-talkie function on them?
11 A.    Yes.
12 Q.    Okay.  And the walkie-talkie function isn't -- would --
13 communications made over the walkie-talkie function would not
14 show up on any type of phone bill, would they?
15             MR. BOLEY:  Objection.  Lack of foundation.
16             THE COURT:  If you know.
17             THE WITNESS:  I don't know, your Honor.
18 BY MR. NISENBAUM
19 Q.    Okay.  And again, communications on the walkie-talkie
20 function, as far as you know, there would be no record, like
21 there would be of a regular phone call, of time, date, and
22 duration of the communication, would there?
23             MR. BOLEY:  Lack of foundation.
24             THE COURT:  You may testify if you know of your own
25 personal knowledge.
```

```
 1              THE WITNESS:  From my own personal knowledge,

 2    your Honor, I don't know.

 3    BY MR. NISENBAUM

 4    Q.   Mr. Lucas indicated that he had clothes at a

 5    wash-and-fold, correct?

 6    A.   I don't know.  You would have to --

 7    Q.   When you were at the van?

 8    A.   I didn't interact with Mr. Lucas at the van.  You'd have

 9    to ask Officer Mayer.

10    Q.   When you got to the van, was Mr. Lucas inside the vehicle

11    or outside of the vehicle?

12    A.   He was inside the vehicle.

13    Q.   And who else was inside that vehicle?

14    A.   Inside the patrol vehicle?

15    Q.   Yes.

16    A.   Was myself, Bradshaw, and Mr. Lucas.

17    Q.   Okay.  And what about the parole agent, Nakamura?  Was he

18    there?

19    A.   Yes.

20    Q.   Did he ride with you to the van?

21    A.   I don't believe he did, but I'm -- I don't believe he rode

22    with us to the van.

23    Q.   Okay.  You had no discussion with Mr. Lucas when he was in

24    the back of your patrol vehicle at the van?

25    A.   No, not that I recall.
```

1   Q.   Okay.  Then you went to another address -- strike that.

2            Apart from the van, at some point you went back to --

3   you went to North County Jail to drop Mr. Bradshaw off,

4   correct?

5   A.   Correct.

6   Q.   Okay.  Before you went back to North County Jail, you

7   searched another residence, correct?

8   A.   Another residence was -- not necessarily searched, but we

9   did arrive at another residence, correct.

10  Q.   Okay.  And you stayed in the car again?

11  A.   Yes.

12  Q.   And was Mr. Lucas saying anything at this time about --

13  well, was he saying anything?

14  A.   I don't recall him saying anything about -- at that time.

15  Q.   Okay.  You don't know if he was talking?  You don't -- do

16  you -- can you say that he was not asking questions about why

17  he was being detained or arrested?

18           MR. BOLEY:  Objection.  Vague as to time.

19           THE COURT:  During this period of time.

20           MR. NISENBAUM:  Yes.

21           THE WITNESS:  I don't recall.  He may have been, but

22  I don't recall at this time.

23  BY MR. NISENBAUM

24  Q.   Okay.  Was he saying that he hasn't done anything wrong?

25  A.   I don't recall what he was saying at this time.

 1  Q.   Okay.  I want to go back to the scene.  Now, as I

 2  understand it, you say that no strip search occurred of

 3  Mr. Lucas at the scene, correct?

 4  A.   Absolutely.

 5  Q.   And you also said that no strip search occurred of

 6  Mr. Bradshaw at the scene, correct?

 7  A.   Absolutely.

 8  Q.   When did Officer Nakamura arrive at the scene --

 9  Agent Nakamura?

10  A.   I believe as we were approaching the van itself.

11  Q.   I'm not talking about the van.  I'm talking about back at

12  the scene on 32nd Street.

13  A.   I don't recall Agent Nakamura particularly at that scene.

14  He may have been there when we were there.  I just -- I don't

15  recall him being there.

16  Q.   Which other officers were at that scene?

17  A.   I believe Officer Martinez, and Officer Mack.

18  Q.   Okay.  With respect to Mr. Bradshaw, who handcuffed him?

19  A.   I handcuffed Mr. Bradshaw.

20  Q.   With respect to Mr. Bradshaw, apart from you, who was the

21  closest police officer to him when he was handcuffed?

22  A.   I was.

23  Q.   Apart from you.

24  A.   I don't recall who was next to me.  All I can tell you is

25  I handcuffed Mr. Bradshaw.

1  Q.   Okay.  Now, you said that it would be dangerous to allow a

2  person to pull their own pants down at your order, correct?

3  A.   Correct.

4  Q.   Okay.  At this point in time, you have no reason to

5  believe that -- apart from a warrant, you had no reason to

6  believe that Mr. Bradshaw had committed any crime, did you?

7  A.   Well, he was under arrest for the warrant.

8  Q.   I understand that he had a warrant, but what -- that was

9  for some crime that had allegedly been previously committed,

10  right?

11  A.   Well, he was under arrest, so he was handcuffed.

12  Q.   That's not my question.  My question is:  what crime did

13  you believe Mr. Bradshaw had committed, if any, that you

14  observed or had reason to believe he had committed, apart from

15  having a warrant?

16  A.   None.  He had a warrant.

17  Q.   Was he coöperative with you?

18  A.   Yes.

19  Q.   Did he appear to be armed in any way?

20  A.   No.

21  Q.   Okay.  He didn't -- he'd -- by the way, be it -- the

22  Cadillac was searched thoroughly, wasn't it?

23  A.   Eventually.  I believe so, yes.

24  Q.   Were you there when it was searched?

25  A.   Yes.

1   Q.   By who?

2   A.   I don't recall who actually searched that vehicle.

3   Q.   Were you involved in the search?

4   A.   No.

5   Q.   You knew when you handcuffed Mr. Bradshaw at that point in

6   time that this was not a dangerous situation, correct?

7            MR. BOLEY:  Objection.  Vague as to the term

8   "dangerous."

9            THE COURT:  Objection is overruled.  You may answer.

10           THE WITNESS:  I'm sorry.  Can you repeat the

11   question?

12   BY MR. NISENBAUM

13   Q.   At the time you handcuffed Mr. Bradshaw, you knew that

14   this was not a dangerous situation, correct?

15   A.   That is incorrect.  You never can tell whether a

16   situation's going to be dangerous or not.  So incorrect.

17   Q.   Okay.  Well, this was not a person who had fled from you

18   in any way, was it?

19   A.   He -- he did not get the opportunity to flee.

20   Q.   When you told him to step out of the car, he stepped out

21   of the car, correct?

22   A.   And he was immediately handcuffed.

23   Q.   Was he asking questions about why he was detained?

24   A.   No.

25   Q.   The vehicle -- when it was signaled to pull over, it

1  pulled over immediately, correct?

2  **A.**    Correct.

3  **Q.**    There was nothing suspicious about the vehicle stop, other

4  than, perhaps, a cracked taillight or something of that nature,

5  correct?

6  **A.**    At that time, correct.

7  **Q.**    You didn't notice any type of bulges or anything that

8  appeared to be a weapon on Mr. Bradshaw, did you?

9  **A.**    After I handcuffed and searched him, correct.

10  **Q.**    Even before that?

11  **A.**    I couldn't see him.  He was sitting in a vehicle.  He may

12  have had something.

13  **Q.**    Well, he got out of the vehicle at your order, right?

14  **A.**    As -- after he was -- the warrant was discovered, correct.

15  **Q.**    And you saw his hands, right?

16  **A.**    Correct.  After I handcuffed him.

17  **Q.**    You didn't see his hand hands before you handcuffed him?

18  **A.**    Well, as he stepped out, I could see his hands.  And he

19  was handcuffed immediately.

20  **Q.**    Okay.

21          **THE COURT:**  But it's your testimony that you were

22  aware of the warrant before you got him out of the car?

23          **THE WITNESS:**  Yes, your Honor.

24          **THE COURT:**  Okay.  Did you have an understanding of

25  what that warrant was for?

1          **THE WITNESS:**  At that time, your Honor, I just knew

2     it -- the dollar amount.  And it was a felony warrant.  I

3     didn't know exactly what the -- the Penal Code section was at

4     that time.

5          **THE COURT:**  How soon thereafter did you learn what it

6     was?

7          **THE WITNESS:**  Once I searched Mr. Bradshaw and I

8     placed him in the back seat of our vehicle, I actually went to

9     our computer screen and saw exactly what the Penal Code section

10    was.  It was for 470(d), your Honor; some type of check

11    forgery, or some forgery Penal Code violation.  Could be check;

12    could be credit card.  It depends on the subsection.

13    **BY MR. NISENBAUM**

14    **Q.**   But as of the time that you handcuffed Mr. Bradshaw, you

15    had no reason to believe that he had a history of violence,

16    correct?

17    **A.**   That's an assumption.

18    **Q.**   I'm just asking you the facts that you were aware of.  I

19    understand you made assumptions.

20    **A.**   I'm sorry.  I just don't understand the question.

21    **Q.**   Sure.  The facts that you were aware of with respect to

22    Mr. Bradshaw -- you had no reason to believe, based upon what

23    you knew of him, that he had a history of violence, correct?

24    **A.**   I didn't know him at all, so therefore, I had to assume

25    that he could be potentially violent.

1  Q.  Well, did you assume that -- that he had drugs on him?

2  A.  I don't -- after he was handcuffed pursuant to the

3  warrant, then there was a search conducted by myself, incident

4  to arrest.  That's when I looked in his pockets for any other

5  contraband that he may have.

6  Q.  Did you make an assumption that Mr. Bradshaw -- that you

7  thought Mr. Bradshaw probably had either drugs or a weapon on

8  him?

9          MR. BOLEY:  Objection.  Vague as to time.

10          THE COURT:  Objection sustained.

11  BY MR. NISENBAUM

12  Q.  At the point in time prior to handcuffing Mr. Bradshaw,

13  did you make an assumption that Mr. Bradshaw probably had drugs

14  or a gun or a weapon on his person?

15  A.  I don't make an assumption either way.  I just try to

16  maintain some type of officer safety that that could be, prior

17  to handcuffing.

18  Q.  Okay.  Now, by the way, you told -- strike that.

19          I know you just listened to your I.A. statement,

20  correct?  I think you testified that you listened to your I.A.

21  statement recently; within the past couple of days, correct?

22  A.  Correct.

23  Q.  Okay.  At the time of the I.A. statement, you didn't

24  recall anything about the search of Mr. Bradshaw, other than a

25  basic search that was conducted after finding out about the

1  warrant, correct?

2  **A.**    Correct.

3  **Q.**    And you didn't know who conducted that search of

4  Mr. Bradshaw at the time you gave the statement to I.A.,

5  correct?

6  **A.**    At that time, correct.

7  **Q.**    Now, have you talked to Officer Mayer about this trial?

8  **A.**    When we were -- I guess when he was the subject officer

9  before we set foot in the courtroom, correct.

10 **Q.**    Okay.  So he hasn't talked to you about any of the

11 testimony in this trial?

12 **A.**    No, he has not.

13 **Q.**    You've had lunch together?

14 **A.**    Yes.

15 **Q.**    And you've had occasion to talk with him during the course

16 of this trial, correct?

17 **A.**    Yes.

18 **Q.**    But he hasn't told you anything about the testimony,

19 correct?

20 **A.**    Absolutely not.

21 **Q.**    Now, I think you had testified in your direct examination

22 that the van that you went to -- Mr. Lucas' van -- was

23 abandoned?

24 **A.**    I believe it was abandoned, but it was a van.

25 **Q.**    What about it made it seem like it was abandoned?

1   **A.**   Well, upon my partner's return -- Officer Mayer -- he

2   advised me that it looked like it's abandoned.

3   **Q.**   "Abandoned" meaning it was -- it had been left there for a

4   long period of time?

5               **MR. BOLEY:**   Objection.  Calls for speculation.

6               **THE COURT:**   Objection is overruled.

7               **THE WITNESS:**   "Abandoned" in terms of nobody was

8   living inside that van.

9   **BY MR. NISENBAUM**

10  **Q.**   Not that the van was inoperable?

11  **A.**   I don't recall the operation of the van being discussed.

12  **Q.**   Not that the van was not in a drivable condition, correct?

13  **A.**   I don't recall that conversation being discussed about the

14  operation of the vehicle.

15              **THE COURT:**   Well, did somebody actually use the term

16  "abandoned"?

17              **THE WITNESS:**   Yes.  I believe I did, your Honor.

18              **THE COURT:**   You did?

19              **MR. NISENBAUM:**   Right.

20              **THE COURT:**   What does that mean?

21              **THE WITNESS:**   Well, in my opinion --

22              **THE COURT:**   For Vehicle Code purposes, what does

23  "abandoned" mean?

24              **THE WITNESS:**   It means inoperable; not able to

25  function on the roadway.

 1          THE COURT:  Mm-hm.  So did you have some reason to
 2   believe it was abandoned?
 3          THE WITNESS:  Your Honor, no.  The way I termed
 4   "abandoned" means that there was nobody living inside that
 5   vehicle.
 6          THE COURT:  Well, there are lots of cars parked on
 7   the street -- vehicles parked on the street, where nobody's
 8   living inside them.  Are those all abandoned?
 9          THE WITNESS:  No, your Honor.  It pertained to this
10   particular van that Lucas said he lived in; that it didn't
11   appear anybody was living in that van.  It was just abandoned.
12   That's just a term I had used.
13          THE COURT:  Okay.  So, in other words, it was sort of
14   a careless use of the term "abandoned"?
15          THE WITNESS:  Absolutely, your Honor.
16          THE COURT:  I see.
17          MR. NISENBAUM:  That clears that up for me, anyhow.
18   I had something else pictured.  So --
19   Q.   Now, at 32nd and Martin Luther King, some keys were found
20   on Mr. Lucas, correct?
21   A.   Correct.
22   Q.   And did you see the keys?
23   A.   Yes.
24   Q.   Okay.  And how many keys were on -- were there?
25   A.   I don't recall how many keys were there.

```
 1  Q.   Was it a few keys?  A lot of keys?

 2  A.   No.  I believe it was maybe either two keys, I believe, or

 3  one key.

 4  Q.   One or two keys?

 5  A.   Yeah.  I don't -- I don't recall, but it was not a

 6  significant amount of keys on there.

 7  Q.   Okay.  Now, I assume that there were keys to the Cadillac

 8  and the ignition.  Is that right?

 9  A.   Yes.

10  Q.   Okay.  And so you're talking about a different set of

11  keys?

12  A.   Yes.

13  Q.   So there were keys to the Cadillac and the ignition.  Were

14  those on a key chain or a key ring?

15  A.   I believe they were.

16  Q.   Okay.  And the keys that you saw -- the other set of keys

17  that you saw that were -- where were those found, to your

18  knowledge?

19  A.   On Mr. Lucas' person.

20  Q.   Okay.  And that's based on what Officer Mayer told you?

21  A.   Correct.

22  Q.   Okay.  And those were on a separate key ring?

23  A.   I believe so, yes.

24  Q.   Okay.  You don't recall how many keys, but I think I

25  understand your testimony.  One or two keys, right?
```

1  **A.**    Correct.

2  **Q.**    Okay.  Now, you testified today that part of the reason

3  those keys -- it might have been yesterday -- part of the

4  reason those keys seemed suspicious was because they were

5  brand-new, perfectly cut keys?

6  **A.**    A perfectly cut key.  Correct.

7  **Q.**    And they appeared brand new, correct?

8  **A.**    Correct.

9  **Q.**    When did you first recall that detail?

10 **A.**    As we were going to the jail, Officer Mayer showed me the

11 key that he had found.

12 **Q.**    Not my question.

13 **A.**    I'm sorry.

14 **Q.**    When did you first remember that?

15 **A.**    Actually, the time that I was about to give my I.A.

16 statement, I remembered that the key was distinctive, and was

17 brand new.

18 **Q.**    So you told that to I.A.?

19 **A.**    I wasn't allowed to.

20 **Q.**    You weren't allowed to tell them?  I'm sorry.  Why weren't

21 you -- how come you weren't allowed to tell them that?

22 **A.**    Well, as I was going into the reasoning that we went to

23 Richmond, I was told that that wasn't exactly what the

24 complaint was about.  So we didn't investigate further.  We

25 just got with the fact of -- that there was no illegal strip

1  search -- or no strip search conducted at the time of the

2  incident.

3  **Q.**   So the investigator just didn't want to -- he actually

4  prevented you from telling him this detail that -- that the

5  keys appeared brand new, and were perfectly cut?  Is that

6  right?

7  **A.**   He just said to address the part of the vehicle stop and

8  the incident in question.

9            **MR. NISENBAUM:**  One moment, your Honor.

10           (Discussion off the record)

11           **MR. NISENBAUM:**  One moment.

12           **MR. BURRIS:**  Your Honor, this is a good time for a

13  break.

14           **THE COURT:**  You can do that.  What time did you

15  envision -- I see Ms. West is not here.  Does that mean that --

16           **MR. BOLEY:**  That's right, your Honor.  She's got back

17  to --

18           **THE COURT:**  She's gone.  So we don't have to break at

19  an earlier hour, then.  Is that correct?  Well, then.  Fine.

20  Let's take ten minutes.

21           **MR. BURRIS:**  Sure.

22           **THE COURT:**  I was trying to squeeze as much time out

23  of this as we can, but that's fine.

24           **MR. BURRIS:**  We don't have to rush out.

25           **THE COURT:**  You may step down.  Do not discuss your

 1   testimony with any other witness or persons who may be

 2   witnesses until the trial is over.

 3              THE WITNESS:  Okay, your Honor.

 4              THE COURT:  Thank you.

 5              (Recess taken from 11:20 a.m. until 11:37 a.m.)

 6              THE CLERK:  Court is in session.  You may remain

 7   seated.

 8              THE COURT:  You may continue.

 9              MR. NISENBAUM:  Thank you, your Honor.

10   Q.   Going back to finding out about Kirby Bradshaw's warrant,

11   what reason did you have to run Kirby Bradshaw's name?

12   A.   As a practice, if we make a stop on a vehicle, we'll ask

13   the individuals for their names inside the vehicle.  And then,

14   you know, once they give us their names, then we'll just

15   conduct a warrant search to see if somebody has an actually

16   outstanding warrant.

17   Q.   And you do that with every vehicle that you stop?

18   A.   Yes.

19   Q.   Okay.  You don't just do that with vehicle you stop where

20   they're black men in the vehicle down on Martin Luther King

21   around the area of 34th or 32nd Street, right?

22              MR. BOLEY:  Objection.  Argumentative.

23              THE COURT:  Objection is overruled.

24              You may answer.

25              THE WITNESS:  Absolutely not.

**BY MR. NISENBAUM**

**Q.**   Okay.  If I were driving up in Rockridge, and you pulled
me over for, say, a cracked taillight, and I had a passenger,
is that someone that you would -- you would get their
identification from, even though they weren't driving, and run
their name?

**A.**   Absolutely.  I would ask, because they may have a murder
warrant.

**Q.**   Now, by the way, did Marty Robinson provide you with an
actual I.D.?

**A.**   I don't recall if it was an actual I.D., but he did
provide his name, which was confirmed through our warrant
check.

**Q.**   So he just gave his name orally?

**A.**   Yes.  Yes, to my recollection.

**Q.**   Okay.  Now, when you went to -- when you went back to
North County to drop Mr. Bradshaw off, I understand it took
some paperwork in order to process him in, correct?

**A.**   Yes.  When we went to North County, that is correct.

**Q.**   Okay.  And at that point in time, there was nothing
incriminating found with regard to Mr. Lucas, correct?

**A.**   At that time, no.

**Q.**   Okay.  And at that time, you hadn't contacted any type of
wash-and-fold, or even tried to find out what wash-and-fold his
clothes were at, had you?

 1  **A.**   I don't understand -- I didn't have a conversation about a

 2  wash-and-fold, so I --

 3  **Q.**   Well, how about laundry?

 4  **A.**   No.  Not to my recollection, no.

 5  **Q.**   Okay.  By the way, at that point in time, Mr. Bradshaw

 6  hadn't said anything about -- not Mr. Bradshaw -- Mr. Lucas

 7  hadn't said anything about a pellet gun, or anyplace in

 8  Richmond, or his wife, correct?

 9  **A.**   That is correct.  *En route* to the jail, no, he did not.

10  **Q.**   When he said he lived in his van, he didn't explain to you

11  why he was living in his van.  Is that right?

12  **A.**   To me, no.  I didn't have any conversation with Mr. Lucas.

13  **Q.**   Well, how about this?  You were present in the car.  You

14  didn't ever hear him say why he was living in the van, correct?

15  **A.**   I did not.

16  **Q.**   You didn't hear him say why he was staying in motels?

17  **A.**   I did not.

18  **Q.**   Okay.  And did you search his wallet?  I assume you didn't

19  search Mr. Lucas' wallet, correct?

20  **A.**   Correct.

21  **Q.**   Okay.  Do you know if his wallet was searched?

22  **A.**   I don't know.  I didn't search Mr. Lucas yet.  You'd have

23  to ask Officer Mayer.

24  **Q.**   Okay.  And it's not documented anywhere, to your

25  knowledge, as to whether or not his wallet was searched, is it?

1  **A.**   Correct.

2  **Q.**   Okay.  So as we sit here today, you cannot say whether or

3  not there were receipts for a wash-and-fold for his laundry in

4  his wallet, correct?

5  **A.**   Correct.  I cannot.

6  **Q.**   You also can't say whether or not there were receipts for

7  motels in his wallet, correct?

8  **A.**   I cannot.  Correct.

9  **Q.**   The decision to go to Richmond was made -- was a team

10 decision made by Nakamura, Mayer, and yourself, correct?

11 **A.**   Correct.

12 **Q.**   When -- in the drive to Richmond, as I understand it, you

13 never went to 3800 MacDonald, right?

14 **A.**   That is correct.

15 **Q.**   Okay.  And you don't recall overhearing any communication

16 with respect to 3800 MacDonald from -- from Officer Mayer with

17 respect to not going there, do you?

18 **A.**   I don't recall that.  Correct.

19 **Q.**   Okay.  And you don't recall Officer Mayer making any

20 statement with respect to "F" -- meaning a curse word -- "F"

21 the Richmond police.  Do you?

22 **A.**   He did not make any statement of the kind.

23 **Q.**   Okay.  And he did not attempt to contact the Richmond

24 police, either, correct?

25 **A.**   Well, I don't recall who contacted the Richmond police.

1   **Q.**   Did someone contact the Richmond police?

2   **A.**   No.  I don't recall if we did or if we didn't.

3   **Q.**   Okay.  That's -- okay.  And, as you drove to Richmond,

4   wasn't Mr. Lucas protesting his -- the -- the drive to

5   Richmond?

6   **A.**   Not that I recall.

7   **Q.**   Wasn't he objecting to going to Richmond?

8   **A.**   Not that I recall.

9   **Q.**   Didn't he ask, "Why are we going to Richmond"?

10  **A.**   Not that I recall.

11  **Q.**   Didn't he say, "What have I done"?

12  **A.**   Yes.  He did ask what did he do.

13  **Q.**   And how many times did he ask that?

14  **A.**   You know, I don't recall how many times; but that was

15  raised.

16  **Q.**   But at that point in time, the only thing he had done is

17  commit some violation; perhaps having a cracked taillight?

18  Correct?

19          **THE COURT:**  Is that a question?

20          **MR. NISENBAUM:**  I'll withdraw the question.

21  **Q.**   And when you got to Richmond, at that point in time

22  when -- by the time you arrived at the 41st Street address that

23  you had been provided, had Mr. Lucas said anything about either

24  living at that address, or there being a pellet gun at that

25  address?

1  **A.**    Yes.  Upon our arrival, yes.

2  **Q.**    Okay.  And who was in the vehicle?

3  **A.**    I was.

4  **Q.**    By yourself?

5  **A.**    Yes.

6  **Q.**    Okay.  So I take it -- I was a little unclear on the

7  question; but you arrived.  And Officer -- Agent Nakamura and

8  Officer Mayer exited the vehicle, leaving you and Mr. Lucas in

9  the vehicle, correct?

10 **A.**    They -- yes.  They were standing right by the vehicle,

11 waiting for additional units to arrive to our location.

12 Correct.

13 **Q.**    Okay.  And once -- so -- so he made that statement.  Were

14 the windows up or down in the vehicle?

15 **A.**    You know, I don't recall that they were up or down.

16 **Q.**    Okay.  When he made that statement, who did you tell that

17 he had made the statement?

18 **A.**    Agent Nakamura.

19 **Q.**    You told Agent Nakamura that?

20 **A.**    Yes.

21 **Q.**    What did you tell him?

22 **A.**    Basically, that Lucas said, "Listen.  I don't really live

23 at that address.  I kind of stay there from time to time.

24 There's nothing in there.  You know, go ahead and search.

25 There's nobody there," and that there was just a pellet gun

1  that was in the house.  And that was all I told him.

2  **Q.**  So you relayed what -- what Mr. Lucas had said to you?

3  **A.**  Correct.

4  **Q.**  To Agent Nakamura, correct?

5  **A.**  Correct.

6  **Q.**  And -- and Officer Mayer was standing nearby, correct?

7  **A.**  I don't know exactly in what proximity he was by

8  Agent Nakamura, but he wasn't too far.  I don't know.  He may

9  have been briefing additional units as to what we were there

10  for in the first place.

11  **Q.**  I assume you didn't tell Internal Affairs about this

12  conversation or this statement by Mr. Lucas, did you?

13  **A.**  No, I did not.  We just stayed on the fact that there was

14  no illegal strip search conducted.

15  **Q.**  Okay.  Once -- or did you have any further discussion with

16  Agent Nakamura or Officer Mayer about that statement by

17  Mr. Lucas?

18  **A.**  No, other than telling Agent Nakamura at that time that,

19  hey, he said he lived there.  There's nobody there.  And that's

20  for officer safety, because I asked, Is there anybody in the

21  house?

22        He said, "No."

23        He was very coöperative.  He also offered the

24  information that there was nothing in that house that was

25  illegal.  It's just a pellet gun.

```
 1              Now, me -- I didn't know how many rooms.  It could
 2   have been in the kids' room, for all I knew.  I didn't know how
 3   many rooms there were.  I didn't ask.
 4   Q.   Okay, did -- so he said he stayed there from time to time.
 5   What did you take that to mean?
 6   A.   Well, I took that to mean that basically he did stay
 7   there, from -- on occasions.  However, he did not necessarily
 8   want to make that his permanent residence of record, for
 9   whatever reasons.
10   Q.   Essentially, he indicated that he visited from time to
11   time?
12   A.   Well, he -- all his clothes were there; that actually, he
13   lived there, but he did not live there.  It wasn't -- it wasn't
14   an official listed address.  That's what I took it --
15   Q.   Did he tell you his clothes were there?
16   A.   No.  I found that out later.
17   Q.   Okay.  By the way, was there any photographs taken of his
18   clothes?
19   A.   You know, I don't -- I don't recall if there were or not.
20   I wasn't there, so I don't know what was photographs were
21   taken.
22   Q.   I assume you have a camera in your vehicle when you
23   patrol, correct?
24   A.   No, we don't.
25   Q.   Do you have a camera on your cell phone?
```

1   **A.**   No, not on that phone.  No.

2   **Q.**   The phone that you had at the time that OPD had issued

3   you -- did that have a camera?

4   **A.**   No, it did not.

5   **Q.**   Okay.  When Officer -- so -- so who searched the Richmond

6   residence?

7   **A.**   Officer Mayer, Agent Nakamura, and -- I believe it was

8   Officer Mack and Officer Dave Martinez that actually arrived

9   and helped.

10  **Q.**   Okay.  So Mack and Martinez also went to the Richmond

11  address?

12  **A.**   I believe so.

13  **Q.**   That was in a separate vehicle?

14  **A.**   Yes.

15  **Q.**   And you have a clear recollection of seeing them there,

16  correct?

17  **A.**   I believe they were there.  That were part of the team.

18  So --

19  **Q.**   Were they present when Mr. Bradshaw -- strike that -- when

20  Mr. Lucas made the statement about -- about the pellet gun that

21  relayed?

22  **A.**   No.

23  **Q.**   Okay.  They arrived after that?

24  **A.**   Yes.

25  **Q.**   You never documented that statement made by Mr. Lucas

1  anywhere, did you?

2  **A.**    No, I did not.

3  **Q.**    Okay.  And, to your knowledge, neither did Officer Mayer,

4  correct?

5  **A.**    Correct, to my knowledge.

6  **Q.**    And to your knowledge, neither did Agent Nakamura,

7  correct?

8  **A.**    To my knowledge, correct.

9  **Q.**    Now, in -- in arresting a parolee for a violation of

10  having access to a pellet gun, it would be important to

11  document an admission such as the one Mr. Lucas made, correct?

12  **A.**    Not necessarily.  If the pellet gun is recovered and the

13  Probation determined that he had access to it, then the parole

14  agent can go along with the fact that the pellet gun was in his

15  access and control.  So he documented that his pellet gun was

16  found in his domain and control.

17  **Q.**    So it would not be important to document, essentially, an

18  admission of violation of parole by a parolee?  Is that

19  correct?

20  **A.**    Well, you've got to take it into context.  I don't know

21  exactly where that pellet gun was.  He never said that it was

22  in his room; in the kids' room; so that it was just a pellet

23  gun in the house.  So I just advised Agent Nakamura that there

24  was a pellet gun in the house.  There may not have been a

25  pellet gun in the house.

1   Q.   Ultimately, a pellet gun was recovered, correct?

2   A.   Correct.

3   Q.   And with respect to violating, you've apprehended how many

4   parolees in your career?

5   A.   Probably thousands.

6   Q.   And with respect to -- and you've been involved in

7   revocation proceedings of many of the parolees whom you've

8   apprehended, correct?

9   A.   Correct.

10   Q.   And at those proceedings, oftentimes you're cross-examined

11   by attorneys, correct?

12   A.   Correct.

13   Q.   Attorneys who represent the person, right?

14   A.   Correct.

15   Q.   Did mr. Lucas say exactly where the pellet gun was?

16   A.   No.

17   Q.   But he just said it was in the house somewhere?

18   A.   He just said it was a pellet gun in the house.

19   Q.   Did he say how long he was living -- how long he was

20   staying at the residence?

21   A.   No.  He didn't offer that information.

22   Q.   Did you ever hear Mr. Lucas say that it was his pellet

23   gun?

24   A.   No.

25   Q.   Okay.  And, by the way, Mr. Lucas was -- during the whole

1   time you were at the residence, Mr. Lucas was in the back of

2   your patrol car, correct?

3   **A.**   Yes.

4   **Q.**   And you were in the front?

5   **A.**   Yes.

6   **Q.**   Any conversation that Officer Mayer had with Mr. Lucas at

7   the residence would have been in your presence, correct, at the

8   Richmond address?  Would have been in your presence, correct?

9   **A.**   Yes.  Upon us leaving, correct.

10  **Q.**   Okay.  And you would have been in a position to hear those

11  conversations?

12  **A.**   Yes.

13  **Q.**   Did you hear any conversations between them?

14  **A.**   Yes.

15  **Q.**   What did you hear?

16  **A.**   Well, as we were leaving, and Lucas, I believe, asked what

17  he was being violated for, and the answer was given by

18  Officer Mayer.  I don't really recall exactly the whole extent

19  of the conversation, but basically Lucas was asking why was he

20  being violated.

21  **Q.**   And that's the only -- the only conversation between Lucas

22  and -- and Officer Mayer that you recall hearing?

23  **A.**   That I recall, correct.

24  **Q.**   Okay.

25          **THE COURT:**  Well, earlier, when he was talking about

1  whether he was staying there or not, what were the exact words

2  he used?

3            THE WITNESS:  Your Honor, he just said he stayed

4  there from time to time.

5            THE COURT:  He stayed there from time to time?

6            THE WITNESS:  That I can recall, yes, your Honor.

7            THE COURT:  He didn't use the term "live there from

8  time to time"?

9            THE WITNESS:  Your Honor, I don't recall him using

10 that particular verbiage.

11 **BY MR. NISENBAUM**

12 **Q.**   Did Mr. Lucas ever say that he was being kidnapped?

13 **A.**   Absolutely not.

14 **Q.**   He never used the term "kidnapping" while he was in the

15 back of your patrol vehicle?

16 **A.**   Absolutely not.

17 **Q.**   While you were -- while he was in the back of the vehicle

18 and you were at the Richmond address, was Mr. -- did Mr. --

19 did you tell Mr. Lucas that if nothing was found in the

20 residence, that he would be released?

21 **A.**   I may have said that.  Correct.

22 **Q.**   Okay.  That would have been after he had told you that

23 there was a pellet gun in the residence, correct?

24 **A.**   That's correct.

25 **Q.**   You indicated that Officer Nakamura had indicia in

1    Mr. Lucas' name, correct?

2    **A.**    Correct.

3    **Q.**    What was that indicia?

4    **A.**    I don't recall the exact -- what Agent Nakamura collected

5    or -- or found inside the residence.

6    **Q.**    With respect to using the bathroom, Mr. Lucas never made a

7    request to use the bathroom?

8    **A.**    He did not.

9    **Q.**    Okay.  He didn't appear to be intoxicated, did he?

10   **A.**    Not to my knowledge.  He didn't appear to be.

11   **Q.**    Okay.  He appeared to be able to control his bodily

12   functions?

13   **A.**    Yes.  He didn't urinate inside the vehicle, so I would say

14   yes.

15   **Q.**    And I assume you've arrested people who have been drunk in

16   public before, correct?

17   **A.**    Yes.

18   **Q.**    And oftentimes they are unable to control their bodily

19   functions, correct?

20   **A.**    And they are also able to control their bodily functions.

21   **Q.**    Right.  Sometimes they do.  Sometimes they don't.

22   **A.**    Correct.

23   **Q.**    Mr. Lucas appeared to be fully capable of controlling his

24   bodily functions, correct?

25   **A.**    Yes.  In my opinion, yes.

1   Q.   Right.  And you never had any doubt about that from the

2   time you initially -- he was initially arrested, or -- strike

3   that -- from the time he was initially detained, up through

4   going to the the Richmond address and returning to -- to

5   Glenn Dyer Jail, correct?

6   A.   Yeah.  He never indicated any problem, correct.

7   Q.   And it was Glenn Glenn Dyer Jail he was taken to; not

8   North County?

9   A.   Well, North County is Glenn Dyer.  Glenn Dyer jail.

10  Correct.

11          MR. NISENBAUM:  Okay.  Okay.  I got you.

12          If I could have one moment, your Honor.

13          THE COURT:  Yes.

14  BY MR. NISENBAUM

15  Q.   Oh.  Did you ever tell Mr. Lucas that it was up to

16  Officer Mayer as to whether or not he would be released?

17  A.   Absolutely not.  It's up to the parole agent.  The parole

18  agent's the only person that can place a parole hold on a

19  parolee.

20  Q.   You don't recall hearing any conversation with respect to

21  Officer Mayer that -- as to whether or not you could enter the

22  Richmond address without the Richmond Police Department

23  present.  Is that right?

24  A.   I don't recall that conversation ever taking place.  No.

25  Q.   And if I understand correctly, Officer Mayer did not tell

1    you -- well, strike that.

2          Did -- did Officer Mayer tell you that you need to

3    take Mr. -- Mr. Bradshaw's pants down?

4    **A.**    Absolutely not.

5    **Q.**    Was it unusual for you to go to a neighboring city with a

6    parolee?

7    **A.**    No, not unusual.

8    **Q.**    Okay.  Is Richmond pretty far for you to go with a

9    parolee?

10   **A.**    No.

11   **Q.**    And, by the way, I assume you never asked Mr. Lucas where

12   the pellet gun was in his house?

13   **A.**    I never did.

14   **Q.**    And neither did any other officer, correct?

15   **A.**    Correct.

16          **MR. NISENBAUM:**  Okay.  Thank you.

17          **THE COURT:**  Mr. Boley.  Redirect examination.

18                    **REDIRECT EXAMINATION**

19   **BY MR. BOLEY**

20   **Q.**    I want to go quickly to Exhibit 16, and the last page.  Do

21   you have it?

22   **A.**    No.

23   **Q.**    Okay.  Let me.  (Indicating).  Oh.  Is that the wrong one?

24   **A.**    Well, no, no, no.  This was the loose paper that -- put it

25   back in.

1  Q.   Oh, okay.  Right.  All right.  So you have the last page

2  of Exhibit 16 in front of you?

3  A.   Yes.

4  Q.   Okay.  And that is a blank Stop Data Collection Form?

5  A.   Yes, it is.

6  Q.   Okay.  And down under the Section 4, do you see a place

7  where the officer filling out this form can indicate whether

8  there are other passengers?

9  A.   Yes.

10  Q.   And do you see a place on the form where the officer can

11  indicate whether the -- whether the race of the occupants were

12  the same as the driver?

13  A.   Yes.

14  Q.   And is it your understanding that one such form is filled

15  out for every stop?

16  A.   Correct.

17  Q.   And it's not necessary to fill out a form for every

18  passenger in the vehicle.  Is that right?

19  A.   That is correct.

20  Q.   All right.  I'm going to have to switch books with you.

21          Can you go to Exhibit 1, page 7923?  All right.  Now,

22  this is a computer purge document.  Is that right?

23  A.   Yes.

24  Q.   Okay.  And you testified you're not an expert on this.

25  Isn't that right?

1   **A.**   Absolutely.

2   **Q.**   Okay, but you have some understanding of -- of -- of the

3   information that's set forth?

4   **A.**   Yes, some basic understanding.

5   **Q.**   Okay.  Now, going down to -- looks like about the fifth or

6   sixth line down, that time, 8:25 -- that's an entry.  Report

7   number added.  And then it's followed by a number.  Do you see

8   that?

9   **A.**   That is correct.

10  **Q.**   Okay.  Now, when you request a report number, do you

11  request that from -- from dispatch?

12  **A.**   Yes.

13  **Q.**   And the -- the personnel at dispatch are the ones who are

14  entering this information that we're seeing on this purge.  Is

15  that right?

16  **A.**   That is correct.

17  **Q.**   Okay.  Now, the time next to that entry -- do you

18  understand that to be the time that you made the request?

19  **A.**   No, it's not.

20  **Q.**   Okay.  What time is that?

21  **A.**   That is the time that we put ourselves on the initial

22  vehicle stop.

23  **Q.**   And do you understand what the term "incident" means, in

24  the context of this system?

25  **A.**   Yes.

1  **Q.**   What does it -- what is the incident?

2  **A.**   The incident is the actual reason for whatever action

3  you're taking; whether it is a vehicle stop or a pedestrian

4  stop.

5  **Q.**   Now, if you initiate an incident, is there always going to

6  be a report number created?

7  **A.**   Yes.

8  **Q.**   And, to your understanding -- okay.  Step back.

9        Is it possible that you would request a report number

10  for a given incident after the incident begins?

11  **A.**   That is correct.

12  **Q.**   And what is your understanding about the time that appears

13  in the CAD records as the time the report number is requested

14  for a particular incident?

15  **A.**   My understanding is -- is that once we put ourselves out

16  on that incident, then that is the time that they would

17  generate an incident along with the report number.

18  **Q.**   Now, generally -- okay.  Let's -- let's talk about the

19  process that you go through in determining whether or not a

20  person has outstanding warrants.  How -- what's the process you

21  go through in order to determine whether or not a person has an

22  outstanding warrant?

23  **A.**   Okay.  Upon making contact with that person, and you

24  develop information that that person has an outstanding

25  warrant, I would go get that information from my vehicle

1   laptop.  It will show that person with a felony warrant or a

2   misdemeanor warrant or some type of warrant for an arrest.

3           Upon finding that, then I will go ahead and handcuff

4   that person, search him, under arrest, place him in the back

5   seat of vehicle; then call our service section to actually

6   confirm that that warrant that I'm seeing on my screen and my

7   laptop is actually still good.

8   Q.   All right.  Let's take the first step.

9           How much -- how long does it typically take to

10  determine initially on your computer screen in your car whether

11  or not a person has an outstanding warrant?

12  A.   Approximately I'd say two -- two to four minutes.  It's

13  pretty fast.

14  Q.   But in order to take somebody into custody, you have to

15  confirm that warrant is -- is still good.  Is that right?

16  A.   That is correct.

17  Q.   And how do you go about doing that?

18  A.   I call our service dispatch, either by cell phone or by

19  our car radio; usually our car radio.  She -- I'll ask her to

20  run a warrant check.  She would come up with the same warrant

21  that I see on my computer screen.  Then she would call

22  either -- if it's Alameda County, she'd call our records

23  division, who would actually run a corpus check to make sure

24  that that warrant is still active to this particular person.

25  Q.   Is there a typical amount of time that that process

1    takes -- the process of confirming that a warrant is still

2    valid?

3    **A.**    Yes.  If it's an out-of-county warrant, like

4    San Francisco County, it may take -- I've seen it take anywhere

5    from 45 minutes, being that we have to actually get a hold of

6    their records department.  Our records will get a hold of their

7    records, so that they can confirm that it still exists in their

8    system.  Then they call us back.  So it depends.  If it's an

9    Alameda warrant, it usually only takes about three -- three to

10   five minutes.

11   **Q.**    Now, if you use the car radio to request confirmation of a

12   warrant, are you using the main police channel?

13   **A.**    No, I'm not.

14   **Q.**    Okay.  What channel are you using?

15   **A.**    We use our service channel.

16   **Q.**    Now, are calls on the service channel reflected in the

17   CAD?

18   **A.**    No, they're not.

19   **Q.**    When you were interviewed by Internal Affairs, were you

20   asked any questions about the condition of Mr. Lucas' key?

21   **A.**    No, I was not.

22   **Q.**    Were you asked any questions about any statements that he

23   made to you in Richmond?

24   **A.**    No, I was not.

25   **Q.**    Because your understanding -- that was not an issue in the

1  Internal Affairs investigation.  Is that right?

2  **A.**    Correct.  The only issue that was discussed was:  was

3  there an illegal search [sic] conducted -- I'm sorry -- strip

4  search conducted?

5  **Q.**    When you call in the mileage to -- to dispatch, do you

6  round off the mileage, or do you get the tenths of the mileage?

7  **A.**    We usually give the tenths of the mileage.

8  **Q.**    So you read off the miles, including the tenths of a mile?

9  **A.**    Yes.

10          **MR. BOLEY:**  Do we have the exhibits he marked?

11          **THE COURT:**  The photographs?

12          **MR. BOLEY:**  Yes.

13          **THE CLERK:**  (Indicating)

14  **BY MR. BOLEY**

15  **Q.**    Okay.  Showing you 3-10A --

16          And do you have Exhibit 3-4 in front of you?

17  **A.**    I'm sorry.  3?

18  **Q.**    3-4.  That may have been marked in evidence, and it may

19  not be.  It should be -- look for Tab 3.

20          **THE COURT:**  Is that it?

21          **THE CLERK:**  It's not in.

22          **THE COURT:**  It's not in?

23          **THE WITNESS:**  3.  Yes.  3-4.

24  **BY MR. BOLEY**

25  **Q.**    Okay.

1    **A.**    Yes.

2    **Q.**    Okay.  Now, 3-4 is an aerial picture of the area,

3    including 34th and Martin Luther King.  Is that right?

4    **A.**    Yes.

5    **Q.**    And, looking at the exhibit that you marked, which is

6    Exhibit 3-10A, are you able to locate the house that is on the

7    corner; what's been described as the blue house on the corner

8    of 34th and Martin Luther King?

9    **A.**    No, I'm not.

10             **THE COURT:**    On 3-4?

11             **MR. BURRIS:**    3-10.

12             **MR. BOLEY:**    No.  I'm asking him -- all right.  Let's

13   go back.  And if you're not able to do it, that's fine.

14   **Q.**    Looking at Exhibit 3-10 that's in your -- in your right

15   hand, and looking at the house in 3-10 that's on the left-hand

16   side, can you locate that house on Exhibit 3-4?

17   **A.**    I'm sorry.  I just -- I can't.

18   **Q.**    Okay.

19             **MR. NISENBAUM:**    On the overhead.

20   **BY MR. BOLEY**

21   **Q.**    I mean, looking at it from an overhead -- from an overhead

22   perspective, can you see the same house that's in 3-10A, and

23   locate it from an overhead view on 3-4?

24   **A.**    Yes.

25   **Q.**    Okay.  Now, can you see the house that you placed the

1  Cadillac in front of on 3-10A, on Exhibit 3-4?

2  **A.**   Yes, approximately.

3  **Q.**   Okay.  Now, the house that you put the Cadillac in front

4  of -- does that appear to be at the corner of Brockhurst and

5  Martin Luther King?

6          **MR. NISENBAUM:**  Objection.  Leading.

7          **THE COURT:**  Objection overruled.

8          You may answer.

9          **THE WITNESS:**  Yes.

10 **BY MR. BOLEY**

11 **Q.**   Okay.  Now, thinking back to the stop, the Cadillac was --

12 you -- thinking back to the stop, you parked your vehicle

13 behind the Cadillac.  Is that right?

14 **A.**   Yes.

15 **Q.**   And behind your car was another police vehicle.  Is that

16 right?

17 **A.**   Correct.

18 **Q.**   Okay.  Looking at Exhibit 3-10, does it appear to you that

19 there is room on that block for three vehicles, if the lead

20 vehicle was parked in front in the location you've marked on

21 Exhibit 3-10?

22 **A.**   No, it does not.

23 **Q.**   Looking at it --

24          **THE COURT:**  Can we have up on the screen what he's

25 marked as 3-10?

```
 1              MR. BOLEY:  Okay.  Okay.  This is Exhibit 3-10.  Is

 2   that right?

 3              THE COURT:  Okay.

 4   BY MR. BOLEY

 5   Q.   And you see where you have located the Cadillac?

 6   A.   Yes.

 7   Q.   All right.  Having looked at -- at Exhibit 3-10 and

 8   Exhibit 3-4, do you think that you -- do you know whether or

 9   not you've located the location of the Cadillac correctly in

10   Exhibit 3-10?

11              MR. NISENBAUM:  Objection.  Leading.

12              THE COURT:  Can you have him locate the Cadillac on

13   3-4?

14              MR. BOLEY:  Oh, okay.  We can do it that way.  I

15   don't understand the Elmo, if I can just have him do it.

16              MR. BURRIS:  All you've got to do it put it up there.

17              THE COURT:  Yeah.  Just put it up there, upside down.

18              MR. BURRIS:  Do you have 3-4?

19              MR. BOLEY:  Let me use yours, because I want him to

20   have --

21              MR. BURRIS:  Turn it around so he can see.  There you

22   go.

23   BY MR. BOLEY

24   Q.   Can you see it on the screen?

25   A.   Yes.
```

1  Q.   All right.  Could you place -- would you be able to place

2  the location of the Cadillac where it stopped -- well, first

3  off, are you able, from looking at Exhibit 3-4, to orient

4  yourself in terms of where the stop was?

5  A.   Yes.

6  Q.   Okay.  And could you locate or place the location of the

7  place where the Cadillac came to -- came to rest after the

8  stop?

9  A.   Yes.  If I can do this without messing it up again.

10 Approximately in this vicinity over here (indicating).

11 Q.   Okay.

12 A.   It's closer to this gray zone here, and right here by this

13 tree.  See, I messed that up.

14 Q.   All right.  Can you mark a box, just so when we print this

15 out, it will come out clearly?

16 A.   And I apologize.  This is my first time ever doing it.

17 Q.   Well, you've done it more times than I have.  So that

18 circle you've drawn -- is that the location of the Cadillac

19 where it stopped after you pulled it over?

20 A.   Yes.  Yes.

21 Q.   Okay.  Can we print that out?

22         MR. NISENBAUM:  What's the title of this one?  3-4?

23         THE COURT:  3-4.

24         MR. BOLEY:  Is there another 3-4?

25         THE CLERK:  This would be the first one.

1      MR. BOLEY:  Okay.  Can we mark this as -- this is

2  3-4?

3          THE CLERK:  Mm-hm

4      (Defendant's Exhibit3-4 marked for identification)

5  BY MR. BOLEY

6  Q.   Showing you what's been marked as 3-4 (indicating), is the

7  mark on the map -- the red mark -- is that the location where

8  the Cadillac came to rest?

9  A.   To my best -- to my recollection, yes.

10 Q.   Okay.  Okay.  Do we have another copy of 3-10?  Do you

11 have a copy?

12         MR. NISENBAUM:  It's in the book.  Should be.

13         MR. BOLEY:  Should be?  Okay.

14         MR. BOLEY:  Is there a 3-10?

15         MR. NISENBAUM:  The Court has the 3-10.

16         MR. BURRIS:  Gave us that one back.

17         MR. BOLEY:  Here (indicating).

18 Q.   Going back to 3-5, what is the larger building which

19 appeared to be then on the corner of M.L.K. and Brockhurst?

20 A.   I mean, it appears to be a house.  I'm sorry, ma'am.

21 Your Honor, you said on Brockhurst?

22         THE COURT:  Well, yes.  Looking at 3-5, see, there's

23 a larger building?

24         THE WITNESS:  Yes, your Honor.

25         THE COURT:  Actually, the same -- it's not that much

 1  larger, but somewhat larger building on the corner there of

 2  Brockhurst.  What does that appear to be?

 3          THE WITNESS:  It just it appears to be, like, an

 4  apartment complex.

 5          THE COURT:  And then, looking at 3-10, is that

 6  building the same building that we see next to this bluish

 7  house; to the right of the bluish house in the photo?

 8          THE WITNESS:  I don't have 3-10.

 9          THE COURT:  You don't have 3-10?

10          THE WITNESS:  I don't have 3-10, your Honor.

11          MR. HADDAD:  I'll show it to the witness.  3-10A

12  (indicating).

13          THE WITNESS:  Yes, your Honor.  It appears to be the

14  same, or like color and structure.

15          THE COURT:  Okay.  So much for Googlemaps.

16          THE WITNESS:  It's hard for me.  I mean, it's hard.

17  BY MR. BOLEY

18  Q.   And just for the record, I want to make certain that we're

19  talking about the same structure.  The structure that you --

20  that you thought may have been an apartment complex that -- do

21  you see some text just off of the -- that there's a kind of a

22  red box with some text next to it?

23  A.   Yes.

24  Q.   Rising Star Missionary Baptist?

25  A.   I'm -- on which?

1    Q.   On 3 -- I'm talking about 3-15.

2            THE COURT:   3-5 and 3-10.   3-5 does have -- does have

3    the --

4            MR. BOLEY:   I'm sorry.   3-5.   Yeah.

5            THE COURT:   -- language, "Rising Star Missionary

6    Baptist."

7            THE WITNESS:   Yes.

8    BY MR. BOLEY

9    Q.   So we're talking about the same building, then, just for

10   the purposes of identifying it on the exhibit?

11   A.   Yes.

12   Q.   Okay.   Now, let's see.   The last -- okay.   3-10.   All

13   right.   Now, showing you 3-10, can you place the location of

14   the Cadillac that corresponds to the location that you placed

15   on Exhibit 3-4?   And then can you make a box?

16           And can we have that printed out?

17           MR. NISENBAUM:   Which 3-10 will this be?

18           THE CLERK:   3-10B.

19           MR. HADDAD:   Wait, wait.   We didn't get a chance

20   to --

21           MR. BOLEY:   Oh.   I'm sorry.

22           MR. HADDAD:   Do you want to clear the screen of this

23   this red mark?

24           MR. BOLEY:   Yes.

25           MR. HADDAD:   You can do it right here (indicating).

1  You just go like that (indicating).

2          **THE CLERK:**  Hold on.  He's got to re-mark it.

3          **MR. HADDAD:**  You can't move it before.

4          **MR. BOLEY:**  I'm sorry.  I'm sorry.

5  **Q.**   And then can you draw a box in the approximate location of

6  the Cadillac?  Okay.

7          **MR. NISENBAUM:**  Judge, can we move for admission of

8  this document, and the previous?

9          **THE COURT:**  When we finish up, yeah.

10          **MR. NISENBAUM:**  Okay.

11          **MR. BOLEY:**  This is 3B.?

12          **THE CLERK:**  3-10B.

13          (Defendant's Exhibit 3-10B marked for identification)

14  **BY MR. BOLEY**

15  **Q.**   Showing you what's been marked as Exhibit 3-10B, is that

16  the location of the Cadillac when it stopped?

17  **A.**   Yes.  To my recollection, yes.

18  **Q.**   Okay.  Now, when the Cadillac stopped, did you -- your

19  patrol car was behind the Cadillac.  Is that right?

20  **A.**   That is correct.

21  **Q.**   And there was another police car behind your car.  Is that

22  right?

23  **A.**   Eventually, yes.

24  **Q.**   All right.  And were all of these three cars on the same

25  block?

**A.**     Yes.

            **THE COURT:**  On the same block?

            **MR. BOLEY:**  Yes.  Were all of the three cars on the

same block?

            **THE COURT:**  Block?  Yeah.  Okay.

            **MR. BOLEY:**  Of Martin Luther King.

            **THE COURT:**  Block.  Right.  Okay.  I didn't

understand that last word.

            **MR. BOLEY:**  Okay.

**Q.**     Now, at the time that you determined you were going to

place Mr. Bradshaw under arrest, did you handcuff him?

**A.**     Yes, I did.

**Q.**     Is that your standard procedure?

**A.**     Yes, it is.

**Q.**     And why is that?

**A.**     Well, it's for officer safety, first and foremost.  It's

to prevent or try to deter the person that you're trying to

take into custody to make that arrest an opportunity to escape

or flee or cause harm to anybody else, so far as other officers

that may be around the incident.

**Q.**     Do you receive any training -- did you receive any

training in your academy with regard to the procedures you

should take when taking somebody into custody?

**A.**     Yes.

**Q.**     And what was your training with respect to how to -- what

1    assumptions to make about the dangerousness of somebody that

2    you are arresting?

3    **A.**    Once you are arresting any individual, you treat everybody

4    as if they are armed, whether it be with a firearm, a knife, or

5    any type of weapon that can cause bodily injury to yourself or

6    another officer.

7    **Q.**    And is this training that you continue to receive

8    throughout your career?

9    **A.**    Correct.

10   **Q.**    Is it fair to say it's drilled into you?

11   **A.**    Yes, it is.

12            **MR. BOLEY:**  No other questions at this time,

13   your Honor.

14            **THE COURT:**  Anything further?

15            **MR. NISENBAUM:**  Yes, your Honor.  First I'd like to

16   move into evidence 3-10A and B, and also the 3-4 that's been

17   marked.

18            **THE COURT:**  The 3-4?

19            **MR. NISENBAUM:**  Right.

20            **THE COURT:**  Any objection?

21            **MR. BOLEY:**  No objection, your Honor.

22            **THE COURT:**  They are admitted.

23            (Defendant's Exhibits 3-10A, 3-10B, and 3-4 received

24             in evidence)

25            **MR. NISENBAUM:**  And I wonder if I could have 3-10A

1    it's --

2              THE COURT:  Is it up here?

3              THE WITNESS:  Yes.  Yes, your Honor.  3-10.

4              THE COURT:  Is that the one that's marked up?

5              MR. BURRIS:  It's the one that we put --

6              MR. NISENBAUM:  Is that 3-10A?  3-10A.  Okay.  Thank

7    you.

8                        **RECROSS EXAMINATION**

9    BY MR. NISENBAUM

10   **Q.**    Now, I want to be clear that I understand this, first let

11   me ask you this.  Have you been back to the scene of this

12   incident, 32nd and Martin Luther King, for purposes of

13   preparing for this trial?

14   **A.**    Yes.

15   **Q.**    When was the last time?

16   **A.**    Before this trial began.  I believe was it Monday.

17   **Q.**    Actually, Court was off on Monday.  Tuesday.  You might

18   have been back on Monday.  I don't know.

19   **A.**    Yes.

20   **Q.**    Okay.  And at that time, did you recall where the

21   pull-over of the Cadillac occurred?

22   **A.**    Yes, because I was physically there.  Yes.

23   **Q.**    Okay.  So at that time was the pull-over of the Cadillac

24   in front of this building that's close to the corner of

25   Brockhurst?

1  **A.**    See, the problem when I initially marked this -- if you

2  look at my screen, it's very dark.  You can't really see the

3  curb itself, until we lightened it up.  So the answer was going

4  to be "No."

5  **Q.**    Okay.  I want to be -- but I thought I asked you whether

6  it was closer to the corner of Brockhurst or closer to the

7  corner of 32nd.  And you said it was closer to the corner of

8  BrockhurstObjection.  Misstates the testimony.

9              **THE COURT:**  Why don't you ask it as a question,

10  rather than what you think he said.

11              **MR. NISENBAUM:**  Okay.

12  **Q.**    You testified on my cross-examination that the pull-over

13  occurred --

14              **THE COURT:**  No, no.  Just ask him the question,

15  please, rather than what he testified to.

16              **MR. NISENBAUM:**  Yeah.  Okay.

17  **Q.**    So the pull-over of the gold Cadillac occurred at the

18  corner of 32nd and Martin Luther King.  Is that right?

19  **A.**    Correct.

20  **Q.**    It did not occur where you marked on 3-10A, correct?

21  **A.**    That is correct.

22  **Q.**    Okay.  Now, do we have 3-10B, now?

23              **THE CLERK:**  You took all of them.  All of 3-10 are

24  out there.

25              **THE WITNESS:**  3-10.

1      **THE COURT:**  He's got 3-10B up there.

2      **MR. NISENBAUM:**  Let me take all of these.  Thank you.

3  I need them all.

4  **Q.**   By the way, when you went out to the scene of 32nd and

5  King on Monday, who was with you?

6  **A.**   My attorney, and Officer Mayer.

7  **Q.**   And your attorney -- which attorney?

8  **A.**   Mr. Boley.

9  **Q.**   Mr. Boley?

10 **A.**   Correct.

11 **Q.**   And Officer Mayer was there, too?

12 **A.**   Correct.

13 **Q.**   Now, the other patrol vehicles that were there -- they

14 were the other black unmarked patrol vehicles that were present

15 at the scene.  Where were they parked?

16 **A.**   They were parked behind our vehicle.

17 **Q.**   Okay.  And is that location shown on -- let's use -- I

18 believe this was 3-4 that you had previously marked.

19 **A.**   Correct.

20 **Q.**   Okay.  Now, if you can, indicate where the other two --

21 where the other patrol vehicles were stopped -- well, strike

22 that.

23      Indicate where your vehicle was stopped, and where

24 the other two patrol vehicles were stopped.  You can use this

25 one, or you can use another photograph, if another photograph

1    would assist you better.

2              **MR. BURRIS:**  No.  This one.

3              **MR. NISENBAUM:**  Okay.  I'm sorry.  I'm sorry.  I want

4    it on this one.

5              **THE COURT:**  On 3-10?

6              **MR. NISENBAUM:**  Yes.

7              **THE COURT:**  On 3-10, or the one we have up here.

8    Excuse me.  3-4.

9              **MR. NISENBAUM:**  The one we have up here, which would

10   be -- I'm sorry.  This is 3-4.

11             **THE COURT:**  Okay.

12             **THE WITNESS:**  Well, behind -- behind our vehicle.

13   Behind the circle -- the first circle that I indicated.

14   **BY MR. NISENBAUM**

15   **Q.**  Okay.  And were they in line behind it?

16   **A.**  Yes.

17   **Q.**  Okay.  So you had the gold vehicle?

18   **A.**  Yes.

19   **Q.**  The gold Cadillac, right?

20        And that's basically stopped at the corner, correct?

21   **A.**  Close to the corner.  Correct.

22   **Q.**  Okay.  And there's a red zone there, correct?

23   **A.**  That is correct.

24   **Q.**  Was it stopped in the red zone?

25   **A.**  Somewhat in the red zone; not all the way in the red zone,

1    yes, that I recall.

2    **Q.**    Okay.  Then you had your vehicle parked directly behind

3    it?

4    **A.**    Yes.

5    **Q.**    And that's indicated.  Where is that indicated on

6    Exhibit 3-4?  Or is this 3-10?

7              **THE CLERK:**  It's 3-4.

8              **MR. NISENBAUM:**  This is 3-4?

9              **THE CLERK:**  Four.

10             **MR. BOLEY:**  You're asking him to indicate it?

11             **THE COURT:**  You want him to make a mark there now?

12             **MR. NISENBAUM:**  Correct.

13   **Q.**    What I want you to do, Officer, is to either use a little

14   rectangle or a circle to indicate the location of each patrol

15   vehicle.

16   **A.**    Okay.  Well, being that this is the gold Cadillac, the

17   first circle, our vehicle would be (indicating) somewhere --

18   I'm sorry -- somewhere behind there; behind the gold Cadillac,

19   possibly five, six feet.

20             And then behind our vehicle -- directly behind our

21   vehicle was the other unit that arrived.

22   **Q.**    Okay.  Indicate that.  And if you could, put a "D1" for

23   your vehicle.

24             **MR. BURRIS:**  Is there something he can mark with?

25             **MR. NISENBAUM:**  A stylus.

```
 1            THE COURT:  Was there a collision there?
 2            MR. NISENBAUM:  No.  I think there may be some
 3  difficulty in drawing.
 4            MR. HADDAD:  Let's clear.
 5            MR. BURRIS:  Clear that, and start it again.
 6            MR. NISENBAUM:  Let's clear that off.
 7            MR. BURRIS:  I don't think you can clear the first
 8  one.
 9            THE COURT:  Can you clear it?
10            THE WITNESS:  Okay.
11            THE CLERK:  Do they want a different color
12  highlighter?
13            THE COURT:  Maybe a different color.  Bright blue, or
14  bright yellow?
15            MR. NISENBAUM:  That would be -- if you know how to
16  do it.
17            THE CLERK:  It's green now.  So you just mark it.
18            THE WITNESS:  Okay.
19  BY MR. NISENBAUM
20  Q.  So the red circle indicates the Cadillac?
21  A.  Yes.
22  Q.  And the green -- the next two green boxes or circles that
23  I want you to draw is your vehicle, and the other police
24  vehicles that were there.
25  A.  Okay.  See if this will work.
```

 1              **THE WITNESS:**  Do I touch the top to change color,

 2  or --

 3              **THE CLERK:**  Do you want -- yeah.  You just top -- you

 4  can press the top corner again on the screen.

 5              **THE WITNESS:**  On the screen.

 6              **THE CLERK:**  It's going to be yellow.

 7              **THE WITNESS:**  Okay.

 8              **MR. NISENBAUM:**  Okay.

 9              **THE COURT:**  I don't think we have lost bumpers there

10  or something.

11              **MR. NISENBAUM:**  Yeah.

12              **THE CLERK:**  Now it's blue.

13              **MR. NISENBAUM:**  That might be the best idea.  Yeah.

14  Okay.  Okay.

15  **Q.**   So it fair to say, though, that the vehicle -- the other

16  patrol vehicle was parked in line behind yours, correct?

17  **A.**   Correct.

18  **Q.**   And in front of you was the gold Cadillac, correct?

19  **A.**   Correct.

20  **Q.**   And were there any other patrol vehicles that came to the

21  scene?

22  **A.**   No.

23              **THE CLERK:**  Do you want that printed?  Marked?

24              **MR. NISENBAUM:**  If we could print that, mark it.

25              **MR. BOLEY:**  I'd object your Honor.  It seems to me

```
 1   that the technology is wanting, in terms of -- I mean, we've
 2   got circles and --
 3              THE COURT:  I think it's very confusing.
 4              MR. NISENBAUM:  Okay.  What I will do, then --
 5              THE COURT:  Can you take -- do you have a clean 3-4?
 6   I know you had a lot of those around here.
 7              MR. NISENBAUM:  I do.  Exactly.
 8              THE COURT:  So take one.  Do we have some colored
 9   pens that can be used?
10              MR. NISENBAUM:  You know, I do have a different
11   exhibit.  That's 3-7, but it shows essentially the same
12   location and area.  And it's on the good print copy paper.
13              MR. BOLEY:  You say 3-7?
14              MR. NISENBAUM:  3-7.  I want a Sharpie pen.  Do you
15   have a pen?
16              THE COURT:  What have you got down there?  You got
17   some colored pens down there, Tony?
18              MR. NISENBAUM:  Well, we had some.
19              THE CLERK:  We have some highlighters.
20              MR. NISENBAUM:  Well, what I have is a Sharpie.
21              THE COURT:  Here's a red one.  I want that one back.
22   Otherwise, I'll kill for it.  Do we have any other colors?
23              THE CLERK:  I have pink.
24              THE WITNESS:  Your Honor, I have blue and red.
25              THE COURT:  Well, here's a highlighter; a yellow
```

1 highlighter.

2          **MR. NISENBAUM:**  I don't think we'll need that.  I

3 think blue and red will be sufficient.

4          **THE COURT:**  You draw these things, you know, when you

5 have auto accidents you have to testify about, right?

6          **THE WITNESS:**  Yes, your Honor.

7          **THE COURT:**  Once in a while.  So make a rectangular

8 kind of something.  I mean, most cars aren't round, right?

9          **THE WITNESS:**  Correct, your Honor.

10          **THE COURT:**  I'm sure it's not your fault.  It's

11 probably the technology.

12          **MR. NISENBAUM:**  That's the old Mazda 323 from the

13 late '80s, with a flying saucer.

14          **THE WITNESS:**  Okay.

15          **THE COURT:**  So draw them, you know, sort of

16 rectangular fashion, to scale.

17          **MR. NISENBAUM:**  To scale, as best as you can.

18          **THE WITNESS:**  Okay.  Which color do you want me to

19 indicate the gold Cadillac?

20          **MR. NISENBAUM:**  With the gold Cadillac, why don't you

21 use the blue?

22          **THE WITNESS:**  All right.  The blue.  And --

23          **MR. NISENBAUM:**  And try to leave enough room so you

24 can place the other two patrol vehicles where they were.

25          (Witness complies)

1        **THE COURT:**  If you want to do it to scale, it's about

2    an eighth of an inch.

3    **BY MR. NISENBAUM**

4    **Q.**   Okay.  Do you have that?

5    **A.**   Yes.

6    **Q.**   Now, with the red pen, draw the two patrol vehicles where

7    they were.  And put a "1" next to the vehicle that's -- that

8    you were in, and a "2" next to the other patrol vehicle.  Okay.

9    Can I see that?

10   **A.**   Sure.

11          **MR. NISENBAUM:**  Thank you.  Better.

12          (Whereupon a document was tendered to the Court)

13          **THE CLERK:**  It will be 3-7A.

14          **THE COURT:**  3-7A. Is that it?

15          **MR. NISENBAUM:**  3-7A.

16          (Plaintiffs' Exhibit 3-7A marked for identification)

17          **THE COURT:**  Okay.  There -- it's not drawn yet, so be

18   careful.

19          **THE CLERK:**  There you go (indicating).

20          **THE COURT:**  Okay.  Can we move along?

21          **MR. NISENBAUM:**  If I can move that into evidence.

22          **THE COURT:**  3-7A is admitted, unsmeared.

23          (Plaintiffs' Exhibit3-7A received in evidence)

24          **MR. NISENBAUM:**  Unsmeared.  I'm going to hand it to

25   the clerk.  Any smearing that occurs from now on --

1          **THE COURT:**  It's his fault.

2  **BY MR. NISENBAUM**

3  **Q.**   All right.  Now, by the way, does the service channel have

4  a CAD purge page, or does -- is there a CAD purge for the

5  service channel?

6  **A.**   You know, I don't know.  I couldn't answer that

7  confidently.  I don't believe so.

8  **Q.**   Do you believe that calls on the service channel over the

9  radio are recorded?

10 **A.**   Yes.

11 **Q.**   They're recorded similar to the other broadcast channels

12 made over your police radio, correct?

13 **A.**   That is correct.

14 **Q.**   Is there any reason to believe that there would not be a

15 CAD purge sheet similar to the CAD purge sheets from other

16 radio channels?

17         **MR. BOLEY:**  Objection.  Lack of foundation.

18         **MR. NISENBAUM:**  If you know.

19         **THE COURT:**  If you know, you may so testify.

20         **THE WITNESS:**  Once again, I'm sorry.  I don't know

21 what type of purge would be for service -- for the service

22 channel.

23 **BY MR. NISENBAUM**

24 **Q.**   Okay.  The incident that you were dealing with before

25 this -- how long did that take?  The -- as I understand it, you

Case 3:07-cv-04179-SI   Document 70   Filed 03/25/10   Page 145 of 267

1  were looking for a different parolee or something?

2  **A.**    Correct.  Well, we initially arrived at the location.  I

3  don't recall exactly how long it took from the time we got

4  there to the time we left.

5  **Q.**    Well, do you recall whether you had been there for more

6  than an hour?

7  **A.**    I don't believe we was there for more than an hour.

8  **Q.**    Okay.  How about half an hour?

9  **A.**    It's possible.  Yeah.

10  **Q.**    And do you have any recollection at all of what you were

11  doing during that half hour?

12  **A.**    You know, I don't even recall if -- I don't recall if we

13  made entry.  I just know we didn't arrest anybody at that

14  location.

15  **Q.**    Okay.  And it's fair to say that there's nothing reflected

16  in any of the purge sheets you've reviewed that indicate any

17  activity related to that -- to what you were doing at -- at the

18  location you were at when you saw Mr. Lucas?

19  **A.**    As far as I know, that's correct.

20  **Q.**    Now, you say the training is drilled into you to handcuff

21  a person when you find out they have a warrant, correct?

22  **A.**    After they're under arrest, correct.

23               **THE COURT:**  That what?

24               **THE WITNESS:**  When they are under arrest, correct.

25               **THE COURT:**  Did I just hear you say that no one was

```
 1  arrested at that site?

 2          THE WITNESS:  Your Honor, he's -- he's referring to

 3  before the car stop was made, our original --

 4          MR. NISENBAUM:  Yeah.  Heard that.

 5          THE WITNESS:  Yeah.  Our original place, time, reason

 6  for being there in that area.  We were going to a specific

 7  target.  At that specific target, I don't believe anybody was

 8  arrested there.

 9          THE COURT:  I see.  Okay.  Now, how about -- but you

10  were also -- were you testifying also that where you were for

11  about a half an hour was at this -- at the 32nd and Martin

12  Luther King location?

13          THE WITNESS:  No, your Honor.  It was referring to,

14  like, the first location.

15          THE COURT:  Before that?

16          THE WITNESS:  Yes, your Honor.  And I indicated I

17  don't really recall how long we spent at that first location.

18  I can just tell you nobody was arrested.

19          THE COURT:  Okay.  Excuse me.

20  BY MR. NISENBAUM

21  Q.   And, referring back to OAK7923 Bates stamp of Exhibit 1,

22  which is --

23          MR. BOLEY:  I'm sorry, Counsel.

24          MR. NISENBAUM:  -- the CAD purge.

25          MR. BOLEY:  Which?
```

```
1              MR. NISENBAUM:  7923.

2              MR. BOLEY:  Okay.

3   BY MR. NISENBAUM

4   Q.    Now, the report number is added when you request it.  Is

5   that right?

6   A.    That's incorrect.

7   Q.    Okay.  When is it added?

8   A.    The report number is generated once an incident is

9   generated.

10  Q.    And the incident is generated when you call it in?

11  A.    The incident is generated once we call in a traffic stop.

12  It generates an incident number as well as a report number.

13  Q.    So you call in the traffic stop.  And it generates

14  typically what we would see here at -- for the entries at 8:25

15  a.m., correct?

16  A.    Correct.

17  Q.    And those are those three entries that you testified

18  about.  And one of them is "Report number added," right?

19  A.    Correct.

20  Q.    And then we don't have another report number added until

21  12:30.  And that's a report number that pertains to

22  Spencer Lucas, correct?

23  A.    Correct.

24  Q.    So if there had been no -- no pellet gun in Spencer Lucas'

25  house, and if there was no decision by -- by the agent that
```

1  Mr. Lucas actually lived in -- that he believed Mr. Lucas was

2  concealing his residence, then Mr. Lucas would have been

3  released, and there would have been no report number at all

4  from Mr. Lucas.  Is that right?

5  **A.**    That's incorrect.

6  **Q.**    Okay.  So there would have been a report number for

7  Mr. Lucas, regardless?

8  **A.**    Yes.

9  **Q.**    Okay.  Well, why wasn't there a report number that was

10 issued when he was at the -- at the outset, at 8:25, for this?

11 **A.**    Because he's part of our original incident.  So there is a

12 report number there.  The vehicle stop indicates that he was in

13 the vehicle.  So there's your report number for the original

14 incident.

15 **Q.**    Why is the report number different at 12:30?

16 **A.**    Because, one, we took Mr. Bradshaw to jail.  A new report

17 number was generated, because we were done with that original

18 incident.

19         And when we went out to make another actually arrest

20 of Lucas in Richmond, we requested a new -- a new incident

21 along with a new report number, because it was a separate

22 incident and a separate report number.

23 **Q.**    Then I mis-asked the question -- I apologize -- because I

24 think I didn't understand it, which is:  if Mr. Lucas had been

25 released -- that is, the agent -- he cited that he wasn't in

1  violation, then there would have never been a report number

2  added that ends 82133.  And that's a 12:30 entry.  Is that

3  correct?

4  **A.**   Again, that would be incorrect, because there was still an

5  incident.  We still went out to Richmond.  We had to document

6  or account for the fact we went to Richmond to conduct a parole

7  search.  So there's a report number with that.

8  **Q.**   So where were you when you requested that Lucas report

9  number, or where you called in that incident?

10  **A.**   You know, I don't recall exactly when we called it in,

11  because we could have called it in on our way back to North

12  County, or we actually could have called it in on Richmond.

13  Our radios work in San Francisco.  So I'm not sure.

14  **Q.**   But you wouldn't have called it in until after the

15  determination was made by the agent to -- to arrest Mr. Lucas

16  for parole violation, correct?

17  **A.**   Absolutely.

18       **MR. NISENBAUM:**  One moment, your Honor.  Oh.  I know

19  what I wanted.

20  **Q.**   You don't recall any significant delay in confirming

21  Mr. Bradshaw's warrant, do you?

22  **A.**   I do not.

23  **Q.**   Okay.  Basically, as I understand it, you -- you obtained

24  Mr. Bradshaw's name pretty quickly, right?

25  **A.**   Correct.

1   Q.   You ran it.  Had a warrant.

2   A.   Yes.

3   Q.   And it was confirmed very quickly after that, correct?

4   A.   You know, I don't recall.  I don't believe it was

5   confirmed very quickly in that manner.  You know, I don't

6   recall exactly the time frame that it took for that warrant to

7   get confirmation.

8   Q.   Where was the warrant out of?

9   A.   I believe it was -- you know, I'm not even sure which

10  county it was out of, to be honest with you.

11  Q.   Do you know if it was out of Alameda County?

12  A.   I don't know.  It could have been.  I don't recall.

13             MR. NISENBAUM:  One moment.

14  Q.   With respect to the investigation you were doing down on

15  34th Street or thereabouts, at the time that you saw the gold

16  vehicle -- the gold Cadillac, there is no verification of that

17  investigation, is there?

18  A.   Well, as it pertains to our unit per the CADs, no; but --

19  however, we work as a team.  So another team member in a whole

20  another unit could have put ourselves out there.  So it would

21  have went under their -- their I.D. number.

22  Q.   So you're saying that your vehicle being involved in

23  another incident wouldn't be included in that -- in the CAD

24  report of that incident.  Is that right?

25  A.   I'm saying that I don't know if that was recorded that

1  way.

2  **Q.**   I want you to turn to 7922 of Exhibit 1.

3        What is this, if you know?

4  **A.**   I'm sorry.  I didn't -- I was looking at this.

5  **Q.**   7922.  What is this document?

6  **A.**   It looks -- appears to be also a CAD purge.

7  **Q.**   Okay.  And it pertains to Officer Michael Mack and

8  Officer David Martinez, correct?

9  **A.**   Yes.

10 **Q.**   And it says -- it says, Criteria, 12/15/05 00:00 through

11 12/15/05 23:59.  Do you see that at the top?

12 **A.**   Yes.

13 **Q.**   Okay.  Now, you were working with Officer Martinez and

14 Officer Mark, correct?

15 **A.**   Yes.  That day they were on duty as our teammates.  Yes.

16 **Q.**   Okay.  Were they involved in this other incident?

17 **A.**   I believe they did eventually arrive, yes.

18 **Q.**   The other investigation?

19        **MR. BOLEY:**  Vague as to "other incident."

20 **BY MR. NISENBAUM**

21 **Q.**   By that I mean the investigation that you were wrapping up

22 at the time that you saw Mr. Lucas' gold Cadillac?

23 **A.**   I believe they were.

24 **Q.**   Okay.  And is there any indication of that; of their

25 involvement in that investigation on OAK7922?

1  **A.**    It doesn't appear so.

2  **Q.**    Okay.  And who else were you working with?

3  **A.**    I don't recall the rest of our teammates there who may

4  have been there.  It could have been Officer Arcane (phonetic),

5  but I don't recall if he was there or not.

6              **THE COURT:**  Well, that other police vehicle that was

7  behind yours, as you've drawn on that exhibit -- whatever the

8  number is -- that we had so many problems with --

9              **THE WITNESS:**  Yes, your Honor.

10             **THE COURT:**  Who was in that vehicle?

11             **THE WITNESS:**  Officer, I believe, Martinez, and

12  Officer Mack.

13             **THE COURT:**  I see.  Is there some reason why that

14  doesn't show up on this CAD?

15             **THE WITNESS:**  See, your Honor, exactly.  They were

16  there on scene.  I don't know why it doesn't indicate that they

17  were there.  It shows a gap for them as well.

18  **BY MR. NISENBAUM**

19  **Q.**    Could it be because they didn't call it in?

20  **A.**    It could be.

21  **Q.**    There's a lot of activity that takes place by Oakland

22  police officers that is not called in on the CAD, correct?

23  **A.**    I don't --

24             **MR. BOLEY:**  Vague as to the term "activity."

25             **THE COURT:**  Clear it up, please.

1  **BY MR. NISENBAUM**

2  **Q.**   Okay.  There are a lot of law-enforcement actions taken by

3  Oakland Police Department officers that are not reflected on

4  CAD records, correct?

5  **A.**   That's true.

6  **Q.**   And there's a lot of communications between officers that

7  occur that is not recorded, correct?

8  **A.**   Correct.

9  **Q.**   And a lot of that is over the cell phone, correct?

10 **A.**   Correct.

11         **MR. NISENBAUM:**  And so the only -- well, I'll strike

12 that.

13         Thank you.

14         **THE COURT:**  Okay.  I just -- I have one question.

15         **THE WITNESS:**  Yes, your Honor.

16         **THE COURT:**  I understand your testimony is at some

17 point along the way to Richmond or in Richmond, Mr. Lucas said

18 with respect to this place that you ended up in Richmond that

19 he stayed there from time to time?

20         **THE WITNESS:**  Correct, ma'am.

21         **THE COURT:**  Is that correct?

22         **THE WITNESS:**  Yes.

23         **THE COURT:**  Did he ever say he lived there?

24         **THE WITNESS:**  Your Honor, no.  He never actually made

25 a direct reference that, "Hey, I do live here."  It's just, "I

1    stay here from time to time."

2              THE COURT:  Did he ever say, "I reside here"?

3              THE WITNESS:  He didn't use that verbiage, ma'am.

4              THE COURT:  Is there a difference between staying

5    someplace from time to time, and residing?

6              THE WITNESS:  I guess.  I guess it could be, ma'am,

7    but it depends on -- it just depends on the person.  Some

8    people indicate, "I stay here from time to time," meaning that

9    they live there.  If that's where their clothes are, they may

10   have a difference residence as well.  I've encountered people

11   with several residences.

12             THE COURT:  But doesn't -- don't the parole

13   conditions say, in terms of where you may be searched, "you,

14   and your residence, and any property under your control," et

15   cetera?  Isn't that what it says?

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:  It doesn't say, "wherever you happen to

18   be"?

19             THE WITNESS:  Correct, your Honor.

20             THE COURT:  Wouldn't it be important to find out

21   where the residence was?

22             THE WITNESS:  Yes, your Honor.  And that's what we

23   were attempting to determine, is if this was his residence.

24             THE COURT:  Well, do you usually search a place to

25   find out if it's somebody's residence?

1          **THE WITNESS:**  No, your Honor.  There have to be other

2   factors that would lead you to believe that that's his

3   residence.

4          **THE COURT:**  And what were the factors in this case?

5          **THE WITNESS:**  The first factor that we took and we

6   started with was the key.  That was the first factor.  There

7   was actually no explanation, according to Officer Mayer, that

8   he could give explaining the key that he had; the set of house

9   keys.

10          The second one was we called or we tried to ascertain

11   exactly if he had a good address through his parole agent.  His

12   parole agent, I guess, as well as Nakamura indicated that he

13   stays from hotel to hotel, and in an abandoned vehicle, which

14   is why we made that attempt to go to the abandoned vehicle:  to

15   see if he actually had clothes there, and he possibly was

16   living there.

17          I don't know about the hotel; exactly what the

18   conversation Officer Mayer and Lucas had as to why we didn't go

19   to the hotel.

20          However, we continued to search through our database,

21   and found several addresses.  We found an address, I believe,

22   on 34th Street.  And then we found and address in Richmond.  So

23   we attempted to go there.  We went to that address on

24   34th Street to see if that key fit.  Officer Mayer advised it

25   did not fit.

```
 1              Then we went to North County, to drop Bradshaw off.
 2              In the meantime, Officer Mayer put in a call to the
 3    marshals to indicate -- to see.  Maybe Lucas had another
 4    address listed with PG&E, East Bay MUD, some other thing, that
 5    would indicate -- okay.  You know what?  He has another place
 6    somewhere that he's paying bills to.  So we put that call in.
 7              Upon doing that, we still had that Richmond address.
 8    So we were going to go to Richmond, just to see if that address
 9    was actually any good, even though it was an older address.
10              Once --
11              THE COURT:  Which Richmond address are you talking
12    about?
13              THE WITNESS:  The 3400 MacDonald.
14              THE COURT:  MacDonald.
15              THE WITNESS:  Your Honor, once Officer Mayer got the
16    call back from the marshals stating that no he has a bill under
17    his name that's current for this particular month, we elected
18    to go to the most-current address first.  So that's what led us
19    to that address.
20              Once we got to that address, and as we pulled up,
21    that's when Lucas said, "Hey, I stay there from time to time.
22    There's nothing there.  You know, I got the key, but I'm -- I
23    kind of don't a live there, but that's kind of where I'm laying
24    my head."  He kind of said both things.  So okay.  Fine.
25              Once we got our teammates there, he also indicated to
```

1  me that, "Hey, I have a pellet gun up in there."  Okay.  I

2  didn't ask where it was.  I didn't ask.

3          **THE COURT:**  Did he say, "I have a pellet gun"?

4          **THE WITNESS:**  No.  There is a pellet gun.

5          **THE COURT:**  See, there's a difference, isn't there?

6          **THE WITNESS:**  Yes, there is.

7          A pellet gun inside the residence.

8          **THE COURT:**  And does it take just one envelope to --

9  to convince you that that's a -- that must be where they

10  reside?

11          **THE WITNESS:**  Your Honor, I don't really know.

12          **THE COURT:**  If you're living on the street, you don't

13  have much of a residence; an address from which things could be

14  sent, correct?

15          **THE WITNESS:**  Correct.

16          And again, your Honor, I didn't search the residence.

17  So I don't know exactly what they actually saw and determined

18  that as well that was in there.

19          **THE COURT:**  Mm-hm, but the idea is you don't search

20  to look to see if that's the residence.  You have to know

21  that's the residence before you start searching, right?

22          **THE WITNESS:**  We have to determine, your Honor.  That

23  was the best way to make the indication that he lived there.

24          **THE COURT:**  Maybe that's not such a good idea.

25          At any rate, okay.  Anything further?

```
 1              MR. NISENBAUM:  Real quick.

 2              THE COURT:  No.  Really.  I'm sorry.  You said that

 3  you're finished.  You're finished.

 4              MR. BURRIS:  You didn't mean it at all.  Okay.

 5              THE COURT:  You may step down.  Don't discuss your

 6  testimony with any other persons who may be witnesses until the

 7  trial is over.

 8              THE WITNESS:  Yes, your Honor.

 9              THE COURT:  Are you going to be calling next

10  Officer Mack back to the stand?

11              MR. BOLEY:  Yes, your Honor.

12              THE COURT:  We broke a little while ago.  Can we get

13  this done in 45 minutes?

14              MR. BOLEY:  Yes, your Honor.

15              THE COURT:  Okay.  And then anybody else after

16  Officer Mayer?

17              MR. BOLEY:  No, your Honor.

18              THE COURT:  Okay.  So we'll see you at 1:45.

19              MR. BOLEY:  Thank you, your Honor.

20              THE COURT:  Thank you.

21              (Lunch recess taken from 1:02 p.m. until 1:45 p.m.)

22              THE COURT:  Yes.  Good afternoon.  Ready?

23              MR. BOLEY:  I am, your Honor.  I call Officer Mayer.

24              THE COURT:  And I'll remind you you're still under

25  oath, so the oath will not be readministered.
```

1              **THE WITNESS:**  Yes, your Honor.

2              **THE COURT:**  You may have a seat.

3                          **INGO MAYER,**

4    called as a witness for the Defendant herein, having been

5    previously sworn, resumed the stand and testified further as

6    follows:

7                     **DIRECT EXAMINATION**

8    **BY MR. BOLEY**

9    **Q.**   Good afternoon.

10   **A.**   Good afternoon.

11   **Q.**   Now, at the time of the incident, you were a member of the

12   PAC team.  Is that right?

13   **A.**   Yes, sir.

14   **Q.**   Now, how -- in a PAC team vehicle, how many officers were

15   assigned to the same car?

16   **A.**   There were usually two officers assigned to one car.

17   **Q.**   And if you had a probable cause to believe that a parolee

18   was hiding contraband of some kind in their -- in their private

19   parts, did you have a facility to conduct a strip search, if

20   necessary?

21   **A.**   We had multiple facilities.  Yes, sir.

22   **Q.**   What facilities were those?

23   **A.**   The jail.  North County Jail would have been one; possibly

24   the police department; and the parole offices as well.

25   **Q.**   And if -- if you had to transport a suspect from the field

1  to such a facility to conduct a strip search, how would you do

2  so?

3  **A.**   For us, we would do it with either two or possibly three

4  people -- meaning law-enforcement officers -- in the car.

5         Again, we -- our cars did not have cages in them.

6  They're not secure, like a normal police car.  So, regardless

7  of why someone was being transported, there would be -- they

8  would be in the back seat, without a cage.

9         If for some reason I felt someone was hiding

10  something that I did not need to recover immediately, but that

11  I thought I would have to get into a strip-search situation in

12  order to recover, I would put them in the back seat of our car,

13  with either another police officer or another parole agent.

14  And their role would be to make sure that the person didn't try

15  to either hide contraband that -- or taking out of their pants

16  in my car, or try to maybe ingest it to destroy it.

17  **Q.**   So you could have a -- you would be able to have an

18  officer in the back seat with a suspect during the ride to the

19  facility for this strip search?

20  **A.**   Yes, sir, I would.  That is how we've done it in the past.

21  **Q.**   Do you have a memory of the search that you conducted of

22  Mr. Lucas?

23  **A.**   Yes, sir.

24  **Q.**   Okay.  And can you describe just the mechanics; just the

25  mechanics of what you did?  And if it's easier for you to step

1   down and demonstrate, you know -- if that's easier for you, you

2   can do so.

3   **A.**   Well, I'll explain it.  And if it's not clear, I can

4   demonstrate it.

5   **Q.**   Oh, okay.

6   **A.**   After learning that Mr. Lucas was on parole, like I said,

7   he was immediately handcuffed.  I did that.  I did that at the

8   car.

9         I didn't allow him to get out of the car

10  unhandcuffed.  I escorted him around the car, out of the

11  street, because it's unsafe to do any type of search in the

12  street, especially in Oakland, with Oakland drivers.  They

13  don't pay attention.  And I don't feel like, you know, being a

14  traffic statistic, so I wouldn't conduct a search in a lane of

15  traffic.

16        Once I got to a safe area to conduct my search, since

17  he was handcuffed, how I would initially control a handcuffed

18  suspect is by the actual chain of the handcuffs, which is now

19  directly behind their back.

20        At that point, I would grab the chain with --

21        **MR. HADDAD:**  Excuse me.  I object, your Honor.  The

22  question was what does he recall.  And now he's talking about

23  what he would do.

24        **THE COURT:**  Objection is sustained.

25        **MR. BOLEY:**  Okay.

1          **THE COURT:**  Just what did you do in this instance.

2          **THE WITNESS:**  Yes, your Honor.

3          I handcuffed Mr. Lucas, and walked him out of the

4    lane of traffic into a safe area where we could conduct a

5    search.  I grabbed the chain of his handcuffs, which is now

6    behind his back.  I pulled that chain back towards me, to rock

7    him off balance.  I had him spread his legs apart as wide as he

8    could; again, to get him off balance, so that if he decided to

9    try to fight or flee, I would have the upper hand in that,

10   because he would have to adjust his body position to gain

11   balance before he did anything else.

12          At that point, having control over the chain of the

13   handcuff, I conducted my search of his person, and his pockets,

14   and around his legs, shoes, socks, that -- his -- basically,

15   his entire body.  I went down one side with one hand, from head

16   to toe.

17          And when I got done with one side of the body --

18   generally, I start with the right side -- I switch hands on the

19   chain.  I use my other hand.  And with Mr. Lucas, I then

20   finished the search in the same way on the other side of his

21   body.

22   **BY MR. BOLEY**

23   **Q.**  Were there any officers nearby, observing what you were

24   doing?

25   **A.**  I know Officer Thurston was nearby.  He was at the time

MAYER - DIRECT EXAMINATION / BOLEY

1  dealing with Mr. Bradshaw.

2          And I know Officers Mack and Martinez were sort of to

3  my rear, working as -- essentially, just simply as cover

4  officers.

5          And no Agent Nakamura was on the scene at the time of

6  my search of Mr. Lucas.  I'm not quite sure where he was.

7          (Reporter interruption)

8  **BY MR. BOLEY**

9  **Q.**   And during the course of that search that you described,

10  did you come across or feel or come to believe that there was

11  any kind of contraband or weapon inside Mr. Lucas' underwear or

12  private parts?

13  **A.**   No, I did not.

14  **Q.**   Was there any reason under the circumstances to remove

15  Mr. Lucas' clothing in order to inspect his underwear, his

16  genitals, or his buttocks?

17  **A.**   No, sir.

18  **Q.**   Did you hear the testimony of Mr. Bradshaw as to the

19  search -- or what he did at the direction of the officers?

20  **A.**   Yes, sir.

21  **Q.**   Is that -- would you conduct a search of a suspect in that

22  fashion?

23  **A.**   Well, first of all, the way he testified -- that wasn't a

24  search conducted by any police officer.

25          Secondly, I would never allow what he described to

MAYER - DIRECT EXAMINATION / BOLEY

1  happen.

2  **Q.**    Why is that?

3  **A.**    Because it's an extreme officer-safety risk.

4  **Q.**    And why so?

5  **A.**    To allow anyone under arrest, for whatever they're under

6  arrest for, to be unhandcuffed, and then to allow them to go

7  into their own pockets or to be allowed to go into their own

8  pants to conduct their own search, would expose myself and my

9  partners and the general public at large to any number of

10  officer-safety issues, which would result in that person --

11  which would be as a result of that person being able to freely

12  go into their pockets, where they may have a weapon, in which

13  case they can use the weapon to escape, or to inflict harm to

14  us because they don't want to go to jail for whatever it is

15  they're being arrested for.

16         And to assume that one person is more dangerous than

17  another -- that's -- that's how people get hurt out there, is

18  because you make those assumptions.  Everyone is treated the

19  same way.  If you're under arrest, you're under arrest.  And

20  I'm not assuming that just because you're under arrest for a

21  traffic warrant and you're under arrest for a violent felony

22  warrant, that I'm going to search you any differently.  Because

23  it's that moment when you don't search the guy who has a

24  traffic warrant who turns out that he's having a bad day and

25  doesn't want to go to jail, and he pulls out a knife, stabs

1   you, and runs away.  So, no, I would never do that.  I would

2   never allow an officer to do that.  And I would have serious

3   issues with any officer who conducted that kind of haphazard

4   search in my presence.

5   **Q.**    Now, did you hear the testimony of Mr. Lucas about the

6   search that he said was conducted at 32nd and Martin Luther

7   King?

8   **A.**    Yes, I did.

9   **Q.**    All right.  Now, under the circumstances as you knew them,

10  would you have conducted a search in that fashion?

11  **A.**    No, sir.

12  **Q.**    Why not?

13  **A.**    There was no reason.

14  **Q.**    Any other reasons you wouldn't do it that way?

15  **A.**    Well, there was no actual physical reason to do it.  And

16  to do it the way he describes it, it would result in all kinds

17  of ramifications.  It's immoral.  It's unethical.  I would

18  expect the community to have issues with it.  I would have

19  issues with it.  My partners would have issues with it because

20  of the same reasons.

21        There are, you know, ramifications to our jobs:  our

22  livelihoods, court proceedings.  So all of those things were

23  playing a part on why I would not conduct a search like that

24  the way he described it, on a busy street in the east -- in

25  West Oakland at 8:00 o'clock in the morning.

1  Q.   Now, after -- or as part of your search of Mr. Lucas, did

2  you look inside his wallet?

3  A.   I did.

4  Q.   And did you find any hotel receipt?

5  A.   I did not.

6  Q.   Or motel receipts?

7  A.   No, sir.

8  Q.   Any receipts relating to clothing being cleaned?

9  A.   That, I do not recall.

10 Q.   When you spoke to Mr. Lucas, what did he tell you about

11 his living situation?

12 A.   He told me that he lived in the van.

13 Q.   Did he tell you that he was living in a motel?

14 A.   I -- that came later, through the parole agent.

15 Q.   Now, did Mr. Lucas have in his possession anything that

16 looked like a hotel key?

17 A.   I did not find anything like that.

18 Q.   Now, you did find a key in his pocket.  Is that right?

19 A.   Yes, I did.

20 Q.   Was there more than one?

21 A.   I believe there was more than one key on that key ring.

22 Q.   Any --

23 A.   But, no, I don't have an exact count, but there were --

24 there were a few keys.

25 Q.   Now, there was one key in particular that attracted your

1  attention.  Is that right?

2  **A.**    Yes, sir.

3  **Q.**    And can you describe that?

4  **A.**    It was very bright and -- and silver in color, like it had

5  just been cut from a blank.  To the best of my ability and --

6  having been around and seen, and had my own keys, it appeared

7  to be a house key, based on the size, the shape, and -- the

8  size and the shape of it, and the cut of it.  It didn't appear

9  to be, let's say, an ignition key to a car.  It didn't have a

10 key fob on it, let's say, like something to a hotel room.  It

11 just seemed to be a house key.

12 **Q.**    Now, have you conducted parole searches of parolees who

13 are living in motels before?

14 **A.**    Yes, I have.

15 **Q.**    If -- if -- if you had been given information that he was

16 living in a specific hotel, what steps would you take?

17 **A.**    We would have tried to find what hotel that was, and what

18 room it was.

19 **Q.**    Now, have you conducted parole searches of parolees who

20 live in -- who live in vehicles such as vans?

21 **A.**    Yes, I have.

22 **Q.**    And -- and -- and what -- how do you conduct a search, and

23 what are you looking for?

24 **A.**    Well, when you say how -- actually, are you referring to

25 the physical search of the van?

983

1  Q.   Yes, yes.

2  A.   Well, first you would secure the van; make sure that there

3  was no one else inside.

4       And then, depending on if it's just you or if you

5  have a partner, you would kind of compartmentalize where you

6  search.

7       So what I mean by that is you might start at the

8  driver's side of the van, and search through the driver's area,

9  the seat of the van, dashboard, center console, headliners, the

10  plastic vinyl on the side of the door frame, anywhere where

11  anything could be hidden.

12       And then you would have move on to the next portion

13  of that van:  passenger side.  Same thing.

14       Then you would move towards the back of the van, and

15  continue your searching of wherever -- whatever was in that van

16  that could contain possible weapons, contraband.

17  Q.   When you searched the van that Mr. Lucas identified as the

18  one belonging to him, did it appear to you to be consistent

19  with him living in that van?

20  A.   No, it did not.

21  Q.   Why not?

22  A.   I did not find any personal effects from Mr. Lucas.  I

23  didn't find any papers or indicia.  I didn't find any sundry

24  items, such as toothbrush, comb, brush, you know, deodorant,

25  that sort of thing.  I didn't really find any clothes to speak

1   of that were in there.  There just wasn't anything in the van

2   that would indicate that someone had been living in it.

3   **Q.**   And you have searched vans that people were living in

4   before?

5   **A.**   Absolutely.  We routinely search vans, because currently,

6   there are a number of parolees who have nowhere else to live

7   because of the current sex -- sex registry laws.  There's one

8   little area in Oakland where they're allowed to actually

9   congregate.  And a lot of them sleep and stay in vans in that

10  area.  So we have a routine to search those vehicles.

11  **Q.**   Now, at some point you went to a residence on 34th Street.

12  Is that right?

13  **A.**   Yes, sir.

14  **Q.**   And -- and what led you to -- to that address?

15  **A.**   That was information that was found during our

16  investigation that showed that Mr. Lucas had used that

17  residence recently; within the last couple of years.

18  **Q.**   And -- and do you remember the information that you

19  received, or what type of information it was?

20  **A.**   There was a record of an arrest in '03 where he used that

21  address, and a record of a traffic accident where he also used

22  that address.  And the traffic accident was, I think, within

23  the same year.

24  **Q.**   When you say "same year," you mean 2005?

25  **A.**   Yes, sir.

1  **Q.**   Now, at what point did you receive the information about

2  the address on 41st Street in Richmond?

3  **A.**   That information came to me while we were at the North

4  County Jail.

5             **MR. BOLEY:**   Just a moment, your Honor.

6  **Q.**   At the time that you were working with the PAC team in

7  Oakland, do you know approximately how many parolees there were

8  in the city of Oakland?

9  **A.**   Yes, sir.

10 **Q.**   How many?

11 **A.**   The average at the time was over 3,000.

12 **Q.**   And of those, how many were -- had absconded and were

13 not -- or were at liberty?

14 **A.**   Within the first few years of working with the PAC team,

15 the average at the time was one third of those; so

16 approximately a thousand individuals who were unaccounted for.

17 **Q.**   And did you have information that the -- the parolees that

18 you were responsible for had been implicated in crimes in the

19 city?

20 **A.**   There was.

21            **MR. HADDAD:**   I'm going to object to relevance.

22 Mr. Lucas had not absconded, so --

23            **THE COURT:**   Where is this going?

24            **MR. BOLEY:**   I just was about to finish up,

25 your Honor.

MAYER - DIRECT EXAMINATION / BOLEY

```
 1              THE COURT:  Well, I don't think --
 2              It has to be specific to this individual.
 3              MR. BOLEY:  Okay.  I don't have anything specific to
 4    this individual, your Honor.  I have nothing further.
 5              THE COURT:  Okay.  Mr. Haddad, I guess this is your
 6    witness, then --
 7              MR. HADDAD:  Okay.  Thank you.
 8              THE COURT:  -- since you've been the one who's been
 9    objecting.
10              MR. HADDAD:  It is now.
11              THE COURT:  It is now.  Right.  He is now.
12              MR. HADDAD:  He is now.  Sorry.  Oops.
13                          CROSS EXAMINATION
14    BY MR. HADDAD
15    Q.    Hello again, Officer.
16    A.    Sir.
17    Q.    So -- so you're sure that Nakamura was on the scene at the
18    time that you searched Mr. Lucas?
19    A.    He was around the area, yes, sir.
20    Q.    And you heard his testimony yesterday, didn't you?
21    A.    I did.
22    Q.    And did you hear him say that he, apparently, wasn't there
23    when you searched Mr. Lucas in any way?
24    A.    I don't recall that exact wording, no, sir.  You'd have to
25    show me a transcript.
```

MAYER - CROSS-EXAMINATION / HADDAD

1  Q.   It would not have been accurate if Agent Nakamura said he

2  was not at the scene when you searched Mr. Lucas.  Is that

3  true?

4  A.   I recall him being around the scene, sir.

5  Q.   Okay.  Have you received training in the code of silence?

6  A.   I know what it is, yes.  We've had training in the academy

7  on that.  Yes, sir.

8  Q.   What is it, to your understanding?

9  A.   To my understanding, it is a -- I'm trying to find the

10  right word -- an illegitimate code --

11  Q.   Mm-hm.

12  A.   -- which is supposedly something that police or

13  law-enforcement officers have or use, I guess, that says that,

14  you know, regardless of what happens, they're not going to say

15  anything --

16  Q.   Uh-huh.

17  A.   -- to get anybody else in trouble.

18  Q.   Okay.  In your training about the code of silence, have

19  you been also trained that really every profession can have a

20  code of silence, to some extent or another?

21  A.   Sure.

22  Q.   So it's not necessarily something that's unique to police,

23  is it, according to your training?

24  A.   It's not necessarily unique, no --

25  Q.   Okay.

```
 1  A.     -- but it seems to be always kind of equated to police

 2  work.

 3  Q.    Well, it's an issue in law enforcement, to your knowledge,

 4  right?

 5          MR. BOLEY:  Objection.  Vague as to "issue."

 6          MR. HADDAD:  It's an issue.

 7          THE COURT:  Rephrase the question.

 8          MR. HADDAD:  Yes.

 9  Q.    It's an issue that you receive periodic training about and

10  instruction about from your department.  Isn't that right?

11  A.    We have received training, yes, sir.

12  Q.    All right.  And you've also received training throughout

13  your career, starting with the academy, about officers' duty to

14  intervene in situations where they see other officers violating

15  the law.  Isn't that right?

16  A.    Yes, sir.

17  Q.    And there's -- in fact, when you got your POST certified

18  training in the academy, there's a whole section about ethics

19  that POST teaches you about, isn't there?

20  A.    That is correct.

21  Q.    And you got some written materials from POST.  I think

22  they call them "training modules," right?

23          MS. SHERWIN:  "Domains."

24  BY MR. HADDAD

25  Q.    Or "learning domains"?
```

MAYER - CROSS EXAMINATION / HADDAD

1  **A.**    Right.

2  **Q.**    And there is some written information in those learning

3  domains way back in the academy, if you can recall?

4  **A.**    I remember the domains.  Yes.

5  **Q.**    Okay.  And some of those learning domains specifically

6  gave you factual scenarios about, if you're on the scene of an

7  incident and you witness another officer using excessive force,

8  for instance, it's your duty to report that under the law,

9  right?

10 **A.**    That is correct.

11 **Q.**    And, first of all, it's your duty to try to stop it, if

12 possible, right?

13 **A.**    To intervene.  Yes, sir.

14 **Q.**    Because an officer's duty is to enforce the law for

15 anybody who violates the law; even another officer, right?

16 **A.**    That is correct.

17 **Q.**    And if you're the leader of an incident in which other

18 officers are involved, and in particular, as the team leader,

19 if you see other officers violate somebody's Fourth Amendment

20 rights, you have a duty to intervene, don't you?

21        **MR. BOLEY:**  Can you read that back, please?

22        (Record read)

23        **MR. BOLEY:**  Objection.  Assumes fact not in evidence,

24 and misstates testimony.

25        **THE COURT:**  Objection is overruled.

MAYER - CROSS EXAMINATION / HADDAD

```
 1              You may answer.

 2              THE WITNESS:  The way you put it is not necessarily

 3   the way we are taught.  The way we're taught is that if I see

 4   something that I believe to be -- that I have to intervene on

 5   that's being done immorally or illegally, I can't then just

 6   turn around and say, "Well, I wasn't the leader.  He should

 7   have done it."  So it's everybody's responsibility, regardless

 8   of your station at that particular scene, to make sure that you

 9   intervene.

10   BY MR. HADDAD

11   Q.   Okay.  When you're an incident leader, though, do you make

12   an effort to be aware of what the other officers on the team

13   are doing?

14              MR. BOLEY:  Objection.  Vague as to term "incident

15   leader."

16              THE COURT:  Objection's overruled.

17              THE WITNESS:  You try to know what's going on with

18   your incident.  Yes, sir.

19   BY MR. HADDAD

20   Q.   All right.  Now, specifically as to Mr. Kirby Bradshaw's

21   testimony that Mr. Boley asked you about --

22   A.   Correct.

23   Q.   -- where -- I'm just going to very generally describe

24   it -- the subject of the testimony -- but where he talked about

25   his -- what he described as a strip search on the street, he
```

```
 1  described that happening about five or ten feet away from you.

 2  Do you recall that testimony?

 3  A.   I don't recall him stating -- I don't know what his

 4  distances were.

 5  Q.   You just --

 6  A.   Specifically.

 7  Q.   You recall him describing it right at the edge of the

 8  curb; kind of in the street and at the curb area?

 9  A.   Correct.

10  Q.   And you, at the time that he describes himself being

11  searched, were searching Lucas?  Do you recall that?

12  A.   That's what he said?

13  Q.   Yeah.

14  A.   I -- I -- I'm assuming that's what -- I don't remember if

15  he said that.

16  Q.   When you did search Lucas, you did it at the back left

17  corner of the Cadillac, right?

18           MR. BOLEY:  Objection.  Misstates testimony.

19           THE COURT:  Objection overruled.

20           THE WITNESS:  When you say "left corner" --

21  BY MR. HADDAD

22  Q.   Driver's side corner.

23  A.   No.

24  Q.   Where was it?

25  A.   I was on the other side.  I was towards the passenger
```

 1   side.

 2   **Q.**   Okay.  So you're at the back of the Cadillac?

 3   **A.**   Towards the back.  It would be the passenger side more

 4   towards the curb.

 5   **Q.**   Okay.

 6   **A.**   I was actually searching Lucas, where Bradshaw says he got

 7   searched.

 8   **Q.**   All right.  If you had seen Officer Thurston or any other

 9   officer ordering Mr. Bradshaw to pull his pants down, you would

10   have had a opportunity to intervene, to stop that, wouldn't

11   you?

12   **A.**   Yes, sir.

13   **Q.**   And you would have had a duty to report that to your

14   department as a violation not only of procedures, but also of

15   law, correct?

16   **A.**   Yes, sir.

17   **Q.**   And you understood that if you failed in your duty to

18   intervene and report in such a situation, you would also be

19   responsible for any violation of rights.  Isn't that right?

20   **A.**   Failing to intervene or refusing to notify of said

21   incident would also be -- yes.

22   **Q.**   Okay.

23   **A.**   You would -- you would --

24   **Q.**   You would be responsible as well, correct?

25   **A.**   Yes.

1   **Q.**   And you knew that, at least, going back to the academy.

2   Is that right?

3   **A.**   Yes, sir.

4   **Q.**   Now, you said a minute ago to -- in response to

5   Mr. Boley's questioning that, as to Mr. Bradshaw's alleged

6   search, you would never allow a person to go into their own

7   pockets.  Do you recall that?

8   **A.**   Yes, sir.

9   **Q.**   Now --

10  **A.**   Can I --

11  **Q.**   Yes.

12  **A.**   Under arrest.  If they were under arrest, I would not

13  allow them to go into their own pockets.

14  **Q.**   All right.  Did you hear Mr. Bradshaw say that he went

15  into his own pockets at any time?

16  **A.**   I did.  And just on a point on that, sitting there,

17  listening to the testimony, everybody kept switching it up.  At

18  one point he said he went into his own pockets.  At some other

19  point, somebody said that the officer did it.  And at some

20  other point, he said he dropped his own pants.  At some other

21  point, somebody said an officer did it.

22          **MR. HADDAD:**  I don't want to interrupt you.

23          And I move to strike that last commented section.

24          **THE COURT:**  After the pockets part, the rest is

25  stricken.

1          **MR. HADDAD:**  Yeah.  Thank you.

2   **Q.**   You mentioned that you looked in Mr. Lucas' wallet.

3          Did you look at his driver's license?

4   **A.**   I don't recall if he had one.

5   **Q.**   Okay.  Did you see any -- any piece of I.D. in his wallet?

6   **A.**   I can't remember.

7   **Q.**   Would you have been looking for any I.D. with his address

8   on it?

9   **A.**   Yes, I would have.

10  **Q.**   Would you have noted it in a report somewhere, if you had

11  found something like that?

12  **A.**   Not necessarily, no.

13  **Q.**   Why not?

14  **A.**   I -- at this point there was no reason to.

15  **Q.**   I understand that you and Officer Thurston were assigned

16  the same squad car over a period of time.  Is that right?

17  **A.**   In the PAC team, you had essentially your own car.

18  **Q.**   Okay.

19  **A.**   So, just to explain, unlike patrol, you might alternate

20  cars, depending on what car's available.  We did not do that.

21  **Q.**   Okay.  So in December of 2005 you had had the same car for

22  some period of time with Officer Thurston.  Is that right?

23  **A.**   That's correct.

24  **Q.**   How long had you been assigned that same car?

25  **A.**   We had it for quite some time.  I don't know the exact

1    time, but we held on to our cars.

2  **Q.**    Okay.

3            **THE COURT:**  Along what?

4            **THE WITNESS:**  I'm sorry, your Honor.

5            **THE COURT:**  We had a long -- something or other.

6            **THE WITNESS:**  We held onto our -- the cars that were

7    assigned to us for quite some time.

8            **THE COURT:**  I see.  Okay.

9  **BY MR. HADDAD**

10 **Q.**    So there was a good number -- strike that.

11           There was --

12           How many miles would you estimate was on that car at

13   the time of the incident?

14 **A.**    Well, I'd have -- in the 60,000 range, I think it was.

15 **Q.**    Okay.  Now, the cell phones that you were using to

16   communicate between officers during this incident -- were they

17   private cell phones, or were they issued by your department?

18 **A.**    They were issued to -- by the department to the entire PAC

19   team.

20 **Q.**    Okay.  Who paid the bills for those cell phones?

21 **A.**    The police.  I believe it was the police department, but

22   you know, now -- it may have also been the parole division.

23 **Q.**    Okay.  Do you know who maintained the billing records that

24   would have identified calls made to and from those phones, and

25   dates, and times?

1   **A.**   No, sir.

2   **Q.**   Now, at the initial traffic stop of the Cadillac, how many

3   other police cars were -- were driving right behind you when

4   you made that stop?

5   **A.**   I remember there was one other police unit with us.

6   **Q.**   And was Officer -- excuse me.  Was Agent Nakamura in that

7   car?

8   **A.**   That, I do not recall.

9   **Q.**   Do you recall telling the Internal Affairs investigator

10  who interviewed you that there were two other semi-marked cars?

11  Do you?

12  **A.**   And you're referring to what time frame, sir?

13  **Q.**   At the time of the traffic stop.

14  **A.**   There was another car that was on the scene.

15  **Q.**   Have you had a chance to review the Internal Affairs

16  summary of the investigation of this incident?

17  **A.**   At some point I did.  I haven't seen it in years.

18  **Q.**   Let me show you what's part of Plaintiffs Exhibit 1, Bates

19  numbered 7899.  Could can we please turn on the Elmo?

20          **MR. BOLEY:**  Your Honor, before we even -- could we

21  have some sort of foundation laid as to --

22          **THE COURT:**  What is 7899?

23          **MR. BOLEY:**  Who prepared it and --

24          **MR. HADDAD:**  Sure.  I'll go to the first page.

25          **MR. BURRIS:**  Which Bates number?

1          **MR. HADDAD:**  7899.

2          **MR. BURRIS:**  Seventy-eight.

3   BY MR. HADDAD

4   **Q.**   Let me just -- I'm just going to use this.  I'll ask this

5   question one more time.  Do you recall telling the Internal

6   Affairs investigators that there were actually two semi-marked

7   police vehicles that acted as cover at the time of the traffic

8   stop?

9   **A.**   Yes.

10  **Q.**   Okay.  So was that accurate when you said that?

11  **A.**   Yes, sir.

12  **Q.**   And where did those two other semi-marked cover vehicles

13  start from, just before the traffic stop?

14  **A.**   Well, one was with us.  And then I don't necessarily

15  remember where the other one was, but I know they were in close

16  proximity.

17  **Q.**   Can you recall any prior incident or involvement in any

18  work that you were doing before -- starting the traffic stop

19  with the Cadillac?

20  **A.**   I know we had -- we were on M.L.K.; in that general area

21  around the 34th; 3300 block.  And I can't remember exactly what

22  it was.  It would be an assumption, but you know, we were

23  looking possibly for an address for a parolee.  Part of our

24  daily routine, but I know there was something that led us to

25  that area.

1  Q.   So you -- you were on view, doing something.  Is that

2  right?

3  A.   We had been.  Yes, sir.

4  Q.   Okay.  I'd like to direct your attention to Exhibit 1, CAD

5  Report 7923 again, already in evidence.

6          Very briefly, you explained what "O.V." means last

7  time.  That means "on view," right?

8  A.   Yes, sir.

9  Q.   So, like, in this incident, it showed you were on view at

10  8:25 at 600 32nd Street, right?

11  A.   Yes, sir.

12  Q.   This does not show that you were on view with any other

13  incident before this, does it?

14  A.   That's correct.  There's no requirement for that.

15  Q.   You're not required to radio in where you are and what

16  you're doing?

17  A.   Not every minute of the day, no, sir.

18  Q.   If you're involved in some particular investigation or on

19  view, you're not required to let the dispatcher know?

20  A.   If I go to an address and there's no one there, there's no

21  contact, and let's say the house is boarded up, then there's no

22  reason for me to put myself out there.

23  Q.   Okay.  Now, some follow-up on the report that you wrote,

24  which is also the first page of Exhibit 2.  Here we go.  When

25  did you fill out this report?

1   **A.**   The day of the incident, sir.

2   **Q.**   Okay.  Where did you turn it in to?

3   **A.**   The -- the jail.

4   **Q.**   You turned it in at the jail when you dropped off

5   Spencer Lucas.  Is that right?

6   **A.**   Yes, sir.

7   **Q.**   So can you just tell us specifically how do you turn these

8   things in at the jail?  Who do you give them to, generally?

9   **A.**   You would give them to the intake deputy.

10  **Q.**   Okay.  And do they typically write some notations on the

11  report when you turn it in?

12  **A.**   I don't know what their procedures are.

13  **Q.**   Do you see at the very top there's some hand -- a

14  handwritten notation that appears to say 1, 3, 2, 4, HRS?

15  **A.**   Yes, sir.

16  **Q.**   And that could mean 13:24 hours.  Would you agree?

17  **A.**   It could.

18  **Q.**   Is that your handwriting?

19  **A.**   No, sir.

20  **Q.**   Do you know what 13:24 hours would pertain to, in

21  relationship to this arrest?

22  **A.**   It would be a speculation --

23  **Q.**   Do you have --

24  **A.**   -- or a guess.

25  **Q.**   Do you have an educated estimate, based on your experience

1  and your involvement with this incident?

2  **A.**    Yes.  I would say that.

3  **Q.**    What is that?

4  **A.**    When you initially bring a prisoner into the jail and the

5  initial intake is done, that doesn't necessarily reflect the

6  time that they are actually input into their system.  That time

7  can very well be they were processed.  And when I say

8  "processed" -- they were searched in -- and they were asked a

9  series of questions.  Those questions aren't -- generally are

10  health related.  And they also entail if any use of force or

11  any inappropriate behavior, as far as the police had occurred.

12  **Q.**    Mm-hm.

13  **A.**    Depending on the answers, they either get an immediate

14  medical screening by a nurse, or, if they say any inappropriate

15  use -- any anything inappropriately was done to them by the

16  police or use of force was used on them that's not being

17  reported, they either, A, have to go to the hospital to get

18  cleared for that use of force, or we have -- they have to a

19  mandatory called a supervisor in for any inappropriate

20  reporting.

21  **Q.**    Could I just bring you back to the question?  The question

22  was:  what is your best estimate of what this time means?

23  **A.**    Well, I have -- I have to explain it to get to it.

24  **Q.**    Okay.

25  **A.**    All right.  So once the questioning is done, then the

1    suspect or the prisoner then is taken to a holding cell.  And

2    the length of time that they're in that holding cell is going

3    to be dependent on how many people they have working at the

4    jail at the time, and how many people they have in the holding

5    cell in front of them.

6           Once that persons time comes up, they're removed from

7    the holding cell; taken to another section of the jail, at

8    which time all of the documentation is done, processing the

9    person physically into the jail.  And so I would imagine that

10   any other times on this document would be those times that the

11   deputies annotate when they're processing the person --

12   **Q.**    Oh.

13   **A.**    -- down the road from the actual intake.

14   **Q.**    Okay.  So that's your speculation about what that could

15   mean.  Is that right?

16   **A.**    That -- I admit it's a speculation.  Yes, sir.

17   **Q.**    Could that time, 13:24, also be when you dropped off

18   Mr. Lucas at the jail?

19   **A.**    I would have to look at the -- at our records, as best as

20   I could to see, if they match up; but off the top of my head,

21   without looking at anything else, I couldn't tell you exactly

22   when we processed him or took him into the jail.

23   **Q.**    Now, I'm going to try to blow this up so we can see some

24   small print in this report, but in Box 18, it describes

25   instructions for filling out the report.  Do you see that?

MAYER - CROSS EXAMINATION / HADDAD

1   **A.**    Yes, sir.

2   **Q.**    And when you fill this out, you're supposed to list the

3   charges by name and code section, correct?

4   **A.**    Correct, sir.

5   **Q.**    And it says if the suspect is arrested without a warrant

6   for an offense which occurred in another jurisdiction, identify

7   agency, investigator's name, and report number, right?

8   **A.**    Yes, sir.

9   **Q.**    Did you do that here, when Mr. Lucas was arrested in

10  Richmond?

11  **A.**    Yes.

12  **Q.**    Where did you do that?

13  **A.**    Yeah.  That would be on the parole detainer.

14  **Q.**    What's the parole detainer?

15  **A.**    That's the second document that went along with this

16  document.

17  **Q.**    What does that look like?

18  **A.**    Ah, well, it can take on different appearance.  There's a

19  handwritten form which an agent in the field can fill out by

20  hand which lists probable cause for the arrest of the parolee,

21  the parolee's name, the parolee's identifying numbers to

22  include CEC number, agent of record, and agent of arrest.  A

23  detainer can also be placed via Teletype from Sacramento, which

24  would be the hub of CDC, by calling in and requesting them to

25  Teletype the authority to the jail, in which case it would be a

1   printed piece of paper, much like a warrant abstract.

2   **Q.**   Have you seen one of those in this incident?

3   **A.**   I have not.

4   **Q.**   Have you looked for it?

5   **A.**   No, sir.  No one asked me to.

6   **Q.**   Did -- do you have any idea what happened to it?

7   **A.**   I do not know what happens to a parole detainer once it

8   goes into North County Jail, no.

9   **Q.**   Is it your testimony that you wrote out a parole detainer?

10  **A.**   I did not write it out.  Nakamura wrote it out.

11  **Q.**   You see, going back to Exhibit 2, page 1, your report.  It

12  also says, "Complete probable-cause narrative."  Do you see

13  that?

14  **A.**   Yes, sir.  Did you do that anywhere?

15  **A.**   I did not.  Agent Nakamura did it on the detainer.

16  **Q.**   How do you know if what Agent Nakamura did was a complete

17  probable-cause narrative for your report?

18  **A.**   It's not my report.  It was his report.  He was the

19  authorizing agent for the arrest.  He's the one who actually

20  documented the report.  So he would be the one to offer the

21  probable cause on the detainer.

22  **Q.**   This document is called, "Consolidated Arrest Report,"

23  correct?

24  **A.**   That is correct.

25  **Q.**   It's an Oakland Police Department document, isn't it?

1    **A.**    Yes, sir.

2    **Q.**    And under Box 10, who does this report identify as the

3    arresting officer?

4    **A.**    That identifies myself.

5    **Q.**    And the other arresting officer is who?

6    **A.**    That identifies Officer Thurston.

7    **Q.**    Does it say Officer Nakamura or Agent Nakamura anywhere on

8    this report?

9    **A.**    Not on this report.  No, sir.

10   **Q.**    All right.  I'd like to ask you about Plaintiff's Exhibit

11   7937 on Exhibit 1.  7937.  Are you there yet, Officer?

12   **A.**    Yes, sir.

13   **Q.**    Okay.  What is this?

14   **A.**    It's an incident report.

15   **Q.**    Okay.  Where does the information on this report come

16   from, if you know?

17   **A.**    I don't know.

18   **Q.**    Is it something that you filled out?

19   **A.**    No, sir.

20   **Q.**    Do you see that it lists you as one of the primary

21   reporting officers?

22   **A.**    Yes, sir.

23            **MR. HADDAD:**  Do you see that it -- well, is there any

24   objection if I move for the admission of this?

25            **MR. BOLEY:**  Yes.

1  **BY MR. HADDAD**

2  **Q.**    Do you see that it lists that the report was taken on

3  December 15, 2005, at 10:00 a.m., in the upper right side?

4  **A.**    Yes, sir.

5  **Q.**    And that's when you wrote out your incident report, which

6  we were just looking at, which is at Exhibit 2.  Isn't that

7  right?

8  **A.**    You talking about the CAR?

9  **Q.**    I'll put that back on the screen.  Yes.

10  **A.**    Correct.

11  **Q.**    And you see that in this incident report now, we're at

12  the -- that we're now talking about 7937.  It says the incident

13  occurred at 214 South 41st Street in Richmond.  That's the

14  house that was searched in this incident, right?

15  **A.**    Yes, sir.

16  **Q.**    Now, under "Persons Involved," the bottom of page 7937, it

17  has the name of Spencer Troy Hidalgo.  Do you see that?

18  **A.**    Yes, sir.

19  **Q.**    Do you know what that word "Hidalgo" comes from?

20  **A.**    I know that's one of his a.k.a.s.

21  **Q.**    Do you know how it got on this report?

22  **A.**    I have no idea.

23  **Q.**    Did he ever use the name "Hidalgo" at any time on this

24  incident on December 15th?

25  **A.**    I do not recall.

MAYER - CROSS-EXAMINATION / HADDAD

1  Q.   Is it a parole violation to give a false name to parole

2  officers or law-enforcement officers?

3  A.   It can be.

4  Q.   If he had given you a false name, is that something that

5  you would have made at least mental note of?

6  A.   Yes.

7  Q.   Do you see, under address for Spencer Troy, under "Person

8  Involved," it lists 828 34th Street?

9  A.   Yes, sir.

10  Q.   Now, that's the house at 34th Street that you went to and

11  determined that he did not live in, correct?

12  A.   That is correct, sir.

13  Q.   Do you have any idea why that would show up as

14  Spencer Troy's address on this Oakland incident report?

15  A.   Again, speculate, because I don't know where all of this

16  information came from; but the information on the bottom part,

17  from "Persons Involved," is coming from systems that we have

18  that would show previous addresses and previous names.  Why

19  they combined the two on here, I don't know, but that's -- that

20  system and that information is one of the reasons why we knew

21  about the 34th Street address.

22  Q.   Now, that system that you used to find out about the

23  34th Street address also incorrectly shows that he still lives

24  at the 34th Street address as of December 15th, 2005, doesn't

25  it?

1   **A.**   Well, it wouldn't have been updated.  How can it be

2   updated on the same day?  The only update would have been from

3   the CAR listing the Richmond address.

4   **Q.**   If you look at page 7937, the incident report --

5   **A.**   Yes, sir.

6   **Q.**   -- this is a report that says, "Report taken on

7   December 15, 2005, at 10:00 a.m."  Do you see that?

8   **A.**   Yes, sir.

9          **MR. BOLEY:**  Your Honor, I'm going to object to

10  further questioning on a document that the witness says he has

11  no idea how it was prepared; where the information comes from.

12  And it -- it just seems to me like we're chasing issues down

13  rabbit holes here.

14          **THE COURT:**  Have you ever seen this document before?

15          **THE WITNESS:**  I've seen a similar document to this,

16  your Honor.  I have not seen this particular document.

17          **THE COURT:**  Where are these documents kept in the

18  ordinary course of business at the police department?

19          **THE WITNESS:**  This particular document, as far -- I

20  don't know.  The only -- the only -- the only thing that I see

21  that I recognize is something that I would find on the computer

22  in a records-management system.  So I'm guessing that this is a

23  printout from that records-management system.  So the only

24  place that I'm aware that those records are kept on a computer

25  database.

 1          THE COURT:  But it's called "Incident Report,"

 2    correct?

 3          THE WITNESS:  Correct, your Honor.

 4          THE COURT:  And do you prepare an incident report?

 5          THE WITNESS:  I do not prepare this.  No, your Honor.

 6    I -- and I -- to be honest, I don't know who does.  I don't

 7    know who inputs this information.

 8          THE COURT:  Do you know from what source this

 9    information is input?

10          THE WITNESS:  Based on looking at it, I know that a

11    lot of it was taken from the Consolidated Arrest Report and

12    added.  And that's the time.  The place matched the place on

13    the arrest tag.  Obviously myself, my partner.  The violation.

14          As far as the bottom part, the specifics on why it's

15    showing here is the 8028 street and the Hidlago name -- I don't

16    know why that has been put -- entered into with the rest of it.

17          THE COURT:  Did Mr. Hidalgo -- did Mr. Lucas give you

18    the Hidalgo name?

19          THE WITNESS:  Not at the time.

20          THE COURT:  At any time during this day, on this

21    December 15th date?

22          THE WITNESS:  No, not -- I don't recall him giving me

23    a name that I had any problems trying to figure out who he was.

24    BY MR. HADDAD

25    Q.   Now --

 1   **A.**   Well, I don't know how you introduced this, because we

 2   don't know what its source is.

 3          **MR. HADDAD:**  Apparently I'll have to wait.

 4          **THE COURT:**  Yes, I think so.

 5          **MR. HADDAD:**  I'm not offering it for the truth of the

 6   matter right now.  I am questioning him about the source of the

 7   data, though.

 8          **THE COURT:**  Well --

 9          **MR. BOLEY:**  He's testified he doesn't know it.

10          **THE COURT:**  I think you pretty much covered it, then.

11   Right?

12          **MR. HADDAD:**  Yes, I have.

13          **THE COURT:**  Okay.

14   **BY MR. HADDAD**

15   **Q.**   Now, would you please turn to 7939?

16          **THE COURT:**  Thirty-nine?

17          **MR. HADDAD:**  Yes.

18   **Q.**   And this looks similar, but at the top you'll see it's

19   called "Arrest Report."  Do you see that?

20   **A.**   Yes, sir.

21   **Q.**   And do you know who prepared this report?

22   **A.**   I do not.

23   **Q.**   Do you see that it lists you as arresting officer?

24   **A.**   I do.

25   **Q.**   And it lists the arrest time and date as the same time and

1  date in your Consolidated Arrest Report, right?

2  **A.**    Yes.

3  **Q.**    And I says, "Arrest Reason:  Probable cause."  Do you see

4  that?

5  **A.**    I'm sorry.

6  **Q.**    Upper right corner.  Do you see, "Reason for Arrest"?

7  **A.**    Yes, yes, yes.

8  **Q.**    And what does it say?

9  **A.**    "Arrest Reason:  Probable Cause."

10 **Q.**    All right.  Is that accurate?  Was that the reason for

11 arrest of Mr. Lucas?  Probable cause to believe something?

12 **A.**    A reason for an arrest, you would have to have probable

13 cause.

14 **Q.**    Okay.

15 **A.**    But it's not -- probable cause isn't independent.  You

16 can't arrest someone for obviously probable cause.

17 **Q.**    It's elementary that you need probable cause to make an

18 arrest, right?

19 **A.**    There has to be.  Yeah, yeah.

20 **Q.**    Now here, under addresses, it lists two addresses.  Do you

21 see, towards the bottom?

22 **A.**    Yes.

23 **Q.**    And one of the addresses is a 34th Street address.  Do you

24 see that?

25 **A.**    Correct.

 1  **Q.**   Now, the other address listed as the 214 South 41st Street

 2  in Richmond.  Do you see that?

 3  **A.**   Yes.

 4  **Q.**   Now, if -- if an officer accessed this document in the OPD

 5  system, sometime in the future after -- the future from when

 6  this was written --

 7  **A.**   Yes.

 8  **Q.**   -- that officer would see two addresses associated with

 9  Mr. Lucas, right?

10  **A.**   Correct.

11  **Q.**   And -- and one of those addresses -- one of those

12  addresses, 34th Street, would not actually have been his

13  address for many years.  Would you agree?

14          **MR. BOLEY:**  Objection.  Misstates testimony, but go

15  ahead.

16          **THE COURT:**  I'm sorry.  What was that objection?

17          **MR. BOLEY:**  Misstates testimony.

18          **THE COURT:**  Objection is overruled, but rephrase the

19  question, because I think it's asking for, perhaps, information

20  that is not available to him.  So ask it in a way to see if he

21  knows the information.

22  **BY MR. HADDAD**

23  **Q.**   Would you agree that this report we're looking at now,

24  7939, incorrectly shows that a current address for

25  Mr. Spencer Lucas at the time of this report was 828

MAYER - CROSS EXAMINATION / HADDAD

1   34th Street?

2   **A.**   Based simply on this report, I would say that's incorrect.

3   **Q.**   Okay.  And it was that type of information you relied ON

4   to determine that 828 34th Street was an address Mr. Lucas had

5   used within the last two or three years before the incident in

6   December '05, right?

7   **A.**   No, sir.  I think you misunderstood my answer.

8           Simply because this report was printed out in

9   January, February, March of '08, that does not mean that the

10  addresses on here are bad, or not current.  They simply state

11  the last time -- whenever this information was entered -- that

12  that particular address was entered; but I don't know, just

13  looking at this piece of paper, on whether or not that person

14  has any relation to either one of those addresses simply by

15  looking at this piece of paper.  I would have to do more

16  investigation.

17          **THE COURT:**  Well, what are the -- what are these

18  reports maintained for, if you know?

19          **THE WITNESS:**  To the best of my knowledge, they're

20  simply a records-management system that records the

21  documentation that is produced regarding an individual.

22          So any -- and these reports are something that --

23  anybody could go to our records department with a report number

24  and get the report.

25          So if you're involved in auto traffic accident in the

 1   city of Oakland, and a report is taken, your information is put

 2   onto this server on this records-management system; whatever

 3   information you give.  So if you live at 123 Park Street, that

 4   is the information that then will be transferred into the

 5   system at a later date.  If you need to recover that traffic

 6   report, as long as you have the report number -- or you could

 7   access it through your name.  Somebody in records could type

 8   out your name, the date of the event or the report number, and

 9   the information would come back, not only -- it would -- and

10   the traffic report would be there, as well as the information

11   that you gave regarding your information that day of the

12   incident.

13            THE COURT:  But in the address block of this

14   document, there are two -- essentially, there are two entries.

15   Active from date.  And both of them are December 15th, 2005,

16   correct?

17            THE WITNESS:  That is correct.

18            THE COURT:  And there are two different addresses,

19   correct?

20            THE WITNESS:  Yes, your Honor.

21            THE COURT:  Do you know how those addresses got in

22   there?

23            THE WITNESS:  They would have been entered at

24   whatever point that Mr. Lucas had contact with the police and

25   gave that address.  So at one point he gave 828 34th Street.

1   So that was entered as an address of his.

2          When we had our event, I entered on the CAR that his

3   address was the Richmond street address, so that was

4   transferred into this document.

5          The document in the system simply holds those

6   records.  So if you go into it, you can look and see that when

7   Mr. Lucas or anybody else was contacted in 2001, per se, his

8   address at that time, which he gave is 123 Park Street.

9          Two years alert, he was involved in a traffic

10  accident.  The address he gave at that time was 567 A Street.

11  That would be reflected here.

12         Two years down the road, another incident.

13         **THE COURT:**  Okay.  I get the picture; but you knew as

14  of December 15th, 2005, that this 34th Street was not his

15  address, correct?

16         **THE WITNESS:**  No, your Honor, I did not know that.

17         **THE COURT:**  He -- he told you that wasn't his

18  address, right?

19         **THE WITNESS:**  Just because he told me that wasn't his

20  address doesn't mean that I believed it.

21         **THE COURT:**  And he also told you that the 41st Street

22  address in Richmond wasn't his address; wasn't his residence,

23  correct?

24         **THE WITNESS:**  He did not tell me anything about the

25  Richmond address.

1          **THE COURT:**  But even after you arrived at that

2    Richmond address, what did he say?

3          **THE WITNESS:**  After we arrived at that address he --

4    he didn't speak to me.  He spoke to Officer Thurston.

5          **THE COURT:**  And you heard Officer Thurston say, "He

6    said, 'I stay there from time to time,'" right?

7          **THE WITNESS:**  Yeah, correct.  Correct, but as far as

8    the 828 34th Street address, at the time, again, using this

9    system, you could look into it and see that within a year of

10   our incident, Mr. Lucas had used 828 as an address.

11         So, for my investigative purposes, that is still an

12   address I need to go check out, because it's -- it's still

13   something that's fairly current.  I have to physically go there

14   and ensure that he actually doesn't live there.

15         **MR. HADDAD:**  Let me bring this more completely to the

16   sense, if possible.

17   **Q.**   Officer, you went to 828 34th Street in the course of this

18   incident, didn't you?

19   **A.**   Yes, sir.

20   **Q.**   And how now, having heard Officer Thurston testify that

21   you went up there and tried the keys out in the lock, does that

22   refresh your memory about doing that?

23   **A.**   Yes, sir.

24   **Q.**   So you recall going up to the door at that address -- 828,

25   34th Street -- trying a key in the door, and not having the key

MAYER - CROSS EXAMINATION / HADDAD

1  work, right?

2  **A.**    That is correct, sir.

3  **Q.**    And then the lady opened the door, and you talked to her,

4  right?

5  **A.**    Briefly, yes, sir.

6  **Q.**    And she confirmed that Mr. Lucas had not lived there for a

7  very long time, right?

8  **A.**    That's correct.

9  **Q.**    More than ten years or something, right?

10  **A.**    That's what she said.

11  **Q.**    All right.  Did you have any information to the contrary

12  that he currently lived at that address?

13  **A.**    I did.  This system.

14  **Q.**    Now, this system --

15  **A.**    Sir --

16        **THE COURT:**  I think we've just established this

17  system isn't worth very much.

18        **THE WITNESS:**  Well, if you were to enter this

19  address -- 828 34th Street -- into this particular system we're

20  talking about, a list of names would come up.  Those names are

21  anyone who has ever been associated within any kind of OPD

22  documentation with that address.

23        **THE COURT:**  Mm-hm.

24        **THE WITNESS:**  Within that system, would you find

25  Mr. Lucas, because his name has been linked to that address.

 1   If you click on Mr. Lucas' name, all the incidents to which he

 2   said he lived there or officers stated that he lived there

 3   would be linked.

 4          **MR. HADDAD:**  Mm-hm.

 5          **THE WITNESS:**  And the dates would also be there.

 6   **BY MR. HADDAD**

 7   **Q.**   Yes.

 8   **A.**   So --

 9   **Q.**   I get it.  And one now one of those incidents is going to

10   be December 15th, 2005, for that address, right?

11   **A.**   That is correct.

12   **Q.**   And that's your incident that you were involved in, right?

13   **A.**   That is correct, sir.

14   **Q.**   You were the arresting officer, right?  Right?

15   **A.**   I was the person who took him into custody and took him to

16   North County Jail.

17   **Q.**   And the lead officer on the incident, right?

18   **A.**   I was the lead officer in the investigation into

19   Mr. Lucas, yes, sir.

20   **Q.**   You've had a chance to review these reports several times

21   since this incident, right?

22   **A.**   Yes, sir.

23   **Q.**   Have you made any effort to go back and correct the

24   information in this system, so some other officer doesn't

25   incorrectly rely on this false information?

```
 1              MR. BOLEY:  Objection.  Relevance, your Honor.

 2              THE COURT:  Objection overruled.

 3              THE WITNESS:  Well, first, it's not incorrect.  Why

 4   would I change an address where I know a known parolee, if he

 5   was still on parole, had at one point stayed?  That is part of

 6   my investigative process, when I'm looking to find where

 7   somebody -- a parolee is living who's not being honest with me.

 8   I have encountered many parolees who are not honest with where

 9   they live.  There's a reason for that; because they don't want

10   where they're staying searched, because they have something

11   there that will send them to jail.

12              So any information that I have, I'm going to enter,

13   so that hopefully, another officer down the road has all the

14   information they need to make an accurate, detailed

15   investigation into where he may be.  And if that is required --

16   requires them to check five other addresses, one being in

17   Richmond, then at least I've given him the tools to do that.

18   So there, taking it out would be counterproductive to any

19   further investigatory process down the road.

20              Now, that officer may go to the Richmond address, and

21   like I discovered at 828 34th Street, that person doesn't

22   currently live there.  Then, you know, you've just minimized

23   the areas that you have to look at.

24   BY MR. HADDAD

25   Q.   Okay.  Let's move one.
```

 1              **THE COURT:**  What is the significance, then, of having

 2    active from date December 15th, and having that old entry?

 3              **MR. BOLEY:**  Your Honor, this is a bold thing to do.

 4    I'm going to object to that question, because you'd have to lay

 5    a foundation.  He knows what the term means.

 6              **MR. NISENBAUM:**  It is bold.

 7              **THE COURT:**  I think we have already a pretty  --

 8              **MR. BURRIS:**  I object to his boldness.

 9              **THE COURT:**  I think we already have a pretty good

10    idea about how this information gets in there.

11              **MR. BOLEY:**  No, we don't.  We have absolutely no

12    information about how this data was entered into this

13    particular form.  The witness says he doesn't know how it was

14    entered into.  He doesn't know how this document was produced.

15    We have absences.  This is something generated from the

16    computer.  He has no information as to how this particular

17    document was produced.  And he has no information  --

18              **THE COURT:**  That's right but, he --

19              **MR. BOLEY:**  -- as to whether or not it has any

20    correlation as to what other officers received.

21              **THE COURT:**  You missed the first part of his

22    testimony, apparently.

23              **MR. BOLEY:**  I did not, your Honor.  I disagree.

24              **THE COURT:**  You're overruled.

25              **THE WITNESS:**  You're asking about the active to date?

1          **THE COURT:**  Yes.  What is the significance of having

2    that there, then, if, in fact, that is not the date, you know,

3    on that date, as of December the 15th, it had been determined

4    that he didn't live there at that time?  Maybe sometime in the

5    past, but not at that time.

6          **THE WITNESS:**  Correct, your Honor.

7          The only thing I'm going to say on that -- and that's

8    just specifically looking at the form -- not -- I'm not using

9    any kind of -- is that if you look at, let's say, address,

10   there's an address, and then there's a colon, and then there's

11   828 34th Street behind it.

12         Now, if you look at the active to date, it says,

13   active to date.  And there's a colon.  And there's nothing

14   behind it.

15         So, to me, reading it, there's -- neither one of

16   these -- there's not an active to date there.  It's been left

17   off.  See what I'm saying?

18         **THE COURT:**  Yeah, but active from date would be the

19   beginning date, and not the ending date?

20         **MR. BOLEY:**  Your Honor, I object.  I really don't

21   understand that that is what is the meaning that you give to

22   that to an officer who's reading that.  I really don't.

23         And we don't have any information about how that

24   information was entered and --

25         **THE COURT:**  Then essentially what you're saying is

 1  that these officers have documents that -- they don't

 2  understand what they're reading.

 3          **MR. BOLEY:**  These aren't documents that he utilizes

 4  or he refers to or HE RELIES upon in the course of his work.

 5  That was his testimony.  We don't know how these were produced.

 6          **MR. HADDAD:**  Could I ask a question?

 7          **THE COURT:**  Yes, you may.  You may ask a question.

 8          **MR. HADDAD:**  All right.

 9  **Q.**   You testified a minute ago to -- in response to

10  Mr. Boley's question that you went to 34th Street because

11  information showed that Mr. Lucas used that residence recently;

12  as recently as the last three years.  Is that right?

13  **A.**   That's correct, sir.

14  **Q.**   What was the information that showed that?

15  **A.**   Specifically, there was a report number.

16  **Q.**   Well, there was a report number on the document we've just

17  been looking at, wasn't there?

18  **A.**   Correct.  Yes.

19  **Q.**   What was the information specifically that showed

20  Mr. Lucas had been living at the 34th Street address?

21  **A.**   Because he listed it as his address.

22  **Q.**   Where?

23  **A.**   In that particular report.

24  **Q.**   He listed the 4th Street as his own address in an arrest

25  report?

1    **A.**    In a traffic report.  Yes.

2    **Q.**    Does the arrestee get to list their own address in a

3    police department traffic report?

4    **A.**    Well, he wouldn't have been arrested in a traffic -- if it

5    was a traffic accident.  There wasn't any kind of illegal -- it

6    was a traffic accident.  So in a traffic accident, why would

7    anybody input anybody's address differently than where they're

8    living?

9    **Q.**    All right.  Have you seen a copy of that traffic report

10   you're talking about any time in connection with this civil

11   lawsuit?

12   **A.**    To this lawsuit?

13   **Q.**    Yeah.

14   **A.**    I -- I've checked the record.

15   **Q.**    When?

16   **A.**    The other day.

17   **Q.**    Are you aware that Spencer Lucas has never had an

18   accident?

19   **A.**    I didn't say he was the one who had the accident.

20   **Q.**    Do you ever use Mapquest for driving directions?

21   **A.**    Yes.

22   **Q.**    So when you want to go from Point A to Point B, and you

23   don't know how to get there, for the record, how do you use

24   Mapquest to get directions?

25   **A.**    You just punch in the address that you're looking for, and

1    it comes up on the map.

2    **Q.**    Okay.  You use a computer to do it, right?

3    **A.**    Either a computer or a --

4    **Q.**    Or your iPhone or something like that?

5    **A.**    Well, yeah.  If we're talking about this incident, our

6    phones weren't that fancy.  Thomas Guide is what I was trying

7    to get out.

8    **Q.**    All right, but Mapquest is an Internet site that you can

9    use to find directions to a place.  Do you know that?

10   **A.**    Yes.

11   **Q.**    And you've used it before, right?

12   **A.**    I have.

13   **Q.**    And it also will tell you how far the two points are,

14   based on the driving directions.  You understand that?

15   **A.**    Yes.

16   **Q.**    And have you ever -- strike that.

17          Now, the other day when I was asking you questions, I

18   asked you what was the distance from the initial scene of the

19   arrest at 32nd at M.L.K., to when you got Mr. Bradshaw down to

20   the jail.

21   **A.**    Yes, sir.

22   **Q.**    Do you recall that?

23   **A.**    Yes.

24   **Q.**    And you said that, considering that first he drove to the

25   van, and then to 34th Street, and then to the jail, it was your

 1   estimate that that was 9 miles.  Do you recall that?

 2   **A.**    I based that off of the purge.

 3   **Q.**    Yeah, because the purge said that you had driven 9 miles

 4   in between those two points, right?

 5   **A.**    Yes, sir.

 6   **Q.**    I'd like to show you Mapquest driving directions that I

 7   got for that very route and ask you to look at it.

 8   **A.**    Sir, this was not the route I took.

 9   **Q.**    You haven't even looked at it yet.  How do you know?

10   **A.**    Because that's not the route I took.

11   **Q.**    Okay.  What route did you take?

12   **A.**    I don't recall.

13   **Q.**    I just want to make sure I understand you.  The route

14   started at 32nd and M.L.K., right?

15   **A.**    That's the start point.  Yes, sir.

16   **Q.**    The next point was about one block down 32nd Street, where

17   you search the van, right?

18   **A.**    Yes, sir.

19   **Q.**    And the next point was 828 34th Street, right?

20   **A.**    Yes.

21   **Q.**    And then the final point was the jail, right?

22   **A.**    Correct.

23   **Q.**    Which is basically right behind the Oakland Police

24   Department headquarters, right?

25   **A.**    Yes.

1  **Q.**    Now please take a look at the Mapquest directions I've

2  shown you.

3  **A.**    I see them.

4  **Q.**    You see?  Now, do you agree that it shows Point A as the

5  initial point of the traffic stop?

6  **A.**    Yes, sir.

7  **Q.**    And Point B as about a block down?

8  **A.**    Yes, sir.

9  **Q.**    And Point C being 828 34th Street?

10  **A.**    Correct, sir.

11  **Q.**    And then point D would be how you get to the jail, even

12  including a little U-turn there, because there's a one-way

13  street.  Do you see that?

14  **A.**    I do.

15  **Q.**    And Mapquest says that whole route takes 2.52 miles.  Do

16  you see that?

17  **A.**    Yes, sir.

18  **Q.**    Do you have any reason to doubt that that route takes

19  2.52 miles?

20  **A.**    That particular route?  I do not.

21  **Q.**    Okay.  Why would you take a route that would take 9 miles

22  instead of 2.52 miles?

23  **A.**    There's a variety of reasons.

24  **Q.**    What was the reason that you did that in this incident?

25  **A.**    Well, based on the Lucas or Bradshaw's testimony, we

1    stopped off and talked to other officers.

2    **Q.**    I'd like to --

3    **A.**    I don't recall that, but they do.

4    **Q.**    I'd like to know based on your testimony.

5    **A.**    I don't recall the exact route.  They're the ones who said

6    that.

7    **Q.**    Are you able to account for the 6.5 mile difference

8    between your mileage, your odometer, and the most direct route

9    for what you've described doing that day?

10    **A.**    Well, first of all, I'm not directed to take the most

11    direct route.  The mileage is simply there to say how far you

12    went, but I don't -- I'm not bound by any policy that says I

13    have to take the most direct route.  If I'm on my way to the

14    jail with a prisoner and I hear another call, a police officer

15    needs assistance five blocks away, and I'm the closest unit,

16    I'm going to go over there.  By the time I get there, he may

17    wave me off, Code 4, which means I haven't actually stopped.

18    So I'm just going to continue.  So, yeah, I've made a

19    circuitous route; but it was for a good cause.

20            I don't remember exactly everything that happened on

21    the way, but the basic point is:  I'm not bound to take the

22    most direct route.  And any time you're working in the city of

23    Oakland, there are variables that come up which would change

24    the route.  The way you're going, a street could be blocked.

25    They could be doing construction on the street.  There may be

1  something else that I saw down the street.  There may be

2  something that myself and the -- in the course of our

3  investigation, figured out we needed to check.  The suspect may

4  have asked me to drive past his wife's house so he can drop off

5  keys to a car.  There are all kinds of reasons why you wouldn't

6  take the most direct route.  It's not fair to say that I was

7  taking the most direct route.

8  Q.    Going back to your Consolidated Arrest Report, this shows

9  this -- the time of the arrest of Mr. Lucas as 10:00 a.m. Is

10 that right?

11 A.    Yes, sir.

12 Q.    That would have been before you even got to Richmond,

13 right?

14 A.    Yes, sir.

15 Q.    You explained yesterday that the probable cause that was

16 generated for Mr. Lucas' arrest was generated as the fruit of a

17 search of the Richmond house.  Is that right?

18 A.    Yes, sir.

19 Q.    You didn't have probable cause to arrest Mr. Lucas at

20 10:00 a.m. on that day, did you?

21 A.    Not at the time.  No, sir.

22 Q.    Now, when you were describing your search of Mr. Lucas to

23 the Internal Affairs investigator in the investigation of this

24 incident, do you recall telling the investigator that you

25 pulled his waistband to make sure nothing was behind it?

1    **A.**    Can I see that?

2    **Q.**    Yes.  It's at page 7899 of Exhibit 1, if you want to look

3    at it.

4    **A.**    7899?

5    **Q.**    Sorry.  7899?

6              **MR. BOLEY:**    Seventy-eight what?

7              **MR. BURRIS:**    Ninety-nine.

8              **MR. HADDAD:**    7899.

9    **Q.**    And it's the second-to-last paragraph.

10   **A.**    Yes, sir.  I see it.

11   **Q.**    Yeah.  Did you tell the Internal Affairs investigator that

12   you looked in Lucas' pockets, and pulled his waistband to make

13   sure nothing was behind it?

14   **A.**    I did.

15   **Q.**    Did you pull the waistband of his underwear to make sure

16   nothing was behind it?

17   **A.**    I did not.

18   **Q.**    Which waistband did you pull?

19   **A.**    The pants.

20   **Q.**    Okay.  And how far did you pull it?

21   **A.**    Enough to run my hand around it.

22   **Q.**    Okay.  Did you look behind it as well?

23   **A.**    No, sir.

24   **Q.**    What was behind his waistband?

25   **A.**    I don't know.

1   Q.   Now, at the Richmond house when you went there to search

2   it, did you search a woman's purse that was found in the house?

3   A.   I do not recall.

4   Q.   Do you know whether you or other officers on the search

5   team searched a woman's purse and took out a Visa card?

6   A.   I did not do that.  No, sir.

7   Q.   Have you seen a photocopy of a Visa card that was

8   reportedly taken from a woman's purse during this search?

9   A.   I have.

10  Q.   Have you inquired to see where that was from?

11  A.   The first I saw of it was yesterday.  And I'm not allowed

12  to talk to anybody about it.  So the only person I could have

13  talked to was Mr. Boley.

14  Q.   Okay.  Did you or other officers in that search, to your

15  knowledge, take a privilege card from a bag under the bed of

16  that house?

17  A.   I know from testimony that that was recovered.  Yes, sir.

18  Q.   Okay.  Are you the one that took it?

19  A.   No, sir.

20  Q.   Did you leave any sort of property receipt at the house to

21  indicate that officers were the ones who had left with property

22  from that house?

23  A.   We did not collect any evidence from that house, sir.  We

24  did not log any evidence into the OPD property room.

25  Q.   Who did?

```
 1    A.    The property was taken by CDC.

 2    Q.    Agent Nakamura?

 3    A.    Agent Nakamura took the property and logged it in with

 4    CDC.

 5    Q.    Mm-hm.  Did he leave any sort of log or receipt at the

 6    house, indicating that he had left with property of the

 7    homeowners?

 8    A.    I do not know.

 9    Q.    Would theft of property during the course of a residential

10    search be something that you have a duty to intervene in?

11    A.    Yes, sir.

12    Q.    Did you do anything to make sure that property was

13    lawfully and appropriately logged and a receipt was left before

14    leaving that house?

15    A.    I did not take that property.  As far as I knew,

16    Agent Nakamura took it.  And I had no reason to believe that he

17    was going to do anything with it but log it in properly within

18    the parameters of his agency.

19    Q.    As the team leader for this incident, did you do anything

20    to see whether or not Agent Nakamura left a receipt for

21    property taken?

22              MR. BOLEY:  Objection.  Misstates testimony.

23              THE COURT:  Objection is overruled.

24              You may answer.

25              THE WITNESS:  You keep referring to me as the team
```

1    leader.  I am not the team leader.  That is the sergeant.

2              I was the one who was investigating Mr. Lucas,

3    correct, at the time of the Richmond address.  When any

4    information -- any documentation was taken, that would all fall

5    under CDC.  They are the lead investigators.  They then become

6    the lead agency.  The reason why we were there in the first

7    place, as far as contacting other agencies and that kind of

8    thing, is that they are a statewide agency.  Their jurisdiction

9    goes throughout the state.  They are the ones who have the

10   jurisdiction to go into these places and look for their

11   parolees, and search for their parolees.  So anything in

12   regards to the Richmond house at which point he was arrested

13   would fall under their agency.

14   **BY MR. HADDAD**

15   **Q.**   Do you have a responsibility to make sure that the parole

16   agent who's part of your particular PAC team acts lawfully and

17   ethically?

18   **A.**   Yes, I do.  And, to the best of my knowledge, he did.

19   **Q.**   Well, that's what I'm trying to understand:  what's the

20   best of your knowledge.  Did you ever look to see whether he

21   left a receipt?

22   **A.**   I did not.

23   **Q.**   Did you ever ask him?

24   **A.**   No, sir.

25   **Q.**   I'd like to show you three photocopies of envelopes that

```
 1  were copied yesterday during the testimony of -- two days ago

 2  during the testimony of Agent Bradley.

 3           MS. SHERWIN:  It was yesterday.

 4           MR. HADDAD:  It was yesterday.

 5           THE COURT:  No.  She was asking about the name

 6  because she wasn't here.

 7           MR. HADDAD:  (Indicating)

 8  Q.   Do those appear to be copies of envelopes taken from the

 9  Richmond house after the search?

10  A.   Yes, sir.

11           MR. HADDAD:  I would move for the admission of those

12  three envelopes as the Plaintiffs' number in line.

13           THE COURT:  Any objection?

14           MR. BOLEY:  There's no foundation that has been laid

15  for those documents.  And also object on the grounds of

16  relevance, your Honor.

17           THE COURT:  I thought he said they were taken.

18           MR. HADDAD:  Yeah.

19           MR. BOLEY:  Well, he says they appear to be; but I

20  mean, we don't have any foundation laid as to these particular

21  documents.

22           MR. HADDAD:  Your Honor, we're in a little bit of a

23  difficult position, because those were never disclosed to us in

24  discovery or in the case, even though, of course, we requested

25  everything connected.  We discovered them in the course of
```

 1  Agent Bradley's testimony.  We weren't even able to ask

 2  Agent Nakamura about them, because he was already off the stand

 3  by then.

 4          So this officer said they appear to be copies of the

 5  envelopes taken.  I think the rest of the objections raised

 6  really go to weight, and they should be admitted.

 7          **MR. BOLEY:**  And, your Honor, I have --

 8          **THE COURT:**  Do you have any reason to question

 9  whether those are documents that were taken from the house on

10  that day of the search?

11          **THE WITNESS:**  Well, your Honor, we -- I know we found

12  documentation there.  And I know some was taken.  And it was

13  related to Mr. Lucas.

14          The only thing I would say is that, you know, I don't

15  know where these photocopies came from.  Someone could say

16  these were photocopies from, you know -- and show documentation

17  that they were logged from that house, then, sure.

18          **MR. HADDAD:**  I would also point out that you'll --

19  **Q.**  Do you see that there's a fax number at the top of each of

20  those?

21  **A.**  Yes, sir.

22  **Q.**  What does that say?

23  **A.**  The number itself, or --

24  **Q.**  There's some words next to it.  Do you see that?

25  **A.**  It says, "City of Oakland."

1   **Q.**   Okay.  And Agent Bradley testified that she was faxed

2   those documents by Arlene Rosen from the City Attorney's Office

3   to review for her testimony?

4            **THE COURT:**  Well, I don't know that that totally

5   clears it up.  I mean, it's somewhat persuasive that that's

6   where they came from.  Maybe you should recall Agent Nakamura,

7   which you certainly can do.

8            **MR. HADDAD:**  Mm-hm.  Okay.

9            **THE COURT:**  Okay?

10           **MR. HADDAD:**  Okay.

11           **THE COURT:**  But you have these marked, though.  Is

12   that correct?  Do they need to be marked?

13           **MR. BURRIS:**  They weren't marked.

14           **MS. SHERWIN:**  We would mark them as Plaintiff's

15   Exhibit 4, which is the next in line.

16           **THE CLERK:**  We had marked them as 35 previously.

17   Fax.

18           **THE COURT:**  Thirty-five.  So they're marked.

19           **THE CLERK:**  Thirty-five.

20           **THE COURT:**  We'll hold them and reserve a ruling if

21   you call Agent Nakamura or somebody else who can identify them

22   for me.

23           **MR. HADDAD:**  All right.

24   **Q.**   Officer, based on your experience with the PAC team, which

25   I understand has lasted several years -- how many years, again?

1    **A.**   I'm sorry.

2    **Q.**   How many years on the PAC team?

3    **A.**   Approximately seven.

4    **Q.**   All right.  So based on that experience, did you know that

5    four out of five people who go before the Parole Board have

6    their parole revoked?

7    **A.**   No, sir.

8    **Q.**   Were you aware that it was a very high percentage of --

9    strike that.

10           A very high percentage of people who go before the

11   Parole Board end up having their parole revoked?

12   **A.**   Not specifically, no, sir.

13   **Q.**   Since 2005 have you typically worked overtime with the

14   police department?

15   **A.**   No, sir.

16   **Q.**   Did you work any overtime last year?

17   **A.**   A little.  Most of it was forced.

18   **Q.**   Okay.  Has the amount of hours of overtime that you've

19   worked in the last three years remained approximately constant?

20   **A.**   I would say so.

21   **Q.**   All right.  Were you aware that as an Oakland police

22   officer, your yearly compensation, including overtime pay, is

23   published as a public record in *The Oakland Tribune*?

24   **A.**   Yes.

25           **MR. HADDAD:**  And, your Honor, for the purposes of

1  punitive damages, I just want to ask one more question for

2  financial position.  If the officer wanted this portion of the

3  record sealed, I would have no objection.

4      **MR. BOLEY:**  Your Honor, I think this is not

5  appropriate at this phase of the case.  And I would object on

6  the ground of relevance.

7      **THE COURT:**  Well, rather than having to have the

8  officer come back and answer the question, I'll allow him to

9  answer the question by saying that -- that, you know, the case

10  gets to the point where punitive damages are proper, but -- but

11  rather than have him called back; but it will be under seal --

12  this portion of it.

13      **MR. BOLEY:**  All right.

14      **THE COURT:**  And will only be used as necessary and

15  appropriate at the right time, if there is one.

16      **THE COURT:**  So from here -- well, what was published

17  salary, if you're going to put that in the record?  That's

18  published.

19      **MR. HADDAD:**  I'm going to ask him whether it's

20  accurate.

21      **THE COURT:**  You can ask him that, but when you get to

22  any additional amounts then for punitive-damages purposes,

23  that's to be under seal.  So keep that in mind, and tell us

24  when, so she gets it down correctly.

25      **MR. HADDAD:**  I misspoke when I said "*Tribune*."  This

1   apparently was published in the *San Francisco Chronicle*.

2           **THE WITNESS:**  I know it's been published in papers.

3   Yeah.

4   **BY MR. HADDAD**

5   **Q.**   In an article dated February 4th, 2009, the *Chronicle*

6   published that in 2008, you earned $139,353 as a police officer

7   with the City of Oakland.

8           Does that sound accurate to you?

9   **A.**   I don't know where they got that number.

10  **Q.**   Does it sound accurate to you?

11  **A.**   I'd have to -- I'd have to check my tax records.  I don't

12  know.  I don't -- I don't know, sir.

13  **Q.**   All right.  Has --

14  **A.**   My ex-wife got most of that, by the way.

15  **Q.**   Has your total pay yearly -- with the Oakland Police

16  Department gone up, remained the same, or gone down since the

17  calendar year 2008?

18  **A.**   Well, that -- it -- I don't know, because I haven't

19  compared the two.

20  **Q.**   Now, this part --

21  **A.**   Actually, it's probably gone down, because we restructured

22  our contract, and we gave back quite a bit of money.

23           **MR. HADDAD:**  Okay.  Now this part, I believe, should

24  be under seal.

25           **THE COURT:**  Okay.  So this part is under seal, and

1    only to be opened upon application by the parties, with notice

2    to the other side.  And the Court, you know, then has to review

3    that and issue an Order.

4          **MR. HADDAD:**  Would the Court want the courtroom

5    emptied, or not?

6          **MR. BOLEY:**  I would ask that, your Honor.

7          **THE COURT:**  Court personnel, but yes.  Yes.

8          **MR. BURRIS:**  I would think so.

9          **THE COURT:**  I have a couple of law clerks who are

10   here.  That's fine, but everybody else should leave the

11   courtroom.

12

13         **MR. BOLEY:**  Your Honor, I'm going to renew my

14   objection.  I don't think there's a savings here.  If we're

15   going to go to a punitive-damages phase, we're going to put on

16   evidence one way or the other that -- I'm not prepared to

17   address that issue now.  I probably would bring the officer

18   back at a later time.  I don't think it's going to save any

19   time.

20         And I would renew my relevance objection, your Honor.

21         **THE COURT:**  Okay.  It's noted.  Yes.

22         (Further proceedings were placed under seal.)

23

24

25

<u>Under seal</u>

1          (Begin sealed portion of the record)

2  **BY MR. HADDAD**

3  **Q.**   All right.  In 2009, what's your best estimate of your

4  total wages earned as an Oakland police officer?

5  **A.**   I don't know, sir.

6  **Q.**   2008 what's your best estimate of your total wages earned

7  as an Oakland police officer?

8  **A.**   Without looking at my records, I could not tell you.

9  **Q.**   It was more than a hundred thousand per year, wasn't it?

10  **A.**   It could have been.

11  **Q.**   In an average week, how many hours do you work as an

12  Oakland police officer?

13  **A.**   Forty.

14  **Q.**   Plus overtime, sometimes?

15  **A.**   Sometimes, yes.

16  **Q.**   All right.  How often do you work overtime?

17  **A.**   I do not.

18  **Q.**   Excuse me?

19  **A.**   I do not often work overtime.  I don't like working

20  overtime.  It -- only if I'm forced to or if something, you

21  know -- we're on an incident that runs over the allotted ten

22  hours.  I do not volunteer for overtime.

23  **Q.**   You've said that the amount of overtime you've worked has

24  remained constant from 2008 to the present.  Is that right?

25  **A.**   Based on mandatory overtime, yes.

1  Q.   All right.  And the *San Francisco Chronicle* also published

2  that in 2008, your overtime pay was $24,758.  Does that sound

3  accurate to you?

4  A.   Did they actually put that in there?

5  Q.   Yes.

6  A.   I've never seen it.  I didn't think -- I didn't think I

7  made the list.  I didn't realize that I was on there.  You

8  know, I don't know.  I -- the overtime, as far as -- you know,

9  if you look at the tax records and things of that nature, it's

10  just one lump sum.  You'd have to go back to each individual

11  pay stub to dissect what was normal salary, and what was

12  overtime salary.

13  Q.   All right.  You're paid by the hour as an Oakland officer.

14  Is that right?

15  A.   That's correct.

16  Q.   What's your current hourly rate?

17  A.   I think we're around 47.

18  Q.   About $47?

19  A.   I think so.

20  Q.   And what about for you, with your level of experience?

21  A.   That -- I'm at -- that's -- that's the top hourly rate,

22  unless you start moving into overtime, of course, or higher --

23  what's the word I'm trying to think of? -- promotions.  So

24  sergeant, lieutenant sort of thing.

25  Q.   So your vacations are paid, right?

**Under seal**

```
 1   A.    Yes.

 2   Q.    So you're paid as a base for approximately -- strike that.

 3         You're paid as a base for 40 hours worked per week,

 4   52 weeks a year.  Is that right?

 5   A.    Yeah.  Yeah.

 6   Q.    All right.  Plus overtime, right?

 7   A.    Any overtime.  Yes.

 8         MR. HADDAD:  All right.  Thank you, your Honor.

 9         THE COURT:  Is that it, as far as anything that needs

10   to be under seal?

11         MR. HADDAD:  That's right.

12         THE COURT:  Okay.  So that that is the end of the

13   sealed portion, subject to the order I indicated earlier.

14         (End sealed portion of the record)

15

16

17

18

19

20

21

22

23

24

25
```

1              (Whereupon the following proceedings were heard in

2    open court)

3              THE COURT:  I just have a couple of questions.  You

4    were asked by Mr. Boley about -- would you search Mr. Lucas the

5    way he described it?  Remember that?

6              THE WITNESS:  Yes.

7              THE COURT:  And you said you would not have conducted

8    the search in the way he described it.  Is that correct?

9              THE WITNESS:  That's correct.

10             THE COURT:  My question is:  did you conduct it in

11   that manner?

12             THE WITNESS:  The way he described it?

13             THE COURT:  Yes.

14             THE WITNESS:  No.  Not at all.

15             THE COURT:  Can you tell us in detail how you did

16   conduct that search?

17             THE WITNESS:  I did not conduct a strip search.  I

18   did not have him put his hands on the wall, because there was

19   no wall.  I did not conduct a pat search.  I conducted a full

20   body parole search.

21             THE COURT:  Meaning?  And be specific about exactly

22   what that consisted of.

23             THE WITNESS:  Meaning that that consisted of

24   incorporating what a pat search would cover, as well as being

25   able to go into a person's pockets; being able to pull out a

1  person's wallet, and look in their wallet; being able to have

2  them sit down on the -- in the police car with their feet out,

3  and take their shoes off to check around their feet and the

4  soles of their shoes.  That's what a full body search would be,

5  whether it was generated by a parole search or a search

6  incident to arrest.

7          **THE COURT:**  Now, at some point you did acknowledge

8  pulling his belt away in some respect?

9          **THE WITNESS:**  That is part of a full body search,

10  where you will first go in around the belt itself to check for

11  any kind of -- let's say the belt has a compartment inside of

12  where the zipper is, against the person's waistband.  You will

13  manipulate the belt buckle to make sure that there's nothing in

14  the belt buckle.  There are, you know, belt buckles that

15  incorporate weapons in them.  And then you can also manipulate

16  the waistband behind the belt, to make sure that -- let's say

17  they don't have a weapon in their waistband of their pants.  So

18  many people don't necessarily carry a weapon in their pocket,

19  or don't necessarily carry it attached to their belt.  They'll

20  shove it in their waistband.  It could be something as simple

21  as a razor blade.  It could be something, you know, much bigger

22  than that, like a firearm; but the waistband is a -- is a

23  general area which we are trained onto check for weapons.

24          **THE COURT:**  And did you look inside of each of those

25  areas?

1              THE WITNESS:  We are not trained to actually make

2    visual searches like that.

3              THE COURT:  I'm asking you what you did do.

4              THE WITNESS:  No.  No, ma'am.  That's not how I

5    conduct a search.

6              THE COURT:  I'm asking you what -- how -- not how you

7    do it generally.  I'm asking you what you did in this instance,

8    this case.

9              THE WITNESS:  No.  I searched by feel.

10             THE COURT:  And how far down inside the pant area did

11   you go?

12             THE WITNESS:  Just within the waistband area.  So the

13   first inch, two inches of the waistband; approximately what the

14   belt would cover.

15             THE COURT:  Uh-huh.  Okay.  Anything further?

16             MR. HADDAD:  No, your Honor.

17             THE COURT:  Anything further?  I guess that winds it

18   up, because you did your examination already.  Correct?  Do you

19   have any re --

20             MR. BOLEY:  I may have some redirect, yes,

21   your Honor.

22             THE COURT:  This tennis match has gone back and forth

23   a couple of times.

24             MR. BURRIS:  Already done redirect.

25

<u>**REDIRECT EXAMINATION**</u>

**BY MR. BOLEY**

**Q.**   You testified about the Consolidated Arrest Report which
you delivered to the jail facility.  Is that facility operated
by the City or the County?

**A.**   The County.

          **MR. BOLEY:**  No other questions, your Honor.

          **THE COURT:**  Anything further?

          **MR. HADDAD:**  No.  Thank you.

          **THE COURT:**  May the officer be excused, without being
subject to being recalled?

          **MR. BOLEY:**  He may, your Honor.

          **THE COURT:**  At least so far as we know.  There may be
some other extraneous issues.

          Do not discuss your testimony with any other persons
who may be witnesses --

          **THE WITNESS:**  Yes, your Honor.

          **THE COURT:**  -- before the trial is over.

          **THE WITNESS:**  Yes, your Honor.  Understood.

          **THE COURT:**  That is it for today.

          **MR. BOLEY:**  That's it for today.  Now, have the
plaintiffs rested?

          **MR. BURRIS:**  We obviously have not rested.  And we
have issues around Farrell (phonetic spelling).

          **THE COURT:**  You're going to do something about that

1    this weekend?

2            MR. BURRIS:  Depos tomorrow.  And we're going to put

3    him on.  And obviously want to finish with Dilley (phonetic

4    spelling).  We're reserving the to call Captain Farrell

5    (phonetic spelling) for a couple of points at the end of us

6    having completed the second case, as well.  He will cover both

7    points, as opposed to him having to come back twice.

8            MR. BOLEY:  All right.  And my understanding,

9    Captain Farrell (phonetic) is testifying as to the -- supposed

10   to testify as to matters relating to the individual incident,

11   as to whether or not the search occurred as alleged.

12           MR. HADDAD:  As the person who's probably going to be

13   examining him --

14           THE COURT:  Is he the I.A. person?

15           MR. HADDAD:  He's the head of Internal Affairs.

16           MR. BOLEY:  The I.A. person.  He's the command.  He

17   was the command.

18           THE COURT:  One of the I.A. persons.

19           MR. BOLEY:  He was the commander of the unit.  He was

20   not the person who actually conducted the investigation, and is

21   most familiar with the documents which I'm assuming they want

22   to examine.

23           MR. BURRIS:  He's a supervisor.

24           MR. HADDAD:  I just want to raise the issue, though.

25   We're going to ask him about the investigations of these cases.

1    The -- this one and the next one.  We're going to present -- he

2    signed the Internal Affairs reports.  There are memos to and

3    from the investigators and him.  He was really involved in the

4    investigation in a personal way.  I believe he'll be able to

5    explain the CAD documentation which some of the officers have

6    had trouble fully explaining.

7           **THE COURT:**  And some of these other documents that we

8    can't figure out.

9           **MR. HADDAD:**  Some of the other documents, because

10   they were all obtained from the copy of the Internal Affairs

11   files that we have.  So it was all stuff he reviewed, and some

12   of which he asked the lower-down investigator to retrieve and

13   get.

14          Obviously, we also have some item to elicit

15   concerning some of the more broad issues, policy, generally how

16   the Internal Affairs Division was reacting to patterns of

17   strip-search complaints.  We can either try to split that in

18   two, and call them twice, or we can try and get it all done at

19   one time.  That's really up to the Court, but we just want some

20   direction.

21          **THE COURT:**  Well, and before you're calling him,

22   you're going to be calling next week the witnesses in the

23   second case?

24          **MR. BURRIS:**  Absolutely.

25          **THE COURT:**  Right?  Why don't we just get started

```
 1   with that?  And you were anticipating calling Farrell,
 2   regardless of what you're allowed to go into with him.  You
 3   were going to call him at the end.
 4            MR. BURRIS:  At the end.  Correct.
 5            THE COURT:  So sort of be an umbrella is that the
 6   case.
 7            MR. BURRIS:  Yes.
 8            THE COURT:  So whom are you calling, other than
 9   Dilley?  You're finished with you're witnesses in this case,
10   other than any overarching policy issues.
11            MR. BURRIS:  Right.  We're going to call Dilley, and
12   then we're going to start on the next case.  Officer Vass will
13   be first.  Vass or Vass will be first.  And then, depending
14   upon what he has to say, we could call a couple of impeaching
15   witnesses; names we have given already.
16            And then we will -- in the order's not totally clear,
17   but we could call Michael Holmes and/or a couple of people
18   around him.  I don't know if we'll get to all of them that day.
19   And we'll sort of go down the order; take care of
20   Michael Holmes.  Then we'll have Rick.  We have some testimony
21   to read, because one of the witnesses has passed:
22   Mr. Thornton.  And I don't know how the Court wants to do that,
23   or if the Court just wants us to read it.
24            THE COURT:  Just mark up the deposition, with
25   respective --
```

1              **MR. BURRIS:**  Right.  Portions of it.

2              **THE COURT:**  -- designations.  And then the other side

3    can mark in the margin with an appropriate rule number or --

4              **MR. BURRIS:**  Sure.

5              **THE COURT:**  -- some sort of a key system, you know;

6    your objections to the other side's designations; but use one

7    deposition.

8              **MR. BURRIS:**  For that --

9              **THE COURT:**  For the designations.  And you can

10   highlight, you know, one can use blue.  One can use yellow.

11   Whatever you want to use, I don't care.

12             **MR. BURRIS:**  Once that's done, do we read it or does

13   the Court want to take it?

14             **THE COURT:**  No.  I'll just read it.

15             **MR. BURRIS:**  That's what we wanted to find out.

16             **MR. BOLEY:**  We don't need actors.

17             **THE COURT:**  Does somebody have a burning desire to

18   act?

19             **MR. HADDAD:**  Ben.

20             **MR. NISENBAUM:**  We hired Billy Dee Williams for it,

21   so --

22             **MR. BURRIS:**  Although this guy's a little old for

23   Billy Dee Williams, but anyway, we wanted direction around

24   that.  So we'll take care of that, in terms of working with

25   counsel.  We'll designate what we want.  And then they can say

1    yea or nay.

2              THE COURT:  You will let them know by Monday whom you

3    are calling on Tuesday?

4              MR. BURRIS:  Oh, yes.

5              MR. BOLEY:  Now, your Honor, you know, with the

6    parties have filed memoranda regarding -- which will have some

7    bearing on these witnesses who are being called, and on the

8    testimony.

9              To the extent to which plaintiffs are allowed to

10   inquire into the -- other act -- other complaints against

11   officer Vass -- and I'm not prepared to argue that now, but I'm

12   just asking when that issue will be addressed.

13             MR. BURRIS:  I will be clear about this.  And I think

14   the Court has already been very clear; that to the extent that

15   we have impeaching witnesses regarding testimony that we

16   anticipate that Officer Vass will give, certainly, pursuant to

17   what he has said in his depositions, we do have witnesses to

18   impeach him on that; much like they thought they were doing or

19   did try to do with respect to our witness, even though, you

20   know, so that's not new.  We've told them about that.  Their

21   names are on the witness list, actually.

22             In fact, it may be -- I don't know what else Counsel

23   was talking about, but it's not our intention just to go.  It's

24   really to bring in those matters that we feel are impeaching to

25   the witness' testimony.

```
 1            Now there are, in fact, other acts that have been
 2   observed where this officer has engaged in conduct related to
 3   our particular witnesses, our particular clients, and maybe, on
 4   one occasion, some other people; but certainly as it relates to
 5   our clients, other acts that they've engaged in that he has
 6   denied ever having done we have witnesses to testify.
 7            THE COURT:  Vis-a-vis your clients?
 8            MR. BURRIS:  Vis-a-vis our clients.
 9            THE COURT:  These two plaintiffs?
10            MR. BURRIS:  We have three; three plaintiffs.
11            MR. BOLEY:  Well, you know, the problem is that, you
12   know, we have a complaint which says it's a series of
13   incidents.  And, you know, the case has been litigated around
14   those incidents.
15            And then now they bring in witnesses they call
16   "impeaching witnesses" who are talking about other incidents,
17   or witnesses that haven't been previously disclosed.  That's my
18   problem.
19            MR. BURRIS:  That's not actually true.
20            THE COURT:  Let's, first of all, just hear
21   Officer Vass' testimony.  And we'll see what comes out.
22            And then we'll figure out what is appropriate.  And
23   there may be some objections while he's testifying as to
24   whether some other incident can come in.  And I think it
25   depends upon what those incidents involve and whom they involve
```

```
 1   and --

 2            MR. BURRIS:  Sure.

 3            THE COURT:  -- when, and so on and so forth.  We'll

 4   have to, I think, size it up at the time.

 5            MR. BURRIS:  Right.

 6            THE COURT:  Okay?

 7            MR. BOLEY:  All right.

 8            THE COURT:  So you'll give them their list on Monday,

 9   and order of call.  And we'll see you, then, on Tuesday at nine

10   o'clock.

11            MR. HADDAD:  Okay.  Thank you.

12            MR. BURRIS:  Thank you.

13            MS. SHERWIN:  Thank you, your Honor.

14            MR. NISENBAUM:  With respect to what we leave here

15   today, should we put it back in that corner?

16            THE COURT:  Put it somewhere away, yes, because we

17   have a calendar in here on Monday all day long.  And --

18            MR. BURRIS:  I'll be back.

19            THE COURT:  -- people are going to need to use these

20   tables.

21            MR. BURRIS:  I'll be back.

22            THE COURT:  Okay.

23            (At 3:37 p.m. the proceedings were adjourned.)

24

25
```

<u>**I N D E X**</u>

**DEFENDANT'S WITNESSES**                                        **PAGE**    **VOL.**

**THURSTON, D'VORE**

| | PAGE | VOL. |
|---|---|---|
| (PREVIOUSLY SWORN) | 818 | 4 |
| Direct Examination by Mr. Boley | 818 | 4 |
| Cross Examination by Mr. Nisenbaum | 831 | 4 |
| Redirect Examination by Mr. Boley | 932 | 4 |
| Recross Examination Resumed by Mr. Nisenbaum | 949 | 4 |

**MAYER, INGO**

| | PAGE | VOL. |
|---|---|---|
| (PREVIOUSLY SWORN) | 974 | 4 |
| Direct Examination by Mr. Boley | 974 | 4 |
| Cross Examination by Mr. Haddad | 986 | 4 |
| Redirect Examination by Mr. Boley | 1045 | 4 |

<u>**E X H I B I T S**</u>

| **PLAINTIFF'S EXHIBITS** | **IDEN** | **VOL.** | **EVID** | **VOL.** |
|---|---|---|---|---|
| 3-7A | 958 | 4 | 958 | 4 |

| **DEFENDANT'S EXHIBITS** | **IDEN** | **VOL.** | **EVID** | **VOL.** |
|---|---|---|---|---|
| 3-10A, 3-10B, 3-4 | | | 948 | 4 |
| 3-10B | 946 | 4 | | |
| 3-4 | 943 | 4 | | |

### CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C. 04-4843-MHP,, James Taylor, et al, v. City of Oakland, et al. were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Thursday, March 25, 2010

**$**

**$139,353 [1]** 103/6
**$24,758 [1]** 1040/2
**$47 [1]** 1040/18

**'**

**'03 [1]** 984/20
**'05 [1]** 1012/6
**'08 [1]** 1012/9
**'80s [1]** 957/13
**'I [1]** 1015/6

**/**

**/s [1]** 1054/17

**0**

**00:00 [1]** 966/10
**04-4843-MHP [2]** 816/8 1054/6
**05 [2]** 966/10 966/11
**05-03110-MHP [1]** 816/15
**05-082609 [1]** 839/7
**051215 [2]** 840/6 854/4
**06:59 [1]** 836/25
**07-04179-MHP [1]** 816/21
**082609 [1]** 839/7

**1**

**10 [41]** 893/13 893/14 893/14 893/15 893/21
895/4 895/6 895/11 895/13 896/5 896/5 896/8
896/9 896/13 939/11 939/14 939/15 940/18
940/21 940/25 941/1 941/7 941/10 943/10
943/14 943/15 944/5 944/8 944/9 944/10
945/2 945/12 945/13 945/17 949/3 950/23
950/25 952/5 952/7 953/6 1004/2
**1053 [1]** 816/2
**10:00 [4]** 1005/3 1007/7 1027/9 1027/20
**10:43 [4]** 852/3 853/21 853/22 860/3
**10:46 [2]** 852/3 853/25
**10A [11]** 938/15 939/6 939/22 940/1 944/11
948/16 948/23 948/25 949/6 949/6 950/20
**10B [7]** 945/18 946/12 946/13 946/15 948/23
950/22 951/1
**11 [2]** 856/23 895/9
**1147 [1]** 834/15
**11:20 [1]** 917/5
**11:37 [1]** 917/5
**12 [1]** 816/11
**12/15/05 [2]** 966/10 966/11
**1200 [1]** 817/6
**1212 [1]** 817/6
**123 [2]** 1013/3 1014/8
**12:30 [9]** 848/20 849/20 849/21 849/24 854/5
854/25 962/21 963/15 964/2
**13:24 [3]** 999/16 999/20 1001/17
**14 [5]** 827/20 834/13 836/19 851/20 855/17
**14:34 [3]** 849/21 855/2 855/3
**14:55 [1]** 855/3
**14:58 [1]** 855/4
**15 [4]** 824/7 945/1 1005/3 1007/7
**15:33 [4]** 827/15 836/24 855/6 855/16
**15th [14]** 825/25 830/25 837/16 840/6 840/21
854/4 1005/24 1006/24 1008/21 1013/15
1014/14 1017/10 1019/12 1020/3
**16 [6]** 877/12 879/5 879/8 879/14 932/20
933/2
**16:47 [1]** 834/19
**18 [2]** 828/13 1001/24
**19 [1]** 828/13
**1926 [2]** 834/20 835/12
**19th [1]** 865/6
**1:02 p.m [1]** 973/21
**1:45 [1]** 973/18
**1:45 p.m [1]** 973/21

**2**

**2.52 miles [3]** 1025/15 1025/19 1025/22
**2001 [1]** 1014/7
**2005 [19]** 825/13 825/21 825/25 828/2 828/16
830/25 837/16 840/6 840/22 854/4 984/24
994/21 1005/3 1006/24 1007/7 1013/15
1014/14 1017/10 1035/13
**2008 [6]** 865/7 1037/6 1037/17 1039/6
1039/24 1040/2
**2009 [2]** 1037/5 1039/3
**2010 [2]** 816/11 1054/18
**2069 [1]** 838/24
**214 [2]** 1005/13 1011/1
**23:59 [2]** 825/5 966/11
**25 [1]** 1054/18
**2:34 [1]** 849/21

**3**

**3,000 [1]** 985/11
**3-10 [40]** 893/13 893/14 893/14 893/15
893/21 895/4 895/6 895/11 895/13 896/5
896/5 896/8 896/9 896/12 939/11 939/14
939/15 940/18 940/21 940/25 941/1 941/7
941/10 943/10 943/14 943/15 944/5 944/8
944/9 944/10 945/2 945/12 945/13 945/17
949/3 950/23 950/25 952/5 952/7 953/6
**3-10A [11]** 938/15 939/6 939/22 940/1 944/11
948/16 948/23 948/25 949/6 949/6 950/20
**3-10B [7]** 945/18 946/12 946/13 946/15
948/23 950/22 951/1
**3-11 [1]** 895/9
**3-15 [1]** 945/1
**3-2 [1]** 859/14
**3-3 [9]** 859/13 859/17 860/6 860/7 889/4
889/8 889/15 892/7 892/8
**3-3B [1]** 892/9
**3-3C [1]** 892/12
**3-4 [28]** 937/14 938/16 938/18 938/23 939/2
939/10 939/16 939/23 940/1 941/8 941/13
941/18 942/3 942/22 942/23 942/24 943/2
943/6 945/15 948/16 948/18 948/23 951/18
952/8 952/10 953/7 953/8 956/5
**3-5 [5]** 943/18 943/22 945/2 945/5 945/4
**3-7 [3]** 956/11 956/13 956/14
**3-7A [5]** 958/13 958/14 958/15 958/16 958/22
**3-8 [3]** 895/3 895/10 895/12
**3-9 [1]** 895/9
**3-D [1]** 862/9
**30 [1]** 823/13
**323 [1]** 957/12
**32nd [19]** 828/18 830/24 844/12 884/21
888/5 891/17 894/5 895/16 898/12 898/20
913/19 949/12 950/7 950/18 951/4 961/11
980/6 1023/19 1024/14
**32nd Street [16]** 831/15 838/7 841/20 841/21
844/7 846/3 849/12 846/14 849/5 860/1
889/24 889/25 905/12 917/21 998/10 1024/16
**3300 [1]** 997/21
**33rd [3]** 860/18 860/21 864/20
**33rd Street [3]** 819/6 860/18 863/14
**3400 [1]** 971/13
**34th [8]** 819/8 860/21 862/11 862/13 917/21
939/3 939/8 997/21
**34th Street [34]** 819/7 860/19 863/8 863/10
863/12 863/14 864/21 964/14 965/15 970/22
970/24 984/11 1006/8 1006/10 1006/21
1006/23 1006/24 1010/23 1011/12 1012/1
1012/4 1013/25 1014/14 1015/8 1015/17
1015/25 1016/19 1018/21 1020/11 1021/10
1021/20 1023/25 1024/19 1025/9
**35 [1]** 1034/16
**3800 [8]** 850/15 850/19 851/7 852/9 852/19

**8**

854/1 920/13 920/16
**3:30 [2]** 849/14 849/24
**3:33 p.m [1]** 855/6
**3:37 p.m [1]** 1052/23
**3B [2]** 892/9 946/11
**3C [1]** 892/12
**3L15 [1]** 827/23
**3L18 [1]** 828/10
**3L19 [1]** 828/10

**4**

**40 [1]** 1041/3
**41st Street [7]** 850/4 850/7 921/22 985/2
1005/13 1011/1 1014/21
**45 [3]** 823/13 937/5 973/13
**4500 [1]** 817/10
**452-5500 [1]** 817/3
**47 [1]** 1040/17
**470 [1]** 909/10
**476 [1]** 817/9
**4A14 [2]** 827/21 841/21
**4th [1]** 1037/5
**4th Street [1]** 1021/24

**5**

**505 [1]** 817/2
**510 [3]** 817/3 817/7 817/10
**52 [1]** 1041/4
**5200 [1]** 817/7
**5500 [1]** 817/3
**567 [1]** 1014/10
**5:00 [1]** 838/2

**6**

**6.5 [1]** 1026/7
**60,000 [1]** 995/14
**600 [10]** 838/7 841/20 841/21 846/3 846/12
846/14 889/23 889/25 894/16 998/10
**60369 [1]** 859/23
**63 [1]** 846/20
**6:00 [7]** 825/9 825/12 825/24 837/19 837/20
838/1 838/4
**6:00a.m [1]** 838/2
**6s [2]** 868/4 868/14

**7**

**7,925 [1]** 825/2
**7899 [7]** 996/19 996/22 997/1 1028/2 1028/4
1028/5 1028/8
**7920 [1]** 856/5
**7922 [2]** 966/2 966/5
**7923 [5]** 827/11 856/6 933/21 962/1 998/5
**7937 [5]** 1004/11 1004/11 1005/12 1005/16
1007/4
**7939 [2]** 1009/15 1011/24
**7:00 a.m [1]** 837/16
**7A [6]** 958/13 958/14 958/15 958/16 958/22
958/23
**7th [1]** 885/1
**7th Street [1]** 884/25

**8**

**8012 [1]** 876/23
**8028 [1]** 1008/15
**816 [1]** 816/2
**82133 [1]** 964/2
**828 [13]** 1006/8 1011/25 1012/4 1013/25
1015/8 1015/10 1015/17 1015/24 1016/19
1018/21 1020/11 1024/19 1025/9
**836-4500 [1]** 817/10
**839-5200 [1]** 817/7
**8500 [1]** 868/11
**8:00 o'clock [1]** 980/25
**8:25 [19]** 838/7 838/23 839/22 840/19 840/21

**8**

**8:25... [14]** 841/20 841/20 841/21 841/22 842/1 843/3 843/24 846/1 846/5 846/20 934/6 962/14 963/10 998/10

**8:30 [1]** 843/22

**9**

**9223 [2]** 817/13 1054/17
**94607 [1]** 817/10
**94612 [2]** 817/3 817/6
**9:00 [1]** 816/11
**9:25a.m [1]** 844/7
**9:28 [2]** 846/22 848/20
**9:28 a.m [1]** 844/5
**9:29 [5]** 851/22 852/3 859/22 859/24 859/25
**9:29a.m [1]** 853/18
**9:30 [1]** 853/22

**A**

**a.k.a.s [1]** 1005/20
**a.m [18]** 816/11 825/9 825/24 837/16 837/19 837/20 838/1 838/2 838/4 838/7 844/5 917/5 917/5 962/15 1005/3 1007/7 1027/9 1027/20
**abandoned [16]** 888/22 911/23 911/24 911/25 912/2 912/3 912/7 912/16 912/23 913/2 913/4 913/8 913/11 913/14 970/12 970/14
**ability [1]** 982/5
**able [17]** 861/20 871/23 912/24 930/11 930/20 939/6 939/13 942/1 942/3 975/17 979/11 1026/7 1033/1 1042/25 1042/25 1043/1 1047/4
**about [137]** 822/5 822/9 822/23 824/7 826/4 830/6 832/12 832/12 837/2 840/19 840/21 845/13 845/25 847/8 849/16 856/6 857/14 858/17 859/20 864/13 865/7 865/15 866/12 870/4 872/3 872/12 872/13 872/15 872/16 874/19 875/20 877/13 882/24 884/21 884/21 885/4 887/23 899/7 899/18 901/22 903/17 904/12 904/14 904/16 905/11 905/11 907/23 908/3 910/24 910/25 911/7 911/10 911/18 911/25 912/13 914/10 915/15 915/24 917/10 919/1 919/3 919/6 919/7 919/13 921/23 923/11 923/16 925/20 925/20 928/25 931/1 934/5 935/12 935/18 936/17 937/9 937/20 937/22 944/19 945/1 945/9 948/1 957/5 958/1 960/8 961/9 961/11 962/18 970/17 971/12 976/22 980/5 981/10 985/1 985/24 987/18 988/9 988/10 988/13 988/18 988/19 989/6 990/21 990/24 991/1 1001/14 1004/10 1005/8 1015/22 1016/20 1019/10 1019/12 1019/25 1020/23 1022/10 1023/5 1024/16 1025/7 1029/12 1032/5 1033/2 1040/18 1040/20 1042/4 1042/21 1045/3 1045/25 1046/25 1050/13 1050/20 1050/23 1051/16
**absconded [2]** 985/12 985/22
**absences [1]** 1019/15
**absolutely [34]** 825/14 828/3 828/17 829/1 829/20 831/1 831/24 832/4 832/10 833/14 833/17 834/22 835/13 858/4 866/4 867/9 869/16 882/6 888/15 905/4 905/7 911/20 913/15 917/25 918/7 929/13 929/16 931/17 932/4 934/1 964/17 984/5 1019/11 1047/24
**abstract [1]** 1003/1
**academy [6]** 947/22 987/6 988/13 988/18 989/3 993/1
**access [5]** 901/17 926/10 926/13 926/15 1013/7
**accessed [1]** 1011/4
**accident [9]** 984/21 984/22 1012/25 1014/10 1022/5 1022/6 1022/6 1022/18 1022/19

**accidents [1]** 957/5
**accomplish [1]** 892/9
**according [14]** 838/6 838/8 847/6 849/17 849/20 849/23 853/17 853/24 854/2 854/3 859/24 860/5 970/7 987/23
**account [2]** 964/6 1026/7
**accuracy [1]** 836/5
**accurate [22]** 835/25 836/25 838/24 894/4 987/1 997/10 1010/10 1018/14 1036/20 1037/8 1037/10 1040/3
**acknowledge [1]** 1043/7
**across [5]** 822/20 891/22 894/12 896/17 978/10
**act [2]** 1049/18 1050/10
**acted [1]** 997/7
**action [4]** 829/3 829/4 829/19 935/2
**actions [1]** 968/2
**activated [2]** 869/22 869/25
**active [9]** 901/2 936/24 1013/15 1019/2 1019/25 1020/12 1020/13 1020/16 1020/18
**activity [5]** 832/15 849/22 960/17 967/21 967/24
**actors [1]** 1049/16
**acts [3]** 1031/16 1051/1 1051/5
**actual [7]** 901/23 918/10 918/11 935/2 976/18 980/15 1001/13
**actually [78]** 820/14 822/4 822/25 823/1 823/23 823/23 833/19 836/14 836/18 842/5 842/7 842/23 845/21 846/13 846/20 846/24 847/9 847/10 848/6 848/10 848/16 852/14 863/21 863/24 863/25 864/3 864/5 869/1 871/4 876/6 877/5 877/9 885/18 887/1 890/25 894/1 897/3 899/10 899/17 901/20 902/2 907/2 909/8 912/15 915/15 916/3 917/15 924/12 925/8 936/7 936/22 937/5 943/25 949/17 963/1 963/19 964/12 968/24 970/7 970/15 971/9 972/17 982/24 984/8 992/6 997/6 1000/6 1003/19 1011/12 1015/14 1026/17 1037/21 1040/4 1044/1 1046/20 1050/21 1051/19
**Adam [6]** 827/20 828/8 834/13 836/19 851/20 855/17
**add [1]** 856/4
**added [15]** 832/3 839/23 840/13 841/22 846/6 848/22 854/5 854/12 934/7 962/4 962/7 962/18 962/20 964/2 1008/12
**adding [1]** 854/21
**additional [7]** 822/25 826/22 849/18 862/24 922/11 923/9 1036/22
**address [94]** 820/20 821/5 821/6 821/9 822/9 822/9 822/17 850/4 850/7 852/9 852/11 852/17 852/18 852/19 904/1 916/7 921/22 921/24 921/25 922/23 924/14 925/11 928/8 929/18 931/4 931/22 970/11 970/21 970/22 970/23 971/4 971/7 971/8 971/9 971/11 971/11 971/19 971/20 972/13 984/14 984/21 984/22 985/2 994/7 997/23 998/20 1006/7 1006/14 1006/21 1006/23 1006/24 1007/3 1010/23 1011/1 1011/13 1011/24 1012/4 1012/12 1013/13 1013/25 1014/1 1014/3 1014/8 1014/10 1014/15 1014/18 1014/20 1014/22 1014/22 1014/25 1015/2 1015/3 1015/8 1015/10 1015/12 1015/24 1016/10 1016/19 1016/22 1016/25 1017/10 1017/18 1018/4 1018/20 1020/9 1020/10 1021/20 1021/21 1021/24 1022/2 1022/7 1022/25 1031/3 1038/17
**addressed [1]** 1050/12
**addresses [13]** 970/21 1006/18 1010/20 1010/20 1010/23 1011/8 1011/11 1011/12 1012/12 1012/14 1013/18 1013/21 1018/16
**adjoining [1]** 853/12
**adjourned [1]** 1052/23

**adjust [1]** 977/10
**admission [5]** 926/1 926/18 946/7 1004/24 1034/1
**admit [1]** 1001/16
**admitted [5]** 877/14 893/15 948/22 958/22 1033/6
**advise [2]** 823/7 847/4
**advised [6]** 835/25 887/4 887/15 912/2 926/23 970/24
**aerial [1]** 939/2
**Affairs [20]** 865/2 866/3 866/10 866/12 866/20 867/1 867/14 867/21 923/11 937/19 938/1 996/9 996/15 997/6 1027/23 1028/11 1046/15 1047/2 1047/10 1047/16
**African [2]** 830/2 830/6 830/16 830/17 876/3
**African-American [3]** 830/6 830/17 876/3
**after [41]** 820/2 820/12 823/14 823/15 824/24 827/15 837/3 842/9 844/21 844/23 844/23 848/19 848/19 849/2 867/16 874/8 886/15 886/17 886/24 899/18 908/9 908/14 908/16 910/2 910/25 925/23 929/22 935/10 942/7 942/19 962/24 964/14 965/3 973/15 976/6 981/1 993/24 1011/5 1015/1 1015/3 1032/9
**afternoon [4]** 820/22 973/22 974/9 974/10
**afterwards [1]** 863/6
**again [32]** 837/9 844/13 844/14 845/9 848/19 853/8 854/3 854/23 855/5 855/11 860/3 864/11 870/5 871/13 882/24 889/10 889/15 902/19 904/10 942/9 954/5 955/4 959/20 964/4 972/16 975/5 977/8 986/15 998/5 1006/15 1015/8 1034/25
**against [3]** 831/2 1043/12 1050/10
**agencies [1]** 1031/7
**agency [6]** 853/1 1002/7 1030/18 1031/6 1031/8 1031/13
**agency's [1]** 853/3
**agent [53]** 821/17 822/24 823/7 823/18 823/24 867/18 867/21 867/22 867/25 903/17 905/9 905/13 922/7 922/18 922/19 923/4 923/8 923/16 923/18 925/7 926/6 926/16 926/23 930/4 931/17 962/25 963/25 964/15 970/11 970/12 975/13 978/5 981/14 987/1 996/6 1002/19 1002/22 1002/22 1003/15 1003/16 1003/19 1004/7 1030/3 1030/3 1030/16 1030/20 1031/16 1032/2 1033/1 1033/2 1034/1 1034/6 1034/21
**Agent Nakamura [32]** 821/17 822/24 823/7 823/18 823/24 867/18 867/22 905/9 905/13 922/7 922/18 922/19 923/4 923/8 923/16 923/18 925/7 926/6 926/23 930/4 978/5 987/1 996/6 1003/15 1003/16 1004/7 1030/2 1030/16 1030/20 1033/2 1034/6 1034/21
**agent's [2]** 824/4 931/18
**agents [1]** 827/5
**ago [4]** 973/12 993/4 1021/9 1032/1
**agree [7]** 831/19 831/25 832/5 999/16 1011/13 1011/23 1025/4
**Ah [1]** 1002/18
**ahead [6]** 820/10 820/10 848/17 922/24 936/3 1011/15
**al [6]** 816/9 816/16 816/19 816/22 1054/6 1054/7
**Alameda [3]** 936/22 937/9 965/11
**Alameda County [1]** 936/22
**alert [1]** 1014/9
**all [98]** 816/13 820/2 820/17 820/21 823/7 823/9 823/10 823/23 824/5 824/10 824/12 826/3 826/18 839/4 851/16 858/9 862/24 866/23 868/15 868/16 869/13 893/1 897/16 898/25 899/1 900/6 905/24 909/24 913/8 923/1 924/2 924/12 933/1 933/20 933/21 936/8 939/12 941/7 941/16 942/1 942/14 945/12 946/24 946/24 947/3 950/23 950/23

Case 3:07-cv-04172-SI ... Filed 04/20/10 ... Page 242/267

# A

**all... [51]** 951/2 951/3 952/23 957/23 959/3 960/10 963/3 973/4 978/23 980/9 980/16 980/22 988/12 989/11 990/20 992/8 993/14 1000/25 1001/8 1004/10 1006/15 1010/10 1016/11 1017/1 1018/13 1021/8 1022/9 1023/8 1026/10 1027/5 1031/4 1034/23 1035/4 1035/21 1036/13 1037/13 1039/3 1039/16 1040/1 1040/13 1046/16 1041/8 1042/14 1046/8 1047/10 1047/11 1047/18 1048/18 1051/20 1052/7 1052/17
**alleged [4]** 829/9 831/20 993/5 1046/11
**allegedly [1]** 906/9
**allotted [1]** 1039/21
**allow [12]** 829/24 831/14 837/7 906/1 976/9 978/25 979/5 979/6 980/2 993/6 993/13 1036/8
**allowed [8]** 915/19 915/20 915/21 979/7 984/8 1029/11 1048/2 1050/9
**allowing [1]** 1022/7
**alone [1]** 830/1
**along [7]** 926/14 935/17 958/20 963/21 968/17 995/3 1002/15
**already [12]** 844/13 877/14 879/6 893/14 998/5 1019/7 1019/9 1033/2 1044/18 1044/24 1048/15 1050/14
**also [42]** 823/19 823/20 828/10 832/5 848/10 852/8 858/23 862/24 867/24 874/7 895/18 905/5 920/6 923/23 925/10 930/20 948/16 961/10 961/10 966/6 971/25 984/21 987/19 988/12 992/14 992/18 992/21 995/22 998/24 1000/10 1001/17 1002/23 1003/12 1006/23 1014/21 1017/5 1023/13 1032/15 1033/18 1040/1 1043/15 1047/14
**alternate [1]** 994/19
**Although [1]** 1049/22
**always [3]** 828/7 935/5 988/1
**am [3]** 973/23 1009/6 1031/1
**Amendment [1]** 989/19
**American [5]** 830/2 830/6 830/16 830/17 876/3
**amount [6]** 850/3 909/2 914/6 936/25 1035/18 1039/23
**amounts [1]** 1036/22
**and/or [2]** 1048/17 1054/13
**angle [1]** 846/17
**ankles [1]** 829/13
**annotate [2]** 872/1 1001/11
**another [37]** 824/17 828/9 835/1 846/5 859/5 859/15 900/18 904/1 904/7 904/8 904/9 940/15 942/24 943/10 946/21 948/6 951/25 951/25 962/20 963/19 965/19 965/20 965/23 971/3 971/5 975/13 975/13 979/17 987/20 989/7 989/15 996/14 1001/7 1002/6 1014/12 1018/13 1026/14
**answer [22]** 833/3 835/9 836/7 837/8 838/13 838/25 856/13 871/7 871/11 871/17 886/23 907/9 917/24 928/17 940/8 950/3 959/6 990/1 1012/7 1030/24 1036/8 1036/9
**answered [2]** 820/6 880/25
**answers [1]** 1000/13
**anticipate [1]** 1050/16
**anticipating [1]** 1048/1
**any [146]** 818/14 821/23 822/2 822/12 822/22 822/22 825/13 825/23 826/7 827/14 828/19 828/20 828/24 829/25 854/25 856/9 857/5 857/5 858/1 859/2 861/12 865/14 867/2 867/22 868/6 868/19 868/19 874/2 880/14 893/2 894/21 900/3 901/6 902/14 906/6 906/13 906/19 907/18 908/7 910/4 911/10 917/1 918/23 919/12 920/15 920/19 920/22 923/15 924/17 928/6 928/13 931/1 931/6 931/20

---

932/14 937/20 937/22 937/22 947/21 947/21 948/3 948/5 948/20 955/19 956/23 958/25 959/14 960/10 960/16 960/18 964/20 966/24 969/14 971/9 972/25 973/6 976/11 977/23 978/11 978/14 978/24 979/9 979/22 980/3 980/14 981/4 981/8 981/22 983/22 983/23 983/23 983/25 986/23 992/8 992/19 993/15 994/5 994/5 994/7 997/17 997/17 998/12 1000/10 1000/11 1000/14 1000/15 1000/19 1001/10 1003/6 1004/23 1005/23 1006/13 1008/20 1008/23 1012/14 1012/22 1016/11 1016/21 1017/23 1018/12 1018/18 1019/19 1020/9 1020/23 1022/5 1022/10 1025/18 1026/12 1026/22 1029/20 1029/23 1029/24 1030/5 1031/3 1031/4 1032/13 1032/20 1033/8 1035/16 1036/22 1038/18 1041/7 1043/11 1044/19 1045/15 1048/10
**anybody [12]** 913/11 923/20 947/19 960/13 961/7 973/15 987/17 989/15 1012/23 1014/7 1022/7 1029/12
**anybody's [1]** 1022/7
**anyhow [1]** 913/17
**anyone [8]** 833/22 850/8 850/8 850/12 851/6 900/10 979/5 1016/21
**anyplace [1]** 919/7
**anything [31]** 845/13 904/12 904/13 904/14 904/24 908/7 910/24 911/18 919/6 919/7 921/23 948/14 972/25 977/11 981/15 981/17 983/11 984/1 986/3 987/15 1000/15 1001/21 1014/24 1030/12 1030/17 1030/19 1031/11 1041/9 1044/15 1044/17 1045/8
**anyway [1]** 1049/23
**anywhere [11]** 868/22 897/23 898/22 900/15 900/19 919/24 926/1 937/4 983/10 1003/14 1004/7
**apart [6]** 904/2 905/20 905/23 906/5 906/14 977/7
**apartment [6]** 822/25 823/2 823/3 852/10 944/4 944/20
**apologies [1]** 882/6
**apologize [4]** 832/21 859/21 942/16 963/23
**apparently [4]** 986/22 1009/3 1019/22 1037/1
**appear [18]** 834/3 834/6 854/10 856/6 893/2 906/19 913/11 930/9 930/10 940/4 940/18 944/2 967/1 982/8 983/18 1032/8 1032/19 1033/4
**appearance [2]** 888/22 1002/18
**APPEARANCES [1]** 817/1
**appeared [7]** 908/8 915/7 916/5 930/11 930/23 943/19 982/6
**appears [21]** 837/17 839/21 846/19 849/16 851/18 851/20 851/21 854/11 854/14 854/20 855/17 856/12 890/11 894/1 895/17 935/12 943/20 944/3 944/13 966/6 999/14
**application [1]** 1038/1
**apprehended [2]** 927/3 927/8
**approaching [1]** 905/10
**appropriate [4]** 1036/5 1036/15 1049/3 1051/22
**appropriately [1]** 1030/13
**approximate [1]** 946/5
**approximately [17]** 823/13 860/17 864/20 865/6 884/23 896/15 896/25 899/7 936/12 940/2 942/10 985/7 985/16 1035/3 1035/19 1041/2 1044/13
**approximation [1]** 864/25
**Arcane [1]** 967/4
**are [115]** 817/2 821/21 821/22 824/24 825/2 826/4 827/17 828/10 836/14 836/20 840/8 843/3 847/9 851/21 851/25 851/25 855/6 855/2 855/4 855/7 855/12 855/12 855/15 857/23 858/17 868/4 868/8 869/17 877/3

---

880/3 880/17 882/9 883/5 900/9 900/9 901/18 902/4 902/8 903/6 908/8 921/9 930/18 930/20 930/19 934/13 934/13 937/12 937/14 937/16 939/6 942/3 948/2 948/3 948/4 948/22 950/23 959/9 960/24 962/17 968/2 968/3 969/9 971/11 973/9 980/21 982/13 982/23 982/24 984/6 989/18 990/3 990/13 998/15 999/12 1000/6 1000/9 1004/11 1007/17 1007/24 1012/10 1012/17 1012/17 1012/22 1013/14 1013/14 1013/15 1013/18 1016/20 1018/8 1022/17 1023/13 1026/7 1026/23 1027/5 1029/18 1031/5 1031/8 1031/9 1033/9 1036/10 1038/9 1040/25 1043/14 1043/23 1044/1 1047/2 1048/8 1050/3 1050/7 1050/9 1051/20 1050/24 1051/1 1051/16 1052/19
**area [24]** 860/1 860/24 863/14 868/10 890/6 893/12 894/13 896/5 917/21 939/2 956/12 961/6 976/16 977/4 983/8 984/8 984/10 986/19 991/8 997/20 997/25 1043/23 1044/10 1044/12
**areas [2]** 1018/23 1043/25
**aren't [4]** 843/14 957/8 1000/9 1021/3
**argue [1]** 1050/11
**Argumentative [5]** 844/22 845/1 881/8 881/15 917/22
**Arlene [1]** 1034/2
**armed [2]** 906/19 948/4
**around [24]** 834/19 849/14 887/8 893/7 894/7 917/21 941/21 947/20 956/6 976/10 977/14 982/6 986/19 987/4 990/6 997/21 1028/21 1040/17 1043/3 1043/10 1045/24 1048/18 1049/23 1051/13
**arrest [58]** 839/6 841/1 841/5 841/14 847/14 854/9 854/12 864/2 867/5 870/19 871/21 878/22 906/7 906/11 910/4 936/2 936/4 947/11 947/18 960/13 960/22 960/24 963/19 964/15 979/5 979/6 979/19 979/19 979/20 979/21 980/24 993/12 993/12 999/21 1002/20 1002/22 1003/19 1003/22 1008/11 1008/13 1009/19 1009/25 1010/1 1010/3 1010/6 1010/9 1010/11 1010/12 1010/16 1010/18 1021/24 1023/19 1027/8 1027/9 1027/16 1027/19 1043/6 1045/3
**arrested [11]** 904/17 930/15 931/2 961/1 961/8 961/18 979/15 1002/5 1002/9 1022/4 1031/12
**arrestee [1]** 1022/2
**arresting [8]** 841/8 926/9 948/2 948/3 1004/3 1004/5 1009/23 1017/14
**arrival [1]** 922/1
**arrive [4]** 904/9 905/8 922/11 966/17
**arrived [13]** 820/2 820/4 847/18 849/9 899/9 921/22 922/7 925/8 925/23 953/21 960/2 1015/1 1015/3
**article [1]** 1037/5
**as [220]** 818/4 818/5 818/18 819/17 819/17 821/25 824/12 827/25 828/9 829/24 829/24 830/2 830/16 830/22 831/16 831/20 832/5 832/7 832/8 832/11 832/25 835/1 836/4 840/10 841/10 843/17 844/19 845/24 846/25 846/25 847/19 848/15 849/11 851/9 851/9 852/17 854/11 856/9 859/24 864/17 864/21 866/7 866/7 869/11 870/18 871/22 871/2 871/25 874/7 875/22 875/22 877/21 881/2 881/24 883/8 883/9 883/9 885/23 886/6 889/10 893/21 894/13 894/18 894/18 902/20 902/22 904/18 905/1 905/10 907/7 908/14 908/18 909/14 910/9 915/10 915/22 916/22 916/23 917/23 919/3 923/9 926/11 928/16 931/16 931/21 933/12 935/13 939/7 940/25 943/1 943/6 946/15 947/19 948/4 950/9 950/17 957/17 957/17 959/25 960/19 960/19 962/12 962/12 964/23 965/18

## A

**as... [111]** 965/19 966/19 966/19 967/7
967/17 967/24 969/10 970/12 970/12 970/18
971/20 972/18 974/4 974/5 974/24 977/7
977/7 978/3 978/3 978/18 979/11 980/9 981/1
982/20 983/17 983/24 988/5 989/18 990/14
990/20 990/25 992/14 992/24 993/5 996/21
997/7 1000/11 1000/11 1001/19 1001/19
1004/2 1004/20 1006/13 1006/24 1007/19
1008/14 1008/14 1009/23 1009/25 1011/1
1013/6 1013/6 1013/10 1013/10 1014/1
1014/13 1015/7 1015/7 1015/10 1019/16
1019/19 1019/20 1020/3 1021/12 1021/12
1021/21 1021/24 1025/4 1025/7 1027/9
1027/16 1028/22 1030/15 1030/15 1030/19
1030/25 1031/7 1031/7 1032/12 1032/20
1034/14 1034/16 1035/21 1035/23 1036/14
1037/6 1039/4 1039/7 1039/11 1040/8 1040/8
1040/13 1041/2 1041/3 1041/9 1041/9
1042/24 1042/24 1043/20 1043/21 1045/13
1046/6 1046/7 1046/9 1046/10 1046/11
1046/11 1046/12 1051/4 1051/23 1054/10

**ascertain [3]** 847/8 852/22 970/10

**aside [1]** 850/8

**ask [43]** 840/3 858/16 859/20 868/22 868/25
869/11 870/5 882/23 887/23 888/1 888/4
888/7 888/14 888/16 888/23 894/21 903/9
917/12 918/7 919/23 921/9 921/12 921/13
924/3 936/19 949/11 950/9 950/14 972/2
972/2 997/4 1004/10 1011/20 1021/6 1021/7
1024/7 1031/23 1033/1 1036/1 1036/19
1036/21 1038/6 1046/25

**asked [28]** 820/6 826/13 826/19 828/23
829/11 829/12 841/15 842/8 847/10 847/14
848/7 880/25 887/2 887/7 923/20 928/16
932/11 937/20 937/22 950/5 963/23 990/21
1000/8 1003/5 1023/18 1027/4 1042/4
1047/12

**asking [18]** 855/15 856/5 898/18 901/22
904/16 907/23 909/18 928/19 939/12 953/10
1011/19 1019/25 1023/17 1032/5 1044/3
1044/6 1044/7 1050/12

**asks [1]** 826/5

**assigned [9]** 826/25 827/17 839/18 875/15
974/15 974/16 994/15 994/24 995/7

**assignment [2]** 825/17 827/19

**assist [1]** 952/1

**assistance [1]** 1026/15

**associated [2]** 1011/8 1016/21

**assume [13]** 820/24 836/9 837/11 838/14
909/24 910/1 914/7 919/18 923/11 924/22
930/15 932/11 979/16

**Assumes [1]** 989/23

**assuming [4]** 845/23 979/20 991/14 1046/21

**assumption [7]** 837/10 844/15 909/17 910/6
910/13 910/15 997/22

**assumptions [3]** 909/19 948/1 979/18

**attached [2]** 878/7 1043/19

**attempt [4]** 826/7 864/1 920/23 970/14

**attempted [2]** 843/6 970/23

**attempting [1]** 969/23

**attention [1]** 835/7 872/23 976/13 982/1
998/4

**attentions [1]** 852/15

**attorney [5]** 817/9 866/7 951/6 951/7 951/7

**Attorney's [1]** 1034/2

**attorneys [2]** 927/11 927/13

**attracted [1]** 981/25

**authority [1]** 1002/25

**authorizing [1]** 1003/19

**auto [2]** 957/5 1012/25

**available [3]** 843/13 994/20 1011/20

**Avenue [2]** 852/10 854/1

**average [3]** 985/1 985/15 1039/17

**aware [12]** 835/8 842/3 844/18 880/17 908/22
909/18 909/21 990/12 1007/24 1022/17
1035/8 1035/21

**away [5]** 980/1 991/1 1026/15 1043/8
1052/16

## B

**B15 [1]** 827/25

**back [74]** 820/19 823/25 824/6 824/7 826/22
827/11 828/18 837/6 850/1 850/21 855/21
860/6 866/9 867/7 882/23 883/21 896/8
903/24 904/2 904/6 905/1 905/11 909/8
916/16 917/10 918/16 928/1 929/15 929/17
932/25 935/8 936/4 937/8 939/13 940/11
940/12 943/16 943/18 949/11 949/18 956/21
961/21 964/11 971/16 973/10 975/8 975/12
975/18 976/19 977/6 977/6 983/14 989/3
989/21 991/16 992/2 992/3 993/1 1000/21
1003/11 1005/9 1013/9 1017/23 1027/8
1036/8 1036/11 1037/22 1038/18 1040/10
1044/22 1046/7 1052/15 1052/18 1052/21

**bad [2]** 979/24 1012/10

**bag [1]** 1029/15

**balance [3]** 977/7 977/8 977/11

**Baptist [2]** 944/24 945/6

**barely [1]** 856/17

**base [2]** 1041/2 1041/3

**based [23]** 828/18 832/5 840/15 842/25
844/10 851/10 852/6 856/2 857/16 858/10
909/22 914/20 982/7 999/25 1008/10 1012/2
1023/14 1024/2 1025/25 1026/4 1034/24
1035/4 1039/25

**basic [3]** 910/25 934/4 1026/21

**basically [8]** 884/25 922/22 924/6 928/19
952/20 964/23 977/14 1024/23

**basis [3]** 851/3 871/6 871/7

**Bates [8]** 832/13 839/22 851/12 851/16
859/22 961/21 996/18 996/25

**bathroom [6]** 826/5 826/13 826/19 826/23
930/6 930/7

**Bay [1]** 971/4

**be [220]** 818/8 820/5 822/10 824/14 827/21
829/5 829/22 831/1 831/1 831/2 832/1 832/8
833/22 834/3 834/6 836/9 837/17 838/2 845/4
845/17 845/21 848/8 848/10 848/11 849/16
851/18 851/20 851/21 853/16 854/10 854/12
854/14 854/21 855/17 855/25 856/6 856/12
857/1 859/3 859/17 859/25 861/20 868/18
870/4 871/7 871/23 874/7 874/11 874/16
874/17 876/17 878/11 878/23 881/6 881/23
883/7 885/1 885/8 886/18 887/17 890/11
890/16 892/9 894/1 894/8 894/9 894/12
895/17 901/2 901/5 901/16 902/20 902/21
906/1 906/19 906/21 907/16 908/8 909/11
909/12 909/25 910/16 917/1 926/10 926/17
929/20 930/9 930/10 930/11 930/23 931/16
934/18 935/6 938/19 938/19 940/4 942/1
942/25 943/12 943/13 943/19 943/20 944/2
944/3 944/13 945/17 947/20 948/4 949/10
950/4 950/5 952/10 953/17 954/2 954/15
955/6 955/13 956/9 957/3 958/13 958/17
959/14 959/21 964/4 965/10 965/23 966/6
967/19 967/20 969/6 969/13 969/18 969/20
970/1 972/9 972/13 973/6 973/9 973/25 975/7
975/8 975/14 977/5 977/6 979/7 979/11
982/7 982/9 982/11 983/11 983/18 986/2
988/1 990/4 990/12 992/3 992/18 992/21
992/24 997/22 999/22 1000/7 1001/3 1001/10
1001/17 1002/13 1002/23 1002/24 1002/25
1003/20 1006/3 1007/1 1008/6 1010/19

1013/4 1013/10 1014/11 1017/3 1017/5
1017/10 1018/15 1018/18 1020/18 1025/11
1026/2 1026/23 1026/25 1027/1 1030/10
1032/8 1032/19 1033/4 1033/6 1034/12
1036/11 1036/14 1036/23 1037/24 1038/1
1041/10 1042/21 1043/4 1043/20 1043/21
1045/10 1045/13 1045/16 1046/12 1047/4
1047/22 1048/5 1048/13 1048/13 1050/12
1050/13 1050/22 1051/23 1052/18 1052/21
1054/13

**bearing [1]** 1050/7

**beats [2]** 828/13 828/13

**Beautiful [1]** 861/11

**because [73]** 822/10 828/5 833/15 834/14
835/21 842/9 842/15 844/2 845/20 850/3
852/14 856/11 865/20 870/19 872/17 872/20
873/21 875/8 882/11 885/19 892/19 894/20
901/2 915/4 918/7 923/20 937/25 941/19
949/22 963/11 963/16 963/17 963/21 963/23
964/4 964/11 967/19 976/11 977/10 979/3
979/14 979/18 979/24 980/9 980/14 984/5
984/7 989/14 1006/15 1009/1 1011/19 1012/8
1014/19 1015/12 1016/25 1018/9 1018/10
1019/4 1021/10 1021/21 1024/3 1024/10
1025/12 1032/6 1032/23 1033/2 1037/18
1037/21 1042/18 1044/18 1047/9 1048/21
1052/16

**become [1]** 1031/5

**bed [1]** 1029/15

**been [120]** 818/4 824/12 826/15 826/16
826/16 826/20 827/17 828/23 829/10 829/11
838/19 838/21 842/15 842/16 842/17 842/25
843/17 843/19 843/23 843/25 844/13 847/7
847/10 849/25 849/25 856/21 857/5 859/12
860/9 863/19 864/6 866/6 867/22 868/13
870/18 873/4 873/11 873/16 875/23 875/24
876/14 877/14 879/6 880/17 883/18 890/15
891/24 893/20 896/1 898/16 898/22 899/3
904/21 905/14 906/9 912/3 915/3 921/23
923/9 924/2 926/24 927/6 928/7 928/8 928/10
929/22 930/15 938/18 939/7 943/6 944/20
946/15 948/16 949/11 949/18 960/5 962/24
963/2 963/3 963/6 963/24 964/1 965/12 967/4
967/4 974/4 974/23 982/5 982/15 984/2
985/18 986/8 986/8 987/1 987/19 994/7
994/24 995/22 998/3 1007/1 1007/2 1008/16
1011/12 1013/23 1016/21 1016/25 1020/3
1020/16 1021/17 1021/20 1022/4 1027/12
1032/14 1037/2 1039/10 1050/14 1051/1
1051/13 1051/17

**before [47]** 816/5 821/18 822/24 825/7
825/15 835/15 837/5 841/18 842/6 843/17
857/7 857/12 859/20 869/24 871/25 877/19
885/4 886/2 886/15 904/6 908/10 908/17
908/22 911/9 930/16 946/3 949/16 959/24
961/3 961/15 972/21 977/11 982/13 984/4
996/20 997/13 997/18 998/13 1007/14 1012/5
1023/11 1027/12 1030/13 1035/5 1035/10
1045/18 1047/21

**began [1]** 949/16

**Begin [1]** 1039/1

**beginning [2]** 838/3 1020/19

**begins [2]** 855/1 935/10

**behalf [1]** 816/13

**behavior [1]** 1000/11

**behind [33]** 819/15 819/23 899/6 899/7
899/10 940/13 940/15 946/19 946/21 951/16
952/12 952/12 952/13 952/15 953/2 953/18
953/18 953/20 953/20 955/16 967/7 976/19
977/6 996/3 1020/11 1020/14 1024/23
1027/25 1028/13 1028/16 1028/22 1028/24
1043/16

**being [38]** 825/21 830/6 846/18 847/6 859/1

Case 3:07-cv-04179-SI   Document 171   Filed 03/25/10   Page 244 of 267

**B**

**being... [33]** 869/18 887/21 888/12 904/17
905/15 912/11 912/13 921/24 928/17 928/20
929/12 937/5 953/16 961/6 965/22 975/7
976/13 979/11 979/15 981/8 987/4 990/5
991/10 1000/16 1018/7 1018/16 1025/9
1042/24 1042/25 1043/1 1045/10 1045/11
1050/7
**believe [75]** 819/5 822/20 823/19 828/1
849/21 850/2 850/6 851/1 851/11 864/9
865/24 866/18 867/6 867/6 873/1 874/1 879/6
889/4 889/17 889/23 890/4 890/13 890/16
891/8 891/20 891/23 899/9 901/16 901/19
901/24 903/21 903/21 905/10 905/17 906/5
906/6 906/13 906/14 906/23 909/15 909/22
911/24 912/17 913/2 914/2 914/2 914/15
914/23 925/17 925/12 925/17 928/16 949/16
951/18 959/7 959/8 959/14 960/7 961/7 965/4
965/9 966/17 966/23 967/11 970/2 970/21
974/17 978/10 981/21 990/4 995/21 1010/11
1030/16 1037/23 1047/4
**believed [2]** 963/1 1014/20
**belonging [1]** 983/18
**below [1]** 834/19
**belt [9]** 1043/8 1043/10 1043/11 1043/13
1043/14 1043/14 1043/16 1043/19 1044/14
**BEN [2]** 817/8 1049/19
**Ben's [1]** 861/9
**Berkeley [2]** 819/11 862/13
**best [12]** 943/9 955/13 957/17 972/23 982/5
1000/22 1001/19 1012/19 1031/18 1031/20
1039/3 1039/6
**better [6]** 829/8 866/2 896/19 896/21 952/1
958/11
**between [22]** 819/6 822/22 846/20 848/13
849/20 849/20 849/24 856/4 856/11 860/18
860/21 863/14 864/20 868/23 869/24 928/13
928/21 968/6 969/4 995/16 1024/4 1026/8
**bicycle [1]** 878/13
**bigger [1]** 1043/21
**bill [3]** 901/8 902/14 971/16
**billing [1]** 995/23
**bills [2]** 971/6 995/20
**Billy [2]** 1049/20 1049/23
**Billy Dee Williams [2]** 1049/20 1049/23
**binder [5]** 859/13 892/17 892/21 892/21
892/22
**bit [3]** 896/16 1032/22 1037/22
**black [7]** 862/14 862/24 900/3 900/3 900/6
917/20 951/14
**blade [1]** 1043/21
**blank [2]** 933/4 982/5
**block [19]** 819/17 846/12 846/14 846/14
846/15 868/11 889/23 889/25 894/16 940/19
946/25 947/2 947/4 947/5 947/7 997/21
1013/13 1024/16 1025/7
**blocked [1]** 1026/24
**blocks [4]** 819/18 885/2 890/1 1026/15
**blow [1]** 1001/23
**blue [10]** 895/6 895/7 939/7 954/13 955/12
956/24 957/3 957/21 957/22 1049/10
**bluish [2]** 944/6 944/7
**Board [2]** 1035/5 1035/11
**boarded [1]** 998/21
**bodily [5]** 930/11 930/18 930/20 930/24
948/5
**body [7]** 977/10 977/15 977/17 977/21
1042/20 1043/4 1043/9
**bold [2]** 1019/3 1019/6
**boldness [1]** 1019/8
**Boley [11]** 817/9 817/11 818/23 932/17
939/20 951/8 951/9 990/21 1029/13 1042/4

---

1045/2
**Boley's [2]** 993/6 1031/10
**book [2]** 877/13 919/12
**booking [1]** 820/13
**books [1]** 933/20
**both [6]** 836/2 849/17 869/17 971/24 1013/15
1046/6
**bottom [4]** 1005/16 1006/16 1008/14 1010/21
1004/2
**bound [3]** 1026/12 1026/21 1054/10
**box [6]** 942/14 944/22 945/15 946/5 1001/24
1004/22
**boxes [1]** 954/22
**Boy [1]** 875/11
**Bradley [2]** 1032/2 1034/1
**Bradley's [1]** 1033/1
**Bradshaw [85]** 819/24 820/3 820/4 820/12
820/15 826/9 831/16 831/21 832/7 838/10
840/17 840/20 840/23 841/1 841/4 841/8
842/3 842/12 843/1 847/3 847/6 848/14
848/16 860/8 867/4 867/11 869/2 870/7 871/4
871/16 878/21 878/24 880/24 881/12 881/14
881/21 884/19 884/20 885/22 886/2 886/5
886/12 886/19 887/12 887/22 887/23 888/24
891/21 895/19 898/8 899/12 903/16 904/3
905/6 905/18 905/19 905/20 905/25 906/6
906/13 907/5 907/13 908/8 909/7 909/14
909/22 910/6 910/7 910/12 910/13 910/24
911/4 918/17 919/5 919/6 925/19 947/11
963/16 971/1 978/1 978/18 992/6 992/9
993/14 1023/19
**Bradshaw's [9]** 841/24 917/10 917/11 932/3
964/21 964/24 990/20 993/5 1025/25
**brand [4]** 915/5 915/7 915/17 916/5
**brand-new [1]** 915/5
**break [4]** 864/3 864/5 916/13 916/18
**briefing [1]** 923/9
**briefly [4]** 822/8 837/13 998/6 1016/5
**bright [3]** 954/13 954/14 982/4
**bring [6]** 1000/4 1000/21 1015/15 1038/17
1050/24 1051/15
**brings [1]** 866/8
**broad [1]** 1047/15
**broadcast [5]** 842/23 842/24 843/4 843/6
959/11
**Broadway [1]** 817/6
**Brockhurst [7]** 898/20 940/4 943/19 943/21
944/2 949/25 950/6
**BrockhurstObjection [1]** 950/8
**broke [1]** 973/12
**Broken [1]** 883/1
**brought [3]** 835/6 855/21 872/23
**brush [1]** 983/24
**buckle [2]** 1043/13 1043/14
**buckles [1]** 1043/14
**building [9]** 897/4 897/5 943/18 943/23 944/1
944/6 944/6 945/9 949/24
**bulges [1]** 908/7
**bumpers [1]** 955/9
**burning [1]** 1049/17
**Burris [2]** 817/5 817/7
**business [3]** 863/21 863/23 1007/18
**busy [1]** 980/24
**buttocks [1]** 978/16
**button [2]** 861/15 861/19

**C**

**CA [2]** 817/3 817/10
**CAD [75]** 824/13 832/12 832/23 833/7
833/18 833/22 834/2 834/3 834/4 835/1 835/5
835/14 835/22 835/22 835/25 836/9 837/10
837/15 838/6 838/8 840/16 844/10 844/13
844/16 844/20 845/6 845/9 845/12 848/12
849/1 849/4 849/6 849/8 849/9 849/10 849/16

---

849/20 849/23 851/10 851/10 851/18 851/19
852/6 853/14 853/23 854/2 854/3 854/23
852/6 853/14 853/24 854/2 854/3 854/23
857/20 856/17 856/20 857/2 857/5 857/12
857/14 857/17 859/2 859/20 859/24 859/25
860/5 935/13 937/17 959/4 959/4 959/15
959/15 961/24 965/23 966/6 967/14 967/22
968/4 998/4 1047/5
**Cadillac [52]** 842/12 863/4 863/6 864/6
864/10 864/19 869/21 876/3 890/20 890/22
896/13 897/2 897/17 898/15 898/19 899/5
899/6 906/22 914/7 914/13 940/1 940/3
940/11 940/13 941/5 941/9 941/12 942/2
942/7 942/18 943/8 945/14 946/6 946/16
946/18 946/19 949/21 949/23 950/17 952/19
953/16 953/18 954/20 955/18 957/19 957/20
965/16 966/22 991/17 992/2 996/2 997/19
**CADs [2]** 857/7 965/18
**cage [1]** 975/8
**cages [1]** 975/5
**calendar [2]** 1037/17 1052/17
**CALIFORNIA [4]** 816/4 816/10 817/6
1054/5
**call [48]** 820/19 821/8 834/11 834/12 838/16
853/9 853/9 853/15 855/17 856/18 858/7
858/10 858/17 859/4 900/14 900/17 901/10
901/10 901/11 901/11 901/15 901/21 902/21
936/5 936/18 936/21 936/22 937/8 938/5
962/10 962/11 962/19 969/17 971/2 971/6
971/16 973/23 988/22 1026/14 1034/21
1046/4 1047/18 1048/3 1048/1 1048/14
1048/17 1051/15 1052/9
**call-ins [2]** 858/10 858/17
**called [22]** 818/4 853/8 853/9 867/17 867/18
867/22 877/7 877/9 964/9 964/10 964/11
964/12 964/14 967/22 970/10 974/4 1000/19
1003/22 1008/1 1009/19 1036/11 1050/7
**calling [8]** 858/17 973/9 1002/24 1047/21
1047/22 1048/1 1048/8 1050/3
**calls [5]** 871/9 912/5 937/16 959/8 995/24
**came [18]** 819/15 823/15 850/21 863/6
881/13 899/15 899/16 899/17 901/12 942/7
942/7 943/8 955/20 981/14 985/3 1006/16
1033/15 1034/6
**camera [3]** 924/22 924/25 925/3
**can [122]** 825/23 826/17 826/22 826/23 829/8
832/20 833/4 834/8 837/25 845/18 847/17
852/5 855/12 855/13 856/7 860/6 860/9
860/10 860/11 860/20 862/1 862/2 862/4
862/5 871/12 889/6 889/8 889/9 890/7 890/7
892/13 892/16 895/22 897/20 899/1 900/16
901/16 904/16 905/24 907/10 907/15 916/14
916/23 926/14 929/6 931/18 933/7 933/10
933/21 937/7 939/16 939/22 939/25 940/24
941/12 941/14 941/15 941/21 941/24 942/9
942/14 942/21 943/1 945/13 945/15 945/16
945/25 946/5 946/7 948/5 951/20 951/24
951/25 953/24 954/7 954/9 955/4 956/5 956/9
957/17 957/24 958/9 958/20 958/21 961/18
973/12 975/24 976/2 976/3 979/13 982/3
987/19 989/3 989/21 993/10 996/19 997/17
999/7 1000/7 1001/23 1002/18 1002/19
1002/23 1006/3 1007/1 1014/6 1023/8 1027/4
1028/1 1034/7 1034/21 1036/21 1042/15
1047/15 1047/17 1047/18 1049/3 1049/9
1049/10 1049/10 1049/25 1051/24
**can't [17]** 845/19 856/8 856/9 857/3 861/22
870/18 873/5 902/2 920/6 939/17 946/3 950/2
990/5 994/6 997/21 1010/16 1047/8
**cannot [3]** 920/2 920/5 920/8
**capable [1]** 930/23
**Captain [2]** 1046/4 1046/9
**Captain Farrell [1]** 1046/9
**capture [1]** 891/24

# C

car **[46]** 821/24 857/3 866/13 847/21 848/2 869/3 885/23 886/19 886/24 904/10 907/20 907/21 908/22 919/13 928/2 936/10 936/19 936/19 937/11 940/15 946/19 946/21 946/21 961/3 974/15 974/16 975/4 975/6 975/12 975/16 976/8 976/9 976/10 982/9 994/16 994/17 994/21 994/24 995/12 996/7 996/14 1005/8 1007/3 1014/2 1027/5 1043/2
car's **[1]** 994/20
card **[4]** 909/12 1029/5 1029/7 1029/15
care **[4]** 893/5 1048/19 1049/11 1049/24
career **[3]** 927/4 948/8 988/13
careful **[1]** 958/18
careless **[1]** 913/14
carry **[2]** 1043/18 1043/19
carrying **[1]** 893/6
cars **[11]** 899/9 913/6 946/24 947/3 957/8 975/5 994/20 995/1 995/6 996/3 996/10
case **[18]** 843/8 866/7 880/18 881/11 890/11 970/4 979/13 1002/25 1032/24 1036/5 1036/9 1044/8 1046/6 1047/23 1048/6 1048/9 1048/12 1051/13
cases **[1]** 1046/25
categories **[2]** 880/4 883/6
cause **[23]** 870/13 870/15 870/23 870/24 871/2 874/8 947/19 948/5 974/17 1002/20 1003/12 1003/17 1003/21 1010/3 1010/9 1010/11 1010/13 1010/15 1010/16 1010/17 1026/19 1027/15 1027/19
CDC **[4]** 1002/24 1030/1 1030/4 1031/5
CEC **[1]** 1002/22
cell **[20]** 858/23 859/4 868/16 868/16 899/19 899/21 899/25 900/9 901/3 901/8 924/25 936/18 968/9 995/15 995/17 995/20 1001/1 1001/2 1001/5 1001/7
cell-phone **[1]** 901/8
center **[2]** 858/8 983/9
certain **[3]** 820/7 876/17 944/18
certainly **[4]** 890/14 1034/7 1050/16 1051/4
CERTIFICATE **[1]** 1054/3
certification **[1]** 1054/12
certified **[2]** 988/17 1054/7
certify **[1]** 1054/5
cetera **[1]** 969/15
chain **[7]** 914/14 976/18 976/20 977/5 977/6 977/12 977/19
challenged **[1]** 896/24
chance **[3]** 945/19 996/15 1017/20
change **[4]** 894/20 955/1 1018/4 1026/23
Changed **[1]** 855/18
channel **[8]** 937/12 937/14 937/15 937/16 959/3 959/5 959/8 959/22
channels **[2]** 959/11 959/16
charge **[2]** 869/14 869/18
charges **[1]** 1002/3
chasing **[1]** 1007/12
check **[16]** 842/5 850/23 891/12 891/12 909/10 909/11 918/13 936/20 936/23 1015/12 1018/16 1027/3 1037/11 1043/3 1043/10 1043/23
checked **[1]** 1022/14
Chris **[1]** 865/23
Chronicle **[3]** 1037/1 1037/5 1040/1
church **[3]** 894/2 894/15 894/17
circle **[10]** 860/24 883/8 883/9 890/6 942/16 952/13 952/13 953/14 953/17 954/20
circles **[2]** 954/22 956/2
circuitous **[1]** 1026/19
circuits **[1]** 843/19
circumstance **[1]** 829/7
circumstances **[9]** 828/24 829/3 830/7 830/18

citation **[6]** 871/18 874/25 875/1 875/5 884/10 884/10
cite **[2]** 874/10 875/9
cited **[1]** 963/25
cities **[1]** 853/12
city **[15]** 816/9 816/16 816/22 844/3 853/2 932/5 985/8 985/19 1013/1 1026/22 1033/25 1034/2 1037/7 1045/5 1054/7
civil **[1]** 1022/10
clean **[4]** 823/3 823/8 827/3 956/5
cleaned **[1]** 981/8
clear **[14]** 876/8 925/15 945/22 949/10 954/4 954/5 954/6 954/7 954/9 967/25 976/3 1048/16 1050/13 1050/14
cleared **[1]** 1000/18
clearer **[1]** 896/7
clearly **[2]** 862/5 942/15
clears **[2]** 913/17 1034/5
clerk **[1]** 958/25
clerks **[1]** 1038/9
click **[1]** 1017/1
clients **[4]** 1051/3 1051/5 1051/7 1051/8
close **[5]** 822/21 898/8 949/24 952/21 997/15
closer **[9]** 863/10 890/2 898/12 898/19 898/20 942/12 950/6 950/6 950/7
closest **[2]** 905/21 1026/15
clothes **[8]** 903/4 918/25 924/12 924/15 924/18 969/9 970/15 983/25
clothing **[4]** 829/12 829/13 978/15 981/8
co **[1]** 869/17
co-partners **[1]** 869/17
code **[17]** 870/11 872/3 872/9 872/15 874/14 883/22 884/8 909/3 909/9 909/11 912/22 987/5 987/10 987/18 987/20 1002/3 1026/17
collect **[1]** 1029/23
collected **[2]** 876/17 930/4
collection **[9]** 877/7 877/10 878/1 878/5 878/6 878/12 879/14 881/23 933/4
collective **[1]** 821/16
collision **[1]** 954/1
colon **[2]** 1020/10 1020/13
color **[6]** 944/14 954/11 954/13 955/1 957/18 982/4
colored **[2]** 956/8 956/17
colors **[1]** 956/22
column **[3]** 824/17 827/12 827/12
columns **[1]** 824/16
comb **[1]** 983/24
combined **[1]** 1006/19
come **[20]** 826/17 826/22 850/25 861/24 867/7 868/9 887/16 888/1 915/21 936/20 942/15 978/10 978/10 1004/15 1013/9 1016/20 1026/23 1036/8 1046/7 1051/24
comes **[6]** 868/9 1001/6 1005/19 1007/11 1023/1 1051/21
coming **[5]** 845/20 850/1 887/7 896/17 1006/17
command **[3]** 855/3 1046/16 1046/17
commander **[1]** 1046/19
commented **[1]** 993/23
commit **[2]** 864/11 921/17
committed **[4]** 906/6 906/9 906/13 906/14
communicate **[1]** 995/16
communication **[2]** 902/22 920/15
communications **[8]** 835/5 857/4 858/8 899/25 900/8 902/13 902/19 968/6
community **[1]** 980/18
compare **[1]** 854/8
compared **[3]** 895/7 896/17 1037/19
compartment **[1]** 1043/11
compartmentalize **[1]** 983/5
compensation **[1]** 1035/22

complaint **[2]** 915/24 1051/12
complaints **[2]** 1047/17 1050/10
complete **[6]** 871/1 878/16 879/3 1003/12 1003/16 1054/10
completed **[1]** 1046/6
completely **[2]** 836/14 1015/15
completing **[2]** 878/4 878/11
complex **[2]** 944/4 944/20
complies **[3]** 861/1 890/5 957/25
Compound **[1]** 871/15
computer **[9]** 909/9 933/22 936/10 936/21 1007/21 1007/24 1019/16 1023/2 1023/3
concealing **[1]** 963/2
concerning **[2]** 822/3 1047/15
conclusion **[1]** 871/9
condition **[2]** 912/12 937/20
conditions **[1]** 969/13
conduct **[25]** 828/23 829/7 829/25 830/23 850/4 863/21 872/8 889/21 917/15 964/6 974/19 975/1 976/14 976/16 977/4 978/21 979/8 980/23 982/22 1042/10 1042/16 1042/17 1042/19 1044/5 1051/2
conducted **[23]** 842/6 878/13 888/20 888/23 891/13 910/3 910/25 911/3 916/11 923/14 938/3 938/4 975/21 977/13 978/24 980/3 980/6 980/10 982/12 982/19 1042/7 1042/19 1046/20
conducting **[6]** 823/15 826/4 829/2 853/1 863/23 864/1
confidently **[1]** 959/7
confirm **[4]** 842/10 936/6 936/15 937/7
confirmation **[2]** 937/11 965/7
confirmed **[6]** 820/15 848/11 918/12 965/3 965/5 1016/6
confirming **[2]** 937/1 964/20
confusing **[1]** 956/3
congregate **[1]** 984/9
connected **[1]** 1032/25
connection **[1]** 1022/10
considering **[1]** 1023/24
consisted **[2]** 1042/22 1042/23
consistent **[3]** 837/18 854/21 983/18
console **[1]** 983/9
Consolidated **[8]** 839/6 854/9 867/4 1003/22 1008/11 1010/1 1027/8 1045/3
constant **[2]** 1035/19 1039/24
Constitution **[1]** 832/8
construction **[1]** 1026/25
consume **[1]** 847/22
contact **[22]** 838/6 851/6 852/25 868/13 868/17 868/18 876/7 881/13 885/19 885/21 885/22 885/24 885/25 886/2 887/2 887/16 888/2 920/23 921/1 935/23 998/21 1013/24
contacted **[4]** 853/5 918/23 920/25 1014/7
contacting **[1]** 1031/7
contacts **[1]** 867/15
contain **[1]** 983/16
contained **[1]** 860/8
content **[2]** 901/14 901/21
contest **[2]** 871/19 871/21
contested **[1]** 871/8
context **[2]** 926/20 934/24
continue **[6]** 818/9 878/25 917/8 948/7 983/15 1026/18
continued **[1]** 970/20
contraband **[5]** 910/5 974/18 975/15 978/11 983/16
contract **[1]** 1037/22
contradicts **[1]** 833/19
contrary **[1]** 1016/11
control **[8]** 926/15 926/16 930/11 930/18 930/20 969/14 976/17 977/12
controlled **[1]** 861/22

**C**

**controlling [1]** 956/23
**conversation [12]** 822/6 868/23 912/13 919/1 919/12 923/12 928/6 928/19 928/21 931/20 931/24 970/18
**conversations [6]** 821/23 822/2 901/23 902/4 928/11 928/13
**convince [1]** 972/9
**copied [1]** 1032/1
**copies [3]** 892/13 1032/8 1033/4
**copy [8]** 889/12 889/13 892/17 943/10 943/11 956/12 1022/9 1047/10
**corner [22]** 894/2 894/5 894/22 895/18 939/7 939/7 940/4 943/19 944/1 949/24 950/6 950/7 950/7 950/18 952/20 952/21 955/4 991/17 991/20 991/22 1010/6 1052/15
**corpus [1]** 936/23
**correct [440]**
**correctly [9]** 831/13 836/1 849/14 850/11 852/24 886/5 931/25 941/9 1036/24
**correlation [1]** 1019/20
**corresponds [1]** 945/14
**could [80]** 826/10 841/17 842/9 842/15 842/15 842/16 842/17 842/19 843/23 843/25 844/13 845/2 845/21 847/10 849/24 849/25 849/25 857/1 868/17 873/3 873/15 874/7 874/20 881/17 884/25 890/3 890/3 890/15 898/22 908/18 909/11 909/12 909/25 910/16 924/1 931/12 931/21 942/1 942/6 948/25 953/22 955/24 964/11 964/12 965/12 965/20 967/4 967/19 967/20 969/6 970/8 972/13 975/17 977/4 977/8 983/11 983/16 996/19 996/20 999/16 999/17 1000/21 1001/14 1001/17 1001/20 1012/23 1013/6 1013/7 1015/9 1021/6 1026/24 1026/25 1029/12 1033/15 1039/8 1039/10 1043/20 1043/21 1048/14 1048/17
**couldn't [10]** 826/1 835/8 838/25 842/16 843/18 863/22 868/5 908/11 959/6 1001/21
**counsel [4]** 830/11 961/23 1049/25 1050/22
**count [1]** 981/23
**counterproductive [1]** 1018/18
**county [41]** 819/25 820/4 820/5 820/15 822/11 823/25 826/9 826/14 848/6 849/9 849/10 852/7 852/9 853/18 853/22 853/23 855/22 855/23 859/23 860/1 860/4 904/3 904/6 918/17 918/19 931/8 931/9 936/22 937/3 937/4 964/12 965/10 965/11 971/1 974/23 985/4 1003/8 1017/16 1045/5 1045/6
**couple [10]** 821/10 885/2 910/21 984/17 1038/9 1042/3 1044/23 1046/5 1048/14 1048/17
**course [12]** 849/18 892/18 911/15 978/9 1007/18 1015/17 1021/4 1027/2 1030/9 1032/24 1032/25 1040/22
**court [25]** 816/3 817/13 857/7 857/12 871/8 871/23 881/7 889/4 892/3 917/6 943/15 949/17 958/12 980/22 1038/2 1038/4 1038/7 1042/2 1047/19 1048/22 1048/23 1049/13 1050/14 1054/5 1054/14
**courtesy [3]** 853/8 853/9 853/12
**courtroom [1]** 911/9 1038/4 1038/11
**cover [8]** 885/14 885/16 978/3 997/7 997/12 1042/24 1044/14 1046/6
**covered [2]** 820/21 1009/10
**coöperative [2]** 906/17 923/23
**cracked [6]** 873/4 874/9 874/10 908/4 918/3 921/17
**created [1]** 935/6
**credit [2]** 850/23 909/12
**crime [3]** 906/6 906/9 906/12

**crimes [1]** 985/18
**criminal [1]** 870/25
**Criteria [1]** 960/10
**cross [5]** 831/9 889/19 927/10 950/12 986/13
**cross-examination [1]** 950/12
**cross-examined [1]** 927/10
**cross-street [1]** 889/19
**CRR [1]** 817/13
**CSR [2]** 817/13 1054/17
**curb [4]** 950/3 991/8 991/8 992/4
**curious [1]** 845/6
**current [13]** 820/20 821/3 821/9 852/16 857/2 874/19 971/17 971/18 984/7 1011/24 1012/10 1015/13 1040/16
**currently [3]** 984/5 1016/12 1018/22
**curse [1]** 920/20
**custody [5]** 820/15 890/25 936/14 947/18 947/23 1017/15
**cut [5]** 915/5 915/6 916/5 982/5 982/8

**D**

**D'VORE [1]** 818/3
**D-E-T [1]** 870/16
**D1 [1]** 953/22
**daily [1]** 997/24
**damages [4]** 1036/1 1036/10 1036/22 1038/15
**dangerous [6]** 880/4 880/5 882/18 906/1 907/6 907/8 907/14 907/16 979/16
**dangerousness [1]** 948/1
**dark [3]** 892/1 916/17 950/2
**DARNELL [1]** 816/12
**dashboard [1]** 983/9
**data [21]** 857/5 877/3 877/7 877/9 877/25 878/4 878/5 878/6 878/12 878/16 878/24 879/1 879/3 879/4 879/14 880/8 880/23 881/23 933/4 1009/7 1019/12
**database [2]** 970/20 1007/25
**date [20]** 825/3 840/2 901/10 902/21 1008/21 1009/25 1010/1 1013/5 1013/8 1013/15 1019/2 1019/25 1020/2 1020/3 1020/12 1020/13 1020/16 1020/18 1020/19 1020/19
**dated [2]** 855/2 1037/5
**dates [2]** 995/25 1017/5
**Dave [1]** 925/8
**DAVID [2]** 816/19 966/8
**day [19]** 833/18 833/23 834/5 835/12 849/14 966/15 979/24 998/17 999/1 1007/2 1008/20 1013/11 1022/16 1023/17 1026/9 1027/20 1033/10 1048/18 1052/17
**days [2]** 910/21 1032/1
**dealing [11]** 842/17 842/25 849/25 868/25 869/1 869/2 885/6 891/21 898/8 959/24 978/1
**December [20]** 825/25 828/2 828/16 830/25 837/16 840/6 840/21 854/4 994/21 1005/3 1005/24 1006/24 1007/7 1008/21 1012/6 1013/15 1014/14 1017/10 1019/2 1020/3
**December '05 [1]** 1012/6
**December 15 [2]** 1005/3 1007/7
**December 15th [12]** 825/25 830/25 840/6 840/21 854/4 1005/24 1006/24 1008/21 1013/15 1014/14 1017/10 1019/2
**December 2005 [2]** 828/2 828/16
**decide [2]** 821/11 878/23
**decided [4]** 871/19 871/21 872/8 977/8
**decision [10]** 821/15 821/16 824/2 824/4 869/20 878/25 885/4 920/9 920/10 962/25
**Dee [2]** 1049/20 1049/23
**Defendant [2]** 818/4 974/4
**Defendant's [5]** 943/4 946/13 948/23 1053/5 1053/17
**Defendants [4]** 816/10 816/17 816/23 817/9
**definite [1]** 856/13

**definitely [1]** 873/5
**delay [1]** 864/20
**delivered [1]** 1045/4
**demonstrate [2]** 976/1 976/4
**denied [1]** 1051/6
**deodorant [1]** 983/24
**department [30]** 821/18 830/22 831/2 832/24 833/8 833/10 833/11 839/7 851/6 875/17 876/17 884/22 885/2 899/23 931/22 937/6 968/3 974/24 988/10 992/14 995/17 995/18 995/21 1003/25 1007/18 1012/23 1022/3 1024/24 1035/14 1037/16
**departmental [1]** 831/23
**dependent [1]** 1001/3
**depending [4]** 983/4 994/20 1000/13 1048/13
**depends [8]** 842/24 846/12 869/19 909/12 937/8 969/7 969/7 1051/25
**depict [2]** 894/22 901/20
**depicted [3]** 893/10 893/23 893/25
**depiction [2]** 894/4 896/7
**depicts [1]** 896/7
**Depos [1]** 1046/2
**deposition [2]** 1048/24 1049/7
**depositions [1]** 1050/17
**deputies [1]** 1001/11
**deputy [1]** 999/9
**describe [3]** 975/24 982/3 990/23
**described [12]** 831/16 832/7 939/7 978/9 978/25 980/24 990/25 991/1 1026/9 1042/5 1042/8 1042/12
**describes [3]** 980/16 991/10 1001/24
**describing [2]** 991/7 1027/22
**designate [1]** 1049/25
**designation [1]** 828/9
**designations [5]** 827/14 828/10 1049/2 1049/6 1049/9
**desire [1]** 1049/17
**destroy [1]** 975/16
**det [1]** 870/16
**detail [5]** 915/9 916/4 1042/15
**detailed [1]** 1018/14
**detain [2]** 888/7 888/9
**detained [5]** 888/12 888/13 904/17 907/23 931/3
**detainer [7]** 1002/13 1002/14 1002/23 1003/7 1003/9 1003/15 1003/21
**detention [2]** 832/3 870/17
**deter [1]** 947/17
**determination [2]** 875/25 964/15
**determine [6]** 829/4 935/21 936/10 969/23 972/22 1012/4
**determined [6]** 821/16 926/13 947/10 972/17 1006/11 1020/3
**determining [1]** 935/19
**develop [1]** 935/24
**device [1]** 896/18
**dialing [1]** 901/6
**did [279]**
**didn't [80]** 821/20 822/9 835/7 850/12 852/13 863/15 865/20 866/22 867/4 867/15 868/1 868/19 868/19 874/19 878/21 885/8 886/22 887/9 888/25 889/21 897/23 902/1 903/8 906/21 908/7 908/17 909/3 909/24 910/23 911/3 913/10 915/24 916/3 919/1 919/10 919/12 919/14 919/16 919/18 919/22 921/2 921/9 921/11 923/11 924/1 924/2 924/3 927/21 929/7 930/9 930/10 930/13 945/19 947/7 960/13 963/24 966/4 967/19 969/3 970/18 972/2 972/2 972/16 973/4 975/14 976/9 982/8 982/9 983/23 983/23 983/25 986/20 1015/5 1015/18 1020/4 1022/19 1027/19 1040/6 1040/6 1040/7
**difference [5]** 856/4 969/4 969/10 972/5

# D

difference... [1] 762/7
difference [21] 828/13 835/2 835/2 846/17 848/4 856/6 856/12 856/12 857/17 857/23 880/4 893/12 895/16 914/10 954/11 954/13 956/10 960/1 963/15 1002/18 1013/18
differentiate [1] 856/11
differently [2] 979/22 1022/7
difficult [3] 868/13 868/15 1032/23
difficulty [1] 954/3
Dilley [3] 1046/3 1048/9 1048/11
direct [12] 818/22 895/6 911/21 968/25 974/7 998/4 1026/8 1026/11 1026/13 1026/22 1027/6 1027/7
directed [1] 1026/10
direction [5] 819/6 978/19 1047/20 1049/23 1054/9
directions [8] 894/14 894/18 1022/20 1022/24 1023/9 1023/14 1024/6 1025/1
directly [5] 822/20 899/6 953/2 953/20 976/19
disagree [1] 1019/23
disassembly [1] 1054/13
disclosed [2] 1032/23 1051/17
discover [1] 852/21
discovered [5] 848/14 871/22 908/14 1018/21 1032/25
discovery [1] 1032/24
discuss [3] 916/25 973/5 1045/15
discussed [3] 912/11 912/13 938/2
discussion [14] 822/22 827/9 831/5 865/14 869/24 870/1 870/3 870/4 872/3 872/12 872/19 903/23 916/10 923/15
discussions [1] 901/15
dispatch [12] 824/13 842/13 843/9 843/13 843/14 846/7 847/4 858/18 934/11 934/13 936/18 938/5
dispatcher [2] 859/5 998/19
disposition [1] 855/18
disrespect [1] 832/22
dissect [1] 1040/11
disseminate [1] 856/10
distance [1] 1023/18
distances [1] 991/4
distinctive [1] 915/16
DISTRICT [5] 816/3 816/4 817/13 827/25 1054/5
District 3 [1] 827/25
division [4] 858/8 936/23 995/22 1047/16
do [255]
document [28] 825/24 851/17 877/22 892/3 926/11 926/17 933/22 946/8 958/12 964/5 966/5 1001/10 1002/15 1002/16 1003/22 1003/25 1007/10 1007/14 1007/15 1007/16 1007/19 1011/4 1013/14 1014/4 1014/5 1019/14 1019/17 1021/16
documentation [8] 866/6 1001/8 1012/21 1016/22 1031/4 1033/12 1033/16 1047/5
documented [4] 919/24 925/25 926/15 1003/20
documents [11] 857/24 1007/17 1021/1 1021/3 1032/15 1032/21 1033/9 1034/2 1046/21 1047/7 1047/9
does [61] 834/3 834/6 834/20 834/25 836/15 839/8 839/9 840/19 840/21 845/12 845/12 849/8 849/9 849/11 851/9 851/9 854/15 856/4 859/1 859/23 861/12 869/14 871/2 879/17 889/16 894/21 894/22 896/5 896/7 912/20 912/22 916/15 935/1 936/9 940/4 940/18 940/22 944/2 945/2 945/2 959/3 959/4 972/8 976/2 998/12 998/13 1002/17 1004/2 1004/7 1004/15 1008/6 1010/8 1012/9 1015/21

1022/2 1033/22 1037/8 1037/10 1040/2 1049/12 1049/17
doesn't [22] 822/8 847/11 887/18 887/19 888/10 893/2 897/21 967/1 967/14 967/16 969/12 969/17 979/25 1000/5 1006/24 1009/9 1014/20 1015/14 1017/24 1018/21 1019/11 1019/14
doing [18] 823/3 864/6 885/13 936/17 942/16 960/11 960/17 965/14 971/7 977/24 990/13 997/18 998/1 998/16 1015/22 1026/9 1026/25 1050/18
dollar [1] 909/2
domain [1] 926/16
domains [5] 988/23 988/25 989/3 989/4 989/5
don't [238] 821/9 821/20 823/3 824/7 826/1 830/10 835/4 835/6 835/7 835/10 835/21 837/19 837/19 838/18 842/20 843/11 843/23 844/1 844/2 845/10 850/2 850/6 851/8 852/21 853/8 854/23 856/13 857/22 861/5 861/7 861/14 862/7 863/1 863/5 863/20 864/12 864/14 865/5 865/17 866/14 867/6 867/18 868/23 869/6 869/11 870/1 870/5 870/25 871/4 872/10 872/17 873/4 873/6 873/10 873/17 873/25 875/18 876/9 876/14 876/24 880/12 880/14 881/14 883/19 888/6 889/20 894/8 891/12 891/13 891/23 892/20 894/6 894/15 897/19 898/7 898/18 898/21 898/23 899/3 899/15 899/17 901/24 902/6 902/17 903/2 903/6 903/21 903/21 904/14 904/15 904/15 904/21 904/22 904/25 905/13 905/14 905/24 907/2 909/20 910/2 910/15 912/11 912/13 913/25 914/5 914/5 914/24 916/18 916/24 917/19 918/11 919/11 919/12 920/15 920/18 920/19 920/25 921/2 921/14 922/15 922/22 923/7 923/8 924/19 924/19 924/20 924/24 926/20 928/18 929/9 930/4 930/21 931/20 931/24 941/15 944/8 944/9 944/10 949/18 950/9 954/7 955/9 957/2 957/20 959/6 959/7 959/20 960/3 960/7 960/12 960/12 961/7 961/17 962/20 964/10 964/20 965/4 965/4 965/5 965/12 965/12 965/25 967/3 967/5 967/16 967/25 967/17 971/21 972/11 972/12 972/17 972/19 973/5 976/13 976/13 979/14 979/23 981/23 986/1 986/3 986/24 989/20 991/3 991/14 993/22 994/4 994/25 997/14 999/12 1004/17 1006/15 1006/19 1007/20 1008/6 1008/6 1008/15 1008/22 1009/1 1009/2 1012/12 1018/9 1019/11 1020/20 1020/22 1020/23 1021/1 1021/5 1022/23 1024/12 1026/3 1026/5 1026/12 1026/20 1028/25 1032/20 1033/14 1034/4 1037/9 1037/11 1037/12 1037/18 1038/14 1038/18 1039/5 1039/19 1040/8 1043/17 1043/18 1043/19 1047/25 1048/18 1048/22 1049/11 1049/16 1050/22
done [23] 828/25 836/20 848/2 864/8 867/13 904/24 921/11 942/16 942/17 963/17 973/13 975/20 977/17 990/5 990/7 1000/5 1000/15 1000/25 1001/8 1044/24 1047/18 1049/12 1051/6
door [5] 823/1 983/10 1015/24 1015/25 1016/3
doubt [2] 931/1 1025/18
down [36] 834/19 884/25 897/3 906/2 916/25 917/20 922/14 922/15 932/3 933/6 934/5 934/6 941/17 956/16 956/17 965/14 973/5 976/1 977/15 992/9 1001/13 1007/12 1014/12 1018/13 1018/19 1023/19 1024/16 1025/7 1027/1 1036/24 1037/16 1037/21 1043/2 1044/10 1047/12 1048/19
downtown [2] 845/11 819/13
downtown-Oakland [2] 819/11 819/13
draw [6] 890/6 946/5 954/23 957/4 957/15

958/6
drawing [3] 954/3
drawn [3] 942/18 958/17 967/7
drilled [1] 948/10 960/20
drivable [1] 912/12
drive [8] 863/11 863/15 874/19 884/25 891/11 920/12 921/4 1027/4
driven [3] 819/3 863/7 1024/3
driver [2] 885/24 933/12
driver's [7] 885/20 887/3 891/13 983/8 983/8 991/22 994/3
drivers [1] 976/12
driving [11] 822/3 826/24 862/20 869/23 871/4 918/2 918/5 996/3 1022/20 1023/14 1024/6
drop [4] 904/3 918/17 971/1 1027/4
dropped [4] 826/9 993/20 999/4 1001/17
drove [2] 921/3 1023/24
drugs [3] 910/1 910/7 910/13
drunk [1] 930/15
DUARTE [1] 816/12
Due [1] 887/15
duration [3] 879/22 901/11 902/22
during [20] 835/7 856/23 866/8 878/13 885/14 891/16 891/16 904/19 911/15 927/25 960/11 975/18 978/9 984/15 995/16 1008/20 1029/8 1030/9 1032/1 1032/2
duty [12] 831/19 835/8 836/14 966/15 988/13 989/8 989/11 989/14 989/20 992/13 992/17 1030/10
Dyer [4] 931/5 931/7 931/9 931/9

# E

each [5] 816/12 953/14 1033/19 1040/10 1043/24
Eades [1] 868/11
earlier [8] 843/24 852/17 886/23 916/19 928/25 1041/13
earned [3] 1037/6 1039/4 1039/6
easier [2] 975/25 976/1
east [5] 868/12 894/7 894/20 971/4 980/24
East Oakland [3] 868/12 894/7 894/20
edge [1] 991/7
educated [1] 999/25
effected [2] 845/13 845/25
effects [1] 983/22
effort [3] 893/3 990/12 1017/23
eight [2] 997/2 1028/6
eighth [1] 958/2
either [21] 841/8 847/19 864/1 868/14 874/3 910/7 910/15 914/2 920/24 921/23 936/18 936/22 953/13 975/3 975/13 975/15 1000/13 1000/17 1012/14 1023/3 1047/17
elected [1] 971/17
elementary [1] 1010/17
Eleven [1] 856/22
elicit [1] 1047/14
Elmo [6] 851/14 859/10 877/14 879/12 941/15 996/19
else [17] 861/23 868/22 903/13 913/18 947/19 967/2 973/15 977/11 983/3 984/6 987/17 1001/21 1014/7 1027/1 1034/21 1038/10 1050/22
Embarcadero [1] 868/10
emptied [1] 1038/5
en [4] 851/11 860/1 860/4 919/9
en route [3] 851/11 860/1 860/4
encountered [2] 969/10 1018/8
end [8] 849/14 859/1 1035/11 1041/12 1041/14 1046/5 1048/3 1048/4
ended [2] 849/17 968/18
ending [1] 1020/19
ends [2] 838/23 964/2

**E**

enforce [2] 884/5 989/11
enforcement [5] 968/2 975/4 987/13 988/3 1006/2
engaged [1] 1051/2 1051/5
enough [3] 890/9 957/23 1028/21
ensure [1] 1015/14
entail [1] 1000/10
enter [3] 931/21 1016/18 1018/12
entered [9] 1008/16 1012/11 1012/12 1013/23 1014/1 1014/2 1019/12 1019/14 1020/24
entering [1] 934/14
entire [3] 836/19 977/15 995/18
entirely [1] 857/23
entries [21] 824/24 825/2 837/13 838/17 843/3 844/4 844/19 845/7 848/20 849/18 851/21 851/25 852/5 855/2 855/6 855/7 855/16 856/12 962/14 962/17 1013/14
entry [24] 824/20 825/5 832/18 835/25 836/1 836/25 838/9 838/24 839/21 839/22 846/3 846/5 848/8 848/19 851/21 855/20 855/21 859/23 860/3 934/6 934/17 960/13 964/2 1019/2
envelope [1] 972/8
envelopes [4] 1031/25 1032/8 1032/12 1033/5
envision [1] 916/15
equated [1] 988/1
equipment [1] 858/2
erroneously [1] 833/23
ERT [2] 851/9 859/23
escape [2] 947/18 979/13
escort [1] 826/23
escorted [1] 976/10
especially [1] 976/12
essentially [7] 924/10 926/17 956/11 978/3 994/17 1013/14 1020/25
established [1] 1016/16
estimate [6] 995/12 999/25 1000/22 1024/11 1039/3 1039/6
et [7] 816/9 816/16 816/19 816/22 969/14 1054/6 1054/7
ethically [1] 1031/17
ethics [1] 988/18
ethnicity [1] 876/1
even [26] 833/18 835/8 862/7 872/22 873/10 874/25 875/6 883/18 888/16 900/14 907/17 908/10 918/5 918/24 960/12 965/9 971/9 989/15 996/20 1015/1 1024/9 1025/11 1027/12 1032/24 1033/1 1050/19
event [7] 854/12 854/22 854/22 854/25 894/21 1013/8 1014/2
evented [1] 854/5
eventually [5] 822/14 875/6 906/23 946/23 966/17
ever [27] 825/17 835/14 850/15 850/18 868/22 877/19 880/23 880/23 881/5 891/22 897/19 919/14 927/22 929/12 931/15 931/24 942/16 968/23 969/2 1005/23 1007/14 1016/21 1022/20 1023/16 1031/20 1031/23 1051/6
every [8] 828/6 878/12 888/7 917/17 933/15 933/17 987/19 998/17
everybody [3] 948/3 993/17 1038/10
everybody's [1] 990/7
everyone [3] 887/16 888/7 979/18
everything [4] 836/23 837/2 1026/20 1032/25
EVID [2] 1053/15 1053/17
evidence [16] 823/23 823/24 839/24 879/7 881/24 893/14 938/18 948/16 948/24 958/21 958/23 989/23 998/5 1029/23 1029/24 1038/16

**ex** [1] 1037/14
ex-wife [1] 1037/14
exact [10] 864/23 873/6 876/24 889/26 929/17 930/4 981/23 986/24 994/25 1026/5
exactly [38] 820/8 829/6 835/6 852/21 857/3 860/16 862/10 863/1 863/5 863/20 865/19 867/18 872/16 872/16 872/17 889/25 893/19 898/7 902/3 909/3 909/9 915/23 923/7 926/21 927/15 928/18 956/7 960/3 964/10 965/6 967/15 970/11 970/17 972/17 997/21 1001/21 1026/20 1042/21
examination [11] 818/22 831/9 911/21 932/17 932/18 949/8 950/12 974/7 986/13 1044/18 1045/1
examine [2] 818/14 1046/22
examined [1] 927/10
examining [1] 1046/13
except [1] 849/17
excessive [1] 989/7
excuse [7] 848/17 870/2 952/8 961/19 976/21 996/6 1039/18
excused [1] 1045/10
exhibit [77] 824/5 827/11 832/13 839/2 839/5 839/22 851/13 851/16 853/17 854/8 854/10 857/19 858/14 858/15 859/10 859/22 870/6 877/12 879/5 879/14 889/4 889/11 889/15 889/16 891/23 891/23 892/15 893/8 893/10 893/21 893/23 895/3 895/4 895/5 895/6 895/7 895/8 895/15 895/18 896/5 896/6 896/13 932/20 933/2 933/21 938/16 939/5 939/6 939/14 939/16 940/1 940/18 940/21 941/1 941/7 941/8 941/10 942/3 945/10 945/15 946/13 946/15 956/3 956/11 958/16 961/21 966/2 967/7 996/18 998/4 998/4 1003/11 1004/10 1004/11 1005/6 1028/2 1034/15
Exhibit 1 [13] 824/5 832/13 839/22 851/13 851/16 859/22 933/21 961/21 966/2 996/18 998/4 1004/11 1028/2
Exhibit 16 [5] 877/12 879/5 879/14 932/20 933/2
Exhibit 2 [9] 827/11 839/2 839/5 854/8 854/10 870/6 998/24 1003/11 1005/6
Exhibit 3 [4] 858/14 858/15 889/4 891/23
Exhibit 3-3 [2] 859/10 889/16
Exhibit 3-4 [1] 953/6
Exhibit 3-8 [8] 891/23 892/15 893/8 893/10 895/5 895/7 895/15 895/18
Exhibit3 [2] 943/4 958/23
Exhibit3-4 [1] 943/4
Exhibit3-7A [1] 958/23
exhibits [5] 893/3 938/10 948/23 1053/15 1053/17
exists [1] 937/7
exited [2] 885/18 922/8
expect [1] 980/18
experience [5] 856/2 999/25 1034/24 1035/4 1040/20
expert [3] 835/22 856/14 933/24
expired [2] 873/5 873/16 874/4
expired-tags [1] 874/4
explain [7] 835/9 856/7 919/10 976/3 994/19 1000/23 1047/5
explained [2] 998/6 1027/15
explaining [2] 970/8 1047/6
explanation [1] 835/21 856/9 970/7
expose [1] 979/8
extend [1] 853/12
extent [5] 818/14 928/18 987/20 1050/9 1051/6
external [1] 829/12
extra [2] 833/16 833/24
extraneous [1] 1045/14
extreme [1] 979/3

**F**

facilitate [1] 829/8
facilities [4] 826/10 826/13 974/21 974/22
facility [6] 848/6 974/19 975/1 975/19 1045/4 1045/4
facing [1] 819/6
fact [17] 831/19 833/16 834/10 843/12 864/15 887/15 900/14 900/17 915/25 923/13 926/14 964/6 988/17 989/23 1020/2 1050/22 1051/1
factor [2] 970/5 970/6
factors [2] 970/2 970/4
facts [2] 909/18 909/21
factual [1] 989/6
failed [4] 831/25 872/1 872/2 992/17
Failing [1] 992/20
fair [16] 836/23 840/15 840/25 841/3 844/10 849/13 849/24 864/15 865/8 869/4 876/12 884/3 948/10 955/15 960/15 1027/6
fairly [1] 1015/13
fall [3] 883/6 1031/4 1031/13
false [3] 1006/1 1006/4 1017/25
familiar [4] 868/11 894/13 894/15 1046/21
fancy [1] 1023/6
far [26] 819/14 819/17 827/11 844/18 851/9 884/21 884/21 894/18 902/20 923/8 932/8 947/19 960/19 1000/11 1007/19 1008/14 1015/7 1023/13 1026/11 1028/20 1030/15 1031/7 1040/8 1041/9 1044/10 1045/13
Farrell [4] 1045/24 1046/4 1046/9 1048/1
fashion [3] 957/16 978/22 980/10
fast [1] 936/13
fatal [2] 957/10 959/1
fax [2] 1033/19 1034/17
faxed [1] 1034/1
February [2] 1012/9 1037/5
February 4th [1] 1037/5
feel [6] 830/2 830/6 976/13 978/10 1044/9 1050/24
feels [2] 830/11 830/14
feet [6] 819/20 899/7 953/19 991/1 1043/2 1043/3
felony [3] 909/2 936/1 979/21
felt [1] 975/9
few [4] 819/19 914/1 981/24 985/14
fiction [1] 874/23
fiction-it [1] 874/23
field [4] 852/22 857/16 974/25 1002/19
field-based-reporting [1] 857/16
fifth [1] 934/5
fight [1] 977/9
figure [4] 847/22 1008/23 1047/8 1051/22
figured [2] 847/3 1027/3
file [1] 1054/14
filed [1] 1050/6
files [1] 1047/11
filing [1] 1054/11
fill [4] 933/17 998/25 1002/2 1002/19
filled [8] 880/9 880/9 880/12 881/2 881/25 882/2 933/14 1004/18
filling [2] 933/7 1001/25
final [1] 1024/21
financial [1] 1036/2
find [22] 822/15 883/22 884/14 918/24 960/21 969/20 969/25 981/4 981/17 981/18 982/17 983/22 983/23 983/23 983/25 987/9 1006/22 1007/21 1016/24 1018/6 1023/9 1049/15
finding [5] 847/25 848/1 910/25 917/10 936/3
fine [10] 826/16 840/4 890/8 890/8 890/8 916/19 916/23 939/13 971/24 1038/10
finger [2] 860/10 895/22
finish [3] 946/9 985/24 1046/3

**F**

finished [5] 819/5
firearm [2] 948/4 1043/22
first [52] 824/6 829/12 829/22 836/24 838/5 838/5 838/5 840/8 851/16 860/7 864/19 869/13 876/5 878/25 882/13 885/19 885/22 915/9 915/14 923/10 936/8 942/2 942/16 942/25 947/16 948/15 949/10 952/13 953/17 954/7 961/14 961/17 970/5 970/6 971/18 978/23 983/2 985/14 989/11 996/24 998/24 1018/3 1019/21 1023/24 1026/10 1029/11 1031/6 1043/10 1044/13 1048/13 1048/13 1051/20
fit [2] 970/24 970/25
five [10] 842/9 899/7 937/10 953/19 991/1 1018/16 1026/15 1034/18 1034/19 1035/5
fix [5] 874/7 875/5 883/15 883/19 888/17
fix-it [5] 874/7 875/5 883/15 883/19 888/17
fled [1] 907/17
flee [3] 907/19 947/19 977/9
flying [1] 957/13
fob [1] 982/10
fold [5] 903/5 918/24 918/24 919/2 920/3
follow [1] 998/23
follow-up [1] 998/23
followed [1] 934/7
following [1] 1042/1
follows [2] 818/6 974/6
foot [1] 911/9
FORBES [1] 816/6
force [7] 830/23 862/14 900/6 989/7 1000/10 1000/16 1000/18
forced [2] 1035/17 1039/20
foregoing [2] 1054/6 1054/9
foremost [2] 829/22 947/16
forgery [2] 909/11 909/11
forgot [1] 844/19
forgotten [1] 867/13
form [26] 843/11 877/5 877/7 877/10 878/1 878/5 878/6 878/12 878/16 878/24 879/1 879/3 879/4 879/14 880/8 880/24 881/2 881/23 933/4 933/7 933/10 933/14 933/17 1002/19 1019/13 1020/8
forth [3] 934/3 1044/22 1052/3
Fortunately [1] 862/7
Forty [1] 1039/13
FOSTER [1] 816/2
found [23] 822/16 842/12 847/8 876/2 886/8 886/11 886/15 886/17 913/19 914/17 915/11 918/21 924/16 926/16 929/19 930/5 970/21 970/21 970/22 984/15 994/11 1029/2 1033/11
foundation [14] 833/1 836/4 837/1 838/11 855/8 880/19 900/22 902/15 902/23 959/17 996/21 1019/5 1032/14 1032/20
foundational [1] 900/21
four [5] 835/8 866/13 936/12 953/9 1035/5
Fourth [1] 989/19
frame [4] 841/19 965/6 983/10 996/12
Francisco [5] 816/10 937/4 964/13 1037/1 1040/1
freely [1] 979/11
Friday [1] 816/10
front [20] 823/1 824/6 834/3 839/2 840/2 859/11 860/10 877/14 877/22 897/4 897/5 928/4 933/2 938/16 940/1 940/3 940/20 949/24 955/18 1001/5
fruit [2] 871/22 1027/16
full [4] 1042/19 1043/4 1043/9 1054/9
fully [2] 930/23 1047/6
function [5] 902/10 902/12 902/13 902/20 912/25
functions [4] 930/12 930/19 930/20 930/24

further [14] 818/5 831/6 915/24 923/15 948/14 972/25 974/5 986/4 1007/10 1018/19 1038/22 1044/15 1044/17 1045/8
future [2] 1011/5 1011/5

**G**

gain [1] 977/10
gap [1] 967/17
garbled [1] 845/4
gathering [1] 877/3
gave [22] 829/6 853/8 853/9 853/14 866/3 866/10 866/19 867/14 867/20 867/24 890/25 891/11 911/4 918/14 943/16 989/6 1013/11 1013/25 1013/25 1014/8 1014/10 1037/22
gear [1] 837/21
gearing [1] 838/3
gender [1] 876/1
general [4] 898/9 979/9 997/20 1043/23
generally [7] 935/18 977/18 990/23 999/8 1000/9 1044/7 1047/15
generate [2] 860/11 935/17
generated [9] 962/8 962/9 962/10 962/11 963/17 1019/15 1027/16 1027/16 1043/5
generates [2] 962/12 962/13
genitals [1] 978/16
gentlemen [1] 877/3
get [48] 842/16 843/18 845/18 845/19 845/21 847/16 847/17 847/20 863/12 883/11 883/14 883/18 883/19 888/25 892/5 894/6 901/19 907/19 918/4 935/25 937/5 937/16 938/6 945/19 965/7 973/12 975/11 976/9 977/8 979/17 987/17 1000/13 1000/17 1000/23 1012/24 1014/13 1017/9 1022/2 1022/23 1022/24 1023/7 1025/11 1026/16 1036/21 1047/13 1047/18 1047/25 1048/18
gets [3] 1019/10 1036/10 1036/24
getting [2] 846/6 872/21
give [17] 826/21 829/7 835/9 874/8 895/11 915/15 917/14 938/7 970/8 999/8 999/9 1006/1 1008/17 1013/3 1020/21 1050/16 1052/8
given [11] 832/2 836/8 842/4 858/7 893/3 928/17 935/10 982/15 1006/4 1018/17 1048/15
giving [3] 846/7 865/20 1008/22
glasses [1] 862/8
Glenn [5] 931/5 931/7 931/7 931/9 931/9
Glenn Dyer [2] 931/9 931/9
Glenn Dyer Jail [2] 931/5 931/7
go [83] 820/10 820/10 821/12 823/10 824/6 824/6 825/2 828/18 837/13 848/17 852/13 852/15 853/20 856/11 859/21 861/2 861/12 864/21 873/23 882/23 883/21 890/17 891/19 891/22 893/2 894/18 894/20 897/18 897/23 905/1 920/9 922/24 926/14 932/5 932/8 932/20 933/21 935/19 935/21 935/25 936/3 936/17 939/13 941/22 946/1 958/19 970/14 970/18 970/23 971/8 971/18 979/6 979/7 979/12 979/19 979/14 979/25 993/6 993/13 996/24 998/20 998/24 1000/17 1011/14 1012/23 1014/6 1015/12 1015/13 1017/23 1018/20 1022/22 1026/16 1031/10 1033/6 1035/5 1035/10 1038/15 1040/10 1042/25 1043/10 1044/11 1048/2 1048/19 1050/22
goes [4] 835/4 895/8 1003/8 1031/9
going [83] 820/23 821/24 827/11 829/5 829/25 836/24 837/4 837/6 847/12 848/3 848/4 848/6 848/19 851/14 851/15 852/15 852/18 853/6 853/25 859/10 860/6 870/5 877/13 882/23 893/20 900/21 907/16 915/10 915/22 917/10 917/10 921/7 921/9 931/4 933/20 934/5 935/5 943/18 947/10 950/3 955/6 958/24 961/6 971/8 973/9 979/22

985/21 985/23 987/14 990/17 990/23 993/1 994/1 1005/24 1001/23 1003/11 1007/9 1018/24 1019/4 1020/7 1026/16 1026/18 1026/24 1027/8 1030/17 1036/17 1036/19 1038/13 1038/15 1038/15 1038/18 1045/25 1046/2 1046/12 1046/25 1047/1 1047/22 1048/3 1048/11 1048/12 1052/19
gold [27] 863/3 863/6 864/6 864/10 869/21 876/3 890/20 890/22 896/9 896/13 897/2 897/16 897/17 898/15 899/5 899/6 950/17 952/17 952/19 953/16 953/18 955/18 957/19 957/20 965/15 965/16 966/22
gone [5] 916/18 1037/16 1037/16 1037/21 1044/22
good [22] 818/1 818/2 818/24 818/25 831/11 831/12 862/6 890/8 896/22 916/12 936/7 936/15 956/12 970/11 971/9 972/24 973/2 974/9 974/10 995/10 1019/9 1026/19
Googlemaps [1] 944/15
got [43] 837/13 841/3 845/4 854/19 868/25 877/15 886/24 886/24 887/1 888/25 892/5 892/22 903/10 908/13 908/22 915/25 916/16 921/21 926/20 931/11 941/16 946/2 951/1 956/2 956/16 956/16 960/3 971/15 971/20 971/22 971/25 976/16 977/17 988/17 988/21 992/6 1005/21 1013/21 1023/19 1024/7 1027/12 1037/9 1037/14
grab [2] 896/8 976/20
grabbed [1] 977/5
gray [1] 942/12
Great [2] 889/12 892/14
green [4] 893/2 954/17 954/22 954/22
ground [1] 1036/6
grounds [1] 1032/15
group [1] 901/7
guess [19] 821/7 823/20 844/13 844/14 848/5 852/14 860/25 860/25 895/8 897/20 899/1 911/8 969/6 969/6 970/12 986/5 987/13 999/24 1044/17
guessing [1] 1007/22
Guide [1] 1023/6
gun [28] 823/5 823/9 823/20 910/14 919/7 921/24 922/25 923/25 925/20 926/10 926/12 926/14 926/15 926/21 926/23 926/24 926/25 927/1 927/15 927/18 927/23 929/23 932/12 962/24 972/1 972/3 972/4 972/7
guy [1] 979/23
guy's [1] 1049/22
guys [2] 823/3 869/8

**H**

had [177] 820/8 820/18 820/20 821/7 822/5 822/6 822/10 823/18 823/19 823/20 826/13 826/19 827/3 828/23 832/11 838/6 840/25 841/1 841/4 841/4 841/7 841/17 842/2 842/3 842/7 842/9 842/19 842/23 843/6 843/9 845/16 847/3 847/8 847/25 848/10 848/14 849/4 849/5 863/7 863/19 864/6 865/9 866/9 866/9 867/13 867/13 867/16 867/16 867/21 867/25 868/1 868/16 868/16 869/7 870/4 872/12 873/11 873/13 876/8 876/10 876/10 884/17 884/18 884/19 884/20 886/8 887/2 890/17 896/1 901/2 901/5 901/6 903/4 903/23 906/5 906/6 906/8 906/9 906/13 906/14 906/14 906/16 907/17 908/12 909/15 909/15 909/22 909/25 909/24 909/24 910/4 910/13 911/9 911/15 911/19 911/21 913/9 913/12 913/18 915/4 918/3 918/25 921/16 921/23 921/23 922/17 923/2 925/2 925/2 926/13 928/6 929/22 929/25 931/1 931/18 952/17 953/2 956/6 956/18 960/5 962/24 963/24 964/5 965/1 967/8 970/8 970/11 970/15 970/18

**had... [49]** 977/3 977/7 977/11 977/14 979/21 979/23
977/7 982/4 982/6 982/15 984/2 984/16
985/12 985/18 985/22 987/6 992/8 992/10
992/13 994/4 994/10 994/17 994/21 994/21
994/24 994/25 995/5 996/15 997/20 998/3
1000/11 1006/4 1008/23 1012/4 1013/24
1014/2 1015/10 1016/6 1017/20 1018/5
1020/3 1021/20 1022/17 1022/19 1024/3
1029/21 1030/6 1030/16 1034/16 1047/6
**Haddad [6]** 817/2 817/4 986/5 986/14
1009/14 1017/6
**hadn't [4]** 828/5 918/23 919/6 919/7
**half [5]** 819/18 884/23 960/8 960/11 961/11
**halfway [1]** 887/7
**HALL [1]** 816/5
**hand [15]** 818/19 824/16 827/11 877/13
897/12 908/17 939/15 939/15 958/24 977/9
977/15 977/19 999/13 1002/20 1028/21
**handcuff [5]** 887/16 936/3 947/11 960/20
977/13
**handcuffed [29]** 885/8 886/3 886/6 886/15
886/18 886/19 886/25 887/6 887/9 887/14
887/21 905/18 905/19 905/21 905/25 906/11
907/5 907/13 907/22 908/9 908/16 908/17
908/19 909/14 910/2 976/7 976/17 976/17
977/3
**handcuffing [2]** 910/12 910/17
**handcuffs [4]** 829/11 847/6 976/18 977/5
**hands [6]** 829/24 908/15 908/17 908/18
977/18 1042/18
**handwriting [1]** 839/14 999/18
**handwritten [2]** 999/14 1002/19
**haphazard [1]** 980/3
**happen [3]** 834/25 969/17 979/1
**happened [9]** 820/2 820/17 823/14 823/17
823/22 835/9 842/15 857/1 1003/6 1026/20
**happening [4]** 846/22 848/2 872/25 991/1
**happens [2]** 987/14 1003/7
**hard [3]** 889/17 944/16 944/16
**harm [2]** 947/19 979/13
**has [50]** 823/9 824/12 836/2 844/13 848/8
867/7 870/20 879/1 879/6 880/17 895/4
911/12 917/15 935/20 935/21 935/24 936/11
943/15 971/5 971/16 1004/19 1006/17
1007/10 1008/16 1010/19 1012/14 1016/21
1016/25 1018/13 1019/16 1019/17 1019/19
1022/17 1032/14 1034/25 1035/18 1037/13
1037/15 1038/2 1039/23 1043/11 1044/22
1048/14 1048/21 1050/14 1050/17 1051/2
1051/5 1051/13
**hasn't [3]** 904/24 911/10 911/18
**have [383]**
**haven't [6]** 830/5 996/17 1024/9 1026/17
1037/18 1051/17
**having [23]** 818/4 829/11 829/12 838/3
870/19 906/15 921/17 926/10 941/7 974/4
977/12 979/24 982/6 1015/20 1015/25 1019/1
1019/2 1020/1 1035/11 1036/7 1046/6 1046/7
1051/6
**he [343]**
**he'd [1]** 906/21
**he'll [1]** 1047/4
**he's [18]** 865/25 887/21 892/22 940/24 946/2
951/1 961/2 962/3 963/11 971/6 976/22
979/24 1003/19 1009/9 1046/15 1046/16
1046/23 1051/23
**head [4]** 971/24 977/15 1001/20 1046/15
**headliners [1]** 983/9
**headquarters [1]** 1024/24
**health [2]** 893/5 1000/10
**health-care [1]** 893/5

**hear [13]** 919/14 919/16 927/22 928/10
928/13 928/15 960/25 978/18 980/5 986/2
980/11 1026/11 1051/20
**heard [6]** 877/11 961/4 986/20 1015/5
1015/20 1042/1
**hearing [2]** 928/22 931/20
**held [2]** 995/1 995/6
**Hello [1]** 986/15
**helped [1]** 925/9
**her [3]** 936/19 1016/3 1034/3
**here [50]** 826/17 841/19 848/11 856/11
856/18 857/18 859/17 860/17 861/10 861/21
872/1 879/13 881/7 893/16 893/25 894/2
894/3 895/8 896/15 896/25 916/15 920/2
942/10 942/12 942/12 943/17 945/25 949/2
952/7 952/9 956/6 962/14 968/25 969/1 969/2
969/8 998/24 1002/9 1006/19 1007/13
1008/15 1010/20 1012/10 1014/11 1032/6
1036/16 1038/10 1038/14 1052/14 1052/17
**here's [4]** 892/11 895/13 956/21 956/25
**hereby [1]** 1054/5
**herein [2]** 818/4 974/4
**herself [1]** 826/8
**hey [5]** 823/7 923/19 968/25 971/21 972/1
**Hidalgo [5]** 1005/17 1005/19 1005/23
1008/17 1008/18
**hidden [1]** 983/11
**hide [1]** 975/15
**hiding [2]** 974/18 975/9
**Hidlago [1]** 1008/15
**high [2]** 1035/8 1035/10
**higher [1]** 1040/22
**highlight [1]** 1049/10
**highlighted [2]** 851/22 851/25
**highlighter [3]** 954/12 956/25 957/1
**highlighters [1]** 956/19
**him [81]** 822/18 826/7 826/23 832/20 868/22
868/25 887/6 887/8 887/21 889/10 891/11
891/22 904/14 905/15 905/18 905/21 907/20
908/9 908/11 908/16 908/17 908/22 909/8
909/23 909/24 910/1 910/8 911/15 916/4
918/18 919/14 919/16 922/21 923/1 929/9
936/4 936/4 939/12 941/12 941/15 941/19
947/11 950/14 953/11 976/9 976/10 976/10
977/3 977/7 977/7 977/8 983/18 983/19
986/22 987/4 991/3 991/7 1001/22 1001/22
1008/22 1009/6 1011/20 1017/15 1017/15
1018/17 1031/23 1036/8 1036/11 1036/19
1036/21 1042/18 1046/3 1046/7 1046/13
1046/25 1047/3 1047/21 1048/2 1048/3
1048/18 1050/18
**himself [2]** 827/3 991/10
**hired [1]** 1049/20
**his [109]** 820/14 822/10 826/23 826/23
829/13 829/13 829/13 841/1 841/4 850/9
852/23 854/15 861/17 869/22 887/2 887/3
891/4 891/13 908/15 908/17 908/18 910/4
910/14 918/12 918/14 918/24 919/8 919/10
919/11 919/18 919/21 919/25 920/3 920/4
920/7 921/4 924/8 924/12 924/15 924/17
926/14 926/15 926/16 926/22 927/22 930/11
930/23 932/12 959/1 963/2 969/23 970/2
970/11 970/11 971/17 977/5 977/6 977/7
977/10 977/13 977/13 977/14 977/14 977/15
977/20 978/15 978/15 978/16 981/2 981/11
981/15 981/18 986/20 990/25 991/3 992/9
993/15 993/18 993/20 994/3 994/5 994/7
1003/18 1005/20 1011/12 1014/4 1014/2
1014/7 1014/14 1014/17 1014/19 1014/22
1014/22 1016/25 1019/8 1019/21 1021/4
1021/5 1021/21 1024/14 1027/4 1027/25
1028/12 1028/15 1028/24 1030/18 1042/18
1043/8 1050/17

**history [2]** 909/15 909/23
**hm [12]** 848/7 860/14 879/9 913/1 943/3
97/2/9 987/7 1000/12 1016/23 1017/4
1030/5 1034/8
**hold [7]** 824/1 824/3 931/18 937/5 937/6
946/2 1034/20
**holding [4]** 1001/1 1001/2 1001/4 1001/7
**holds [1]** 1014/5
**holes [1]** 1007/13
**Holmes [1]** 1048/17 1048/20
**homeless [2]** 867/16 868/1
**homeowners [1]** 1030/7
**honest [4]** 965/10 1008/6 1018/7 1018/8
**Honor [162]** 818/2 818/10 818/21 827/8
829/14 830/3 831/4 831/6 831/8 834/6 834/10
834/13 834/16 834/18 834/22 834/24 835/4
835/5 835/13 835/16 835/18 835/21 836/13
836/18 845/1 845/15 845/22 846/4 846/9
846/23 847/11 847/19 847/24 848/18 851/15
855/11 856/8 857/13 857/22 857/25 858/4
858/11 858/19 858/22 858/25 859/3 862/3
872/5 872/10 872/18 872/21 873/3 873/10
873/15 873/25 874/3 874/6 874/11 874/21
874/24 875/1 875/4 881/8 881/15 882/8
882/25 883/3 883/13 883/16 883/20 883/24
901/1 902/6 902/17 903/2 908/23 909/1
909/10 912/17 913/3 913/9 913/15 916/9
916/12 916/16 917/3 917/9 929/3 929/6 929/9
931/12 943/21 943/24 944/10 944/13 948/13
948/15 948/21 949/3 955/25 956/24 957/6
957/9 961/2 961/13 961/16 964/18 967/9
967/15 968/15 968/24 969/16 969/19 969/22
970/1 971/15 972/11 972/16 972/22 973/8
973/11 973/14 973/17 973/19 973/23 974/1
976/21 977/2 985/5 985/25 986/4 995/4
996/20 1007/9 1007/16 1008/3 1008/5
1013/20 1014/16 1018/1 1019/3 1019/23
1020/6 1020/20 1032/16 1032/22 1033/7
1033/11 1035/25 1036/4 1038/6 1038/13
1038/20 1041/8 1044/16 1044/21 1045/7
1045/12 1045/17 1045/19 1050/5 1052/13
**HONORABLE [1]** 816/5
**hope [1]** 891/25
**hopefully [4]** 859/13 860/19 894/6 1018/13
**hospital [2]** 893/6 1000/17
**hotel [9]** 970/13 970/13 970/17 970/19 981/4
981/16 982/10 982/16 982/17
**hour [12]** 837/25 846/20 847/20 847/23 849/4
916/19 960/6 960/7 960/8 960/11 961/11
1040/13
**hourly [2]** 1040/16 1040/21
**hours [11]** 826/2 833/24 835/8 849/2 849/5
999/16 999/20 1035/18 1039/11 1039/22
1041/3
**house [47]** 823/10 823/12 823/15 823/21
848/5 895/6 895/7 923/1 923/21 923/24
926/23 926/24 926/25 927/17 927/18 932/12
939/6 939/7 939/15 939/16 939/22 939/25
940/3 943/20 944/7 944/7 962/25 970/8 982/7
982/11 998/21 1005/14 1006/10 1027/4
1027/17 1029/1 1029/2 1029/16 1029/20
1029/22 1029/23 1030/6 1030/14 1031/12
1032/9 1033/9 1033/17
**how [107]** 819/14 823/12 824/16 830/2 830/6
830/10 830/14 834/8 834/25 849/9 856/9
856/10 856/10 856/10 856/21 858/1 858/5
862/25 863/1 863/12 863/19 863/20 868/4
868/13 869/14 878/23 881/13 884/21 884/21
885/4 886/24 898/24 901/18 909/5 913/24
913/25 914/24 915/21 919/3 919/13 921/13
921/14 924/1 924/2 927/3 927/19 927/19
935/20 936/9 936/9 936/17 947/25 954/15
959/25 960/3 960/8 961/9 961/17 974/14

# H

**how... [48]** 974/14 975/17 975/20 978/17
979/17 982/22 982/24 985/7 985/10 985/12
994/24 995/12 996/2 999/7 1001/3 1001/4
1003/16 1005/21 1007/11 1007/11 1009/1
1013/21 1015/20 1019/10 1019/12 1019/13
1019/14 1019/16 1020/23 1021/5 1022/23
1022/23 1023/13 1024/9 1025/11 1026/11
1028/20 1034/25 1035/2 1039/11 1039/16
1042/15 1044/4 1044/6 1044/6 1044/10
1047/15 1048/22
**however [15]** 822/17 834/10 835/20 845/17
846/9 847/7 848/3 849/8 852/16 857/4 859/4
867/19 924/7 965/19 970/20
**HRS [1]** 999/14
**hub [1]** 1002/24
**huh [2]** 987/16 1044/15
**hundred [1]** 1039/9
**hurt [1]** 979/17
**hurts [1]** 893/5

# I

**I'd [15]** 837/9 844/14 884/23 936/12 948/15
955/25 995/14 998/4 1004/10 1024/6 1026/2
1026/4 1031/25 1037/11 1037/11
**I'll [24]** 818/7 837/7 840/2 861/20 862/2
892/7 895/11 895/11 897/12 921/20 936/19
944/11 956/22 968/11 973/24 976/3 996/24
997/4 1005/9 1009/3 1036/8 1049/14 1052/18
1052/21
**I'm [124]** 820/7 833/4 833/23 835/21 841/19
842/4 845/6 845/9 851/14 851/15 855/11
855/11 855/15 856/14 856/17 859/7 859/10
859/18 861/17 861/25 868/11 871/13 872/21
872/22 877/13 877/13 881/17 882/23 885/19
886/10 893/5 893/20 894/14 894/17 896/4
896/23 897/10 898/18 900/16 900/21 901/22
902/1 903/21 905/11 905/11 907/10 909/18
909/20 915/13 915/20 933/20 936/6 937/13
938/3 938/17 939/9 939/12 939/17 943/20
944/25 945/1 945/4 945/21 946/4 946/4 952/3
952/3 952/10 953/18 957/10 958/24 959/20
961/2 964/13 965/9 965/25 966/4 971/22
971/23 973/2 978/6 979/20 979/22 985/21
987/9 990/23 991/14 995/4 997/4 1001/23
1007/9 1007/22 1007/24 1009/5 1010/5
1011/16 1018/6 1018/12 1019/4 1020/7
1020/8 1020/17 1026/10 1026/12 1026/13
1026/15 1026/16 1026/18 1026/21 1029/11
1031/19 1035/1 1036/19 1038/13 1038/16
1039/20 1040/21 1040/23 1044/3 1044/6
1044/7 1046/21 1050/11 1050/11
**I've [11]** 857/5 867/15 875/24 937/4 969/10
1007/15 1018/17 1022/14 1025/1 1026/18
1040/6
**LA [10]** 865/25 910/19 910/20 910/23 911/4
915/15 915/18 1046/14 1046/16 1046/18
**LD [5]** 918/10 918/11 965/21 994/5 994/7
**idea [15]** 838/25 854/7 855/5 884/17 884/18
884/19 884/20 955/13 972/19 972/24 1003/6
1005/22 1006/13 1007/11 1019/10
**IDEN [2]** 1053/15 1053/17
**identifiable [1]** 863/25
**identification [4]** 918/5 943/4 946/13 958/16
**identified [4]** 824/12 841/23 983/17 995/24
**identifies [2]** 1004/4 1004/6
**identify [3]** 1002/6 1004/2 1034/21
**identifying [1]** 945/10 1002/21
**ignition [3]** 914/8 914/13 982/9
**illegal [5]** 915/25 923/14 923/25 938/3 1022/5
**illegally [1]** 990/5
**illegitimate [1]** 987/10

**imagine [1]** 1001/9
**immediate [2]** 829/1 1008/12
**immediately [5]** 907/22 908/1 908/19 975/10
976/7
**immoral [1]** 980/17
**immorally [1]** 990/5
**impeach [1]** 1050/18
**impeaching [4]** 1048/14 1050/15 1050/24
1051/16
**implicated [1]** 985/18
**important [3]** 926/10 926/17 969/20
**inappropriate [3]** 1000/11 1000/14 1000/19
**inappropriately [1]** 1000/15
**inch [2]** 958/2 1044/13
**inches [1]** 1044/13
**incident [86]** 821/10 829/5 835/7 838/10
864/16 865/2 865/11 866/2 866/8 867/7 879/3
884/10 891/16 891/16 910/3 916/2 916/8
934/23 935/1 935/2 935/5 935/10 935/10
935/14 935/16 935/17 947/20 949/12 959/24
962/8 962/10 962/11 962/12 963/11 963/14
963/18 963/20 963/22 964/5 964/9 965/2
965/24 966/16 966/19 974/11 989/7 989/17
990/11 990/14 990/18 992/21 995/13 995/16
996/16 997/17 998/9 998/13 999/1 1000/1
1003/2 1004/14 1005/5 1005/11 1005/12
1005/14 1005/24 1006/14 1007/4 1008/1
1008/4 1012/5 1013/12 1014/12 1015/10
1015/18 1017/12 1017/17 1017/21 1023/5
1025/24 1027/24 1030/19 1039/21 1043/6
1046/10 1051/24
**incidents [6]** 1017/1 1017/9 1051/13 1051/14
1051/16 1051/25
**include [1]** 1002/22
**included [1]** 965/23
**includes [2]** 836/19 895/18
**including [4]** 938/8 939/3 1025/12 1035/22
**incorporate [1]** 1043/15
**incorporating [1]** 1042/24
**incorrect [12]** 841/9 841/11 856/25 870/14
886/21 907/15 907/16 962/6 963/5 964/4
1012/2 1018/3
**incorrectly [3]** 1006/23 1011/24 1017/25
**incriminating [1]** 918/21
**independent [1]** 1010/15
**indicate [36]** 825/24 827/24 834/20 837/20
839/8 839/9 842/9 846/1 847/18 849/8 849/9
849/11 851/7 860/2 863/13 871/3 879/4
879/17 895/22 896/9 896/13 933/7 933/11
951/20 951/23 953/10 953/14 953/22 957/19
960/16 967/16 969/8 971/3 971/5 984/2
1029/21
**indicated [16]** 824/21 841/18 844/7 848/11
897/5 903/4 924/10 929/25 931/6 952/13
953/5 953/5 961/16 970/12 971/25 1041/13
**indicates [9]** 839/12 841/15 852/8 879/19
879/22 879/25 895/18 954/20 963/12
**indicating [27]** 820/19 836/13 859/16 860/18
860/24 877/13 879/13 892/11 892/25 895/13
896/2 896/11 896/15 896/25 897/14 932/23
938/13 942/10 943/6 943/17 944/12 945/25
946/1 953/17 958/19 1030/6 1032/7
**indication [7]** 850/18 851/2 853/14 870/10
881/24 966/24 972/23
**indications [1]** 879/1
**indicia [5]** 823/19 868/19 929/25 930/3
983/23
**individually [1]** 816/13
**individual [8]** 828/20 829/10 948/3 986/2
986/4 1012/21 1040/10 1046/10
**individualized [1]** 816/6 816/6
**individuals [6]** 828/24 842/18 866/8 876/7
917/13 985/16

**inflict [1]** 979/13
**information [59]** 843/2 845/9 846/8 847/1
847/9 856/23 856/25 857/3 857/24 858/1 858/5
858/9 858/23 876/17 922/3 922/24 927/21 934/3
934/14 935/24 935/25 982/15 984/15 984/18
984/19 985/1 985/3 985/17 989/2 1004/15
1006/16 1006/16 1006/20 1007/11 1008/7
1008/9 1011/19 1011/21 1012/3 1012/11
1013/1 1013/3 1013/4 1013/9 1013/10
1013/11 1016/11 1017/24 1017/25 1018/12
1018/14 1019/10 1019/12 1019/16 1019/17
1020/23 1020/24 1021/11 1021/14 1021/19
1031/4
**informed [2]** 843/13 860/9
**infraction [1]** 864/10 875/2 875/3
**ingest [1]** 975/16
**INGO [1]** 974/3
**initial [8]** 847/24 847/25 848/1 934/21 996/22
1000/5 1023/18 1025/5
**initially [8]** 931/2 931/2 931/3 936/10 950/1
960/2 976/17 1000/4
**initiate [1]** 935/5
**injury [1]** 948/5
**inoperable [2]** 912/10 912/24
**input [8]** 835/4 854/23 858/2 858/9 861/25
1000/6 1008/9 1022/7
**inputs [1]** 1008/7
**inputted [3]** 845/17 854/24 856/9
**inputter [4]** 835/22 837/10 845/9 857/5
**inquire [1]** 1050/10
**inquired [1]** 1029/10
**ins [2]** 858/10 858/17
**inside [29]** 822/23 823/8 823/10 823/12 847/2
876/7 879/2 887/7 887/7 887/9 891/1 891/8
903/10 903/12 903/24 912/4 912/8 913/4
913/8 917/13 930/5 930/13 972/7 978/11
981/2 983/3 1043/11 1043/24 1044/10
**inspect [1]** 978/15
**instance [3]** 977/1 989/8 1044/7
**instead [1]** 1025/22
**instruction [1]** 988/10
**instructions [1]** 1001/25
**intake [3]** 999/9 1000/5 1001/13
**intended [1]** 841/14
**intention [2]** 841/7 1050/23
**interact [1]** 903/8
**interacting [1]** 846/25
**interference [1]** 845/24
**Internal [20]** 865/1 866/3 866/10 866/12
866/19 867/1 867/14 867/20 923/11 937/19
938/1 996/9 996/15 997/5 1027/23 1028/11
1046/15 1047/2 1047/10 1047/16
**Internet [1]** 1023/8
**interrupt [1]** 993/22
**interruption [1]** 978/7
**intersection [2]** 863/8 895/16
**intervene [11]** 831/20 831/25 988/14 989/13
989/20 990/4 990/9 992/10 992/18 992/20
1030/10
**interview [5]** 865/4 865/5 865/10 865/12
865/16
**interviewed [5]** 865/1 865/15 865/22 937/19
996/10
**intoxicated [1]** 930/9
**introduced [1]** 1009/1
**investigate [1]** 915/24
**investigating [1]** 1031/2
**investigation [29]** 818/16 821/5 826/4 848/3
848/14 864/5 867/2 869/5 869/9 869/13
869/15 869/17 869/19 938/1 965/14 965/17
966/18 966/21 966/25 984/16 996/16 998/18
1012/16 1017/18 1018/15 1027/3 1027/23
1046/20 1047/4

## I

investigations [1] 1046/23
investigative [1] 1015/11 1018/6
investigator [7] 865/25 916/3 996/9 1027/23
1027/24 1028/11 1047/12
investigator's [1] 1002/7
investigators [3] 997/6 1031/5 1047/3
investigatory [1] 1018/19
involve [2] 1051/25 1051/25
involved [16] 832/2 842/18 866/8 907/3 927/6
965/22 966/16 989/18 998/18 1005/16 1006/8
1006/17 1012/25 1014/9 1017/12 1047/3
involvement [3] 966/25 997/17 1000/1
involving [1] 819/2
iPhone [1] 1023/4
is [516]
isn't [15] 832/24 833/7 861/25 902/12 933/25
969/15 972/5 988/10 988/15 988/19 992/19
1003/25 1005/6 1010/15 1016/17
issue [144] 829/23 874/8 884/10 893/6 937/25
938/2 988/3 988/5 988/6 988/9 1038/3
1038/17 1046/24 1050/12
issued [8] 871/18 884/9 899/23 900/9 925/2
963/10 995/17 995/18
issues [11] 818/19 979/10 980/3 980/18
980/19 980/19 1007/12 1045/14 1045/24
1047/15 1048/10
it [632]
it's [132] 824/7 824/21 832/23 833/10 833/15
834/20 835/20 836/8 839/21 840/15 842/23
846/16 846/16 847/13 850/11 854/18 854/24
857/1 857/17 858/7 859/3 859/4 859/12
859/13 861/6 861/7 861/9 861/10 861/14
861/17 864/15 874/6 874/9 875/1 875/1 875/3
875/5 876/12 877/9 877/14 877/22 877/25
889/17 890/2 891/24 892/1 895/25 896/17
901/2 908/21 912/2 919/24 923/25 931/17
933/17 934/7 934/19 936/12 936/22 937/3
937/8 938/21 938/22 942/12 943/12 943/25
944/16 944/16 947/16 947/16 948/10 949/1
949/5 950/2 953/7 954/17 955/6 955/12 956/3
956/12 957/10 957/10 958/1 958/17 959/1
960/9 960/15 968/25 969/25 975/25 976/3
976/11 979/3 979/23 980/17 980/17 983/4
987/22 987/24 988/3 988/6 988/9 989/8
989/11 990/7 1001/16 1003/18 1003/25
1004/14 1008/1 1008/14 1009/18 1010/15
1010/17 1011/19 1015/12 1015/12 1018/3
1020/16 1027/6 1028/2 1028/9 1034/5
1036/19 1037/2 1037/21 1038/18 1038/21
1040/9 1050/23 1050/23 1051/12
item [1] 1047/14
items [2] 883/1 983/24
its [2] 876/18 1009/2
itself [6] 848/5 873/12 905/10 950/3 1033/23
1043/10

## J

J.P [1] 890/9 890/11
Jack [1] 868/10
jail [43] 819/25 820/4 824/1 826/10 826/14
847/14 847/17 847/19 848/16 855/22 855/23
904/3 904/6 915/10 919/9 931/5 931/7 931/9
963/16 974/23 974/23 979/14 979/25 985/4
999/3 999/4 999/8 1000/4 1001/4 1001/7
1001/9 1001/18 1001/22 1002/25 1003/8
1017/16 1018/11 1023/20 1023/25 1024/21
1025/11 1026/14 1045/4
JAMES [2] 816/6 1054/6
January [1] 1012/9
jobs [1] 980/21
John [2] 817/5 817/7

## Judge

Judge [3] 862/5 871/23 946/7
JULIA [1] 817/4
jurisdiction [6] 853/2 853/2 853/3 1002/6
1031/8 1031/10
just [130] 818/11 820/7 823/4 826/21 831/4
832/12 834/10 835/21 845/6 846/16 847/13
850/3 855/12 855/15 856/5 856/13 856/13
856/14 860/9 865/17 865/19 866/7 866/8
870/2 871/4 872/19 873/4 873/6 873/17
875/25 882/5 883/22 889/10 889/17 890/11
893/6 894/17 897/21 898/23 899/11 899/14
900/6 900/21 905/14 909/1 909/18 909/20
910/15 910/19 913/11 913/12 915/25 916/3
916/7 917/14 917/19 918/14 922/25 923/13
923/25 926/22 926/23 927/17 927/18 929/3
939/17 941/15 941/17 942/14 944/3 944/18
944/21 945/9 946/1 950/14 954/17 955/3
960/13 960/25 961/18 968/14 968/25 969/7
971/8 972/8 975/24 975/24 977/1 978/3
979/20 982/5 982/11 983/4 984/1 985/5
985/24 990/5 990/17 993/16 994/19
997/4 997/4 997/13 999/7 1000/21 1005/6
1007/12 1012/12 1014/19 1016/16 1018/22
1020/8 1021/16 1022/25 1024/13 1026/18
1036/1 1040/10 1042/3 1044/12 1046/24
1047/19 1047/25 1048/23 1048/24 1049/14
1050/12 1050/3 1051/20
justification [1] 828/20

## K

keep [2] 1030/25 1036/23
kept [8] 823/24 842/22 900/15 900/18 900/18
993/17 1007/17 1007/24
key [26] 823/1 847/8 914/3 914/14 914/14
914/22 915/6 915/11 915/16 937/20 970/6
970/8 970/24 971/22 981/16 981/18 981/21
981/21 981/25 982/7 982/9 982/10 982/11
1015/25 1015/25 1049/5
keys [27] 868/19 891/11 913/19 913/22
913/24 913/25 914/1 914/1 914/2 914/4 914/6
914/7 914/11 914/13 914/16 914/16 914/24
914/25 915/3 915/4 915/5 916/5 970/9 981/24
982/6 1015/21 1027/5
kidnapped [1] 929/12
kidnapping [1] 929/14
kids' [2] 924/2 926/22
kill [1] 956/22
kind [22] 821/6 821/6 874/2 896/1 920/22
922/23 944/21 957/8 971/23 971/23 971/24
974/18 978/11 980/3 983/5 988/1 991/8
1016/21 1020/9 1022/5 1031/7 1043/11
kinds [2] 980/16 1027/5
King [27] 819/5 819/9 819/12 828/18 830/25
844/8 844/12 846/16 860/22 884/22 884/25
890/2 891/17 894/5 894/16 896/2 913/19
917/20 939/3 939/8 940/5 947/6 949/12
950/18 951/5 961/12 980/7
Kirby [7] 867/4 870/7 885/22 898/25 917/10
917/11 990/20
Kirby Bradshaw [3] 867/4 870/7 885/22
knew [11] 866/23 907/5 907/13 909/1 909/23
924/2 980/9 993/1 1006/20 1014/13 1030/15
knife [2] 948/4 979/25
know [220] 818/11 821/10 823/3 823/4 824/7
829/6 833/15 833/15 833/18 833/19 835/6
835/10 837/20 839/11 842/13 843/9 843/14
843/23 844/18 845/7 845/10 850/12 851/10
851/19 852/19 854/10 854/18 855/4 855/9
855/16 857/2 861/7 861/14 863/1 863/2 863/5
863/5 863/20 863/20 866/20 867/19 868/6
868/23 870/2 872/10 872/25 873/3 873/17
874/16 874/18 876/24 880/12 880/14 891/3
891/4 891/5 891/10 891/15 892/16 895/4

895/15 895/25 897/21 898/12 898/14 898/21
899/2 899/15 899/17 900/23 900/24 902/4
902/9 902/15 902/16 902/17 902/20 902/24
903/2 903/6 904/15 909/3 909/24 910/19
911/3 917/14 919/21 919/22 921/14 922/15
922/24 923/7 923/8 924/1 924/2 924/19
924/20 926/20 941/8 949/18 954/15 956/6
956/10 957/4 957/15 959/6 959/6 959/18
959/19 959/20 960/12 960/13 960/19 964/10
964/18 965/4 965/5 965/9 965/11 965/12
965/25 966/3 967/16 970/17 971/5 971/22
972/11 972/17 972/20 976/1 976/13 977/25
978/2 980/21 983/24 985/7 987/6 987/14
990/17 991/3 994/25 995/22 995/23 997/15
997/20 997/22 997/24 998/19 999/12 999/20
1003/7 1003/16 1004/16 1004/17 1005/19
1005/20 1005/21 1006/15 1006/19 1007/20
1008/6 1008/7 1008/8 1008/10 1008/16
1009/1 1009/2 1009/9 1009/21 1012/12
1012/18 1013/21 1014/16 1018/4 1018/22
1019/13 1019/14 1020/2 1021/5 1022/23
1023/9 1024/9 1026/4 1028/25 1029/4
1029/17 1030/8 1033/11 1033/12 1033/14
1033/15 1033/16 1034/4 1035/4 1036/9
1037/2 1037/9 1037/12 1037/12 1037/18
1038/2 1039/5 1039/21 1040/8 1040/8 1040/8
1043/14 1043/21 1045/13 1048/18 1048/22
1049/5 1049/10 1050/2 1050/5 1050/20
1050/22 1051/11 1051/12 1051/13
knowing [1] 870/20
knowledge [27] 838/24 851/17 855/10 855/20
862/23 884/12 884/13 900/8 900/11 900/13
900/15 900/25 901/1 902/25 903/1 914/18
919/25 926/3 926/5 926/6 926/8 930/10 988/3
1012/19 1029/15 1031/18 1031/20
known [1] 1018/4
knows [2] 1011/21 1019/5

## L

label [1] 897/11
labeled [1] 855/2
lack [11] 833/1 836/4 837/1 838/11 855/8
880/19 882/24 900/22 902/15 902/23 959/17
lady [1] 1016/3
laid [4] 835/20 996/21 1032/14 1032/20
lane [2] 976/14 977/4
language [1] 945/5
lapse [4] 842/20 845/21 847/9 847/11
laptop [2] 936/1 936/7
large [1] 979/9
larger [4] 943/18 943/23 944/1 944/1
Lasix [1] 862/8
last [25] 824/20 825/5 835/25 836/1 855/6
855/15 855/15 859/20 866/17 897/24 898/3
932/20 933/1 945/12 947/8 949/15 984/17
993/23 998/6 1012/5 1012/11 1021/12 1028/9
1035/16 1035/19
lasted [1] 1034/25
late [1] 957/13
later [7] 835/12 852/16 867/14 924/16 981/14
1013/5 1038/18
laundry [2] 919/3 920/3
law [13] 817/5 817/9 968/2 975/4 987/13
988/3 988/15 989/8 989/14 989/15 992/15
1006/2 1038/9
law-enforcement [4] 968/2 975/4 987/13
1006/2
lawfully [2] 1030/13 1031/16
laws [1] 984/7
lawsuit [2] 1022/11 1022/12
lawyer [1] 865/9
lay [1] 1019/4
laying [1] 971/23

Case 3:07-cv-04179-SI    Document 49-7    Filed 07/25/10    Page

# L

**lead [8]** 869/6 869/9 940/19 970/2 1017/17
1017/18 1031/5 1031/6
**leader [8]** 989/17 989/18 990/6 990/11
990/15 1030/19 1031/1 1031/1
**Leading [2]** 940/6 941/11
**learn [1]** 909/5
**learned [4]** 840/19 840/25 841/4 852/16
**learning [4]** 976/6 988/25 989/2 989/5
**least [7]** 844/18 859/24 863/2 993/1 1006/5
1018/17 1045/13
**leave [8]** 882/4 890/17 890/24 957/23
1029/20 1030/5 1038/10 1052/14
**leaving [5]** 892/9 897/19 922/8 928/9 928/16
1030/14
**led [5]** 869/4 887/19 971/18 984/14 997/24
**left [19]** 820/8 827/11 853/18 853/18 859/25
885/1 890/20 895/6 912/3 939/15 960/4
991/16 991/20 1020/16 1029/21 1030/6
1030/13 1030/20 1031/21
**left-hand [2]** 827/11 939/15
**legal [1]** 871/9
**legs [2]** 977/7 977/14
**length [1]** 1001/2
**let [24]** 826/7 830/1 843/9 843/14 854/10
858/16 870/5 879/12 886/23 891/22 893/16
894/21 895/3 895/25 896/8 932/23 941/19
949/10 951/2 996/18 997/4 998/19 1015/15
1050/2
**let's [19]** 837/13 872/19 916/20 935/18
935/18 936/8 939/12 945/12 951/17 954/4
954/6 982/9 982/10 998/21 1018/25 1020/9
1043/11 1043/16 1051/20
**letting [1]** 842/13
**level [1]** 1040/20
**liberty [1]** 985/13
**license [8]** 873/8 873/11 873/13 883/11
883/14 887/3 891/13 994/3
**licensed [1]** 891/11
**lieutenant [1]** 1040/24
**light [8]** 819/8 819/12 863/9 863/11 863/16
864/22 873/20 873/22
**lighten [1]** 896/16
**lightened [1]** 950/3
**lights [2]** 869/22 869/25
**like [48]** 819/6 819/17 824/5 824/7 835/15
838/2 844/17 859/8 883/1 890/9 901/8 901/9
901/21 902/20 911/25 912/2 934/5 937/3
944/3 944/14 946/17 948/15 961/14 975/6
976/6 976/13 980/23 981/16 981/17 982/4
982/10 994/11 998/4 998/9 1002/17 1003/1
1004/10 1007/12 1018/21 1023/4 1024/6
1026/2 1026/4 1031/25 1039/19 1043/22
1044/2 1050/18
**line [5]** 934/6 952/15 955/16 1032/12 1034/15
**link [1]** 859/5
**linked [2]** 1016/25 1017/3
**linking [1]** 827/23
**list [6]** 1002/2 1016/20 1022/2 1040/7
1050/21 1052/8
**listed [9]** 824/17 824/18 834/9 882/10 924/14
971/4 1011/1 1021/21 1021/24
**Listen [1]** 922/22
**listened [3]** 866/15 910/19 910/20
**listening [1]** 993/17
**listing [1]** 1007/3
**lists [7]** 1002/20 1002/20 1005/2 1006/8
1009/23 1009/25 1010/20
**litigated [1]** 1051/13
**little [10]** 845/4 892/1 922/6 953/13 973/12
984/8 1025/12 1032/22 1035/17 1049/22
**live [16]** 822/8 922/22 924/13 929/7 968/25

969/9 971/23 982/20 982/20 984/6 1006/11
1013/3 1015/14 1048/9 1048/23 1020/7
**lived [14]** 850/9 850/12 913/10 919/10 923/19
924/13 963/1 968/23 972/23 981/12 1016/6
1016/12 1017/2 1017/2
**livelihoods [1]** 980/22
**lives [1]** 1006/23
**living [22]** 822/11 848/15 912/8 913/4 913/8
913/11 919/11 919/14 921/24 927/19 970/16
972/12 981/11 981/13 982/13 982/16 983/19
984/2 984/3 1018/7 1021/20 1022/8
**local [2]** 853/1 853/3
**locate [5]** 939/6 939/16 939/23 941/12 942/6
**located [5]** 844/11 844/11 894/2 941/5 941/9
**location [40]** 819/1 822/5 838/7 841/20
841/21 844/7 860/10 864/18 864/23 864/24
866/20 888/10 889/5 889/16 889/18 889/20
890/12 895/5 896/9 898/9 922/11 940/20
941/9 942/2 942/6 942/18 943/7 945/13
945/14 946/5 946/16 951/17 953/14 956/12
960/2 960/14 960/18 961/12 961/4 961/17
**lock [1]** 1015/21
**locked [1]** 890/22
**locker [1]** 837/23
**log [4]** 842/21 1029/24 1030/5 1030/17
**logged [4]** 859/4 1030/3 1030/13 1033/17
**logs [1]** 856/7
**London [1]** 868/10
**long [20]** 823/12 849/9 856/21 863/19 863/20
866/13 885/4 886/24 912/4 927/19 927/19
936/9 959/25 960/3 961/17 994/24 995/5
1013/6 1016/7 1052/17
**look [31]** 824/5 839/4 851/22 854/8 857/21
859/8 875/15 881/5 892/16 938/19 950/2
972/20 981/2 994/3 1001/19 1002/17 1007/4
1014/6 1015/9 1018/23 1020/9 1020/12
1024/7 1025/1 1028/2 1028/22 1031/10
1031/20 1040/9 1043/1 1043/24
**looked [11]** 846/14 846/17 883/22 910/4
912/2 941/7 981/16 994/2 1003/4 1024/9
1028/12
**looking [30]** 824/10 835/25 841/19 856/18
859/22 939/5 939/14 939/15 939/21 940/18
940/23 942/3 943/22 944/5 960/1 966/4
982/23 994/7 997/23 1001/21 1005/6 1008/10
1011/23 1012/13 1012/15 1018/6 1020/8
1021/17 1022/25 1039/8
**looks [7]** 824/7 844/17 872/20 890/9 934/5
966/6 1009/18
**loose [1]** 932/24
**lost [1]** 955/9
**lot [8]** 914/1 956/6 967/21 968/2 968/6 968/9
984/9 1008/11
**lots [1]** 913/6
**love [1]** 893/11
**lower [2]** 829/13 1047/12
**lower-down [1]** 1047/12
**Lucas [162]** 819/3 820/16 820/20 821/12
821/23 822/2 822/6 822/17 822/23 823/2
823/25 824/2 826/10 826/13 826/21 831/16
831/21 832/8 838/10 841/8 846/25 847/7
848/1 848/4 848/15 848/24 849/6 849/10
850/8 850/11 850/13 850/18 852/20 853/7
853/18 853/23 854/13 854/22 855/21 860/1
860/8 867/16 867/25 868/24 868/25 869/1
880/24 881/14 882/14 882/11 884/17 884/18 885/6
885/8 885/21 885/25 886/2 886/18 886/24
886/24 887/1 887/2 887/4 887/14 887/21
895/19 898/25 899/12 903/4 903/8 903/10
903/16 903/23 904/12 905/3 913/10 913/20
918/21 919/16 919/12 919/22 921/4 921/23
922/8 922/22 923/2 923/12 923/17 925/20
925/25 926/11 927/15 927/22 927/25 928/1

928/6 928/16 928/19 928/21 929/12 929/19
930/6 930/23 931/15 937/11 960/18 962/22
963/1 963/7 963/9 963/4 963/7 963/20 963/24
964/8 964/15 968/17 970/18 971/3 971/21
975/22 976/6 977/3 977/19 978/6 980/5 981/1
981/10 981/15 983/17 983/22 984/16 985/22
986/18 986/23 987/2 991/11 991/16 992/6
999/5 1001/18 1002/9 1008/17 1010/11
1011/9 1011/25 1012/4 1013/24 1014/7
1015/10 1016/6 1016/25 1017/19 1021/11
1021/20 1022/17 1025/25 1027/9 1027/19
1027/22 1031/2 1033/13 1042/4
**Lucas' [24]** 819/15 819/23 823/19 854/9
867/21 881/12 888/19 889/16 889/18 890/25
894/23 911/22 914/19 919/19 930/1 937/20
962/24 966/22 978/11 978/15 994/2 1017/1
1027/16 1028/12
**lump [1]** 1040/10
**lunch [2]** 911/13 973/21
**Luther [24]** 819/5 819/9 819/12 828/18
830/25 844/8 844/12 846/16 860/22 884/22
890/2 894/5 894/16 896/2 913/19 917/20
939/3 939/8 940/5 947/6 949/12 950/18
961/12 980/6
**Lydia [3]** 817/3 1054/4 1054/17

# M

**M. [1]** 897/20
**M. R. 1 [1]** 897/20
**M.L.K [6]** 891/17 895/16 943/19 997/20
1023/19 1024/14
**ma'am [6]** 857/17 943/20 968/20 969/3 969/6
1044/4
**MacDonald [10]** 850/16 850/19 851/7 852/9
852/19 854/1 920/13 920/16 971/3 971/14
**Mack [7]** 905/17 925/8 925/10 966/7 967/12
973/10 978/2
**made [46]** 819/19 821/15 844/16 844/17
846/2 869/20 885/19 885/21 885/24 885/24
885/25 886/2 893/3 894/1 894/23 899/11
899/18 900/14 900/17 901/11 902/13 909/19
911/25 920/9 920/10 922/13 922/16 922/17
925/20 925/25 926/11 930/6 934/18 937/23
959/12 960/13 961/3 964/15 968/24 970/14
995/24 996/4 1006/5 1017/23 1026/18 1040/7
**main [1]** 937/12
**maintain [1]** 910/16
**maintained [3]** 833/11 995/23 1012/18
**make [40]** 818/11 826/7 832/11 860/23 876/5
876/18 885/1 899/25 900/21 910/6 910/13
910/15 917/12 920/22 924/8 936/23 944/18
945/15 947/18 948/1 953/11 957/7 963/19
972/23 975/14 979/18 983/2 990/8 990/11
1010/17 1018/14 1024/13 1027/25 1028/12
1028/15 1030/12 1031/15 1043/13 1043/16
1044/1
**making [4]** 875/24 875/24 920/19 935/23
**management [4]** 1007/22 1007/23 1012/20
1013/2
**mandated [1]** 828/6
**mandatory [2]** 1000/19 1039/25
**manipulate [2]** 1043/13 1043/15
**manner [5]** 829/8 843/16 886/13 965/5
1042/11
**manual [2]** 831/2 831/23
**many [30]** 826/2 857/1 862/25 863/1 868/4
898/24 913/24 913/25 914/24 921/13 921/14
924/1 924/3 927/3 927/7 967/8 974/14 985/7
985/10 985/12 995/12 996/2 1001/3 1001/4
1011/13 1018/8 1034/25 1035/2 1039/11
1044/8
**map [2]** 943/7 1023/1
**Mapquest [6]** 1022/20 1022/24 1023/8

# M

**Mapquest... [3]** 962/6 1025/7 1025/13
**March [4]** 816/11 865/6 1012/9 1054/18
**margin [1]** 1049/3
**MARILYN [1]** 816/5
**mark [16]** 889/10 889/10 942/14 943/1 943/7 943/7 945/23 946/2 953/11 953/24 954/17 955/24 966/14 1034/14 1048/24 1049/3
**marked [28]** 859/18 891/24 892/5 893/20 938/10 938/18 939/5 940/20 940/25 943/4 943/6 946/13 946/15 946/17 949/4 950/1 950/20 951/18 955/23 958/16 996/10 997/6 997/12 1034/11 1034/12 1034/13 1034/16 1034/18
**marker [1]** 877/15
**marshals [6]** 820/19 821/8 822/5 850/21 971/3 971/16
**Martin [24]** 819/5 819/8 819/12 828/18 830/25 844/7 844/12 846/16 860/22 884/22 890/2 894/5 894/16 896/2 913/19 917/20 939/3 939/8 940/5 947/6 949/12 950/18 961/11 980/6
**Martinez [7]** 905/17 925/8 925/10 966/8 966/13 967/11 978/2
**Marty [2]** 891/5 918/9
**match [2]** 1001/20 1044/22
**matched [1]** 1008/12
**materials [1]** 988/21
**matter [4]** 830/1 881/7 888/10 1009/6
**matters [3]** 818/19 1046/10 1050/24
**may [70]** 818/9 829/17 833/3 836/7 837/8 838/13 842/6 843/17 845/18 846/10 846/13 847/7 853/10 855/9 859/12 859/17 871/11 871/17 876/14 899/3 900/24 902/24 904/21 905/14 907/9 908/11 910/5 916/25 917/1 917/6 917/8 917/24 918/7 923/8 926/24 929/21 937/4 938/18 938/18 940/8 944/20 947/20 954/2 959/19 967/3 969/9 969/13 973/5 973/6 974/2 979/12 990/1 995/22 1018/15 1018/20 1021/7 1021/7 1026/16 1026/25 1027/1 1027/3 1030/24 1044/20 1045/10 1045/12 1045/13 1045/16 1050/22 1051/23 1054/13
**maybe [9]** 855/13 914/2 954/13 971/3 972/24 975/16 1020/4 1034/6 1051/3
**Mayer [68]** 820/16 820/18 821/8 821/17 822/24 824/20 824/21 825/18 825/21 828/7 832/18 832/21 838/18 838/21 846/25 847/7 849/17 849/17 853/9 862/18 862/20 868/24 869/4 869/22 872/3 872/11 872/24 878/17 878/23 880/9 881/3 884/12 885/20 885/24 887/2 887/6 888/23 903/9 911/7 912/1 914/20 915/10 919/23 920/10 920/16 920/19 922/8 923/6 923/16 925/7 926/3 928/6 928/18 928/22 931/16 931/21 931/25 932/2 951/6 951/11 970/7 970/18 970/24 971/2 971/15 973/16 973/23 974/3
**Mayer's [2]** 824/17 836/2
**Mazda [1]** 957/12
**me [68]** 820/18 826/21 830/12 844/17 848/17 854/10 856/12 857/1 858/16 866/6 866/10 870/2 870/5 879/12 881/6 882/9 886/23 889/3 891/22 893/17 894/8 894/21 895/4 895/25 896/8 897/9 905/24 912/2 913/17 915/10 918/3 919/12 924/22 941/19 944/16 949/11 951/2 952/8 955/25 957/18 961/19 972/1 976/21 977/6 981/12 985/3 986/25 996/6 996/18 997/4 998/22 1003/5 1007/12 1008/22 1014/19 1014/24 1015/4 1015/15 1018/7 1020/15 1026/17 1027/4 1030/25 1034/22 1039/18 1054/7 1054/10
**mean [36]** 821/3 832/21 836/16 840/19

**meaning [7]** 912/3 920/20 969/8 975/4 1020/21 1042/21 1042/23
**means [11]** 836/18 855/5 885/18 912/24 913/4 934/23 998/6 998/7 1000/22 1019/5 1026/17
**meant [1]** 836/15
**meantime [1]** 971/2
**mechanical [4]** 880/5 882/20 883/5 883/10
**mechanical/registration [3]** 880/5 883/5 883/10
**mechanics [2]** 975/24 975/25
**medical [1]** 1000/14
**member [2]** 965/19 974/11
**members [3]** 822/25 830/23 878/11
**memoranda [1]** 1050/6
**memorandum [1]** 876/25
**memory [2]** 975/21 1015/22
**memos [1]** 1047/2
**men [4]** 832/3 876/2 876/3 917/20
**mental [1]** 1006/5
**mentioned [1]** 994/2
**message [1]** 901/20
**messaging [1]** 901/22
**messed [1]** 942/13
**messing [1]** 942/9
**MHP [4]** 816/8 816/15 816/21 1054/6
**MICHAEL [4]** 817/4 966/7 1048/17 1048/20
**Michael Holmes [2]** 1048/17 1048/20
**Michael Mack [1]** 966/7
**midnight [5]** 825/7 825/13 825/13 825/25 825/25
**might [7]** 843/19 847/4 915/3 949/17 955/13 983/7 994/19
**MIL [1]** 859/23
**mile [4]** 884/23 884/23 938/8 1026/7
**mileage [6]** 938/5 938/6 938/6 938/7 1026/8 1026/11
**miles [8]** 938/8 995/12 1024/1 1024/3 1025/15 1025/19 1025/21 1025/22
**mind [3]** 823/3 868/9 1036/23
**mine [1]** 861/8
**minimized [1]** 1018/22
**minor [1]** 888/16
**minute [4]** 843/1 993/4 998/17 1021/9
**minutes [9]** 823/13 842/9 846/20 866/13 916/20 936/12 937/5 937/10 973/13
**mis [1]** 963/23
**mis-asked [1]** 963/23
**misdemeanor [1]** 936/2
**missed [1]** 1019/21
**Missionary [2]** 944/24 945/5
**misspoke [1]** 1036/25
**misstates [9]** 829/14 839/24 869/10 950/8 989/24 997/18 1011/14 1011/17 1030/22
**misstating [1]** 839/25
**mistake [2]** 836/9 844/17
**mistakes [2]** 844/16 845/6
**misunderstood [2]** 886/23 1012/7
**Mm [12]** 818/17 860/13 879/9 913/1 943/3 972/19 987/11 1000/12 1016/23 1017/4 1030/5 1034/8
**Mm-hm [12]** 818/17 860/13 879/9 913/1 943/3 972/19 987/11 1000/12 1016/23 1017/4 1030/5 1034/8
**modules [1]** 988/22
**moment [12]** 827/8 831/4 831/8 845/23 882/5 916/9 916/11 931/12 964/18 965/13 979/23

985/5
**Monday [7]** 949/16 949/17 949/18 951/5 1050/2 1052/5 1052/17
**money [1]** 1037/22
**monitored [1]** 900/10
**Montclair [1]** 888/13
**month [1]** 971/17
**months [1]** 821/10
**more [23]** 820/20 821/3 821/9 821/9 835/15 843/1 852/16 866/9 875/11 942/17 960/5 960/7 979/16 981/20 981/21 992/3 997/5 1012/15 1015/15 1016/9 1036/1 1039/9 1047/15
**more-current [1]** 852/16
**morning [14]** 818/1 818/2 818/24 818/25 825/9 825/12 831/11 831/12 843/22 843/24 844/2 863/25 875/14 980/25
**most [11]** 957/8 971/18 1026/8 1026/10 1026/13 1026/22 1027/6 1027/7 1035/17 1037/14 1046/21
**most-current [1]** 971/18
**mostly [2]** 869/2 894/7
**motel [8]** 868/2 868/4 868/14 868/17 868/18 868/20 981/6 981/13
**Motel 6 [4]** 868/2 868/17 868/18 868/20
**Motel 6s [2]** 868/4 868/14
**motels [3]** 919/16 920/7 982/13
**motion [1]** 875/8
**move [12]** 820/24 946/3 946/7 948/16 958/20 958/21 983/12 983/14 993/23 1004/24 1018/25 1032/11
**moved [1]** 879/6
**moving [23]** 844/4 874/2 874/5 874/6 874/11 874/12 874/13 875/7 875/7 880/4 880/4 882/14 882/16 882/17 882/18 883/4 883/8 883/9 883/12 883/18 883/23 897/10 1040/22
**MR [17]** 818/23 837/12 845/5 854/17 855/14 859/9 859/17 880/24 897/17 929/18 929/18 932/3 939/20 986/14 1009/14 1017/6 1045/2
**mr. [257]**
**Mr. Boley [6]** 932/17 951/8 951/9 990/21 1029/13 1042/4
**Mr. Boley's [2]** 993/5 1021/10
**Mr. Bradshaw [78]** 819/24 820/3 820/4 820/12 820/15 826/9 831/16 831/21 832/7 838/10 840/17 840/20 840/23 841/1 841/4 841/8 842/3 842/12 843/1 847/3 847/6 848/14 848/16 860/8 867/11 869/2 871/4 878/16 878/21 878/24 880/24 881/12 881/14 881/21 884/19 884/20 886/2 886/5 886/12 886/19 887/12 887/22 887/23 888/24 891/21 895/19 898/8 904/3 905/6 905/18 905/19 905/20 905/25 906/6 906/13 907/5 907/13 908/8 909/7 909/14 909/22 910/6 910/7 910/12 910/13 910/24 911/4 918/17 919/5 919/6 925/19 947/11 963/16 978/1 978/18 992/9 993/14 1023/19
**Mr. Bradshaw's [5]** 841/24 932/3 964/21 964/24 993/5
**Mr. Haddad [1]** 986/5
**Mr. Hidalgo [1]** 1008/17
**Mr. Kirby [1]** 990/20
**mr. Lucas [136]** 819/3 820/20 821/12 821/23 822/2 822/6 822/17 822/23 823/2 823/25 824/2 826/10 826/13 826/21 831/16 831/21 832/8 838/10 841/8 848/1 848/4 848/15 848/24 849/6 849/10 850/8 850/11 850/13 850/18 852/20 853/7 853/23 854/13 854/22 860/1 860/8 867/16 867/25 869/1 880/24 881/14 881/21 884/17 884/18 885/6 885/8 885/21 885/25 886/2 886/18 886/24 886/24 887/1 887/2 887/4 887/14 891/21 895/19 899/12 903/4 903/8 903/10 903/16 903/23

# M

**mr. Lucas...** [72] 904/19 905/3 913/26 918/21 919/6 919/12 919/22 921/4 921/23 922/8 923/2 923/12 923/17 925/20 925/25 926/11 927/15 927/22 927/25 928/1 928/6 929/12 929/19 930/6 930/23 931/15 932/11 960/18 963/1 963/1 963/2 963/4 963/7 963/24 964/15 968/17 975/22 976/6 977/3 977/19 978/6 980/5 981/1 981/10 981/15 983/17 983/22 984/16 985/22 986/18 986/23 987/2 1001/18 1002/9 1008/17 1010/11 1011/9 1012/4 1013/24 1014/7 1015/10 1016/6 1016/25 1017/19 1021/11 1021/20 1027/9 1027/19 1027/22 1031/2 1033/13 1042/4
**Mr. Lucas'** [18] 819/15 823/19 881/12 888/19 889/16 889/18 894/23 911/22 914/19 919/19 930/1 937/20 966/22 978/11 978/15 994/2 1017/1 1027/16
**Mr. Nisenbaum** [1] 831/7
**Mr. Robertson** [2] 891/10 891/15
**Mr. Robinson** [4] 897/18 897/19 897/24 898/3
**Mr. Spencer Lucas** [1] 1011/25
**Mr. Thornton** [1] 1048/22
**Ms.** [1] 916/15
**Ms. West** [1] 916/15
**much** [12] 858/1 894/25 916/22 936/9 943/25 944/15 972/13 1003/1 1009/10 1016/17 1043/21 1050/18
**MUD** [1] 971/4
**muffler** [1] 873/4
**multiple** [3] 877/22 879/1 974/21
**multiple-page** [1] 877/22
**murder** [1] 918/7
**must** [1] 972/9
**my** [82] 819/17 823/13 826/6 826/16 835/6 836/19 842/25 850/13 856/18 861/5 861/14 861/24 866/6 866/10 872/23 875/7 882/6 884/13 889/13 890/15 894/6 895/8 900/11 900/13 901/1 903/1 906/12 906/12 912/1 912/21 915/12 915/15 916/18 916/18 926/8 930/10 930/25 935/15 935/25 936/6 936/6 936/21 942/16 943/9 943/9 946/17 950/2 950/12 951/6 971/24 975/16 976/16 977/13 977/19 978/3 978/6 979/8 980/4 980/19 982/5 982/6 987/9 1001/20 1003/18 1008/13 1012/7 1012/19 1015/11 1018/6 1026/13 1028/21 1031/18 1037/11 1037/14 1038/13 1038/20 1039/8 1042/10 1046/8 1051/17 1054/8
**myself** [10] 821/16 836/19 838/18 903/16 910/3 979/8 998/22 1004/4 1008/13 1027/2

# N

**Nakamura** [42] 821/17 822/24 823/7 823/18 823/24 867/17 867/18 867/22 903/17 905/8 905/9 905/13 920/10 922/7 922/18 922/19 923/4 923/8 923/16 923/18 925/7 926/6 926/23 929/25 930/4 970/12 978/5 986/17 987/1 996/6 1003/10 1003/15 1003/16 1004/7 1004/7 1030/2 1030/3 1030/16 1030/20 1033/2 1034/6 1034/21
**name** [18] 823/19 824/17 824/17 824/25 825/3 832/15 832/20 836/2 836/2 844/19 844/20 845/8 849/18 891/3 891/4 891/5 917/11 918/6 918/12 918/14 930/1 964/24 971/17 1002/3 1002/7 1002/21 1005/17 1005/23 1006/1 1006/4 1008/15 1008/18 1008/23 1013/7 1013/8 1016/25 1017/1 1032/5
**names** [7] 917/13 917/14 1006/18 1016/20 1016/20 1048/15 1050/21

**narrative** [5] 870/13 870/15 871/2 1003/12 1003/17
**nature** [1] 882/9 908/4 1040/9
**nay** [1] 1050/1
**near** [1] 862/23
**nearby** [3] 923/6 977/23 977/25
**necessarily** [17] 822/8 845/19 847/4 847/11 885/8 889/20 904/8 924/7 926/12 987/22 987/24 990/2 994/12 997/14 1000/5 1043/18 1043/19
**necessary** [3] 933/17 974/20 1036/14
**need** [18] 829/6 862/7 868/18 875/11 877/15 879/2 892/21 932/2 951/3 957/2 975/10 1010/17 1013/5 1015/12 1018/14 1034/12 1049/16 1052/19
**needed** [1] 1027/3
**needs** [2] 1026/15 1041/9
**neighboring** [1] 932/5
**neither** [5] 884/12 926/3 926/6 932/14 1020/15
**never** [30] 829/24 852/11 853/5 857/4 857/5 880/8 880/17 882/2 884/8 887/1 888/25 907/15 920/13 925/25 926/21 929/14 930/6 931/1 931/6 932/11 932/13 964/1 968/24 978/25 980/1 980/2 993/6 1022/17 1032/23 1040/6
**nevertheless** [1] 867/7
**new** [11] 878/4 878/5 915/5 915/7 915/17 916/5 963/16 963/20 963/20 963/21 1050/20
**next** [28] 823/22 840/10 844/4 848/8 848/19 855/1 860/3 882/15 882/19 882/21 891/20 892/6 905/24 934/17 944/6 944/22 954/22 958/7 958/8 973/9 983/12 1024/16 1024/19 1033/24 1034/15 1047/1 1047/22 1048/12
**Nextel** [1] 902/8
**nine** [3] 1009/16 1028/7 1052/9
**Ninety** [1] 1028/7
**Ninety-nine** [1] 1028/7
**NISENBAUM** [7] 817/8 831/7 837/12 845/5 854/17 855/14 859/9
**no** [197] 816/8 816/15 816/21 821/22 821/25 822/4 828/22 832/18 832/22 836/18 838/25 841/7 845/24 847/24 848/1 849/22 850/10 850/17 850/22 850/24 851/8 851/8 852/12 852/24 852/25 853/14 853/16 854/7 855/5 855/20 855/20 856/25 857/22 860/3 861/18 861/22 864/7 868/18 870/7 870/10 870/13 875/1 878/25 881/6 881/6 883/16 884/16 884/17 884/18 884/19 884/20 889/20 890/23 890/25 892/20 892/22 894/14 897/23 898/11 899/14 899/22 900/5 902/20 903/23 903/25 905/2 905/5 906/4 906/5 906/20 907/4 907/24 909/15 909/22 911/12 913/3 913/9 914/2 915/25 916/1 918/22 919/4 919/4 919/9 919/12 921/2 923/13 923/14 923/18 923/22 924/16 924/24 925/1 925/1 925/4 925/22 926/2 927/16 927/21 927/24 931/24 932/7 932/10 932/22 932/24 932/24 934/19 937/13 937/16 937/19 938/11 939/12 940/22 948/12 948/21 950/4 950/14 950/14 952/2 954/2 955/22 960/25 961/13 962/24 962/24 962/25 963/4 965/16 965/18 968/24 970/1 970/7 971/16 972/4 972/3 973/17 978/5 978/13 978/17 980/1 980/11 980/13 980/15 981/7 981/23 983/3 983/20 986/24 987/24 991/23 994/12 994/14 996/1 998/14 998/17 998/20 998/20 998/21 999/19 1003/5 1003/15 1003/8 1004/8 1004/19 1005/22 1007/11 1008/5 1008/22 1012/7 1014/16 1019/11 1019/11 1019/16 1019/17 1027/21 1028/23 1029/6 1029/19 1030/16 1031/24 1032/5 1032/14 1035/7 1035/12 1035/15 1036/3 1042/14 1042/19 1044/4 1044/4 1044/9

**1044/16 1045/7 1045/9 1049/14**
**nobody** [5] 912/7 913/4 922/25 923/19 961/16**
**nobody's** [1] 913/7
**non** [1] 880/4
**nondangerous** [2] 882/12 883/9
**none** [5] 858/4 866/9 868/15 901/14 906/16
**normal** [2] 975/6 1040/11
**north** [33] 819/25 820/4 820/5 820/15 823/25 826/9 826/14 848/6 849/9 849/10 852/7 852/9 853/18 853/22 853/23 855/23 859/23 860/1 860/4 894/12 898/19 904/3 904/6 918/17 918/19 931/8 931/9 964/11 971/1 974/23 985/3 1003/8 1017/16
**NORTHERN** [2] 816/4 1054/5
**northwest** [1] 894/4
**not** [313]
**notation** [1] 999/14
**notations** [1] 999/10
**note** [1] 1006/5
**noted** [2] 994/10 1038/21
**nothing** [17] 823/2 823/8 831/6 864/13 908/3 918/20 922/24 923/24 929/19 960/15 971/22 986/4 1020/13 1027/25 1028/13 1028/16 1043/13
**notice** [2] 908/7 1038/1
**notify** [3] 821/18 821/21 992/20
**now** [151] 819/8 819/19 819/24 820/2 821/3 821/15 823/14 824/12 824/24 825/9 826/3 826/9 826/24 829/10 832/1 832/12 834/19 836/15 836/23 838/16 842/8 847/3 848/8 848/19 850/7 850/11 856/18 857/6 862/5 862/11 862/14 863/7 865/1 866/2 867/7 867/10 868/4 868/13 873/18 875/9 876/2 876/8 880/8 882/23 884/21 885/4 888/19 889/3 895/3 899/11 905/1 906/1 910/18 911/7 911/21 913/19 914/7 915/2 918/9 918/16 924/1 926/9 933/21 934/5 934/10 934/17 935/5 935/18 937/11 937/16 939/2 939/25 940/3 940/11 945/12 945/13 946/18 947/10 949/10 950/22 950/22 951/13 951/20 953/11 954/17 955/12 958/6 958/25 959/3 960/20 961/9 962/4 966/13 974/11 974/14 976/18 976/22 977/5 980/5 980/9 980/1 981/11 981/18 981/25 982/12 982/19 984/11 985/1 986/10 986/11 986/11 986/12 990/20 993/4 993/9 995/15 995/22 996/2 998/23 1001/23 1005/11 1005/12 1005/16 1006/10 1006/22 1008/25 1009/6 1009/15 1010/20 1011/1 1011/4 1011/23 1015/20 1016/14 1017/9 1018/20 1020/12 1023/17 1025/1 1025/4 1027/22 1029/1 1037/20 1037/23 1038/17 1043/7 1045/21 1050/5 1050/11 1051/1 1051/15
**nowhere** [1] 984/6
**number** [78] 824/8 834/17 835/2 835/12 839/4 839/7 839/12 839/16 839/18 839/21 839/23 840/11 840/13 840/17 840/22 841/4 841/16 841/22 842/8 846/6 846/7 846/14 846/15 847/10 847/15 848/7 848/22 848/23 849/6 852/10 854/9 876/23 876/24 901/11 934/7 934/7 934/10 935/6 935/9 935/13 935/17 962/4 962/8 962/12 962/12 962/18 962/20 962/21 963/3 963/6 963/9 963/12 963/13 963/15 963/17 963/21 963/22 964/1 964/7 964/9 965/21 967/8 979/9 984/6 995/10 996/25 1002/2 1002/7 1002/22 1012/23 1013/6 1013/8 1021/15 1021/16 1032/12 1033/13 1033/23 1037/9 1049/3
**numbered** [1] 996/19
**numbers** [16] 838/23 839/11 840/1 840/8 840/10 840/10 840/16 841/23 854/5 854/8 854/19 854/20 855/1 878/6 901/7 1002/21

**N**

nurse [1]  1060/14

**O**

o'clock [2]  980/25 1052/10
O.V [1]  998/6
OAK79123 [1]  836/2
OAK7920 [5]  851/12 851/16 853/17 854/4
859/22
OAK7922 [1]  966/25
OAK7923 [4]  824/8 832/13 839/22 961/21
OAKLAND [62]  816/9 816/16 816/22 817/3
817/6 817/10 819/5 819/6 819/11 819/13
821/24 821/25 830/22 830/23 831/14 832/24
833/7 833/10 833/11 839/5 839/6 852/23
856/21 863/11 863/15 866/24 868/4 868/12
875/14 875/17 876/16 884/22 885/1 888/11
894/7 894/13 894/14 894/20 899/23 967/21
968/3 976/12 976/12 980/25 984/8 985/7
985/8 1003/25 1006/14 1013/1 1024/23
1026/21 1033/25 1035/21 1035/23 1037/7
1037/15 1039/4 1039/7 1039/12 1040/13
1054/7
Oakland's [1]  853/2
oath [5]  818/7 818/8 860/14 973/25 973/25
object [9]  955/25 976/21 985/21 1007/9
1019/4 1019/8 1020/20 1032/15 1036/5
objecting [2]  921/7 986/9
objection [73]  818/18 820/6 820/9 820/21
820/23 829/14 830/3 830/9 830/19 830/20
832/25 833/2 836/4 836/6 837/1 838/11
838/12 839/9 839/24 841/10 841/12 844/22
855/8 857/10 857/13 869/10 871/9 871/10
871/15 871/16 880/19 880/20 880/25 881/1
881/8 881/9 881/16 900/22 902/15 904/18
907/7 907/9 910/9 910/10 912/5 912/6 917/22
917/23 940/6 940/7 941/11 948/20 948/21
959/17 976/24 988/5 989/23 989/25 990/14
991/18 991/19 1004/24 1011/14 1011/16
1011/18 1018/1 1018/2 1030/22 1030/23
1032/13 1036/3 1038/14 1038/20
Objection's [2]  829/16 990/16
objections [3]  1033/5 1049/6 1051/23
observation [1]  876/5
observe [2]  828/19 872/24
observed [14]  819/2 819/4 819/14 828/19
830/7 830/24 860/7 863/6 864/10 872/23
873/22 884/5 906/14 1051/2
observing [1]  977/23
obstructed [2]  876/11 876/11
obtain [1]  847/1
obtained [4]  846/15 849/6 964/23 1047/10
obviously [7]  836/8 844/15 1008/13 1010/16
1045/23 1046/3 1047/14
occasion [3]  825/13 911/15 1051/4
occasions [1]  924/7
occupant [3]  891/1 891/2 891/8
occupants [3]  847/1 879/2 933/11
occur [4]  831/14 832/7 950/20 968/7
occurred [15]  831/20 831/22 848/12 866/21
895/20 901/23 905/2 905/5 949/21 950/13
950/17 1000/11 1002/6 1005/13 1046/11
occurring [1]  832/1
occurs [3]  844/4 869/13 958/25
odometer [1]  1026/8
off [34]  820/8 824/21 826/9 827/9 831/5
836/12 836/14 836/15 836/24 864/3 864/5
869/8 904/3 916/10 918/17 938/6 938/8 942/3
944/21 949/17 954/6 971/1 977/7 977/8 999/4
1001/17 1001/20 1020/17 1024/2 1026/1
1026/17 1027/4 1033/2 1043/3
offense [1]  1002/6

offer [3]  856/9 927/21 1003/20
offered [1]  923/23
offering [1]  1009/5
Office [1]  1034/2
officer [158]  818/1 818/24 820/16 820/18
821/8 821/17 822/24 824/17 824/20 824/21
825/18 825/21 828/7 829/23 830/22 831/11
832/18 832/21 836/2 838/18 838/21 846/25
847/7 853/9 856/21 858/2 862/18 862/20
865/1 868/24 869/4 869/22 870/18 872/3
872/11 872/24 875/13 878/17 878/20 878/23
880/9 881/3 884/12 885/20 885/24 887/2
887/6 888/23 903/9 905/8 905/17 905/17
905/21 910/16 911/7 911/8 912/1 914/20
915/10 919/23 920/16 920/19 922/7 922/8
923/6 923/16 923/20 925/5 925/7 925/8 925/8
926/3 928/6 928/18 928/22 929/25 931/16
931/21 931/25 932/2 932/14 933/7 933/10
947/16 948/6 951/6 951/11 953/13 966/7
966/8 966/13 966/14 967/4 967/11 967/12
970/7 970/18 970/24 971/2 971/15 973/10
973/16 973/23 975/13 975/18 977/25 978/24
979/3 979/10 980/2 980/3 986/15 989/7
989/15 992/8 992/9 993/19 993/21 994/15
994/22 996/6 1004/3 1004/5 1004/6 1004/7
1004/11 1009/23 1011/4 1011/8 1015/4
1015/5 1015/17 1015/20 1017/14 1017/17
1017/18 1017/24 1018/13 1018/20 1020/22
1026/14 1033/4 1034/24 1035/22 1036/2
1036/8 1037/6 1038/17 1039/4 1039/7
1039/12 1040/13 1045/10 1048/12 1050/11
1050/16 1051/2 1051/21
Officer David Martinez [1]  966/8
Officer Mack [4]  905/17 925/8 967/12
973/10
Officer Martinez [2]  905/17 966/13
Officer Mayer [64]  820/16 820/18 821/8
821/17 822/24 824/20 824/21 825/18 825/21
828/7 832/18 832/21 838/18 838/21 846/25
847/7 853/9 862/18 862/20 868/24 869/4
869/22 872/3 872/11 872/24 878/17 878/23
880/9 881/3 884/12 885/20 885/24 887/2
887/6 888/23 903/9 911/7 912/1 914/20
915/10 919/23 920/16 920/19 922/8 923/6
923/16 925/7 926/3 928/6 928/18 928/22
931/16 931/21 931/25 932/2 951/6 951/11
970/7 970/18 970/24 971/2 971/15 973/16
973/23
Officer Mayer's [2]  824/17 836/2
Officer Nakamura [3]  905/8 929/25 1004/7
Officer Thurston [10]  818/1 818/24 977/25
992/8 994/15 994/22 1004/6 1015/4 1015/5
1015/20
Officer Vass' [1]  1051/21
officer's [1]  989/14
officer-safety [3]  829/23 979/3 979/10
officers [39]  823/12 823/15 826/22 829/2
830/17 831/14 876/18 877/5 881/13 900/1
905/16 947/19 967/22 968/3 968/6 974/14
974/16 975/4 977/23 978/2 978/4 978/19
987/13 988/14 989/18 989/19 990/12 995/16
1004/21 1006/2 1006/2 1017/2 1020/10
1021/1 1026/1 1026/2 1029/14 1029/21
1047/5
officers' [1]  988/13
offices [2]  817/5 974/24
official [6]  817/13 832/24 832/25 833/7
924/14 1054/4
often [2]  1039/16 1039/19
oftentimes [2]  927/10 930/18
oh [20]  843/19 845/11 848/18 849/13 861/11
861/11 877/15 882/6 885/11 892/18 896/20
931/15 932/23 933/1 941/14 945/21 964/18

976/5 1001/12 1050/4
okay [402]
old [3]  957/17 1019/2 1049/22
older [1]  821/6 971/9
once [33]  820/4 820/14 821/7 826/18 845/17
846/15 847/3 853/8 854/23 854/24 855/5
855/11 875/9 899/9 909/7 917/14 922/13
923/15 935/15 948/3 957/7 959/20 962/8
962/11 971/10 971/15 971/20 971/25 976/16
1000/25 1001/6 1003/7 1049/12
one [135]  822/16 824/21 827/8 831/8 833/13
833/13 835/1 835/15 838/19 852/5 852/6
855/3 855/3 855/3 857/18 858/16 859/15
859/20 860/9 861/13 862/2 862/4 863/2
863/24 868/9 868/9 868/11 869/11 869/14
872/23 872/25 878/23 879/3 879/4 879/5
881/23 881/24 882/15 882/19 882/21 885/19
890/1 892/5 892/6 892/11 893/17 901/22
914/3 914/4 914/25 916/9 916/11 926/11
931/12 932/23 933/14 942/22 942/25 943/16
949/4 949/5 951/25 952/2 952/4 952/7 952/9
954/8 956/8 956/21 956/21 960/25 962/18
963/16 964/18 965/13 968/14 970/10 972/8
974/16 974/23 977/15 977/15 977/17 979/16
981/20 981/21 981/25 983/3 983/18 984/7
985/15 986/8 993/18 994/4 996/5 997/5
997/14 997/15 998/20 1003/2 1003/5 1003/19
1003/20 1004/20 1005/20 1006/20 1010/23
1011/11 1011/11 1012/14 1013/25 1017/9
1017/9 1018/5 1018/16 1018/25 1020/15
1022/19 1024/16 1025/12 1029/18 1031/2
1036/1 1036/15 1038/16 1040/10 1046/18
1047/1 1047/1 1047/19 1048/21 1049/6
1049/10 1049/10 1051/4
one-way [1]  1025/12
ones [4]  934/13 1026/5 1029/21 1031/9
only [34]  823/4 824/25 838/21 841/15 844/17
845/8 862/17 865/19 866/12 866/23 867/16
868/9 876/2 879/2 921/16 922/8 921/8 928/21
931/18 937/9 938/2 968/11 992/14 1007/2
1007/20 1007/20 1007/20 1007/23 1013/9
1020/7 1029/12 1033/14 1036/14 1038/1
1039/20
Oops [1]  986/12
OP [1]  841/21
OP/4A14 [1]  841/21
OPD [9]  824/13 839/5 862/24 878/6 900/9
925/2 1011/4 1016/21 1029/24
open [3]  829/9 890/24 1042/2
opened [2]  1016/3 1038/1
operate [1]  835/11
operated [1]  1045/4
operating [4]  834/4 835/11 845/24 858/2
operation [2]  912/11 912/14
Operator [1]  855/3
operators [1]  858/8
opinion [2]  912/21 930/25
opportunity [3]  907/19 947/18 992/10
opposed [1]  1046/7
orally [1]  918/14
order [19]  864/4 867/1 870/20 876/23 876/24
877/2 878/3 899/16 906/2 908/13 918/18
935/21 936/14 975/12 978/15 1038/3 1041/13
1048/19 1052/9
order's [1]  1048/16
ordered [1]  828/23
ordering [1]  992/9
ordinary [1]  1007/18
orient [1]  942/3
original [5]  961/3 961/5 963/11 963/13
963/17
OT [1]  855/19
other [113]  822/24 825/2 828/9 829/2 830/16

# O

**other... [108]** 830/23 833/2 843/19 845/6
845/6 845/7 845/20 847/1 856/18 858/16
862/22 862/22 863/2 863/10 863/12 891/1
892/11 892/21 898/18 898/24 899/2 899/8
899/9 899/13 899/15 900/1 905/16 908/3
910/4 910/24 913/13 914/16 917/1 923/18
932/14 933/8 947/19 948/12 951/13 951/14
951/20 951/21 951/24 953/21 954/23 955/15
955/20 956/22 957/24 958/8 959/11 959/15
966/16 966/18 966/19 967/6 970/1 971/4
973/6 977/19 977/20 980/14 988/14 989/17
989/19 990/12 991/25 992/8 993/18 993/20
993/20 995/5 996/3 996/5 996/10 997/12
997/15 998/12 1001/10 1004/5 1011/1
1017/24 1018/16 1019/20 1022/16 1023/17
1026/1 1029/4 1029/14 1031/7 1038/2
1038/16 1045/7 1045/14 1045/15 1047/7
1047/9 1048/8 1048/10 1049/2 1049/6
1050/10 1050/10 1051/1 1051/4 1051/5
1051/16 1051/24
**others [1]** 816/13
**Otherwise [1]** 956/22
**our [76]** 819/23 821/5 826/6 834/11 836/19
836/19 836/20 836/20 838/1 838/3 847/14
851/1 851/20 852/7 852/9 852/15 852/17
855/17 857/16 858/7 859/4 863/24 869/22
876/6 885/18 899/10 899/14 899/17 909/8
909/9 918/12 922/1 922/11 936/5 936/18
936/19 936/19 936/22 937/6 937/15 951/16
952/12 953/17 953/20 953/20 961/3 961/5
963/11 964/11 964/13 965/18 966/15 967/3
970/20 971/25 975/5 975/12 980/21 980/21
984/15 995/1 995/6 997/23 1001/19 1012/23
1014/2 1015/10 1023/5 1027/2 1037/22
1050/19 1050/23 1051/3 1051/3 1051/5
1051/8
**ourself [1]** 836/14
**ourselves [4]** 834/10 934/21 935/15 965/20
**out [111]** 822/11 823/15 829/8 831/15 834/11
835/20 842/5 842/16 842/19 846/13 847/3
847/21 847/22 847/25 848/1 852/15 853/1
853/2 859/12 860/11 862/1 875/13 875/13
876/2 880/9 880/10 881/3 881/25 882/2
883/22 885/18 886/8 886/11 886/16 886/17
886/19 886/24 887/1 887/17 888/25 889/3
889/3 889/9 898/24 899/2 907/20 907/20
908/13 908/18 908/22 910/25 916/22 916/24
917/10 918/24 924/16 933/7 933/15 933/17
935/15 937/3 942/15 942/15 942/21 945/16
950/24 951/4 960/21 963/19 964/5 965/8
965/10 965/11 965/20 969/20 969/25 975/15
976/9 976/10 977/3 979/17 979/24 979/25
998/22 998/25 1001/25 1002/2 1002/19
1003/9 1003/10 1003/10 1004/18 1005/5
1006/22 1008/23 1012/8 1013/8 1015/12
1015/21 1018/18 1023/7 1027/3 1029/5
1033/18 1035/5 1042/25 1043/2 1047/8
1049/15 1051/21 1051/22
**out-of-county [1]** 937/3
**outlines [1]** 878/3
**outset [1]** 963/10
**outside [2]** 846/24 903/11
**outstanding [8]** 841/17 842/7 847/13 917/16
935/20 935/22 935/24 936/11
**OV [1]** 841/20
**over [34]** 839/18 842/11 842/13 842/14 843/4
844/20 857/2 869/21 874/9 876/6 890/25
896/25 900/9 902/13 907/25 908/1 917/2
918/3 942/10 942/19 944/21 949/23 950/12
950/17 959/8 959/12 968/9 973/7 977/12
985/11 994/16 1026/16 1039/21 1045/18

# P

**p.m [4]** 855/6 973/21 973/21 1052/23
**PAC [10]** 827/19 974/12 974/14 985/6 985/14
994/17 995/18 1031/16 1034/24 1035/2
**page [27]** 824/10 825/2 827/11 836/24 839/5
854/9 856/5 858/14 859/12 870/6 870/6 870/6
877/14 877/22 877/23 879/5 932/20 933/1
933/21 959/4 996/24 998/24 1003/11 1005/16
1007/4 1028/2 1053/5
**page 2 [1]** 839/5
**pages [4]** 816/2 824/7 856/10 893/1
**paid [5]** 995/20 1040/13 1040/25 1041/2
1041/3
**pant [1]** 1044/10
**pants [8]** 906/2 932/3 975/15 979/8 992/9
993/20 1028/19 1043/17
**paper [5]** 932/24 956/12 1003/1 1012/13
1012/15
**papers [2]** 983/23 1037/2
**paperwork [1]** 918/18
**paragraph [1]** 1028/9
**parameters [1]** 1030/18
**Pardon [1]** 830/12
**Park [2]** 1013/3 1014/8
**parked [19]** 822/12 822/19 822/20 863/13
863/17 863/19 864/19 899/4 899/6 899/8
899/10 913/6 913/7 940/12 940/20 951/15
951/16 953/2 955/16
**parole [54]** 818/16 824/1 824/1 824/2 824/4
827/5 848/2 850/4 852/10 853/1 854/1 864/1
864/3 867/21 887/3 887/5 887/15 887/17
887/21 887/24 888/8 888/14 903/17 926/13
926/18 931/17 931/17 931/18 964/6 964/16
969/12 970/11 970/12 974/24 975/13 976/6
981/14 982/12 982/19 995/22 1002/13
1002/14 1003/7 1003/9 1006/1 1006/1 1018/5
1031/15 1035/5 1035/6 1035/11 1035/11
1042/20 1043/5
**parolee [13]** 826/3 884/14 926/9 926/18
931/19 932/6 932/9 960/1 974/17 997/23
1002/20 1018/4 1018/7
**parolee's [2]** 1002/21 1002/21
**parolees [11]** 875/15 927/4 927/7 982/12
982/19 984/6 985/7 985/17 1018/8 1031/11
1031/11
**part [23]** 829/5 857/16 881/11 881/20 915/2
915/3 916/7 925/17 963/11 980/23 981/1
993/24 996/18 997/23 1006/16 1008/14
1018/5 1019/21 1031/16 1037/20 1037/23
1037/25 1043/9
**particular [33]** 821/7 822/17 826/24 842/17
845/17 845/19 846/23 847/12 872/13 876/21
882/3 887/4 913/10 929/10 935/14 936/24
971/17 981/25 989/18 990/8 998/18 1007/16

**overall [1]** 866/7
**overarching [1]... [1]** 1048/10
**overhead [4]** 939/19 939/21 959/21 959/23
**overhearing [1]** 920/15
**overruled [22]** 820/9 820/23 829/16 833/2
836/6 838/12 841/12 871/10 871/16 881/1
881/16 907/9 912/6 917/23 940/7 989/25
990/16 991/19 1011/18 1018/2 1019/24
1030/23
**overtime [22]** 825/15 825/17 825/20 828/5
828/7 1035/13 1035/16 1035/18 1035/22
1039/14 1039/16 1039/19 1039/20 1039/22
1039/23 1039/25 1040/2 1040/8 1040/12
1040/22 1041/6 1041/7
**own [20]** 829/13 851/1 855/9 900/24 901/1
902/24 903/1 906/2 979/7 979/7 979/8 982/6
993/6 993/13 993/15 993/18 993/20 994/17
1021/24 1022/2

**p.m [4]** *(see left column P)*

**1007/19** 1012/12 1016/19 1019/13 1019/16
1021/23 1825/20 1031/16 1032/20 1051/3
1051/9
**particularly [1]** 905/13
**parties [2]** 1038/1 1050/6
**partner [4]** 825/21 836/20 983/5 1008/13
**partner's [1]** 912/1
**partners [3]** 869/17 979/9 980/19
**parts [2]** 974/19 978/12
**passed [1]** 1048/21
**passenger [9]** 885/14 885/25 886/1 898/25
918/3 933/18 983/13 991/25 992/3
**passengers [2]** 885/20 933/8
**past [6]** 825/13 825/25 910/21 975/20 1020/5
1027/4
**pat [3]** 847/21 1042/19 1042/24
**patched [1]** 844/3
**PATEL [1]** 816/5
**patrol [24]** 828/5 828/7 828/10 885/18 899/9
899/13 900/4 903/14 903/24 924/23 928/2
929/15 946/19 951/13 951/14 951/21 951/24
953/14 955/16 955/20 957/24 958/6 958/8
994/19
**patterns [1]** 1047/16
**pay [5]** 976/13 1035/22 1037/15 1040/2
1040/11
**paying [1]** 971/6
**pedestrian [3]** 880/5 882/22 935/3
**pellet [27]** 823/5 823/9 823/20 919/7 921/24
922/25 923/25 925/20 926/10 926/12 926/14
926/15 926/21 926/22 926/24 926/25 927/1
927/15 927/18 927/22 929/23 932/12 962/24
972/13 972/3 972/4 972/7
**pen [3]** 956/14 956/15 958/6
**Penal [3]** 909/3 909/9 909/11
**pending [1]** 824/1
**pens [2]** 956/9 956/17
**people [20]** 874/18 876/18 877/3 893/6
898/24 899/2 930/15 969/8 969/10 975/4
979/17 984/3 1001/3 1001/4 1035/5 1035/10
1043/18 1048/17 1051/4 1052/19
**per [5]** 890/25 965/18 1014/7 1039/9 1041/3
**percentage [2]** 1035/8 1035/10
**perfectly [3]** 915/5 915/6 916/5
**perhaps [4]** 834/20 908/4 921/17 1011/19
**period [5]** 843/1 904/19 912/4 994/16 994/22
**periodic [1]** 988/9
**periods [1]** 851/19
**permanent [1]** 924/8
**permit [2]** 830/16 830/23
**person [48]** 826/7 829/23 847/12 847/25
865/14 865/22 868/17 868/24 869/14 870/20
871/19 871/21 888/7 888/9 906/2 907/17
910/14 914/19 927/13 931/18 935/20 935/21
935/23 935/24 936/14 936/4 936/11 936/24
947/17 960/21 969/7 975/14 977/13 979/10
979/11 979/16 993/6 1001/9 1001/11 1006/7
1012/13 1017/15 1018/21 1029/12 1046/12
1046/14 1046/16 1046/20
**person's [5]** 876/1 891/3 1042/25 1043/1
1043/12
**personal [7]** 855/10 900/25 901/1 902/25
903/1 983/22 1047/4
**personnel [2]** 934/13 1038/7
**persons [7]** 917/1 973/6 1001/6 1005/16
1006/17 1045/15 1046/18
**perspective [1]** 939/22
**persuasive [1]** 1034/5
**pertain [2]** 854/12 999/20
**pertained [3]** 838/9 852/19 913/9
**pertaining [7]** 840/22 844/19 844/20 848/23
853/7 870/7 876/18
**pertains [9]** 836/1 841/23 851/19 877/3

**P**

pertains... [5] 887/1 881/20 962/21 965/18
966/7
**PG** [1] 971/4
**phase** [2] 1036/5 1038/15
**phone** [22] 820/19 821/8 858/24 859/4 868/17
899/19 899/21 899/25 900/17 900/18 901/3
901/6 901/7 901/8 901/21 902/14 902/21
924/25 925/1 925/2 936/18 968/9
**phones** [8] 868/16 900/9 902/8 995/15 995/17
995/20 995/24 1023/6
**phonetic** [5] 967/4 1045/24 1046/3 1046/5
1046/9
**photo** [1] 944/7
**photocopies** [3] 1031/25 1033/15 1033/16
**photocopy** [1] 1029/7
**photograph** [2] 951/25 951/25
**photographs** [3] 924/17 924/20 938/11
**photos** [1] 896/17
**physical** [2] 980/15 982/25
**physically** [3] 949/22 1001/9 1015/13
**picked** [1] 858/5
**picture** [3] 889/10 939/2 1014/13
**pictured** [1] 913/18
**pictures** [2] 823/20 861/24
**piece** [5] 881/24 994/5 1003/1 1012/13
1012/15
**pink** [1] 956/23
**pinpointed** [1] 864/24
**place** [29] 824/2 834/10 865/4 865/5 868/1
868/23 923/10 931/18 931/24 933/6 933/10
936/4 942/1 942/1 942/6 942/7 945/13 947/11
957/24 961/5 967/21 968/18 969/24 971/5
1007/24 1008/12 1008/12 1023/9 1031/7
**placed** [8] 824/1 847/6 898/23 909/8 939/25
945/14 1002/23 1038/22
**places** [1] 1031/10
**Plaintiff's** [3] 1004/10 1034/14 1053/15
**plaintiffs** [11] 816/7 816/14 816/20 817/2
817/5 880/18 996/18 1045/22 1050/9 1051/9
1051/10
**Plaintiffs'** [4] 893/21 958/16 958/23 1032/12
**plastic** [1] 983/10
**plates** [3] 873/8 873/11 873/13
**playing** [1] 980/23
**please** [9] 831/7 860/23 897/10 950/15 967/25
989/2 996/19 1006/15 1025/1
**Plus** [2] 1039/14 1041/6
**pocket** [2] 981/18 1043/18
**pockets** [12] 829/24 910/4 977/13 979/7
979/12 993/7 993/13 993/15 993/18 993/24
1028/12 1042/25
**point** [61] 820/17 820/18 821/11 822/7
822/22 823/6 826/19 837/3 837/3 837/4 837/5
842/1 842/2 876/2 883/11 883/14 883/19
886/22 888/19 889/3 889/3 901/2 904/2 906/4
907/5 910/12 918/20 919/5 921/16 921/21
968/17 976/20 977/12 984/1 985/1 985/16
993/18 993/19 993/20 993/21 994/14 996/17
1013/24 1013/25 1018/5 1022/22 1022/22
1024/15 1024/16 1024/19 1024/21 1025/4
1025/5 1025/7 1025/9 1025/11 1026/21
1031/12 1033/18 1036/10 1043/7
**Point A** [1] 1022/22
**Point B** [1] 1022/22 1025/7
**points** [4] 1023/13 1024/4 1046/5 1046/7
**police** [67] 821/18 821/21 830/16 830/22
830/23 831/14 832/24 833/8 833/10 833/11
839/6 851/6 853/5 853/15 856/21 862/22
870/6 870/18 875/17 876/17 878/20 884/22
885/1 899/4 899/23 905/21 920/21 920/24
920/25 921/1 931/22 937/12 940/15 946/21

954/23 959/12 967/6 967/22 968/3 974/24
975/6 975/13 978/21 987/13 987/23 988/1
995/21 995/21 996/3 996/5 997/7 1000/11
1000/16 1003/25 1007/18 1013/24 1022/3
1024/23 1026/14 1035/14 1035/21 1037/6
1037/15 1039/4 1039/7 1039/12 1043/2
**policy** [10] 826/5 826/6 826/6 826/20 831/2
876/21 876/22 1026/12 1047/15 1048/10
**portion** [7] 865/16 983/12 1036/2 1036/12
1039/1 1041/13 1041/14
**Portions** [1] 1049/1
**position** [5] 819/23 928/10 977/10 1032/23
1036/2
**possession** [1] 981/15
**possible** [6] 896/16 935/9 960/9 983/16
989/12 1015/16
**possibly** [6] 888/16 953/19 970/15 974/23
975/3 997/23
**POST** [3] 988/17 988/19 988/21
**potentially** [1] 909/25
**practice** [1] 917/12
**precise** [2] 864/18 864/23
**prepare** [4] 867/1 878/24 1008/4 1008/5
**prepared** [7] 867/5 878/20 996/23 1007/11
1009/21 1038/16 1050/11
**preparing** [1] 991/4
**presence** [3] 928/7 928/8 980/4
**present** [9] 832/2 865/9 899/13 919/13
925/19 931/23 951/14 1039/24 1047/1
**presented** [1] 866/6
**press** [1] 955/4
**pretty** [6] 932/8 936/13 964/24 1009/10
1019/7 1019/9
**prevent** [1] 947/17
**prevented** [1] 916/4
**previous** [3] 946/8 1006/18 1006/18
**previously** [11] 818/5 824/12 857/6 857/15
859/18 893/20 906/9 951/18 974/5 1034/16
1051/17
**primary** [3] 841/21 868/24 1004/20
**print** [11] 860/11 862/1 892/13 897/9 897/10
902/2 942/14 942/21 955/24 956/12 1001/24
**print-out** [1] 860/11
**printed** [5] 889/9 945/16 955/23 1003/1
1012/8
**printout** [2] 824/13 1007/23
**printouts** [1] 851/10
**prior** [8] 829/23 838/2 843/2 843/2 865/15
910/12 910/16 997/17
**prisoner** [4] 852/8 1000/4 1001/1 1026/14
**private** [4] 899/21 974/18 978/12 995/17
**privilege** [1] 1029/15
**probable** [20] 870/13 870/15 870/23 870/24
871/2 874/8 974/17 1002/20 1003/12 1003/17
1003/21 1010/3 1010/9 1010/11 1010/12
1010/15 1010/16 1010/17 1027/15 1027/19
**probable-cause** [5] 870/13 870/15 871/2
1003/12 1003/17
**probably** [10] 819/17 876/12 899/17 910/7
910/13 927/5 957/11 1037/21 1038/17
1046/12
**probation** [5] 887/4 887/24 888/8 888/14
926/13
**problem** [4] 931/6 950/1 1051/11 1051/18
**problems** [2] 967/8 1008/23
**procedure** [2] 878/4 947/13
**procedures** [4] 831/23 947/22 992/14 999/12
**proceed** [1] 829/17
**proceedings** [9] 816/25 927/7 927/10 980/22
1038/22 1042/1 1052/23 1054/6 1054/10
**process** [8] 849/10 918/18 935/19 935/20
936/25 937/1 1018/6 1018/19
**processed** [6] 820/5 820/12 820/14 1000/7

1000/8 1001/22
**processing** [3] 878/1 1091/8 1001/11
**produced** [5] 880/17 1012/21 1019/14
1019/17 1021/5
**profession** [1] 987/19
**profiling** [6] 875/18 875/20 875/22 876/16
877/9 877/25
**promotions** [1] 1040/23
**proper** [1] 1036/10
**properly** [1] 1030/17
**property** [11] 969/14 1029/20 1029/21
1029/24 1030/1 1030/3 1030/6 1030/9
1030/12 1030/15 1030/21
**protesting** [1] 921/4
**provide** [2] 918/9 918/12
**provided** [1] 921/23
**providing** [2] 885/14 885/16
**proximity** [3] 822/21 923/7 997/16
**PTY** [1] 859/23
**public** [3] 930/16 979/9 1035/23
**published** [7] 1035/23 1036/16 1036/18
1037/1 1037/2 1037/6 1040/1
**pull** [14] 869/20 874/9 902/2 906/2 907/25
949/21 949/23 950/12 950/17 992/9 1028/15
1028/18 1028/20 1042/25
**pull-over** [4] 949/21 949/23 950/12 950/17
**pulled** [10] 822/4 842/11 842/13 908/1 918/2
942/19 971/20 977/6 1027/25 1028/12
**pulling** [3] 842/14 876/6 1043/8
**pulls** [1] 979/25
**punch** [1] 1022/25
**punitive** [4] 1036/1 1036/10 1036/22 1038/15
**punitive-damages** [2] 1036/22 1038/15
**purge** [20] 838/8 848/12 851/18 853/24 854/2
854/3 856/14 859/25 933/22 934/14 959/4
959/4 959/15 959/15 959/21 960/16 961/24
966/6 1024/2 1024/3
**Purpose** [1] 878/3
**purposes** [7] 837/15 912/22 945/10 949/12
1015/11 1035/25 1036/22
**purse** [3] 1029/2 1029/5 1029/8
**pursuant** [3] 897/4 910/2 1050/16
**put** [36] 842/19 846/15 851/14 852/14 859/10
860/10 877/14 879/12 890/3 890/6 897/20
932/24 934/21 935/15 940/3 941/16 941/17
949/5 953/22 958/7 965/20 971/2 971/6
975/12 990/2 998/22 1005/9 1008/16 1013/1
1036/17 1038/15 1040/4 1042/18 1046/2
1052/15 1052/16
**putting** [2] 829/24 846/13

**Q**

**quality** [1] 892/19
**question** [54] 830/4 830/5 830/10 830/13
833/5 834/5 837/8 839/1 840/3 841/2 842/25
843/11 844/24 844/24 845/2 854/15 854/18
855/12 859/20 869/11 871/12 871/13 881/18
888/1 888/6 900/16 906/12 906/12 907/11
909/20 915/12 916/8 921/19 921/20 922/7
950/9 950/14 963/23 968/14 976/22 988/7
997/5 1000/21 1000/21 1011/19 1019/4
1021/6 1021/7 1021/10 1033/8 1036/1 1036/8
1036/9 1042/10
**questioning** [4] 993/5 1000/25 1007/10
1009/6
**questions** [11] 887/23 904/16 907/23 937/20
937/22 948/12 1000/9 1000/9 1023/17 1042/3
1045/7
**quick** [2] 819/18 973/1
**quickly** [8] 886/6 886/8 886/11 886/14
932/20 964/24 965/3 965/5
**quite** [4] 978/6 994/25 995/7 1037/22

# R

**rabbit [1]** 1007/15
**race [2]** 876/1 933/11
**racial [6]** 875/18 875/20 875/22 876/16 877/9 877/25
**radio [19]** 838/5 838/16 839/19 842/15 842/21 842/22 843/4 843/17 843/19 845/20 845/22 858/20 936/19 936/19 937/11 959/9 959/12 959/16 998/15
**radios [1]** 964/13
**RAFAEL [1]** 816/12
**raise [1]** 1046/24
**raised [2]** 921/15 1033/5
**ramifications [2]** 980/17 980/21
**ran [1]** 965/1
**range [1]** 995/14
**rate [3]** 972/25 1040/16 1040/21
**rather [4]** 950/10 950/15 1036/7 1036/11
**razor [1]** 1043/21
**re [2]** 946/2 1044/19
**re-mark [1]** 946/2
**reacting [1]** 1047/16
**read [9]** 871/14 883/21 938/8 989/21 989/22 1048/21 1048/23 1049/12 1049/14
**reading [4]** 896/4 1020/15 1020/22 1021/2
**readministered [2]** 818/8 973/25
**ready [4]** 838/4 847/9 847/13 973/22
**Real [1]** 973/1
**realize [1]** 1040/7
**really [17]** 843/11 856/13 868/1 922/22 928/18 950/2 961/17 972/11 973/2 983/25 987/19 1020/20 1020/22 1033/6 1047/3 1047/19 1050/24
**rear [3]** 827/5 885/25 978/3
**reask [1]** 845/2
**reason [39]** 825/23 852/13 852/17 879/19 881/6 881/12 881/12 881/21 884/4 906/4 906/5 906/14 909/15 909/22 913/1 915/2 915/4 917/11 935/2 959/14 961/5 967/13 975/9 978/14 980/13 980/15 994/14 998/22 1010/3 1010/6 1010/9 1010/10 1010/12 1018/9 1025/18 1025/24 1030/16 1031/6 1033/8
**reasoning [1]** 915/22
**reasons [6]** 924/9 980/14 980/20 1006/20 1025/23 1027/5
**recall [121]** 821/20 837/19 838/18 842/20 844/2 851/3 851/8 852/21 853/8 863/1 863/7 864/12 864/13 865/5 865/17 866/14 866/22 867/10 867/15 867/18 867/20 870/1 870/3 870/25 871/4 872/17 873/4 873/6 873/10 876/9 876/15 889/19 889/20 891/4 891/12 891/13 894/25 897/19 898/7 898/13 898/21 898/23 898/25 899/1 899/3 903/25 904/14 904/21 904/22 904/25 905/13 905/15 905/24 907/2 910/24 912/11 912/13 913/25 914/5 914/24 915/9 918/11 920/15 920/18 920/19 920/25 921/2 921/6 921/8 921/10 921/14 922/15 924/19 928/18 928/22 928/23 929/6 929/9 930/4 931/20 931/24 949/20 953/1 960/3 960/5 960/12 960/12 961/17 964/10 964/20 965/4 965/6 965/12 967/3 967/5 976/22 981/9 986/24 987/4 989/3 991/2 991/3 991/7 991/11 993/7 994/4 996/8 996/9 997/5 997/17 1005/25 1008/22 1015/24 1023/22 1024/1 1024/12 1026/3 1026/5 1027/24 1029/3 1034/6
**recalled [2]** 867/24 1045/11
**receipt [6]** 981/4 1029/20 1030/5 1030/13 1030/20 1031/21
**receipts [4]** 920/3 920/6 981/6 981/8
**receive [5]** 947/21 947/21 948/7 985/1 988/9

**received [10]** 820/18 821/8 840/22 948/23 958/23 984/19 987/5 988/4 988/13 1010/20
**receiving [1]** 845/2
**recent [1]** 821/9
**recently [5]** 866/15 910/21 984/17 1021/11 1021/12
**recess [2]** 917/5 973/21
**recognize [5]** 824/13 827/14 893/10 893/23 1007/21
**recollection [18]** 819/17 823/13 836/25 837/18 850/13 854/11 854/16 864/15 866/2 866/9 890/15 895/4 918/15 919/4 925/15 943/9 946/17 960/10
**record [24]** 818/12 827/9 831/5 832/24 833/7 871/14 900/15 900/18 902/20 916/10 924/8 944/18 984/20 984/21 989/22 1002/22 1022/14 1022/23 1035/23 1036/3 1036/17 1039/1 1041/14 1054/10
**recorded [12]** 859/1 865/12 865/15 900/12 901/2 901/5 901/24 902/5 959/9 959/11 965/25 968/7
**records [20]** 935/13 936/22 937/6 937/6 937/7 968/4 995/23 1001/19 1007/22 1007/23 1007/24 1012/20 1012/20 1012/23 1013/2 1013/7 1014/6 1037/11 1039/8 1040/9
**records-management [4]** 1007/22 1007/23 1012/20 1013/2
**recover [3]** 975/10 975/12 1013/5
**recovered [5]** 823/21 823/24 926/12 927/1 1029/17
**RECROSS [1]** 949/8
**rectangle [1]** 953/14
**rectangular [2]** 957/7 957/16
**red [16]** 861/6 873/20 873/22 877/15 943/7 944/22 945/23 952/22 952/24 952/25 952/25 954/20 956/21 956/24 957/3 958/6
**redirect [5]** 932/17 932/18 1044/20 1044/24 1045/1
**refer [1]** 832/20
**reference [3]** 819/19 819/22 968/25
**referenced [1]** 819/19
**referring [7]** 890/12 961/2 961/13 961/21 982/24 996/12 1030/25
**refers [1]** 1021/4
**reflect [5]** 835/15 840/16 852/5 852/7 1000/5
**reflected [5]** 843/3 937/16 960/15 968/3 1014/11
**reflecting [1]** 855/21
**refresh [2]** 854/15 1015/22
**refreshed [2]** 866/5 895/4
**refreshes [1]** 854/11
**refusing [1]** 992/20
**regard [5]** 818/15 876/21 918/21 947/22
**regarding [8]** 819/1 853/5 856/14 865/2 1012/21 1013/11 1050/6 1050/15
**regardless [6]** 887/19 963/7 975/6 987/14 990/7 1048/2
**regards [1]** 1031/12
**registered [2]** 822/16 822/18
**registration [7]** 822/12 873/6 880/5 882/20 883/5 883/10 887/3
**registry [1]** 984/7
**regular [2]** 901/8 902/21
**related [4]** 960/17 1000/10 1033/13 1051/2
**relates [1]** 1051/4
**relating [2]** 981/8 1046/10
**relation [3]** 897/16 899/4 1012/14
**relationship [1]** 999/21
**relayed [2]** 923/2 925/21
**released [4]** 929/20 931/16 963/3 963/25
**relevance [1]** 818/19 830/3 830/9 830/19 985/21 1018/1 1032/16 1036/6 1038/20
**relevant [1]** 830/13

**relied [1]** 1012/3
**RELIES [1]** 1021/4
**relieve [1]** 826/17
**relieved [1]** 827/2
**rely [1]** 1017/25
**relying [2]** 833/22 833/22
**remain [1]** 917/6
**remained [3]** 1035/19 1037/16 1039/24
**remember [22]** 819/20 821/23 822/2 823/14 825/12 844/1 857/3 864/18 864/20 864/21 864/23 894/17 915/14 984/18 989/4 991/1 994/6 996/5 997/15 997/21 1026/20 1042/5
**remembered [2]** 876/12 915/16
**remind [2]** 818/7 973/24
**removal [1]** 1054/13
**remove [2]** 829/12 978/14
**removed [1]** 1001/6
**renew [2]** 1038/13 1038/20
**repeat [6]** 833/4 841/2 855/12 881/17 900/16 907/10
**rephrase [3]** 871/12 988/7 1011/18
**report [118]** 838/23 838/25 839/4 839/6 839/7 839/12 839/16 839/18 839/22 840/11 840/13 840/17 840/22 841/3 841/16 841/22 841/24 842/8 844/11 844/13 844/16 846/6 846/7 846/15 847/10 847/15 848/7 848/22 848/23 849/5 849/6 854/9 854/13 854/21 867/5 870/7 878/20 934/6 934/10 935/6 935/9 935/13 935/17 962/4 962/8 962/12 962/18 962/20 962/21 963/3 963/6 963/9 963/12 963/13 963/15 963/16 963/21 963/22 964/1 964/7 964/8 965/24 989/8 992/13 992/18 994/10 998/5 998/23 998/25 999/11 1001/24 1001/25 1002/7 1003/11 1003/17 1003/18 1003/18 1003/20 1003/22 1004/2 1004/8 1004/9 1004/14 1004/15 1005/2 1005/5 1005/11 1005/21 1006/14 1007/4 1007/6 1007/16 1008/1 1008/4 1008/11 1009/19 1009/21 1010/1 1011/23 1011/25 1012/2 1012/8 1012/23 1012/24 1013/1 1013/6 1013/6 1013/8 1013/10 1021/15 1021/16 1021/23 1021/25 1022/1 1022/3 1022/9 1027/8 1045/3
**reported [3]** 817/13 1000/17 1054/7
**reportedly [1]** 1029/8
**reporter [5]** 817/13 978/7 1054/3 1054/4 1054/8
**reporter's [1]** 1054/12
**reporting [3]** 857/16 1000/20 1004/21
**reports [8]** 857/12 857/15 859/2 867/2 1012/18 1012/22 1017/20 1047/2
**represent [1]** 927/13
**request [9]** 826/20 891/1 930/7 934/10 934/11 934/18 935/9 937/11 962/4
**requested [4]** 935/13 963/20 964/8 1032/24
**requesting [1]** 1002/24
**required [4]** 821/21 998/15 998/19 1018/15
**requirement [3]** 852/25 852/25 998/14
**requires [2]** 876/17 1018/16
**reserve [1]** 1034/20
**reserving [1]** 1046/4
**reside [2]** 969/2 972/10
**residence [38]** 818/15 822/3 822/13 822/21 822/23 823/8 823/9 823/25 826/18 826/23 852/23 904/7 904/8 904/9 924/8 925/6 927/20 928/1 928/7 929/20 929/23 930/5 963/2 969/10 969/14 969/21 969/23 969/25 970/3 972/7 972/13 972/16 972/20 972/21 984/11 984/17 1014/22 1021/11
**residences [2]** 853/6 969/11
**residential [1]** 1030/9
**residing [1]** 969/5
**respect [19]** 826/20 851/7 876/16 905/18

# R

**respect...** [15] 965/20 969/21 920/18 920/17
920/20 927/3 927/6 930/6 931/20 947/25
965/14 968/18 1043/8 1050/19 1052/14
**respective** [1] 1048/25
**response** [4] 826/14 826/16 993/4 1021/9
**Responsibilities** [1] 878/9
**responsibility** [2] 990/7 1031/15
**responsible** [5] 832/1 878/11 985/18 992/19
992/24
**rest** [7] 826/17 942/7 943/8 967/3 993/24
1008/16 1033/5
**rested** [2] 1045/22 1045/23
**restructured** [1] 1037/21
**result** [4] 879/22 979/10 979/11 980/16
**results** [1] 859/8
**resumed** [2] 818/5 974/5
**retrieve** [1] 1047/12
**return** [1] 912/1
**returned** [2] 820/16 823/18
**returning** [1] 931/4
**revealed** [1] 842/6
**review** [6] 867/2 867/4 996/15 1017/20
1034/3 1038/2
**reviewed** [3] 867/6 960/16 1047/11
**revocation** [1] 927/7
**revoked** [2] 1035/6 1035/11
**Richmond** [76] 818/16 820/20 821/6 821/12
821/18 821/19 821/21 821/24 821/25 822/3
822/22 826/18 849/12 850/1 850/1 850/7
850/16 850/19 851/6 853/5 853/6 853/7
853/15 853/23 855/22 860/4 915/23 919/8
920/9 920/12 920/21 920/23 920/25 921/1
921/3 921/5 921/7 921/9 921/21 925/5 925/10
928/8 929/18 931/4 931/22 931/22 932/8
937/23 963/20 964/5 964/6 964/12 968/17
968/17 968/18 970/22 971/7 971/8 971/11
985/2 1002/10 1005/13 1007/3 1011/2 1014/3
1014/22 1014/25 1015/2 1018/17 1018/20
1027/12 1027/17 1029/1 1031/3 1031/12
1032/9
**Rick** [1] 1048/20
**ride** [2] 903/20 975/18
**riding** [1] 826/4 834/5
**right** [221] 819/25 820/2 820/17 823/10 824/5
824/10 824/12 824/16 825/3 825/5 825/7
825/7 825/10 826/3 826/18 827/21 828/14
831/17 832/11 833/13 833/16 833/20 834/15
839/4 839/6 839/13 843/20 844/25 846/20
848/2 848/20 848/24 849/7 853/11 854/19
860/17 860/18 860/19 862/12 865/7 866/23
868/16 873/18 874/20 874/23 877/3 878/11
878/15 881/7 884/25 885/23 886/6 886/9
888/5 890/18 891/20 892/20 894/2 895/7
895/10 896/15 897/5 897/12 897/16 906/10
908/13 908/15 912/19 914/8 914/25 916/6
916/16 917/21 919/11 920/13 922/10 927/13
930/21 931/1 933/23 933/1 933/1 933/18
933/20 933/21 933/22 933/25 934/15 936/8
936/15 938/1 939/3 939/12 939/14 940/13
940/16 941/2 941/7 942/1 942/12 942/14
944/7 945/13 945/25 946/19 946/22 946/24
947/7 948/19 950/18 952/19 957/5 957/8
957/22 959/3 962/5 962/18 963/4 964/24
965/24 972/21 974/12 977/18 980/9 981/18
982/1 984/12 986/11 987/10 988/4 988/10
988/12 988/15 988/22 989/1 989/9 989/12
989/15 990/20 991/7 991/17 992/8 992/19
993/2 993/14 994/16 994/22 996/3 998/2
998/7 998/10 999/5 1000/25 1001/15 1002/7
1004/10 1005/3 1005/7 1005/14 1009/6
1009/11 1010/1 1010/6 1010/10 1010/18

1011/9 1012/6 1014/18 1015/6 1016/1 1016/4
1016/7 1016/8 1016/11 1017/10 1017/23
1017/14 1017/14 1017/17 1017/21 1019/18
1021/8 1021/12 1022/9 1023/2 1023/8
1023/11 1024/4 1024/14 1024/17 1024/19
1024/21 1024/23 1024/24 1026/7 1027/13
1027/17 1034/23 1035/4 1035/21 1036/13
1036/15 1037/13 1039/3 1039/16 1039/24
1040/1 1040/13 1040/14 1040/25 1041/4
1041/6 1041/6 1041/8 1041/11 1046/8
1047/25 1048/11 1049/1 1052/5 1052/7
**right-hand** [1] 824/16
**rights** [2] 989/20 992/19
**ring** [3] 914/14 914/22 981/21
**Rising** [2] 944/24 945/5
**risk** [1] 979/3
**road** [5] 874/18 1001/13 1014/12 1018/13
1018/19
**roadway** [1] 912/25
**ROBERT** [1] 816/6
**Robertson** [3] 891/5 891/10 891/15
**Robinson** [6] 897/18 897/19 897/24 898/3
899/1 918/9
**rock** [1] 977/6
**Rockridge** [2] 888/5 918/2
**rode** [1] 903/21
**role** [1] 975/14
**room** [11] 826/17 837/23 868/2 924/2 926/22
926/22 940/19 957/23 982/10 982/18 1029/24
**rooms** [2] 924/1 924/3
**Rosen** [1] 1034/2
**round** [2] 938/6 957/8
**route** [22] 851/11 860/1 860/4 919/9 1024/7
1024/8 1024/10 1024/11 1024/13 1025/15
1025/18 1025/20 1025/21 1026/5 1026/8
1026/11 1026/13 1026/19 1026/22 1026/24
1027/6 1027/7
**routine** [2] 984/10 997/24
**routinely** [1] 984/5
**RPR** [2] 817/13 1054/17
**rule** [1] 1049/3
**rules** [2] 831/3 831/23
**ruling** [1] 1034/20
**run** [8] 822/12 842/5 873/20 917/11 918/5
936/20 936/23 1028/21
**running** [1] 846/24
**runs** [2] 980/1 1039/21
**rush** [1] 916/24

# S

**S.** [1] 820/19
**Sacramento** [1] 1002/23
**safe** [3] 843/16 976/16 977/4
**safety** [6] 829/23 910/16 923/20 947/16 979/3
979/10
**said** [65] 822/8 823/2 823/7 823/8 831/13
850/13 862/11 864/25 867/16 867/25 868/20
897/23 901/20 902/3 905/5 906/1 913/10
916/7 919/6 919/7 919/10 921/23 922/22
923/2 923/19 923/22 924/4 926/21 927/17
927/18 929/3 929/21 943/21 950/7 950/10
968/17 971/21 971/24 973/2 976/6 980/6
987/1 991/12 991/15 992/20 993/4 993/18
993/19 993/20 993/21 997/10 1015/6 1016/10
1017/2 1023/24 1024/3 1026/5 1032/17
1033/4 1036/25 1039/23 1042/7 1050/17
1054/10 1054/12
**salary** [3] 1036/17 1040/11 1040/12
**same** [38] 820/21 834/4 834/21 834/23 835/1
839/21 840/10 846/16 854/19 854/20 856/23
887/23 889/10 913/2 913/12 936/20 939/22 943/25
944/6 944/14 944/19 945/9 946/24 947/2
947/4 956/11 974/15 977/20 979/19 980/20

983/13 984/23 984/24 994/16 994/21 994/24
1007/2 1009/25 1037/16
**sample** [2] 878/6 879/14
**San** [5] 816/10 937/4 964/13 1037/1 1040/1
**San Francisco** [3] 964/13 1037/1 1040/1
**San Francisco County** [1] 937/4
**saucer** [1] 957/13
**save** [2] 893/2 1038/18
**savings** [1] 1038/14
**saw** [25] 829/2 829/6 841/17 846/14 847/5
863/3 864/19 872/11 872/11 874/17 880/8
885/11 886/18 897/24 898/3 908/15 909/9
914/16 914/17 960/18 965/15 966/22 972/17
1027/1 1029/11
**say** [84] 821/3 828/4 833/23 836/23 837/9
840/15 840/25 841/3 844/10 844/14 844/14
849/13 849/24 854/24 864/15 869/4 871/1
872/2 873/5 876/12 880/9 884/4 884/23
885/16 892/7 893/1 901/5 904/16 905/2 918/3
919/14 919/16 920/2 920/6 921/11 927/15
927/19 927/22 929/12 932/13 936/12 948/10
955/15 956/13 960/15 960/20 960/25 968/23
969/2 969/13 969/17 972/3 982/9 982/10
982/24 984/24 986/22 987/14 990/6 991/20
993/14 998/21 999/14 1000/2 1000/7 1000/14
1004/7 1010/8 1012/2 1015/2 1015/5 1020/7
1020/9 1022/19 1026/11 1027/6 1033/14
1033/15 1033/22 1035/20 1043/11 1043/16
1048/14 1049/25
**saying** [11] 857/24 904/12 904/13 904/14
904/24 904/25 965/22 965/25 1020/17
1020/25 1036/9
**says** [35] 826/1 834/15 834/19 839/6 840/13
841/20 841/22 855/18 870/15 878/3 878/9
878/11 879/17 880/3 880/3 880/9 882/7
966/10 966/10 969/15 987/13 992/6 1002/5
1003/12 1005/12 1007/6 1007/10 1010/3
1019/13 1020/12 1025/15 1026/12 1032/19
1033/25 1051/12
**scale** [3] 957/16 957/17 958/1
**Scantron** [1] 878/5
**scenarios** [1] 989/6
**scene** [27] 830/8 832/2 867/17 867/19 890/17
891/16 898/2 905/1 905/3 905/6 905/8 905/12
905/13 905/16 949/11 951/4 951/15 955/21
967/16 978/5 986/17 987/2 987/4 989/6 990/8
996/14 1023/18
**screen** [19] 847/5 851/22 860/10 860/23
861/4 861/5 861/9 892/19 909/9 936/6 936/10
936/21 940/24 941/24 945/22 950/2 955/4
955/5 1005/9
**screening** [1] 1000/14
**se** [1] 1014/7
**seal** [6] 1036/11 1036/23 1037/24 1037/25
1038/22 1041/10
**sealed** [4] 1036/3 1039/1 1041/13 1041/14
**search** [111] 818/15 823/4 823/15 828/20
828/23 829/2 829/7 830/1 830/1 830/17
831/14 831/20 831/22 832/1 832/6 832/7
847/21 848/11 850/4 852/10 853/1 853/6
854/1 864/1 864/3 888/19 888/23 889/21
901/19 905/2 905/5 907/3 910/3 910/24
910/25 911/3 916/1 916/1 917/15 919/18
919/19 919/22 922/24 923/14 936/4 938/3
938/4 964/7 969/24 970/20 972/16 972/19
974/19 975/1 975/11 975/19 975/21 976/11
976/14 976/16 977/5 977/13 977/20 978/6
978/9 978/19 978/21 978/24 979/8 979/22
979/23 980/4 980/6 980/10 980/23 981/1
982/22 982/25 983/6 983/8 984/5 984/10
990/25 991/16 993/6 1024/17 1027/7
1027/22 1029/1 1029/2 1029/4 1029/8
1029/14 1030/10 1031/11 1032/9 1033/10

**S**

search... [14] 1042/4 1042/8 1042/16 1042/17
1042/19 1042/20 1042/24 1043/4 1043/5
1043/5 1043/9 1044/5 1046/11 1047/17
searched [29] 829/11 829/12 830/7 847/6
867/10 889/1 904/7 904/8 906/22 906/24
907/2 908/9 909/7 919/21 919/25 925/5
969/13 983/17 984/3 986/18 986/23 987/2
991/11 992/7 1000/8 1005/14 1018/10 1029/5
1044/9
searches [4] 830/24 982/12 982/19 1044/2
searching [5] 829/23 972/21 983/15 991/11
992/6
seat [8] 827/5 909/8 936/5 974/2 975/8
975/12 975/18 983/9
seated [1] 917/7
second [7] 826/21 868/10 970/10 1002/15
1028/9 1046/6 1047/23
second-to-last [1] 1028/9
secondary [2] 822/4 852/18
Secondly [1] 978/25
seconds [1] 899/18
section [13] 832/15 857/17 874/14 879/17
879/19 909/3 909/9 933/6 936/5 988/18
993/23 1001/7 1002/3
Section 3 [1] 879/19
sections [1] 848/4
secure [2] 975/6 983/2
see [120] 823/1 824/16 824/20 824/22 824/25
827/12 835/19 842/11 843/19 844/5 845/11
851/23 856/8 858/12 859/3 859/7 859/7
859/12 860/15 861/5 861/20 862/4 862/5
869/1 872/9 877/17 881/3 882/7 885/8 887/9
891/15 891/22 892/15 893/8 893/21 894/11
901/8 902/3 908/11 908/17 908/18 913/16
913/22 916/15 917/15 933/6 933/10 934/7
936/21 939/22 939/25 941/5 941/21 941/24
942/13 943/22 944/6 944/21 945/12 950/1
950/2 954/25 958/9 961/9 962/14 966/11
967/13 967/15 970/15 970/24 971/3 971/8
972/5 972/20 973/18 988/14 989/19 990/3
994/5 995/8 999/13 1001/20 1001/23 1001/25
1003/11 1003/12 1004/20 1004/23 1005/2
1005/11 1005/17 1006/7 1007/7 1007/20
1009/18 1009/19 1009/23 1010/3 1010/6
1010/21 1010/24 1011/2 1011/8 1011/20
1014/6 1015/9 1020/17 1025/3 1025/4
1025/13 1025/16 1028/1 1028/10 1029/10
1030/20 1031/20 1033/19 1033/24 1051/21
1052/9
seeing [5] 856/5 866/7 925/15 934/14 936/6
seem [1] 911/25
seemed [2] 915/4 982/11
seems [3] 955/25 988/1 1007/12
seen [19] 835/14 876/25 876/25 877/2 877/2
877/19 880/23 882/2 937/4 982/6 992/8
996/17 1003/2 1007/14 1007/15 1007/16
1022/9 1029/7 1040/6
semi [3] 996/10 997/6 997/12
semi-marked [3] 996/10 997/6 997/12
send [2] 858/23 1018/11
sending [1] 893/6
sense [2] 898/9 1015/16
sent [1] 972/14
separate [5] 861/18 914/22 925/13 963/21
963/22
sequence [3] 840/9 841/23 855/1
sergeant [3] 865/23 1031/1 1040/24
Sergeant Chris Shannon [1] 865/23
series [5] 824/24 854/5 878/5 1000/9 1051/12
serious [2] 829/22 980/2
seriously [1] 875/18

server [1] 1013/2
service [12] 842/5 842/19 891/12 936/5
936/18 957/16 957/16 959/3 959/5 959/8
959/21 959/21
session [1] 917/6
set [10] 840/10 844/4 848/20 855/6 855/15
911/9 914/10 914/16 934/3 970/8
sets [1] 856/13
setting [1] 894/17
seven [1] 1035/3
Seventeenth [1] 817/2
Seventy [2] 997/2 1028/6
Seventy-eight [2] 997/2 1028/6
several [6] 840/8 848/12 969/11 970/21
1017/20 1034/25
sex [2] 984/7 984/7
shall [1] 878/11
Shannon [1] 865/23
shape [2] 982/7 982/8
share [1] 826/6
Sharpie [2] 956/14 956/20
she [9] 936/19 936/20 936/21 1016/6 1016/10
1032/5 1032/6 1034/1 1036/24
she'd [1] 936/22
She's [2] 916/16 916/18
sheet [15] 832/12 832/23 833/7 833/19
833/22 834/2 834/3 834/4 835/1 835/25
844/20 845/7 845/13 853/14 959/15
sheets [3] 835/14 959/15 960/16
Sherwin [2] 817/2 817/4
shift [7] 836/20 838/1 838/3 844/20 849/14
849/16 878/13
shoes [3] 977/14 1043/3 1043/4
shorthand [1] 1054/8
shorts [1] 829/13
should [17] 838/4 845/15 845/17 845/24
860/2 878/23 897/11 938/19 943/12 943/13
947/23 990/6 1033/6 1034/6 1037/23 1038/10
1052/15
shove [1] 1043/20
show [18] 861/3 889/16 893/20 895/3 895/11
896/5 902/14 936/1 944/11 967/14 986/25
996/18 998/12 1006/13 1006/18 1024/6
1031/25 1033/16
showed [6] 915/10 984/16 998/9 1021/11
1021/14 1021/19
showing [7] 861/7 861/14 938/15 943/6
945/13 946/15 1008/15
shown [2] 951/17 1025/2
shows [6] 956/11 967/17 1006/23 1011/24
1025/4 1027/8
sic [3] 855/22 878/4 938/3
side [35] 819/5 819/11 819/13 862/13 863/10
863/11 863/12 863/15 874/18 885/14 885/20
894/8 894/9 894/12 895/6 895/7 898/14
898/18 898/19 898/20 939/16 977/15 977/17
977/18 977/20 983/8 983/10 983/13 991/22
991/25 992/1 992/3 1005/3 1038/2 1049/2
side's [1] 1049/6
sidewalk [5] 898/4 898/6 898/7 898/10
898/16
sign [5] 834/11 834/12 855/17 856/18 873/23
signaled [1] 907/25
signed [1] 1047/2
significance [3] 836/11 1019/1 1020/1
significant [2] 914/6 964/20
Significantly [1] 896/21
silence [3] 987/5 987/18 987/20
silver [1] 982/4
similar [4] 959/11 959/15 1007/15 1009/18
similarly [1] 816/13
simple [1] 1043/20
simply [10] 863/17 870/19 978/3 1012/2

1012/8 1012/10 1012/14 1012/20 1014/5
1026/11
simultaneously [1] 886/1
since [11] 828/6 829/5 868/24 869/23 871/3
889/20 976/16 986/8 1017/21 1035/13
1037/16
sir [93] 974/13 974/21 975/20 975/23 978/17
978/20 980/11 981/7 982/2 984/13 984/25
985/9 986/16 986/19 986/24 987/4 987/7
988/11 988/16 989/13 990/18 992/12 992/16
993/3 993/8 996/1 996/12 997/11 998/3 998/8
998/11 998/17 999/1 999/6 999/15 999/19
1001/16 1002/1 1002/4 1002/8 1003/5
1003/14 1004/1 1004/9 1004/12 1004/19
1004/22 1005/4 1005/15 1005/18 1006/9
1006/12 1007/5 1007/8 1009/20 1012/7
1015/19 1015/23 1016/2 1016/5 1016/15
1017/13 1017/19 1017/22 1021/13 1023/21
1024/5 1024/8 1024/15 1024/18 1025/6
1025/8 1025/10 1025/17 1027/11 1027/14
1027/18 1027/21 1028/10 1028/23 1029/6
1029/17 1029/19 1029/23 1030/11 1031/24
1032/10 1033/21 1035/7 1035/12 1035/15
1037/12 1039/5
siren [1] 869/25
sirens [1] 869/23
sit [2] 920/2 1043/2
site [2] 961/1 1023/8
sitting [3] 874/18 908/11 993/16
situated [1] 816/13
situation [5] 907/6 907/14 975/11 981/11
992/18
situation's [1] 907/16
situations [1] 988/14
six [2] 899/7 953/19
sixth [2] 879/5 934/6
size [3] 982/7 982/8 1052/4
skips [1] 895/9
sleep [1] 984/9
slot [2] 825/5 828/7
small [1] 1001/24
smearing [1] 958/25
so [248]
socks [1] 977/14
soles [1] 1043/4
some [80] 823/18 823/20 843/1 846/2 852/17
863/23 872/3 874/13 874/16 875/11 875/25
876/2 888/19 888/22 892/21 896/18 901/2
904/2 906/9 909/10 909/11 910/16 913/1
913/19 918/18 921/17 934/2 934/4 936/2
944/21 944/22 954/2 956/8 956/17 956/18
956/19 967/13 968/16 969/7 971/4 974/18
975/9 984/11 987/20 988/2 989/2 989/5
993/18 993/19 993/20 994/22 994/25 995/7
996/17 996/21 998/18 998/23 999/10 999/13
1001/23 1017/24 1033/12 1033/24 1043/7
1043/8 1044/20 1045/14 1047/5 1047/7
1047/9 1047/11 1047/14 1047/15 1047/19
1048/20 1049/5 1050/6 1051/4 1051/23
1051/24
somebody [16] 827/2 829/25 846/13 846/17
864/2 912/15 917/15 936/14 947/23 948/1
993/19 993/21 1013/7 1018/7 1034/21
1049/17
somebody's [3] 836/9 969/25 989/19
someone [9] 844/19 870/19 918/4 921/11
975/7 975/9 984/2 1010/16 1033/15
someplace [1] 969/5
something [36] 861/15 861/23 883/2 908/4
908/12 913/18 953/24 955/10 957/8 960/1
975/10 982/10 987/12 987/22 990/4 994/11
995/5 997/24 998/1 1004/18 1006/4 1007/21
1010/11 1012/22 1015/13 1016/9 1018/10

**S**

**something... [9]** 1019/19 1025/4 1027/7 1027/2 1030/10 1039/20 1043/20 1043/21 1045/25

**sometime [3]** 852/22 1011/5 1020/4

**sometimes [4]** 930/21 930/21 1039/14 1039/15

**somewhat [3]** 944/1 952/25 1034/5

**somewhere [9]** 863/14 866/23 889/23 927/17 953/17 953/18 971/6 994/10 1052/16

**soon [1]** 909/5

**sorry [35]** 833/4 833/24 855/11 855/12 871/13 881/17 886/10 900/16 902/1 907/10 909/20 915/13 915/20 938/3 938/17 939/17 943/20 945/4 945/21 946/4 946/4 952/3 952/3 952/10 953/18 959/20 961/23 966/4 973/2 986/12 995/4 1010/5 1011/16 1028/5 1035/1

**sort [13]** 859/7 874/16 913/13 957/15 978/2 983/25 996/21 1029/20 1030/5 1040/24 1048/5 1048/19 1049/4

**sound [5]** 865/7 865/8 1037/8 1037/10 1040/2

**source [3]** 1008/8 1009/2 1009/6

**south [4]** 894/8 894/9 1005/13 1011/1

**speak [3]** 857/8 983/25 1015/4

**speaking [2]** 869/19 894/18

**Special [3]** 876/23 877/2 878/3

**specific [7]** 870/24 961/6 961/7 982/16 986/2 986/3 1042/21

**specifically [8]** 989/5 990/20 991/6 999/7 1020/8 1021/15 1021/19 1035/12

**specifics [1]** 1008/14

**speculate [1]** 1006/15

**speculating [1]** 873/18

**speculation [4]** 912/5 999/22 1001/14 1001/16

**spelling [1]** 1045/24 1046/4 1046/5

**Spencer [12]** 853/18 854/9 855/21 867/21 962/22 962/24 999/5 1005/17 1006/7 1006/14 1011/25 1022/17

**Spencer Lucas [5]** 853/18 855/21 962/22 999/5 1022/17

**Spencer Lucas' [3]** 854/9 867/21 962/24

**Spencer Troy's [1]** 1006/14

**spent [2]** 849/10 961/17

**split [1]** 1047/17

**spoke [2]** 981/10 1015/4

**spread [1]** 977/7

**squad [1]** 994/16

**Square [1]** 868/10

**squeeze [1]** 916/22

**stabs [1]** 979/25

**stamp [5]** 839/22 851/12 851/16 859/22 961/21

**stamped [1]** 832/13

**stand [4]** 818/5 973/10 974/5 1033/2

**standard [1]** 947/13

**standing [2]** 922/10 923/6

**stands [1]** 854/7

**Star [2]** 944/24 945/5

**start [10]** 837/19 838/9 954/5 972/21 977/18 983/7 997/13 1024/15 1040/22 1048/12

**started [4]** 825/9 970/6 1024/14 1047/25

**starting [2]** 988/13 997/18

**starts [1]** 838/1

**state [3]** 871/12 1012/10 1031/9

**stated [8]** 822/8 843/17 852/17 864/17 868/20 871/25 881/2 1017/2

**statement [22]** 818/11 865/21 866/3 866/11 866/12 866/20 867/21 867/25 910/19 910/21 910/23 911/4 915/16 920/20 920/22 922/13 922/16 922/17 923/12 923/16 925/20 925/25

**statements [1]** 937/22

**STATES [2]** 816/3 1054/4

**statewide [1]** 1031/8

**stating [3]** 842/4 971/16 991/5

**station [1]** 990/8

**stationary [1]** 874/17

**statistic [1]** 976/14

**statute [1]** 874/13

**stay [8]** 868/1 922/23 924/6 969/1 969/8 971/21 984/9 1015/6

**stayed [11]** 850/13 850/18 868/22 888/24 904/10 923/13 924/4 929/3 929/5 968/19 1018/5

**staying [6]** 868/20 919/16 927/20 929/1 969/4 1018/10

**stays [1]** 970/13

**Ste [1]** 817/6

**step [6]** 907/20 916/25 935/8 936/8 973/5 975/25

**stepped [2]** 907/20 908/18

**steps [1]** 982/16

**still [17]** 818/7 847/7 875/7 887/12 936/7 936/15 936/24 937/1 937/7 964/4 964/5 971/7 973/24 1006/23 1015/11 1015/12 1018/5

**stood [1]** 891/20

**stop [89]** 819/15 828/21 842/4 842/19 843/14 845/13 845/14 845/16 845/18 845/25 846/2 846/13 847/24 848/2 864/4 864/6 866/21 869/3 870/20 871/8 871/19 871/23 872/8 872/19 873/23 874/20 875/9 877/7 877/9 877/25 878/5 878/6 878/12 878/13 878/16 878/24 879/1 879/3 879/4 879/14 879/19 879/22 879/23 879/25 880/8 880/23 881/23 882/11 884/14 885/15 885/23 887/20 888/17 894/1 894/22 895/19 895/23 896/1 896/6 897/4 899/11 899/18 908/3 916/7 917/12 917/17 917/19 933/4 933/15 934/22 935/3 935/4 940/11 940/12 942/4 942/8 961/3 962/11 962/13 963/12 989/11 992/10 996/2 996/4 996/13 997/8 997/13 997/18 1025/5

**stoplight [1]** 862/11

**stopped [28]** 843/12 848/13 871/6 871/24 871/25 877/3 881/13 881/21 881/25 884/3 884/4 885/23 896/14 897/2 897/3 897/3 899/12 942/2 942/19 946/16 946/18 951/21 951/23 951/24 952/20 952/24 1026/1 1026/17

**stopping [8]** 843/4 843/9 863/8 870/23 870/24 872/4 872/13 873/24

**stops [3]** 875/24 875/25 876/18

**stored [1]** 833/10

**street [90]** 817/2 817/9 819/6 819/7 822/20 831/15 838/7 841/20 841/21 844/7 846/3 846/12 846/14 846/17 849/5 850/4 850/7 860/1 860/18 860/19 863/8 863/10 863/12 863/14 863/14 864/21 884/25 889/19 889/19 889/24 889/25 890/14 894/3 894/8 894/9 897/3 898/17 905/12 913/7 913/7 917/21 921/22 965/15 970/22 970/24 972/12 976/11 976/12 980/24 984/11 985/2 990/25 991/8 998/10 1005/13 1006/8 1006/10 1006/21 1006/23 1006/24 1008/15 1010/23 1011/1 1011/12 1012/1 1012/4 1013/3 1013/25 1014/3 1014/8 1014/10 1014/14 1014/21 1015/8 1015/17 1015/25 1016/19 1018/21 1020/11 1021/10 1021/20 1021/24 1023/25 1024/16 1024/19 1025/9 1025/13 1026/24 1026/25 1027/1

**stricken [1]** 993/25

**strike [23]** 837/14 840/20 843/24 853/21 864/4 876/25 877/21 879/18 881/12 885/5 887/22 904/1 910/18 925/19 931/2 932/1 951/21 968/11 993/23 995/10 1023/16 1035/9 1041/2

**strip [26]** 828/20 828/23 829/2 830/1 830/7 830/17 830/24 831/14 831/20 831/22 832/1 832/6 832/7 985/2 1005/5 915/25 916/1 923/14 938/5 974/19 973/1 975/11 975/19 990/25 1042/17 1047/17

**strip-search [4]** 828/20 830/17 975/11 1047/17

**strip-searched [1]** 830/7

**structure [3]** 944/14 944/19 944/19

**stub [1]** 1040/11

**stuff [1]** 1047/11

**stylus [1]** 953/25

**subject [4]** 911/8 990/24 1041/13 1045/11

**subjects [1]** 846/24

**subsection [1]** 909/12

**such [12]** 825/5 831/20 832/6 832/6 853/14 926/11 933/14 972/24 975/1 982/20 983/24 992/18

**sufficient [1]** 957/3

**suggest [1]** 883/21

**sum [1]** 1040/10

**summary [1]** 996/16

**sundry [1]** 983/23

**supervisor [3]** 880/14 1000/19 1046/23

**suppose [1]** 868/15

**supposed [6]** 822/10 843/14 859/3 859/5 1002/2 1046/9

**supposedly [2]** 848/15 987/12

**sure [34]** 832/11 845/3 845/3 859/8 859/18 861/17 861/25 872/22 893/5 909/21 916/21 936/23 957/10 958/10 964/13 965/9 975/14 978/6 983/2 986/17 987/21 990/8 996/24 1024/13 1027/25 1028/13 1028/15 1030/12 1031/15 1033/17 1043/13 1043/16 1049/4 1052/2

**suspect [8]** 826/3 974/25 975/18 976/18 978/21 1001/1 1002/5 1027/3

**suspects [2]** 830/6 830/17

**suspicious [3]** 872/20 908/3 915/4

**sustained [5]** 830/20 880/20 881/9 910/10 976/24

**switch [3]** 869/8 933/20 977/18

**switching [1]** 993/17

**sworn [2]** 818/5 974/5

**symbol [1]** 890/11

**system [27]** 835/5 836/16 845/20 856/23 857/3 857/5 857/17 934/24 937/8 1000/6 1006/20 1006/22 1007/22 1007/23 1011/5 1012/20 1013/2 1013/5 1014/5 1015/9 1016/13 1016/14 1016/17 1016/19 1016/24 1017/24 1049/5

**systems [1]** 1006/17

**T**

**tab [3]** 824/6 890/3 938/19

**tables [1]** 1052/20

**tag [3]** 847/14 878/22 1008/13

**tags [6]** 873/14 873/15 874/4 874/19 882/24 882/24

**taillight [7]** 873/4 874/9 874/10 883/1 908/4 918/3 921/17

**take [43]** 829/3 829/4 829/19 837/25 847/20 848/22 852/5 857/21 865/4 880/8 916/20 922/6 924/5 926/20 932/3 936/8 936/9 936/14 937/4 937/4 947/18 947/23 951/2 956/5 956/8 959/25 972/8 982/16 1002/18 1024/11 1025/1 1025/21 1025/21 1026/10 1026/13 1026/21 1027/6 1029/15 1030/15 1043/3 1048/19 1049/13 1049/24

**taken [23]** 850/3 859/12 917/5 924/17 924/21 931/7 968/2 973/21 1001/1 1001/7 1005/2 1007/6 1008/11 1013/1 1029/8 1030/1 1030/21 1031/4 1032/8 1032/17 1033/5 1033/9 1033/12

**T**

**takes [7]** 837/21 875/17 957/1 957/9 967/21 1025/15 1025/18
**taking [7]** 836/14 931/24 935/3 947/23 975/15 1018/18 1027/7
**talk [4]** 901/7 911/15 935/18 1029/12
**talked [6]** 911/7 911/10 990/24 1016/3 1026/1 1029/13
**talkie [4]** 902/10 902/12 902/13 902/19
**talking [18]** 837/2 904/15 905/11 905/11 914/10 928/25 944/19 945/1 945/9 971/11 976/22 1005/8 1005/12 1016/20 1022/10 1023/5 1050/23 1051/16
**target [2]** 961/7 961/7
**targets [1]** 863/25
**Task [2]** 862/14 900/6
**taught [2]** 990/3 990/3
**tax [2]** 1037/11 1040/9
**TAYLOR [2]** 816/6 1054/6
**teaches [1]** 988/19
**team [21]** 822/25 827/19 920/9 925/17 965/19 965/19 974/12 974/14 985/6 985/14 989/18 990/12 994/17 995/19 1029/5 1030/19 1030/25 1031/1 1031/16 1034/24 1035/2
**teammates [3]** 966/15 967/3 971/25
**technically [1]** 896/23
**technology [2]** 956/1 957/11
**Teletype [2]** 1002/23 1002/25
**tell [40]** 829/2 826/1 834/8 845/13 845/15 845/25 847/17 850/8 850/8 857/1 860/6 863/22 865/6 868/5 871/23 882/9 889/17 905/24 907/15 915/20 915/21 922/16 922/21 923/11 924/15 929/19 931/15 931/25 932/2 961/18 981/10 981/13 999/7 1001/21 1014/24 1023/13 1028/11 1036/23 1039/8 1042/15
**telling [5]** 916/4 923/18 996/9 997/5 1027/24
**ten [5]** 899/18 916/20 991/1 1016/9 1039/21
**tendered [2]** 892/3 958/12
**tennis [1]** 1044/22
**tenths [3]** 938/6 938/7 938/8
**term [12]** 836/11 877/11 907/7 912/15 913/12 913/14 929/17 929/14 934/23 967/24 990/14 1019/5
**termed [1]** 913/3
**terms [8]** 869/6 869/9 869/18 912/7 942/4 956/1 969/13 1049/24
**test [1]** 823/1
**testified [11]** 818/5 819/1 819/24 832/12 857/14 869/8 875/14 897/21 910/20 911/21 915/2 933/24 950/12 950/15 962/17 974/5 978/23 1009/9 1021/9 1034/1 1045/3
**testify [8]** 855/9 900/24 902/24 957/5 959/19 1015/20 1046/10 1051/6
**testifying [3]** 961/10 1046/9 1051/23
**testimony [40]** 829/10 829/15 842/1 869/10 908/21 911/11 911/18 914/25 917/1 950/8 968/16 973/6 978/18 980/5 986/20 989/24 990/21 990/24 991/2 991/18 993/17 1003/9 1011/14 1011/17 1019/22 1021/5 1025/25 1026/4 1029/17 1030/22 1032/1 1032/2 1033/1 1034/3 1045/15 1048/20 1050/8 1050/15 1050/25 1051/21
**text [4]** 901/20 901/22 944/21 944/22
**than [31]** 821/7 829/8 835/15 843/1 843/12 843/24 845/7 846/17 856/18 866/3 866/9 896/7 908/4 910/24 923/18 942/17 950/10 950/15 960/6 960/7 979/16 981/20 981/21 1016/9 1022/7 1036/7 1036/11 1039/9 1043/22 1048/8 1048/10
**Thank [28]** 818/10 818/21 831/8 834/1 835/24 848/18 856/19 859/15 859/21 862/3 896/12 896/23 917/4 917/9 932/16 949/6

951/2 958/11 968/13 973/19 973/20 986/7 994/1 1041/8 1045/9 1052/11 1053/12 1052/17
**that [1461]**
**that's [127]** 821/6 830/13 835/17 835/18 836/13 837/18 839/13 839/13 841/18 843/8 846/21 850/3 851/22 853/24 854/3 854/5 856/8 858/20 861/22 866/6 869/3 873/5 873/19 874/22 874/24 874/25 877/7 883/25 890/8 890/8 890/8 890/8 890/13 890/15 892/20 899/1 901/24 906/12 909/17 910/4 913/12 914/20 916/16 916/23 921/3 923/19 924/14 928/21 929/24 934/3 934/6 939/13 939/14 939/15 939/22 948/16 949/4 949/24 952/20 953/5 956/11 957/12 958/7 960/19 962/6 962/21 963/5 964/2 968/5 969/9 969/22 970/2 971/17 971/18 971/21 971/21 972/2 972/9 972/21 972/24 976/1 979/17 979/17 987/22 990/5 991/12 991/14 994/23 998/14 1000/16 1001/14 1002/15 1005/5 1005/13 1005/20 1006/10 1006/19 1008/12 1012/2 1015/13 1016/8 1016/10 1017/12 1019/18 1020/7 1021/13 1024/10 1024/15 1031/19 1034/5 1036/17 1036/23 1038/10 1040/15 1040/21 1040/21 1041/11 1042/9 1043/4 1044/4 1045/21 1047/19 1049/12 1049/15 1050/20 1051/17 1051/19
**The Oakland Tribune [1]** 1035/23
**theft [1]** 1030/9
**their [50]** 829/24 871/21 878/13 887/19 906/2 917/13 917/14 918/4 918/6 930/18 930/20 937/6 937/6 937/7 965/21 965/21 966/24 969/9 974/18 974/18 975/14 975/15 976/19 979/7 979/7 979/7 979/8 979/12 979/6 993/13 999/12 1000/6 1022/2 1031/8 1031/10 1031/11 1031/13 1035/6 1035/11 1043/1 1043/2 1043/3 1043/3 1043/4 1043/17 1043/17 1043/18 1043/19 1043/20 1050/20 1052/8
**them [54]** 824/1 829/7 829/23 841/14 847/22 852/5 862/1 870/21 888/4 888/13 888/14 888/16 893/6 902/10 913/8 915/20 915/21 925/15 928/13 950/23 951/3 957/15 962/18 967/17 975/5 975/12 979/6 980/9 984/9 988/22 993/13 999/8 999/9 1000/15 1000/16 1001/5 1002/24 1013/15 1018/11 1018/16 1025/3 1032/25 1033/2 1034/14 1034/16 1034/20 1034/21 1043/2 1043/15 1047/18 1048/18 1050/2 1050/20 1052/8
**then [100]** 823/23 828/9 829/7 837/7 841/22 841/22 842/9 842/11 845/16 846/1 846/15 846/22 847/21 848/5 848/15 849/5 849/10 852/8 855/1 855/6 855/17 858/6 858/17 860/11 865/19 868/10 875/9 878/9 882/19 883/8 895/9 895/25 904/1 910/3 916/19 916/19 917/3 917/14 926/13 934/7 935/16 936/3 936/5 936/21 937/8 943/19 944/5 945/9 945/15 946/5 953/2 953/20 956/4 962/20 963/2 963/23 964/1 970/22 971/1 973/15 977/19 979/6 983/4 983/12 983/14 986/6 990/5 997/14 998/21 1000/25 1001/1 1009/10 1013/4 1016/3 1018/17 1018/22 1019/1 1020/2 1020/10 1020/10 1020/25 1023/25 1023/25 1024/21 1025/11 1031/5 1033/3 1033/17 1036/22 1038/2 1043/15 1048/12 1048/13 1048/16 1048/20 1049/2 1049/25 1051/15 1051/22 1052/9
**there [303]**
**there's [59]** 823/2 823/8 824/8 827/12 828/9 829/10 832/15 832/18 840/2 847/8 852/24 852/25 853/14 855/20 855/20 860/3 869/13 870/13 876/21 877/5 890/9 894/2 922/24 922/25 923/19 943/22 944/21 952/22 960/15

963/13 964/7 967/21 968/6 971/22 972/5 984/7 988/12 988/18 989/14 998/20 998/20 999/24 999/13 1002/18 1018/9 1020/10 1020/10 1020/10 1020/13 1020/13 1020/15 1020/16 1025/12 1025/23 1032/14 1033/19 1033/24 1038/14 1043/13
**thereabouts [1]** 965/15
**thereafter [2]** 909/5 1054/8
**therefore [4]** 845/10 848/7 879/2 909/24
**these [33]** 829/3 830/17 838/17 847/20 856/6 857/23 859/2 890/1 893/1 893/3 902/8 946/24 951/2 957/4 999/7 1007/17 1012/17 1012/22 1017/20 1020/16 1021/1 1021/3 1021/5 1031/10 1032/20 1033/15 1033/16 1034/11 1046/25 1047/7 1050/7 1051/9 1052/19
**they [125]** 823/18 829/6 843/23 852/7 852/8 854/10 854/20 856/10 857/2 858/8 863/3 863/5 863/6 868/8 875/18 876/18 881/24 893/4 894/20 899/9 899/9 901/6 901/16 902/10 902/14 914/15 915/4 915/7 917/14 918/5 918/7 922/10 922/10 922/13 925/17 925/19 925/23 930/18 930/20 930/21 930/21 935/16 937/7 937/8 948/4 948/22 951/1 951/15 951/16 952/15 954/11 957/24 958/7 960/21 960/24 966/15 966/16 966/17 966/23 967/15 967/16 967/19 969/9 969/9 972/9 972/17 975/7 976/12 979/12 979/13 979/14 988/14 988/22 992/13 995/16 995/17 995/18 997/15 999/10 1000/6 1000/7 1000/8 1000/8 1000/10 1000/13 1000/14 1000/17 1000/18 1001/3 1001/4 1001/20 1006/19 1012/10 1013/23 1018/9 1018/9 1018/10 1018/14 1021/1 1026/3 1026/25 1031/5 1031/5 1031/8 1031/9 1032/17 1032/19 1034/4 1033/6 1033/17 1034/6 1034/2 1034/13 1037/9 1040/4 1043/17 1046/21 1047/10 1049/25 1050/18 1050/18 1051/15 1051/15 1051/25
**They'll [1]** 1043/19
**they're [22]** 859/5 888/7 888/12 900/12 917/20 937/18 959/11 960/22 975/6 979/5 979/15 984/8 987/14 1001/2 1001/6 1001/11 1012/19 1018/10 1021/2 1022/7 1026/5 1034/18
**they've [2]** 856/23 1051/5
**thing [14]** 823/4 848/12 858/16 901/22 921/16 971/4 983/13 983/25 1007/20 1019/3 1020/7 1031/8 1033/14 1040/24
**things [7]** 901/21 957/4 971/24 972/13 980/22 999/8 1040/9
**think [46]** 825/23 830/10 845/4 869/7 875/11 875/14 886/23 891/24 892/20 892/21 910/20 911/21 914/24 941/8 950/10 954/2 954/7 955/9 956/3 957/2 957/3 963/24 984/22 986/1 988/21 995/14 1009/4 1009/10 1011/19 1012/7 1016/16 1019/7 1019/9 1033/5 1036/4 1038/8 1038/14 1038/18 1040/6 1040/6 1040/17 1040/19 1040/23 1050/13 1051/24 1052/4
**thinking [2]** 940/11 940/12
**third [6]** 817/9 827/24 858/14 891/2 891/8 985/15
**Thirty [3]** 1009/16 1034/18 1034/19
**Thirty-five [2]** 1034/18 1034/19
**Thirty-nine [1]** 1009/16
**this [292]**
**Thomas [1]** 1023/6
**Thomas Guide [1]** 1023/6
**Thornton [1]** 1048/22
**thoroughly [1]** 906/22
**those [70]** 818/19 827/14 827/17 828/10 828/16 828/24 828/24 832/3 833/24 839/11 840/8 840/16 852/5 855/4 855/7 857/18 862/7

# T

**those... [53]** 873/13 874/12 883/5 883/5 883/8
892/13 901/18 902/4 913/8 914/14 914/17
914/22 915/3 915/4 927/10 928/10 956/6
962/17 962/17 974/22 979/18 980/22 984/10
985/12 985/15 989/2 989/5 995/20 995/24
997/12 1000/9 1001/10 1003/2 1007/24
1011/11 1011/11 1012/14 1013/21 1014/5
1016/20 1017/9 1024/4 1032/8 1032/11
1032/15 1032/23 1033/9 1033/20 1034/2
1043/24 1050/24 1051/14 1051/25
**though [14]** 832/23 833/18 853/11 895/10
897/11 918/5 955/15 971/9 990/11 1009/7
1032/24 1034/11 1046/24 1050/19
**thought [8]** 842/21 878/20 910/7 944/20
950/5 975/11 1032/17 1050/18
**thousand [2]** 985/16 1039/9
**thousands [1]** 927/5
**three [20]** 849/2 849/5 851/25 855/2 867/14
879/5 937/9 937/9 940/19 946/24 947/3
962/17 975/3 1012/5 1021/12 1031/25
1032/12 1035/19 1051/10 1051/10
**through [27]** 820/12 821/5 835/5 837/13
843/18 845/18 845/19 845/20 848/11 851/1
859/5 863/8 863/11 863/15 864/21 873/22
873/23 918/12 931/3 935/19 935/21 966/10
970/11 970/20 981/14 983/8 1013/7
**throughout [4]** 844/3 948/8 988/12 1031/9
**Thursday [1]** 1054/18
**Thurston [13]** 818/1 818/3 818/24 892/10
892/14 977/25 992/8 994/15 994/22 1004/6
1015/4 1015/5 1015/20
**ticket [6]** 874/7 874/23 874/25 883/15 883/19
888/17
**tied [1]** 843/19
**time [230]** 819/2 819/3 819/14 821/7 826/25
827/6 827/6 827/15 828/6 828/19 833/16
833/20 834/14 837/6 837/21 840/25 841/3
841/7 841/10 841/15 841/18 841/19 842/1
842/2 842/4 842/5 842/6 842/8 842/17 842/19
842/19 843/1 843/6 843/9 843/13 843/16
844/2 844/10 845/17 845/19 845/21 846/23
847/4 847/9 847/11 847/12 848/5 848/13
848/13 848/16 849/8 849/11 850/4 850/14
850/14 852/14 855/21 856/11 859/25 863/3
863/6 864/12 864/17 866/9 866/17 866/19
867/14 867/15 867/20 867/24 868/20 868/21
869/3 870/25 871/5 872/5 872/10 872/22
872/25 873/22 873/25 882/3 885/13 886/13
886/18 886/22 887/4 887/6 889/1 891/14
897/24 898/3 899/1 899/13 901/10 902/21
904/12 904/14 904/18 904/19 904/22 904/25
906/4 907/6 907/13 908/6 909/1 909/4 909/14
910/9 910/12 910/23 911/4 911/6 912/4
915/15 916/1 916/12 916/14 916/22 918/20
918/22 918/23 919/5 921/16 921/21 921/22
922/23 922/23 923/18 924/4 924/4 924/10
924/11 925/2 928/1 929/4 929/4 929/5 929/5
929/8 929/8 931/2 931/3 934/6 934/17 934/18
934/20 934/21 935/12 935/13 935/16 936/25
942/16 947/10 948/12 949/15 949/20 949/23
960/3 960/4 961/5 965/6 965/15 966/22
968/19 968/19 969/1 969/1 969/5 969/5 969/8
969/8 971/21 971/21 974/11 977/25 978/5
985/6 985/11 985/15 986/18 991/10 993/15
994/16 994/22 994/25 995/1 995/7 995/13
996/12 996/13 997/5 997/7 998/7 1000/6
1000/6 1000/22 1001/2 1001/4 1001/6 1001/8
1001/17 1005/23 1008/12 1008/19 1008/20
1009/25 1009/25 1012/11 1012/11 1014/8
1014/10 1015/6 1015/8 1016/7 1020/4 1020/5
1022/10 1026/16 1026/22 1027/9 1027/21

---

1031/3 1036/15 1038/18 1038/19 1047/19
1052/4 1054/11
**time, [1]** 1015/6
**timely [1]** 886/13
**times [9]** 857/1 921/13 921/14 942/17 995/25
1001/10 1001/10 1017/20 1044/23
**tinted [2]** 876/10 876/11
**title [1]** 942/22
**titled [1]** 877/25
**today [9]** 867/10 881/7 884/1 884/2 915/2
920/2 1045/20 1045/21 1052/15
**today's [1]** 883/25
**Todd [2]** 817/9 817/11
**toe [1]** 977/16
**together [2]** 859/6 911/13
**told [18]** 820/18 822/5 826/21 850/11 907/20
910/18 911/18 914/20 915/18 915/23 922/19
923/1 929/22 981/12 1014/17 1014/19
1014/21 1050/20
**tomorrow [1]** 1046/2
**ton [1]** 893/4
**Tony [1]** 956/17
**too [7]** 832/1 861/13 892/13 893/6 893/16
923/8 951/11
**took [26]** 819/24 820/4 820/15 823/23 848/16
849/11 863/20 865/5 868/23 918/17 924/6
924/14 950/23 960/3 963/16 965/6 970/5
1001/22 1017/15 1017/15 1024/8 1024/10
1029/5 1029/18 1030/3 1030/16
**tools [1]** 1018/17
**toothbrush [1]** 983/24
**top [12]** 834/14 836/24 839/6 955/1 955/3
955/4 966/11 999/13 1001/20 1009/18
1033/19 1040/21
**total [3]** 1037/15 1039/4 1039/6
**totally [1]** 1034/4 1048/16
**touch [3]** 860/23 860/23 955/1
**towards [6]** 977/6 983/14 991/25 992/3 992/4
1010/21
**track [1]** 842/22
**traffic [44]** 819/2 819/8 819/15 828/20
845/20 863/9 863/11 863/16 864/10 864/12
864/22 866/21 872/8 880/1 880/3 882/7
882/11 897/4 962/11 962/13 976/14 976/15
977/4 979/21 979/24 984/21 984/22 996/2
996/13 997/7 997/13 997/18 1012/25 1013/5
1013/10 1014/9 1022/1 1022/3 1022/4 1022/5
1022/6 1022/24 1022/9 1025/5
**trained [7]** 870/18 875/20 875/23 875/24
987/19 1043/23 1044/1
**training [17]** 832/5 875/11 883/25 947/21
947/22 947/25 948/7 960/20 987/5 987/6
987/18 987/23 988/9 988/11 988/12 988/18
988/22
**transactions [1]** 901/6
**transcribed [1]** 1054/8
**transcript [3]** 816/25 986/25 1054/13
**transferred [3]** 857/2 1013/4 1014/4
**transmission [7]** 836/16 842/16 842/21
842/23 842/24 843/18 845/22
**transmissions [1]** 842/22
**transmit [1]** 845/18
**transmitted [1]** 845/16
**transport [1]** 974/25
**transported [2]** 823/25 975/7
**transporting [1]** 827/2
**travel [4]** 819/14 849/11 850/15 873/21
**traveled [1]** 821/25
**treat [1]** 948/3
**treated [1]** 979/18
**tree [1]** 942/13
**trees [1]** 893/2
**trial [9]** 881/20 911/7 911/11 911/16 917/2

---

949/13 949/16 973/7 1045/18
**Tribune [2]** 1035/23 1036/25
**tried [3]** 853/13 918/24 970/10 982/17
1015/21
**trouble [2]** 987/17 1047/6
**Troy [2]** 1005/17 1006/7
**Troy's [1]** 1006/14
**true [5]** 860/12 968/5 987/3 1051/19 1054/10
**truth [1]** 1009/5
**try [19]** 826/7 829/4 851/15 853/12 865/19
884/14 893/13 910/15 947/17 957/23 975/14
975/16 977/9 989/11 990/17 1001/23 1047/17
1047/18 1050/19
**trying [12]** 820/7 847/1 852/22 864/1 916/22
947/17 987/9 1008/23 1015/25 1023/6
1031/19 1040/23
**Tuesday [3]** 949/17 1050/3 1052/9
**turn [14]** 851/12 858/14 877/12 879/5 887/8
941/21 966/2 990/6 996/19 999/2 999/7
999/11 1009/15 1025/12
**turned [5]** 837/15 880/14 890/25 894/7 999/4
**turns [2]** 887/16 979/24
**twice [2]** 1046/7 1047/18
**two [42]** 819/18 824/16 832/3 847/1 855/7
855/15 856/6 856/12 856/12 868/9 879/5
914/2 914/4 914/25 936/12 936/12 951/20
951/24 954/22 957/24 958/6 974/16 975/3
996/10 997/6 997/12 1006/19 1010/20 1011/8
1012/5 1013/14 1013/14 1013/18 1014/9
1014/12 1023/13 1024/4 1032/1 1037/19
1044/13 1047/18 1051/9
**two inches [1]** 1044/13
**type [19]** 829/25 841/20 846/2 863/23 869/20
875/25 887/19 902/14 908/7 909/10 910/16
918/23 936/2 948/5 959/21 976/11 984/19
1012/3 1013/7
**types [2]** 856/6 857/23
**typewriting [1]** 1054/9
**typical [1]** 936/25
**typically [8]** 853/11 855/25 869/7 869/8
936/9 962/14 999/10 1035/13

---

# U

**U-turn [1]** 1025/12
**U. [1]** 820/19
**U. S. Marshals [1]** 820/19
**Uh [2]** 987/16 1044/15
**Uh-huh [2]** 987/16 1044/15
**Ultimately [1]** 927/1
**Um [1]** 857/20
**umbrella [1]** 1048/5
**unable [1]** 930/18
**unaccounted [1]** 985/16
**unclear [1]** 922/6
**uncover [1]** 821/5
**under [52]** 818/7 828/24 829/2 830/7 830/17
830/24 831/15 831/15 832/15 849/18 860/14
879/17 879/19 880/3 882/10 906/7 906/11
933/6 936/4 947/11 960/22 960/24 965/21
969/14 971/16 973/24 978/14 979/5 979/5
979/19 979/19 979/20 979/21 980/9 989/8
993/12 993/12 1004/2 1005/16 1006/7 1006/7
1010/20 1029/15 1031/5 1031/13 1036/11
1036/23 1037/24 1037/25 1038/22 1041/10
1054/8
**underneath [2]** 855/18 892/23
**understand [47]** 832/6 832/9 836/1 843/11
849/14 850/11 852/24 854/23 856/17 859/24
865/19 865/20 869/6 875/22 877/21 881/11
881/20 883/8 886/5 888/6 895/5 902/1 905/2
906/8 909/19 909/20 914/25 918/17 919/1
920/12 931/25 934/18 934/23 941/15 947/8
949/10 959/25 963/24 964/23 968/16 994/15

## U

understand... [6] 1020/21 1021/2 1025/14
1024/13 1031/19 1034/25
understanding [16] 832/23 840/16 852/6
875/7 894/6 908/24 933/14 934/2 934/4 935/8
935/12 935/15 937/25 987/8 987/9 1046/8
understood [3] 831/13 992/17 1045/19
underwear [3] 978/11 978/15 1028/15
unethical [1] 831/2 831/23 980/17
unhandcuffed [2] 976/10 979/6
uniform [1] 838/4
unique [2] 987/22 987/24
unit [33] 824/21 827/12 827/14 827/19
827/21 827/23 827/24 827/25 828/1 828/8
828/9 828/10 834/15 834/20 835/1 836/12
836/15 836/19 836/23 836/25 837/15 838/6
841/21 842/21 844/11 851/20 855/17 953/21
965/18 965/20 996/5 1026/15 1046/19
Unit 3L15 [1] 827/23
Unit 4A14 [1] 827/21
UNITED [2] 816/3 1054/4
units [7] 827/17 828/11 828/16 862/24 899/17
922/11 923/9
unlawful [2] 831/1 831/22
unless [1] 1040/22
unlike [1] 994/19
Unlocked [1] 890/24
unmarked [1] 951/14
unsafe [1] 976/11
unsmeared [2] 958/22 958/24
until [12] 819/15 822/4 826/22 845/21 849/5
917/2 917/5 950/3 962/20 964/14 973/6
973/21
unusual [4] 835/17 835/18 932/5 932/7
UO [1] 855/3
up [75] 822/4 827/3 836/24 837/2 837/4
837/21 837/25 838/3 843/19 846/14 849/5
850/1 858/5 859/1 861/3 861/8 861/12 861/14
861/24 863/14 879/12 882/4 885/20 888/5
888/13 896/2 896/16 902/2 902/14 913/17
918/2 922/14 922/15 931/3 931/15 931/17
936/20 940/24 941/16 941/17 942/9 942/13
946/9 949/2 949/4 950/3 951/1 952/7 952/9
966/21 967/14 967/25 968/18 971/20 972/1
985/24 993/17 998/21 998/23 1001/6 1001/20
1001/23 1006/13 1015/21 1015/24 1016/20
1023/1 1026/23 1034/5 1035/11 1037/16
1044/18 1047/19 1048/24 1052/4
update [1] 1007/2
updated [3] 852/18 1007/1 1007/2
upon [23] 832/5 833/23 844/10 851/10 852/6
858/10 871/6 871/7 876/6 876/6 887/2 909/22
912/1 922/1 928/9 935/23 936/3 971/7 1021/4
1038/1 1048/14 1051/25 1054/13
upper [3] 977/9 1005/3 1010/6
upside [1] 941/17
urinate [1] 930/13
us [27] 817/13 822/5 822/9 834/3 845/13
849/11 856/7 863/20 874/8 903/22 917/14
928/9 937/8 943/16 971/18 975/3 979/14
995/7 996/5 997/14 997/24 999/7 1032/23
1036/23 1042/15 1046/5 1048/23
use [42] 826/5 826/13 826/17 826/19 826/23
862/2 889/8 889/10 893/17 895/22 895/22
912/15 913/14 929/7 930/7 937/11 937/15
941/19 951/17 951/24 955/21 955/13 957/21
969/3 977/19 979/13 987/13 997/4 1000/10
1000/15 1000/16 1000/18 1005/23 1022/20
1022/23 1023/2 1023/9 1049/6 1049/10
1049/10 1049/11 1052/9
used [23] 826/11 846/18 856/23 857/7 857/9
857/12 868/17 899/19 899/25 913/12 929/2

929/14 956/9 984/16 984/20 984/21 1000/16
1006/22 1012/5 1015/10 1021/11 1023/11
1023/12
using [10] 827/5 838/16 889/4 896/5 929/9
930/6 937/12 937/14 989/7 995/15 1015/8
1020/8
usually [6] 868/1 936/19 937/9 938/7 969/24
974/16
utilizes [1] 1021/3

## V

vacations [1] 1040/25
vague [13] 832/25 841/10 857/10 857/13
864/16 864/17 904/18 907/7 910/9 966/19
967/24 988/5 990/14
valid [2] 891/14 937/2
validity [1] 1054/12
van [45] 848/5 888/19 888/22 888/24 889/1
889/4 889/5 889/16 889/18 890/12 890/17
903/7 903/8 903/10 903/20 903/22 903/24
904/2 905/10 905/11 911/22 911/22 911/24
912/8 912/10 912/11 912/12 913/10 913/11
919/10 919/11 919/14 981/12 982/25 983/2
983/8 983/9 983/13 983/14 983/15 983/17
983/19 984/1 1023/25 1024/17
vans [3] 982/20 984/3 984/5 984/9
variables [1] 1026/23
variety [1] 1025/23
Vass [5] 1048/12 1048/13 1048/13 1050/11
1050/16
Vass' [1] 1051/21
vehicle [185] 819/2 819/16 819/23 819/23
820/16 822/19 826/5 826/6 826/24 826/25
827/3 834/4 834/9 834/15 834/17 834/20
834/21 834/23 835/1 835/2 835/3 835/12
835/15 836/16 836/17 836/20 842/11 842/18
842/19 843/4 843/10 843/12 845/14 845/16
845/18 846/24 847/2 848/13 849/22 853/6
853/8 858/20 860/8 862/15 862/17 863/2
870/4 870/11 870/24 870/25 871/1 871/3
871/6 871/24 871/25 872/1 872/3 872/4 872/7
872/8 872/9 872/14 872/15 872/17 873/8
873/11 873/20 873/22 874/9 874/10 874/13
874/14 874/17 874/20 874/22 875/7 875/8
875/9 875/10 875/24 876/6 876/7 876/8
876/16 876/17 879/2 881/13 882/12 883/7
883/22 884/4 884/6 884/8 884/14 885/15
885/19 885/21 885/23 887/1 887/7 887/7
887/10 887/12 888/17 888/24 889/1 891/1
891/9 894/1 894/22 894/23 895/19 895/23
896/1 896/6 896/10 897/17 899/4 899/10
899/12 899/13 899/14 903/10 903/11 903/12
903/13 903/14 903/24 907/2 907/25 908/3
908/11 908/13 909/8 912/14 912/22 913/5
916/7 917/12 917/13 917/17 917/19 917/20
922/2 922/8 922/9 922/10 922/14 924/22
925/13 929/15 929/17 930/13 933/18 934/22
935/3 935/25 936/5 940/12 940/15 940/20
951/16 951/23 952/12 952/17 953/2 953/15
953/17 953/20 953/21 953/23 954/23 955/15
955/16 958/7 958/8 963/12 963/13 965/16
965/22 967/6 967/10 970/13 970/14 974/14
vehicles [26] 822/12 822/16 843/15 862/22
862/22 862/24 863/1 899/8 899/15 900/3
900/4 900/6 913/7 940/19 951/13 951/14
951/21 951/24 954/24 955/20 957/24 958/6
982/20 984/10 997/7 997/12
verbiage [2] 929/10 969/3
verification [1] 965/16
very [32] 819/18 829/22 834/4 838/5 838/9
839/5 841/17 862/6 864/17 886/6 886/8
886/11 886/14 896/17 896/22 896/22 923/23
950/2 956/3 965/3 965/5 982/4 990/23 998/6

999/13 1000/7 1016/7 1016/17 1024/7 1035/8
1035/10 1050/14
via [2] 858/23 1002/23
vicinity [4] 822/13 846/16 849/4 942/10
view [7] 895/16 939/23 998/1 998/7 998/9
998/12 998/19
views [1] 893/12
vinyl [1] 983/10
violate [1] 989/19
violated [3] 831/22 928/17 928/20
violates [1] 989/15
violating [2] 927/3 988/14
violation [55] 818/16 819/2 819/4 819/15
832/8 864/12 870/4 870/10 870/11 870/25
871/1 871/3 872/1 872/4 872/7 872/9 872/15
872/17 872/22 872/24 872/24 873/1 873/7
873/12 874/2 874/4 874/5 874/7 874/11
874/12 874/13 874/17 875/8 875/10 876/14
880/5 882/22 883/4 883/5 883/12 883/22
884/5 884/6 884/8 887/19 909/11 921/17
926/9 926/18 964/1 964/16 992/14 992/19
1006/1 1008/13
violations [1] 882/10
violence [2] 909/15 909/23
violent [2] 909/25 979/21
vis [4] 1051/7 1051/7 1051/8 1051/8
Vis-a-vis [2] 1051/7 1051/8
Visa [2] 1029/5 1029/7
vision [1] 876/11
visited [1] 924/10
visual [1] 1044/2
void [1] 1054/13
VOL [5] 1053/5 1053/15 1053/15 1053/17
1053/17
Volume [1] 816/1
volunteer [1] 1039/22

## W

wages [2] 1039/4 1039/6
waistband [12] 1027/25 1028/12 1028/15
1028/18 1028/24 1043/12 1043/16 1043/17
1043/20 1043/22 1044/12 1044/13
wait [7] 826/22 842/10 848/10 897/9 945/19
945/19 1009/3
waiting [1] 922/11
waiving [1] 818/18
walk [1] 891/22
walked [2] 885/20 977/3
walkie [4] 902/10 902/12 902/13 902/19
walkie-talkie [4] 902/10 902/12 902/13
902/19
walking [2] 875/25 878/12
wall [2] 1042/18 1042/19
wallet [11] 919/18 919/19 919/21 919/25
920/4 920/7 981/2 994/2 994/5 1043/1 1043/1
want [49] 822/9 828/18 832/11 839/4 850/12
851/12 858/14 877/12 879/4 889/3 895/3
897/9 905/1 916/3 924/8 932/20 941/19
944/18 945/22 949/10 950/5 952/3 953/11
953/13 954/11 954/23 955/3 955/23 956/14
956/21 957/18 958/1 966/2 979/14 979/25
993/22 1018/9 1022/22 1024/13 1028/2
1036/1 1038/4 1046/3 1046/21 1046/24
1047/19 1049/11 1049/13 1049/25
wanted [5] 818/11 964/19 1036/2 1049/15
1049/23
wanting [1] 956/1
wants [4] 851/1 851/3 1048/22 1048/23
WARD [1] 816/19
warrant [65] 820/14 841/1 841/4 841/18
842/3 842/7 842/10 847/4 847/5 847/13
847/25 848/9 848/14 870/16 870/17 870/19
870/20 871/22 886/8 886/11 886/16 886/17

# W

warrant... [4] 891/12 901/19 908/5 960/7
906/8 906/15 906/16 908/14 908/22 908/25
909/2 910/3 911/1 917/10 917/15 917/16
918/8 918/12 935/22 935/25 936/1 936/2
936/2 936/6 936/11 936/15 936/20 936/20
936/24 937/1 937/3 937/9 937/12 960/21
964/21 965/1 965/6 965/8 979/21 979/22
979/24 1002/5 1003/1
warrants [3] 851/1 851/4 935/20
was [592]
wash [5] 903/5 918/24 918/24 919/2 920/3
wash-and-fold [5] 903/5 918/24 918/24 919/2
920/3
wasn't [29] 820/7 835/7 866/13 871/4 874/12
898/8 906/22 915/19 915/23 921/4 921/7
923/8 924/13 924/13 924/20 963/9 963/25
978/23 984/1 986/22 990/6 1014/17 1014/19
1014/22 1014/22 1021/17 1022/5 1032/6
1039/9
watch [1] 827/24
wave [1] 1026/17
way [61] 835/20 838/16 839/13 847/14
848/23 849/13 852/7 852/9 860/9 861/12
865/14 875/17 891/15 893/1 896/2 897/2
897/2 899/19 900/3 901/19 906/19 906/21
907/18 910/15 910/18 913/3 918/9 919/5
924/17 927/25 932/11 941/14 951/4 952/25
959/3 964/11 966/7 972/23 977/20
978/23 979/19 980/14 980/16 980/24 986/23
989/3 990/2 990/3 990/3 1011/20 1025/12
1026/13 1026/21 1026/24 1037/14 1038/16
1042/5 1042/8 1042/12 1047/4
we [284]
we'd [1] 874/9
we'll [15] 860/15 917/12 917/14 957/2 973/18
1034/20 1048/18 1048/19 1048/20 1049/24
1049/25 1051/21 1051/22 1052/3 1052/9
we're [28] 820/23 829/25 844/3 844/18 852/8
856/5 881/7 934/14 944/18 945/9 990/3
1005/11 1005/12 1007/12 1011/23 1016/19
1023/5 1032/22 1038/14 1038/15 1039/21
1040/17 1046/2 1046/4 1046/25 1047/1
1048/11 1048/12
we've [7] 892/5 956/1 975/20 987/6 1016/16
1016/20 1050/20
weapon [9] 908/8 910/7 910/14 948/5 978/11
979/12 979/13 1043/17 1043/18
weapons [3] 983/16 1043/15 1043/23
week [3] 1039/11 1041/3 1047/22
weekend [1] 1046/1
weeks [1] 1041/4
weigh [1] 893/4
weight [1] 1033/6
well [158] 829/22 829/24 830/5 832/11 834/9
836/8 837/21 838/1 841/7 841/15 841/17
841/19 842/23 843/23 844/17 845/12 845/23
846/25 847/19 847/20 849/11 853/12 853/21
854/18 858/5 858/16 859/7 860/17 863/10
863/13 866/6 866/7 868/9 868/18 869/7
869/20 869/20 869/22 871/21 872/2 873/1
873/8 874/7 876/10 877/12 877/21 878/25
879/18 881/7 881/11 882/4 883/7 883/9 886/6
886/13 886/15 887/22 888/7 889/18 890/2
891/22 893/12 894/6 895/10 895/24 896/1
898/16 898/18 898/19 898/25 899/17 900/20
904/13 906/7 906/11 907/17 908/13 908/18
910/1 912/1 912/15 912/21 913/6 915/22
916/19 919/3 919/13 920/25 924/6 924/12
926/20 928/16 928/25 931/9 932/15 942/24
942/2 942/17 943/22 947/16 951/21 952/12
953/16 956/18 956/20 956/25 960/2 960/5
962/12 963/9 965/18 967/6 967/17 968/11
969/10 969/24 970/13 972/18 973/21 976/7
982/2 980/1 983/20 985/7 986/1 988/25
990/6 992/24 995/14 997/14 1000/7 1000/23
1002/18 1004/23 1007/1 1009/1 1009/8
1012/17 1013/10 1016/18 1018/3 1021/16
1022/4 1023/5 1025/25 1026/10 1028/22
1031/19 1032/19 1033/11 1034/4 1036/7
1036/16 1037/18 1042/24 1046/6 1047/21
1051/11
went [39] 821/18 822/25 826/18 848/4 852/11
853/22 853/23 891/16 897/22 904/1 904/2
904/3 904/6 909/8 911/22 915/22 918/16
918/16 918/19 920/13 925/10 951/4 963/19
964/6 964/6 965/21 970/23 971/1 977/15
984/11 993/14 993/18 1002/15 1006/10
1015/17 1015/21 1021/10 1026/12 1029/1
were [242]
weren't [9] 865/2 869/1 915/20 915/20
915/21 918/5 1023/6 1033/1 1034/13
West [7] 852/23 866/23 875/14 888/5 894/14
916/15 980/25
what [254]
what's [18] 834/12 836/11 866/5 892/4
893/20 935/20 939/7 942/22 943/6 946/15
990/17 996/18 1002/14 1031/19 1039/3
1039/6 1040/16 1040/23
whatever [13] 838/1 864/6 875/10 884/5
924/9 935/2 967/7 979/5 979/14 983/15
1013/2 1013/24 1049/11
when [148] 821/3 826/9 826/14 829/25
840/19 840/22 842/23 842/24 843/6 843/13
843/14 843/16 845/13 845/16 845/21 845/25
846/6 846/24 847/9 847/13 847/16 847/17
847/18 848/2 848/7 849/16 850/7 852/19
852/21 853/1 855/21 860/7 864/19 865/4
865/5 866/3 866/10 866/17 867/18 867/24
869/7 869/13 872/2 872/22 875/13 876/5
885/16 885/22 886/24 889/1 891/8 891/11
894/20 899/11 899/15 901/5 903/7 903/10
903/23 905/8 905/14 905/21 906/24 907/5
907/20 907/25 910/4 911/8 911/18 915/9
915/14 918/16 918/16 918/19 919/10 920/12
921/21 921/22 922/16 924/22 925/5 925/19
925/19 928/25 934/10 937/19 938/5 942/14
946/9 946/16 946/18 947/23 949/15 950/1
951/4 957/4 960/18 960/21 960/24 962/4
962/7 962/10 963/10 963/19 964/8 964/10
971/2 971/21 977/17 979/23 981/10 982/24 983/17
984/24 986/23 987/2 988/17 990/11 991/16
991/20 996/3 997/10 998/24 999/4 999/11
1000/4 1000/7 1001/11 1001/17 1001/22
1002/2 1002/9 1005/5 1011/5 1014/2 1014/6
1018/6 1022/15 1022/22 1023/17 1023/19
1027/22 1029/1 1031/3 1036/21 1036/24
1036/25 1050/12 1052/3
whenever [1] 1012/11
where [113] 819/3 820/8 822/19 832/18
843/18 848/15 850/25 852/15 860/6 860/6
866/20 868/8 870/15 882/7 889/4 890/3
891/15 891/19 891/20 894/1 895/19 895/19
895/23 896/9 896/13 897/5 897/16 897/17
897/17 897/20 897/21 898/2 898/6 898/7
898/8 898/10 898/23 899/4 899/8 901/12
913/7 914/17 917/19 926/21 927/15 932/11
933/7 933/10 941/5 942/2 942/4 942/7 942/19
943/7 949/20 950/20 951/15 951/20 951/21
951/23 951/23 953/5 957/24 958/6 961/10
964/8 964/9 965/8 969/9 969/13 969/21
971/23 972/2 972/9 977/4 978/6 979/12 983/5
983/10 984/8 984/20 984/21 985/23 988/14
990/23 990/24 991/24 992/6 997/12 997/15
998/15 999/2 1002/12 1004/15 1006/15
1007/11 1007/17 1018/4 1018/6 1018/8
1018/10 1018/15 1023/22 1022/7 1024/16
1029/6 1033/15 1035/6 1036/10 1037/9
1043/10 1043/12 1051/2
whereas [1] 848/8
Whereupon [3] 892/3 958/12 1042/1
wherever [2] 969/17 983/15
whether [41] 854/11 854/18 863/7 870/3
879/25 888/4 888/4 888/5 888/7 891/10
895/15 900/14 900/17 907/15 919/25 920/2
920/6 929/1 931/16 931/21 933/7 933/11
933/11 935/3 935/19 935/21 936/10 941/8
948/4 950/5 960/5 1012/13 1019/19 1029/4
1030/20 1031/20 1033/9 1036/19 1043/5
1046/11 1051/24
which [70] 819/18 824/21 825/7 832/12
836/19 838/2 848/11 849/21 862/24 871/6
871/7 873/11 877/12 883/6 884/8 885/24
889/25 894/22 898/14 905/16 918/12 939/5
943/18 944/25 945/17 951/7 952/9 957/18
961/22 961/25 963/24 965/9 970/13 971/11
972/13 976/18 977/5 979/10 979/11 979/12
987/12 989/17 996/25 998/24 1001/8 1002/6
1002/19 1002/20 1002/23 1002/25 1005/5
1005/6 1014/8 1017/1 1024/23 1026/17
1026/23 1028/18 1031/12 1034/7 1034/15
1034/24 1043/23 1045/3 1046/21 1047/5
1047/12 1050/6 1050/9 1051/12
while [12] 834/2 852/22 885/20 891/17
891/20 929/14 929/17 929/17 957/7 973/12
985/3 1051/23
white [2] 900/3 900/4
who [78] 821/15 826/3 827/3 829/10 838/16
846/13 865/15 865/22 869/20 872/23 877/3
884/17 884/18 884/19 884/20 887/16 891/7
899/11 903/13 905/18 905/20 905/24 907/1
907/2 907/17 911/3 917/1 920/25 922/2
922/16 925/5 927/13 930/15 934/13 936/23
951/5 967/2 967/3 967/10 973/6 979/23
979/24 980/3 982/12 982/19 982/20 984/6
985/16 989/15 995/20 995/23 996/10 996/23
999/8 1003/19 1004/2 1004/5 1008/6 1008/7
1008/23 1009/21 1016/21 1017/15 1018/8
1022/19 1026/5 1029/21 1029/25 1031/2
1031/9 1034/21 1035/5 1035/10 1038/9
1045/16 1046/20 1050/7 1051/16
who'll [2] 869/9 869/9
who's [6] 869/14 986/8 1018/7 1020/22
1031/16 1046/12
whoever's [1] 846/7
whole [10] 832/15 844/3 846/19 847/23
856/23 927/25 928/18 965/19 988/18 1025/15
whom [4] 927/7 1048/8 1050/2 1051/25
whose [1] 824/2
why [52] 825/23 826/21 829/21 835/9
837/20 861/17 861/25 865/20 865/20 869/11
871/24 873/5 881/21 881/24 887/14 887/21
904/16 907/23 915/20 919/11 919/14 919/16
921/9 928/19 947/15 950/9 957/20 963/9
963/15 967/13 967/16 970/14 970/18 975/7
979/2 979/4 980/12 980/23 983/21 994/13
1006/13 1006/18 1006/20 1008/14 1008/16
1018/3 1022/6 1025/21 1027/5 1031/6
1047/25
wide [1] 977/7
wife [4] 822/10 850/9 919/8 1037/14
wife's [1] 1027/4
will [29] 818/8 891/23 895/5 936/1 936/3
937/6 942/15 945/17 954/25 956/4 957/3
958/13 973/25 1013/4 1018/11 1023/13
1036/11 1036/14 1043/10 1043/12 1046/6
1048/12 1048/13 1048/16 1050/2 1050/6
1050/12 1050/13 1050/16

Case 3:07-cv-04179-SI ... 07/50/10

## W

**Williams [2]** 1039/20 1045/23
**window [1]** 876/10
**windows [3]** 876/8 876/11 922/14
**winds [1]** 1044/17
**withdraw [1]** 921/20
**within [13]** 821/9 873/12 874/7 910/21
984/17 984/22 985/14 1012/5 1015/9 1016/21
1016/24 1030/17 1044/12
**without [16]** 818/18 825/17 825/21 829/11
829/11 842/13 863/8 870/20 873/23 931/22
942/9 975/8 1001/21 1002/5 1039/8 1045/10
**witness [15]** 818/4 861/1 890/5 892/16 892/17
917/1 944/11 957/25 974/4 986/6 989/7
1007/10 1019/13 1050/19 1050/21
**witness' [1]** 1050/25
**witnesses [17]** 818/15 917/2 973/6 1045/16
1047/22 1048/9 1048/15 1048/21 1050/7
1050/15 1050/17 1051/3 1051/6 1051/15
1051/16 1051/17 1053/5
**woman's [3]** 1029/2 1029/5 1029/8
**wonder [1]** 948/25
**word [6]** 882/13 920/20 947/8 987/10
1005/19 1040/23
**wording [1]** 986/24
**words [4]** 835/2 913/13 929/1 1033/24
**work [22]** 825/9 825/20 826/2 828/6 833/16
833/19 837/14 837/19 837/21 891/23 894/7
954/25 964/13 965/19 988/2 997/18 1016/1
1021/4 1035/16 1039/11 1039/16 1039/19
**worked [15]** 825/15 825/17 825/20 825/24
828/1 828/5 828/6 828/7 828/16 833/23 857/4
1035/13 1035/19 1039/23 1041/3
**working [13]** 825/12 827/25 827/25 847/7
966/13 967/2 978/3 985/6 985/14 1001/3
1026/22 1039/19 1049/24
**worth [1]** 1016/17
**would [245]**
**wouldn't [13]** 850/3 853/16 898/16 901/16
964/14 965/23 969/20 976/14 980/14 992/10
1007/1 1022/4 1027/5
**wrapping [1]** 966/21
**write [2]** 999/10 1003/10
**written [4]** 890/9 988/21 989/2 1011/6
**wrong [5]** 833/13 833/15 857/1 904/24
932/23
**wrote [5]** 839/16 998/23 1003/9 1003/10
1005/5

## Y

**YANCIE [1]** 816/12
**yea [1]** 1050/1
**yeah [35]** 861/24 882/6 886/13 890/10 893/18
901/24 914/5 931/6 941/17 945/4 946/9 947/5
950/16 955/3 955/11 955/13 960/9 961/4
961/5 991/13 994/1 1002/13 1010/19 1010/19
1015/7 1020/18 1022/13 1023/5 1024/3
1026/18 1028/11 1032/18 1037/3 1041/5
1041/5
**year [8]** 857/3 984/23 984/24 1015/9 1035/16
1037/17 1039/9 1041/4
**yearly [2]** 1035/22 1037/15
**years [16]** 856/22 856/24 867/14 984/17
985/14 996/17 1011/13 1012/5 1014/9
1014/12 1016/9 1021/12 1034/25 1034/25
1035/2 1035/19
**yellow [4]** 954/14 955/6 956/25 1049/10
**yes [345]**
**yesterday [12]** 819/1 819/19 819/24 820/22
866/18 915/3 986/20 1027/15 1029/11 1032/1
1032/3 1032/4
**yet [5]** 891/24 919/22 958/17 1004/11 1024/9

**you [1323]**
**you'd [7]** 885/1 888/23 903/8 919/23 986/24
1019/4 1040/11
**you'll [4]** 883/22 1009/18 1033/18 1052/8
**you're [62]** 824/10 837/2 846/6 853/1 856/25
857/24 858/17 860/14 866/19 869/19 873/17
875/20 888/4 888/5 888/10 894/13 894/15
914/10 927/10 933/24 935/3 939/13 947/17
953/10 965/22 972/12 973/3 973/3 973/24
979/19 979/19 979/20 979/21 986/17 989/6
989/17 990/11 992/2 996/12 998/15 998/16
998/18 998/19 1002/2 1012/25 1019/24
1019/25 1020/25 1022/10 1022/25 1026/22
1026/24 1036/17 1040/13 1041/2 1041/3
1045/25 1047/21 1047/22 1048/2 1048/9
1048/9
**you've [33]** 868/25 870/18 875/23 876/25
876/25 877/2 877/2 882/2 883/18 897/5
911/13 911/15 926/20 927/3 927/6 927/7
930/15 940/20 941/9 941/16 942/17 942/18
960/16 967/7 986/8 988/12 1017/20 1018/22
1023/11 1026/9 1035/18 1039/23 1039/23
**YOUNG [1]** 816/12
**your [349]**
**your Honor [155]** 818/2 818/10 818/21 827/8
829/14 830/3 831/4 831/6 831/8 834/6 834/10
834/13 834/16 834/18 834/22 834/24 835/4
835/5 835/13 835/16 835/18 835/21 836/13
836/18 845/1 845/15 845/22 846/4 846/9
846/23 847/11 847/19 847/24 848/18 851/15
855/11 856/8 857/13 857/22 857/25 858/4
858/11 858/19 858/22 858/25 859/3 862/3
872/5 872/10 872/18 872/21 873/3 873/10
873/15 873/25 874/3 874/6 874/11 874/21
874/24 875/1 875/4 881/8 881/15 882/8
882/25 883/3 883/16 883/20 883/24 901/1
902/6 902/17 903/2 908/23 909/1 909/10
912/17 913/3 913/9 913/15 916/9 916/12
916/16 917/3 917/9 929/3 929/6 929/9 931/12
943/21 944/10 944/13 948/13 948/15 948/21
949/3 956/24 957/9 961/2 961/13 961/16
964/18 967/9 967/15 968/15 968/24 969/16
969/19 969/22 970/1 972/11 972/16 972/22
973/8 973/11 973/14 973/19 973/23 976/21
977/2 985/5 985/25 986/4 995/4 996/20
1007/9 1007/16 1008/3 1008/5 1013/20
1014/16 1018/1 1019/3 1019/23 1020/6
1020/20 1032/16 1032/22 1033/7 1033/11
1035/25 1036/4 1038/6 1038/13 1038/20
1041/8 1044/16 1044/21 1045/7 1045/12
1045/17 1045/19 1050/5 1052/13
**yours [3]** 941/19 955/16 967/7
**yourself [4]** 920/10 922/4 942/4 948/5

## Z

**Zinn [3]** 817/13 1054/4 1054/17
**zipper [1]** 1043/12
**zone [5]** 942/12 952/22 952/24 952/25 952/25