Volume I

Pages 1 - 216

United States District Court

Northern District of California

Before The Honorable Marilyn Hall Patel

David Ward,                  )
                             )
          Plaintiff,         )
                             )
  vs.                        )          No. C07-4179 MHP
                             )
City of Oakland, et al.,     )
                             )          **Bench Trial**
          Defendant.         )
_____)

San Francisco, California
Tuesday, March 16, 2010

**Reporter's Transcript Of Proceedings**

**Appearances**:

For Plaintiff:          Law Offices of John L. Burris
                        Airport Corporate Center
                        7677 Oakport Street, Suite 1120
                        Oakland, California  94612
                   By:  **John L. Burris, Esquire**
                        **Ben Nisenbaum, Esquire**

                        Haddad & Sherwin
                        505 Seventeenth Street
                        Oakland, California  94612
                   By:  **Michael J. Haddad, Esquire**
                        **Julia Sherwin, Esquire**

(Appearances continued on next page.)

*Reported By:*          *Sahar McVickar, RPR, CSR No. 12963*
                        *Official Reporter, U.S. District Court*
                        *For the Northern District of California*

(Computerized Transcription By Eclipse)

**Appearances, (cont'd.)**

For Defendant:          **Law Office of Todd Boley**
                        476 Third Street
                        Oakland, California  94607
              By:  **Todd Boley, Esquire**

                        City of Oakland
                        Office of the City Attorney
                        1 Frank Ogawa Plaza, 6th Floor
                        Oakland, California  94612
              By:  **Arlene Rosen, Esquire**
                        **Deputy City Attorney**


                        ---oOo---

3

**I N D E X**

Page

**Opening Statements:**

Opening Statement by Ms. Sherwin                    5
Opening Statement by Mr. Boley                      6

**Plaintiff's Witnesses:**

**Vass, Richard**
**(Sworn/called as an adverse witness)**

Cross-Examination by Mr. Haddad                     9

**Defendant's Witnesses:**

None

---o0o---

```
1                      E X H I B I T S


2


3   Plaintiff's Exhibits:        W/Drawn          Iden.           Evid.

4   8                                                              128
    6B                                                             164
5   4642                                                           188

6


7


8


9


10  Defendant's Exhibits:        W/Drawn          Iden.           Evid.

11  None

12


13


14


15                          ---o0o---

16


17


18


19


20


21


22


23


24


25
```

1    **Tuesday**, **March 16, 2010**                    **10:00 A.M.**

2                        P R O C E E D I N G S

3            **THE COURT:**  You may proceed.

4                **OPENING STATEMENT BY MS. SHERWIN**

5            **MS. SHERWIN:**  Thank you, Your Honor.

6            In these three cases, Mr. Engram, Mr. Holmes and

7    Mr. Rix were all searched more than once by the defendant

8    officer, Richard Vass.  You will hear about six strip searches

9    of Mr. Holmes, a couple strip searches of Mr. Engram, and a

10   couple of strip searches of Mr. Rix.

11           Those strip searches were characterized, in general,

12   by Officer Vass unbuckling the men's pants, reaching --

13   frequently reaching his hand down into the space between their

14   jeans and their boxer shorts, running his hand up the crack of

15   their buttocks, often looking inside their underwear, sometimes

16   handling their genitals through their boxer shorts, sometimes

17   pulling their pants and underwear down far enough for their

18   private parts to be exposed in public.

19           Some of the strip searches were witnessed by other

20   people, including 90-year-old Johnnie Thornton, who was riding

21   by in his wheelchair and saw Mr. Engram being strip-searched,

22   decided it was none of his business, and went inside his house;

23   two independent witnesses who witnessed strip searches of

24   Mr. Holmes.

25           And then finally, on January 16th of 2007, Percy

**Opening Statement / Boley**

 1  Jones, witnessed Officer Vass strip-search Mr. Engram in

 2  public.  And he came up to Mark at that time and said, "I saw

 3  what happened to you; if you need a witness to stand up for

 4  you, I will do so."

 5          Prior to this time, Mr. Engram and his cousin,

 6  Michael Holmes, were very afraid of Officer Vass and did not

 7  want to come forward, but Mr. Jones' encouragement caused

 8  Mr. Engram to think, there is something I can do about this and

 9  to try to find some witnesses to these strip searches.

10          Both of these men, in fact, all three of them, were

11  strip searched in their neighborhood.  Michael Holmes and

12  Mr. Engram grew up in the house on 9504 C Street.  Their

13  grandmother and mothers have lived there since 1969.

14          Now, you will hear from not only the plaintiffs, but

15  also from Mr. Engram's mom, who will testify that Mark told her

16  about these improper strip searches long before this lawsuit

17  was filed and how it made him feel.

18          And given the time limitation, I'll just leave it at

19  that, and we'll get into the evidence, Your Honor.

20          **THE COURT:**  Thank you.

21          **OPENING STATEMENT BY MR. BOLEY**

22          **MR. BOLEY:**  Thank you, Your Honor.  The joint

23  pre-trial statement -- I mean, throughout the case, and as late

24  as the joint pre-trial statement, this case has been presented

25  as involving a claim of a series of discrete incidents.  The

1    first is an incident involving Mr. Engram, Michael Holmes, and

2    Richard Rix, that they contend that on September 22nd, 2005,

3    they were searched by Officer Vass.  Officer Vass worked on

4    street-level narcotics crime in the neighborhood; however, he

5    was not on duty on the date and time alleged by the plaintiffs.

6    He knows the three individuals, the three plaintiffs, but he

7    has never seen all three together.

8         Secondly, a few days after October 17th, 2005,

9    Richard Rix contends that Officer Vass searched him.  He claims

10   that Officer Vass checked his name for warrants.  Officer Vass

11   denies having any contact with Mr. Rix, as described by

12   Mr. Rix.  And there is no record of his name having been

13   checked for warrants on that date or within that time frame.

14        On July 19th, 2006, Officer Vass arrested Mr. Holmes

15   for possession of rock cocaine for sale.  The arrest took place

16   in a secluded backyard, where Officer Vass captured Mr. Holmes

17   after a brief foot chase over a high wooden fence.  Officer

18   Vass only searched Mr. Holmes' outer clothing at the time of

19   the arrest.

20        On February 20th, this is the fourth incident on

21   February 20th, 2007, Officer Vass stopped a vehicle driven by

22   Daniel Garibay in the 9400 block of International Boulevard.

23   Officer Vass was working with a federal narcotics

24   investigation.  Through a wiretap, he and other officers

25   learned that the person from the vehicle had just sold heroin

**Opening Statement / Boley**

1    to another individual.

2         Officer Vass conducted a stop for the purpose of

3    confirming the identity of the persons in the vehicle.  He

4    documented that Michael Holmes was a passenger in the car.  A

5    police sergeant who participated in the search searched

6    Mr. Holmes.  The officers did not want to interfere with the

7    ongoing investigation by arresting any of the occupants of the

8    car; the officers, therefore, only searched the occupants for

9    weapons.

10         Finally, Mr. Engram alleges that Officer Vass

11   strip-searched him at the corner of 98th and D Street on

12   January 16, 2007; Officer Vass was on another investigation at

13   the time of the alleged search.

14         These are the only incidents which form the basis of

15   the complaint.  Plaintiffs would like to expand this case by

16   litigating other searches involving other incidents than

17   alleged in the complaint.  This evidence, which is highly

18   contested, is not relevant to the issues before the Court.  The

19   defendants will be prejudiced if the Court permits plaintiffs

20   to introduce evidence on these incidents since the defendants

21   have organized their defense around the incidents alleged in

22   the complaint.  We therefore object to any evidence regarding

23   other alleged searches of the plaintiff or alleged searches of

24   other persons.

25         Thank you, Your Honor.

```
 1            THE COURT:  Thank you.

 2            And you are calling your first witness?

 3            MR. HADDAD:  Plaintiffs call Defendant Officer Vass.

 4            We are calling him, obviously, as an adverse

 5   witness, Your Honor.

 6            THE COURT:  Yes, I would assume so.

 7                        RICHARD VASS,

 8   called as an adverse witness for the Plaintiff, having been

 9   duly sworn, was examined and testified as follows:

10            THE CLERK:  Please state your full name and spell

11   your last name for the record.

12            THE WITNESS:  First name is Richard, R-i-c-h-a-r-d,

13   last is Vass, V-a-s-s.

14            THE COURT:  You may proceed.

15            MR. HADDAD:  Thank you.

16                     CROSS-EXAMINATION

17   BY MR. HADDAD:

18   Q.  Good morning, Officer.

19   A.  Good morning, sir.

20   Q.  I believe we've only met once before at your deposition; is

21   that right?

22   A.  That's one time we have met, I've seen you around, but yes,

23   one time we've met.

24   Q.  Ready to go?

25   A.  Sure.
```

**Vass - Cross / Haddad**

1   *Q.*  Okay.

2         How long have you been employed with the Oakland

3   Police Department?

4   *A.*  I've been employed for ten years.

5   *Q.*  Okay.

6   *A.*  But as a police officer, it will be ten years in September.

7   *Q.*  And the extra length of time that you are implying there

8   would be when you attended the academy; is that right?

9   *A.*  Yes, sir.

10  *Q.*  You went to a POST certified academy in 2000?

11  *A.*  Yes.

12  *Q.*  And by now, I take it that you have testified in court

13  hundreds of times?

14  *A.*  Yes, sir.

15  *Q.*  You received training about court testimony?

16  *A.*  Yes.

17  *Q.*  What have you been trained about?

18          *MR. BOLEY:*  Objection.  Vague, Your Honor.

19          *THE COURT:*  Objection is sustained.  Objection is

20  sustained.

21          *MR. HADDAD:*  That's fine.

22  *BY MR. HADDAD:*

23  *Q.*  Have you had a chance to review your deposition in this

24  case?

25  *A.*  I have.

**Vass - Cross / Haddad**

1    **Q.**  Have you had a chance to review any other records or

2    documentation in anticipation of trial?

3    **A.**  Sure.

4    **Q.**  What else have you reviewed?

5    **A.**  Other police reports.  I've tried to look for items -- I'm

6    not even sure the proper term, but to try to find other field

7    contact reports, or so forth, of when I've contacted, you know,

8    contacted these individuals.

9    **Q.**  Okay.

10          Have you found any other field contact cards?

11          **MR. BOLEY:**  Objection.  Vague.  Other than what?

12   **BY MR. HADDAD:**

13   **Q.**  Other than what we knew about at the time of your

14   deposition and asked you about.

15          **MR. BOLEY:**  Objection.  Relevance.  And calls for

16   speculation.

17          **THE COURT:**  Objection overruled.

18          You may answer.

19          **THE WITNESS:**  Not -- no, not really.  But just to

20   further, you know, I know I mentioned also that I read the

21   point of view, I think when you deposed me.  At the same time,

22   I have read, of course, the point of view again.

23   **BY MR. HADDAD:**

24   **Q.**  You said the "point of view"?

25   **A.**  Oh, right.  It's the DA literature.  I know we discussed it

**Vass - Cross / Haddad**

1  in the deposition.

2  *Q.*  All right.

3        **THE COURT:**  Is that a publication put out by the

4  District Attorney's Association?

5        **THE WITNESS:**  I believe it is.

6  *BY MR. HADDAD:*

7  *Q.*  Now, would you briefly take us through your different

8  assignments with the Oakland Police Department, please.

9  *A.*  Sure.

10        I was -- as a patrol officer, part of it, of course,

11  was the field training, field training time.  But I was a

12  patrol officer in the area of Fruitvale, Lake Merritt area for

13  my first probably two years, maybe a tad less.

14        From there, I then went to Crime Reduction Team 6,

15  which is out of East Oakland, generally from 82nd Avenue to the

16  border of the City of San Leandro, and did most of my time in

17  that.

18        I think I did -- I left that somewhere -- I think in

19  '08, maybe, as to which time I then somewhat did -- I was a

20  field training officer, assigned as a field training officer.

21        And from there, I went to Criminal Investigations

22  divisions, where I was an assault investigator.  I pretty much

23  did that until almost the present.

24  *Q.*  Where are you assigned now?

25  *A.*  Somewhat in limbo, if you will.  Still Criminal

**Vass - Cross / Haddad**

1   Investigations division, but I'm back on somewhat loan, if you

2   will, to the DEA starting yesterday.

3   *Q.*   To the DEA?

4   *A.*   Starting yesterday.

5   *Q.*   All right.

6          When you were an assault investigator for the

7   Criminal Investigations sections -- section, what kind of

8   assaults did you investigate?

9   *A.*   Pretty much everything.

10  *Q.*   Okay, including sexual assaults?

11  *A.*   I'm sorry, no.  It was assault from just a simple battery

12  of a person, let's say punching somebody, or so forth, all the

13  way to a person being shot or stabbed.

14  *Q.*   All right.

15  *A.*   And basically, of course, if a person died, or whatever,

16  the homicide unit did that.

17  *Q.*   You mentioned that you were assigned as a field training

18  officer in 2008, what does that entail?

19  *A.*   Um --

20          *MR. BOLEY:*   Objection.  Relevance.

21          *THE COURT:*   Objection overruled.

22          You may answer.

23          *THE WITNESS:*   Basically involved additional training

24  to train another person that is getting released out of the

25  academy on what it's like to be -- as a police officer going

**Vass - Cross / Haddad**

1  through, there is a book that you have with daily activities to

2  try to get them to know, just because some of these people have

3  never made, let's say a vehicle stop, and so forth.  So you are

4  giving them firsthand knowledge of what it's like.

5  *BY MR. HADDAD:*

6  *Q.*  So as a field training officer, your Police Department has

7  entrusted you to train the next generation of patrol officers;

8  is that right?

9  *A.*  That would be true.

10  *Q.*  Now, you were assigned to Team 6 on East Oakland beat from

11  about 2002 to 2008; is that right?

12  *A.*  I would say everything, but not so much when you say a

13  "beat."  I was more assigned to an area.

14  *Q.*  Okay.

15         What was the area that you worked between 2004 and

16  2007?

17  *A.*  Same area.

18  *Q.*  Can you describe the boundaries of that area, please.

19  *A.*  Sure.  82nd Avenue to the City of San Leandro would be

20  Oakland's east and west boundaries.  And when I say Oakland,

21  that is not true to a map, but that is -- the cities refer to

22  east and west.

23         And then so the north and south division would be,

24  of course, the hills, and south would be, let's say, the water,

25  if you will.

**Vass - Cross / Haddad**

 1   Q.  All right.

 2           Now, between 2004 and 2007, I want to ask you if the

 3   area that you worked included the following specific areas

 4   where it has been alleged that you have done strip searches on

 5   people in the field.

 6           First of all, during that period of time --

 7           *MR. BOLEY:*  I'm going to move to strike the

 8   reference to searches and the allegations.

 9           *THE COURT:*  Just ask the question about the

10   location.

11   *BY MR. HADDAD:*

12   Q.  During that period of time, did -- were you assigned to an

13   area that included C Street and 98th?

14   A.  Yes.

15   Q.  Did your area of work also include International and 103rd

16   Avenue?

17   A.  Yes, they did.

18   Q.  Did the area of your work include MacArthur and 109th

19   Avenue?

20   A.  Yes.

21   Q.  Did the area of your work include International Boulevard

22   and -- excuse me, International Boulevard and 94th Avenue?

23   A.  Yes.

24   Q.  Did the area of your work include 9504 C Street?

25   A.  Yes.

**Vass - Cross / Haddad**

 1   *Q.*  Did the area of your work include 107th Avenue and Pontiac?

 2   *A.*  Yes, it did.

 3   *Q.*  Did the area of your work include 98th Avenue and E Street?

 4   *A.*  Yes.

 5   *Q.*  Did the area of your work include C Street and 92nd Avenue?

 6   *A.*  Yes, it did.

 7   *Q.*  Did the area of your work include B Street and 98th Avenue?

 8   *A.*  Confirm you said B, as in boy?

 9   *Q.*  Yes.

10   *A.*  Yes.

11   *Q.*  Did the area of your work include 9409 C Street?

12   *A.*  Yes.

13   *Q.*  Did the area of your work include 87th Avenue and Birch

14   Street?

15   *A.*  Yes.

16   *Q.*  And did your patrol duties typically regularly take you to

17   the North County Jail, as well?

18        *MR. BOLEY:*  Objection as to the term "patrol."

19        *MR. HADDAD:*  Strike that.

20   *BY MR. HADDAD:*

21   *Q.*  As a patrol officer between 2004 and 2007, on occasion did

22   you go to the North County Jail in the course of your job?

23   *A.*  Um, if I can just interject?  Just the word patrol officer,

24   assuming I'm somewhat more tied to patrol, not so much the

25   case.  But I did go to North County, if that's your answer.

**Vass - Cross / Haddad**

1   *Q.*   Okay.

2   *A.*   As well as Santa Rita Jail.

3   *Q.*   Okay.

4        Did the area of your work also include Elmhurst and

5   D Street?

6   *A.*   Yes, it did.

7   *Q.*   Now, were you a patrol officer, or were you not a patrol

8   officer, during -- between 2004 and 2007?

9   *A.*   Um, you know, it's kind of -- I don't want to say a loose

10  term, but not so much.

11  *Q.*   Okay.

12       So specifically, what did your job require you to do

13  during that period?

14  *A.*   You said '04 to '07?

15  *Q.*   '04 to '07.

16  *A.*   Um, well, I pretty much wasn't in patrol.  I was assigned

17  to a special unit, or a preferred unit, if you will, to CRT6,

18  which is primary objectives were violence as well as -- you

19  know, stopping the violence, of course, as well as narcotic

20  activity.  And they seemed like, honestly, they just kind of

21  overlapped.

22  *Q.*   So, in this special unit you were assigned to, how did that

23  differ than a normal patrol officer duty?

24  *A.*   Um, in general, we were not tied to the radio, meaning that

25  we didn't have a general line-up with the rest of patrol.

**Vass - Cross / Haddad**

1  We -- unless -- depending upon the call.  But generally, a

2  dispatcher comes on, and there is a crime that happens on,

3  let's say, a beat, dispatcher get on and sends a unit over to

4  this crime.  Could be a domestic violence call, or whatever,

5  and that patrol officer would respond to that.

6        We really didn't so much respond by dispatchers,

7  because what we were responsible for is generally meeting with

8  homicide, being in touch with the homicide investigators,

9  discussing what was going on in their cases.  And they would

10  ask, say, there was a homicide, in a general spot.  They would

11  request, hey, can you guys find some witnesses over there,

12  maybe do some surveillance over there?

13        A lot of times we would set up a surveillance spot,

14  which was generally high activity going on.  We would arrest,

15  generally, let's say a seller, maybe a buyer or two.  Maybe

16  homicide would or would not want to interview them.  That was,

17  of course, a big part of what we were doing.

18        The other role, also, was just general narcotic

19  activity, as well, doing, let's say, a buy/bust operation where

20  you have undercover officers go out, buy drugs from a drug

21  dealer; we would then, of course, arrest the drug dealer that

22  sold drugs to the undercover officer.

23        We also did surveillance operations, maybe, for

24  instance, for me would do a surveillance.  I would be

25  undercover at the time, observe the drug transactions, and just

**Vass - Cross / Haddad**

1    general talking and getting to know the people that were

2    actually out there selling drugs by our being out in the area.

3    *Q.*  Okay.

4              So as a member of that team, were you given more --

5    strike that.

6              As a member of that team, were you given more

7    discretion than a normal patrol officer about how you would

8    spend your day?

9              *MR. BOLEY:*  Objection.  Vague and calls for

10   speculation.

11             *THE COURT:*  Objection is overruled.

12             You may answer.

13             *THE WITNESS:*  I'm not sure when you say -- I mean, I

14   don't know, when you say discretion, I mean, a supervisor would

15   have a general idea of what was going on, and so forth.  I'm

16   not sure if that would be considered part of the discretion

17   part.

18   *BY MR. HADDAD:*

19   *Q.*  Rather than being dispatched to particular incidents, you

20   or you and your partner would use your judgment about where you

21   would go in the area that you worked; is that right?

22   *A.*  Um, for the most part, yes, but, at the same time, it would

23   also depend upon -- you know, they had a lot of other

24   operations that we were constantly doing, so what other

25   operations were going on at that time, and maybe if a murder

**Vass - Cross / Haddad**

```
 1   happened, or whatever, we would then generally be tied to
 2   assisting with that as opposed to -- we sometimes we didn't --
 3   Q.  If there wasn't a particular job that you were assigned to
 4   at any given time, you were allowed to use your discretion to
 5   decide where you would take your patrol car and do your work in
 6   East Oakland; is that right?
 7   A.  I would say generally, yes.
 8   Q.  Okay.
 9           Now, how many other members were on your team?
10   A.  Pretty much stayed with six for -- six police officers.
11   There was a time I think we were up to eight for a while, but
12   generally always gravitated back to six.
13   Q.  Did the same team remain relatively constant between 2004
14   and 2007?
15   A.  No.
16   Q.  Did you communicate with members of your team by cell
17   phone?
18   A.  Yes.
19   Q.  And that was when you were on the job patrolling; is that
20   right?
21   A.  You said patrolling, and I'm just trying to get --
22   Q.  Driving around in East Oakland in your patrol cars.
23   A.  Um-hmm.
24   Q.  Yes?
25   A.  Is your question, did I use my cell phone to talk to other
```

**Vass - Cross / Haddad**

1  members of the team during that time period?

2  *Q.*  Yes.

3  *A.*  Occasionally, yes.

4  *Q.*  Sometimes you used the radio and sometimes you used your

5  cell phones, is that it?  Yes?

6  *A.*  Sure.

7  *Q.*  Now, when you spoke with other officers from your team by

8  cell phone, that typically would be a conversation that the

9  Police Department did not record; is that right?

10            *MR. BOLEY:*  Objection.  Calls for speculation.

11            *THE COURT:*  Objection overruled.

12            You may testify, if you know.

13            *THE WITNESS:*  I would imagine they did not record

14  it.

15  *BY MR. HADDAD:*

16  *Q.*  It was your understanding that they did not record cell

17  phone conversations, correct?

18  *A.*  That's true.

19  *Q.*  But they did record radio transmissions, right?

20  *A.*  They did.

21  *Q.*  And when you spoke on a cell phone to other team members,

22  you understood that those conversations did not trigger written

23  entries in the computer-aided dispatch system, correct?

24            *MR. BOLEY:*  Objection.  Calls for speculation.

25  Lacks foundation.

**Vass - Cross / Haddad**

1           **THE COURT:**  Objection overruled.

2                On this line of questioning, I'm going to ask you to

3    answer based upon your understanding; in other words, did you

4    understand the cell phone conversations were recorded, or other

5    kinds of records that is being referred to, okay?

6                So would you repeat the question so it's clear.

7    **BY MR. HADDAD:**

8    **Q.**  You know what computer-assisted dispatch is, right?

9    **A.**  I do.

10   **Q.**  And you understand that a CAD log is produced from radio

11   transmissions and radio purges, right?

12   **A.**  I know some things are produced.  To go in the exact

13   definition of a CAD purge and all that, that is not my

14   specialty.  I do know things are documented.

15   **Q.**  We are going to look at some later.

16                You have seen CAD purges before, right?

17   **A.**  Yes.

18   **Q.**  And it's true, isn't it, officer, that cell phone

19   communications do not end up on a CAD purge, generally?

20   **A.**  Using the term, 'generally," to my knowledge, cell phones

21   are not -- are not in CAD data.  It would be just the same as

22   me using my cell phone during the course of business or not

23   during the course of business, you know, same expectation of

24   privacy is there.

25   **Q.**  Okay.  So the CAD system -- strike that.

**Vass - Cross / Haddad**

1          The CAD system is designed to record search

2   information about radio transmissions?

3          **MR. BOLEY:**  Objection.  Calls for speculation.

4   *BY MR. HADDAD:*

5   *Q.*  To the best of your knowledge, isn't that true?

6          **THE COURT:**  Objection is -- you may answer the

7   question.

8   *BY MR. HADDAD:*

9   *Q.*  To the best of your knowledge, the CAD system that your

10  department uses only records certain information about radio

11  transmissions; is that right?

12  *A.*  Sounds fairly accurate.

13  *Q.*  Now, in the course of -- strike that.

14          As a member of this Team 6, what kind of clothes did

15  you typically wear?

16  *A.*  It was like a BDU style uniform, blue in color.

17  *Q.*  BDU?

18  *A.*  Um-hmm.

19  *Q.*  For the Court, can you please describe what that is?

20  *A.*  Um, it's not made out of wool, which a typical police

21  uniform is.  It's actually maybe a nylon kind of looking

22  uniform.  It has an Oakland patch on one side and still -- as

23  opposed to a normal badge that you would pin on.  It would be a

24  sewn-on badge.  And then just additional pockets, and so forth.

25  *Q.*  Why were you assigned to wear the BD uniform rather than

**Vass - Cross / Haddad**

1    that typical formal uniform?

2            *MR. BOLEY:*  Objection.  Calls for speculation.

3            *THE COURT:*  You may testify, if you know.

4            *THE WITNESS:*  I would say part of the reason why --

5    one of the reasons we were able to wear it was due to we were

6    doing more search warrants.  Searching just requires mainly

7    more just searches, in general, search warrants, searching in

8    vehicles.  Uniform was getting dirtier more often, so you could

9    actually just wash this in the washer.

10   *BY MR. HADDAD:*

11   *Q.*  That BDU-type uniform you are describing is the uniform

12   typically used by members of the SWAT team, for instance; is

13   that right?

14           *MR. BOLEY:*  Objection.  Calls for speculation.

15           *THE COURT:*  Objection overruled.

16           *MR. BOLEY:*  Relevance, too, Your Honor.

17           *THE COURT:*  Overruled.

18           *THE WITNESS:*  Well, it's not quite the same, if

19   that's what you are asking.

20   *BY MR. HADDAD:*

21   *Q.*  They wear BDU uniforms too, don't they?

22   *A.*  Under the general umbrella, yes, they wear them.  But

23   different colors, different markings.

24           *THE COURT:*  And BDU stands for?

25           *THE WITNESS:*  I knew you would ask.

**Vass - Cross / Haddad**

```
 1              I have no idea, honestly.

 2              THE COURT:  Just called BDU?

 3              THE WITNESS:  Yeah, just a technical term.  I don't

 4    know.

 5              THE COURT:  Okay.

 6              THE WITNESS:  I'm sure it's somewhat of a military

 7    kind of background.  I think they are acronyms.  I'm not sure.

 8    BY MR. HADDAD:

 9    Q.  Were part of your duties as a member of Team 6 to do parole

10    and probation searches of people?

11    A.  Yes.

12    Q.  And if you didn't know whether or not a person was on

13    probation or parole, were you allowed to stop them without

14    cause to search them?

15    A.  No.

16    Q.  If you did know a person was on probation and parole, were

17    you allowed to stop them without cause and search them?

18    A.  Yes.

19                     (Cell phone rings.)

20              THE WITNESS:  I'll turn it off.  Sorry.  I actually

21    turned it off, this morning; not sure, really, what happened.

22    BY MR. HADDAD:

23    Q.  Now, as to the previous question I asked you, when a person

24    is not -- strike that.

25              When you don't know whether a person is on probation
```

**Vass - Cross / Haddad**

1   and parole, in your training and experience have you ever

2   learned why you are not allowed to stop them without cause to

3   search them?

4   **A.**   Sorry, give me one second.  I'm going to pull the battery

5   out because I'm not sure what's going on.

6          Sorry about that.

7   **Q.**   Ready?

8   **A.**   What was the question, though?

9   **Q.**   In your training and experience, do you have an

10  understanding as to why you are not allowed to stop a person

11  who you don't know is on probation and parole without cause?

12  **A.**   Just -- I'm sorry, I'm just not catching the question.  Can

13  you please repeat it?

14  **Q.**   Based on your training and experience, do you have any

15  understanding about why you are not allowed to stop without

16  cause a person who you don't know is on probation and parole?

17  **A.**   I'm just not catching the question.

18         Can you explain it maybe different?

19  **Q.**   Okay.

20         You just explained that you knew that if you were

21  not aware a person was on probation or parole --

22  **A.**   Um-hmm.

23  **Q.**   -- then you were not allowed to stop them without cause to

24  search them?

25  **A.**   That's true.

**Vass - Cross / Haddad**

1   **Q.**  Why?

2   **A.**  Well, you said without cause; I mean, it's generally --

3   just to give an explanation, can't just drive up to a person

4   and search a person without cause.

5   **Q.**  Okay.

6            Even if the person happens to be on parole if you

7   don't know they are on parole when you stop them, then it's not

8   proper to stop them; isn't that right?

9   **A.**  Well, you are saying stop versus search, you can talk --

10  you know, whoever you would like, but as far as going -- if a

11  person is not on parole, can you search them -- if you know

12  they are on parole, can you search them?  The answer is no.

13  **Q.**  Okay, let me go a different way.

14           If a person is on parole but you don't know it, you

15  are not allowed to search them without cause; isn't that right?

16  **A.**  I would say without -- you can't do it without cause.  And

17  I'm assuming if there is a consent issue as well, if they don't

18  consent, that would be true.

19  **Q.**  And you knew that before 2004, didn't you?

20  **A.**  Absolutely.

21  **Q.**  Okay.

22           Now, have you had training about strip searches?

23  **A.**  I have.

24  **Q.**  And you received training about strip searches at the POST

25  certified academy that you attended; is that right?

**Vass - Cross / Haddad**

1   *A.*  You know, I wouldn't -- I would be speculating.  I'm sure I

2   did; unfortunately, I can't necessarily say that, you know, I

3   definitely recall that particular block or not.  But I'm sure I

4   did.

5   *Q.*  All right.

6        You do recall being trained about strip searches by

7   your department; isn't that right?

8   *A.*  I do.

9   *Q.*  You do?  In fact, you recall being trained in 2004 by

10  Deputy Chief Israel himself about the revised strip search

11  policy?

12  *A.*  Not deputy chief at that time, but yes.

13  *Q.*  He had a different rank, but it was Jeffrey Israel,

14  correct?

15  *A.*  Yes, it was.

16  *Q.*  Who is now deputy chief, correct?

17  *A.*  Yes.

18  *Q.*  And you understood that you have always been required to

19  follow all the policies and procedures of the Oakland Police

20  Department; is that right?

21  *A.*  Yes.

22  *Q.*  As long as you are a member of the department, it's your

23  duty to know those policies and follow them, correct?

24  *A.*  I would say definitely to the best of my ability,

25  absolutely.

**Vass - Cross / Haddad**

1  *Q.*  All right, well, there is a specific order that requires

2  you to know them and follow them; isn't that true?

3  *A.*  I would say I imagine there is, yes.

4  *Q.*  Okay.

5          I'm going to ask you about Exhibit 15.  And I'll

6  bring it up for your review.

7  *A.*  Okay.

8  *Q.*  Is it in front of you now?

9  *A.*  Yes.

10  *Q.*  I've turned it to the second page for you.

11          First of all, do you recognize this page, which says

12  Manual of Rules, 1998, at the very upper left-hand corner?

13  *A.*  I'm sure I read it a long time ago.  I don't honestly have

14  a recollection, but I'm sure I've read it or perused it.

15  *Q.*  Do you see section 314.36, "Knowledge of Laws and

16  Regulations"?

17  *A.*  Yes.

18  *Q.*  Do you see that?

19  *A.*  Yes, I do.

20  *Q.*  And you see where it says, "every member is required to

21  establish and maintain a working knowledge of all laws and

22  ordinances enforced in the City"; do you see that?

23  *A.*  I do.

24  *Q.*  Further, "every member and employee is required to

25  establish and maintain a working knowledge of the rules and

**Vass - Cross / Haddad**

1  policies of the department and all general and special orders

2  of the department or appropriate division thereof"; do you see

3  that?

4  *A.*  I do.

5  *Q.*  "In the event of improper action or breach of discipline,

6  it will be presumed that the member or employee was familiar

7  with the law, rule or policy in question."

8           Do you see that?

9  *A.*  I do.

10  *Q.*  So this is a rule of your Police Department; is that right?

11  *A.*  That is.

12  *Q.*  And you understood that as long as you've been a member of

13  the department; is that right?

14  *A.*  That is true.

15  *Q.*  And you are bound by this rule as well; is that right?

16  *A.*  True.

17           *MR. HADDAD:*  Your Honor, this exhibit is already in

18  evidence, but I just was wondering; do you want us to move for

19  the admission of things that have already been entered in

20  evidence in this new phase?

21           *THE COURT:*  If they've already been admitted, no.

22  But I would suggest that you check with Mr. Bowser to make sure

23  that he shows they are admitted.

24           *MR. HADDAD:*  Okay.

25           *THE COURT:*  Is 16 admitted?

**Vass - Cross / Haddad**

1          **MR. HADDAD:**  This is 15.

2          **THE COURT:**  Excuse me.

3          **MR. BOLEY:**  Your Honor, with regard to our

4    understanding, we had moved for separate trials, and we

5    understood that this is a separate trial, and that the evidence

6    on this issue, i.e., the liability of Officer Vass, will be

7    based on the evidence that is presented during this portion of

8    the trial.

9          **THE COURT:**  Well, yes.  And then there would be no

10   evidence in the other trial unless similar evidence were

11   introduced that that officer was familiar with this document,

12   okay?

13         **MR. BOLEY:**  And for convenience, I don't have any

14   problem referring to the exhibit, but I just want to be clear

15   that the evidence -- that the liability of each officer is

16   based on the evidence produced at the time of --

17         **THE COURT:**  Yes, yes.

18         **MR. BOLEY:**  -- of their trial.

19         **THE COURT:**  Okay, yes, certainly.

20   **BY MR. HADDAD:**

21   **Q.**  Now, take a look at Exhibit 14, if you will.  It's the

22   previous one in that book.

23   **A.**  I'm there.

24   **Q.**  You've seen this before, haven't you?

25   **A.**  Yes, I have.

**Vass - Cross / Haddad**

1  **Q.**  What is that?

2  **A.**  It was the training bulletin for searching of persons,

3  when -- which also fell under the strip search policy, which

4  was dated 27 May '04.

5  **Q.**  Okay.  So this --

6            **MR. BOLEY:**  Sorry, Counsel, what number is that?

7            **MR. HADDAD:**  Fourteen.

8            **MR. BOLEY:**  All right.

9  **BY MR. HADDAD:**

10  **Q.**  So Exhibit 14 is the revised strip search policy that now

11  Deputy Chief Israel trained you on; is that right?

12  **A.**  Well, you say "now"; at that time trained me on, correct?

13  **Q.**  Yes.

14  **A.**  Yes.

15  **Q.**  What was his rank then, captain?

16  **A.**  I believe so.  Not a hundred percent, but I believe so.

17  **Q.**  All right.

18            Shall we refer to him as Captain Israel when we are

19  talking about him in 2004?

20  **A.**  No, no, deputy chief is fine.  Just so we were on the same

21  page, I just want to verify that.

22            **THE COURT:**  And this particular document is dated

23  May 27, '04?

24            **MR. HADDAD:**  Yes.

25            For the record, this has already been moved into

**Vass - Cross / Haddad**

1    evidence.

2            *THE COURT:*  I believe that's correct.

3            *THE CLERK:*  Yes.

4    *BY MR. HADDAD:*

5    *Q.*  Now, this 2004 policy governed any strip search that you

6    might want to perform after May 27, 2004; is that right?

7    *A.*  It did.

8    *Q.*  And this policy also defined what a strip search was, do

9    you recall that?

10   *A.*  Yes, it does.

11   *Q.*  All right.

12           Now, based on your training and experience in the

13   field, how does your department define strip search?

14   *A.*  Um, did you want me to read this; is that what you are

15   asking?

16   *Q.*  No, I would like you to tell me what you can remember from

17   your training and experience, please.

18   *A.*  I would say from this particular training day, it was

19   rearranging of the clothing to observe underwear or, let's say,

20   private parts of a person.

21   *Q.*  And based on the other training that you've received

22   throughout your career with the Oakland Police Department, is

23   that definition, to your knowledge, consistent with the laws

24   concerning strip searches?

25           *MR. BOLEY:*  Objection.  Calls for a legal

**Vass - Cross / Haddad**

```
1   conclusion.

2              THE COURT:  Well, it's his understanding.

3              And the objection is overruled.

4              You may answer.

5              THE WITNESS:  Repeat the question, then, for me.

6   BY MR. HADDAD:

7   Q.  Yep.

8              Based on your training and experience with the

9   Oakland Police Department, is the definition of strip search

10  that you just gave consistent with the law concerning strip

11  searches, as far as you know?

12  A.  Um, I really don't know.  I mean, I don't know.

13  Q.  Okay.

14             Now, do you agree that as a police officer you are

15  always required to follow the law; is that right?

16  A.  That's true.

17  Q.  And there are certain duties that you have as a police

18  officer that you need to perform lawfully; is that right?

19  A.  True.

20  Q.  In fact, all of your duties, right?

21  A.  That's true.

22  Q.  Okay.

23             And in order to perform your duties lawfully, you

24  need to know what that law allows and doesn't allow; isn't that

25  right?
```

**Vass - Cross / Haddad**

1    **A.**   Yes.

2    **Q.**   Strip searches in the field are one of the things that your

3    department authorizes you to do, correct?

4    **A.**   That's true.

5    **Q.**   And in order to perform your job lawfully, to the extent

6    you do a strip search, you need to know what the law allows and

7    doesn't allow, correct?

8    **A.**   Yes.

9    **Q.**   And it's your duty to know that, isn't it?

10   **A.**   I would imagine it is my duty, but it's also the training

11   that I get from the department that goes along with that.

12   **Q.**   All right.

13        Would you agree that a reasonable officer would

14   inform him or herself about to what extent the law allows or

15   does not allow a strip search in any given situation?

16        **MR. BOLEY:**   Objection.  Calls for a legal

17   conclusion.

18        **THE COURT:**   Objection overruled.

19        **THE WITNESS:**   I would probably research it to the

20   best of my ability.

21   **BY MR. HADDAD:**

22   **Q.**   And you think that would be what a reasonable officer would

23   do?

24        **MR. BOLEY:**   Objection.  That does call for a --

25        **MR. HADDAD:**   I'll rephrase that.

```
 1              MR. BOLEY:  -- a legal conclusion.

 2              THE COURT:  Yes.

 3   BY MR. HADDAD:

 4   Q.  Why don't you turn to page 6 of Exhibit 14, please.

 5              MR. BOLEY:  Sorry, what exhibit?

 6              MR. HADDAD:  Fourteen.

 7   BY MR. HADDAD:

 8   Q.  Do you see that?

 9   A.  Page 6, correct.

10   Q.  Yes.

11   A.  Yes.

12   Q.  Do you see the term "strip search" in quotes there near the

13   top of the page?

14   A.  Oh, yes, I do.

15   Q.  Okay.

16              And this policy says, quote, "strip search,"

17   unquote, "means a search that requires a person to remove or

18   arrange some or all of his or her clothing so as to permit a

19   visual inspection of the underwear, brassiere, breasts,

20   buttocks or genitalia of such a person," unquote.

21              Is that what this says?

22   A.  That is what this says.

23   Q.  And that is what Deputy Chief Israel trained you a strip

24   search was; is that right?

25   A.  That's true.
```

**Vass - Cross / Haddad**

1  **Q.**  Now, even before this May 27th, 2004 policy, there was a

2  previous policy of your department that governed strip

3  searches, wasn't there?

4  **A.**  There was.

5  **Q.**  Would you turn to Exhibit 13, please.

6          **MR. BOLEY:**  Object on the grounds of relevance, Your

7  Honor.

8          **THE COURT:**  Exhibit 13?

9          **MR. HADDAD:**  Yes.

10  **BY MR. HADDAD:**

11  **Q.**  What is this policy?

12          **MR. BOLEY:**  Objection on the grounds of relevance,

13  Your Honor.  This is a policy from --

14          **THE COURT:**  This policy was in effect prior to the

15  dates in question; is that correct?

16          **MR. HADDAD:**  Yes -- well, prior to the May 27th

17  policy, but not prior to all of the searches that are alleged

18  in this case.

19          **MR. BOLEY:**  The first allegation is 2005.

20          **THE COURT:**  They go to '05, '06, '07?

21          **MR. HADDAD:**  There is how many -- two '04 searches.

22          **MR. BOLEY:**  Your Honor, there is no -- looking at

23  the complaint, the only -- the only allegations are from '05

24  on.

25          **THE COURT:**  Yes?

1             **MR. HADDAD:**  In depositions, defense counsel asked

2   Mr. Holmes, for instance, have you been strip-searched other

3   times?  Mr. Holmes said -- I believe he said at least about

4   five other times.  And then they just dropped it, they didn't

5   ask him about those.

6             **MR. BOLEY:**  Well --

7             **MR. HADDAD:**  So it's true they are not in the

8   complaint, but they are incidents that are relevant for a

9   number of reasons.  And I believe they are going to be relevant

10   to show -- well, I'll argue this when we need to argue it, but

11   there are going to be some 2004 strip searches that we are

12   going to ask this officer about.

13             **MR. BOLEY:**  Your Honor, those aren't pled in the

14   complaint, not mentioned in the pre-trial statement.

15             **THE COURT:**  What is the theory for those, for

16   those -- going into those if they are not alleged as searches

17   that are the gravamen of the case?

18             **MR. HADDAD:**  Officer Vass has denied ever

19   strip-searching any of these three plaintiffs.  These are other

20   incidents where he did strip search them, and there will be

21   witnesses to confirm that.

22             Also, the nature of the strip searches and the way

23   he performed these strip searches goes to show a pattern.  It

24   goes to show intent and motive.  They are also going to be

25   relevant for purposes of punitive damages.

**Vass - Cross / Haddad**

1              **THE COURT:**  Let's wait until we get to those, then,

2    before we go into a policy that is existing before the dates in

3    question here now.

4              **MR. HADDAD:**  All right.

5    **BY MR. HADDAD:**

6    **Q.**  The definition that you -- that you just gave for a strip

7    search, officer, as far as you know, that was the definition

8    that your department used for a strip search, starting with

9    when you began working for the department; isn't that right?

10             **MR. BOLEY:**  Objection.  Relevance, Your Honor.

11             **THE COURT:**  Well, objection is overruled.

12             You may answer the question.

13             **THE WITNESS:**  I don't know if that was the same

14   definition they used before '04 or not.

15   **BY MR. HADDAD:**

16   **Q.**  Do you have any recollection about whether the definition

17   of strip search changed according to your department in

18   May 2004?

19   **A.**  I don't.

20             **MR. BOLEY:**  Objection.  Relevance, Your Honor.

21             **THE COURT:**  Objection is overruled.

22             You may answer.

23             **THE WITNESS:**  I don't know.

24             **THE COURT:**  Well, did any of your practices change

25   at any point in time after 2007 or mid 2007?

**Vass - Cross / Haddad**

```
 1                THE WITNESS:  No.

 2                THE COURT:  Excuse me, 2004.  Excuse me.

 3                THE WITNESS:  I'm sorry, what was the question?

 4                THE COURT:  Did any of your practices with regard to

 5      strip searches change after May 2004?

 6                THE WITNESS:  Um, I don't believe they did.  I don't

 7      know.

 8                THE COURT:  Okay.

 9      BY MR. HADDAD:

10      Q.  Now, you've also been trained about parole and probation

11      searches, correct?

12      A.  I have.

13      Q.  And as you've described, that is a part of your job on Team

14      6, right?

15      A.  It is.

16      Q.  And a parole search is essentially the same as a search

17      incident to arrest; is that right?

18                MR. BOLEY:  Objection.  Vague as to what he's

19      referring to.

20                THE COURT:  Objection is overruled.

21                We've had other testimony about that.

22                THE WITNESS:  I would say it's very similar to that,

23      yes.

24      BY MR. HADDAD:

25      Q.  Okay, are there any differences?
```

**Vass - Cross / Haddad**

1           (Extended pause in the proceedings.)

2           THE WITNESS:  Well, I mean, I guess it's somewhat --

3    just depends on what the person was arrested for that might

4    make some of the differences.

5    BY MR. HADDAD:

6    Q.  But as a general matter, are there any differences between

7    a parole search and a search incident to an arrest?

8           You are trained in both, right?

9    A.  Right.

10   Q.  You do both in the field, don't you?

11   A.  I do.

12   Q.  Are there any differences?

13   A.  I would say in general practice, probably not.  I would say

14   they are very similar.

15   Q.  Okay.

16          How many parole and probation searches have you done

17   in your career with the Oakland Police Department?

18          MR. BOLEY:  Objection, relevance, Your Honor.

19          THE COURT:  Objection overruled.

20          THE WITNESS:  It would be hard to put a number on

21   it.  A lot.  That's kind of ambiguous, but quite a few.

22   BY MR. HADDAD:

23   Q.  At this point, do you think it's more than a thousand?

24   A.  I don't know.

25   Q.  In the several hundreds, at least?

**Vass - Cross / Haddad**

1  *A.*  Probably.

2  *Q.*  Officer, isn't it true that you do not know whether you're

3  legally allowed to strip search a person in the field just

4  because they are on probation or parole?

5           *MR. BOLEY:*  Objection.  Relevance, Your Honor.

6           *THE COURT:*  Objection overruled.

7           *THE WITNESS:*  Um, I'm assuming you are referring to

8  this -- your strip search policy; is that what you are

9  referring to when you make that claim?

10  *BY MR. HADDAD:*

11  *Q.*  I'm asking what you know.

12           Isn't it true that you don't know whether you are

13  legally allowed to strip search a person in the field just

14  because they are on probation or parole?

15  *A.*  Um, I can tell you what I did on that as far as the

16  general, I'm -- it's -- I don't have a great answer on that,

17  no.

18  *Q.*  Okay.

19           So as you sit here today, you really don't know

20  whether or not you are allowed to strip search somebody in the

21  field simply because they are on probation or parole?

22           *MR. BOLEY:*  Argumentative, Your Honor.

23           *THE COURT:*  Objection overruled.

24           *THE WITNESS:*  No, I'm not saying that.

25           Like I said, I always believed that you needed a

**Vass - Cross / Haddad**

1    little something more.  But, if you want me to cite to a

2    particular case law, I cannot.

3    *BY MR. HADDAD:*

4    *Q.*  All right.

5             I'm going to hand you a copy of your deposition.

6    Give one to the Court.  I'm opening this to page 85.

7             Are you ready?

8    *A.*  Sure.

9    *Q.*  Now, I would like to read to you from line 2.

10            *MR. BOLEY:*  Can we first find out what he is

11   referring to?

12            *MR. HADDAD:*  I said page 85, line 2, to page 86,

13   line 2.

14            *THE COURT:*  Line 2 begins in the middle.

15            *MR. HADDAD:*  Oh, my mistake.

16            Line 10, 85, line 10.

17            *THE COURT:*  I think it's line 11, but that's all

18   right.

19            Is that where you are saying is your question,

20   "Okay, I'm just trying to understand"?

21            *MR. HADDAD:*  No, "Based on your experience."

22            *MR. BOLEY:*  Going to what line?

23            *THE COURT:*  Eighty-five.

24            *MR. HADDAD:*  Eighty-five, line 10.

25            *MR. BOLEY:*  It's not impeachment.

**Vass - Cross / Haddad**

1            **THE COURT:**  You are asking the question, "I'm just

2  trying to understand what your understanding is based on your

3  experience and training" is that it?

4            **MR. HADDAD:**  Apparently, I have a different page and

5  line numbers.  I don't know why that is.

6                 **(Counsel confer.)**

7            **THE COURT:**  Looking at 85.

8            **MR. HADDAD:**  No, it's not the number at the very

9  bottom of the page, there is a little 85 kind of right here.

10           **THE COURT:**  Well, okay, I think what you are looking

11  at is 86, at least in the manner in which we have the bound

12  depositions.

13           You are asking about, "Based on your experience,

14  training and your policies of department" --

15            **MR. HADDAD:**  Yeah, yeah, that's where I'm starting.

16            **THE COURT:**  On page 86.

17            **MR. HADDAD:**  All right.

18            **MR. BOLEY:**  All right, so let me --

19            **THE COURT:**  It goes on with a lot of objections.

20            **MR. HADDAD:**  But his answer concludes on line 2 of

21  the next page.

22            **THE COURT:**  I see that, but once we get through with

23  a lot of objections --

24            **MR. BOLEY:**  What --

25            **THE COURT:**  Might as well start on line 19, because

**Vass - Cross / Haddad**

```
 1    you've got objections and "repeat that again," et cetera.

 2              MR. BOLEY:  And --

 3              MR. HADDAD:  I do need to ask the initial

 4    question -- can I just ask and we'll get through it quickly?

 5              THE COURT:  And then get down to the bottom of the

 6    page without all the yes and answered stuff.

 7              MR. HADDAD:  Yes.

 8    BY MR. HADDAD:

 9    Q.  At line 10, read along with me.

10    A.  On page 85?

11    Q.  Yeah.

12    A.  Okay.

13              MR. HADDAD:

14          "Q.  Based on" --

15              MR. BOLEY:  Page 86?

16              THE COURT:  Eighty-six.

17              MS. ROSEN:  86.

18              MR. HADDAD:

19          "Q.  Based on your experience,

20           training and your policies of your

21           department, are you allowed to conduct

22           a strip search of a parolee in the

23           field based solely on that person's

24           status as a person on parole?"

25           And then skipping to line 19:
```

**Vass - Cross / Haddad**

 1           *"Q.*   I'm not asking what you do, I'm

 2           asking what you are allowed to do

 3           under the policies of your department

 4           based on your training and

 5           experience."

 6            Line 23:

 7           *"A.*   I'm not sure.  I don't know on

 8           that particular example.  I don't

 9           know.

10           *"Q.*   All right.  So you're not sure?

11           *"A.*   That's my answer."

12   *Q.*  Did I just read that accurately?

13   *A.*  You read it, yes.  Sounds pretty accurate.

14           *MR. BOLEY:*  Your Honor, I think we should be reading

15   to page 87, line 8.

16            *THE COURT:*  Fine, go ahead.

17            *MR. HADDAD:*

18           *"Q.*   Now, have you ever conducted a

19           strip search of a parolee?"

20            "Ms. Rosen:  Anywhere?"

21            "Me:  In the field.

22           *"A.*   It's possible.  I can't think of

23           a specific incident, but it is

24           possible.

25           *"Q.*   So certainly, it's not your

**Vass - Cross / Haddad**

1              normal procedure, you personally?

2         **"A.**    Right.

3         **"Q.**    To do a strip search whenever you

4              determine a person is on probation or

5              parole; is that correct?

6         **"A.**    That is very true.

7         **"Q.**    When you received training about

8              your department strip search policy

9              from Deputy Chief Israel, what, if

10             anything, did Deputy Chief Israel tell

11             you about whether or not you could do

12             a strip search of a person on

13             probation or parole?

14        **"A.**    I don't recall.

15        **"Q.**    Have you ever seen anything in

16             writing in terms of the policies of

17             your department that say whether or

18             not you can do a strip search of a

19             person just because they are on

20             probation or parole?

21        **"A.**    Solely on that?  I don't know if

22             I have."

23        **MR. BOLEY:**  Your Honor, I would move to strike this

24   reading.  I don't see that it's impeachment.

25        **MR. HADDAD:**  You just asked me to read that.

**Vass - Cross / Haddad**

1              **MR. BOLEY:**  Well, I want to put the whole thing in

2     context, and I --

3              **THE COURT:**  Objection is overruled.

4     *BY MR. HADDAD:*

5     *Q.*  As you sit here today, do you recall any training you have

6     ever gotten about whether you can legally strip search a person

7     just because they are on probation or parole?

8     *A.*  No, I don't recall.

9     *Q.*  And as you sit here today, have you ever seen any written

10    policies of the Oakland Police Department saying whether or not

11    you can strip search a person just because they are on

12    probation or parole?

13    *A.*  Yes.  Have I received training on that?

14    *Q.*  Yeah.

15    *A.*  Not that I can recall.

16    *Q.*  Have you seen policies on it, anything in writing from your

17    department?

18    *A.*  Not that I recall.

19    *Q.*  All right.

20             Now, would you please turn to Exhibit 14 again, at

21    page 3.

22    *A.*  Sorry, Exhibit 14?

23    *Q.*  Yeah.

24             At the boom of that page, do you see a section that

25    is headed, "Detainee on Parole or Probation"?

 1   *A.*  I do.

 2   *Q.*  And you see that this policy says, quote, "as a general

 3   rule, a pat search will be justified merely because the officer

 4   learns the detainee is on parole or is on probation and the

 5   search clause authorizes such a search.  In fact, a parolee or

 6   a probationer who has an authorizing search clause may be

 7   subjected to a full body search, as described in this bulletin,

 8   page 5, without any further justification, i.e., reasonable

 9   suspicion or probable cause."

10         Did I just read that correctly?

11   *A.*  You did.

12   *Q.*  So let's turn to page 5 that it refers to.

13         At the bottom of page 5, do you see the definition

14   of full body search?

15   *A.*  Point me in the right direction on the page.

16   *Q.*  The very last paragraph of page 5.

17   *A.*  All right.

18   *Q.*  It says quote, "full body"; do you see that?

19   *A.*  I do.

20   *Q.*  So your department explains further, quote --

21         *MR. BOLEY:*  Objection.  The document speaks for

22   itself.

23         *THE COURT:*  Do you have a question regarding --

24         *MR. HADDAD:*  I do want to ask him about it.

25         *THE COURT:*  You may continue.

**Vass - Cross / Haddad**

1   *BY MR. HADDAD:*

2   *Q.*   This paragraph about full body search defines what a full

3   body search is; is that right?

4   *A.*   Can I read it?

5   *Q.*   Yes.

6   *A.*   Now that I read it, what is the exact question?

7   *Q.*   Doesn't that paragraph define what a full body search is,

8   according to your department?

9   *A.*   Um, it seems to me like it actually kind of goes more into

10  talking about incident to arrest where a person is going to be

11  going to jail.

12  *Q.*   Okay, so I'm going to have to read these three lines to

13  you.

14          This policy says, quote, "full body," unquote,

15  search, parens, "incident to an arrest where the arrestee is

16  going to be transported to the jail or the hospital, close

17  parens, means a pat down and thorough examination of the

18  arrestee's clothing and containers in his or her possession.

19  The top layers of multiple layers of clothing may be removed

20  for examination."  Unquote.

21          Did I read that correctly?

22  *A.*   You did.

23  *Q.*   The next page gives an example of a full body search.  Do

24  you see that?

25  *A.*   I do.

**Vass - Cross / Haddad**

 1   **Q.**  And the example your department gives of a full body search

 2   is --

 3              **MR. BOLEY:**  Objection.  Document speaks for itself.

 4              **THE COURT:**  Objection overruled.

 5              **MR. HADDAD:**  Front pants pockets are pulled out,

 6   reversed and examined.  Back pockets are entered by reaching

 7   inside, and contents are removed.  Hats, gloves and shoes are

 8   removed and examined.  Waistbands are examined.  If suspected

 9   evidence, weapons or contraband is discovered during a routine

10   full body search, a more intrusive search, paren strip search,

11   closed parens, is allowed for the purpose of removing the

12   item."

13              Did I read that correctly?

14   **A.**  You did.

15   **Q.**  So your department explained that a strip search is a more

16   intrusive search than a full body search, correct?

17   **A.**  Yeah.

18   **Q.**  That's what that says, isn't it?

19   **A.**  That's what it says.

20   **Q.**  And right after that it defines strip search.  Do you see

21   that?

22   **A.**  I did see that.

23   **Q.**  And that is a different definition of a search than a full

24   body search, isn't it?

25   **A.**  It is.

**Vass - Cross / Haddad**

1   *Q.*  They are not the same?

2   *A.*  I'm sorry?

3   *Q.*  They are not the same, are they?

4   *A.*  Full body search and a strip search?  Seems like they are

5   different to me.

6   *Q.*  To your knowledge, is Exhibit 14, this 2004 strip search

7   policy, still in full effect?

8   *A.*  No, it's not.

9   *Q.*  Okay.

10          Now, as of the time of your deposition, on

11  January 14, 2009 nobody had ever told you that Exhibit 14, the

12  2004 strip search policy, had been revised or was no longer the

13  policy of your department; isn't that true?

14          *MR. BOLEY:*  Objection.  Relevance, Your Honor.

15          *THE COURT:*  Objection overruled.

16          *THE WITNESS:*  To my knowledge, yes.

17  *BY MR. HADDAD:*

18  *Q.*  And as of January 14th, 2009, you had never been told that

19  that policy at Exhibit 14 had been ruled unconstitutional by

20  this Court as of March 27th, 2008; isn't that true?

21          *MR. BOLEY:*  Objection.  Lack of foundation.

22          *THE COURT:*  Objection is overruled.

23          *THE WITNESS:*  Um, I don't know if you can -- the

24  word "told"; I actually, I think, read it online.

25  ///

**Vass - Cross / Haddad**

1  *BY MR. HADDAD:*

2  *Q.*  But --

3  *A.*  I think, like, in the papers.

4  *Q.*  But it was still your belief on January 14, 2009 that that

5  policy was still in full effect, correct?

6  *A.*  Yes.

7  *Q.*  Now, throughout your career with the Oakland Police

8  Department, you have also understood that the Constitution of

9  the United States governs when and how you are allowed to strip

10  search a person, correct?

11  *A.*  Yes.

12  *Q.*  And has it always been your understanding that a lawful

13  strip search in the field should only be performed when you

14  have probable cause to believe the person may be hiding

15  contraband in their underwear?

16  *A.*  You said a lawful strip search?

17  *Q.*  In the field, yes.

18        *MR. BOLEY:*  Overbroad and incomplete hypothetical.

19        *THE COURT:*  The objection is overruled.

20        *THE WITNESS:*  Okay.

21        Repeat the question, please, again.

22  *BY MR. HADDAD:*

23  *Q.*  Would you like me to repeat it?

24  *A.*  Yeah.  I'm sorry.

25  *Q.*  Has it always been your understanding that a lawful strip

**Vass - Cross / Haddad**

 1  search in the field should only be performed when you have

 2  probable cause to believe the person may be hiding contraband

 3  in their underwear?

 4  *A.*  When you say -- my understanding, no, I wouldn't say that

 5  was my understanding.

 6  *Q.*  Has that been your practice?

 7  *A.*  It has been my practice, yes.

 8  *Q.*  Have you always understood, as long as you've been a member

 9  of the Oakland Police Department, that you're not allowed to

10  strip search someone in the field who is merely detained?

11              *MR. BOLEY:*  Objection.  Relevance.

12              *THE COURT:*  Objection is overruled.

13              *THE WITNESS:*  Well, when I read -- when I read the

14  training bulletin, it -- as I recall, it actually goes into

15  reasonably believing that someone actually was concealing

16  something.  I think that's how it said it in there.

17  *BY MR. HADDAD:*

18  *Q.*  Okay.

19              But this is a different question.

20  *A.*  All right.

21  *Q.*  This is about the difference between someone who is

22  detained and someone who's under arrest.

23  *A.*  I thought that --

24  *Q.*  You understand that there is a difference between detention

25  and arrest, right?

**Vass - Cross / Haddad**

1   **A.**  I do.

2   **Q.**  As long as you've been a member of the Oakland Police

3   Department, have you understood that you are not allowed to

4   strip search someone in the field who is only detained rather

5   than arrested?

6   **A.**  I would say that based upon the training, that's kind --

7   the training is kind of vague at that point because, in a

8   sense, when a person is on probation or parole, and this is

9   through the training of the department, they would not be under

10  arrest at that point.

11  **Q.**  Would you turn to page 90 of your deposition, please.

12  **A.**  Sure.

13          **MR. HADDAD:**  I would like to read from line 6 to 10.

14          **MR. BOLEY:**  That's not impeachment, Your Honor, not

15  inconsistent with his testimony.

16          **THE COURT:**  The objection is overruled.

17          You may proceed.

18  **BY MR. HADDAD:**

19  **Q.**  Start with me on line 6 of page 90, Officer.  Read to

20  yourself.

21          "**Q.**   So are you allowed to do a strip

22           search in the field of a person who is

23           merely detained?

24          "**A.**   No.

25          "**Q.**   You said no?

**Vass - Cross / Haddad**

1          **"A.**    Yeah, I don't believe so."

2              Did I read that correctly?

3    **A.**  You read it.

4    **Q.**  And that's the testimony you gave when you were under oath

5    in your deposition; is that right?

6    **A.**  Absolutely.

7    **Q.**  Excuse me?

8    **A.**  Yeah, I was under oath, absolutely.

9    **Q.**  And that is the testimony you gave, then, isn't it?

10   **A.**  Yes, it is.  That's what I said.

11   **Q.**  All right.

12   **A.**  Can I clarify?

13   **Q.**  Excuse me?

14   **A.**  You are asking me a question; am I allowed to clarify?

15   **Q.**  You can clarify later when your attorney asks you

16   questions.

17   **A.**  Okay.

18   **Q.**  Have you ever performed a strip search in the field?

19          **MR. BOLEY:**  Objection.  Relevance, Your Honor.

20          **THE COURT:**  The objection is overruled.

21          **THE WITNESS:**  I have.

22   **BY MR. HADDAD:**

23   **Q.**  How many times?

24   **A.**  I don't recall.

25   **Q.**  It's possibly as many as ten times, isn't it?

**Vass - Cross / Haddad**

1   **A.**  Yes, that's possible.

2   **Q.**  It could be more than ten, couldn't it?

3   **A.**  I said it's possible.  I don't --

4   **Q.**  And have you ever done a strip search in the field at the

5   side of a house?

6   **A.**  I have.

7   **Q.**  How many times have you visually inspected somebody's anus

8   in the course of your job as an Oakland police officer?

9   **A.**  I only recall once.

10  **Q.**  And who was that to?

11          **MR. BOLEY:**  Objection.  Relevance, Your Honor.

12          **THE COURT:**  Objection is overruled.

13          **THE WITNESS:**  I don't know if this is his true name,

14  but I believe the last name was McCree, first of, I think

15  Dynami, D-y-n-a-m-i.

16  **BY MR. HADDAD:**

17  **Q.**  Now, you've been trained in the definition of a visual

18  cavity search, haven't you?

19  **A.**  I have.

20  **Q.**  Okay.

21          And, first of all, what is your understanding, based

22  on your training and experience, of the definition of a visual

23  cavity search?

24  **A.**  My understanding, without reading it, is actually looking

25  inside visually someone's rectum, for the male, or for female

**Vass - Cross / Haddad**

1    inside as well.

2    *Q.*  Okay.

3              So at Exhibit 14, page 6, your department says,

4    "visual body cavity search means visual inspection of a body

5    cavity, parens, rectum or vagina," unquote.

6              Is that also your understanding?

7    *A.*  It is, but there is a line that it actually goes into a

8    little bit deeper in depth.  I don't know if you want to find

9    that, but it's in there.

10   *Q.*  There is a line in this policy that goes deeper in depth

11   about visual body cavity searches?

12   *A.*  I believe so.

13             Can a take a minute?

14   *Q.*  Yeah.

15                   **(Reviewing.)**

16             **THE WITNESS:**  Are you ready?

17   *BY MR. HADDAD:*

18   *Q.*  Yeah.

19   *A.*  Page 7.

20   *Q.*  Um-hmm.

21   *A.*  The heading is going to be under "Physical and Visual Body

22   Cavity Searches in the Field."

23   *Q.*  Okay.

24   *A.*  I'll read that whole thing.

25   *Q.*  Yes, go ahead.

**Vass - Cross / Haddad**

1  **A.** "Officer shall never conduct physical body cavity

2  searches" --

3              **(Court reporter interruption.)**

4          **THE WITNESS:** "Officers shall never conduct physical

5  body cavity searches," parentheses, (i.e., physical penetration

6  of the rectum or vagina,) parentheses, "or visual body cavity

7  searches in the field."  And then next sentence:  "Remember, a

8  visual body cavity search means looking inside a rectum or

9  vagina."

10         That was the point I was referring to.

11 **Q.**  Okay.

12 **A.**  And then, "a search warrant or an exigency is required for

13 a physical body cavity search, and it can only be conducted by

14 an authorized medical professional."

15         That's the end.

16 **Q.**  All right.

17         So you understood that your department forbade you

18 from conducting any visual cavity searches in the field,

19 correct?

20 **A.**  Um, based upon that definition, yes.

21 **Q.**  And a visual cavity search includes looking at a person's

22 anus; isn't that right?

23 **A.**  Actually, on one page, it gave the general answer.  On page

24 7 what I just read, it went into a more in-depth explanation of

25 what it was.

**Vass - Cross / Haddad**

 1  *Q.*  But the question is, looking at someone's anus constitutes

 2  a visual cavity search; isn't that true?

 3          *MR. BOLEY:*  Objection.  Argumentative, Your Honor.

 4          *THE COURT:*  Objection overruled.

 5          *THE WITNESS:*  Sorry, I just -- I read verbatim what

 6  it says and it says looking inside.

 7  *BY MR. HADDAD:*

 8  *Q.*  It's been your understanding in the field that looking at

 9  someone's anus constitutes a visual cavity search; isn't that

10  right?

11  *A.*  Um, no, not really, no.

12  *Q.*  Okay.

13          Would you turn to page 88 of your deposition,

14  please.

15  *A.*  You said 88, sir?

16  *Q.*  88.

17          I would like to read lines 14 to 21.

18  *A.*  What were the lines, please?

19  *Q.*  Fourteen to 21.

20  *A.*  Okay.

21                  **(Reading.)**

22          *THE WITNESS:*  I read it.

23  *BY MR. HADDAD:*

24          **"*Q.*  You've testified"** --

25          *MR. BOLEY:*  Objection, Your Honor.  It's not

```
 1   impeachment.  It's not inconsistent with his testimony.

 2               THE COURT:   The objection is overruled.

 3               MR. HADDAD:

 4          "Q.   You've testified that when you

 5           did a search of Dynami McCree, you

 6           actually visually looked at his anus,

 7           do you recall testifying to that?

 8          "A.   I did.

 9          "Q.   Does that constitute a visual

10           body cavity search?

11          "A.   Possibly.  I guess somewhat by

12           default of him bending over," unquote.

13   Q.   Did I read that correctly?

14   A.   You did, but I also -- there was more discussion about

15   there that went further on, which I think statements -- the

16   testimony and everything was there.

17   Q.   This is the question I want to ask you at this time,

18   Officer.

19               Now, with Dynami McCree, who you've testified you

20   looked at his anus in the field, in that situation you pulled

21   his shorts and underwear down and made him bend over until you

22   could inspect his anus; is that correct?

23               MR. BOLEY:   Objection, Your Honor.

24               This is objecting on the grounds of relevance.  This

25   is going to require us to go into --
```

**Vass - Cross / Haddad**

```
 1                    THE COURT:  This is going into another incident,

 2  correct?

 3                    MR. HADDAD:  This is the only question I have at

 4  this time about this incident.

 5                    THE COURT:  Well, I think you have asked enough

 6  questions about it.

 7  BY MR. HADDAD:

 8  Q.  Is there any other time that you have ever done a visual

 9  strip search of a person in the field?

10                    MR. BOLEY:  Objection.

11                    MR. HADDAD:  I'll rephrase that question.  I didn't

12  ask it right, anyways.

13  BY MR. HADDAD:

14  Q.  Is there any other time that you have done a visual cavity

15  search of a person in the field?

16                    MR. BOLEY:  Objection.  Relevance.

17                    THE COURT:  Overruled.

18                    You may answer.

19                    THE WITNESS:  Not that I recall.

20  BY MR. HADDAD:

21  Q.  Is there any other time when you have been able to see

22  another person's anus when you have strip searched them in the

23  field?

24                    MR. BOLEY:  Objection.  Relevance.

25                    THE COURT:  Objection is overruled.
```

**Vass - Cross / Haddad**

```
 1              THE WITNESS:  I don't believe so.
 2   BY MR. HADDAD:
 3   Q.  Have you ever seen or been present when other Oakland
 4   police officers have strip searched people on the street?
 5              MR. BOLEY:  Objection.  Relevance.
 6              THE COURT:  Objection is overruled.
 7              THE WITNESS:  Um, I may have.
 8   BY MR. HADDAD:
 9   Q.  Can you recall any situations like that?
10   A.  Not off the top of my head, I do not.
11   Q.  What documentation are you required to do when you arrest
12   somebody?
13   A.  I guess it just depends on what kind of arrest, more than
14   anything else.
15   Q.  Generally, are you required to fill out an incident report?
16   A.  Um, and when you -- are you referring to an arrest tag when
17   you say "incident report" or actually like a narrative police
18   report?
19   Q.  A narrative police report.
20   A.  When you arrest somebody, was the question?
21   Q.  Yeah.
22   A.  That may be one of the forms you do.
23   Q.  Okay.
24   A.  Not necessarily.  It doesn't necessarily go hand in hand.
25   Q.  You are expected to document your arrest of a person in
```

**Vass - Cross / Haddad**

1   some way, aren't you?

2   *A.*  Well, surely, but you mentioned as far as on the narrative

3   form; there would be like an arrest tag.  Say a person with a

4   warrant, for instance, if a person had a warrant, for instance,

5   that would, of course, be documented on an arrest tag.

6           You wouldn't necessarily fill out an actual police

7   report with a narrative on it, it would be that one piece of

8   paper with that documentation.

9   *Q.*  But at a minimum, the type of arrest report you would fill

10  out for someone arrested on a warrant would include information

11  such as name of the arresting officer and the subject arrested?

12  *A.*  That would be the minimal, absolutely.

13  *Q.*  And the date, time and place of the arrest; is that right?

14  *A.*  Yes, they should.

15  *Q.*  And the fact of the warrant; is that right?

16  *A.*  Yes, the violation itself.

17  *Q.*  And other information as well, correct?

18  *A.*  Yes.

19  *Q.*  And there is a form your department provides you in that

20  situation, right?

21  *A.*  True.

22          *THE COURT:*  Is that form separate and apart from a

23  typical arrest report form?

24          *THE WITNESS:*  Yes, it is, ma'am, it is.  Two

25  separate forms kind of for -- it can be for two separate things

**Vass - Cross / Haddad**

```
 1    as well.
 2    BY MR. HADDAD:
 3    Q.   Now, when you arrest somebody not because of a warrant, but
 4    because of a crime committed in your presence, for instance,
 5    you have to fill out a narrative arrest report, correct?
 6    A.   I believe so.  Offhand, I can't think of a reason why you
 7    wouldn't, so I would say probably yes.
 8    Q.   You have been trained about the importance of documenting
 9    your arrests, haven't you?
10    A.   I have.
11    Q.   And you understand that when you arrest somebody, the
12    District Attorney will have to review whether the person should
13    be charged with a crime, right?
14    A.   That's true.
15    Q.   And typically, the District Attorney will review the
16    reports that you turn in in connection with that arrest,
17    correct?
18    A.   Um, I would imagine they review the report, yes.
19    Q.   Isn't that your understanding, that they do review it?
20    A.   It is my understanding, yes.
21    Q.   When you are writing your report, one of the people you are
22    writing it for is someone in the DA's office to look at it,
23    right?
24    A.   That's true.
25    Q.   You are also writing it for your supervising officers as
```

**Vass - Cross / Haddad**

1    well, right?

2    *A.*  Yes, probably.

3    *Q.*  And you understand that whenever you fill out any

4    documentation for your department, it's imperative that you be

5    absolutely truthful, correct?

6              *MR. BOLEY:*  Objection as to the term "imperative."

7              *THE COURT:*  Objection is overruled.

8    *BY MR. HADDAD:*

9    *Q.*  Is that right?

10   *A.*  Yeah, we absolutely try to be truthful.

11   *Q.*  When you are writing a narrative report of an arrest, you

12   have been trained that it's important to include all the

13   relevant details in connection with the arrest; is that right?

14   *A.*  Um, I think your definition of relevance may be subjective,

15   I mean me versus you.  I believe what is needed for charging

16   and so forth for court, I think that's maybe slightly

17   different.

18   *Q.*  Okay.

19              Well, let me ask you this:  If you ever conducted a

20   search of a person who you arrested --

21   *A.*  Um-hmm.

22   *Q.*  -- would you document that in a report?

23   *A.*  Yeah, absolutely.  You are supposed to.

24   *Q.*  You are supposed to, right?

25   *A.*  Correct.  Yes, absolutely.

**Vass - Cross / Haddad**

1   *Q.*  And it doesn't matter where you do the strip search, does

2   it, you are supposed to document it, anyways?

3   *A.*  When you say anywhere, not quite sure.

4   *Q.*  You do it on the street, at the jail, at the Police

5   Department; if you strip search someone, you are supposed to

6   document it in a report, aren't you?

7   *A.*  Well, I would probably say everything, yes, except the

8   jail.  I mean, I don't think I would be doing a strip search so

9   much in the jail.  So I mean a -- the jailers may, not

10  necessarily I.  I don't know if I want to go along with that

11  part of it.

12  *Q.*  Have you ever done a strip search of anybody in the jail?

13          *MR. BOLEY:*  Objection.  Relevance, Your Honor.

14          *THE COURT:*  Objection overruled.

15          *THE WITNESS:*  Um, I have never done a strip search.

16  I have been asked to be a witness for a strip search when

17  someone was brought in for narcotics.  Just makes me think

18  about it just now.

19  *BY MR. HADDAD:*

20  *Q.*  Now --

21          *THE COURT:*  Excuse me.

22          And in the -- in a jail setting, who is the person

23  who ordinarily conducts such strip searches?

24          *THE WITNESS:*  I would imagine it would be their jail

25  facility.  In the case that I'm thinking of, it was actually

**Vass - Cross / Haddad**

1  their jailer.  Happened to find someone that snuck in --

2  brought in narcotics to the jail.  And so I didn't see them

3  catch it, but they caught it.  And they asked me to be a

4  witness for the jailer, just so they can have another person

5  there.

6           **THE COURT:**  Okay.

7           And you take persons into custody to the jail

8  frequently; is that correct?

9           **THE WITNESS:**  Yes, ma'am.

10          **THE COURT:**  Have you seen the jailers conduct strip

11  searches of such persons?

12          **THE WITNESS:**  Um, that's the one time that I can

13  definitely think of.  It's -- when you say strip search, I

14  mean, it's kind of like an all-encompassing definition, because

15  at some point you are visually looking at their underwear in a

16  sense as you are doing a strip search.

17          So for undergarments, there is times when you bring

18  a person to jail, and they are wearing multiple clothing so

19  their pants would have to be removed.  And now they are down

20  to, let's say, their thermals.  Or they are only allowed to

21  bring one item of clothing, so they may have to remove some

22  clothing.

23          So, in a sense, yeah, I guess for them to be brought

24  in, you know, their underwear was observed, but nothing beyond.

25          Does that answer your question?

**Vass - Cross / Haddad**

1              **THE COURT:**  Yes.

2              Have you brought persons into custody --

3              **THE WITNESS:**  Um-hmm.

4              **THE COURT:**  -- that the jailers have not strip

5    searched?

6              **THE WITNESS:**  Yeah.  I said the majority of the time

7    that's par for the course.

8              **THE COURT:**  That they don't strip search?

9              **THE WITNESS:**  That they don't strip search, no.

10             **THE COURT:**  What kind of a search do they conduct?

11             **THE WITNESS:**  A more thorough search to kind of get

12   them in jail.  They will have them take off their shoes, remove

13   all kinds of laces.  Sometimes sweatshirts and shirts have to

14   be removed to take off, let's say, laces, and everything.  They

15   are not allowed to have laces because they might try to commit

16   suicide while they are in there.  So there is extra precautions

17   they have to do for them to be booked.  But that is done

18   through them.

19             **THE COURT:**  That more like a full body search?

20             **THE WITNESS:**  Yeah, it is.  I mean, I think -- I

21   mean, I think kind of -- full body searches kind of may be a --

22   you know, because a full body search in the field versus in the

23   jail, they are doing just a lot more things, I guess, you know?

24   That's probably the only way I can describe it.

25             They are doing a lot more to ensure that this person

**Vass - Cross / Haddad**

 1   can't hurt himself or others.  So they are just doing a little

 2   bit more.

 3              **THE COURT:**  So removing any kind of items that could

 4   be used --

 5              **THE WITNESS:**  Right.

 6              **THE COURT:**  -- for suicidal purposes or injury of

 7   themselves or others?

 8              **THE WITNESS:**  Right.  They have their own set of

 9   protocols for them to actually be booked in a jail.

10   **BY MR. HADDAD:**

11   **Q.**  Have you ever requested that a prisoner you brought into

12   the jail be strip searched at a jail?

13              **MR. BOLEY:**  Objection.  Relevance.

14              **THE COURT:**  Overruled.

15              You may answer.

16              **THE WITNESS:**  I know that was -- I can only recall

17   one time, and that was my intention, but that never happened.

18   **BY MR. HADDAD:**

19   **Q.**  What do you mean?  I don't understand what you mean.  Why

20   do you say it never happened?

21   **A.**  Um, I think, actually, you do, but a person ended up dying

22   on the way to jail.

23   **Q.**  Oh, okay.

24              But, have you ever actually taken a person -- a

25   prisoner into the jail and asked the jailers to conduct a strip

**Vass - Cross / Haddad**

 1  search of that person at the jail?

 2  *A.*  I don't believe I ever have.

 3  *Q.*  Have you ever assisted with a strip search of anybody at

 4  the jail?

 5            *MR. BOLEY:*  Asked and answered, Your Honor.

 6            *THE COURT:*  The objection is overruled.

 7            You may answer.

 8            *THE WITNESS:*  Other than that other time that I

 9  discussed, not that I recall.

10  *BY MR. HADDAD:*

11  *Q.*  Now, would you please turn to Exhibit 16 in that book in

12  front of you.

13            *MR. HADDAD:*  I believe this is also already in

14  evidence.

15            *THE WITNESS:*  You said Exhibit 16?

16  *BY MR. HADDAD:*

17  *Q.*  Yes.

18  *A.*  Okay.

19  *Q.*  Have you seen this before?

20  *A.*  I'm sure I have.

21  *Q.*  Okay.

22            So this is a special order From the Office of the

23  Chief of Police; is that right?

24  *A.*  It is.

25  *Q.*  It's dated April 1st, 2003, correct?

**Vass - Cross / Haddad**

```
 1   A.   It is.

 2   Q.   The subject is Racial Profiling Stop Data Collection Form;

 3   is that right?

 4   A.   Yes, it is.

 5   Q.   This is one of those rules of your department that you are

 6   required to obey, correct?

 7   A.   That's true.

 8   Q.   And since the date of this special order, you can see under

 9   section (a)(1) on the first page?

10   A.   Sorry I don't see a 2(a)(1).

11   Q.   See "Responsibilities"?

12   A.   Oh, okay I do.

13   Q.   "A:  Members shall be responsible for, 1" --

14        MR. BOLEY:  Objection.  The document speaks for

15   itself.

16        THE COURT:  Well, you are going to ask him a

17   question about it, I assume?

18        MR. HADDAD:  Yeah, I am.

19        THE COURT:  That's fine.

20   BY MR. HADDAD:

21   Q.   This special order requires you to complete a stop data

22   collection form for every vehicle, walking, or bicycle stop

23   conducted during your shift; is that right?

24   A.   That's true.

25   Q.   And then you are supposed to submit those forms to the
```

**Vass - Cross / Haddad**

1  assigned supervisor or the available field sergeant or watch

2  commander for review and approval; is that right?

3  **A.**  Yes.

4  **Q.**  All right.

5              There are no exceptions under the special order for

6  when a stop data collection form is required, correct?

7  **A.**  Not to my knowledge.

8  **Q.**  Is that correct?

9  **A.**  I believe that's correct.

10  **Q.**  So from April 1, 2003 to the present, whenever you have

11  stopped anybody, you have been required to fill out a stop data

12  collection form, correct?

13  **A.**  Well, someone, um, associated with that stop needs to fill

14  it out, not necessarily me.  But the end result is, a stop data

15  form needs to be completed in regards to this stop, not

16  necessarily by me.

17  **Q.**  So for every stop you are involved in, some officer has to

18  make sure that a stop data collection form is filled out,

19  correct?

20  **A.**  That's true.

21  **Q.**  And it's every officer's responsibility in the stop to make

22  sure that a stop data collection form gets filled out for that

23  stop, correct?

24  **A.**  Yes.

25  **Q.**  In addition to stop data forms, what documentation are you

**Vass - Cross / Haddad**

```
 1   required to fill out when you detain somebody in the field?
 2              MR. BOLEY:  Objection.  Vague as to the term
 3   "detained."
 4              THE COURT:  Detained?
 5              MR. BOLEY:  Yeah.
 6              THE COURT:  I think it's pretty clear what that
 7   means.
 8              THE WITNESS:  Can you repeat your question?
 9   BY MR. HADDAD:
10   Q.  In addition to a stop data form, what documentation are you
11   required to fill out when you detain somebody in the field?
12   A.  I would say, at minimal, it should be a field contact
13   report.
14   Q.  Okay.
15              And so can you identify what one of those looks
16   like, I'm going to give you a different book now and ask you to
17   look at Plaintiff's Exhibit 6.
18   A.  Are we done with this one?
19   Q.  So I've opened the exhibit book to Plaintiff's Exhibit 6
20   for you.
21              Do you see what that shows on that page?
22   A.  I do.
23   Q.  The first page, which is Bates No. 4615, is an example of a
24   field contact card; is that correct?
25   A.  It is.
```

**Vass - Cross / Haddad**

1    *Q.*  And this happens to be one that you filled out concerning a

2    stop involving plaintiff Michael Holmes; is that right?

3    *A.*  Yes, it is.

4    *Q.*  All right, I'll ask you more about that later.

5              Now, you are supposed to fill one of those field

6    contact cards out every time you detain a person; is that

7    correct?

8    *A.*  You keep saying me; are you referring actually physically

9    to me, or just in general is one supposed to be done?

10             *THE COURT:*  Rephrase the question.

11   *BY MR. HADDAD:*

12   *Q.*  You or another officer involved in the detention is

13   required to fill out a field contact card for every single

14   detention, correct?

15   *A.*  Yes -- or, that's my understanding of it, yes.

16   *Q.*  And it's every officer's responsibility in the detention to

17   make sure that a field contact card gets filled out by some

18   officer, correct?

19   *A.*  Yes, it is.

20   *Q.*  Based on your training and experience, what is the reason

21   for filling out a field contact card?

22             *MR. BOLEY:*  Objection.  Calls for speculation.

23             *THE COURT:*  You may testify, if you know of your own

24   personal knowledge.

25             *THE WITNESS:*  I can only -- I would be -- are we

**Vass - Cross / Haddad**

1   speculating to the whole -- the broad range of it?

2           Some of its use is for going back and identifying

3   maybe who this person is, associates or what other

4   investigation is going on at that time.

5   *BY MR. HADDAD:*

6   *Q.*  Okay.

7           One of the reasons --

8           *MR. BOLEY:*  Excuse me, Your Honor, and I don't mean

9   to interrupt at this particular point:  I would like to take a

10  break at some point, whenever it's convenient for you to.

11          *MR. HADDAD:*  Could I finish up on this field contact

12  stuff?

13          *THE COURT:*  Yes, but did I hear you say in your

14  answer I thought I heard you use the word speculate, that you

15  were speculating that that is what it's used for.

16          *THE WITNESS:*  I may have, Your Honor.

17          *THE COURT:*  Well, then, I'm going to strike the

18  answer.

19          *MR. BURRIS:*  He said a portion of it.

20          *THE COURT:*  The whole thing.

21  *BY MR. HADDAD:*

22  *Q.*  Officer --

23          *THE COURT:*  You want to ask a question so that it's

24  clear that he is not speculating as to his answer, you may do

25  so.

**Vass - Cross / Haddad**

1   *BY MR. HADDAD:*

2   *Q.*  Have you been trained that one of the reasons you are

3   required to have a field contact card filled out for every

4   detention is for officer accountability?

5   *A.*  Give me an example.  That particular statement doesn't

6   stand out.  If you can give me maybe an example of that.

7   *Q.*  Have you been taught that your department wants field

8   contact cards filled out for every detention of a person so

9   that your department knows what its officers are doing on the

10  street?

11  *A.*  I would imagine that's probably a goal of theirs.

12  *Q.*  Okay.

13         *MR. HADDAD:*  So I'm done with this section now if

14  the Court would like to take a break.

15         *THE COURT:*  What, in fact, is this card called that

16  we are looking at, Exhibit 6?

17         *THE WITNESS:*  Yes, ma'am, it's called a field

18  contact card.

19         *THE COURT:*  And is this kind of a form -- is this

20  form filled out even if no one is arrested, if you just make

21  contact with the individual without any arrest whatsoever?

22         *THE WITNESS:*  Yes, Your Honor.

23         *THE COURT:*  Okay.  Is it filled out if, in fact,

24  there is an arrest made?

25         *THE WITNESS:*  Not necessarily.  It's kind of -- it

**Vass - Cross / Haddad**

1  kind of just goes off -- if the officer -- we would kind of

2  like to maybe link more people or maybe link more associates

3  together, or so forth.  But it's not necessarily, no.  You just

4  generally need one -- one item of documentation to talk about

5  contacting these people.

6         *THE COURT:*  And if you made a contact with somebody

7  who was on parole or probation but no arrest report was made,

8  would you use this form to so indicate contact was made?

9         *THE WITNESS:*  Just so I understand, and he also

10  didn't get arrested, so there is no arrest tag?

11         *THE COURT:*  Yes.

12         *THE WITNESS:*  Yeah, if it's just a parole search and

13  you stopped this person, that would be the only documentation

14  you would use.

15         *THE COURT:*  And would that -- would it reflect on --

16  would you reflect on such a card that a parole search was done?

17         *THE WITNESS:*  Yes.  Yes, ma'am.

18         *THE COURT:*  I do want to ask you a couple of other

19  questions.

20         Maybe what we can do is just, given the time, we can

21  break for lunch rather than to break and then break again; is

22  that agreeable?

23         *MR. HADDAD:*  Yes.

24         *MR. BOLEY:*  Fine, Your Honor.

25         *THE COURT:*  Okay.

**Vass - Cross / Haddad**

```
1              You mentioned about probation and parole searches;
2    do you understand that there is a difference between a
3    probation search and a parole search?
4              THE WITNESS:  Well, I guess, of course, there is a
5    difference, but they are -- to my knowledge, they are very
6    closely tied together.  When -- when I say that, if a person is
7    on probation with a search condition, that -- their end result
8    of the search is very similar to that of parole.
9              THE COURT:  Is the nature of the search that can be
10   conducted the same as if someone is on parole?
11             THE WITNESS:  To my knowledge, yes.
12             THE COURT:  Are there probation grants that do not
13   have a search condition?
14             THE WITNESS:  There is.  There is different levels
15   of probation.  If I may expand for a minute?
16             There is -- a person may have a search condition,
17   which is referred to maybe as an S7 in the Court system or
18   referred to as a four-way search condition.  That would mean --
19   and generally when they say four-way, it's their person, their
20   vehicle, their residence, and there was one other thing, I
21   can't remember.
22             THE COURT:  Or property under their control.
23             THE WITNESS:  Yeah, thank you.
24             So it would be versus some other search conditions
25   that are maybe like an S3, for instance, which is just maybe a
```

**Vass - Cross / Haddad**

1   person's search and their vehicle but not their residence.  So

2   there is different degrees of what you can and can't do.  And

3   it's specified by the Court.

4          **THE COURT:**  And so how do you determine that when

5   you stop somebody who is on probation?

6          **THE WITNESS:**  Um.

7          **THE COURT:**  How do you determine what type of search

8   condition they have?

9          **THE WITNESS:**  It will actually say.  When you --

10  first of all, they can, of course, say that they are.  And

11  generally they do know what their search conditions are.

12         Or, you could run them out on the computer.  A lot

13  of us have computers in the cars, or call in dispatch, and

14  they'll say.

15         When you run a person out, or you conduct a file

16  check of a person through a computer or dispatch, it actually

17  goes and talks about this person.  It gives the person's name,

18  where they live.  And it gives a description of what their

19  search condition is.  A lot of times says S7, or a four-way

20  search condition.

21         **THE COURT:**  And you were asked earlier about

22  stopping persons and asking if they were on parole or

23  probation; if you are walking down the street, can you just

24  walk up to somebody and ask him if he is on probation or

25  parole?

**Vass - Cross / Haddad**

1              *THE WITNESS:*  Yes.

2              *THE COURT:*  Anybody, without any reason whatsoever

3    other than the fact that they looked at you crossways, or

4    something?

5              *THE WITNESS:*  Yeah, I would say you can ask.  I

6    mean --

7              *THE COURT:*  Okay.

8              Anything further right now?

9              *MR. HADDAD:*  I could ask a couple of follow-up

10   questions about the contact cards.

11             *THE COURT:*  And then we will break for lunch.

12   *BY MR. HADDAD:*

13   *Q.*  I believe you mentioned for a parole search, the only

14   documentation you would do would be a field contact card; is

15   that correct?

16   *A.*  For a parole search on a document -- um, I think that's

17   kind of the -- I think I said it's like the minimal amount of

18   paperwork you would do.

19   *Q.*  You would still be required to do a stop data form in

20   addition, correct?

21   *A.*  Someone would have to, yes.

22   *Q.*  All right.

23             Do you make sure that someone involved in every stop

24   you are involved in does a stop data form?

25   *A.*  I probably should.  Do I go and ask each person if they did

**Vass - Cross / Haddad**

1    it?  No, I don't.

2    *Q.*  How often --

3    *A.*  Sometimes I do, but I don't think I can say 100 percent

4    that I ask that question every time.

5    *Q.*  In the course of a normal day, when you were working with

6    Unit 6, how many people would you stop?

7    *A.*  I don't know.  It just depends on -- it just depends.

8    *Q.*  Okay.

9            How often would you personally fill out a stop data

10   form?

11   *A.*  I would try to fill one out after every stop.

12   *Q.*  After you fill out the field contact cards, what do you do

13   with them?

14   *A.*  Um, there is a report writing receptacle, which is

15   basically a wooden box.  One is at Eastmont -- or actually, I'm

16   sorry -- there is a cardboard box at Eastmont.  There is

17   actually a wood receptacle at the Police Department at 7th and

18   Broadway, and you turn it in there.

19   *Q.*  Okay.

20           Is that the appropriate place that you have been

21   trained where you should deposit completed field contact cards?

22   *A.*  Yes.

23   *Q.*  And what is your understanding of what happens to those

24   field contact cards after you leave them in the box?

25           *MR. BOLEY:*  Objection.  Lack of foundation.

**Vass - Cross / Haddad**

```
 1              THE COURT:  What his understanding is.

 2              Objection is overruled.

 3              THE WITNESS:  Eventually, someone comes down to

 4   either Eastmont or the Police Department at 7th and Broadway,

 5   picks up all the reports, including field contact reports, and

 6   somehow I don't know, but documents it somewhere.

 7   BY MR. HADDAD:

 8   Q.  Okay.

 9              THE COURT:  You are saying Eastmont, the substation

10   there?

11              THE WITNESS:  Yes, ma'am, 73rd Avenue, right about

12   Bancroft.

13              MR. HADDAD:  That's all I have right now.

14              THE COURT:  And then what do you do -- what do you

15   actually do with the stop data forms?  Where do they go?

16              THE WITNESS:  It's changed over the years.  At

17   times, you ended up just turning them into the box.

18              THE COURT:  The same box where you put the cards or

19   the --

20              THE WITNESS:  Correct.

21              THE COURT:  Arrest reports?

22              THE WITNESS:  I think over time, you then maybe had

23   to turn them into a supervisor.  I don't know what point it was

24   during the time frame --

25              THE COURT:  Well, during that period of time
```

**Vass - Cross / Haddad**

 1  involved in the case, we're talking about 2005, ed Sec, were

 2  you working with a partner?

 3          **THE WITNESS:**  Yeah, from -- probably about

 4  99 percent of the time I was.

 5          **THE COURT:**  So the two of you were traveling in the

 6  vehicle together, correct?

 7          **THE WITNESS:**  Yes, ma'am.

 8          **THE COURT:**  Did you have some understanding about

 9  the responsibilities for filling out, for example, the

10  detention -- the cards that were used, detention cards?

11          **THE WITNESS:**  Right.

12          **THE COURT:**  Who did that?

13          **THE WITNESS:**  We would just take turns.

14          **THE COURT:**  And did -- was that just understood, you

15  know, that you knew that day who was going to be doing it, or

16  did you just turn to each other and say, you going to fill this

17  one out or I'll fill this one out?

18          **THE WITNESS:**  Right, it was more of the latter.

19          **THE COURT:**  Um-hmm.

20          **THE WITNESS:**  Or, you know, maybe another car was

21  there with two other people as well; you know, they would --

22  you know, we would talk, hey, who is doing this, who is writing

23  this or doing this, documenting it.

24          **THE COURT:**  And who took the responsibility, then,

25  for the filling out the stop data forms?

**Vass - Cross / Haddad**

1              **THE WITNESS:**  It would just be just whoever decided

2       they were going to do it at that point.

3              **THE COURT:**  But did you have some way of checking to

4       make sure that if you didn't do it somebody else did it?

5              **THE WITNESS:**  Generally, they would just say, hey,

6       I'll do it.  Or a lot of the times, I don't know, you just -- I

7       don't know, I want to say I assume that they did it, but you

8       are seeing -- I guess you believe they did it.

9              **THE COURT:**  In your unit, do you have a rough

10      approximation of what percentage of the time those stop data

11      collection forms were filled out?

12             **THE WITNESS:**  I know we tried to do it after

13      everyone, ma'am.

14             **THE COURT:**  Okay.

15             Anything further?

16             **MR. HADDAD:**  No.

17             **THE COURT:**  What is that, now, almost quarter to.

18      We'll see you at 12:30 then, okay?

19             **MR. BOLEY:**  Thank you, Your Honor.

20             **THE COURT:**  Okay, thank you.

21             You may step down.  Do not discuss your testimony

22      with any other persons who may be witnesses until the

23      proceeding is over.

24             And we'll see you after the break.  Thank you.

25                    **(Recess taken at 11:41 a.m.)**

**Vass - Cross / Haddad**

1                    **(Proceedings resumed at 12:45 p.m.)**

2              *THE COURT:*  You may continue.

3              *MR. HADDAD:*  Thank you.

4    *BY MR. HADDAD:*

5    *Q.*  Officer Vass, the cell phones that you mentioned this

6    morning that you used on duty sometimes, were those provided to

7    you by the Oakland Police Department?

8    *A.*  There was a time -- there was a time that cell phones were

9    provided.  At this time I don't know, but there was a period of

10   time for several years that I had a cell phone.  I don't know

11   if it was this time or not.

12   *Q.*  And when you had the cell phones, they were also paid for

13   by the Oakland Police Department; is that right?

14   *A.*  Yes, they were.

15   *Q.*  By that, I mean the phone bills, right?

16   *A.*  I never observed them paying the phone bill.  I would

17   imagine that would be the case.

18   *Q.*  You didn't pay them, did you?

19   *A.*  No, I did not.

20   *Q.*  Do you know who Michael Holmes is?

21   *A.*  I do.

22   *Q.*  Where have you usually seen him?

23   *A.*  Um, well, he would be on C Street, 9500 block of C Street.

24   Seen him in his vehicle, 109th and Mac, MacArthur several

25   times.  Those are the usual places I've seen him.

**Vass - Cross / Haddad**

```
 1   Q.  Okay.

 2           And how long have you known him, or known of him?

 3   A.  It's been quite a while, maybe 2005, somewhere around

 4   there.

 5   Q.  Could it have been earlier?

 6   A.  You know, it could have been.  I really don't have an exact

 7   time frame of when I recall seeing him.

 8   Q.  Okay.

 9           You understand that he lives in his grandmother's

10   house at 9504 C Street, don't you?

11   A.  I don't know if the word "lives" -- I think he stays there

12   quite a bit, and that's probably the best answer.

13   Q.  All right.

14           And that's right on your beat, isn't it?

15   A.  In my area it is.

16   Q.  Okay.

17           I understand that you have arrested Mr. Holmes on

18   one occasion; is that correct?

19   A.  I don't think that's -- no.

20   Q.  You think you have arrested him more times?

21   A.  I'm probably going to need you to clarify when you say

22   "arrest."  But the two times that I personally was on scene

23   where I actually took him into custody is the two times that I

24   can think of.

25   Q.  So you are trained in the term arrest, aren't you?
```

**Vass - Cross / Haddad**

1   *A.*   I am.

2   *Q.*   You know what that -- you know what an arrest is, don't

3   you?

4   *A.*   I do.

5   *Q.*   All right, so that's the question:  How many times have you

6   arrested Mr. Holmes?

7   *A.*   That's why I tried to clarify, because it's kind of vague

8   for what you say, because I actually wrote a search warrant for

9   his house.  I wasn't on scene, but he was arrested.  I somewhat

10  directed that arrest, but I really didn't participate in it.

11  So I'm not quite sure if that is what you are referring to.

12  *Q.*   So you weren't there when he was arrested, physically,

13  correct?

14  *A.*   For that particular time, no.  Two physical times I

15  actually was on scene I arrested him.

16  *Q.*   All right.

17          Now, have you had a chance to review the Internal

18  Affairs files for the complaints made in this matter by

19  Mr. Holmes, Engram and Rix?

20  *A.*   I have read some of them.

21  *Q.*   Okay.

22  *A.*   Not thoroughly, but I have read some of them.

23  *Q.*   And I mention all three together because it's accurate,

24  isn't it, that Internal Affairs investigated all their

25  complaints in one investigation?

**Vass - Cross / Haddad**

1   *A.*  Um, I did separate interviews.  I don't know if they

2   lumped -- if they placed them all together, or how they

3   actually did it.

4   *Q.*  All right.

5          Now are you aware that the plaintiffs have only

6   been -- produced one arrest report for one time when you have

7   arrested Mr. Holmes in this action?

8              *MR. BOLEY:*  Objection.  Lack of foundation.

9              *THE COURT:*  Objection is overruled.  The question is

10  what he is aware of.

11             *THE WITNESS:*  I don't know what you provided me.

12  *BY MR. HADDAD:*

13  *Q.*  Have you recently seen two separate arrest reports for

14  times that you have arrested Mr. Holmes?

15  *A.*  Um, I did.

16  *Q.*  And to the best of your recollection, what are the dates of

17  those?

18  *A.*  Um, in '06, there is a arrest report that, of course, I

19  made for the 107 Pontiac arrest for the possession of base

20  cocaine for sale.

21          I was able to find that there was a warrant arrest

22  for Michael Holmes, I want to say in the 9500 block of C

23  Street.  And I want to say the warrant was for driving on a

24  suspended license.  And it might have also been something else,

25  but it was for driving kind of offenses.

**Vass - Cross / Haddad**

1   **Q.**  When was that?

2   **A.**  I believe it was in '05.

3   **Q.**  Do you know the month?

4   **A.**  Not off the top of my head.  I could find out, but not off

5   the top of my head.

6   **Q.**  Okay.

7   **A.**  It was something I just recently came across.

8   **Q.**  How did you come across it?

9   **A.**  I started trying to actually look for times that I have

10  contacted Mr. Holmes and documented it.

11  **Q.**  When did you do that?

12  **A.**  Last week.

13  **Q.**  Last week?

14  **A.**  Um-hmm.  I mean, it was over a period of time, but I just

15  happened to find this the other day.

16  **Q.**  Okay.

17  **A.**  Maybe somewhere around that time frame.

18  **Q.**  Okay.

19          And in the course of this case, you recall

20  responding to some discovery requests that asked you to produce

21  all documentation of any sort regarding any contacts, detention

22  or stops you made of any of these three plaintiffs, Holmes,

23  Engram, and Rix?

24  **A.**  I know in the deposition you spoke about it, I didn't know

25  it at that time.  But it did jog my memory, though; you asked

**Vass - Cross / Haddad**

```
 1  me about a warrant, have I arrested him for a warrant, and I
 2  said it's possible.
 3          I believe this was probably what coincides with
 4  that, so I didn't think there was so much a discovery issue.
 5  You asked me already about this question.
 6  Q.  Have you found any other documentation for any contacts
 7  with any of these three plaintiffs since you've looked further?
 8          MR. BOLEY:  Objection, other?  Objection.  Vague as
 9  to "other documentation."
10          THE COURT:  Referring to other --
11  BY MR. HADDAD:
12  Q.  Beyond what you knew at the time.
13          THE COURT:  Other of his contacts, or talking about
14  other officers' contacts?
15          MR. HADDAD:  I'll rephrase it.
16          THE COURT:  Okay.
17  BY MR. HADDAD:
18  Q.  Have you found any other documentation for any other
19  contacts you had with Holmes, Engram, or Rix, other than what
20  you already knew about by the time of your deposition?
21  A.  I'm trying to think.  I think we kind -- I know we
22  discussed it.  I believe, at least.
23          The surveillance of Mark Engram, I believe we
24  discussed that, and I think you already have that police
25  report, so that could be possibly one.
```

**Vass - Cross / Haddad**

1  **Q.**  When was that?

2  **A.**  February -- was it -- February '05, I believe.  I think you

3  talked to me about the date, I just don't know if you had --

4  anyways.

5  **Q.**  Did you have contact with Mr. Engram in February of '05?

6  **A.**  That day, I was doing a surveillance on him.

7  **Q.**  So what does that entail?  What did that entail?

8  **A.**  You are going to have to be more specific.

9  **Q.**  Were you just looking at him, or did you talk to him?

10  **A.**  Oh.  I did not talk to him, I just observed him -- arrested

11  him after he sold narcotics.  But I think you guys, to my

12  knowledge, you were already aware of that.

13  **Q.**  But you didn't have any contact with him personally on that

14  date?

15  **A.**  No personal contact, no.

16  **Q.**  So other than what you have just told me about now, there

17  is no other documentation that you discovered more recently

18  since your deposition concerning your personal contacts with

19  any of these three plaintiffs?

20  **A.**  I don't believe so.

21  **Q.**  That's correct, isn't it?

22  **A.**  That's what I'm saying, I don't believe so.

23  **Q.**  All right.

24            Now, so you have arrested Mr. Holmes on two

25  occasions; is that right?

**Vass - Cross / Haddad**

1  **A.**  Well, I think I have -- I think I've always been upfront

2  that I think there was a possible warrant arrest.  So --

3  **Q.**  Okay.  But the question is, is it accurate that you have

4  arrested Michael Holmes on two occasions?

5  **A.**  Yes.

6  **Q.**  And you also detained him several times, correct?

7  **A.**  That's -- yes, I have.

8  **Q.**  How many?  How many times?

9       **MR. BOLEY:**  Objection.  Relevance, Your Honor.

10       **THE COURT:**  Objection overruled.

11       **MR. BOLEY:**  And vague as to time.

12       **THE COURT:**  Objection overruled.

13       **THE WITNESS:**  Um, there was those two.  Of course,

14  there was the one on International, that field contact report

15  was made on.

16       There was a stop at 109th Avenue and MacArthur, and

17  I remember doing a probation search for Mr. Holmes at 9504 C

18  Street, his residence quite a while ago.

19  **BY MR. HADDAD:**

20  **Q.**  Um-hmm.

21       In the past, you have given the estimate that you

22  detained him probably more than five times; is that accurate?

23  **A.**  Well, I think I'm close to five right there, so I think,

24  you know, probably somewhere around five.  I mean, fairly an

25  accurate number.

**Vass - Cross / Haddad**

1  *Q.*  And you understand that a detention is different than an

2  arrest, right?

3  *A.*  It is different, yeah.

4  *Q.*  All right.

5        So you got two arrests and probably more than five

6  detentions, is that right, of Mr. Holmes?

7  *A.*  We, I honestly was probably using the more broad term of

8  his being stopped, detained by the police at the time when you

9  asked me that question.  I don't honestly know if I physically

10  broke it down.

11  *Q.*  All right.

12        Would you please turn to page 33 of your deposition.

13  *A.*  Okay.

14        Page 33?

15  *Q.*  Yes.

16  *A.*  All right, sir.

17  *Q.*  From line 5 to 16.

18  *A.*  Five through 16?

19  *Q.*  Um-hmm.

20        Page 33.

21        "*Q.*   Have you ever arrested him on any

22         other occasions?

23        "*A.*   I may have.

24        "*Q.*   Have you detained him on any

25         other occasions?

**Vass - Cross / Haddad**

```
 1              "A.   Yeah.

 2              "Q.   Do you have a sense of about how

 3               many times you have detained Michael

 4               Holmes?

 5              "A.   No.

 6              "Q.   Would you say it's more than ten?

 7              "A.   I don't know.

 8              "Q.   Would you say it's more than

 9               five?

10              "A.   I'd say probably more than five."

11              Did I read that correctly?

12   A.   It does sound like you read it correctly.  To be honest, I

13   wasn't able to follow along, but it sounds like that's fairly

14   accurate.

15   Q.   Now, so in the more than five times that you have detained

16   Michael Holmes, how many field contact cards have you seen to

17   document those five-plus detentions?

18   A.   When you say that I've seen, that I personally filled out,

19   or that I was able to go back and confirm that they are there?

20   Q.   Yeah, that you've confirmed are there.

21   A.   Um, none.  I don't think I've managed to find any.

22   Q.   All right.

23              And just to jog your memory, we did look at one this

24   morning --

25   A.   Oh, I'm sorry.
```

**Vass - Cross / Haddad**

1  **Q.**  -- from the Yukon incident.  That was at Exhibit 6, do you

2  recall that?

3  **A.**  Yes, that would be one.

4  **Q.**  So there is one that you are aware of at this time; is that

5  right?

6  **A.**  Now that you point that out, you're right, there is one.

7  **Q.**  Do you know who Mark Engram is?

8  **A.**  Yes, sir, I do.

9  **Q.**  And how long have you known him?

10  **A.**  Maybe around -- well, probably a little bit longer because

11  I remember not having any real direct contact with him, but I

12  remember him being arrested there on E Street, same general

13  area, by two other officers.

14          And so, I remember somewhat driving by to -- just

15  seeing who they arrested but not really having any direct

16  contact with the investigation, itself.

17  **Q.**  But the question was, how long have you known him?

18  **A.**  That would be, I guess, the time from when I started to

19  know him.

20  **Q.**  When was that?

21  **A.**  I believe that arrest maybe occurred in '04.

22  **Q.**  All right.

23          Where have you usually seen Mark Engram?

24  **A.**  On C Street.

25  **Q.**  And that is in the area where you were assigned with Team

1  6?

2  **A.**   Yes.  When I say C, I'm sorry, the 9500 block area.

3  **Q.**   You have detained Mark Engram several times?

4  **A.**   I have.

5  **Q.**   How many times?

6  **A.**   I don't have an exact number.  Probably possibly more than

7  five.

8  **Q.**   Okay.

9          Could be ten times, right?

10 **A.**   It could be.

11          I -- like I said, I don't recall.  I don't have a

12 specific number.

13 **Q.**  And how many -- you've searched -- strike that.

14          You've searched Mr. Engram even more times than you

15 have detained him; is that right?

16              **MR. BOLEY:**  Objection.  Relevance.

17              **THE COURT:**  You may answer.

18              Overruled.

19              **THE WITNESS:**  You said that I've searched him more

20 times than I've detained him?

21 **BY MR. HADDAD:**

22 **Q.**   Yeah.  Let me rephrase it.

23          You've searched Mark Engram more than ten times,

24 right?

25 **A.**   I don't believe so.

**Vass - Cross / Haddad**

1   *Q.*  Would you turn to page 73 of your deposition, please.

2           *THE COURT:*  Which one?

3           *MR. HADDAD:*  Seventy-three.

4           *THE COURT:*  73?

5   *BY MR. HADDAD:*

6   *Q.*  Page 73, at the bottom.

7   *A.*  When -- you say 73, correct?

8   *Q.*  No.  If you go to the next page you'll see a little 73 in

9   the upper right side -- yeah, that is 73, but we are going to

10  be on the previous page.

11  *A.*  Okay.

12  *Q.*  Lines 10 to 16, starting with "On the times that you've

13  detained."

14  *A.*  Line 10 through 16?

15  *Q.*  Yeah.

16          Ready?

17  *A.*  Yes, I am.

18          *MR. HADDAD:*

19          "*Q.*   On the times that you've

20          detained" --

21          *MR. BOLEY:*  Your Honor, I object.  It's not

22  inconsistent.  It's not impeachable, so I object to it being

23  read into the record.

24          *MR. HADDAD:*  Well, it's an admission of a party

25  opponent, no matter what, so there should be no objection of it

 1    being read into the record.

 2              **THE COURT:**  He testified to the number of times.

 3    It's not inconsistent.

 4              **MR. HADDAD:**  That's right.  I actually misread it.

 5              **THE COURT:**  Yeah, okay.

 6    **BY MR. HADDAD:**

 7    **Q.**  Have you handcuffed Mark Engram every time that you have

 8    searched him?

 9    **A.**  I don't believe so, no.

10    **Q.**  Sometimes you have searched Mr. Engram without handcuffing

11    him first; is that right?

12    **A.**  Yeah.

13    **Q.**  Is that consistent with your training and experience as a

14    member of the Oakland Police Department?

15    **A.**  To my training and experience?

16    **Q.**  To search somebody without handcuffing them first.

17    **A.**  Yes.

18    **Q.**  In this case, have you seen any documentation for any of

19    your stops of Mr. Engram?

20              **MR. BOLEY:**  Asked and answered.

21              **THE COURT:**  Was that your objection?

22              **MR. BOLEY:**  Yes.

23              **THE COURT:**  Couldn't tell where it came from.

24                      **(Laughter.)**

25              **MR. BURRIS:**  It wasn't mine, I can assure you.

**Vass - Cross / Haddad**

1              ***THE COURT:*** Overruled.

2              ***THE WITNESS:***  I don't believe so.

3    ***BY MR. HADDAD:***

4    ***Q.***  Have you looked?

5    ***A.***  I actually did somewhat look.  I did.

6    ***Q.***  Okay.

7              And you couldn't find any documentation for any of

8    your stops of Mr. Engram, correct?

9    ***A.***  That's true.

10             ***THE COURT:***  Did you say "that's true"?

11             ***THE WITNESS:***  Yes, ma'am, I did.

12   ***BY MR. HADDAD:***

13   ***Q.***  Do you know who Richard Rix is?

14   ***A.***  I do.

15   ***Q.***  How long have you known him?

16   ***A.***  Probably since 2003.

17   ***Q.***  And where have you usually seen him?

18   ***A.***  9200 block of C Street, just a little west of the location.

19   ***Q.***  Have you ever arrested Richard Rix?

20   ***A.***  I don't believe so.

21   ***Q.***  And as far as you know, he does not have any conviction

22   involving drug dealing, does he?

23   ***A.***  Not drug dealing, no.

24   ***Q.***  You also detained Mr. Rix several times, haven't you?

25   ***A.***  I believe I have.

**Vass - Cross / Haddad**

1  **Q.** And you have detained him approximately five times; is that

2  right?

3  **A.** I don't know if I would say that.  I'd say it's possible,

4  but I don't -- I think that's always been kind of my answer,

5  it's possible.

6  **Q.** Possibly five times?

7  **A.** That it's possible five times, yes.

8  **Q.** In this case, have you seen any documentation for any of

9  your detentions of Mr. Rix?

10 **A.** No.

11 **Q.** If there were documentation for every time that you

12 detained Mr. Rix, you would know exactly how many times you

13 detained him.  Is that accurate?

14          **MR. BOLEY:** Objection.  Argumentative, Your Honor.

15          **THE COURT:** Objection is overruled.

16          **THE WITNESS:** I would say most likely, yes.

17 **BY MR. HADDAD:**

18 **Q.** Have you looked for documentation of your stops of Mr. Rix

19 over the years?

20 **A.** Um, I believe I did.

21 **Q.** Okay.

22          Now, collectively, you have stopped these three

23 plaintiffs, Holmes, Engram and Rix, on about 20 occasions; is

24 that right?

25 **A.** You are saying collectively?  I mean, I -- it's possible.

**Vass - Cross / Haddad**

1    You would have to -- I don't know.

2    *Q.*  Have you ever seen any stop data forms for any stop or

3    arrests you have ever made of either Holmes, Engram or Rix?

4    *A.*  I don't --

5              *MR. BOLEY:*  Lacks foundation, Your Honor.

6              *THE COURT:*  Objection is overruled.

7              *THE WITNESS:*  I don't have access to that.

8    *BY MR. HADDAD:*

9    *Q.*  Have you seen them?

10   *A.*  Like I said, I don't even have access to be able to see

11   them.

12   *Q.*  Have you seen them?  Have you seen any?

13   *A.*  Whether I answer this, are you saying seeing them as far as

14   me filling them out, or seeing them on the other end?

15   *Q.*  On the other end.

16   *A.*  I don't have access to them.

17   *Q.*  Have you looked for them?

18   *A.*  Like I said, I do not have access to that.

19   *Q.*  You testified that up to a week ago, you were looking for

20   documentation of -- of your contact with any of these three

21   guys, were you looking for stop data forms as well?

22   *A.*  I didn't even think to look for that.

23             *THE COURT:*  Does that mean you weren't looking for

24   them?

25             *THE WITNESS:*  Your Honor, I did not look for them.

**Vass - Cross / Haddad**

1            But just can I add something to that?

2    *BY MR. HADDAD:*

3    *Q.*  No.  There is a question coming now.

4            Have you ever found any contraband in the pants of

5    either Michael Holmes, Mr. Engram or Richard Rix at any time?

6    *A.*  No.

7    *Q.*  Do you have any explanation for your department's lack of

8    documentation for all of the times that you have admitted

9    stopping Holmes, Engram or Rix?

10           *MR. BOLEY:*  Objection.  Lack of foundation and

11   argumentative.

12           *THE COURT:*  The objection is overruled.  The

13   question is whether he has any explanation.

14           *THE WITNESS:*  You know, I do not.  I can say,

15   though, I don't necessarily know how stop data forms are

16   collected, but it -- they don't really have any information

17   other than date and -- date, time and location.  That doesn't

18   say who it was.  But like I said, I don't have access to that.

19   *BY MR. HADDAD:*

20   *Q.*  Uh-huh.

21           Let's turn to Plaintiff's Exhibit 16.  I'll bring

22   you the book again.  And I would like to specifically direct

23   your attention to the last page of that exhibit.

24           Are you with me?

25   *A.*  I am.

**Vass - Cross / Haddad**

1   *Q.*   I'm going to put this one on the ELMO.

2          *MR. HADDAD:*   It's already in evidence.

3          *THE WITNESS:*   Okay.

4   *BY MR. HADDAD:*

5   *Q.*   This is an example of a stop data form, isn't it?

6   *A.*   That is correct.

7   *Q.*   And actually, this form has spaces for a lot of different

8   types of information, doesn't it?

9   *A.*   You are right.

10  *Q.*   This form includes the driver's license number of the

11  person stopped, doesn't it?

12  *A.*   It does.

13  *Q.*   And the license plate number of any car that they are in,

14  correct?

15  *A.*   That's true.

16  *Q.*   Of course, it includes the reason for the stop, doesn't it?

17  *A.*   It does.

18  *Q.*   It includes whether or not a search was done, right?

19  *A.*   It does.

20  *Q.*   And the legal basis for the search.  See that?

21  *A.*   Yes.

22  *Q.*   It allows you to break down who within a car of multiple

23  people was searched, right?

24  *A.*   It does.

25  *Q.*   And it also asks you to check a circle answering the

**Vass - Cross / Haddad**

1    question, "have you or do you have knowledge that another

2    officer stopped this person within the past six months?"  Do

3    you see that up here?

4    *A.*  Yes.

5    *Q.*  This is all information that's collected by your

6    department --

7    *A.*  It is.

8            *MR. BOLEY:*  Objection.  Lacks foundation.

9            *THE COURT:*  That wasn't really a question.

10           Do you have a question.

11           *MR. HADDAD:*  Didn't get a chance to finish it

12   actually.

13           *THE COURT:*  Okay.  It's more of a statement.

14   *BY MR. HADDAD:*

15   *Q.*  Isn't it?

16                   **(Laughter.)**

17           *MR. BOLEY:*  Objection.

18                   **(Laughter.)**

19           *MR. BOLEY:*  Objection.  Lack of foundation, Your

20   Honor, as to "collecting."

21           *THE COURT:*  He may answer the question.

22           *THE WITNESS:*  Right, no, it does.

23           *THE COURT:*  I assume that's not Sacramento or

24   Richmond or something else.  He's an officer, been an officer

25   for ten years.  He's collecting information for his department.

```
 1              Is that correct?
 2              THE WITNESS:  Correct.
 3              THE COURT:  Yeah, okay.
 4    BY MR. HADDAD:
 5    Q.  Have you heard anyone in your department is losing contact
 6    field reports or arrest reports or failing to keep track of
 7    them?
 8              MR. BOLEY:  Objection.  Relevance.  Lack of
 9    foundation.
10              THE COURT:  Objection sustained.
11              THE WITNESS:  I can --
12              THE COURT:  You don't have to answer that.
13    BY MR. HADDAD:
14    Q.  I would like to ask you about an incident now that has been
15    alleged at C Street and 98th on or about September 22nd, 2005.
16              THE COURT:  For my information, I certainly know the
17    numbered streets, but where are C Street, B Street, et cetera,
18    in the City of Oakland?
19              THE WITNESS:  If you go 580, let's say.
20              THE COURT:  Yes?
21              THE WITNESS:  And you go down 98th Avenue.
22              THE COURT:  Yes?
23              THE WITNESS:  Towards, let's say the airport --
24              THE COURT:  Yes?
25              THE WITNESS:  It's going to be that direction.  It's
```

**Vass - Cross / Haddad**

1   going to be MacArthur, Bancroft, International, or East 14th

2   Street.  And then below International, that is where the

3   lettered streets would stop.  So it would be International, A,

4   Street, C Street, D Street.  So right below International.

5           **THE COURT:**  I see.  Thank you.

6   *BY MR. HADDAD:*

7   *Q.*  So they start between International and the water?

8   *A.*  If you are looking at a true map, yes.

9   *Q.*  Okay.

10          Now, to orient you to the first incident I want to

11  ask you about, specifically, this is the one that's been

12  alleged at C and 98th on or about September 22nd, 2005.  Are

13  you familiar with that allegation?

14          **MR. BOLEY:**  Objection.  Actually misstates that

15  allegation, but -- in the complaint, but you -- I'm just making

16  that objection.

17          **THE COURT:**  Do you have a specific date?

18          **MR. HADDAD:**  On or about September 22nd, 2005.

19          **THE COURT:**  So, on or about, but is it, in fact,

20  September 22nd; is that correct?

21          **MR. HADDAD:**  Well, I would like to ask the officer,

22  and we'll determine that.

23          **THE COURT:**  Okay, fine, then ask him.

24  *BY MR. HADDAD:*

25  *Q.*  Have you reviewed the Internal Affairs investigation for

**Vass - Cross / Haddad**

1  the plaintiffs' complaints about this particular date and

2  location?

3  *A.*  I did one.  I don't recall thoroughly looking at them all,

4  but I did read the one.

5  *Q.*  All right.

6          So you are aware of the allegation by Mr. Holmes and

7  Mr. Engram, aren't you, that you strip searched each of them

8  near the side of a house in the area of C Street and 98th

9  Avenue on or about September 22nd, 2005; is that right?

10  *A.*  That is correct, with the time that Mr. Engram said it

11  happened, I think for an hour, from like 9:10 to 10:10, I think

12  more specifically on the 22nd, because I recall he said that he

13  looked on the cell phone to get the correct time.

14  *Q.*  You recall Mr. Holmes and Mr. Engram say that you stopped

15  them while they were with Mr. Rix in the morning as they were

16  walking their dogs, don't you?

17  *A.*  That's what they claim, yes.

18  *Q.*  And you have seen Mr. Engram with a dog before, haven't

19  you?

20  *A.*  I've seen Mr. Engram with a dog in what is -- the 10th of

21  February '05 is when I saw them with the dog.

22  *Q.*  So you saw him with a dog, to your recollection, about

23  seven or eight months before this incident?

24  *A.*  Before they claim that incident occurred, yes.

25  *Q.*  Did you strip-search Mr. Holmes or Mr. Engram in this

**Vass - Cross / Haddad**

1    incident?

2    **A.**  No, because I was not even at work.

3    **Q.**  Okay.

4            Bear with me on these questions, if you will.

5            Did you reach inside Mr. Holmes sweatpants and run

6    your hand between Mr. Holmes' buttocks over Mr. Holmes boxer

7    shorts?

8    **A.**  My answer is going to be the same.

9    **Q.**  Okay.

10   **A.**  I can prove that I wasn't at work at that particular time.

11   I didn't start work at that time.

12   **Q.**  Okay.

13           So it's your testimony that you weren't even working

14   at that time; is that right?

15   **A.**  That's true.

16           You know, I actually contacted my bank, which is

17   Wells Fargo --

18   **Q.**  Um-hmm?

19   **A.**  -- talked to the bank investigator.  And I asked, because,

20   of course, going back to '05, I couldn't actually have a

21   specific recollection on this date what did I do.  So I spoke

22   to the bank investigator, asked him, hey, is there any chance

23   that I maybe used any of my ATM or credit cards during this

24   time.  They said, yes, I used my -- just so you know, mine and

25   my wife's credit cards is different.  You were provided with a

**Vass - Cross / Haddad**

1    copy of that so I can prove that we don't have the same credit

2    cards, so if -- so these times are going to be different from

3    my wife and mine.

4            So I was able to prove that I went to Wells Fargo

5    and I used an ATM, and -- that, of course, just due to the

6    time, they don't have video surveillance anymore.  They stopped

7    having that surveillance I think back in '06.

8            But I used my credit card at the ATM, and then I

9    used it at two other locations outside of Oakland during the

10   times that this occurred, which also matched my time sheet that

11   started at 2:00 o'clock that afternoon.  So I don't quite know

12   what to say in regards to that.

13   **Q.**  I'd like to ask you some more about it.

14   **A.**  Okay.

15   **Q.**  So in the orange book -- let me help give you some room.

16                    **(Assisting witness with exhibit binders.)**

17   **BY MR. HADDAD:**

18   **Q.**  Would you turn to page 4644, please, of Exhibit 5.

19   **A.**  Are you referring to me?

20   **Q.**  Yes.

21   **A.**  Turn to what page?

22   **Q.**  4644.

23   **A.**  I see a page 44, but I don't see a page 46, per se.  Is

24   that what you are referring to?

25                    **(Assisting witness with exhibits.)**

**Vass - Cross / Haddad**

1          *THE WITNESS:*  Thank you.

2     *BY MR. HADDAD:*

3     *Q.*  Now, would you take a look at this page and the next five

4     pages after it.

5     *A.*  Okay.

6     *Q.*  In fact, through page 4653.

7          What do these pages appear to be?

8     *A.*  Um, an incident generated by an Oakland Police Department

9     dispatch.

10    *Q.*  They appear to be CAD logs for September 22nd, 2005,

11    pertaining to you; is that right?

12          *MR. BOLEY:*  Objection.  Lack of foundation.

13          *THE COURT:*  The objection is overruled.

14          *THE WITNESS:*  It would appear so, yes.

15    *BY MR. HADDAD:*

16    *Q.*  All right.

17          Now, going to the first page that I asked you to

18    look at, which is 4644 --

19    *A.*  Um-hmm.

20    *Q.*  Do you see that it refers to a unit with a number?

21    *A.*  Yes.

22    *Q.*  That's 20A62?

23    *A.*  Yes.

24    *Q.*  Is that your unit?

25    *A.*  At that time, yes.

**Vass - Cross / Haddad**

1    *Q.*  All right.

2           And then it says "agency OP," that's Oakland Police,

3    right?

4    *A.*  Um-hmm.

5    *Q.*  Yes?

6    *A.*  Yes, it was.

7    *Q.*  Next, it has the date, September 22nd, 2005?

8    *A.*  Yes.

9    *Q.*  Next, it has the time, which would be 3:19 in the

10   afternoon?

11   *A.*  That's correct.

12   *Q.*  And next it says "unit on, vehicle 1923," right?

13   *A.*  Yes.

14   *Q.*  What does that mean?

15           *MR. BOLEY:*  Objection.  Lack of foundation.

16           *THE COURT:*  The objection is overruled.

17           *THE WITNESS:*  What time I started work, if you will,

18   through dispatch.

19   *BY MR. HADDAD:*

20   *Q.*  So this --

21   *A.*  And I logged on with that vehicle number.  I'm working with

22   vehicle 1923.

23   *Q.*  Oh, so are you saying that this record indicates that you

24   were in car 1923 on that day?

25   *A.*  At this time, I would say yes.

**Vass - Cross / Haddad**

1   **Q.**  And this record indicates that you didn't start work that

2   day until about 3:19 in the afternoon?

3   **A.**  Well, that's what that CAD record would show, yes.  And --

4   **Q.**  Now, does this CAD record show some of the work that you

5   did throughout that day?

6           **MR. BOLEY:**  Objection.  Lack of foundation.

7           **THE COURT:**  Are you referring to all of the pages?

8           **MR. HADDAD:**  Yeah.

9           **THE COURT:**  You may answer the question.

10          **THE WITNESS:**  It appears so.

11  **BY MR. HADDAD:**

12  **Q.**  All right.

13          So what's the next entry that you understand that

14  describes some work that you did?

15  **A.**  Well, there is another entry here at, what, 729,

16  technically says 1929, and it says "incident initiated."  I

17  don't know what that is but, of course, that's a reference that

18  apparently I did something at that time.

19  **Q.**  Okay.

20  **A.**  Um, and then if you look down at the same time on the next

21  page, it shows me in the 1500 block of 35th Avenue.

22          Are you with me?

23  **Q.**  Yeah, I'm with you.

24          And on that page, which is 4646, under "SDAT," there

25  is some codes.  What does "OV" mean?

**Vass - Cross / Haddad**

1           **MR. BOLEY:**  Objection.  Lack of foundation.

2    **BY MR. HADDAD:**

3    **Q.**  If you know.

4           **THE COURT:**  You may answer.

5           **THE WITNESS:**  On-view arrest.

6    **BY MR. HADDAD:**

7    **Q.**  On-view arrest?

8           What does "EU" mean, if you know?

9    **A.**  I don't know.

10   **Q.**  What does "AV" mean, if you know?

11          **THE COURT:**  Which one do you want answered first?

12          **MR. HADDAD:**  He said he didn't know.

13          **THE COURT:**  Okay.

14          **MR. BURRIS:**  I didn't hear that.

15          **THE COURT:**  I didn't hear that, either.

16          **THE WITNESS:**  You know, those are -- at some point

17   we started where -- in the police vehicles we started using

18   those codes.  I'm not familiar with those codes.  And I would

19   imagine that at that time frame dispatch was placing those

20   codes in.

21   **BY MR. HADDAD:**

22   **Q.**  Okay.

23          Do any of these pages of CAD records show when you

24   got off duty that day?

25   **A.**  Yes.

**Vass - Cross / Haddad**

1    **Q.**  Which page?

2    **A.**  4652.

3    **Q.**  Thank you.  And how can you tell when you got off duty?

4    **A.**  Because on the very last line --

5    **Q.**  Yeah?

6    **A.**  At 9/22/05, 2354 hours, it says "unit off."

7    **Q.**  So unit off means you are going off duty?

8    **A.**  I didn't type that in, I mean, but to the right of my name

9    it says -- or to the right of that is my name.

10   **Q.**  But your understanding of how these CAD forms work, unit

11   off means that you are going off duty; is that right?

12   **A.**  I would imagine so.

13   **Q.**  Is that your understanding?

14   **A.**  That would -- that would be my understanding, yes.

15   **Q.**  So it's your testimony that because you weren't working on

16   the morning of September 22nd, 2005, it would not have been

17   possible for you to strip-search Holmes and Engram on that

18   morning; is that right?

19   **A.**  Well, it's an interesting question, because if I'm not at

20   work, I'm not strip searching him.  I'm not coming in to

21   strip-search from my house.

22           I'm not quite sure what the question is.

23   **Q.**  It's not a trick question, I'm just trying to get things

24   clear for the record.

25           Is it your testimony that because you were not

**Vass - Cross / Haddad**

```
 1  working on the morning of September 22nd, 2005, therefore, you

 2  were not on duty and could not have strip-searched Mr. Holmes

 3  and Mr. Engram on that date?

 4  A.  That seems pretty accurate.

 5  Q.  Okay.

 6          What was your shift around that time?

 7  A.  2:00 to midnight.

 8  Q.  Excuse me?

 9  A.  2:00 in the afternoon to midnight.

10  Q.  Were you assigned to any morning shifts?

11  A.  That day?

12  Q.  No, within September of 2005.  Do you know?

13  A.  I don't know.  It's possible.  Probable.

14  Q.  Probable, you said?

15  A.  Yeah, probable.

16  Q.  Uh-huh.

17  A.  But I don't know that.  I'm just guessing.

18  Q.  Uh-huh.

19          What about, on September 29th, do you know if you

20  were working a morning shift that day?

21  A.  You know, I don't know.

22  Q.  Would you turn to pages 4657 to 4659, please.

23  A.  All right.

24  Q.  So what does the first page of this appear to be?

25  A.  A very similar CAD printout on a different day.
```

**Vass - Cross / Haddad**

1  Q.  So this appears to be a CAD printout for September 29,

2  2005; is that right?

3  A.  That's true.

4  Q.  And this also has your name on it, doesn't it?  Richard

5  Vass?

6  A.  Oh, yes, I see it now.

7  Q.  And the first entry says "unit on, vehicle 1923," right?

8  A.  Yes, it does.

9  Q.  That's your car, isn't it?

10  A.  That is my car.

11  Q.  That would indicate that you informed the dispatcher that

12  you were in your car and ready for duty at 9:13 a.m. on

13  September 29th, 2005; is that right?

14  A.  I believe so.

15  Q.  What time would you have started your shift that day?

16  A.  I don't know.  I mean, I don't know.  I have no idea.

17  Q.  Well, if you were working a morning shift, were there

18  regular times when your shift began?

19  A.  Not necessarily.  It depends what we were doing that day.

20  I mean, sometimes you come in for an operation.  I think some

21  of these points I was doing -- we had to backfill patrol to

22  help out with patrol, so I'm not quite sure.

23  Q.  What would you typically do around that time period before

24  telling the dispatcher that you were unit on, ready for duty?

25  A.  Well, I think kind of like back to the previous incident

**Vass - Cross / Haddad**

1   that we talked about on the 22nd of September, it shows me

2   starting on at, like, 3:20 when, in, fact, I probably was

3   actually at work at 2:00 o'clock.

4           So we would have a briefing, talk about operations,

5   what is going on.  And so because generally I worked from 2:00

6   to midnight.  So that is where you get the ending time close to

7   midnight on that night.

8   *Q.*  So it's possible that on September 29th, 2005, your shift

9   began at 8:00 a.m.; is that right?

10  *A.*  I honestly have no idea.  Maybe if there was an overtime

11  record or maybe just a time sheet we could look at, but just

12  right here with a piece of paper, I can't tell you anything

13  more than what is written on this piece of paper.

14  *Q.*  All right.

15          But you are not unit on until you are in your car in

16  your area that you are required to be on; is that right?

17  *A.*  No, not necessarily, because sometimes I would log on and

18  then go to court.  I'm really not ready for duty, I'm at court.

19  *Q.*  Now, if you look at the next entry, 9:14 a.m., do you see

20  that?

21  *A.*  I do.

22  *Q.*  This has a location for you, doesn't it?

23  *A.*  It does.

24  *Q.*  1826 101st Avenue; is that right?

25  *A.*  Yes.

**Vass - Cross / Haddad**

1   **Q.** And that's on the east side, squarely within the area that

2   you were assigned; is that right?

3   **A.** It is, but if I just may add, it appears, just by looking

4   at this, that I was actually working patrol.

5   **Q.** Uh-huh.

6   **A.** And so when you are working patrol, I could be really

7   working anywhere in the City.  It just appears this day I am

8   actually working the same area that I generally would work at.

9   **Q.** All right.  So one minute after you went unit on, you were

10  at that address I just gave, 1826 101st, right?

11  **A.** Well, like I said, I don't know how the dispatcher does

12  this information.  I would imagine I probably wasn't there a

13  minute later.  I would probably say that I -- that's the time

14  that she dispatched me to that location.  And like said, I'm

15  just kind of speculating.  I'm not quite sure.

16  **Q.** Um-hmm.

17       **MR. BOLEY:** Your Honor, move to strike the last

18  answer as speculation.

19       **THE COURT:** The last phrase is stricken.

20  **BY MR. HADDAD:**

21  **Q.** What does "415F" mean?  That's the type.

22       **MR. BOLEY:** Objection.  Lack of foundation.

23       **THE COURT:** Objection overruled.

24       You may answer.

25       **THE WITNESS:** Disturbing the peace.

**Vass - Cross / Haddad**

1  *BY MR. HADDAD:*

2  *Q.*  So it appears that you were dispatched to a disturbing the

3  peace call; is that right?

4  *A.*  Yes.

5          *THE COURT:*  Well, are all of these items in the type

6  column, do those tend to be the penal code or vehicle code, or

7  whatever it may be, sections?

8          *THE WITNESS:*  I would say, generally, yes,

9  because -- but there is --

10          *THE COURT:*  2002 is a vehicle code?

11          *THE WITNESS:*  Right, that is going to be a hit and

12  run.

13          *THE COURT:*  Um-hmm.

14          *THE WITNESS:*  But --

15  *BY MR. HADDAD:*

16  *Q.*  Now -- sorry.

17  *A.*  955A, that is like, I want to say a vicious dog, or

18  something.  And I don't really think -- I really don't recall

19  that being a vehicle code or penal code section.  So some of

20  that also is just the Oakland Police Department radio code

21  mixed within that.

22          *THE COURT:*  I see, okay.

23  *BY MR. HADDAD:*

24  *Q.*  You said that from looking at this, you thought you were on

25  patrol that day, why is that?

**Vass - Cross / Haddad**

1    *A.*  I'm just looking at the locations and just responding to --

2    first starts out at 4:15.  Then I have a ringing alarm that I

3    responded to apparently at 9:39.

4            And then the other one is like a hit and run at like

5    10:30, then still on it at 10:53.  These are just -- those are

6    just indicative of being on patrol, responding to patrol calls.

7    *Q.*  All right.

8            And do you think you were driving alone that day?

9    *A.*  You know, I don't know.

10    *Q.*  This only lists your name.  There is no other officer

11    listed, is there?

12    *A.*  That's true.  It would be nice to actually see.  I'm sure

13    somewhere, I just don't see it, of what my call sign was that

14    day.

15    *Q.*  Uh-huh.

16    *A.*  If you could show me my call sign -- okay 3 tack *(phonetic)*

17    41, looks like my call sign.

18    *Q.*  3 tack 61, I think?

19    *A.*  Was that a 61?  Thank you.

20    *Q.*  Sorry, looks like -- the very top entry but underneath unit

21    where it says 2T61?

22    *A.*  Right.

23    *Q.*  What does 2 tack 61 mean to you?

24    *A.*  It would be a day watch position, a supplemental position

25    helping out patrol, and 6 being District 6.

**Vass - Cross / Haddad**

1   **Q.**  And what is day watch?

2   **A.**  The department has three different shifts:  There is days,

3   there is swing, and then there is graveyard.  So day watch

4   would be just the general -- general hours during the day.

5   **Q.**  And when you started that shift, did you start at the

6   Oakland Police headquarters on Broadway and 7th?

7   **A.**  I would be guessing at this point.

8   **Q.**  Where else might you have started that day?

9   **A.**  Eastmont.

10  **Q.**  One of those two headquarters locations, right?

11  **A.**  I believe so, yes.

12  **Q.**  And then you get geared up, right?

13        Let me take you through your day.  You would show up

14  at one of those headquarter location?

15  **A.**  Um-hmm.

16  **Q.**  And get dressed up for work that day in your police uniform

17  and get your gear ready, right?

18        Yes?

19  **A.**  Yes.

20  **Q.**  And then you would have line-up, right?

21  **A.**  Um, it's hard to say with this particular day because --

22  'cuz if you can bear with me real quick, whatever -- I would

23  imagine this is probably working.  We were mandated to work

24  overtime to supplement patrol.  It appears this is what is

25  going on.

1          So it fluctuated back and forth, what truly happened

2     on that day for a briefing, if you will.  Some of the times

3     are -- some of the times you would just start work at

4     9:00 o'clock.  There wouldn't be a briefing, you would just

5     start your shift.

6     *Q.*  Uh-huh.

7          But in any event, before the first entry or second

8     entry shows you at 101st Avenue, sometime before that you would

9     have started out at one of the OPD headquarter locations,

10    right?

11    *A.*  Yes.

12    *Q.*  Now, can you determine from these three pages of CAD notes

13    when you ended your shift that day?

14              *MR. BOLEY:*  Which three?

15              *MR. HADDAD:*  4657 to 4659.

16              *MR. BOLEY:*  I would object on the grounds of just

17    lack of foundation in terms of there has been no showing made

18    as to how this document was prepared, where the information --

19    how the information was recovered, or -- and whether this

20    witness is able to testify as to any of these matters.

21              *THE COURT:*  You can testify, if you know.

22              You are looking at 4659 now?

23              *THE WITNESS:*  Yes, Your Honor, I am.

24              *THE COURT:*  And all of these pages have this

25    officer's name on them, so -- at any rate, go ahead with your

1    question.

2    *BY MR. HADDAD:*

3    *Q.*  Can you determine when you ended your duty on

4    September 29th, 2005?

5    *A.*  It appears the way I read this, like I said before, I was

6    working patrol.  Looks like I'm logging off at 13:29 hours, or

7    1:29.  And I'm logging off from that patrol shift and then

8    logging back on the same day, switching my call sign.  It says

9    2L62 -- whatever -- says 2L62, unit logging on, and it's 1436.

10           It appears that maybe somewhere around 18:30 that

11   call sign was changed to 20L62.  Maybe me or the dispatcher

12   made a mistake on the original call sign, but it looks like

13   that is kind of what was going on.

14   *Q.*  So this looks like you were still on duty as of 22:50 that

15   evening, is that accurate?

16   *A.*  Right.  I think we did probably say that up until that

17   point I was on duty.  I don't know if I can speak for after

18   that.

19   *Q.*  All right.

20           Now, flipping back briefly to the first page, 4657,

21   do you see that?

22   *A.*  Okay.

23   *Q.*  On this page, it describes several different sort of

24   incidents or issues that you responded to between 9:14 and 1:04

25   p.m., correct?

**Vass - Cross / Haddad**

1    **A.**  Right.

2    **Q.**  And then when you go to the third page, 4659, between time

3    14:36 and 18:23, two entries later, there is really no

4    information listed for what you were doing; is that right?

5    **A.**  Well, there is an entry -- so between 2:36, there is

6    another entry at 5:41.  There is no entry what that is as far

7    as to the right of it.  But apparently there is something going

8    on because I was associated with the time.  And then at 18:23,

9    I was logged off.

10   **Q.**  So from 2:36 to 5:41, there is really no mention of what

11   you were doing on duty, correct?

12          **MR. BOLEY:**  Objection.  Lack of foundation.  You are

13   asking the witness to talk about, you know, a lack of evidence

14   of something, and he doesn't have any information about how

15   this document was prepared or where the information comes from.

16          **THE COURT:**  Objection is overruled.

17          You may answer.

18          **THE WITNESS:**  I have no -- according to CAD, I have

19   no idea what I was doing, especially not just with looking at

20   this information now.

21   **BY MR. HADDAD:**

22   **Q.**  Do you ever use the Internet site MapQuest for maps or

23   directions?

24   **A.**  I'm sure I have.

25   **Q.**  And it's something you have used to get directions when you

**Vass - Cross / Haddad**

1   want to go somewhere and you don't know how to get there?

2   **A.**  Yeah, sure.

3   **Q.**  And would you turn to page -- well, before you turn:  One

4   more time to the first page of these three CAD logs we were

5   looking at, 4657.

6              Once again, your first assignment noted at 9:14 a.m.

7   on September 29, 2005 was the location 1826 101st Avenue; is

8   that right?

9   **A.**  Yes.

10  **Q.**  Now, please turn to Plaintiff's Exhibit 8.

11  **A.**  You said 8?

12  **Q.**  Yeah.

13             Does this appear to be a MapQuest map?

14  **A.**  Yes, it does say MapQuest.

15  **Q.**  All right.

16             Now, do you see point B at the top it says, "ending

17  location point B" being 1826 101st Avenue?

18  **A.**  Yes, I do, I see it.

19  **Q.**  And orienting yourself on the map, does the point B, as

20  depicted on the map, appear to actually be 1826 101st Avenue?

21  **A.**  I mean, based upon I guess the star, I would say that is

22  probably accurate.

23  **Q.**  Okay.

24             Now, the plaintiffs, Holmes and Engram, allege that

25  you strip-searched them on or about September 22th, 2005, at C

**Vass - Cross / Haddad**

1    Street and 98th.

2    *A.*   Um-hmm.

3    *Q.*   So do you see that point A is located at 9760 C Street,

4    which is near 98th?

5    *A.*   True.

6    *Q.*   And according to this map, the distance between point A,

7    where the plaintiffs allege they were strip-searched, and point

8    B, where you had your first call on September 29, was

9    approximately .78 miles.  Do you see that on the map?  It says

10   at the top.  It's in writing.

11   *A.*   I do see it.

12   *Q.*   Do you have any reason to dispute that that would be

13   approximately .78 miles distance between those two points, as

14   depicted on this map?

15   *A.*   I have no basis to dispute.

16   *Q.*   All right.

17          Does this map look accurate to you in terms of the

18   streets?

19   *A.*   It appears accurate.

20   *Q.*   All right.

21          **MR. HADDAD:**  I move for the admission of Plaintiff's

22   Exhibit 8 at this time.

23          **MR. BOLEY:**  Objection.  Lack of foundation, Your

24   Honor in terms -- he testified he's used MapQuest before.

25          **THE COURT:**  Well, he's also testified about this

**Vass - Cross / Haddad**

```
 1  map.
 2              MR. BOLEY:  Right.
 3              THE COURT:  Objection is overruled.
 4                       (Plaintiff's Exhibit 8 was received in
 5                       evidence.)
 6  BY MR. HADDAD:
 7  Q.  Have you seen any reports or field contact cards or stop
 8  data forms or other documentation for stopping either
 9  Mr. Holmes, Engram or Rix on September 29, 2005?
10              MR. BOLEY:  Objection.  Relevance, Your Honor.
11              THE COURT:  Objection is overruled.
12              THE WITNESS:  I don't recall seeing any.
13  BY MR. HADDAD:
14  Q.  Did you have any contact at all with either Holmes, Engram
15  or Rix on September 29, 2005, when you worked the morning
16  shift?
17  A.  You are saying when I worked that morning did I have
18  contact with them?
19  Q.  Yes.
20  A.  It doesn't appear that I did, no.
21  Q.  Okay.
22              Then why did you run Mark Engram's name for warrants
23  later on the day of September 29, 2005 if you never had contact
24  with him that day?
25  A.  I think you said that morning, doesn't appear that I did.
```

**Vass - Cross / Haddad**

1    So it is possible in the afternoon that I did.

2    *Q.*  I asked you about the day.

3           **MR. BOLEY:**  Objection.  Misstates the testimony.

4    *BY MR. HADDAD:*

5    *Q.*  Let me ask you again:  Did you have any contact at all with

6    either Holmes, Engram or Rix on the day of September 29, 2005

7    when you started work in the morning?

8    *A.*  All right, if you -- can you break the question down?

9    *Q.*  Did you have any contact at all with Holmes, Engram or Rix

10   on September 29, 2005?

11   *A.*  And I may have.  It appears, based upon this CAD entry when

12   I was working patrol, it appears I did not.

13   *Q.*  Okay.

14          If you had contact with them, you should have filled

15   out a field contact card and turned it in, right?

16   *A.*  When you say I should have, so sounds to me like you are

17   saying I didn't.

18   *Q.*  You were required to, right?

19   *A.*  If I stopped him, yes.

20   *Q.*  All right.

21          Then if you had contact, meaning a stop, of Holmes,

22   Engram or Rix on September 29, 2005, you were also required to

23   make sure that a stop data form was completed, right?

24          **MR. BOLEY:**  Well, objection, Your Honor.  The

25   question was contact, not stop.

**Vass - Cross / Haddad**

1              **THE COURT:**  Why don't you ask the question whether

2      he stopped them or detained them, whatever term you are going

3      to use.

4      **BY MR. HADDAD:**

5      **Q.**  If you stopped Holmes, Engram or Rix on September 29, 2005,

6      you were you required to fill out a stop data form to document

7      that, right?

8      **A.**  If I stopped them, yes.

9      **Q.**  Yeah.

10              Would you turn to Exhibit 5, page 4660, please.

11     **A.**  The page again, please?

12     **Q.**  4660.

13              Did you find the page?

14     **A.**  I did.

15     **Q.**  Now, at the very top there appears to be an e-mail; is that

16     right?

17     **A.**  Yes.

18     **Q.**  Who's Christopher Shannon?

19     **A.**  Lieutenant of Police.

20     **Q.**  He was the Internal Affairs investigator for the Holmes,

21     Engram, Rix complaint against you, correct?

22     **A.**  He was.

23     **Q.**  He interviewed you, didn't he?

24     **A.**  He did.

25     **Q.**  Who is Phyllis Bruning *(phonetic)*?

**Vass - Cross / Haddad**

1  **A.** I know she is -- I believe she's a dispatcher, police

2  dispatcher.  Not exactly sure of what her true affiliation is,

3  but I believe she is a dispatcher and works out of dispatch.

4  **Q.** She has a supervisory job with the dispatch unit; isn't

5  that right?

6  **A.** I don't know.

7  **Q.** Now, this page, which is -- strike that.

8           You indicated that you have reviewed some of the

9  Internal Affairs investigation for these complaints against

10 you; is that right?

11 **A.** Um-hmm.

12 **Q.** Yes?

13 **A.** Yes.

14 **Q.** All right.

15          Now, have you seen this page before?

16 **A.** I don't recall if I have.  I don't know.  Might have -- I

17 don't know.  They may have showed it to me during the Internal

18 Affairs investigation.  I don't remember.

19 **Q.** Okay.

20          Now, do you see there is the e-mail that says, "hi

21 Chris.  Here is the response from your additional response

22 criteria.  I indicated in bold who the person was that accessed

23 the info."  And it's signed, "Phyllis."

24          Do you see that?

25          **MR. BOLEY:**  Objection, Your Honor.  The document

**Vass - Cross / Haddad**

1    speaks for itself.

2              There has been no foundation laid that the witness

3    has not seen this document before.  I don't see how he can

4    testify about its contents.

5              *MR. HADDAD:*  The witness said he reviewed the

6    Internal Affairs investigation, that's what he said.

7              *MR. BOLEY:*  He said he didn't remember whether or

8    not he had looked at this indictment.

9              *THE COURT:*  What is your question about this

10   document?

11             *MR. HADDAD:*  I want to ask him about the portion

12   below it, but I'm trying to get there, first.

13             *THE COURT:*  You may proceed.

14   *BY MR. HADDAD:*

15   *Q.*  All right, do you see the portion I just read?

16   *A.*  I do.

17   *Q.*  And below that, do you see that there is some entries that

18   have your name on them?  Do you see that?

19   *A.*  I do.

20   *Q.*  And there is a date of 2005.272, do you see that under

21   "name 1, first entry"?

22   *A.*  Yes, I do.

23   *Q.*  And then someone has written, "September 29," do you see

24   the entry there?

25   *A.*  I do.

**Vass - Cross / Haddad**

```
 1   Q.   Now, do you know whether or not 272 refers to the 272nd day
 2   of the year, which is September 29th?
 3            MR. BOLEY:   Objection.   Lack of foundation.
 4            MR. HADDAD:   Asking if he knows.
 5            THE COURT:   The question is whether -- these
 6   objections, some of which makes no sense.
 7            MR. BOLEY:   Well, Your Honor --
 8            THE COURT:   "The document speaks for itself," what
 9   does that mean?   There is no such rule in the Federal Rules,
10   okay?   I mean, that is some other era.
11            MR. BOLEY:   Well, certainly, I think it's still the
12   rule that to have somebody testify about a document, they have
13   to have some understanding of what it is.   And there has been
14   no foundation laid as to what this information represents.
15            THE COURT:   He is asking a question as to the
16   meaning of a certain -- whether or not that's what it could
17   mean.   And also, he's testified that he's reviewed some of
18   these documents.
19            Now, let's see where it goes.   So far, I haven't
20   heard a basis for objecting.
21            MR. BOLEY:   Well, I think it calls for speculation
22   and lack of foundation.   Just renew my objection.
23            THE COURT:   There's a lot of speculation, I guess,
24   going on.
25            Objection is overruled.
```

**Vass - Cross / Haddad**

 1          *THE WITNESS:*  I don't know if that is the 272nd day

 2     of the year.

 3     *BY MR. HADDAD:*

 4     *Q.*  Okay.

 5          But do you have the understanding that your

 6     department keeps date records in this way for certain type of

 7     warrant access information?

 8          *MR. BOLEY:*  Lack of foundation.

 9          *THE WITNESS:*  I'm aware they can go back and

10     retrieve information that's ran out on people.  How they do it

11     or how they go about it I don't know.

12     *BY MR. HADDAD:*

13     *Q.*  Would you turn to page 4663, couple pages later.

14     *A.*  All right.

15     *Q.*  Still in Exhibit 6 -- excuse me, Exhibit 5, the Internal

16     Affairs investigation.

17          See this chart here?

18     *A.*  I see it.

19     *Q.*  Let's go to number 272 to orient you.

20     *A.*  Um-hmm.

21     *Q.*  And if you read the chart, that appears to indicate that

22     that number is September 29, do you agree?

23     *A.*  That's what -- it appears that that's what that chart says,

24     yes.

25     *Q.*  Now, going back to page 4660, these entries under "name No.

**Vass - Cross / Haddad**

1    1," don't those indicate that on September 29, 2005, you,

2    Officer Vass, did a warrant check on Mr. Engram?

3            **MR. BOLEY:**  Objection.  Lack of foundation.

4            **THE COURT:**  The objection is overruled.

5            **THE WITNESS:**  I -- I would imagine -- well, I don't

6    know.  I would be speculating exactly what it is.

7            **THE COURT:**  Okay.

8            **THE WITNESS:**  I can tell you what it says here.

9    **BY MR. HADDAD:**

10   **Q.**  Um-hmm.

11   **A.**  But to say working from or how they got it I don't know.

12   **Q.**  Have you seen this kind of code information pulled up when

13   you do a warrant check on somebody?

14   **A.**  No.

15   **Q.**  Do you know what "KEXC" refers to?

16   **A.**  No, sir.

17   **Q.**  Do you see where it says "L1 Engram," comma, "Mark" on the

18   third line of the substantive entries?

19   **A.**  I do.

20   **Q.**  And below that appears to be his driver's license number,

21   do you see that?

22           **MR. BOLEY:**  Objection.  Lack of foundation.

23           **THE COURT:**  Do you know if that is his driver's

24   license number or appears to be his driver's license number?

25           **THE WITNESS:**  I don't have his driver's license

**Vass - Cross / Haddad**

1    number memorized, I don't know.  It could be, though.

2    *BY MR. HADDAD:*

3    *Q.*  You don't have his driver's license number memorized, is

4    that what you said?

5    *A.*  Yes, sir, I don't.

6    *Q.*  So if you ran a warrant check using his driver's license

7    number, you would have had to ask him that number pretty

8    recently, don't you agree?

9    *A.*  I don't know.  I don't know if -- like I said, generally,

10   when you run a person out, I mean, you -- you normally don't

11   run based upon their CDL alone, their driver's license alone.

12   *Q.*  What else do you run it on?

13   *A.*  Generally, their name and date of birth.

14   *Q.*  Their name and date of birth, too?

15   *A.*  That would be -- I try to think how, generally, I do it;

16   it's the name and date birth.

17   *Q.*  On the next entry, so this is -- the next entry, do you see

18   at the bottom where it says "Engram," comma, "Mark, X DOB"?

19   *A.*  Um-hmm.

20   *Q.*  1979 0101?

21   *A.*  I do see that.

22   *Q.*  That appears to be Mark Engram's name and date of birth,

23   doesn't it?

24   *A.*  I know it's his name.  I don't have his date of birth

25   memorized.

**Vass - Cross / Haddad**

1  **Q.**  Once again, for you to be able to do a warrant check on

2  Mr. Engram, you would have needed someone to provide you with

3  his date of birth close in time to when you did the warrant

4  check, correct?

5  **A.**  Somewhat, yeah.  The answer is maybe yes, maybe no.  There

6  is times when you are still just trying to check up to see what

7  that person's status is, you would run them out.

8  **Q.**  Uh-huh.

9  **A.**  And so at times you would just use a general date of birth,

10  for instance, you know.

11  **Q.**  What do you mean, a general date of birth?

12  **A.**  Well, you would try -- there is a certain -- you have to

13  get the year query somewhat close to what his date of birth

14  would be.

15  **Q.**  Oh.

16          So given that you -- strike that.

17          Given that this entry refers to January 1, 1979, is

18  that the type of general birthdate you might give when you're

19  doing it that way?

20          **MR. BOLEY:**  Objection.  Lack of foundation.  We

21  haven't established the date.

22          **THE COURT:**  The objection is overruled.

23          **THE WITNESS:**  I -- unfortunately, I don't know.  It

24  may have been his true date of birth or a general inquiry.  I

25  don't know.

1  *BY MR. HADDAD:*

2  **Q.**  Do you know why your name appears on these entries with

3  Mark Engram's name?

4  **A.**  No, I don't.

5  **Q.**  Have you spoken with the Internal Affairs investigator

6  about the information on this sheet?

7  **A.**  I don't know.

8  **Q.**  Did you ever have any discussions with the Internal Affairs

9  investigator or anyone from IA, including Benson Farrell, about

10  whether you had any contact with either Holmes, Engram or Rix

11  on September 29, 2005?

12  **A.**  Honestly, I don't know.  It's possible.  I don't know.

13            **THE COURT:**  Well, do the numbers in, for example,

14  this very first entry on the page we have been looking at have

15  any significance to you, such as the ORV 8399?

16            **THE WITNESS:**  Trying to find out where you see that,

17  ma'am.

18            **THE COURT:**  On page 4660.

19            **THE WITNESS:**  Um-hmm.

20            **THE COURT:**  The very first entry.

21            **THE WITNESS:**  I'm looking for the ORV.

22            **THE COURT:**  ORV.

23            **THE WITNESS:**  Where do you see that?

24            **THE COURT:**  On the same line as your name, on the

25  first line.

```
 1                    THE WITNESS:  Oh, okay.

 2                    THE COURT:  Does that number have any meaning to

 3     you?

 4                    THE WITNESS:  Yes.

 5                    THE COURT:  What is it?

 6                    THE WITNESS:  That is a number that's kind of

 7     assigned to me at Oakland Police.  Generally, that's like a

 8     call sign for like me to access the CAD system, and so forth,

 9     or if I was to run somebody out, or so forth, that would be a

10     number that's kind of like a name identifier.

11                    THE COURT:  That's a number that you would enter?

12                    THE WITNESS:  To my knowledge, I would.  But, like I

13     said, I don't recognize any of this format or anything else

14     that goes with it.

15                    THE COURT:  What about the 00046 to the left of

16     that, does that mean anything?

17                    THE WITNESS:  No.

18     BY MR. HADDAD:

19     Q.  These entries also have a time listed by them, do you see

20     that?

21     A.  I do.

22     Q.  18:07:59 which would be 6:07:59, right?

23     A.  Yes.

24     Q.  If you turn to the previous page, Bates 4659, which, again,

25     is part of the CAD entries for your work on September 29.
```

**Vass - Cross / Haddad**

1    *A.*   Um-hmm.

2    *Q.*   What were you doing at that time, 6:07:59?

3            *MR. BOLEY:*   Objection.  Lack of foundation as to

4    this document recording what he was doing, he's referring to

5    this document.

6            *THE COURT:*   You can ask him if it refreshes his

7    recollection as to what he was doing.

8    *BY MR. HADDAD:*

9    *Q.*   Do the CAD entries at 46:59 refresh your memory about what

10   you were doing on that date, September 29, at 18:07:59?

11   *A.*   No, it doesn't refresh my memory.  I can read off what it

12   says, but it doesn't refresh my memory.

13   *Q.*   Is there any entry on this that would indicate what you

14   were doing at that time?

15   *A.*   Like I said, I can read off what it says.

16   *Q.*   Go ahead.

17   *A.*   Well, actually, there is no entry for 59, so maybe that's

18   probably the best answer.

19   *Q.*   And what is the nearest entry to 18:07 that you see on page

20   4659?

21   *A.*   The time, please, again?

22   *Q.*   18:07.

23   *A.*   Well, it is 18:23.  It says "unit off."

24   *Q.*   Um-hmm.

25   *A.*   But it appears that if you look to the far left, it says

1    2062, that really wasn't my call sign, 20L62 was down there

2    below.  So it appears there may have been a mistake somewhere,

3    either by me or dispatch.  I don't know who.

4    *Q.*  So shortly after 18:07 p.m. -- excuse me, 18:07 military

5    time, 6:07 p.m., you were apparently having some communications

6    with the dispatcher about your on and off-duty status; is that

7    right?

8    *A.*  Sure.

9              *MR. BOLEY:*  Objection.  Lack of foundation.

10   Misstates testimony.

11             *THE COURT:*  You may testify, if you know from review

12   of this.

13             *THE WITNESS:*  I would say it appears to be so, just

14   based upon it says unit on, unit off.  Seems to be something

15   going on, I don't know what, but appears to be something.

16   *BY MR. HADDAD:*

17   *Q.*  All right.

18             Now, does your department maintain Internal Affairs

19   files, as far as you know?

20   *A.*  I'm not -- kind of broad.  Can you narrow it down?

21   *Q.*  Yeah.

22             There is an Internal Affairs division at OPD?

23   *A.*  There is.

24   *Q.*  And to your knowledge, does the Internal Affairs division

25   keep files on particular investigations that they have done on

**Vass - Cross / Haddad**

1   officers?

2               *MR. BOLEY:*  Lack of foundation.

3               *THE COURT:*  You may testify, if you know.

4               *THE WITNESS:*  I know they have some files.  To the

5   depth that they have and how long, the longevity of it, I don't

6   know.

7   *BY MR. HADDAD:*

8   *Q.*  All right.

9   *A.*  But I know they have some things.

10  *Q.*  As for the files that you testified you reviewed about the

11  plaintiffs' complaints against you, that is an Internal Affairs

12  file you are talking about, right?

13  *A.*  I believe it is, yeah.

14  *Q.*  And that is a file that the OPD maintains in its records,

15  isn't it?

16  *A.*  I mean, you are asking me about an assumption.  I'm

17  assuming they do, I don't know beyond that.  But they have some

18  kind of records keeping of Internal Affairs files.

19  *Q.*  Do you have any doubt that they have a copy of this

20  Internal Affairs report somewhere in the Internal Affairs

21  division?

22  *A.*  No, I'm sure they do because we managed to get it.  Beyond

23  talking with this one or how far they go back and what all they

24  keep, I don't know.

25  *Q.*  I'm not asking about other reports, just about this one.

**Vass - Cross / Haddad**

1   **A.**   Okay.

2   **Q.**   This is a report that the Internal Affairs division keeps

3   in the ordinary course of its business, isn't that right?

4            **MR. BOLEY:**   Objection.   Lack of foundation.

5            **THE COURT:**   You may testify, if you know.

6            **THE WITNESS:**   I don't know, if you say ordinary

7   course of business.   They did an investigation.

8   **BY MR. HADDAD:**

9   **Q.**   And you were able to look at it by getting a copy from

10  Internal Affairs; is that right?

11           **MR. BOLEY:**   Objection.   Vague as to "it."

12  **BY MR. HADDAD:**

13  **Q.**   This report, which is Plaintiff's Exhibit 5.

14  **A.**   I'm not sure what all I got through them.   Some -- I got

15  discovery things that you got, and so I think some of it was in

16  there.

17  **Q.**   All right.

18           Now --

19           **MR. HADDAD:**   Based on that testimony, together with

20  the stipulation from the City that all records of the City of

21  Oakland and OPD are authentic, I move for the admission of just

22  the pages we've been discussing, Bates No. 4657 to 4659, which

23  are the CAD logs, and Bates Number 4660 and 4663.

24           **MR. BOLEY:**   Your Honor, the parties reserved any

25  objections that they may have to it.

**Vass - Cross / Haddad**

1          There's been no foundation laid as to who prepared

2     these documents, what information is contained in them.  And

3     the witness was able to talk about some of these entries based

4     on his understanding of what CAD reports are.  He also

5     testified that there appeared to be some errors in the CAD in

6     that there was a reference to a unit that he was not assigned

7     to.

8          And as to 4660 to 4662, he has no information

9     whatsoever as to how these documents were prepared.

10          **MR. HADDAD:**  And I would point out that the

11     objections raised go to weight.  And furthermore, since the

12     City of Oakland is a party, these are also admissions of a

13     party.

14          **MR. BOLEY:**  Well, Your Honor, they aren't admissions

15     of anything.  And it doesn't go to weight, it goes to

16     admissibility, Your Honor.

17          **THE COURT:**  Well, are you suggesting to me, with

18     respect to the CAD reports now, that these are not accurately

19     kept and maintained, and they are not maintained in the regular

20     course of business?

21          **MR. BOLEY:**  Well, there is two problems, Your Honor.

22     First off, we don't -- it depends on the type of query that is

23     done into the computer as to the type of information that you

24     could get back.  And depending on the query you make, you don't

25     necessarily get all the entries relating to a particular

**Vass - Cross / Haddad**

 1  incident, for instance.

 2           Also, errors do occur in --

 3           **THE COURT:**  That doesn't defeat foundation for a

 4  document, the fact that there may be errors in it.  If it's

 5  something that is kept in the regular course of business, the

 6  fact that there may be an error in it doesn't make it

 7  inadmissible.

 8           **MR. BOLEY:**  Well, that's true, Your Honor --

 9           **THE COURT:**  Okay.

10           **MR. BOLEY:**  But, he's being asked to attest as to

11  what these documents are that they are kept in the ordinary

12  course of business, that they represent some particular type of

13  information that has been retrieved from OPD records, and he

14  simply can't do that.

15           And so we don't know that these -- you know, we

16  don't know that these are complete, for instance, you know,

17  plaintiff -- I mean counsel is making certain insinuations that

18  there is not entries that one would expect.  And we have no

19  information about whether or not one would expect them based on

20  the query that was done in order to get the data.

21           **THE COURT:**  With respect to these last few

22  documents, if I can go back and find the pages that he was

23  asked about, he does not have -- he can't lay the foundation

24  through this witness for those.

25           But, I mean, these CAD reports have been used and

**Vass - Cross / Haddad**

1   relied upon by both sides.  Okay, the ones I'm talking about

2   more recently are the ones, 4660, et cetera.  And he really

3   hadn't been able to testify as to those.  He can sort of glean

4   some things maybe from reading them, but we don't know what we

5   are reading.

6           With respect to the CAD reports, there has been all

7   kinds of testimony regarding those and the contents of them, so

8   I will allow those to come in.

9           **MR. BOLEY:**  And that's 40 --

10          **THE COURT:**  As to the others, the 4660, et cetera,

11   you are going to have to bring somebody in who can lay the

12   foundation for those.

13          **MR. HADDAD:**  We'll bring in the head of IA to talk

14   about those, Your Honor.

15          **THE COURT:**  Okay, fine.

16          So you need to straighten out with Mr. Bowser the

17   page numbers that are actually coming in.

18          **MR. HADDAD:**  Okay, we will.

19          **THE COURT:**  Sometime before the end of the day.

20   **BY MR. HADDAD:**

21   **Q.**  Do you know a very old man who lived on C Street named

22   Johnnie Thornton?

23   **A.**  Not off the top of my head.

24          **THE WITNESS:**  Your Honor?  A break?

25          **THE COURT:**  You need a break?

**Vass - Cross / Haddad**

1           **MR. HADDAD:**  This is a good time.

2           **THE COURT:**  About how much longer are you going to

3    be with the witness?

4           **MR. HADDAD:**  Unfortunately a while, an hour or two.

5           **THE COURT:**  Really?

6           **MR. HADDAD:**  Yeah.

7           **MR. BURRIS:**  Your Honor, we have a couple of

8    witnesses, certainly at least one, that is really only

9    available today.  And we would probably like to interrupt at

10   some point in time to make sure we get that witness in for both

11   direct and cross-examination.  Should not be long, but it is

12   something we should do.

13          **THE COURT:**  Not somebody who is a party.

14          **MR. BURRIS:**  Not a party, no, a witness.

15          **MS. SHERWIN:**  Renee Glenn the mother of

16   Mark Engram.

17          **THE COURT:**  We'll take ten minutes now and reconvene

18   with this witness' testimony.  And let's try to get through it,

19   okay, because we haven't gotten much of any of the actual

20   incidents.

21          **MR. HADDAD:**  I'm through the first one now.

22          **THE COURT:**  Okay.

23          **MR. HADDAD:**  A few more to go.

24               **(Recess taken at 2:07 p.m.)**

25               **(Proceedings resumed at 2:30 p.m.)**

**Vass - Cross / Haddad**

```
 1              THE COURT:  Okay.  Mr. Haddad?

 2              MR. HADDAD:  Yes.  I'm going to try to pick up the

 3    pace, so I'm going to start talking really fast.

 4              THE COURT REPORTER:  No.

 5                        (Laughter.)

 6              MR. BURRIS:  Faster.

 7              THE COURT REPORTER:  No, no.

 8                        (Laughter.)

 9    BY MR. HADDAD:

10    Q.  Okay, turning to the next claim that I would like to ask

11    you about, I want to ask you about a claim that you strip

12    searched Michael Holmes at 107th and Pontiac during his arrest

13    on July 19, 2006.

14              Do you recall arresting Michael Holmes on July 19,

15    2006?

16    A.  I do.

17    Q.  At 107th and Pontiac?

18    A.  Yes.

19    Q.  Do you recall that that incident started around dusk, 8:00

20    p.m. or a little later?

21    A.  I believe the time is correct.

22    Q.  And --

23    A.  I'm sorry, you said 8:00 p.m. or later?

24    Q.  Yeah.

25    A.  Could be a little bit earlier, but yes.
```

**Vass - Cross / Haddad**

1  **Q.**  Okay.

2         Who was your partner that day?

3  **A.**  At the time, Officer Todd Mork, M-o-r-k, first name, Todd.

4  **Q.**  How long were you partners with Officer Mork?

5  **A.**  I'm guessing maybe two years.  I don't have a basis for

6  that answer.  It was a while, but I really don't have a great

7  answer.

8  **Q.**  All right.

9         Well, he was your main assigned partner for a

10  significant period of time; is that right?

11  **A.**  Yes.

12  **Q.**  So that is the basis on which I'm asking for an answer:

13  What's your best memory of the period of time from one year to

14  another that you were assigned with Officer Mork?

15  **A.**  I believe '06 I was.  That was my best period -- I don't

16  really have a basis, you know, one way or the other.

17  **Q.**  All right.

18         Now in the incident, you drove up with Officer Mork

19  and saw Michael Holmes somewhere, right?

20  **A.**  Yes, I was in the vehicle on the passenger's side, but,

21  yes.

22  **Q.**  You were in the passenger's side?

23  **A.**  I believe so.

24  **Q.**  All right.

25         And I understand that you saw Michael Holmes washing

**Vass - Cross / Haddad**

1   a car in the street; is that right?

2   **A.**   Not really.   There was a car that was being washed,

3   presumably his, or possibly his.   I don't think he was washing

4   so much.   He was there on the sidewalk area.

5   **Q.**   He was next to the car that was being washed?

6   **A.**   He was, I guess, close to it.   I don't know -- I'm -- he

7   didn't have a sponge that he was washing the car, physically.

8   **Q.**   Do you know what he was doing before you drove up?

9   **A.**   No, I wasn't there.

10   **Q.**   Okay.

11         Now, you knew Michael Holmes by name by that time;

12   is that right?

13   **A.**   That's true.

14   **Q.**   And you also knew that Michael Holmes was not on probation

15   or parole at that time, right?

16   **A.**   I don't know.

17   **Q.**   Okay.

18         Would you please turn to page 40 -- let me see,

19   double-check the page.

20         Page 47.

21   **A.**   You said 47?

22   **Q.**   Yeah, lines 8 to 11.

23   **A.**   And just so I confirm, the small upper right one, or are we

24   going with the bottom one?

25   **Q.**   On the page that you have, it's going to say 46 at the

**Vass - Cross / Haddad**

 1    upper right.

 2  **A.**   Gotcha.

 3  **Q.**   But it's actually page 37, lines 8 to 11.

 4          With me?

 5  **A.**   No.

 6  **Q.**   Starting "At the time."

 7  **A.**   Hang on real quick.

 8          Forty-six, what line?  I'm sorry.

 9  **Q.**   Eight to 11.

10  **A.**   Eight?  Number 8?  Okay.

11          **MR. HADDAD:**

12          "**Q.**   At the time, by the way, did you

13          know whether or not Mr. Holmes was on

14          probation or on parole?

15          "**A.**   I don't believe he was on

16          either."

17  **Q.**   I read that correctly, didn't I?

18  **A.**   You did.

19  **Q.**   All right.

20          So does that also refresh your memory about the fact

21    that he was not on probation or parole on July 19, 2006?

22          **MR. BOLEY:**  Misstates the testimony.

23          **THE COURT:**  Objection -- what is your objection?

24          **MR. BOLEY:**  Okay, the question is, does it refresh

25    your recollection.  I withdraw my objection.

**Vass - Cross / Haddad**

1          **THE COURT:**  Okay.  Thank you.

2          **THE WITNESS:**  I don't -- I don't have a physical

3    basis this minute at that time if he was on probation or

4    parole.  I can tell you what I said in my deposition.  I don't

5    recall.

6    **BY MR. HADDAD:**

7    **Q.**  At your deposition, you testified that he was not on

8    probation or on parole on July 19, 2006, right?

9    **A.**  That appears accurate.

10   **Q.**  Okay.

11          Okay, now, as you drove up and saw Mr. Holmes, I

12   understand he ran from you; is that right?

13   **A.**  That's true.

14   **Q.**  And you got out of the car, and you chased him?

15   **A.**  I did.

16   **Q.**  And at some point, he jumped over a fence and you followed

17   him; is that right?

18   **A.**  In a sense, yes.

19   **Q.**  While that was happening, Officer Mork was driving the car

20   around to another place so that he could assist you; is that

21   right?

22   **A.**  I don't know what Officer Mork did.

23   **Q.**  Okay.

24          When you caught Michael Holmes, he had fallen down

25   after trying to get over a fence; is that right?

**Vass - Cross / Haddad**

1  **A.**  Yes.  Yes.

2  **Q.**  And you claimed at the time that he gave up and he handed

3  you a Baggie of suspected drugs; is that right?

4  **A.**  That's true.

5  **Q.**  And at that point, you arrested him; is that right?

6  **A.**  Yes.

7  **Q.**  And then you searched him, incident to arrest; is that

8  right?

9  **A.**  Yes.

10  **Q.**  And you were in the backyard of that house at 107th and

11  Pontiac, I understand; is that right?

12  **A.**  Well, it's --

13  **Q.**  It's actually a side yard, isn't it?

14  **A.**  It is a side yard, but it's not so much the exact corner

15  house, it's actually the one house above.  He ran through that

16  corner house, jumped the fence going into the one yard.

17  Oakland direction is north, true directions, that would be east

18  one yard.

19  **Q.**  Where did you search Michael Holmes at that time?

20  **A.**  Directly where he landed, in that one yard north right

21  where he fell on top of the pottery.

22  **Q.**  Okay.  And what type fence did he fall off trying to climb?

23  **A.**  As I recall, it was just a wooden fence.

24  **Q.**  Wooden fence or a chain link fence?  Do you recall?

25  **A.**  I think it was wood.

**Vass - Cross / Haddad**

1    Q.   Okay.

2            You could see through the fence, couldn't you?

3            **MR. BOLEY:**  Objection.  Which fence?

4            **MR. HADDAD:**   The fence that he was next to when he

5    searched him.

6            **THE WITNESS:**  Oh, yeah, you could see -- there is

7    two fences, if this is where we are at.  There is the main wood

8    fence you can't see, chain-link fence that leads out to 107th

9    Avenue, you could see there.

10   **BY MR. HADDAD:**

11   Q.   So you could see the area where you were searching

12   Michael Holmes from the street; is that correct?

13   A.   Yes.

14   Q.   Did anyone else see your search of Michael Holmes at that

15   time?

16           **MR. BOLEY:**  Objection.  Calls for speculation.

17           **MR. HADDAD:**  If you know.

18           **THE COURT:**  You can testify, if you know.

19           **THE WITNESS:**   I believe Sergeant Bernard Ortiz, he

20   was there or witnessed from the chain-link fence on the street.

21   **BY MR. HADDAD:**

22   Q.   Why do you believe that Sergeant Ortiz saw the search?

23   A.   I can't say what exact moment, but I remember looking

24   through the chain-link fence and observing Sergeant Ortiz.

25   Q.   Okay.

**Vass - Cross / Haddad**

1              Was Officer Mork present during that search?

2    *A.*   I don't believe so.

3    *Q.*   You said you don't believe so?

4    *A.*   I don't believe so.

5    *Q.*   Describe the search, please.

6    *A.*   Um, a search incident to arrest?

7    *Q.*   The search that you did on Michael Holmes at that time.

8    *A.*   Right.

9    *Q.*   Can you describe it, please.

10   *A.*   I don't have an exact recollection of what I did.  I can

11   tell you, in generality, what I would generally do, but I

12   remember -- I know I searched him.  He had some -- of course,

13   he handed me the drugs.  I searched him.  I found currency in

14   his pockets.  And that was pretty much it.  I don't remember

15   there being much else in regards to the search.  I didn't do,

16   of course, what is being claimed.

17   *Q.*   You would have searched around his waist area and belt

18   area, wouldn't you?

19   *A.*   Sure, absolutely.

20   *Q.*   Did you search around the crotch area of Mr. Holmes' body?

21   *A.*   I'm sure I did, but only through the exterior of his

22   clothing, just of what a normal search incident to arrest would

23   be.

24   *Q.*   Uh-huh.

25              Did you unbutton Mr. Holmes' pants and pull his

**Vass - Cross / Haddad**

1   pants and boxers away to examine his genital area with a

2   flashlight?

3   *A.*   No.  And second of all, it was still light outside.

4   *Q.*   Okay.

5            Now, on other occasions with other people when you

6   have strip-searched them at night, you have used a flashlight

7   to look into their pants, haven't you?

8            *MR. BOLEY:*  Objection.  Relevance.

9            *THE COURT:*  Overruled.

10           You may answer.

11           *THE WITNESS:*  You said people?  Like I said, I don't

12   recall how many people I've strip-searched.  I have mentioned I

13   have; have I used a flashlight?  Yeah, I'm sure I have.  Yes, I

14   believe I have.

15   *BY MR. HADDAD:*

16   *Q.*   Okay.

17           Did you strip-search Mr. Holmes during this incident

18   we have been discussing?

19   *A.*   No.

20   *Q.*   And why didn't you strip-search him on that occasion?

21   *A.*   You are saying why didn't I?

22   *Q.*   Yeah.

23   *A.*   I would say there was no need.  I mean, there was just no

24   reason to.

25   *Q.*   Was a strip search justified on Michael Holmes during this

**Vass - Cross / Haddad**

1  arrest?

2  *A.*  No.

3  *Q.*  And the search that you did perform incident to arrest, did

4  you find anything suspicious on him?

5  *A.*  You are saying the search that I did to Michael Holmes, did

6  I find anything suspicious on him?

7              *MR. BOLEY:*  Objection.  Vague as to "suspicious."

8              *THE COURT:*  Objection is overruled.

9              You may answer.

10             *THE WITNESS:*  No, I don't believe so.

11             I'm just trying to think of everything that

12  occurred.  Nothing stands out as being suspicious.  I mean, we

13  recovered his money, that was during the searches; we believe

14  they were proceeds from the sales because we arrested him for

15  sales of narcotics.  I don't know when you are saying

16  suspicious.

17  *BY MR. HADDAD:*

18  *Q.*  Okay.

19             But it's accurate to say that you would not have

20  been legally justified to strip search Mr. Holmes at that time

21  and place, correct?

22             *MR. BOLEY:*  Calls for a legal conclusion.

23             *THE COURT:*  The objection is overruled.

24             You may answer.

25             *THE WITNESS:*  With everything that just occurred

1    here, with these facts, there was no reason to do a strip

2    search.

3    *BY MR. HADDAD:*

4    *Q.*  Okay.

5              And you would not have been legally justified to do

6    a strip search on Michael Holmes under those facts, correct?

7    *A.*  Um, I don't believe I would have been justified in doing a

8    strip search.  There was no -- I mean, you are talking in a

9    vacuum.  There is no reason to do it.  I mean, I didn't do it,

10   so I don't really know of a reason why I could even give you to

11   do one.

12   *Q.*  All right.

13             You had no probable cause to believe he was hiding

14   anything in the crotch of his pants or inside his private area,

15   did you?

16             *MR. BOLEY:*  Asked and answered and argumentative.

17             *THE COURT:*  Objection overruled.

18             *THE WITNESS:*  I did not believe he had anything

19   inside his pants.

20   *BY MR. HADDAD:*

21   *Q.*  Okay.

22   *A.*  And further, when I searched I didn't feel anything, or so

23   forth, to the exterior of his clothing that would lead me to

24   believe that he had anything in his pants.

25   *Q.*  You also were not in a private area where it would have

**Vass - Cross / Haddad**

1  been appropriate to do a strip search; is that right?

2  **A.**  I don't know.  I'm not sure.  When you say "private area,"

3  we are in a backyard.  I'm not sure.  I know one didn't occur.

4  **Q.**  So you don't know whether the area that you did the search

5  incident to an arrest was a private area sufficient to do a

6  field strip search under the policies and practices of your

7  department; is that your testimony?

8  **A.**  Um, no.

9  **Q.**  Okay.

10  **A.**  I'm saying I would have to relook at the area again to see

11  who has actual visibility to see where we are, to see if a

12  strip search should or should not occur, if we are saying I

13  should do a strip search.

14  **Q.**  Okay.

15        Did you write a report or documentation about this

16  stop?

17  **A.**  I did.

18  **Q.**  And very briefly, at -- would you please turn to Exhibit 6.

19  It's the orange book.

20  **A.**  Oh.

21  **Q.**  Starting at the third page of Exhibit 6, which is Bates

22  No. -- it's very hard to read -- looks like 4616.

23        Do you see that?

24  **A.**  Are you referring to page 3 of 4 of my police report?  Is

25  that what you are referring to?  Or am I just on a different

**Vass - Cross / Haddad**

1    page than you?

2    **Q.**   I'm referring to the front page of your police report.

3    **A.**   Oh, okay.

4    **Q.**   At the very upper right-hand corner, it says "Vass, Exhibit

5    A"; do you see that?

6    **A.**   I do.

7    **Q.**   This is the report that you wrote for the arrest of

8    Mr. Holmes?

9    **A.**   It is.

10   **Q.**   And how many pages is your report?

11   **A.**   Four pages.

12   **Q.**   All right.

13             Now, I notice on the first two pages it says

14   "reported by R. Vass."

15   **A.**   Um-hmm.

16   **Q.**   Is that right?

17   **A.**   That's true.

18   **Q.**   That's your handwriting, correct?

19   **A.**   Does appear to be so.

20   **Q.**   All right.

21             And then the last two pages are a typewritten

22   narrative of what happened, correct?

23   **A.**   That's true.

24   **Q.**   Is that the narrative that you wrote up for the incident?

25   **A.**   Yes, it is.

**Vass - Cross / Haddad**

1  **Q.**  Why does this say reported by R. Alcantar, A-l-c-a-n-t-a-r?

2  **A.**  Just like I explained in the deposition, this is the form

3  report.  The narrative, you know, you can just freely type in.

4  You have to actually click in that box to change that

5  information.  So I know at certain periods of time, me and

6  Alcantar shared a computer, so I may have typed this out on the

7  same computer, but it appears that this was a template at one

8  point of his that I used.

9         And I didn't click on that box because that's a box

10  that stays constant because if you look on the following page,

11  that box is still constant on that following page.

12  **Q.**  So, actually, it says, "reported by Officer Alcantar," it

13  was actually reported by you, correct?

14  **A.**  That's true.

15  **Q.**  So that's an error where it says Alcantar, correct?

16  **A.**  That's true.

17  **Q.**  Probably because you were reusing an older report that

18  Officer Alcantar had typed out and left on the computer,

19  correct?

20  **A.**  I would imagine.  That's probably my best guess.

21  **Q.**  You did write over previously written reports by other

22  officers around that time period, didn't you?

23  **A.**  Yeah, I did.

24  **Q.**  All right.

25         The next incident I would like to ask you about

**Vass - Cross / Haddad**

1   occurred, allegedly, at International and 94th Avenue.

2   **A.**   Um-hmm.

3   **Q.**   And this is the time that you pulled over a Yukon on

4   February 20, 2007, with Mr. Holmes in it.

5          Do you recall that?

6   **A.**   I do.

7   **Q.**   And just to orient you a little bit more, the front page of

8   Exhibit 6 is the field contact card we discussed earlier,

9   right?

10  **A.**   Yes.

11  **Q.**   That pertains to this incident, doesn't it?

12  **A.**   It does.

13  **Q.**   Where did you make this vehicle stop?

14  **A.**   9400 block of East 14th Street, or International Boulevard.

15  Same street.

16  **Q.**   That's a very busy area, isn't it?

17  **A.**   It is.

18  **Q.**   East 14th Street/International Avenue is one of the main

19  roads in the City of Oakland; is that right?

20  **A.**   That's fairly accurate, yes.

21  **Q.**   And were there a lot of people on the street at the time

22  you made this stop?

23  **A.**   I don't know if there was a lot of people.  I mean, it's a

24  thorough traffic fare, it's very feasible it could be.

25  **Q.**   What time did the stop happen?

**Vass - Cross / Haddad**

 1  *A.*  If I'm making out the numbers, it looks like 4:04.  Mine's

 2  kind of faded, but that looks fairly accurate.

 3  *Q.*  4:04 p.m.?

 4  *A.*  Right.  It says 16:04, so it would be 4:04 p.m.  Like I

 5  said, that's what it appears it's written to me.

 6  *Q.*  And at the bottom, beneath the copy of the field contact

 7  card, somebody has handwritten in some information.  Do you see

 8  that?

 9  *A.*  Yes.

10  *Q.*  Do you know who wrote that in?

11  *A.*  No, I don't.

12  *Q.*  Somebody handwrote in the date and what appears to be 10:00

13  o'clock.  Do you see that?

14  *A.*  Yeah, I do.  I don't have an answer.

15  *Q.*  Is it possible that this traffic stop happened at 10:00

16  o'clock.

17          *MR. BOLEY:*  Objection.  Calls for speculation.

18          *THE COURT:*  Objection is overruled.

19          *THE WITNESS:*  I don't believe so, actually.

20  *BY MR. HADDAD:*

21  *Q.*  You said what?

22  *A.*  I don't believe so.

23  *Q.*  Do you have an independent memory of the time of day that

24  it happened?

25  *A.*  I don't -- I know it happened after another -- this was

**Vass - Cross / Haddad**

1    like a result of another -- of a sale.  And I think it did

2    happen right around 4:00 o'clock in the afternoon.

3    Q.  All right.  Since --

4    A.  Like I said, I didn't write that down below.

5    Q.  But your name appears on this field contact card?

6    A.  It does.

7    Q.  You were the officer that filled it out, correct?

8    A.  I am.

9    Q.  That is your handwriting on this card?

10   A.  Yes, it is.

11           MR. HADDAD:  I would move for the admission of

12   Plaintiff's Exhibit 6, which is a portion of the Internal

13   Affairs investigation.

14           MR. BOLEY:  No objection.

15           THE COURT:  And which pages are you referring to?

16           MR. HADDAD:  Just the front page 4615.

17           THE COURT:  4615 is admitted.  We'll call that --

18               **(Plaintiff's Exhibit 6-B was received in**

19               **evidence.)**

20           THE COURT:  6B, is that satisfactory?

21           MR. HADDAD:  Okay.

22           THE COURT:  Since it says Exhibit B at the top, we

23   might as well be consistent.

24           MR. HADDAD:  We can go with that.

25           MR. BOLEY:  Exhibit 6B?

**Vass - Cross / Haddad**

1          *THE COURT:*  Yes.

2     *BY MR. HADDAD:*

3     *Q.*  Officer, will you please help me read this writing a little

4     bit.

5               Under "date and time" on the card, what does it say?

6     *A.*  It appears 2/10/07.  And like I said, it looks like a copy

7     of a few copies.

8     *Q.*  Yeah.

9     *A.*  Based upon this, it's 2/10/07.  And the time to the right,

10    it says 16:04.

11    *Q.*  And the next box, can you read in the name and the other

12    information there?

13    *A.*  Last name is first, is Garibay, comma, Daniel.  Male

14    Hispanic -- sorry M, letter, H letter.  And then, maybe 24.

15    *Q.*  Um-hmm.

16              For his address residence, what did you write?

17    *A.*  451 105th Avenue.  Wrote down his date of birth.

18              Do you want me to say each number?

19    *Q.*  Please.

20    *A.*  Date of birth, 5-14-82.  His height is 5'11", weight 190.

21    Black hair.  Brown eyes.  I think that's -- under complexion,

22    it says medium.  Looks like the PFN, which is hard to read, but

23    it looks like boy, boy, V, as in Victor, and B at the end.

24              On probation, looks like 10851, stolen vehicle.  And

25    it says he is driving.  I listed the plate that he was driving,

**Vass - Cross / Haddad**

 1  the plate numbers, and then the year, the make of the vehicle,

 2  and so forth.

 3  **Q.**  Let's go to the substantive part.

 4  **A.**  Okay.

 5  **Q.**  It says "in company with"; who was he with?

 6  **A.**  Last, Ortega, first, Salvador.  DOB, looks like 04-26-86,

 7  with an address to the right of him of 9400 C Street.

 8         And then the next person down is last of Holmes,

 9  first of Michael, with a DOB of 11/25/81.  Looks like an

10  address of 9504 C Street.

11  **Q.**  And then the next box says, "explain reason for stop,

12  findings, disposition"; what did you write there?

13  **A.**  Vehicle stop, no blinker.  And then I had 976, which is our

14  police jargon, if you will, a code for vehicle stop.

15         And we did a probation search of Holmes with

16  negative results.  FC, which is this form, field contact

17  report, only.  And then, of course, it goes down to the box

18  below.

19  **Q.**  Okay.

20         So the reason that you wrote for the traffic stop

21  was no blinker; is that right?

22  **A.**  Yes.

23  **Q.**  Is that, in fact, the reason why you pulled over the Yukon?

24  **A.**  It was, partly.

25  **Q.**  Was there another reason that you didn't write down?

**Vass - Cross / Haddad**

1    **A.**   Yes.  This was a ID wall stop for a federal investigation.

2    **Q.**   What's that?

3    **A.**   Well, at the time there was a wiretap going on, not

4    directly, of course, with Mr. Holmes, but there was a wiretap

5    going on.

6            Salvador Ortega had sold drugs, had just sold drugs

7    to another person.  And I don't know how much you want me to

8    get into this, but there was a phone call between Salvador

9    Ortega and -- I want to say his name is Jose Juan Penoza Juario

10   *(phonetic)*.  He was actually the subject of a wire

11   investigation, one of the subjects, one of the targets.

12           Salvador Ortega called him.  I can't recall at that

13   time if we knew it was Salvador or not.  During the

14   surveillance we learned it was Salvador, or they did, I wasn't

15   on the surveillance.

16           Anyways, Salvador agrees to purchase drugs.  They

17   meet.  I want to say the meet took place somewhere near 100th

18   Avenue, International Boulevard, a few blocks away.  Salvador

19   is selling drugs to a person by the name of Eric Mays.

20           At that time, then Salvador gets in his car.  I

21   think maybe Michael Holmes was observed with him, not so much

22   doing the drug transaction, but just there, maybe being

23   involved, maybe not, I don't know, don't recall, but not as,

24   we'll say, directly as Salvador was because Salvador placed a

25   phone call.

**Vass - Cross / Haddad**

1          Then we needed to do an ID stop of the vehicle to

2     determine who they were.  At the time, I wasn't -- the wiretap

3     was ran out of San Francisco.  I wasn't here at that point.  I

4     was just basically somewhat of a stop car, if you will, for

5     this wiretap.

6          So how it works is, to protect the wire or the T3

7     investigation, the wiretap, you wall off certain parts of

8     investigation from this from disclosing the wire.  The wire is

9     going to be going for probably a year or so, so you don't want

10    to make that known or disclose it.  So we did an ID stop to

11    document the stop of who was actually with Salvador at that

12    time.

13          Does that make sense?

14    **Q.**  Yes.

15          Why didn't you document the real reason for stopping

16    was to do an ID stop?

17    **A.**  Because it's a matter of public record.  We don't --

18    **Q.**  So instead, you wrote that it was a blinker violation?

19    **A.**  There was a blinker violation.  The probable cause was

20    there for the stop, yes, but you also protect the wire, and you

21    wall this off from the wire itself.  I don't know if that makes

22    sense.

23    **Q.**  This describes a certain beat, what beat is that?

24    **A.**  Thirty-three x-ray, I believe.

25    **Q.**  What location is that, what is the beat?

**Vass - Cross / Haddad**

1   *A.*   I believe it's 33 with an X.

2   *Q.*   What does that mean?

3   *A.*   Beat 33X.  I don't know.

4   *Q.*   What is beat 33?

5   *A.*   It's -- I'm not sure exactly what you are saying.

6   *Q.*   Can you define the boundaries of beat 33?

7   *A.*   The boundaries are from 83rd Avenue, would be -- we'll go

8   in true directions.  Here would be the north.  International

9   Boulevard would be the east.  98th Avenue would be the south.

10  And I believe San Leandro Boulevard is the west.

11  *Q.*   Okay.

12          Now, you detained Mr. Holmes in this vehicle stop;

13  is that right?

14  *A.*   He was one of the people detained, yes.

15  *Q.*   What did you do to Mr. Holmes?

16  *A.*   Um, well in, fact, I didn't even realize it was Mr. Holmes

17  originally until I walked up to the car.

18          As I'm walking up, somewhere around there I know my

19  sergeant arrived on scene.  I'm not sure if I waited for him to

20  arrive because at some point I know he was right behind me.  I

21  went to Mr. Holmes first, back passenger, generally, the first

22  person to go to, anyways.

23          I had him exit the car, did a quick search of him,

24  not a strip search, a quick search.  I may have even handcuffed

25  him at that time, I don't recall.  I ended up passing him off

**Vass - Cross / Haddad**

1    to Sergeant Downum.

2    **Q.**   Let me stop you there so I can follow up.

3    **A.**   Okay.

4    **Q.**   You may or may not have handcuffed Michael Holmes when you

5    searched him in this incident; is that right?

6    **A.**   That's true.

7    **Q.**   This is an incident where you believed he was associated

8    with people who had just done a drug transaction, right?

9    **A.**   Yes.

10   **Q.**   Driving in a Yukon, right?

11   **A.**   I'm not -- yeah.

12   **Q.**   A Yukon SUV?

13   **A.**   Yes.

14   **Q.**   Yes?

15           There was a possibility that one or more occupants

16   of that vehicle were armed; isn't that right?

17   **A.**   I'd say it's a possibility, yes.

18   **Q.**   Why didn't you handcuff Mr. Holmes before searching him?

19           **MR. BOLEY:**   Objection.  Misstates the evidence.

20           **THE WITNESS:**   You said why didn't I; I said I may

21   have.  I am not saying I did or I didn't.

22   **BY MR. HADDAD:**

23   **Q.**   Why are you unsure under those circumstances whether you

24   handcuffed him before searching him?

25   **A.**   Um, we were trying to do a low-key stop and ID of the

**Vass - Cross / Haddad**

1   people in this vehicle.

2   **Q.**  On any of the occasions that you've ever stopped or

3   arrested Michael Holmes, has he ever had a weapon?

4          **MR. BOLEY:**  Objection.  Relevance, Your Honor.

5          **THE COURT:**  Objection is overruled.

6          **THE WITNESS:**  I would say I don't recall ever

7   arresting him specifically for a weapon.  I will say this:

8   That one of the probation searches I did of his house in the

9   very beginning, there was a firearm in the house that his -- I

10  think maybe grandma said that was related to, I want to say her

11  husband that had passed away, or something.  Besides that, I

12  don't really recall him being around a firearm.  But, of

13  course, drug dealers, yeah, he could have a firearm.

14         **MR. HADDAD:**  I move to strike the reference to drug

15  dealer.

16         **THE COURT:**  It is stricken.

17  **BY MR. HADDAD:**

18  **Q.**  You've never recovered any sort of weapon from Michael

19  Holmes at any time; isn't that true?

20  **A.**  Yeah, I have not.

21  **Q.**  Can you describe the type of search that you did to

22  Mr. Holmes on this incident?

23  **A.**  It was a quick pat -- I don't want to say pat search, but a

24  quick search of him, and then I handed him off to Sergeant

25  Downum.  It was not inside his pants, or anything of that

**Vass - Cross / Haddad**

1   nature.

2   **Q.**  Where was that search done?

3   **A.**  Right there at the vehicle.

4   **Q.**  In the street, on International Boulevard?

5   **A.**  Right, on International Boulevard, sidewalk but --

6   **Q.**  Were you driving alone in the police car at that time?

7   **A.**  Yes, I was.

8   **Q.**  The only other officer at the scene would have been

9   Sergeant Downum; is that right?

10  **A.**  To my knowledge, that is the only person that was there.

11  **Q.**  So Sergeant Downum would have been dealing with the other

12  two occupants in the car at the time you were dealing with

13  Mr. Holmes; is that right?

14  **A.**  Not quite, because I brought out Mr. Holmes first, I

15  believe, gave him to Sergeant Downum, and we had the other

16  people exit the car.  So I think he was still somewhat dealing

17  with Mr. Holmes.

18          Now, I may have actually -- you know, I know at one

19  point Sergeant Downum then did look inside the car and located

20  a phone of Salvador Ortega's, and so I had custody of Michael

21  Holmes for that period of time.

22  **Q.**  What was Sergeant Downum doing while you were searching

23  Michael Holmes?

24  **A.**  I believe he was somewhat behind me, maybe to my right,

25  somewhere around there.

**Vass - Cross / Haddad**

1  **Q.**  But you might have searched Michael Holmes before Sergeant

2  Downum arrived on the scene, correct?

3  **A.**  No.

4  **Q.**  No?

5  **A.**  No.

6  **Q.**  Do you know whether or not Sergeant Downum saw your search

7  of Mr. Holmes on this incident?

8  **A.**  He had to, he was standing right there.

9  **Q.**  I thought you just said you weren't sure what he was doing

10  when you were searching Michael Holmes?

11          **MR. BOLEY:**  Objection.  Misstates the testimony.

12          **THE COURT:**  Objection is overruled.

13          **THE WITNESS:**  Well, to say that I'm actually looking

14  at him, what he is doing, I'm not.  But I know he is right

15  there.

16  **BY MR. HADDAD:**

17  **Q.**  On this occasion in International Boulevard, did you

18  unbutton Mr. Holmes' jeans, stick your hand inside, and run

19  your hand between Mr. Holmes' buttocks on the outside of his

20  boxer shorts?

21  **A.**  No.

22  **Q.**  Did you pull Mr. Holmes' waistband away from his body to

23  see if anything fell out of his boxer shorts?

24  **A.**  No.  No.

25  **Q.**  Those things I just described would have constituted a

 1   strip search; is that right?

 2   *A.*  Definitely the jeans.  Pulling his pants out or pulling, I

 3   think you said his underwear; is that what you said?

 4   *Q.*  Yeah.

 5   *A.*  Kind of hard to say.  I mean, if he is wearing maybe a long

 6   shirt over it, maybe not.  I don't know.

 7   *Q.*  If you rearrange a person's clothing so as to be able to

 8   inspect or observe their underwear or privates, that's a strip

 9   search, isn't it?

10   *A.*  Yes.  So that's why I said if he is wearing a long shirt,

11   kind of depends.

12   *Q.*  Do you recall what kind of shirt he was wearing?

13   *A.*  No, I don't.

14   *Q.*  Now, Mr. Holmes was only detained at that time, not

15   arrested correct?

16   *A.*  That's true.

17   *Q.*  And you understood that you were not justified in searching

18   a person who was merely detained, right?

19   *A.*  Wait, what's the question, now?

20   *Q.*  You understood at the time that in order to strip search

21   somebody in the field, they had to be under arrest?

22   *A.*  Well --

23            *MR. BOLEY:*  That misstates the testimony.

24            *THE COURT:*  I could not understand the latter part

25   of that.

**Vass - Cross / Haddad**

1                   What did you say?

2                   **MR. BOLEY:**  Misstates the testimony.

3                   **THE COURT:**  Restate that question.

4  **BY MR. HADDAD:**

5  **Q.**  Isn't it true that to strip search a person in the field,

6  consistent with OPD policy at that time, they had to be under

7  arrest?

8  **A.**  I think when I read the policy, I don't think that's what

9  it says when I read the policy.

10                  **MR. HADDAD:**  Is it --

11                  **THE COURT:**  Are you looking in your blue --

12                  **MR. HADDAD:**  Yeah, the blue book, Exhibit 14.

13                  **THE COURT:**  Um-hmm.

14                  **MR. HADDAD:**  Exhibit 14.

15                  **THE COURT:**  Um-hmm.

16                  **MR. HADDAD:**  I'm directing the witness to page 6 of

17  Exhibit 14.

18  **BY MR. HADDAD:**

19  **Q.**  There is a heading at the bottom third of the page, it says

20  "Strip Searches in the Field"; do you see that?

21  **A.**  I do.

22  **Q.**  And it says below that, "a strip search incident to an

23  arrest may be conducted in the field only when..." and then it

24  describes the circumstances.  Do you see that?

25  **A.**  I do.

**Vass - Cross / Haddad**

1   **Q.**  All right.  So this policy pertains to strip searches

2   incident to an arrest; is that right?

3   **A.**  What you are reading is correct.

4          If I may go back to a couple of pages, since you are

5   quoting this?

6   **Q.**  If that will be helpful for you, go ahead.

7                    **(Witness reviewing exhibit.)**

8   *BY MR. HADDAD:*

9   **Q.**  Do you see anything in this policy, Exhibit 14, that says

10  you are allowed to strip search a person who is only detained

11  rather than arrested?

12  **A.**  For this particular spot that you are reading, I would say

13  no, but --

14          *MR. BURRIS:*  I'm sorry, I couldn't hear you.  I'm

15  sorry.

16          *THE WITNESS:*  Still, actually, I was still reading.

17          *MR. BURRIS:*  Sorry?

18          *THE WITNESS:*  I said, actually, I was still reading.

19          *MR. BURRIS:*  Oh, okay.  Sorry.

20          I thought he was mumbling.

21          *THE WITNESS:*  I probably was.

22          *THE COURT:*  And so were you.

23                    **(Laughter.)**

24          *MR. BURRIS:*  Yeah, not allowed.

25                    **(Laughter.)**

*Sahar McVickar, C.S.R. No. 12963, RPR*
*Official Court Reporter, U.S. District Court*
*(415) 626-6060*

**Vass - Cross / Haddad**

1            **THE COURT:**  Can we get through this somehow?

2                          **(Laughter.)**

3            **THE WITNESS:**  Sorry, Your Honor.

4    **BY MR. HADDAD:**

5    **Q.**  Officer, it's your duty to know this policy as an officer

6    with the OPD, isn't it?

7            **MR. BOLEY:**  Your Honor, there is a question pending.

8    He is reviewing the document.

9            **THE COURT:**  I told him move it along.

10   **BY MR. HADDAD:**

11   **Q.**  Have you found anything in this policy, after having a few

12   minutes to look at it, that says you can strip search a person

13   who is merely detained?

14   **A.**  Um, I would not say that, but I would say that a person on

15   probation or parole this section is vague on.  And so it

16   really, you know, I can -- like I always say, well, I know what

17   my practice is, but going for this, a person on probation or

18   parole, doesn't -- in this training bulletin is not covered,

19   does not appear to be covered under this section.  Seems that

20   it's vague and ambiguous.  And there is two different things

21   going on.

22   **Q.**  All right.

23            Now, going back to the stop of Mr. Holmes and the

24   Yukon, you would agree, wouldn't you, that you were not legally

25   justified to strip-search Mr. Holmes on that occasion?

1              **MR. BOLEY:**  Asked and answered, Your Honor.

2              **THE COURT:**  The objection is overruled.

3              **THE WITNESS:**  Well, you are putting in there

4    something that didn't occur.  Are there other facts?  You are

5    apparently alluding to something that occurred, so now I'm

6    having to speculate on something else that occurred based

7    upon -- I mean, no strip search occurred.

8    *BY MR. HADDAD:*

9    *Q.*  And you would not have been legally justified to

10   strip-search Mr. Holmes under those circumstances; isn't that

11   true?

12             Do you need the question read back?

13   *A.*  No, I know the question.  It's -- it's hard to answer that

14   question in a vacuum with this.  I mean --

15   *Q.*  So you think it's possible you could have been justified in

16   doing a strip search on Mr. Holmes on that occasion if you

17   wanted to?

18   *A.*  With these facts alone, no.

19   *Q.*  That's what I'm asking you about, these facts alone.

20   *A.*  No.

21   *Q.*  All right.

22             You knew that at the time, didn't you?

23   *A.*  Honestly, it wasn't even -- I did know it, and it wasn't

24   even something to think about.

25   *Q.*  Okay.

**Vass - Cross / Haddad**

1           I want to turn to the next incident.  This one is

2   alleged at 98th and E Street, involving Mr. Engram on

3   January 16, 2007.

4   *A.*  I'm sorry, did you have a place where I was supposed to go

5   to?  I was moving that other one around.

6   *Q.*  Yeah, I'm sorry.  You have too many -- let me have --

7   *A.*  Which one you want?

8   *Q.*  That one.

9           I just want to direct your attention, in general, to

10  this allegation.  Are you familiar with the allegation by

11  Mark Engram that you subjected him to a strip search on or

12  about January 16, 2007 at 98th and D Street?

13  *A.*  I'm sorry, you said 98th Ave. and D?

14  *Q.*  Yeah.

15  *A.*  Could be wrong, but I think Elmhurst and C or D.

16  *Q.*  My mistake, let me rephrase that.

17          Are you familiar with the allegation of Mark Engram

18  that you strip-searched him at Elmhurst and D Street on or

19  about January 16, 2007?

20  *A.*  I am.  I do believe that the complaint said -- I'm sorry,

21  Elmhurst and C, as in Charles?

22  *Q.*  Um-hmm.

23  *A.*  Oh.  But Elmhurst and D is the same block, general area.

24  *Q.*  Okay.

25          And you understand that this is one of the

**Vass - Cross / Haddad**

1  complaints that was investigated by Internal Affairs; is that

2  right?

3  **A.** Yes, I do.

4  **Q.** Okay.

5         Do you recall detaining Mark Engram anywhere in the

6  vicinity of that location of Elmhurst and D around January 16,

7  2007?

8  **A.** No, I was on another operation with an arrest during that

9  time frame.

10 **Q.** On that particular date, you say that you are on a

11 different operation; is that right?

12 **A.** Yes, it's documented.

13 **Q.** Okay.

14         And specifically, by the late afternoon of

15 January 16, 2007, what were you doing?

16 **A.** Can you be specific on which time -- I got the date, I just

17 don't have the specific time, like what time of day you are

18 referring to.

19 **Q.** Say, between 2:00 and 5:00 p.m.?

20 **A.** Um, at -- we were still dealing with the arrest from an

21 arrest earlier in the day involving a vehicle chase, and so

22 forth.

23 **Q.** All right.

24         You have the orange book in front of you, do you?

25 **A.** I don't know, do I?

**Vass - Cross / Haddad**

1   **Q.**  Would you please turn to Exhibit 5, page 4642.

2   **A.**  4642?

3   **Q.**  Yeah.

4   **A.**  Okay.

5   **Q.**  All right, this appears to be another CAD page with your

6   name on it, right?

7   **A.**  Just confirming, 4652, right?

8   **Q.**  4642.

9   **A.**  Oh, -42.  Thank you.

10            Yes.

11  **Q.**  And this is January 16, 2007, right?

12  **A.**  Yes, sir, it is.

13  **Q.**  Were you officer 8173 at that time?

14  **A.**  No, I was not.

15  **Q.**  Who was that, do you know?

16  **A.**  Officer Todd Mork.

17  **Q.**  And he was your partner at that time, wasn't he?

18  **A.**  Yes, he was.

19  **Q.**  You would have been assigned to the same car with him on

20  that day, right?

21  **A.**  Yes, I was a passenger.

22  **Q.**  Do you recall ever leaving Officer Mork to work in a

23  different car that day?

24  **A.**  No, I did not.

25  **Q.**  You would have been together with him all day; is that

**Vass - Cross / Haddad**

1    right?

2    *A.*  Um, as I recall, there was some other operation late that

3    evening, or something.  So I can't really say for that part of

4    it.  But for the majority of the hours I was with sergeant --

5    or Officer Mork.

6    *Q.*  Okay.

7              Now, what was the major incident that you were

8    involved in on that day?

9    *A.*  Um, I'm trying to think of the person's name.

10   *Q.*  We don't need the name, just the description of what it

11   was.

12   *A.*  I was on an arrest team for the Alameda County Task Force.

13   They had a search warrant along with -- for multiple

14   residences, as well as -- I think they had like an undercover

15   involved as well.  And there was a suspect that was going to be

16   bringing multiple ounces of heroin.

17             I think -- I believe they had surveillance on the

18   subject, and anyways, we tried to make a vehicle stop on that

19   subject, as you can see, at 11:25 hours at Baldwin and

20   Hegenberger.

21             As I recall, the person drove through the Pak'nSave

22   parking lot, drove around city streets for a while, got on the

23   freeway.  And granted, this is, you know, a high-speed vehicle

24   chase, lights and sirens on.  We have a search warrant for

25   multiple places.

**Vass - Cross / Haddad**

1          So anyways, we eventually lose him on the freeway.

2     He gets off, I want to say at 23rd Avenue or 29th Avenue, but

3     other units were involved with this vehicle chase at this time.

4     So we end up having to turn around and come back.  He is

5     already taken into custody at that point.

6     **Q.**  Then he was caught, and what did you do?

7     **A.**  I had to -- he ended up, I want to say crash -- I want to

8     say he backed into or did something to another car trying to

9     get away, so I ended up having to do a police map for that.  We

10    had to also -- I think I ended up doing the tow for the car, so

11    I had to wait for the tow truck because I remember being there

12    when the tow truck came about.

13         We had to retrace that area that we -- Alameda PD

14    ended up, you know, actually physically taking the body.  So we

15    then went to, I want to say -- one of the people they had a

16    search warrant for was somewhere around 96th and Cherry Street.

17    We went over there, they had already made entry at that time,

18    and so we hung around there for a little bit to see if they

19    needed any help.  I think we had to go back and retrace.  And

20    then so -- that's kind of --

21              **THE COURT:**  You had to go back and what?

22              **THE WITNESS:**  Retrace.

23              **THE COURT:**  Retrace?

24              **THE WITNESS:**  Our routes.

25              And so now it kind of gets to -- that is the arrest.

**Vass - Cross / Haddad**

1    Now, you get to the Oakland Police Department policy, and so

2    forth, of dealing with a report writing, retracing where you

3    drove, and so forth, and then going back to the Eastmont

4    substation, where we actually did write the report.

5              And one of the things -- this was actually quite a

6    long case.  So we had to get with Sergeant Downum, explain to

7    him what was going on.  He actually did an affirmative action

8    report.  So he had, you know, a lot of typing to kind of say

9    what was going on, that we assisted Alameda County Task Force,

10   we got -- had this big drug seizure, because, as we found out,

11   County Task Force ended up going to a house.  I think they got

12   some large amount, like 11 pounds of heroin, something like

13   that.

14             So we went back to where the County Task Force

15   Office is.  We ended up getting their pictures to try to do

16   somewhat of a small but big presentation to kind of talk about

17   this case.  So we were on this case for quite a bit of time.

18   *Q.*  How come this catalog doesn't document that you went to

19   that Cherry Street address?

20             *MR. BOLEY:*  Objection.  Lack of foundation.

21             *THE COURT:*  Overruled.

22             You may answer the question.

23   *BY MR. HADDAD:*

24   *Q.*  Do you have any idea why?

25   *A.*  Don't know.

**Vass - Cross / Haddad**

1            **THE COURT:**  You don't know?

2            **THE WITNESS:**  It's very possible we didn't put --

3   **BY MR. HADDAD:**

4   **Q.**  Do you have any idea why this wouldn't document you went

5   back to the Alameda Task Force headquarters?

6   **A.**  Honestly, it's not something you put on CAD.

7   **Q.**  Now, between 14:27 that day, which is 2:27 in the

8   afternoon --

9   **A.**  What was the time?

10  **Q.**  14:27 to 21:19, there is nothing noted for you in the CAD.

11  Do you see that?

12  **A.**  I do see that.  I'm not sure what I would expect to see.  I

13  mean, we were writing reports and doing all that administrative

14  stuff at that point.  It's really not something you do on CAD.

15  **Q.**  Uh-huh.

16          And how do you know that's what you were doing at

17  that point?

18  **A.**  I remember being there forever dealing with this.

19  **Q.**  Uh-huh.

20          Now, where did you do those reporting?

21  **A.**  At my substation on 73rd Avenue.

22  **Q.**  And at what point were you there doing the reports?

23  **A.**  Sorry, what point?

24  **Q.**  Yeah, what time of the day were you there?

25  **A.**  It was all in conjunction with this -- all in conjunction

 1   after the arrest.

 2   *Q.*  What time did you get to the Eastmont substation?

 3   *A.*  I can't tell you what time I got there.

 4   *Q.*  You don't recall?

 5   *A.*  No, I don't recall, but I can -- I mean, it's all, you

 6   know, in the time frame of going to Cherry and then doing all

 7   the paperwork.  It was a lot of paperwork in the administrative

 8   function of this.

 9   *Q.*  Where did you come from before going to the Eastmont

10   substation?

11   *A.*  I believe we came from that address somewhere at 96 and

12   Cherry.

13   *Q.*  Ninety-six and Cherry?

14   *A.*  Right.

15   *Q.*  How far away from Elmhurst and D is 96 and Cherry?

16   *A.*  I don't know, maybe ten blocks.  Hard to say.  This is just

17   a guess.  If there is a map, we can say, but I'm not sure.

18   *Q.*  This is the area that you regularly were assigned, isn't

19   it?

20   *A.*  Well, not really.  I mean, you are closer to 96 and -- it's

21   truly at the -- like close to 96 and Bancroft, you know,

22   Bancroft and now below International three, four streets, not

23   really.

24   *Q.*  At any time on January 16, 2007, did you stop Mark Engram

25   and question him?

**Vass - Cross / Haddad**

1    **A.**   You said January 16th?

2    **Q.**   Yeah.

3    **A.**   No.

4    **Q.**   Mark Engram alleges that on that date, in the vicinity of

5    Elmhurst and D Street, you pulled his pants down to his thighs,

6    put one hand in between his boxer shorts and jeans next to

7    crack of his buttocks and then ran your bare hand up and down

8    the crack of Mr. Engram's buttocks.

9              Did you do that?

10   **A.**   No.

11   **Q.**   Would you have been justified at any time during the day of

12   January 16th, '07, in doing that to Mr. Engram?

13              **MR. BOLEY:**   Objection.   Calls for speculation.

14              **THE COURT:**   Objection overruled.

15              **THE WITNESS:**   You asked me?

16   **BY MR. HADDAD:**

17   **Q.**   Would you have been justified?

18   **A.**   No.   Justified?   I wouldn't run my bare hand down there --

19   it's --

20   **Q.**   And you certainly would not have been justified in doing

21   that kind of thing to Mr. Engram in view of people on the

22   street, correct?

23   **A.**   Yeah, I wouldn't have done that.

24   **Q.**   All right.

25              Have you heard people on the street in Oakland refer

**Vass - Cross / Haddad**

1   to a particular type police strip search as a "credit card

2   search" or a "credit card swipe"?

3   *A.*  No.

4   *Q.*  Have you ever heard people in Oakland refer to certain

5   police strip searches as a "butt crack search"?

6   *A.*  No.

7              *MR. HADDAD:*  Before we move on, I move to admit this

8   single page from Exhibit 5, the CAD notes at page 4642.

9              *MR. BOLEY:*  Objection.  Lack of foundation, Your

10  Honor.

11             *THE COURT:*  Just 4642?

12             *MR. HADDAD:*  Yes.

13             *THE COURT:*  4642 is admitted.

14                     **(Plaintiff's Exhibit 4642 was received in**

15                     **evidence.)**

16             *MR. HADDAD:*  Was that admitted, Your Honor?  I'm

17  sorry.

18             *THE COURT:*  Yes.

19             *MR. HADDAD:*  Thank you.

20  *BY MR. HADDAD:*

21  *Q.*  Now, if you turn to page 4621, Officer Vass, is this the

22  report for that high-speed chase incident that you just

23  described in detail?

24  *A.*  It appears to be it.

25             *MR. HADDAD:*  And for the record, this is part of

**Vass - Cross / Haddad**

 1  Exhibit 5, the Internal Affairs report.

 2  *BY MR. HADDAD:*

 3  *Q.*  Do you see any report prepared by you in connection with

 4  this incident?

 5  *A.*  How far do you want me to go back?

 6  *Q.*  To the end of the report for this incident.

 7                    **(Witness flipping through documents.)**

 8            *THE WITNESS:*  It appears -- I'm to the end; I don't

 9  see the report that I wrote.

10            I do know that, of course, when I was -- contacted

11  by Internal Affairs they showed me, of course, the map that I

12  wrote.  At that same time, I know Officer Mork wrote a

13  narrative report that went in conjunction with this.  So I

14  don't quite know what to say.

15  *Q.*  Since the time of this Orozco incident, have you seen your

16  report?

17  *A.*  I believe I was shown during -- in the Internal Affairs

18  investigation my map, but beyond that, no.

19  *Q.*  Okay.

20            So is it possible that you're mistaken about having

21  written a report?  Maybe you didn't write it?

22  *A.*  You are referring to a map, correct?

23            *MR. BOLEY:*  Objection.  Calls for speculation.

24  Argumentative.

25  ///

**Vass - Cross / Haddad**

1    *BY MR. HADDAD:*

2    *Q.*  Did you write a report or just a map for the Orozco

3    incident?

4    *A.*  I did the map, Officer Mork did the narrative to explain

5    that chase and everything else.

6    *Q.*  Oh, all right.

7              And from the first page of the Orozco incident

8    report, 4621, that's the page number, according to this report,

9    the suspect was arrested on January 16, 2007, at 12:30 p.m.; is

10   that right?

11   *A.*  That's what it says.

12   *Q.*  Do you have any reason to dispute that?

13   *A.*  No, but once again, that's the arrest versus -- doesn't say

14   what time the tow -- because I waited for the tow truck -- what

15   time the tow truck left, what time I arrived at Cherry.  All

16   those things kind of add up plus the administrative process.

17   *Q.*  Do you know who Percy Jones is?

18   *A.*  I would say, somewhat.

19   *Q.*  What do you know about him?

20   *A.*  I was made aware that he is apparently a witness to this

21   case.  Beyond that, I really don't know anything particular

22   about him.

23   *Q.*  Have you ever talked with him, to your recollection?

24   *A.*  I don't know what he looks like, so I'm not sure.

25   *Q.*  Do you think you have ever arrested him or detained him?

1   **A.**  Like I said, I have never seen his face.  I have no idea.

2   **Q.**  All right.

3         Now I want to direct your attention to the claim

4   made by Richard Rix at C Street and 92nd Avenue.  Are you

5   familiar with the allegations in that claim?

6   **A.**  It's been a while since I've read it.

7   **Q.**  Let me jog your memory.

8   **A.**  Okay.

9   **Q.**  The allegation by Mr. Rix is in approximately late fall

10  2005, you made a vehicle stop of Mr. Rix in the driveway of an

11  apartment.  He had no driver's license.  He begged you not to

12  take his car.

13        You detained Mr. Rix in handcuffs for several

14  minutes and searched Mr. Rix's car.  Mr. Rix said that you

15  strip-searched him twice, pulling down his pants and boxer

16  underwear.  And then squatting behind him, you pulled apart his

17  buttocks and inspected his anus.  And Mr. Rix says that you

18  released him at the scene with no citation and no documentation

19  of this contact.

20        Did you strip-search Mr. Rix, as he has alleged in

21  the late fall of 2005 near an apartment?

22  **A.**  No.

23  **Q.**  Do you recall ever stopping Mr. Rix in his car at that

24  location, C Street and 92nd?

25  **A.**  No, I do not.

**Vass - Cross / Haddad**

1    **Q.**  Okay.

2              Have you ever performed a strip search at any time

3    of Mr. Rix?

4    **A.**  No.

5              **MR. BOLEY:**  Objection.  Relevance.

6              **THE COURT:**  Objection overruled.

7    **BY MR. HADDAD:**

8    **Q.**  Have you ever performed a strip search at any time of

9    Mr. Engram?

10   **A.**  No.

11   **Q.**  Have you ever performed a strip search at any time of

12   Mr. Holmes?

13             **MR. BOLEY:**  Objection.  Relevance.

14             **THE COURT:**  Objection overruled.

15             **THE WITNESS:**  No, sir.

16   **BY MR. HADDAD:**

17   **Q.**  Whenever you have performed a strip search of anyone, have

18   you always documented it, as required by your department's

19   policies?

20             **MR. BOLEY:**  Objection.  Relevance, Your Honor.

21             **THE COURT:**  Objection is overruled.

22             **THE WITNESS:**  Yes.

23   **BY MR. HADDAD:**

24   **Q.**  Now, you mentioned you recalled a contact with Michael

25   Holmes at -- strike that.

1           At MacArthur and -- let me rephrase this again.

2           You mentioned you recalled a contact with Michael

3    Holmes at MacArthur and 109th, do you recall that?

4    *A.*  I do.

5    *Q.*  And approximately when was that?

6    *A.*  I believe it was 2006.

7    *Q.*  Have you located --

8           *MR. BOLEY:*  Your Honor, object on grounds of

9    relevance as to this incident, which is not alleged in the

10   complaint.

11          *THE COURT:*  Is this one that is alleged?

12          *MR. HADDAD:*  It's not alleged specifically in the

13   complaints, but this is for impeachment, Your Honor.  He opened

14   the door when he said he has never strip-searched Michael

15   Holmes, and there will be a witness who will testify to

16   observing that.

17          *MR. BOLEY:*  Again, Your Honor --

18          *THE COURT:*  You are talking about Rix, now?

19          *MR. BURRIS:*  No, Holmes.

20          *THE COURT:*  We're back to Holmes again?

21          *MR. HADDAD:*  Yeah.

22          *THE COURT:*  Okay.

23          *MR. BOLEY:*  Your Honor, again, there should be some

24   limit in terms of how far we go into these incidents when they

25   go beyond the scope of the complaint.

**Vass - Cross / Haddad**

1           ***THE COURT:***  The objection, insofar as it relates to

2    Holmes, is overruled.

3    ***BY MR. HADDAD:***

4    ***Q.***  So at MacArthur and 109th, there is a Church's Chicken

5    located there, isn't there?

6    ***A.***  Well, it's down on the street.

7    ***Q.***  Where is it, 108th Street and MacArthur, approximately?

8    ***A.***  It appears so.  I would say it's north, you know, true

9    north from that location, maybe a block or two.

10   ***Q.***  All right.

11           What do you recall about the stop that you made of

12   Michael Holmes at that approximate location, MacArthur and

13   109th or 108th?

14   ***A.***  Well, actually, was 109th, it wasn't 108th.

15   ***Q.***  What do you recall about that?

16   ***A.***  It was during the time frame that we were doing the federal

17   wiretap.  We knew that Michael Holmes was going -- I want to

18   say somewhere on 109th Avenue, above like the 2600 block, which

19   is above MacArthur.  And we knew that there was some drug

20   dealing association with that apartment there.

21           And at that time -- I'm trying to remember; I don't

22   think we had it narrowed down to which one at that point.  But

23   nonetheless, so we knew he was doing some narcotics activity,

24   probably Salvador as well, as I recall, in that particular

25   area.  I don't think we quite narrowed it down.

**Vass - Cross / Haddad**

1          As we were driving, not looking for him, per se, but

2     we are just driving, I see Holmes walking.  I think he had just

3     turned the corner on 109th Avenue from MacArthur.  And if I can

4     use the Oakland directions to help me out, it would be the

5     northwest corner.  He was walking.  He observed me, I think I

6     was with Officer Leal, L-e-a-l.

7          He observed us.  I'm not even sure if he necessarily

8     recognized me so much as just seeing the police car right

9     there, and he appeared very startled.  He was on probation, I

10    did recall this.  And, of course, we had this -- with this

11    narcotic activity going on in this block.

12         Contacted him, trying to figure out more

13    information, trying to pinpoint an address or what he was --

14    what his association was in that area for the narcotic

15    activity.  We also detained him.  I don't recall, honestly,

16    putting him in handcuffs, but I think I did.

17    *Q.*  Um-hmm.

18    *A.*  Detained him as part of his probation.  And I remember I

19    asked him what he was doing here, how did he get here, some of

20    those kind of questions to try to get some information.

21         Part of the questions I remember is he said he was

22    walking, and he -- I remember he said he did not have a car or

23    anything else in this area; well, as we do a probation search

24    of him, I remember I found a key that ended up working to a

25    car, like, I don't know, maybe 30 or so feet up the street.

**Vass - Cross / Haddad**

1  And it was on the east-hand side of the street.

2  **Q.**  How did you find out that the key you recovered from

3  Michael Holmes at that time worked on a car?

4  **A.**  I'm not sure if it had a fob or -- I remember eventually

5  trying -- we actually did do a search of the car.  I'm not sure

6  if it was the only Chrysler on the block.  I know he was

7  driving that car for a while.  It's a Chrysler 300, as I

8  recall, silver in color.  I'm not quite sure, but nonetheless,

9  we did go and search the car.

10  **Q.**  All right.

11       And in order to locate the car, did you drive --

12  drive down on the street or walk down the street by pressing

13  the key fob to see if the locks opened?

14  **A.**  Like I said, I don't recall how we actually physically got

15  to the car, but I do know that we did locate the car, and this

16  car was associated with him.

17  **Q.**  You may have driven to it; is that what you are saying?

18  **A.**  I don't believe so.  I don't have a great answer for you.

19  It's just I don't believe so.

20  **Q.**  So what happened after you got to that car?  You searched

21  it?

22  **A.**  Yes, we did.

23  **Q.**  Did you search Michael Holmes in this incident?

24  **A.**  I did search him, yes.

25  **Q.**  Where?

**Vass - Cross / Haddad**

1  *A.*  At the corner of 109 and MacArthur.

2  *Q.*  109 and MacArthur?

3  *A.*  Yes, the northwest corner.

4  *Q.*  Specifically, where was he when you searched him?

5  *A.*  On the sidewalk.

6  *Q.*  And what kind of search did you do?

7  *A.*  Search very consistent with the search incident to arrest,

8  although it was probation.  Did not go into his clothing,

9  exterior only, but I did search him.

10  *Q.*  Did you pull his pant down, no?

11  *A.*  Absolutely not.

12  *Q.*  Did you do a strip search of him at that time?

13  *A.*  Absolutely not.

14  *Q.*  There were lots of people around at the time that you do

15  recall the search that you described; is that right?

16  *A.*  No, at that point I don't recall seeing anybody around.

17  When I got to the car -- and he had actually so many things in

18  the car, we actually had to remove things from the car.  There

19  was people starting to show up at that point.

20  *Q.*  Did you search Michael Holmes near where you found the car

21  that worked with his key?

22  *A.*  Are you referring to other than what you just described?

23  Are you saying that that was close proximity to it?

24  *Q.*  Did you do another search by the car?

25  *A.*  I don't recall doing another search with a car.

**Vass - Cross / Haddad**

 1  *Q.*  How far away from where you did describe the search did you

 2  find Michael Holmes' car?

 3  *A.*  I think I already kind of said, it was up the street, maybe

 4  30 feet, or so.

 5  *Q.*  Did you --

 6  *A.*  And that's just a guess.  Trying to remember.

 7  *Q.*  So was Officer Leal also involved in the stop with you?

 8  *A.*  Yes, he was.

 9  *Q.*  Did the two of you document this in any way?

10  *A.*  Yeah, actually, we did.

11  *Q.*  Where is the documentation?

12  *A.*  I don't know.  That was actually one of the things that I

13  was looking for prior to coming, was that stop.

14  *Q.*  Did you fill out a stop data form for that, too?

15  *A.*  I don't have specific recollection of doing a stop data

16  form, but I can say I always try to do them.

17  *Q.*  Did that happen in the summertime?

18  *A.*  I believe so.  Not a hundred percent, I believe.  But I

19  believe there was a span that it could have been.

20  *Q.*  Now, another contact with Michael Holmes that you recalled

21  was doing a probation search on him at the location of his

22  house, 9504 C Street, do you recall that?

23  *A.*  Yeah.  Originally, I had not recalled that, but, you know,

24  of course, thinking about this case more and more, that was one

25  of the cases that kind of came to me.

1    *Q.*  When did that happen?

2    *A.*  It was probably, I don't really know if I can give a date.

3    It was more in the beginning of seeing Mr. Holmes.  I don't

4    really know.

5    *Q.*  Does 2004 sound like the time frame that that search would

6    have happened?

7    *A.*  Maybe '05, maybe '04, somewhere around there, I would say.

8    *Q.*  And where did you do this probation search of Mr. Holmes

9    near his house?

10   *A.*  In his house.

11   *Q.*  In his house?

12   *A.*  Yes.

13   *Q.*  Inside the building of his house?

14   *A.*  Right.  His grandma was there.  I believe that's his

15   grandma.  She was there.

16   *Q.*  Did you ever search Michael Holmes at the side of his house

17   outdoors?

18   *A.*  No -- just to clarify, I didn't say strip search, I said

19   probation search in his house invoking a search condition.

20   *Q.*  I understand.

21          Is there sufficient privacy to conduct a strip

22   search, if you want to do one, at the side of Michael Holmes'

23   house at 9504 C Street?

24          *MR. BOLEY:*  Objection.  Calls for speculation.

25          *THE COURT:*  You may testify, if you know, if you are

**Vass - Cross / Haddad**

1   familiar with the area.

2           *THE WITNESS:*  I know.  I don't recall what

3   particular -- that yard is.

4   *BY MR. HADDAD:*

5   *Q.*  All right, do you recall stopping Michael Holmes at

6   approximately International and 103rd Avenue, where there is a

7   little strip mall?

8   *A.*  I've never stopped him there.  I know the mall you are

9   talking about, but I never stopped him there.

10  *Q.*  There is a detail shop across the street, are you familiar

11  with that location?  A rim shop.  Sorry.

12  *A.*  Yeah, that sounds familiar.  I mean, I know the location.

13  Didn't occur.

14  *Q.*  So it's your testimony that you have never stopped Michael

15  Holmes in that parking lot of that strip mall at International

16  and 103rd, correct?

17  *A.*  That's correct.

18  *Q.*  And I take -- strike that.

19          Did you ever strip-search Michael Holmes in the

20  parking lot of that strip mall?

21  *A.*  No.

22  *Q.*  Have you ever referred to any member of the public in the

23  City of Oakland -- strike that.

24          Have you ever referred to people in a house that you

25  were searching by the derogatory name for an African-American

**Vass - Cross / Haddad**

```
 1    that starts with "N"?

 2              MR. BOLEY:  Objection.  Relevance, Your Honor.

 3              THE COURT:  Objection sustained.

 4              THE WITNESS:  No.

 5              THE COURT:  You don't have to answer.

 6              THE WITNESS:  Oh, sorry.

 7              MR. HADDAD:  Your Honor, I would just request the

 8    ability to ask him the question about whether he has used this

 9    word in public to show intent and bias.  And I believe it's

10    admissible under Price versus Kramer.

11              MR. BOLEY:  Your Honor, it's not an element of the

12    cause of action.

13              THE COURT:  Do you have any proffer?

14              MR. HADDAD:  Yes.  There is an Internal Affairs

15    complaint at Plaintiff's Exhibit 9, I believe, where it was

16    alleged by the complainant that Officer Vass did just that, he

17    referred to people in a house by the "N" word.

18              MR. BOLEY:  Well, Your Honor --

19              THE COURT:  Hold on.  Just one moment.

20              MR. BOLEY:  Sure.

21              THE COURT:  Nine?  Page, line, whatever we have?

22              MR. HADDAD:  Sorry, it's not Exhibit 9, it's Exhibit

23    10 at page 7496.  It's the first page of Exhibit 10.

24              THE COURT:  First page of Exhibit 10?

25              MR. HADDAD:  Yeah.  And it's the first two lines of
```

**Vass - Cross / Haddad**

 1   "Summary of Complaint."

 2          **THE COURT:**  Can we tell who the officer is?  Because

 3   it refers to "officers."

 4          **MR. BOLEY:**  Yeah.  And, Your Honor, farther back,

 5   there is a report related to -- in which many officers were

 6   involved in the incident.

 7          **MR. HADDAD:**  The subject of this complaint is

 8   Officer Vass.

 9          **THE COURT:**  But it says "complainant alleged

10   officers..." et cetera.

11          **MR. HADDAD:**  It says below in the next box,

12   "tentative name of involved personnel," and it only lists

13   Officer Vass.

14          **MR. BOLEY:**  But that is not a record of a complaint.

15          **THE COURT:**  I'm going to sustain the objection.

16   **BY MR. HADDAD:**

17   **Q.**  Officer Vass, do you recall on December 1, 2004, at 9409 C

18   Street, reaching into a man's pants to recover alleged drugs at

19   the request of another officer named Officer Sayna *(phonetic)*.

20          **MR. BOLEY:**  Objection.  Relevance, Your Honor.

21          **THE COURT:**  Objection is overruled.

22          You may answer.

23          **THE WITNESS:**  I don't know.

24   **BY MR. HADDAD:**

25   **Q.**  You don't recall?

**Vass - Cross / Haddad**

1   **A.**  No, I don't.

2   **Q.**  Would you turn to Plaintiff's Exhibit 10, page 7557,

3   please.

4   **A.**  Is it in this --

5   **Q.**  Same -- oh, sorry, I'll get it for you.

6   **A.**  What was the section?

7                          **(Counsel confer regarding exhibit number.)**

8   **BY MR. HADDAD:**

9   **Q.**  Did you find the page?

10  **A.**  I did.

11  **Q.**  All right.

12          This appears to be a report written by

13  Officer Sayna, do you see that?

14  **A.**  Yeah, it does appear to be.

15  **Q.**  Now, in the last paragraph it -- I'm just going to put this

16  on the ELMO because I've highlighted it, so it will make it

17  easier to ask you about it.

18          In the last paragraph, first two lines it says,

19  "After the residence was secure, I asked Officer R. Vass'

20  assistance in recovering the plastic bag from Walker's

21  underwear."

22  **A.**  Um-hmm.

23  **Q.**  "I pulled Walker's pants down slightly, and R. Vass

24  recovered the evidence."

25          Do you see that?

**Vass - Cross / Haddad**

1  **A.**  I do.

2  **Q.**  Does that refresh your memory?  Do you recall doing that

3  now?

4  **A.**  Honestly, not really, but --

5  **Q.**  And you wrote a report about it, too.

6        Why don't you turn to page 7553 and 7554.

7  **A.**  I'm sorry, your --

8  **Q.**  A couple pages back, 7553.

9        This is your report, right?

10 **A.**  Right, it's my report with a lot of people writing

11 supplemental reports on it.  It was a surveillance.

12 **Q.**  Okay.

13       But this has your name at the bottom, right?

14 **A.**  If I can find that report, I'll tell you for sure.

15       You said 753?

16 **Q.**  7553.

17 **A.**  All right, I have it.  Yes, it's my report.

18 **Q.**  All right, last paragraph on that 753.

19 **A.**  Um-hmm.

20 **Q.**  Do you see where you wrote, "While I was inside the

21 residence, I was told by Officer Sayna that he witnessed,

22 Walker, comma, Craig, place a Baggie of suspected cocaine into

23 the crotch area of his pants.

24       "I recovered one plastic Baggie which contained 18

25 individually wrapped in plastic pieces of suspected base

**Vass - Cross / Haddad**

```
 1    cocaine, Evidence Item No. 2 from Walker's front crotch area."

 2              That is what you wrote in your report, isn't it?

 3    A.  Yes.

 4    Q.  Does that refresh your memory about that incident?

 5    A.  Vaguely, but it does a little bit.

 6    Q.  Now, at the time that you reached in and pulled out the

 7    drugs from Walker's front crotch area, he was already

 8    handcuffed by Officer Sayna, correct?

 9    A.  Yes, he was.

10    Q.  Um --

11    A.  Well, he was handcuffed.  I don't necessarily know about

12    saying it was Officer Sayna, but he was handcuffed.

13    Q.  Can you think of any reason why Officer Sayna needed your

14    help to get these drugs back from Craig Walker?

15              MR. BOLEY:  Calls for speculation.

16              THE COURT:  Objection sustained.

17              THE WITNESS:  I know --

18              THE COURT:  The objection is sustained.

19              THE WITNESS:  Okay.  Sorry.

20    BY MR. HADDAD:

21    Q.  Do you have any personal enjoyment about strip-searching

22    people?

23              MR. BOLEY:  Objection.  Argumentative, Your Honor.

24              THE COURT:  Objection sustained.

25              MR. HADDAD:  Your Honor, this goes to motive.
```

**Vass - Cross / Haddad**

1          **MR. BOLEY:**  Well, Your Honor, motive isn't an

2    element of the cause of action.

3          **THE COURT:**  Objection is sustained.

4          **MR. HADDAD:**  Okay.

5    **BY MR. HADDAD:**

6    **Q.**  Do you recall arresting a man named Caesar Johnson?

7    **A.**  I do.

8    **Q.**  And that was in March 2005, right?

9          **MR. BOLEY:**  Objection.  Relevance, Your Honor.

10          **THE COURT:**  Objection is overruled.

11          **THE WITNESS:**  I don't know the date, but I know I

12   have participated in arresting him.

13   **BY MR. HADDAD:**

14   **Q.**  Do you recall he was arrested for reckless driving?

15   **A.**  Yes, he was.

16   **Q.**  He wasn't arrested for any drug-related offense on that

17   occasion, was he?

18   **A.**  No.

19   **Q.**  And you were the one who took him to the jail; is that

20   right?

21   **A.**  It's probable.  It's possible.  I don't really recall.

22   **Q.**  All right.

23          Now, do you recall taking him to the jail and

24   requesting that the jailers perform a strip search of Caesar

25   Johnson?

**Vass - Cross / Haddad**

1   *A.*  No.

2   *Q.*  Do you recall assisting in any strip search of Caesar

3   Johnson at the jail?

4   *A.*  No.

5   *Q.*  Can you think of any reason why jailers would need your

6   assistance to strip search somebody at the jail?

7            *MR. BOLEY:*  Objection.  Calls for speculation.

8            *THE COURT:*  And this is taking us into the jail,

9   which is a custodial situation.  Seems to me that is taking it

10  far removed from the street.

11          *MR. HADDAD:*  Again, we are offering it to show

12  motive, Your Honor, that this man is a person who puts himself

13  in positions where he is able to strip-search people when he is

14  really not needed to do that.  And it goes to show his intent

15  and motive of why he would do these things alleged by the

16  plaintiffs.

17          *THE COURT:*  Well, the objection is sustained.  I

18  think it's far afield.

19  *BY MR. HADDAD:*

20  *Q.*  Do you know Richard Rix's nickname, or street name?

21  *A.*  I do.

22  *Q.*  What's that?

23  *A.*  Bobo, B-o-b-o.

24  *Q.*  Have you reviewed other Internal Affairs files of

25  complaints about you conducting strip searches related to this

**Vass - Cross / Haddad**

1    action?

2              *MR. BOLEY:*  Objection.  Relevance, Your Honor.

3              *THE COURT:*  Objection is overruled.

4              *THE WITNESS:*  Like I said, just vaguely.

5    *BY MR. HADDAD:*

6    *Q.*  Do you recall reviewing one by a complainant whose name was

7    unidentified because it was redacted who complained about being

8    strip-searched by you on one occasion while he was with Bobo at

9    98th Avenue and B Street, "pants down, cheeks spread again."

10             Do you recall that?

11             *MR. BOLEY:*  Objection.  Relevance, Your Honor.

12             *THE COURT:*  Objection overruled.

13             *THE WITNESS:*  I don't recall that, no.

14   *BY MR. HADDAD:*

15   *Q.*  Okay.

16             Did you ever strip-search Bobo at 98th Avenue and B

17   Street with his pants down and his cheeks spread?

18   *A.*  No, I did not.

19   *Q.*  Have you ever had a complaint about a strip search

20   sustained against you?

21             *MR. BOLEY:*  Objection.  Relevance, Your Honor.

22             *THE COURT:*  Objection overruled.

23             You may answer.

24             *THE WITNESS:*  I don't believe so.

25   ///

**Vass - Cross / Haddad**

1   *BY MR. HADDAD:*

2   *Q.* Do you recall that the Citizens Police Review Board

3   sustained a complaint of improper strip search against you in

4   connection with the Dynami McCree incident?

5           *MR. BOLEY:* Objection. Relevance, Your Honor.

6           *THE COURT:* Objection overruled.

7           *THE WITNESS:* I'm not quite sure. I know that they

8   had -- they had something in regards to something of that. I

9   don't recall exactly what they were.

10  *BY MR. HADDAD:*

11  *Q.* Okay.

12          Now, you were the subject of the Internal Affairs

13  complaint filed by Mr. McCree's mother after his death, weren't

14  you?

15  *A.* I don't know who filed it, but I know that I had to go to

16  the CPRB. I was summoned to it. I don't really know.

17  *Q.* Would you turn to Plaintiff's Exhibit 12 at the first page,

18  please.

19  *A.* Sure.

20  *Q.* Are you there?

21  *A.* I am.

22  *Q.* Do you see at the bottom of the first page where it says

23  "Allegations as to an Officer"?

24          *MR. BOLEY:* Objection. Lack of foundation.

25          *MR. HADDAD:* I'm asking if he sees it right now.

**Vass - Cross / Haddad**

1   *BY MR. HADDAD:*

2   *Q.*  "Allegation one:  The officer conducted an improper search

3   of Mr. McCree at the front of the house."  Do you see that?

4          *MR. BOLEY:*  I'm just objecting.  There has been no

5   foundation made as to what this document is.

6          *THE COURT:*  The question is whether he sees it,

7   okay?

8   *BY MR. HADDAD:*

9   *Q.*  Do you see that part?

10  *A.*  I do.

11  *Q.*  You are the one that searched Mr. McCree at the front of

12  that house during that incident, aren't you?

13  *A.*  Yes, I am.

14  *Q.*  And do you see the finding of the Citizens Police Review

15  Board that the finding was sustained.  Do you see that just

16  below?

17          *MR. BOLEY:*  Objection.  Relevance and lack of

18  foundation.

19          *THE COURT:*  Objection is overruled.

20          *THE WITNESS:*  Um, it is sustained, but it doesn't

21  say in front of the house, it says in public.

22  *BY MR. HADDAD:*

23  *Q.*  Okay.

24          So the Citizens Police Review Board sustained a

25  complaint against you for conducting a search in public; is

**Vass - Cross / Haddad**

1  that right?

2  **A.**  That's true.

3  **Q.**  Were you ever disciplined by your department in any way in

4  connection with this sustained CPRB complaint?

5        **MR. BOLEY:**  Objection.  Relevance, especially at

6  this stage of the proceedings, Your Honor.

7        **THE COURT:**  Objection is overruled.

8        **THE WITNESS:**  Repeat the question, please.

9  **BY MR. HADDAD:**

10  **Q.**  Were you ever disciplined by your department in any way in

11  connection with this sustained CPRB complaint?

12  **A.**  No.

13  **Q.**  Were you ever provided additional or supplemental training

14  by your department in connection with this sustained finding by

15  the CPRB?

16  **A.**  No.

17  **Q.**  Okay.

18        **MR. HADDAD:**  That's all we have at this time.

19        **MR. BOLEY:**  Your Honor, I reserve my questions until

20  our case in chief.

21        **THE COURT:**  And you intend not to ask any questions

22  at this time not just because of the hour, but because you are

23  reserving?

24        **MR. BOLEY:**  Yes, that's correct, Your Honor.

25        **THE COURT:**  Okay.

```
 1            Well, you see what the hour is, 4:00 o'clock.

 2            MS. SHERWIN:  Your Honor, we do have Renee Glenn,

 3   who has been here much of the day.  And I don't anticipate she

 4   will be very long.  I would request that we just get her on and

 5   off.  She has to work tomorrow.

 6            MS. ROSEN:  Well, we have to cross-examine her as

 7   well, Your Honor.

 8            MR. BURRIS:  That won't take long.

 9            MS. SHERWIN:  She's the mother of Mark Engram,

10   and --

11            THE COURT:  I can appreciate that, but I ran this

12   from 9:00 to 4:00 for a reason.  And it's sort of like, I have

13   500 other cases on my calendar, and they stack up in there

14   while I'm spending all day in here, so that I, you know, have

15   to get to other work.

16            MR. BURRIS:  Could we bring her in quick and order

17   her to come back?

18            MS. SHERWIN:  Could the Court at least order her to

19   come back so she won't have problems with her --

20            THE COURT:  Yes, certainly.  I would be happy to do

21   that.

22            You may step down.  Do not discuss your testimony

23   with any other persons who may be witnesses.

24            (Witness steps down.)

25            THE COURT:  And if we wouldn't waste our time on so
```

```
 1   many objections that don't amount to a hill of beans, such as
 2   speaks for itself, things like that, you know?  We could save a
 3   lot of time.
 4            MR. BOLEY:  Your Honor --
 5            THE COURT:  Speaks for itself is no objection, okay?
 6            MR. BOLEY:  I think I made two or three of those,
 7   Your Honor.
 8            THE COURT:  Yes, you did.
 9            MR. BOLEY:  Your Honor --
10            MR. BURRIS:  Times ten.
11            MR. BOLEY:  No, I think I made two or three of
12   those.
13            THE COURT:  You made some of those totally useless
14   objections.
15            MR. NISENBAUM:  I'll have to remember that for
16   depositions.
17            THE COURT:  It's not the best evidence.
18                 (Ms. Glenn enters courtroom.)
19            THE COURT:  Could you have Ms. Glenn come forward.
20            MR. BURRIS:  Ms. Glenn, come forward, please.
21                 (Witness steps forward.)
22            THE COURT:  Good afternoon, Ms. Glenn.  I'm sorry
23   you have had to wait, but some of these things take a while.
24   And sometimes testimony takes longer than we expect.
25            What hours do you work?
```

1          **MS. GLENN:**  I work from -- I have flexible hours,

2     but tomorrow I work from -- actually, I have to go in and talk

3     to my boss tomorrow.  But right now, I'm not working at this

4     time tomorrow in the morning.

5          **THE COURT:**  Um-hmm.

6          **MR. BURRIS:**  Good.

7          **THE COURT:**  Okay.

8          **MS. GLENN:**  But I need to talk to her before I come

9     in the morning.

10          **THE COURT:**  What time can you talk to her in the

11     morning?

12          **MS. GLENN:**  Probably about 10:00 o'clock, 11:00,

13     something like that.

14          **THE COURT:**  What time do you need to talk with her

15     in the morning?

16          **MS. GLENN:**  Probably about 10:00 or 11:00.

17          And then I have to go to my other job by 2:15.

18          **THE COURT:**  What time can you be here?

19          **MS. GLENN:**  How about, maybe 10:00 o'clock?  And

20     I'll just call my job and let them know, the 2:00 o'clock job,

21     that I can't make it.

22          **THE COURT:**  Okay, or that you will be a little late.

23          **MS. GLENN:**  Yes.

24          **THE COURT:**  How long will you be with her on direct?

25          **MS. SHERWIN:**  Possibly 10 minutes.

1      **THE COURT:**  And cross?

2      **MS. ROSEN:**  Probably about the same, 10 or 15.

3      **THE COURT:**  Could you get here at 9:00 o'clock in

4  the morning, do you think?  And then we can get you on and off

5  and out of here before 10:00 o'clock.

6      **MS. GLENN:**  Okay.

7      **THE COURT:**  Would that work?

8      **MS. GLENN:**  Yes.

9      **THE COURT:**  Okay, so then you be back here tomorrow

10  morning at 9:00 o'clock.

11      And if there is any question with your employer,

12  whomever you have to talk with, tell them that I ordered you to

13  be in here at 9:00.  And then we will release you as soon as

14  you are finished.  And we'll try to get you out of here well

15  before 10:00.

16      **MS. GLENN:**  Okay.

17      **THE COURT:**  All right?

18      **MS. GLENN:**  Okay.

19      **THE COURT:**  Thank you very much.

20      Okay, we'll see you tomorrow morning, then, at

21  9:00 o'clock.

22          **(Proceedings adjourned at 4:02 p.m.)**

23

24

25          **---o0o---**

### CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_/s/ Sahar McVickar_

**Sahar McVickar, RPR, CSR No. 12963**

**Wednesday, March 24, 2010**