1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   NORTHERN DISTRICT OF CALIFORNIA

8

9    JOHN SMITH, KIRBY BRADSHAW, SPENCER          No. C 07-6298 MHP
     LUCAS, et al.,

10
             Plaintiffs ,

11
         vs.

12
     CITY OF OAKLAND, a municipal corporation,

13   WAYNE TUCKER, in his capacity as Chief of Police
     for the City of Oakland, MAYER, individually and in

14   his capacity as a police officer for the City of Oakland,
     et al.,

15
             Defendants.                          No. C 07-4179 MHP

16   ─────────────────────────────────/

17   DAVID WARD, MARK ENGRAM, MICHAEL             **FINDINGS OF FACT**
     HOLMES, RICHARD RIX, et al.,                 **AND CONCLUSIONS**

18                                                **OF LAW**
             Plaintiffs,

19
         vs.

20
     CITY OF OAKLAND, a municipal corporation;

21   WAYNE TUCKER, in his capacity as Chief of Police
     for the City of Oakland, RICHARD VASS,

22   individually and in his capacity as a police officer for
     the City of Oakland, et al.,

23
             Defendants.

24   ─────────────────────────────────/

25

26

27

28

**United States District Court**
For the Northern District of California

INTRODUCTION

These actions are two of the over forty actions filed in this court related to claims brought against individual police officers, police chiefs and the City of Oakland pursuant to 42 U.S.C. section 1983 for violations of the Fourth Amendment to the United States Constitution, specifically alleging unlawful searches, referred to as "strip searches", conducted in public or publicly observable places by officers of the Oakland Police Department.  By stipulation the trials of five of these plaintiffs were tried before the court without a jury.  Two of the five, Kirby Bradshaw and Spencer Lucas, are named plaintiffs in C 07-6298 MHP; three of the five, Mark Engram, Michael Holmes and Richard Rix, are named plaintiffs in C 07-4179 MHP.  The incident complained of in the first case involved Officer Ingo Mayer and other officers who are not named in the complaint. One incident alleged in the second case involved all three plaintiffs and a single officer, Richard Vass.  Officer Vass is also alleged to have violated the Fourth Amendment rights of each of these three on other occasions.  These particular claims were selected by the parties to be tried in a bench trial before the remainder of the claims of other parties are tried.

Plaintiffs have requested the dismissal of any racial discrimination claims pled in their complaints; they have also stipulated to dismissal of the claims against Officer Mork in C 07-4179. All of these claims are hereby dismissed.

Testimony was limited to the issues of individual liability and damages, with municipal and supervisory liability issues deferred until after the resolution of this first phase.  Having considered the testimony and evidence presented at trial, the briefs of counsel, and for the reasons set forth below, the court now enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(c).  To the extent that Findings of Fact are contained in the Conclusions of Law they are deemed Findings of Fact and to the extent Conclusions of Law are included in the Findings of Fact they are deemed Conclusions of Law.

//
//
//
//

**United States District Court**
For the Northern District of California

I. <u>FINDINGS OF FACT - C 07-6298</u>

1.  On December 15, 2005, around 8:00 am, plaintiff Spencer Troy Lucas was driving his gold color Cadillac Coupe DeVille in West Oakland.  With him in the front seat was his friend, Marty Robinson, and in the back seat was plaintiff Kirby Bradshaw.  The three are all African-American men.  They had picked up breakfast to go and then drove on Telegraph Avenue to 34th Street.

2.  They proceeded westbound on 34th Street and turned left on Martin Luther King Drive ("MLK").  As they approached the intersection of 34th and MLK, Lucas saw two unmarked, black police cars stopped for a red light in the southbound lane of MLK.  When he made the left turn onto MLK Lucas saw the police cars drive through the red light and follow him.  Lucas' Cadillac was pulled over by the two unmarked police cars on MLK at the northwest corner of 32nd Street.  Bradshaw and Robinson testified similarly.

3.  At the time he encountered the police cars at 34th and MLK, Lucas was driving within the speed limit, and he passed through the intersection on the green light.  The Cadillac was fully registered and licensed.

4.  On that day, defendant Officer Ingo Mayer and his long time partner, Officer D'VourThurston, were driving in an unmarked police car.  Parole Agent Steven Nakamura and Oakland Police Officers Mack and Martinez were in a second unmarked car.  They were all working as part of the Parole and Corrections (PAC) Team.

5.  Officer Mayer made the decision to pull over the Cadillac.  He was the lead officer for this traffic stop and the ensuing events, although he and the other officers were acting as a team.  Officer Mayer testified he pulled over the Cadillac for a "traffic violation."  However, Mayer could not articulate any factual or legal basis for this stop.  Nor was any report or other writing produced at trial documenting the stop.  None of the other officers involved in this stop could identify the specific reason for the stop.  No evidence was produced at trial to show that the Cadillac was operated in violation of any law at the time.  Officer Mayer states that he did not know who was in the Cadillac.  The windows of Lucas' vehicle were not tinted and from all the evidence in the record the court concludes that a reasonable officer would have been able to observe that the occupants

were three black men.  Neither officer Mayer nor any other officer on the scene knew anything about the parole or probation status of the men in the Cadillac before stopping them.  The court finds that there was no reasonable suspicion to justify this traffic stop.

6.  Officer Mayor was required to complete a "Racial Profiling Stop-Data Collection Form" for this traffic stop.  That form was supposed to document the reason for the stop.  Officer Mayer was unable to locate a completed stop data form for this incident, and none was ever produced by the City of Oakland at trial.

7.  Officer Mayer came to the driver's side window of the Cadillac and was joined by Parole Agent Nakamura.  Officer Thurston went to the passenger side of the car.  The officers each asked for I.D. and whether anyone was on probation or parole.  Lucas told Mayer he was on parole.  Mayer told Lucas to get out of the car, and he handcuffed him.  Mayer agrees that Lucas was totally compliant and not acting suspicious in any way.  Mayer claims he was merely detaining, and not arresting, Lucas at that time.

8.  Despite his questions to the officers, Lucas was never told by Mayer or any other officer why his car was pulled over or why he was being handcuffed and detained.  At the time of this detention the officers were not aware of any parole or probation violations.

9.  While Officer Mayer was talking to Lucas, Officer Thurston was at the passenger side window talking to Robinson and Bradshaw.

10.  Officer Mayer took Lucas to the back of the Cadillac with Agent Nakamura.  Mayer and Nakamura questioned Lucas about where he lived and whether he had any drugs on him.  During this time, Nakamura also spoke with Lucas' parole agent, Agent Olgastine Bradley, over a cell phone.  Lucas could hear part of that cell phone conversation as Nakamura repeated it to Mayer.  Both Lucas and Agent Bradley stated that Lucas was doing fine on parole, and that he was essentially homeless at that time, sleeping in a van he owned or at a nearby motel. It is not disputed that Lucas' parole was scheduled to terminate in approximately one month.

11.  Officer Mayer conducted a parole search of Lucas, emptying his pockets onto the trunk of the Cadillac.  Mayer agrees he conducted a parole search of Lucas at this time, patting him down outside of his clothing, as well as inside his waistband and underneath his belt. [1]

12.   During the time Mayer was dealing with Lucas, Bradshaw and Robinson were told to exit the car and did so.   Robinson was standing near the curb, next to the passenger side of the Cadillac.  Bradshaw was also near the curb but at the back of the Cadillac.  Bradshaw was not handcuffed.  Other officers were searching the Cadillac.

13.   As Officer Mayer continued to interrogate Lucas about drugs while they stood in the street behind the Cadillac, he undid Lucas' belt buckle, causing his pants to fall down to his ankles. Lucas protested that he was on parole for using a fake ID, not drugs.  Lucas told Mayer, "I'm going to get off parole in 30 days."  Mayer replied, "Not if I can help it."  Mayer asked Lucas if he had any "dope in your butt cheeks," as he pulled Lucas' underwear halfway down.  Lucas spread his ankles apart to try to keep his boxer shorts from coming all the way down.  Then, Mayer shook Lucas' boxer shorts against his testicles.

14.   Lucas heard Bradshaw arguing with officers and briefly looked over in that direction. Lucas heard Officer Mayer tell the officer near Bradshaw to see if Bradshaw had stashed anything, or something to that effect.  When Lucas looked over there again, he saw Bradshaw with his pants down to the ground.  Lucas and Bradshaw were each complaining about their treatment to officers. Shortly after that, Lucas looked over and saw that Bradshaw "was standing out there butt naked, just like I was," with his boxer shorts down.

15.   Bradshaw testified similarly that he was moved to the rear of the Cadillac near Lucas, where he was also subjected to a pat down search.  He still was not handcuffed.  He looked toward Lucas and saw Officer Mayer reach around and unbuckle Lucas' belt.  Bradshaw heard Officer Mayer say to Officer Thurston, who was searching Bradshaw, "you need to have him take his pants down."  Then, the officer who Mayer had just addressed ordered Bradshaw to take his own pants down.  Bradshaw complied.  Bradshaw recalled, "It was Officer Mayer [who] gave the order to have my pants taken down.  And another officer stood by and said, go ahead, take your pants down, let them fall, and pull your pants your underwear out and shake them.  And at the time, I'm looking around at Troy [Lucas] being done the same way at the same time."  Bradshaw complied with orders

//

//

5

United States District Court
For the Northern District of California

to pull his boxer shorts down below his buttocks.  Bradshaw's shorts ended up at his ankles.  Bradshaw explained that "It was the officer instructing me to do that, not Mayer.  Mayer instructed him to instruct me."

16.  Lucas and Bradshaw saw each other with their pants and underwear down.  While they were standing in the street with their pants down, officers were talking and laughing.  Officers repeatedly told Bradshaw to keep his head down, although he glanced around occasionally.  Bradshaw estimates that his pants and shorts were down for five to seven minutes – "It felt like a long time."  Bradshaw recalls that Lucas' pants were down for about the same time.  Eventually, the officer who was dealing with Bradshaw told him to pull his own pants up and he complied..  Lucas, who was handcuffed was not able to pull his own pants up.  Mayer pulled Lucas' shorts and pants back up without fastening his pants, so that Lucas had to hold his pants up.

17.  Throughout this entire incident Lucas and Bradshaw were compliant.  The officers never discovered anything illegal on either of their persons.

18.  Officers Mayer and Thurston denied that Lucas or Bradshaw were strip searched or that their pants were ever down.  Officer Thurston testified that he was the officer who searched Bradshaw, however at the time he was interviewed by an Internal Affairs investigator concerning this incident, he could not remember having searched Bradshaw. At trial he again said he did not recall searching Bradshaw.  Mayer and Thurston agree that under the circumstances any strip search of Lucas or Bradshaw clearly would have been unjustified, contrary to their department's policy on field strip searches, and unlawful.

19.  Officers Mayer and Thurston recalled that they were trained, and knew at the time, that if they had been aware of other officers strip searching Lucas or Bradshaw, they would have been under a legal and ethical duty to intervene to stop the searches and report such misconduct.   In fact, Mayer has known since the police academy that if he failed to intervene when he had a duty to do so, he would be equally responsible for any resulting violation of rights.

20.  Officer Mayer testified that a parole or probation search is not a strip search, and that a person's parole or probation status alone does not legally justify a strip search.  Any strip search he did, whether or not the person was on probation or parole, would be subject to the specific strip

1    search requirements in the Oakland Police Department's 2004 strip search policy.  Mayer had been

2    trained that a strip search can be a deeply humiliating experience for the person being searched.

3         21.  The area where this incident took place was "a busy street" at 8:00 in the morning.

4    During this incident, Mayer observed a fair number of people walking around the area.  There was

5    also a convenience store located across the street.  Had Officer Mayer wanted to conduct a strip

6    search of either Lucas or Bradshaw, he agreed he could have done so at the jail or at other private

7    facilities available to him.

8         22.  Lucas recalled that while he was being strip searched  people started coming around to

9    watch: "It start[ed] forming a crowd."  A "nice sized group" of people had gathered to watch at the

10   corner and across the street in front of the store and restaurant.  Bradshaw also recalled cars passing

11   by and people watching from the corner and across the street.  Robinson confirmed the presence of

12   other people watching during the incident and searches.

13        23.  Agent Nakamura was present during this entire stop, including during the search of

14   Lucas.  Additionally, there were two other officers nearby while Lucas was being searched, and both

15   Mayer and Thurston testified that Oakland Police Officers Mack and Martinez were present from the

16   beginning of this traffic stop through the search of a house in Richmond.

17        24.  Nakamura testified that Mayer did not tell him nor did he know of the reason for the

18   initial stop.  Further he says he did not observe the searches.  Neither Mack or Martinez were called

19   to testify at trial.  Lt. Christopher Shannon, who conducted the Internal Affairs investigation of this

20   matter, testified that the police radio Computer Assisted Dispatch ("CAD") report showed that

21   Officers Mack and Martinez never called in their presence at the scene of the stop or at the

22   subsequent house search in Richmond.

23        25.  The Court heard other credible testimony about the searches from Marty Robinson,

24   Rachel Lucas, Clarence Green, and Dymetrie Shaw.

25        26.  Marty Robinson witnessed the searches of Lucas and Bradshaw, initially from the

26   northwest corner of 32nd and MLK, where the Cadillac was stopped.  When Robinson heard Lucas

27   complain about his pants being pulled down he looked over and saw Lucas, who was handcuffed,

28   with his pants down to his knees.  An officer told Robinson to look away, so he did.  Robinson heard

1   more complaints from Lucas, looked over again, and saw Lucas with his boxer shorts down around

2   his knees.  Robinson asked the officers why they were harassing them.  Next, he heard an officer

3   order Bradshaw to pull his pants down, and Bradshaw protesting.  Robinson saw Bradshaw with his

4   pants down, and then with his boxer shorts down too.  Bradshaw was not handcuffed.  Robinson

5   kept complaining to the officers; he was told to cross the street and that he would be arrested if he

6   persisted.  The last thing he saw was Bradshaw with his shorts down, but did not see all of his body.

7   Robinson crossed to the SW corner of the street and called Lucas' wife and another friend and told

8   them that he was watching the police make her husband and Bradshaw take their pants down in

9   public.  At the other side of 32nd Street, Robinson encountered Dymetrie Shaw, also known as

10  "Dilly."  They had a brief conversation about how the police were mistreating Lucas and Bradshaw.

11          27.  Rachel Lucas is Spencer Troy Lucas' wife from whom he was separated at the time of

12  this incident..  She has worked as a manager of a department store for two and a half years.  She

13  received a call at the time of this incident from Robinson, who told her that the police were

14  searching Lucas and Bradshaw and "pulling their pants and underwear down."  Robinson was

15  excited while he was talking to her, and it was clear to Ms. Lucas that the incident was still

16  happening as Robinson described it to her.

17          28.  Clarence Green is a permanent part-time employee of the City of Oakland's Department

18  of Public Works.  He briefly worked with Lucas and Bradshaw in the early nineties, but had had no

19  contact with them since then.  At the time of the incident he was working for the City and driving

20  northbound on MLK.  As he crossed 32nd Street, he saw police cars, and he recognized Bradshaw

21  with his pants down around his ankles.  Wondering what was going on, Green pulled over and

22  continued to watch the events from his side view mirror.  Bradshaw was not handcuffed.  He also

23  saw Lucas in handcuffs.  At his deposition Green could recall seeing Lucas with his pants down as

24  well, however at trial, he could not recall whether Lucas' pants were also down.  Green observed a

25  lot of other people in the area at the time, including people going to work and kids going to school.

26  At trial one of Green's supervisors, Renay Jackson, was called to impeach Green's testimony and,

27  based on the Department's records, testify as to where and when Green was working at the time of

28  this incident.  Jackson did not have any independent knowledge or recollection of these facts.

**United States District Court**
For the Northern District of California

1    Having observed the testimony and demeanor of Green, the court finds him a credible witness and

2    the discrepancies between the record and Green's account do not justify discounting his testimony.

3        29.  Dymetrie "Dilly" Shaw is an auto mechanic.  He works on cars in the street in front of

4    his mother's house on 32nd Street.  He was at home waiting for Lucas to come by to discuss some

5    auto work at the time of the incident.  When he saw the front of Lucas' Cadillac parked on MLK at

6    the corner of 32nd Street, he started to walk over.  As he was walking to the corner, he encountered

7    Robinson, who said something about how the police were "doing them wrong",  referring to Lucas

8    and Bradshaw.  As Dilly looked over toward the Cadillac, he could see Bradshaw standing at the

9    trunk with "his pants around his ankles."  Bradshaw was not handcuffed, although there were police

10   around him.  When Dilly saw this, he turned around and walked back home, because he was on

11   probation and "I didn't want to be involved with the police."  He states he "wasn't trying to look at

12   his butt," but he could see Bradshaw's bare buttocks.  Dilly could also see the top of Lucas' head as

13   he stood in the street behind the Cadillac, but the rest of Lucas' body was obscured from Dilly's

14   view by the open trunk.

15       30.  Based on credible testimony, this Court finds by a preponderance of the evidence that

16   Lucas and Bradshaw were strip searched by or at the direction of Officer Mayer as described by the

17   plaintiffs.  Although Officer Thurston denies recalling the search of Bradshaw, the evidence

18   indicates he conducted the search and the evidence is persuasive that Mayer was the officer who

19   either ordered Bradshaw's disrobing or was present and failed in his duty to intercede.  In fact, there

20   was no other officer at the scene who could have searched Bradshaw,   It is clear that it was not

21   Mayer or Nakamura.

22       31.  After Lucas and Bradshaw were strip searched, Bradshaw was handcuffed and arrested

23   on an outstanding warrant.  Lucas and Bradshaw were placed in the back of the police car assigned

24   to Officers Mayer and Thurston.

25       32.  When searching Lucas, Officer Mayer found a house key in Lucas' pocket.  Mayer

26   agrees he had found nothing illegal on Lucas.  Nor was anything illegal found on Bradshaw as a

27   result of the search.  Mayer had been informed by both Lucas and Lucas' parole agent, Agent

28   Bradley, that Lucas was "doing fine" on parole, he had about thirty days left on his parole time, and

he was currently homeless and sleeping at a motel or in his van as Bradley had witnessed in the past. Mayer was also informed that Agent Bradley told another officer that "there wasn't anything specific with her that she needed [Lucas] to be taken into custody for." Without having probable cause to arrest Lucas for any crime, Officer Mayer led an investigation to try to find a parole violation.

33. OPD Special Order No. 6071 required all officers to inform the Communications Division by radio with their starting and ending odometer mileage whenever they transport a prisoner anywhere. Officer Mayer acknowledges that he is required to follow this Special Order. Mayer claims he was not required to radio in an "incidental movement" of a prisoner that is within one block. Other than such an incidental movement Mayer admitted officers are supposed to tell the dispatcher every location they go with a prisoner.

34. Officer Mayer drove Officer Thurston, Lucas, and Bradshaw to Lucas' van which was parked nearby. Other officers and Agent Nakamura met them there. Lucas and Bradshaw testified that the van was parked approximately eight blocks away at W. MacArthur Ave. and Market Street. Mayer testified the van was only about one block up the street on 32nd Street. Officer Mayer did not inform the Communications Division of this movement of prisoners.

35. Officer Mayer searched Lucas' van, and says he found no evidence that Lucas was living there. Lucas says he told Mayer that his clothes and blankets were being cleaned at the "Wash and Fold," and showed Mayer a receipt for the wash. Lucas also testified that the van had a pull-down bed. Mayer never opened the pull-down bed. Mayer did not document his search of the van anywhere.

36. Next, Officer Mayer checked his department's records and found that Lucas had once been associated with a house at 828 34th Street. Mayer took Lucas and Bradshaw there along with the other officers. Lucas informed Mayer that the house was an old girlfriend's and he had not stayed there for years. Officer Mayer tried to open the door to that house with the key he took from Lucas and was greeted by the owner. He learned that Lucas did not live there. Officer Mayer did not document this stop in any report. Mayer says he radioed in his transport of prisoners to 828 34th Street, which should be reflected in the CAD report. However, the CAD report does not record any

1   //

2    reference to this transport of prisoners or to 828 34th Street.  Officers left that location, and Mayer

3   testified they drove directly to the jail at Fifth and Clay Streets, next to police headquarters.

4      37.  Officer Mayer testified that, as required by Special Order No. 6071, he informed the

5   Communications Division of his car's mileage when they left the scene of the original traffic stop at

6   32nd and MLK, and again at the jail.  The CAD report shows Mayer left the traffic stop location at

7   9:29 a.m.  Mayer's beginning mileage was 60,369, and his ending mileage at the jail was 60,378.

8   Officer Mayer travelled nine miles with Lucas and Bradshaw in the back of his police car.  Yet the

9   entire route that Officer Mayer says he took from the traffic stop, to the van, to the house, and to the

10  jail, is only 2.5 miles.  Initially when asked about this discrepancy at trial, Mayer estimated that the

11  distance for that 2.5 mile route was nine miles.  This is inherently unbelievable in view of the fact

12  that Mayer had been assigned to the PACT team for seven and a half years and had worked city

13  wide including this area of West Oakland.  Later, when he was shown that the actual distance for the

14  route he said he took was 2.5 miles, Officer Mayer could not explain where he drove Lucas and

15  Bradshaw for the other 6.5 miles, and he speculated that possibly Lucas and Bradshaw were correct

16  when they testified that Mayer drove around West Oakland with them before taking them to the jail.

17     38.  Officer Mayer and other officers acknowledged communicating with each other by cell

18  phone during this incident, rather than by police radio.  They understood that radio transmissions

19  were monitored, recorded, and preserved by their department, unlike their cell phone

20  communications.

21     39.  Officers Mayer and Thurston dropped off Bradshaw at the jail for booking based on the

22  outstanding warrant.  Bradshaw does not challenge the lawfulness of his arrest on this warrant.

23     40.  Officer Mayer arrested Lucas at 10:00 am for a parole hold/violation.  The Consolidated

24  Arrest Report that Officer Mayer wrote says he was the arresting officer, and that the arrest took

25  place at 10:00 am.  Mayer testified that Lucas was being processed at the jail for his arrest at that

26  time.  There are no factual details contained in Officer Mayer's arrest report describing any probable

27  cause for his arrest of Lucas, despite instructions on that form to include a "complete probable cause

28  narrative."  Officer Mayer agrees that it is elementary that an officer needs probable cause to make

**United States District Court**
For the Northern District of California

an arrest.  Yet, Mayer acknowledged at trial that he did not have probable cause to arrest Lucas at 10:00 am.  In fact, Mayer acknowledged that Lucas had been detained for approximately two hours before he had probable cause to arrest him.

41.  By 10:00 am, Lucas had been strip searched and detained in Mayer's custody almost two hours and handcuffed for most of that time.  This Court finds that Lucas was arrested by 10:00 am, and that there was no probable cause for his arrest at 10:00 am.

42.  At 10:43 am, Officer Mayer and Thurston left the jail with Lucas to go to the City of Richmond.  The CAD report states that they were en route to "3800 MACDONALD AV APT 2 – FOR PAROLE SEARCH."  Officer Thurston testified they got the MacDonald address from a wants and warrants check on Lucas.  This was a previous address that Lucas had confirmed when he was asked by the officers.  Officer Mayer told the Court that he was not sure what that CAD entry meant and that he does not recall going to the MacDonald location.  Officer Mayer could not explain why the address in Richmond he did go to with Lucas – 214 South 41st Street – did not appear anywhere in the CAD report.

43.  It took Officers Mayer and Thurston about 20 minutes to get from the jail to Richmond.  Officers Mack and Martinez, with Agent Nakamura, met them there.  Officer Mayer drove Lucas to 214 South 41st Street in Richmond, which was a house where Lucas estranged wife and her aunt lived.  Lucas told the officers that he was separated from his wife and did not live at that address with her.  Officer Thurston told the Court that Lucas told him "he stayed there from time to time," but never said that he lived or resided there.  Without a warrant, Mayer and other officers searched the house.  That search lasted from 30-60 minutes.  At the end of that search, officers came out with a brand new pellet gun, still in the box, that they found in a closet.  Then officers informed Lucas that he was under arrest for having a simulated firearm in what they decided was his residence.

44.  Rachel Lucas confirmed that Spencer Troy Lucas was not living with her at 214 South 41st Street, and that the pellet gun was hers.  She was not home during the search, but she came home later to find her home had been "ramshaked" with mattresses moved and everything pulled out of her drawers and storage bins, including her clothing and intimate apparel.  Her credit cards were pulled from her wallet and left out.  Thinking she had been robbed, she called the Richmond police.

1  Officer Mayer admits leading the investigation and warrantless search of Ms. Lucas' home, and that

2  officers left no documentation or note behind to inform the occupants of the house that Oakland

3  police had searched it.  Agent Nakamura testified that officers left that house "in a state of disarray."

4  Other than the state of disarray, the Oakland police left no trace that they had been to 214 South 41st

5  Street.

6          45.  Officer Mayer drove Lucas back to the Oakland jail where he left him in the custody of

7  the jailers.  Lucas testified that for the entire time he was in Mayer's custody, he was not allowed to

8  use the bathroom, despite his repeated pleas to do so.  Lucas testified that he did not get back to the

9  jail until approximately 2:30 or 3:00 pm.  Officers Mayer and Thurston provided no information in

10 any report about the details of their activities with Lucas and Bradshaw that day, and the CAD

11 reports do not indicate when officers arrived back at the jail with Lucas.  Officer Mayer's CAD

12 report notes that a report number for Lucas was added at 12:30 pm.  The CAD reports do not show

13 any record of the activities of Officers Mayer and Thurston between 10:46 am, when they were en

14 route to Richmond, and 3:33 pm when their unit was logged off.

15         46.  Due to this arrest, Lucas was sent to a parole hearing and his parole was revoked.  He

16 was sentenced to serve another ten months in prison.  Eligible for half time, Lucas served five

17 months in prison.

18         47.  The court notes that neither of the plaintiffs in this case filed a complaint with the

19 Internal Affairs office of OPD, although several years earlier Lucas had filed a complaint about

20 officer harassment.

21         48.  This Court heard credible testimony concerning plaintiffs' emotional distress from these

22 events.  Spencer Troy Lucas described how he felt "disrespected, downgraded," and "humiliated" by

23 being strip searched in the street in front of many people.  Lucas explained why he felt "helpless"

24 and "kidnapped" when Mayer drove him around in handcuffs, not even letting him use the

25 bathroom.  Lucas' emotion when testifying to these issues was very apparent.  Rachel Lucas

26 explained that her husband has been very upset and emotional about these events.  She adds, "He

27 sheds a tear every time he talks about it, which is often."  This Court finds that plaintiff Lucas'

28 emotional distress suffered as a result of the vehicle stop, strip search, and his arrest is substantial.

1   //

2

3        49.  Plaintiff Kirby Bradshaw, who repeatedly was told to keep his head down while being

4   forced to stand naked in the street, testified how that made him feel:

5        "It was the most craziest thing that I've ever been through in my entire life.  It's
     against the law to, you know, urinate on the street, so to be having your pants taken down by
6    a law officer on the street, it was very humiliating.  I feel I was back in the Jim Crow days.  It
     was like I was very submissive.  And it's terrorizing to me to this day....I felt that I had -- you
7    can't say anything.  And you -- there is nothing that you could say at the time.  You are just
     submissive to whatever these officers say.  And they don't never tell you what they are doing
8    it for, or they don't give you any reason for pulling you over. [M]y sense of dignity was taken
     away at that time, and I feel that it shouldn't have been.  I felt that it shouldn't have happened.
9    I shouldn't have been having my pants down in the street like that.  And I was very
     humiliated... [I felt] like a slave... [i]n the sense that I couldn't look up.  In the sense that I
10   was instructed to look down, and no -- I don't care if you are the police or not, nobody should
     have the authority to make you not look where you want to look....I felt that -- that that strip
11   search was a threat to the rest of the community, who was ever able to see out there.  I felt
     that the police were – because they didn't really inspect me, I felt that they were doing that to
12   show everybody else what they will do to them.  That's [the] way I really felt, that this was
     now for a show for everybody, this is what we are going to come here and do to you, too....It
13   was intimidation."  TT, 519:1-7; 536:1-537:16; 540:21-541:4.

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

14

1  //

2  //

3  <u>II. FINDINGS OF FACT - C 07-4179</u>

4      <u>Background Facts</u>

5         1.  Plaintiff Michael Holmes is 28 years old and lives at 9504 C Street in Oakland with

6  Geraldine Glenn Green, his mother, and his grandmother.  He has lived at that address all his life.

7         2.  Michael Holmes has been on parole since January 27, 2010.

8         3.  Holmes was also on probation at the time of trial.

9         4.  He was on probation with a four-way search clause in September of 2005.

10         5.  Holmes' first contact with defendant Officer Richard Vass was in approximately 2004.

11  Officer Vass believes he has known Holmes since at least 2005 and that he has detained Holmes

12  "probably more than five times".   He believes Holmes was selling drugs in the neighborhood and

13  arrested him once in July 2006 for this offense.  On another occasion he arrested him on a warrant he

14  authored.

15         6.  Mark Engram is Michael Holmes' cousin and frequently lives at 9504 C Street when he

16  has no where else to go.

17         7.  Engram knows Officer Vass from previous years of coming in contact with him.

18         8.  Engram served time in state prison for some period prior to his release on parole on

19  March 30, 2004.  He was on probation before that date.

20         9.  Engram was reincarcerated several times thereafter and then released on parole.  He  was

21  on parole in September, 2005 and at the time of one of the alleged  incidents.  He was in the custody

22  of the Alameda County Sheriff's Department at the time of this trial.

23         10.  Engram believes his first contact with Officer Vass was in 2002 and thereafter he had

24  come in contact with him at other times in the neighborhood.  Vass believes he has known Engram

25  since around 2004.  He has detained Engram a number of times, probably about ten.

26         11.  Officer Vass believes Engram is a street level dealer of narcotics.

27         12.  Plaintiff Richard Leon Rix, Jr. was born on October 17, 1982.

28         13.  He knows Michael Holmes and Mark Engram because they resided in the same

**United States District Court**
For the Northern District of California

1   neighborhood.

2   //

3

4          14.  At the time of the incidents in question here and at all relevant times Rix stayed at 92nd

5   and C Streets.

6          15.  Vass has known Rix since approximately 2003.  He had received information of citizen

7   calls to a drug hotline reporting that Rix was involved in the sale of drugs.  He has never arrested Rix,

8   but has detained him about five times.

9          16.  At the time of trial Rix was on leave from his job as an auto technician at Wal-Mart.  He

10   was staying home and helping his mother and also he was recovering from a shoulder injury at that

11   time.

12          17.  In 2005, Rix was on probation.

13          18.  Officer Vass commenced his employment with the Oakland Police Department and

14   graduated from its Academy in 2000.  After graduation he worked with a field training officer

15   observing narcotics arrests and learning the paperwork involved.  He also worked in areas with

16   substantial drug activity.  In November or December of 2002, Officer Vass was transferred to work

17   with Crime Reduction Team ("CRT") 6 in East Oakland .  As part of Team 6, Vass was not "tied to

18   the radio", as is typical of a patrol officer.  Vass was allowed to use his discretion about what work he

19   would do, and where he would do it, throughout the day, but remaining within his assigned area.  His

20   narcotics experience was developed through surveillance activities, buy-bust operations, grand jury

21   indictment training, and work with the Alameda County Narcotics Task Force.

22          19.  On Team 6, Vass sometimes communicated with other officers by radio, and sometimes

23   by cell phone.  Vass understood that his cell phone communications were not recorded; radio

24   transmissions were.  Vass also knew that information he communicated by cell phone would not

25   appear in CAD reports.

26          20.  All of the specific locations where plaintiffs allege that Vass strip searched them are

27   within Vass' assigned area with Team 6.

28          21.  Part of his duty on Team 6 was to conduct parole and probation searches.  Vass has

16

1   performed several hundred parole and probation searches.  Vass testified that a parole search is very

2   similar to a search incident to arrest.

3   //

4          22.  Holmes testified to six different incidents on which Vass strip searched him.

5

6   Holmes and Engram 2004 Incident

7          23.  The first of the instances about which Holmes testified he was strip searched occurred

8   sometime in 2004, but he does not recall the date.  He and Engram were standing outside their house

9   at 9504 C Street.

10         24.  Holmes testified that Vass drove up, handcuffed Holmes, and put him into the back of

11  Vass' police car.  After about 5 minutes, Vass came and told Holmes to take off his shoes and socks,

12  and searched Holmes' socks.  Holmes further testified that Vass took him off public property and into

13  an aisle next to Holmes' house, where Vass unbuttoned Holmes' pants and pulled them down to his

14  knees, and pulled down Holmes' boxer shorts; told Holmes to bend over; then spread Holmes'

15  buttocks and looked inside Holmes' buttocks while Holmes was bent over.  Holmes testified "all my

16  privates" were exposed.

17         25.  Finding no contraband, Vass put Holmes back into the police car for a short while before

18  releasing him.

19         26.  Holmes did not report the incident because he didn't want the police to give him "extra

20  heat."   This incident was not alleged in the complaints.

21         27.  Vass denies strip searching plaintiff, although he admits "doing a probation search for

22  Holmes at 9504 C Street, his residence quite a while ago," "maybe '05, maybe '04, somewhere

23  around there, I would say."  There is no Police Department documentation for this search.

24

25  Holmes, Engram, Rix Incident September 2005

26         28.  The second incident occurred on approximately September 22, 2005, at about 8 or 9 a.m.

27  when Holmes and Engram decided to walk their dogs from the house on C Street to a park at 98th and

28  C Street, approximately one to two blocks away.  Their friend Richard Rix joined up with them as

United States District Court
For the Northern District of California

they walked to the park.

29.  Holmes and Engram testified that they were both searched, handcuffed and placed in the back of the police car.  Rix testified that he was handcuffed and pat searched but left on the sidewalk. Rix testified at trial that he was not strip-searched by Officer Vass on September 22, 2005, contrary to what was alleged in the original complaint and First Amended Complaint (hereinafter referred to as "complaints" and/or "FAC").

30.  Holmes and Engram each testified that Vass then took them one at a time to the side of a house, between that house and another, and strip searched them, describing in detail the manner of the searches.  Each also stated that he saw the strip search of the other and described what he observed.

31.  Rix also attested to seeing the strip search of Holmes, after which he was pat searched again, unhandcuffed and allowed to leave.

32.  Ultimately, both Holmes and Engram were released, Officer Vass finding no contraband.

33.  There are numerous  inconsistencies in the plaintiffs' recounting of  the events of  "that" morning.  Holmes testified that he was not sure how Vass was dressed, but then testified that  Vass was wearing blue latex gloves that came from the side of his jumpsuit pocket.  Neither of the other two plaintiffs mentioned anything about Vass wearing blue (or any other) latex gloves. In the complaints, both the original and the FAC, plaintiffs alleged Vass performed these searches with his bare hands.

34.  Holmes testified that they were stopped by Officer Vass at about 9:00 or 10:00 in the morning.  Richard Rix testified that he saw Michael Holmes and Mark Engram with their pit bulls at either 8:00 or 9:00 a.m.  According to Engram's cell phone record, the alleged incident happened between approximately 10:00 and 11:00 in the morning.  Engram testified the entire incident took about an hour.  Rix testified the entire incident took about 10 to 15 minutes.

35.  Engram testified the dogs they were walking ran, after Vass approached them, and that some of the Mexican neighbors they know came and got the dogs.  Rix testified that Vass "was concerned about the dogs" when he got out of the car, and tied the leashed dog to a gate.

36.  Engram testified that Officer Vass pat-searched him, undid his pants, looked in his pants,

United States District Court
For the Northern District of California

1    then put him in the car and that he placed Engram in handcuffs after searching him but before placing

2    him in the car.  Rix testified that Officer Vass handcuffed  Engram immediately, then handcuffed.

3    Holmes and Rix.  Rix also testified that Vass then pat-searched Engram, leaned him against the car,

4    and then pat-searched  Holmes and himself.   Holmes testified that right after he approached them,

5

6     Vass put Engram and him in handcuffs and then put him and Engram in the police car while Rix

7    remained standing on the sidewalk.

8          37.   Rix testified that he complied with Vass' request to sit down on the sidewalk with his

9    legs crossed and waited and watched from that position.  Although he remained on the sidewalk, Rix

10   did not see what Vass did with Mark Engram after he pat searched him.  He did not see any further

11   search of Engram, and did not see Vass take Engram anywhere.  A review of his deposition testimony

12   did not refresh Rix's recollection about whether Vass took Mark to the side of the house.

13         38.   Holmes testified that he was in the police car about two minutes when Officer Vass had

14   him get out and walked him between two houses on C Street in the block just before Willie Wilkins

15   Park at 98th Avenue.  Rix testified that Vass took them to the side of Michael Holmes' house.

16         39.   Holmes testified that while he was being searched between the houses, three or four

17   other officers were on the sidewalk five to ten yards from where Vass' car was parked, looking

18   around and kicking up dirt.  The other officers arrived after they were handcuffed and put in the back

19   of the police car.  Two or three other cars arrived.  Engram testified that after Vass finished searching

20   Holmes between the houses,  Vass brought Holmes to the car and put him in handcuffs before putting

21   him back in the car.  However, Holmes testified that he was handcuffed before he was placed in the

22   police car the first time, and never mentions that he was not in handcuffs when the search between

23   the buildings took place.

24         40.   Holmes testified that after he returned to the car, Vass pulled Engram out and walked

25   him to the front of the car, unbuttoned his pants, moved the elastic waistband of his boxers away from

26   his body and looked down his pants.  Engram testified that he was searched in front of the car before

27   being taken between the houses, where the same search was repeated, only "rougher."  This included

28   Vass swiping his hand between his pants and his boxers.

41.  Engram testified that several other officers and cars arrived on the scene by the time he was returned to the car following his search between the houses.  He vaguely testified that those officers "…was probably there searching around, and stuff…maybe outside…"  Rix, who was on the sidewalk throughout most of the incident, makes no mention of other officers arriving on the scene.

//

42.  If at least several other officers and police cars had arrived on the scene, one would expect to find some documentation in the CAD and/or incident logs from running the names of these three plaintiffs.  However, Lt. Christopher Shannon testified that he had his office conduct a records search and found no matches for this incident in the date range that included two weeks on either side of September 22, 2005.

43.  All three plaintiffs claim Office Vass was driving alone in a police car.  Sgt. Mork, Vass' partner at the time, testified that he can think of no time during his partnership with Officer Vass, which included September of 2005, when Vass was in a car by himself and Sgt. Mork pulled up to a scene later in another car.  When he and Vass were partners they rode together in the same car.  Engram testified that although he's not sure whether Mork arrived sometime after Vass, but it looked like Mork was there.

44.  Rix testified that this was the only time Officer Vass encountered the three of them together.  However, at deposition, he testified that the three had had numerous encounters with Officer Vass while together.

45.  Sgt. Mork testified that he has never seen Officer Vass with Engram, Holmes and Rix at the same time, nor does he recall ever seeing Holmes and Engram together with Officer Vass.

46.  The parties submitted the deposition of Johnnie Thornton in lieu of live testimony.  Thornton, who had deceased before trial, testified at his deposition that he saw part of the incident.  Thornton lived on C Street across from Elmhurst Park where he had resided for decades.  Thornton was born in 1920, and at the time of this incident he was 84 years old.  Thornton used a wheelchair at the time.  Thornton recognized Mark Engram as someone who had grown up in the neighborhood, but did not know Engram's name.  Thornton was traveling on C Street in his wheelchair, headed home, when he saw Mark Engram in the presence of Oakland police officers who searched Engram

20

1   "and opened his trousers up," unzipping Engram's trousers.  Thornton testified that he saw Engram's

2   underwear, then went into his house because he did not want any involvement with the police and

3   believed this was none of his business.  He said Engram's zipper was still open when he headed back

4   into his house.

5   //

6        47.  Vass denies strip searching Holmes and Engram, because he was not working near that

7   location on the morning of September 22, 2005.  Vass' time sheet for September 22, 2005 shows he

8   started work at 2:00 p.m. and a CAD log shows he had his unit on at 3:19 p.m.  His shift that date was

9   from 2:00 p.m. until midnight.   No incidents in the CAD log for that date occurred on C Street.

10        48.  Holmes and Engram on the other hand are unsure of the actual date, and stated that the

11   incident was within a week or two of Engram's release from prison in mid-September.  When it was

12   suggested that this event may have occurred on September 29, 2005, the record shows that Vass was

13   working alone on that date and his CAD log shows that at 9:13 a.m. he was at 1826 101st Avenue,

14   approximately one mile from the location of the strip searches of Holmes and Engram.  The record

15   also shows that he had run Engram's name on his computer later that day.

16        49.  Defendants produced no written documentation, such as a field contact card or stop data

17   form, for any contact by Vass with Engram on the day Vass ran Engram's name nor have they

18   produced any documents concerning Vass' work schedule for any of the surrounding days.  Vass

19   admits he "may have" had contact, again undocumented, with Holmes, Engram, and Rix on

20   September 29, 2005, but there is no documentation nor was any complaint filed with Internal Affairs

21   by Holmes or Engram.  It is also clear that plaintiffs have continuously asserted that the date of this

22   event was September 22, 2005.

23        50.  Engram also told OPD's Internal Affairs office in an interview after the filing of this

24   action that his aunt and grandmother saw the incident.  However, at trial he was uncertain and

25   thought perhaps his aunt saw it, but didn't know if she saw it or not.

26

27   Holmes Spring 2006 Incident

28        51.  The third incident occurred in the spring of 2006 in the parking lot of a shopping center

**United States District Court**
For the Northern District of California

at 103rd Avenue and International Boulevard.  This incident also was not alleged in the complaints.

52.  When Holmes drove into the parking lot he testified that he saw Vass approaching and stayed in his van.  Vass ordered him out, handcuffed him and strip searched him.  He put Holmes in the back seat of the police car and searched Holmes' van.  He then released Holmes and left.  Holmes testified that the incident lasted about 25 to 30 minutes.

53.  Cedric Jackson, who at one time had resided at 9409 C Street and was a friend of Holmes, was meeting him at the shopping center.  He testified that he saw the strip search described by Holmes.  His testimony is questionable, since it is doubtful he saw the entire incident.  Furthermore, he believes that Officer Vass harassed him when he lived on C Street, including signing an affidavit in support of a search warrant that resulted in a search of his premises.  Therefore, Jackson has reason to be biased.

Holmes July 2006 Incident

54.  The fourth incident occurred on the evening of July 19, 2006, when Holmes was getting his car washed in the area of 107th Avenue and Pontiac Street in Oakland.

55.  Holmes testified that he had drugs on his person and when he saw Vass drive up he ran and tossed the drugs.  He then jumped into the backyard of a house and in doing so fell.  The homeowner's dogs began to bite his legs.  Vass pepper sprayed the dogs and Sgt. Bernard Ortiz of the Oakland Police Department arrived at about that time.  Ortiz went to see the homeowner to get keys to open a gate to the property.  During that brief time of a minute or two, according to Holmes testimony, Vass handcuffed him, pat searched him and then strip searched him.  Holmes was taken to jail after this incident.

56.  Vass denies performing a strip search, stating that he performed a search incident to an arrest and that he recalls finding some currency in Holmes' pocket, but doesn't remember much else.  He states that he would have searched around the waist and belt area and around the crotch area through the exterior of Holmes' clothing, but that he did not strip search Holmes.

57.  Vass prepared a report of the arrest, although another officer's name appeared on the report.

United States District Court
For the Northern District of California

58.   Sgt. Todd Mork was on duty with Vass on this occasion.  He saw Vass chase Holmes, but did not have them in his vision at all times and did not see the arrest or any search.  However, he stated that it was less than five minutes between the beginning of the chase and when Vass returned to the police car with Holmes in custody.

//

59.   Sgt. Ortiz testified as to his appearance and activities on the scene.  While he did not see Vass and Holmes at all times, he did not see Vass perform a strip search, and did not believe there was enough time when they were out of his sight during which a strip search could be performed.

60.   Holmes made no complaint about a strip search and did not complain to Sgt. Ortiz about such a search; nor did he complain at the time of booking or at any other time.

61.   Here, too, Holmes testimony lacks credibility.  In his complaints, both original and the FAC, Holmes alleged that he ran from the officers because he "knew he had a warrant for his arrest due to outstanding traffic tickets".  Compl't. at ¶35; FAC at ¶33.   He says nothing in his complaints about being in possession of drugs and tossing them to avoid detection.

62.   His depiction of what happened after he climbed the fence is also contradictory.  At first he said that Officer Vass jumped over the fence as soon as  Holmes landed on the ground.  Later, he testified that he was on the ground for thirty seconds until Vass came to his location.

63.   He denied pleading no contest to the trafficking charge, but his testimony is contradicted by the court record.

64.   His testimony about discarding the drugs is inconsistent with Sgt. Ortiz' description of what he saw.

65.   Officer Vass and Holmes were alone only for 1 ½ minutes.  That is not enough time to conduct the search that Holmes describes.

66.   The court finds that the officer was entitled to conduct a search incident to an arrest, but that no strip search was conducted.  In fact, Holmes' demeanor at the time was inconsistent with his having been strip searched.

Holmes February 2007 Incident

67. The fifth incident occurred on February 20, 2007, when Holmes was riding in the back seat of a Yukon SUV on the way to an auto detailing shop. On International Boulevard between 94th and 95th Avenues, Vass, who was alone in an unmarked police car, pulled the Yukon over. He ordered Holmes out of the vehicle, handcuffed him and placed him in his patrol car. After ordering the others out of the Yukon he searched it. Then he pulled Holmes out of the police car and searched him, including according to Holmes testimony, performing a strip search which Holmes described. After that he unhandcuffed Holmes and released him.

68. This testimony is wholly at odds with the testimony of the officers on the scene. Holmes testified that the only officer present at the scene of this event was Officer Vass. However, Sgt. Darrin Downum testified that he was present when the Yukon was stopped. Both Vass and Downum testified that Downum was present for the entire search. This testimony is more believable since it is highly unlikely that Sgt Downum would allow a single officer to confront three potentially dangerous suspects. Sgt. Downum testified that Holmes was in his custody for the entire detention except for a 5 second period when he checked a cell phone ringing in the vehicle.

69. Downum was a street team supervisor at the time of this joint investigation. The information giving rise to the stop was that a delivery of heroin was to be made. The target of their investigation was a Salvador Ortega who was believed to be involved in shootings, murders and drug dealing. The undercover team followed the Yukon and received communication about its whereabouts and activities. Their instructions were not to arrest the occupants of the Yukon.

70. Under those instructions Vass made a regular car stop. Holmes was in the car. Vass got Holmes out of the car and, finding out that he was on probation, he handed Holmes to Sgt. Downum. Sgt. Downum pat searched Holmes to make sure he didn't have weapons and handcuffed him. Downum stood with him on the sidewalk. Meanwhile, Vass was dealing with the other Yukon occupants.

71. Downum is pretty sure that he handcuffed Holmes. Later Downum told Vass to hold onto Holmes while he attended to a phone on the front seat of the Yukon because of an existing wiretap on that phone.

72. According to Downum the entire search took less than ten minutes. During that time

1   Holmes was next to Downum except when Downum went into the vehicle to check on the phone

2   which took approximately five seconds.

3        73.  The officers searched the occupants for weapons.  Downum testified that he "absolutely"

4   did not see Vass strip search  Holmes nor did he see him loosen Holmes' pants.

5   //

6        74.  In fact, Downum testified that if he had seen Vass conducting a strip search, he would

7   have taken immediate corrective action, stating that, "We didn't want to find anything, we didn't

8   want to do any of that. That wasn't necessary for our task at hand at all."  They did not want to find

9   any narcotics because they would have to make an arrest which would interfere with their

10  investigation.

11

12  Holmes August 2007 Incident

13       75.  The sixth incident, which was not alleged in the complaints, Holmes claims occurred in

14  August 2007, when Vass stopped him near the residence of his uncle Michael Douglas at 2926 109th

15  Avenue and MacArthur Boulevard in Oakland.  Holmes, who was returning from a nearby Church's

16  Chicken, testified that Vass jumped out of the police car's passenger seat and asked Holmes, "this is

17  where you've been?"  He then handcuffed Holmes and searched him.

18       76.  According to Holmes and Douglas, Vass strip searched Holmes.  Douglas testified that

19  he saw Vass unbuckle Holmes' belt and pants and search around his waist.  He said he saw Vass look

20  inside Holmes' pants and that "[Y]ou could see him just go all the way down and see his underwear

21  and everything."

22       77.  After the search Vass put Holmes in the police car, took his keys and found Holmes' car

23  which he searched, emptying the contents onto the street.  He then pulled Holmes out of the police

24  car, unhandcuffed and released him.

25       78.  The court notes that both Holmes and Douglas have reasons to be biased since both of

26  them were the subjects of search warrants authored by Vass.  OPD has no record of this incident.

27  Despite the alleged event occurring at about the time of the filing of the original complaint and about

28  one month after the filing of the FAC, no mention is made of it in either complaint.

United States District Court
For the Northern District of California

Engram 2007 Incident

79. Mark Engram testified to an incident that involved only him and occurred on January 16, 2007, when he was walking on Elmhust Street around the corner from where he lived.  Officers Vass and Mork drove up in their police car and Vass ordered Engram to "come here".  Engram testified that Vass told him to open his mouth and Vass inspected it.  He then grabbed Engram and pushed him against the back of the police car and kicked his legs open.  He then pat searched Engram, grabbed Engram's genitals and pulled down his clothes, strip searching him.

80. A neighbor, Percy Jones, testified to observing this.

81. After the search Engram was released.

82. Engram's description of the search at Elmhurst and D is vague and  incomprehensible.  He states that he made a note that the search occurred on January 16, 2007.  However, the more persuasive evidence is that Officers Mork and Vass were working the entire date on another assignment in a different part of the city.

83. Jones' description of the search contradicts the description given by Mr. Engram.  He is also biased toward Vass and believes him to be "a white supremacist" and a "legal killer with a gun."  He disliked Officer Vass because he was "gung ho" about combating the drug trade in the neighborhood.  Jones said he did not care about drug dealing in his neighborhood.  The court does not find Jones a credible witness.


Rix November 2005 Incident

84. Robert Rix testified that in late October or early November 2005 he was driving on C Street when he saw Officer Vass driving toward him and that he determined from Vass' look that Vass wanted him to pull over.  Rix did so, pulling over in the area of 92nd Avenue and C Street.

85. Rix exited his vehicle and in response to Vass' inquiry told them there wasn't "anything" in his car.  Vass handcuffed him, ordered him to spread his legs and pat searched him.  Then, according to Rix's testimony, Vass strip searched him after which he put Rix in the back of the patrol car and searched Rix's car.  Rix testified that he was allowed to get out of the patrol car, but that he was then strip searched again before he was unhandcuffed and released.

OPD and Officer Policies and Practices

86. The officers, including sergeants and a lieutenant, have testified that the Police Department requires that forms called stop data forms be completed for all contacts, stops or

//

detentions. Field contact cards may be created for detentions, but are not required. Arrest reports are to be completed for all arrests. Documentation might not be produced for consensual encounters.

87. The purpose of the stop data forms was to determine whether the Oakland Police Department was engaging in racial profiling and officers were supposed to fill them out for any vehicle, walking stop, and/or bicycle stop. The forms are turned into the Department where the supervisor reviews them for completeness, signs them and places them in a report writing receptacle. There have been problems on occasion with failure to complete the forms or turn them in; on other occasions some forms that were turned in had been lost.

88. Sgt. Downum testified that he is familiar with stop data forms. They are prepared when a self-initiated stop is made. As a supervisor, he reviews them and signs them. In 2005, he signed them, and reviewed them for completeness. He gave them to a lieutenant who kept them in a box under his desk. As a field supervisor, he would review forms to determine if the forms turned in were consistent with the officer's workload. He would take corrective action if an officer was making stops and not completing forms. He would also take action if the officer was not making stops.

89. When he supervised Officer Vass, the number of stop data forms he turned in was consistent with his workload.

90. A field contact card and a report were prepared in connection with the stop of the Yukon on February 20, 2007. The field contact card was produced. The report, according to Sgt. Downum, was turned over to the DEA and no copy retained by OPD.

91. Stop data forms and field contact cards were not produced for any of the other stops or detentions alleged in this case.

92. When asked at trial whether or not he was allowed to strip search someone in the field simply because they are on probation or parole, Vass testified he "always believed that you needed a

27

1    little something more."  When asked about that same subject at his deposition on January 14, 2009,

2    Officer Vass answered that he was not sure and he did not know whether he was allowed to conduct a

3    strip search of a parolee in the field based solely on that person's status as a person on parole.  Vass

4    could not recall any written policies or any training he had ever received on that issue.

5      //

6            93.  Officer Vass is required by his department to know and obey all laws, as well as all of

7    his department's rules, policies, and orders.  Vass was aware of OPD Rule 314.36, which states: "In

8    the event of improper action or breach of discipline, it will be presumed that the member or employee

9    was familiar with the law, rule or policy in question."

10           94.  The OPD's 2004 strip search policy governed any strip search Officer Vass performed

11   after May 27, 2004.  Officer Vass was trained on the policy in 2004 by Captain, now Deputy Chief,

12   Jeffrey Israel.  The 2004 strip search policy defined "strip search" as "a search that requires a person

13   to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the

14   underwear, brassiere, breasts, buttocks, or genitalia of such person."  Officer Vass' understanding of

15   that term was consistent with the policy.

16           95.  The 2004 strip search policy explained that a "strip search" is more intrusive than, and

17   different from, a "full body search" of a person on probation or parole.  While that policy allows field

18   strip searches under certain circumstances, the policy also prohibits any visual or physical body

19   cavity search in the field.

20           96.  Officer Vass testified that the mechanics of a probation or parole search of the person is

21   the same as a search pursuant to arrest and consists of touching "pretty much" the entire body through

22   the subject's clothing including the waist, groin and buttocks areas.  Sgt. Mork testified similarly.

23   Vass described the manner in which he conducts parole or probation searches and searches incident

24   to arrest.  It is probable that such a search would detect the existence of contraband or weapons in a

25   suspect's private parts.  Officer Vass testified that he routinely attempts to have the suspect recover

26   the drugs and that suspects usually comply.

27           97.  Vass stated that it  has been his practice to only perform field strip searches when he has

28   probable cause to believe the person may be hiding contraband in their underwear.

United States District Court
For the Northern District of California

98.  At trial, Vass was unsure about whether he was allowed to strip search a person who was on probation or parole where such person was merely detained and not arrested.  At his deposition, Vass testified unequivocally that he was not allowed to conduct a strip search in the field of a person who was merely detained.  The 2004 strip search policy only refers to field strip searches "incident to

//

arrest."  While at trial he thought the policy may allow him to do a field strip search of a detainee, after reviewing the policy he could not find support for that proposition.

99.  Officer Vass admits he has performed possibly ten or more strip searches in the field. Once he did so at the side of a house.  He also may have been present when other officers conducted on-the-street strip searches, but cannot recall any details.  Vass said he only recalls visually observing a person's anus in the field once and acknowledges to "somewhat by default" this may have been a forbidden visual body cavity search.

100.  Officer Vass denied ever having a complaint about a strip search sustained against him. When shown documentation about the Oakland Citizen's Police Review Board's (CPRB) misconduct findings in a complaint filed on behalf of Dynami McCree who Vass strip searched at the front of a house, Vass acknowledged that the CPRB did sustain the complaint against him for conducting a strip search in public.  Officer Vass was never disciplined or provided supplemental training as a result of that sustained strip search charge.

101.  Officer Vass was required to write an arrest report for every person he arrested.  He was required to ensure that a Field Contact Card was filled out for every detention in which he was involved.  And, Officer Vass was required to ensure that a Racial Profiling Stop Data Collection Form was filled out and turned in to his supervisor for every vehicle, walking, or bicycle stop during his shift.  A parole search should generate, at a minimum, a Field Contact Card and a Stop Data Form.  Officer Vass assumes his department requires him to fill out field contact cards for officer accountability, so his department knows what its officers are doing on the street.  Officer Vass says he tried to fill out this required documentation for every stop.

102.  Officer Vass denies that he has ever performed a strip search of Holmes, Engram or Rix at any time.

103. Sgt. Downum also testified that when he supervised Officer Vass, he observed him in the field on a daily basis. He never saw him act in a way he felt to be unprofessional. He has never seen him conduct a strip search in the field.

104. Lt. Christopher Shannon of OPD testified that OPD's law enforcement databases for the period including and around the dates asserted in this case were checked to determine whether warrant checks on any of these three plaintiffs had been run or whether their names had been run through the databases. The response was negative.

Summary of Facts and Conclusions

105. The court is not persuaded by a preponderance of the evidence that the strip searches complained of by Holmes, Engram and Rix occurred. A number of factors convince the court that each of these plaintiffs is lacking in credibility and candor.

106. First of all, there is no evidence that any of the incidents complained of were reported to Internal Affairs of OPD. Although there is evidence of other persons having made such complaints. The first that Officer Vass or the Department ever learned of these numerous alleged violations was when the complaint in this action was filed, firstly on August 15, 2007, and then with a First Amended Complaint on September 17, 2007.

107. Even then these three plaintiffs complained of only five specific instances of strip searches. Thereafter, they added others about which they were permitted to testify for evidentiary purposes only, but not to support further claims. The plaintiffs are quite elaborate in their articulation of the details of each incident, but their testimony is not consistent with the allegations of the complaints, with their depositions and with each others recitation of them.

108. For example, the first incident which was testified to at trial involved Holmes and Engram. Yet, they could only point to the incident occurring sometime in 2004. Given the humiliation and anguish they claim to have suffered neither could point to even a season, let alone a month, when the event occurred. And, despite alleging other strip searches in the complaints filed in this action, the 2004 event was not mentioned.

109. The event originally alleged to have occurred on September 22, 2005, at approximately

**United States District Court**
For the Northern District of California

8-9 a.m., turned out to possibly have occurred at some other time, if at all.  The court is not persuaded by a preponderance of the evidence that it occurred.  The complaints and other papers filed by plaintiffs in this action uniformly refer to the incident occurring on September 22, 2005.  Yet, when confronted at trial with the fact, which this court finds persuasive, that Officer Vass, the alleged offender in all of these searches, was not on duty until the afternoon of that day, the plaintiffs waffled and began suggesting that it may have occurred on September 29, 2005.  In the end, they were not sure when it occurred.

110.  The plaintiffs have testified to several searches of their buttocks areas.  In the complaint Vass is alleged to have performed some of these searches with his bare hands.  Yet, on at least one of these occasions, the January 2007 incident with Engram, Engram testified to the contrary and says Vass wore gloves.  There are numerous other inconsistencies in their own testimony and among themselves.  Furthermore, plaintiffs offer no plausible explanation why Officer Vass would unnecessarily subject himself the unpleasantness of a strip search performed in the manner they have described, particularly since discipline was a possible consequence.

111.  The court is persuaded that the OPD records discredit many of plaintiff's accounts.

112.  The incident involving the Yukon is also discredited by several officers' accounts, including that of Sgt. Downum, as well as the records of OPD.  First of all, Officer Vass had probable cause to stop the vehicle for a traffic violation.  The search of Holmes in the 9400 block of International was pursuant to standard drug investigation procedures.  The court concludes that given the nature of the ongoing investigation, the purpose and location of the stop, the time involved and the other activities occurring at the scene that no strip search occurred or could have occurred.  Furthermore, there was not enough time to perform such a search and no reason for such a search is suggested by the record.

113.  Holmes and Engram were on probation or parole at the time of the searches in this case and, therefore, were subject to parole or probation searches.  The searches conducted, to the extent they occurred, were consistent with the parameters of parole or probation searches.  The court finds there were no strip searches at any of the times claimed.

114.  One of the searches alleged occurred when Vass arrested Holmes at 106th and Pontiac.

He was thus entitled to conduct a search incident to arrest.  He did not, however, conduct a strip search on that occasion, contrary to Holmes' testimony.

115.  Incidents that were not alleged in the complaint do not assist plaintiff Holmes.   If these incidents  had actually occurred, there is no reason that plaintiff would not have included them in one or both of  the complaints.

116.  The court need only determine whether plaintiffs have shown by a preponderance of the evidence that these strip searches occurred.  The court concludes that they have failed in this effort.  Nonetheless, the motivation for creating them out of whole cloth is of concern.  Whether this is attributable to news accounts of other cases, whether legitimate searches that did take place on some occasions have been magnified into strip searches, or for whatever reason, the court finds that plaintiffs' testimonies are strained and unbelievable.

117.  In several of these instances there is no record of Officer Vass' contact with any of the plaintiffs.  While there were times when he stopped them, conversed with them casually, or conducted a probation or parole search (because he knew that one or more of them was on probation or parole at the time), there is no credible evidence that he strip searched them.

118.  The court finds that to the extent there were witnesses who testified that they observed strip searches, their testimony has credibility problems.  One is a relative; others are friends or neighbors who have their own antipathy to or negative experiences with the police.

119.  What also persuades the court of this evaluation of the credibility of plaintiffs is the accumulation of allegations that appear to have been elaborated on during their testimony.  Rix, in particular, seemed to relish having an audience at trial listening to his recounting of events and embellished them beyond credulity.

120.  Sgts. Mork, Ortiz and Downum were present at some of the incidents.  Their accounts were credible and more consistent with the time frames involved and the facts that are established independently.

121.  Therefore, the court finds that these three plaintiffs have failed to establish by a preponderance of the evidence that they were strip searched on any of the occasions they have alleged in their complaints or at trial.

United States District Court
For the Northern District of California

122.  While OPD officers should do a better job of recording and reporting stops, detentions and searches, the court does not find by a preponderance of the evidence that the strip searches occurred in the manner and times described by plaintiffs.  Therefore, Officer Vass did not violate the Fourth Amendment rights of these three plaintiffs.

//

CONCLUSIONS OF LAW

I.  The Applicable Law of Search and Seizure

Jurisdiction in these actions is premised on section 1983 of Title 42 U.S.C. which provides that:

> "Every person who, under the color of any statute...subjects any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privilege, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

This section is not itself a source of substantive rights, but merely provides the vehicle by which federal rights conferred by the United States Constitution or federal statutes may be vindicated.  In this case plaintiffs' claims are founded on the Fourth Amendment to the Constitution, which is applicable to the states through the Fourteenth Amendment.  The court also exercises supplemental jurisdiction over the state law claims by reason of 28 U.S.C. section 1367.

The Fourth Amendment as pertinent here guarantees: "[t]he right of the people to be secure in their persons...against unreasonable searches and seizures, shall not be violated."  U.S.Const. amend IV.  Plaintiffs claim they were subjected to unreasonable searches because they were strip searched in public places without probable cause and in violation of federal and state law interpreting the Fourth Amendment.  Plaintiffs Lucas and Bradshaw claim that in the first instance they were subjected to an unlawful vehicle stop which precipitated their detention and strip searches.

Plaintiffs in both actions bear the burden of proving their claims by a preponderance of the evidence.  In order to establish their strip search claims each plaintiff must show that (1) a right secured by the Constitution and laws of the United States, namely, the Fourth Amendment right to be free from an unreasonable search of his person, was violated; (2) that he was searched by a strip

search of his person; (3) that the search was conducted by a person acting under the color of law; (4) that the person conducting the search acted intentionally; and (5) that the search was unreasonable.

With respect to the unlawful vehicle stop, plaintiffs Lucas and Bradshaw must each show that (1) his Fourth Amendment right to be free from unreasonable seizure was violated in that the vehicle stop was unlawful; (2) that the stop was conducted by a person acting under color of law; (3) that the person stopping the vehicle was acting intentionally, (4) and that the stop was unlawful.

Plaintiffs need not prove that the defendants acted with the intent to violate their rights, only that the acts themselves were intentional.  The parties have stipulated that each of the officers in these cases was acting under color of law.  If the plaintiffs prove the alleged searches occurred, the conduct would necessarily be intentional.  And, of course, the stop of Lucas' vehicle was intentional.  The question is whether any of the officers charged in these complaints deprived any of the plaintiffs of the particular rights they assert -- either the right to be free of an unreasonable search or the right to be free of an unreasonable seizure or stop.  The court treats separately each of the plaintiffs, each of the incidents, and each of the officers alleged to be involved.

II.  The Stop, Detention and Seizure of Lucas and Bradshaw

The starting point with respect to the claims of Lucas and Bradshaw is the vehicle stop. There is no question that at the time defendant officers did not know the identity of any of the three passengers in the car.  They did not know whether any of them were on probation or parole.  The court has already found that they did not have an articulable basis for the stop.  In fact, none of the officers could agree or remember why the car was stopped, only that there was some vehicle code violation.  No record was made of it; no citation was issued; and they offered no reason for the stop at the time of making it.

Before addressing the specifics of the stop and the strip searches in this case, the court looks to the background of seizures and searches in general.  A stop of an automobile for a vehicle code violation or for other violations of the law is often referred to as an investigatory stop or temporary detention. *Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011)(citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  In connection with such a stop a very limited type of search may be conducted, commonly

1  referred to as a "frisk" or pat down for weapons.  *Id.*   A stop of a vehicle is a seizure within the

2  meaning of the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809-10 (1996)(citing

3  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  Such a stop is reasonable when there is probable

4  cause to believe a traffic violation has occurred,  *Liberal v. Estrada*, 632 F.3d at 1078, or reasonable

5  suspicion to believe that the "motorist is engaging in illegal activity."  *Id.* at 1077.   Probable cause is

6  necessary for an arrest; reasonable suspicion suffices for an investigatory stop or temporary

7  detention.

8          Probable cause is "more than bare suspicion: Probable cause exists where 'the facts and

9  circumstances within their (the officers') knowledge and of which they had reasonably trustworthy

10  information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an

11  offense has been committed."  *Brinegar v. United States*, 338 U.S. 160, 175-77 (1949)(quoting

12  *Carroll v. United States*, 267 U.S. 132, 162 (1925)).  Reasonable suspicion requires "specific,

13  articulable facts which, together with objective and reasonable inferences, form the basis for

14  suspecting that the particular person detained is engaged in criminal activity."  *United States v.

15  Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000);  *see also United States v. Rojas-Millan*, 234 F.3d

16  464, 468-69 (9th Cir. 2000).  Such facts may include an observation of an actual vehicle code

17  violation, a reasonable basis for believing that the vehicle is stolen, contains contraband or was used

18  in criminal activity.  The only asserted basis here was some type of traffic violation and that basis has

19  been negated by the credible evidence in this case.

20          A vehicle traffic stop is not only a stop of the driver, but also of the passenger.  If it is

21  unlawful as to the driver, it is also unlawful as to the passenger.  *Brendlin v. California*, 551 U.S.

22  249, 256-63 (2007).  This was not a new concept introduced in *Brendlin*, but was extant in the Ninth

23  Circuit since the time of *United States v. Twilley*, 222  F.3d  1092 (9th Cir. 2000), and in nearly all the

24  federal circuits as noted in *Brendlin,* 551 U.S. at 258-59.

25          For the reasons set forth above the court finds that certainly there was no probable cause and

26  there was no reasonable suspicion for the traffic stop.  Thus, the traffic stop in this case was unlawful

27  and a violation of the Fourth Amendment rights of Lucas and Bradshaw.

28          The court notes that if this had been a lawful traffic stop an officer could require that not only

35

United States District Court
For the Northern District of California

1  the driver, but also the passengers, exit the vehicle and could make inquiries of the passengers.

2  *Arizona v. Johnson*, 555 U.S. 323,___, 129 S.Ct. 781, 786-87 (2009).  Under these circumstances the

3  officer could also conduct a frisk for weapons if he had a reasonable belief that the passenger was

4  armed and dangerous.  *Id*. at 784 (capturing the "combined thrust" of the Court's earlier decisions in

5  *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Maryland v. Wilson*, 519 U.S. 408 (1997), and

6  *Brendlin v. California*, 551 U.S. 249 (2007 )).  The "investigatory stop must be lawful" and the

7  //

8  officer must "reasonably suspect that the person stopped is armed and dangerous."  *Liberal v.*

9  *Estrada*,  632 F.3d at 1079 (quoting *Arizona v. Johnson*, 129 S.Ct. at 784).

10  However, the officers parlayed this unlawful stop into an inquiry about whether any of the

11  occupants were on parole.  But for the unlawful stop, they could not have made this inquiry and set in

12  motion the events that occurred thereafter.  California cases, published and unpublished, are legion

13  where officers have stopped vehicles for failing to obey a stop sign, lack of a license plate or tail

14  lights, even failure to fasten a seat belt, and then asked the driver or occupants whether they are on

15  parole.  This practice has been accepted as being within the parameters of a standard parole search

16  clause and the Fourth Amendment.  However, the method employed here steps outside those bounds

17  because there was no lawful stop.

18

19  III.  The Prolonged Detention of Lucas

20  Before taking up the question of the searches, the court takes one detour in its analysis of the

21  claims at issue here to traverse the detour taken in the detention of Lucas.  A "prolonged detention

22  may well be a more serious exploitation of an illegal arrest than a short one."  *Dunaway v. New York*,

23  442 U.S  200, 220 (1979)(Stevens, J., concurring); *see also United States v. Luckett*, 484 F.2d 89, 90-

24  91 (9th Cir. 1973)(condemning as unreasonable continued detention of cited jaywalker to check for

25  warrant).  *Terry v. Ohio* speaks to this issue, noting a stop or search which is "reasonable in its

26  inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope".  392

27  U.S. at 17 (citing to the Court's earlier holdings going back to 1931; citations omitted).  In 1983, the

28  Court revisited the issue of prolonged or investigative detentions and held that "an investigative

United States District Court
For the Northern District of California

1   detention must be temporary and last no longer than is necessary to effectuate the purpose of the

2   stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983)(plurality opinion); *see also United States v.*

3   *Gross*, 624 F.3d 309, 320 (6th Cir. 2010)(quoting *United States v. Luckett*, 484 F.2d at 90-91); *Gilles*

4   *v. Repicky*. 511 F.3d 239 (2d Cir. 2007).  Again, in 1985 the Supreme Court in *United States v.*

5   *Sharpe*, 470 U.S. 675, 686 (1985),  pointed out the need for diligence in pursuing an investigation

6   after an investigatory stop.  This court finds that the detention of Lucas bears out Justice Stevens'

7   caution.

8

9           Unlike the foregoing cases where there was a lawful basis for a stop, the officers here did not

10  effect a lawful stop; they did not issue a citation; and they do not now offer a valid reason for the

11  stop.  Even after a preliminary inquiry the officers knew there was no criminal activity afoot.  The

12  only question was Lucas' current residence.  A conversation with Agent Bradley, Lucas' Parole

13  Officer, confirmed that he was homeless and generally had been living at motels.  Instead of

14  arranging for him to meet with the Parole Officer and clarify his living location, the officers drove

15  him around Oakland and then to a nearby city looking for a residence and evidence of a violation.

16  This only exacerbated an already unlawful situation compounding its unlawfulness.  They were not

17  effectuating the purported purpose of the stop.  Certainly an unlawful stop cannot give rise to a period

18  of detention longer than would be justified by a lawful one.  Judge Illston of this court, speaking of

19  seizures and searches of parolees, aptly noted that "[i]t is not only the initial search or seizure that

20  must be reasonable, but also any subsequent detention." *Turner v. Craig*,  No. C 09-03652 SI,  2011

21  WL 2600648 at *8 (N.D.Cal. June 30, 2011).  This court agrees and finds that the prolonged

22  detention of Lucas was a violation of his limited Fourth Amendment rights as a parolee.

23          In fact, given the length of Lucas' detention and the transporting of him around town and to

24  another city, somewhere in this continuum the detention became an arrest before he was actually

25  arrested after the search of the house in Richmond.  The court need not fix the exact moment this

26  detention became an arrest, but by the time the officers arrived at the OPD facility and dropped off

27  Bradshaw enough time had elapsed for the detention to effectively become an arrest.  Certainly,

28  during the period from leaving the facility and traveling to Richmond the detention became an arrest.

And, it was an arrest without probable cause.  Officer Mayer, himself, agreed that the requirement of probable cause is "elementary," and essentially admitted that at or about 10:00 a.m. the records show Lucas was arrested, but probable cause was lacking at that time.  See Findings of Fact at ¶40, *supra*.

Having determined that defendants violated the Fourth Amendment rights of Lucas and Bradshaw by an unlawful stop, all that flowed therefrom is a continuum of those violations, including the detention, the strip searches and the prolonged detention in search of a parole violation for Lucas that followed.  Nothing that occurred after the unlawful stop and seizures cured their illegality or intervened in the continuum.

IV. The Effect of After-Acquired Knowledge

Another principle of search and seizure law intersects with Lucas status as a parolee and with Bradshaw's status as the subject of a warrant.  The officers have testified that at the time of the stop they did not know the identities of the occupants of the car or whether they were on parole or probation.  The California Supreme Court has held that a parole search conducted without prior knowledge that the subject is a parolee is not a reasonable search under the Fourth Amendment.  *See People v. Sanders*, 31 Cal.4th 318, 331-332 (2003)(noted approvingly in *Samson v. California*, 547 U.S. 843, 856 n.5 (2006)).  The same rationale applies to a stop or seizure of a person subject to a warrant without prior knowledge of that status.  This Circuit summed up its agreement with these principles, holding that "police officers cannot retroactively justify a suspicionless search and arrest on the basis of an after-the-fact discovery of an arrest warrant or a parole condition."  *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005), *cert. denied,* 547 U.S. 1207 (2006).  Similarly, after-acquired knowledge that a person is on parole and subject to a parole search condition cannot justify an unlawful seizure, in this case a traffic stop.  *See, e.g., United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001)(en banc); *United States v. DiCesare*, 765 F.2d 890 (9th Cir.), *amended on other grounds*, 777 F.2d 543 (1985).  Most recently, the Sixth Circuit held that "where an officer engages in an illegal stop and then discovers through his own investigation or prompting that the individual or individuals he has illegally stopped have outstanding warrants, the evidentiary fruits of the subsequent arrest are tainted as fruit of the poisonous tree and must be suppressed."  *United States v.*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    *Gross*, 624 F.3d at 321-22.  The principles enunciated in these cases makes the stop and the

2    subsequent actions of the officers even more problematic.

3

4        V.  Qualified Immunity for Stop and Detention

5            To the extent that the officers assert qualified immunity for the stop, such assertions are

6    plainly without merit.  Probable cause has been a bedrock principle of our system of justice since the

7    adoption of the Fourth Amendment and was defined as early as the time of Chief Justice Marshall's

8    decision in  *Locke v. United States*, 7 Cranch  339 (1813).   The distinctions between probable cause

9    and reasonable suspicion evolved from *Terry v. Ohio*, 392 U.S. 1 (the germinal stop-and-frisk case),

10   through *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975 (involving vehicle stop to investigate

11   presence of illegal aliens), to *Delaware v. Prouse*, 440 U.S. 648 (1979)(stop of automobile for vehicle

12   code violation), to the present day plethora of vehicle stop cases.   So, it was recently stated by this

13   Circuit that "[i]t has been settled law since the 1970's that in order for a police officer to initiate an

14   investigatory stop of a motorist, there must at least exist reasonable suspicion that the motorist is

15   engaging in illegal activity.*"  Liberal v. Estrada*, 632 F.3d  at 1077 (quoting *Bingham v. City of*

16   *Manhattan Beach*, 341 F.3d 939, 948 (9th Cir 2003)(history omitted)).  In view of this history, it was

17   clearly established law at the time of the vehicle stop in this case that at least reasonable suspicion

18   was required in order to lawfully effect a stop.  Having found  no credible evidence to support a

19   lawful stop for a vehicle code violation, the court finds there was no reasonable suspicion.  Nor did

20   the officers know or have a reasonable basis to believe that any of the occupants of the vehicle were

21   on parole or probation.

22           In addition, the law was also clearly established at the time of these events that prolonged

23   detentions or detentions that go beyond the scope of the reasons for the stop are unreasonable under

24   the Fourth Amendment.  *See Terry v. Ohio,* 392 U.S. at 18(citing to holdings in 1931, 1948 and

25   1957); *see also Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004) ("[T]hat a police officer

26   may arrest a suspect only if he has probable cause to believe a crime has been committed is a bedrock

27   Fourth Amendment precept.").  The court now turns to the strip searches which are the primary focus

28   of this case.

1   VI.  The Law of Strip Searches

2          A strip search is defined under California law as:

3          "A search which requires a person to remove or arrange some or all of his or her clothing so
           as to permit a visual inspection of the underclothing, breasts buttocks, or genitalia of such
4          person." Cal. Pen. Code, § 4030(c)

5    Section 4030 distinguishes among strip searches, subparagraph (c); visual body cavity searches,

6   (d)(2); and physical body cavity searches, (d)(3).[2]  The Oakland Police Department's 1998 and 2004

7   policies defined a strip search as "any search that requires the officer to remove or arrange some or

8   all of a person's clothing to permit visual inspection of the subject's underclothing, breasts, buttocks,

9   or

10

11   genitals." *See Opinion, Foster v. City of Oakland,* C-05-3110 (related case), Doc. No. 71, filed

12  March 27, 2008.

13          Strip searches are ordinarily conducted in a jail setting after a person has been arrested and

14  before placed in the general population of the jail.  The Supreme Court in its seminal opinion, *Bell v.*

15  *Wolfish*, 441 U.S.520 (1979), addressed the Fourth Amendment parameters for strip searches of

16  prisoners and pretrial detainees.  *Bell* did not address searches of arrestees or detainees before being

17  booked into a detention facility or introduced into the general jail population.  Nor did *Bell* address

18  searches of probationers or parolees in the field or before arrest.  The Court recognized that even

19  arrestees and inmates in a custodial facility "retain some Fourth Amendment rights" and that "[t]he

20  Fourth Amendment prohibits only unreasonable searches.  *Id* at 558.  This requires a balancing of the

21  need for the particular search against the invasion of personal rights that the search entails.  Courts

22  must consider the scope of the particular intrusion, the manner in which it is conducted, the

23  justification for initiating it, and the place in which it is conducted.  *Id*. at 559.

24           The Supreme Court also has noted that persons such as parolees and probationers have a

25  "diminished expectation of privacy" because they are under supervision by a probation or parole

26  officer.  *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987).  The terms and conditions of probation or

27  parole usually contain some provision for searches of the subject without warrant or probable cause,

28  such as a four-way search provision.  The Court in *Griffin* characterized these as "special needs"

**United States District Court**
For the Northern District of California

1   provisions that justify searches only upon reasonableness and not probable cause.  Furthermore, in

2   *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court unanimously concluded that a

3   condition requiring a probationer to submit to a search of his person, property, residence, vehicle or

4   personal effects at any time, with or without a warrant on "reasonable suspicion" constituted a

5   reasonable search under the Fourth Amendment.

6           California has taken the search clause for parolees one step further, requiring that a parolee

7    submit to a search at any time "with or without cause".  Cal.Penal Code. § 3067.  No particularized

8   or reasonable suspicion is required, although it must be for a "proper purpose".  *See People v. Smith*,

9   172 Cal.App.4th 1354, 1361 (2009).  A search clause under section 3067 is treated as a condition of

10   release from confinement when the releasee is placed on parole.  The parolee must agree as a

11   condition of release to certain terms and conditions including a condition that he submit to a search of

12   his person or property without a warrant and with or without probable cause.  However, a search

13   which is "arbitrary, capricious, or harassing turns on its purpose" and may be "constitutionally

14   unreasonable".  *Id*. at 1362.  In June 2006 the United States Supreme Court upheld California's

15   suspicionless parole searches finding that the State's  "prohibition on 'arbitrary, capricious, or

16   harassing' searches" was sufficient to save its constitutionality.  *Samson v. Caliifornia*, 547 U.S. at

17   856 (citing and upholding the California Supreme Court's earlier decision in *People v. Reyes*, 19

18   Cal.4th 743 (1998), *cert denied*, 526 U.S. 1092 (1999)).  The question that now confronts this court is

19   whether a strip search of a parolee conducted in the field is arbitrary, capricious, harassing or for an

20   improper purpose.[3]

21           Also, as noted herein, a person under arrest, whether or not on probation or parole, may be

22   searched by a pat down search for drugs or weapons and for officer safety.  Probable cause is

23   required in order to subject a person to arrest.  A search of the person under these circumstances may

24   consist of a pat down search to satisfy the officer that the arrestee is not in possession of weapons,

25   drugs or other easily destroyed or disposed of contraband.  The search generally consists of patting

26   the exterior of the clothing firmly and in the areas where such items may be secreted.  It does not

27   consist of a strip search, even if the person is under arrest.  Strip searches may be and are generally

28   conducted, if at all, upon the arrestee's introduction into the general population of the jail to which he

1    is taken for booking and detention pending further proceedings.  This court is mindful of the

2    sensibility of the Supreme Court in *Illinois v. Lafayette* when it observed that:

3           "the scope of a stationhouse search will often vary from that made at the time of arrest.
            Police conduct that would be impractical or unreasonable - or embarassingly intrusive - on
4           the street can more readily - and privately - be performed at the station.  For example, the
            interest supporting a search incident to arrest would hardly justify disrobing an arrestee on
5           the street, but the practical necessities of routine jail administration may justify taking a
            prisoner's clothes before confining him...."
6    462 U.S. 640, 645 (1983).

7           Certainly, strip searches are not permitted for a person who is merely detained.  Detention

8    requires only that the officer have a reasonable suspicion that the defendant is involved in criminal

9    activity.  The purpose of a detention is not to search the person for evidence of a crime.  The purpose

10   of the limited search permitted under *Terry* and its progeny is "to allow the officer to pursue his

11   investigation without fear of violence".  *Adams v. Williams*, 407 U.S. 143, 146 (1972).  Thus, a frisk

12   for weapons may be appropriate.  This limited purpose doe not include a search "to discover evidence

13   of crime".  *Id.*  "*So long as the officer is entitled to make a forcible stop*, and has reason to believe

14   that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this

15   protective purpose."  *Id.* (emphasis added).  This court has concluded, as explained herein, that the

16   officers were not entitled to make a forcible stop.  It is also clear that if they had a legitimate basis for

17   the stop, their search would have been confined to a search for weapons if they feared for their safety.

18          At the point Bradshaw became an arrestee the officers could search him pursuant to an

19   arrest.  That did not authorize them to strip search him.  Bradshaw was not a parolee and therefore

20   was not subject to a search without suspicion.  Nor have the officers articulated any reason why a pat

21   search would not satisfy their needs before taking him to the "stationhouse".  A search pursuant to

22   arrest would have satisfied their need to know whether he had weapons or contraband upon his

23   person. Furthermore, they did not even determine the basis for the warrant and whether that

24   portended any reason to fear for their safety.  As it turned out, the warrant was for a bad check

25   charge.

26          The court evaluates the strip search that was performed on Lucas in light of his status as

27   parolee.  As courts have reminded us, even persons on parole retain some Fourth Amendment rights.

28   Under *Samson* a parole search must be for a proper purpose and may not be arbitrary, capricious or

1    harassing.  It is not clear what the purpose of the strip search was in the case of Lucas.  The officers

2    had no prior notice that any of the occupants of the vehicle were involved in criminal activity or that

3    any of them were on parole or in violation of parole.  If they had learned of the parole status by

4    reason of a lawful stop, they might have been entitled to investigate whether Lucas was in violation

5    of any of his parole conditions.  They might have been entitled to pat search for drugs, weapons or

6    other contraband.  However, even if they had a basis for arresting Lucas for parole violations or new

7    offenses, they were not entitled to perform strip searches in public.  The guidance given by the

8    Department's policy and by case law takes into consideration limitations on strip searches and the

9    circumstances under which they may be conducted.

10          Since there are few cases dealing with strip searches conducted outside of a custodial

11   situation, the court looks to custody cases for guidance.  A parolee has "at least as much protection as

12   he had within prison walls."  *Latta v. Fitzharris*, 521 F.2d 246, 248 (9th Cir.), *cert. denied*, 423 U.S.

13   897 (1975).  This is also appropriate because the theory behind section 3067 parole searches is that

14   parole is in lieu of some further period of incarceration.  Thus, "a parolee remains in the legal custody

15   of the Department of Corrections through the balance of his sentence and must comply with all of the

16   terms and conditions of parole...."  *People v. Smith*, 172 Cal.App.4th at 1361; *see also Samson v.*

17   *California*, 547 U.S. at 850 (""parole is an established variation on imprisonment of convicted

18   criminals....The essence of parole is release from prison, before the completion of sentence....'"

19   (quoting *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972))).

20          Even in custody cases, courts examine the "scope, manner, and justification" of the searches

21   to determine whether they sufficiently protect the Fourth Amendment interests of the incarcerated

22   and the security interests of the institution.  *See Bull v. City and County of San Francisco*, 595 F.3d

23   964, 974 (9th Cir. 2010)(en banc).  In *Bull* the Circuit approved the strip search policies employed by

24   the Sheriff's Department because they were limited to visual inspections and "expressly prohibited

25   tactile strip searches"; they were to be conducted in a "professional manner"; they were conducted in

26   a place that "afforded privacy"; and they were justified by a history of problems with contraband.  *Id*.

27   The court noted that strip searches are "invasive and embarrassing" and "instinctively give[s] us the

28   most pause".  *Id*. (citing *Bell v. Wolfish*, 441 U.S. at 558-59).

1    *Bull* also pointed out that the strip search practices at issue applied only to those arrestees

2  who were being placed into the jail's general population.  The practices did not apply to those posting

3  bail, cited and released or held in what are referred to colloquially as "drunk tanks" until they became

4  sober.  The court particularly noted that the decision in Bull did  not  "disturb our prior opinions

5  considering searches of *arrestees* who were not classified for housing in the general jail or prison

6  population." *Id.* at 981.  "The constitutionality of searches of arrestees at the place of arrest, searches

7  at the station-house prior to booking, and searches pursuant to an evidentiary investigation must be

8  analyzed under different principles than those at issue today." *Id.*

9    In one of the few cases involving a strip search beyond the "prison walls", the Fourth Circuit

10  found that the search was not "unnecessarily intrusive" where the search was conducted inside a

11  police van and the subject's trousers were pulled down, but his shorts were not removed.  *United*

12  *States v. Dorlouis*, 107 F.3d 248, 256 (4th Cir. ), *cert. denied*, 521 U.S. 1126 (1997).  In an Eighth

13  Circuit case the strip search of an *arrestee* in a motel room removed from public view was held

14  acceptable for Fourth Amendment purposes.  *Richmond v. City of Brooklyn Center*, 490 F.3d 1002,

15  1008 (8th Cir.  2007).

16    Even if defendants could vault over the unlawful stop and bring themselves within the ambit

17  of suspicionless searches of parolees, they still cannot justify conducting a strip search of a parolee or

18  arrestee in public.  They failed to take the precautions of conducting searches in a professional

19  manner by conducting them in public.  They failed to conduct them in a place that afforded privacy.

20  The searches were not merely visual searches; they were not within the State's statutory definition of

21  strip searches, which contemplates the person, not the officer, rearranging or removing items of

22  clothing for visual inspection by the officer.  Nor have the officers justified the searches as being for

23  a proper purpose.  Searches of this nature, conducted in public, in view of passersby and others, are

24  arbitrary, capricious and harassing.  They do not pass constitutional muster.

25    Finally, officers have long had an affirmative duty to intercede when they observe their

26  fellow officers committing violations of the constitutional rights of persons where they have the

27  opportunity to do so.  *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir.2000)(relying on *United*

28  *States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996)).

1    In this case Officer Mayer not only was standing next to Officer Thurston when the latter was strip

2    searching Bradshaw and saw the search, he also directed Thurston to search Bradshaw.  Mayer also

3    testified that he understood his duty to intervene to prevent such violations.  Thus, Officer Mayer

4    breached his duty and is liable to Bradshaw for the illegal strip search.

5

6    VII.  Qualified Immunity on Strip Search Claims

7         A reasonable officer would know that strip searches conducted in public places under the

8    circumstances here are unreasonable searches under the Fourth Amendment.  They to not comport

9    with well-established case law, state law or their own Department's policy.  Thus, they do not enjoy

10   qualified immunity for their actions.  From the time of *Bell v. Wolfish*, handed down in 1979, courts

11   and law enforcement officials have been advised that with respect to strip searches they  must

12   consider the scope of the particular intrusion, the manner in which it is conducted, the justification for

13   initiating it, and the place in which it is conducted.  In the words of one court:

14        "We think that, as a matter of law, no police officer in this day and time could reasonably
          believe that conducting a strip search in an area exposed to the general view of persons
15        known to be in the vicinity whether or not any actually viewed the search is a
          constitutionally valid governmental 'invasion of (the) personal rights that (such a) search
16        entails.'"

17   *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981)(quoting *Bell v. Wolfish*, 441 U.S. at 559).

18   Certainly, if strip searches gave the Supreme Court "the most pause" in 1979, they should have been

19   giving police officers pause for these last thirty plus years.

20        Finally, the Department's own policies dictated against strip searches under these conditions

21   and are sufficient to put reasonable officers on notice of what constitutes objectively unreasonable

22   searches.  *See, e.g., Drummond v. City of Anahiem*, 343 F.3d 1052, 1062 (9th Cir. 2003), *cert denied*,

23   542 U.S. 918 (2004); *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1131 (9th

24   Cir.2002), *cert denied sub nom.  County of Humboldt v. Burton*, 537 U.S. 1000 (2002).  For all the

25   foregoing reasons, the court finds that Officer Mayer is not entitled to avail himself of the defense of

26   qualified immunity.  As explained above, Officer Mayer also understood  his duty to intercede and,

27   thus, is not entitled to qualified immunity for the failure to intervene.

28

1  VIII.  Summary - C 07- 6298

2       In summary, based on the findings and conclusions above, the court is satisfied that Lucas

3  and Bradshaw have established beyond a reasonable doubt that they were subjected to a traffic stop

4  without any reasonable suspicion that they had committed a traffic violation or any other violation of

5  law.  At the time of the stop the officers had not observed any illegal conduct.  They could not

6  articulate or agree upon a basis for the stop.  No record was made of a vehicle code or other violation.

7       Furthermore, the officers had no reasonable basis for believing that any of the occupants

8  were on parole.  Three black men in a moving vehicle does not create reasonable suspicion.[4]  It may

9  be, although not admitted, that the officers were playing the numbers game or profiling since their

10  mission was to look for parolees who were in violation of the terms or conditions of their parole.

11  However, the officers admitted that they did not recognize any of the occupants of the vehicle and did

12  not know whether any of them were on parole.  In any event, whether a hunch or a suspicion, the stop

13  was not premised on any facts and was not reasonable.  No articulable reason was given at the time of

14  the stop and no credible reason was given at trial.  Upon stopping the vehicle Officer Mayer asked

15  whether any of the occupants were on parole.  From that inquiry the events unfolded that led to a strip

16  search.

17       The court finds that the plaintiffs and their witnesses who testified to the strip searches of

18  Lucas and Bradshaw were credible and their testimony generally consistent with each other's

19  testimony and their earlier depositions to the extent they were used at trial.  On the other hand the

20  court finds that the testimony of the officers and Agent Nakamura lacked credibility and was not

21  convincing.

22       With respect to Bradshaw, he was taken into custody on a warrant, but there was no

23  justification for a strip search on the street, which is where the court finds it occurred.  With respect

24  to Lucas, it appears that some reason was needed to justify taking him into custody for a parole

25  violation.  Hence, the officers drove him around in search of a violation.  Ultimately, the officers took

26  Lucas all the way to Richmond, approximately thirteen to fourteen miles from Oakland, to conduct a

27  search of a house with little basis for a nexus to Lucas and for which there was no probable cause to

28  believe it was his residence at the time of the search.  The truth of the officers' testimony was

United States District Court
For the Northern District of California

1  strained; the time periods to which they testified  were wholly unreasonable given the distances

2  involved.

3      The court is not persuaded by the fact that a parole violation was found by the California

4  Parole Board.  That violation related to Lucas' place of residence and does not go to the basis for a

5  stop and a strip search in violation of the Fourth Amendment.

6      The court has held herein that the rights violated were clearly established at the time of the

7  violations and, therefore, Officer Mayer is not entitled to qualified immunity.

8

9  IX.  Damages

10      The court having determined that plaintiffs Lucas and Bradshaw have established that their

11  rights under the Fourth Amendment were violated finds that they are entitled to damages.

12   //

13

14      There are three types of damages ordinarily recoverable for constitutional violations brought

15  pursuant to 42 U.S.C. section 1983.  Actual damages or compensatory damages are intended to

16  compensate persons for injuries caused by a deprivation of constitutional rights.  These include out-

17  of-pocket losses, other monetary losses, and losses for personal humiliation, mental anguish and

18  emotional distress which are the direct result of defendant's unconstitutional conduct.  *Memphis*

19  *Community School Dist. v. Stachura*, 477 U.S. 299, 306-07 (1986); *Floyd v. Laws*, 929 F.2d 1390 (9th

20  Cir. 1991).

21      If a plaintiff is unable to establish actual loss, he is still entitled to recover nominal or

22  presumed damages for the violation.  *Memphis v. Stachura*, 377 U.S. at 308, n 11;  *Carey v. Piphus*,

23  435 U.S. 247, 266 (1978);  *Guy v. City of San Diego*, 608 F.3d 582, 587 (9th Cir. 2010); *Jacobs v.*

24  *Clark County School District*, 526 F.3d 419, 426 (9th Cir. 2008).  Nominal damages are generally

25  defined as a "mere token" or "trifling", most often awarded in the amount of $1.00.  *See Cummings v.*

26  *Connell*, 402 F.3d 936, 943 (9th Cir. 2005)(citing *Carey v. Piphus*, 435 U.S. at 266-67); *Romano v. U-*

27  *Haul Intern*., 233 F.3d 655, 671 (1st Cir. 2000), *cert denied*, 534 U.S. 815 (2001)(nominal damages

28  not limited to $1, but "even amount of $500 exceeds the appropriate higher boundary").

**United States District Court**
For the Northern District of California

1    Punitive damages may be recovered where the defendant's conduct was willful, wanton,

2    malicious or oppressive, or when it involved reckless or callous indifference to the constitutional

3    rights of others.  Such damages are also for the purpose of deterring others.  *Memphis v. Stachura*,

4    377 U.S. at 306, n.9;  *Smith v. Wade*, 461 U.S. 30, 51 (1983) ("we are content to adopt the policy

5    judgment of the common law - that reckless or callous disregard for the plaintiff's rights as well as

6    intentional violations of federal law, should be sufficient to trigger a jury's consideration of the

7    appropriateness of punitive damages"); *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).  In making

8    this determination the court is also mindful of this Circuit's Jury Instructions on punitive damages.[5]

9    With respect to the unlawful stop and detention of Lucas and Bradshaw no actual damages

10   have been established.  Neither plaintiff suffered any out-of-pocket or monetary losses.  The evidence

11   does not show that the stop in and of itself caused any humiliation, mental anguish or emotional

12   distress.  Therefore, only nominal damages are recoverable for the unlawful stop.[6]  The court awards

13   the amount of $25.00 each to Lucas and Bradshaw as and for nominal damages.

14   As the detention continued it merged into the strip searches found unlawful by this court.

15   There is no evidence of actual monetary losses as a result of the continued detention and strip

16   searches.  However, the strip searches were conducted in public view which witnesses, both friends

17   and strangers, could view.  Plaintiffs testified to their humiliation and feelings of degradation as a

18   result of this public spectacle as well as the subsequent recurrent memories of feeling terrorized.  The

19   testimony of the feeling of "submissiveness" also speaks to the sense of degradation.  This feeling is

20   particularly poignant when viewed in light of the history of young black men in this country.  Courts

21   have recognized the dehumanizing, humiliating and degrading affronts to personal privacy and

22   dignity that strip searches can engender.  *See, e.g., Way v. County of Ventura*, 445 F.3d 1157, 1160

23   (9th Cir.), *cert denied*, 549 U.S. 1052 (2006)(scope of visual body cavity search in custody an

24   "indisputably [a] 'frightening and humiliating' invasion, even when conducted 'with all due

25   courtesy'"(quoting *Giles v. Ackerman*, 746 F.2d 614, 617 (9th Cir. 1984), *cert denied*, 471 U.S. 1053

26   (1985))); *Chapman v. Nichols*, 989 F.2d 393, 396 (10th Cir. 1993)("no doubt that a strip search is an

27   invasion of personal rights of the first magnitude" and "axiomatic that a strip search represents a

28   serious intrusion upon personal rights"); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th

48

1   Cir. 1983)(strip searches "demeaning, dehumanizing, undignified, humiliating, terrifying unpleasant,

2   embarrassing, repulsive, signifying degradation and submission").

3          Therefore the court finds that an award of actual damages for humiliation, mental anguish

4   and emotional distress is justified.  The court takes note that awards in other strip search cases have

5   ranged from $500 to $75,000, depending on the circumstances, the extent of privacy or lack thereof,

6   the location, whether there were onlookers, and other factors that can add to or mitigate the degree of

7   humiliation.  Nearly all of these cases involve strip searches in custodial or jail-type settings.  Some

8   were by or in front of members of the opposite sex; some were in front of other inmates; some

9   afforded more privacy than others.

10          The court finds that conducting these searches in public view without any attempt to shield

11  the plaintiffs from bystanders and considering the manner in which they were conducted justifies a

12  damage award of $100,000 each to Lucas and Bradshaw.

13    //

14

15          Lucas also testified about the humiliation, shame, anguish and discomfort he felt while being

16  driven around in the back seat of the police car during the prolonged detention or arrest without

17  probable cause.  Adding to these feelings was the fact the he was in the company of the same officers

18  who had strip searched them.  The court finds that an award of $5,000 for this violation is

19  appropriate.

20          Plaintiffs also seek an award of punitive damages for being subjected to the strip searches.

21  The facts support a finding that Officer Mayer acted with callous disregard and reckless indifference

22  to the Fourth Amendment rights of plaintiffs Lucas and Bradshaw.  From the unlawful stop in an

23  effort to find parole violations to the detentions while trying to find a violation, to the strip searches

24  in clear violation and disregard fo well-established rights, case law and Department policy, the

25  officers proceeded to strip search the plaintiffs in the most flagrant way.  Officer Mayer deliberately,

26  callously and oppressively violated plaintiffs' Fourth Amendment rights.  An award of punitive

27  damages in favor to each of the plaintiffs against Officer Mayer is justified since he himself searched

28  Lucas and he directed and failed to intervene in the search of Bradshaw.

1    Under both federal law and California tort law the court must look to three factors to

2 determine the amount of punitive damages: the nature of the defendant's acts, the amount of

3 compensatory damages awarded,  and the defendant's wealth or ability to pay, i.e., net worth.  *Prf'l*

4 *Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council, Inc*., 727 F.2d 1470, 1473 (9th Cir. 1984);

5 *Adams v. Murakami,* 54 Cal.3d 105, 131 (1991)(without evidence of defendant's present wealth a

6 punitive damage award will not stand).

7    While this court heard evidence of defendant Mayer's annual salary and overtime, no

8 evidence was submitted to establish defendant's net worth.  It would be error for this court to

9 determine an actual amount of punitive damages without such a showing.  In view of the fact that this

10 court has found that plaintiffs made the necessary showing by a preponderance of the evidence that

11 they are entitled to an award of punitive damages and the trial having been conducted in a bifurcated

12 fashion, the court will allow the plaintiffs to submit evidence of defendant Mayer's net worth and for

13 defendants to respond, unless the parties can reach a stipulation.  The parties shall contact the court's

14 Courtroom Deputy to set a schedule for these submissions.

15  //

16

17  X.  Summary - C 07- 4179

18    In the case of plaintiffs Holmes, Engram and Rix, the court has found their testimony about

19 the several strip searches was not credible and finds that the defendant Vass and defendants'

20 witnesses accounts were credible.  Therefore, these three plaintiffs have failed to establish by a

21 preponderance of the evidence that their rights were violated and their claims including state law

22 claims are dismissed with prejudice.

23    A supervisor's or municipality's actions or failures to act are actionable where it is first

24 established that the underlying constitutional violation actually occurred.  *Andrade v. City of*

25 *Burlingame*,  847 F.Supp. 760, 767 (N.D. Cal. 1994), *aff'd  sub nom.  Marquez v. Andrade*, (9th Cir.),

26 *cert denied*, 519 U.S. 869 (1996).  Therefore, to the extent that the liability of defendants Chief of

27 Police and City of Oakland depend on the liability of Officer Vass, plaintiffs cannot prevail against

28 them and the claims of plaintiffs Holmes, Engram and Rix against these defendants are dismissed

**United States District Court**
For the Northern District of California

1   with prejudice.

2

3   <u>CONCLUSION</u>

4        The foregoing constitutes this court's Findings of Fact and Conclusions of Law as plaintiffs

5   Lucas and Bradshaw in C 07-6298 and plaintiffs Holmes, Engram and Rix in C 07-4179.  Upon

6   submission of the information sought for the punitive damage award in C 07-6298, the court will

7   determine the appropriate award and issue a final order.  The parties shall contact the court's

8   Courtroom Deputy and arrange a schedule for their submissions.

9        Since in both cases there are other plaintiffs whose claims have not been adjudicated, the

10  parties may seek a judgment under Federal Rule of Civil Procedure 54(b) as to the plaintiffs in this

11  proceeding if the requirements of the Rule can be satisfied.  This may be done immediately with

12  respect to C 07-4179.  Such a request cannot be made in C 07-6298 until the final order with respect

13  to all damages has issued.

14  //

15  //

16  //

17

18       For the reasons set forth in these Findings of Fact and Conclusions of Law:

19       1) the claims of plaintiffs Holmes, Engram and Rix case C 07-4179 are DISMISSED with

20  prejudice, including the dismissal of claims against Sgt. Mork, the racial discrimination claims and

21  the state law claims; and judgment may be entered accordingly in favor of all defendants;

22       2) plaintiffs Lucas and Bradshaw are entitled to recover of Officer Mayer the amounts of $25

23  each as and for nominal damages on their claims of an unlawful stop; $100,000 each as and for actual

24  damages; $5,000 to Lucas as and for the prolonged detention/arrest without probable cause; and such

25  amounts for punitive damages as this court determines proper upon the submissions referred to

26  above.  Also in accordance with the motion referred to herein all racial discrimination claims in C 07-

27  6298 are DISMISSED.  Upon the issuance of the final order with respect to all damages judgment

28  may be entered in favor of plaintiffs.

1

2          IT IS SO ORDERED.

3

4    Dated: August 4, 2011                          _____

5                                                   MARILYN HALL PATEL
                                                    United States District Court Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

52

1

2

### ENDNOTES

3    1.  Testimony refers to a four-way search clause.  The parties agree in their testimony that such a
clause means a search of the person, place, property and house.  Although it is generally used in
4    reference to a probation search, a parole search is similarly defined.

5    2.  Physical body cavity searches are not in issue in this case.  They are subject to different
requirements and precautions.

6

7    3.  Another principle of parolee searches is also of concern here.  This involves the search of the
residence in Richmond.  While a parolee may be searched without cause, in searching a residence an
officer still must have probable cause to believe the parolee is a resident of the place or house to be
8    searched.  *Cuevas v. De Roco*, 531 F.3d 726, 7332 (9th Cir. 2008).  In this case, before searching the
Richmond house, the officers learned from the Parole Officer that Lucas was homeless and generally
9    was staying in motels.  The only indicia connecting him to the Richmond location was a key found in
his pocket.  Lucas at first told the officers they didn't belong to anything.  Later he said the key
10    was to his wife's place but that he did not live there.  This was after he denied knowing anything
about the Richmond address.  While all of this may have provided a worthwhile lead to pursue
11    further, it hardly amounted to probable cause to believe that it was his residence.

12    4.  Chief Justice Warren, writing for the majority in *Terry v. Ohio*, observed  that there were
complaints of "minority groups, particularly Negroes, about wholesale harassment by certain
13    elements of the police community".  392 U.S. at 14-15.  He pointed to a report of the President's
Commission on Law Enforcement and Administration of Justice finding that "field interrogations are
14    a major source of friction between the police and minority groups".  Id.  These interrogations, he
noted, often involve the routine stopping, questioning and frisking of youth and minority group
15    members.
        Today, black males make up a hugely disproportionate share of the parolee population in
16    California.  In 2000, they were just seven percent of the general male population, but represented one
of every four men on parole.  *See* State of California, Department of Finance, *Population Projections for*
17    *California and Its Counties 2000-2050, by Age, Gender and Race/Ethnicity*,  Sacramento, California, July 2007, available
at www.dof.ca.gov/research/demographic/reports/projections/p-3/ (stating that in 2000, African American men
18    represented approximately 6.4% of the general male population in California); *compare* State of California, California
Department of Correction and Rehabilitation, *California Prisoners & Parolees 2009*, Sacramento, CA, 2010 at 65,
19    available at
http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Offender_Information_Reports.html,
20    (stating that in 2000, African American men accounted for 25.2% of male parole and outpatient population in California.).
        This may well lead officers to suspect that a car containing three black males is likely to
21    include at least one on parole.  This, however, is not reasonable suspicion, but only a hunch.  It does
not amount to specific, articulable facts sufficient to support an investigatory stop or detention.

22

23    5.  Ninth Circuit Jury Instruction 5.5 provides in pertinent part as follows:
        " Conduct is malicious if it is accompanied by ill will, or spite, of if it is for the purpose of
24    injuring the plaintiff.  Conduct is in reckless disregard of the plaintiff's rights if, under the
circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant
25    acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law.
An act or omission is oppressive if the defendant injures or damages or otherwise violates the rights
26    of the plaintiff with unnecessary harshness or severity, such as by the misuse or abuse of authority or
power or by the taking advantage of some weakness or disability or misfortune of the plaintiff."

27    6.  As a result of the unlawful traffic stop, an award of some amount of damages is appropriate, even
if only nominal.  In the case of Bradshaw, a warrant was outstanding and he would likely have been
28    taken into custody at some point or he may have self-surrendered on the warrant.  However, the
evidence does not support a finding of either of these options.  In the case of Lucas, as a result of the

unlawful stop he then suffered an unlawful arrest, prolonged detention as he was driven around the City of Oakland and then to Richmond, and, finally, suffered incarceration on a parole violation. There is no question that the events that occurred up until he was found to have violated his parole were caused by the unlawful stop.  The question is whether nonetheless he would have suffered a parole violation and further incarceration.  Again, there is no evidence in the record that would support a finding on this question.

**United States District Court**
For the Northern District of California